## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 15 |
| | ) |
| CDS U.S. HOLDINGS, INC., *et al.*, | ) Case No. 20-11719 (CSS) |
| | ) |
| Debtors in a Foreign Proceeding,[1] | ) |
| | ) (Joint Administration Requested) |
| | ) |

### VERIFIED PETITION FOR (I) RECOGNITION OF FOREIGN
### MAIN PROCEEDINGS, (II) RECOGNITION OF FOREIGN REPRESENTATIVE,
### AND (III) RELATED RELIEF UNDER CHAPTER 15 OF THE BANKRUPTCY CODE

Cirque du Soleil Canada Inc., in its capacity as the authorized foreign representative (the "Foreign Representative") of the above-captioned debtors (collectively, the "Debtors" or "Cirque du Soleil"), which are the subject of jointly-administered proceedings under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (as amended, the "CCAA") in the Superior Court of Quebec, Commercial Division (the "Canadian Proceedings"), submits this verified petition (together with the form petitions filed concurrently herewith, the "Verified Petition") for recognition of the Canadian Proceedings with respect to each of the Debtors as "foreign main proceedings" and certain related relief pursuant to sections 105(a), 1507, 1510, 1515, 1517, and 1521 of title 11 of the United States Code (the "Bankruptcy Code").

### Relief Requested

1.      In support of the Verified Petition, the Foreign Representative has filed contemporaneously herewith (a) the *Declaration of Foreign Representative Pursuant to*

---

[1]      The last four digits of Debtor CDS U.S. Holdings, Inc.'s tax identification number are (0086).  Due to the large number of debtor entities in these chapter 15 cases, for which the Debtors have requested joint administration, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at www.omniagentsolutions.com/cirquedusoleil.  The location of the Debtors' service address for purposes of these chapter 15 cases is:  8400, 2e Avenue Montréal, Quebec H1Z 4M6 Canada.

*11 U.S.C. § 1515 and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure and in Support of Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "<u>Lefebvre Declaration</u>") and (b) *the Declaration of Guy P. Martel in Support of Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* (the "<u>Martel Declaration</u>"), each of which are incorporated herein by reference.

## Preliminary Statement

2.       With humble beginnings as a group of street performers in a small village outside Quebec City, over the past 35 years, Cirque du Soleil has become the world's premier live entertainment media company known for having reinvented circus arts and creating one of the industry's most iconic creative brands.   Based in Montreal, Quebec, Cirque du Soleil has conceptualized, produced, and presented shows on a global scale to over 180 million spectators, in approximately 450 cities spanning 60 countries across six continents.   Cirque du Soleil performs its marvels in custom-built, partner-hosted resident venues and, through touring, in different cities around the world, or licenses to third parties for performances.

3.       In 2018 and 2019, the Debtors recorded, on a consolidated basis, a net loss of $71.161 million and $80.01 million, respectively.

### A.       Canadian Proceeding Status/Summary

4.       On June 28, 2020, the Debtors executed a stalking horse asset purchase agreement with Acquisition LP, as further discussed herein, which provides for a $416 million implied purchase price, a new capital infusion of $250 million to provide funding through a restart of the Debtors' businesses, and the establishment and funding of contractor and employee funds to provide financial assistance to independent contractors and employees.   The stalking horse asset

purchase agreement provides a floor for the Debtors' continued marketing of their assets through a sale and investment solicitation process, to obtain the highest or otherwise best bid for the Debtors' assets and maximize value for all stakeholders and parties in interest.

5.       The Debtors have now commenced these chapter 15 cases to facilitate the fair and efficient administration of the Canadian Proceedings and to complete the marketing process for their assets.  These chapter 15 cases serve a critical role in effectuating the marketing of the Debtors' business and assets which will be implemented as part of an extensive solicitation process conducted in the Canadian Proceedings and that seeks proposals for a potential recapitalization of, equity investment in, or sale of the CDS Group's assets.  Specifically, these chapter 15 cases prevent the Debtors' stakeholders, many of whom have contacts with the United States and are subject to personal jurisdiction of this Court, from commencing actions in the United States that are more properly the subject of the Canadian Proceedings or that will interfere with the Debtors' restructuring process.  Recognition of the Canadian Proceedings will, among other things, ensure that the restructuring process, as implemented through the Canadian Proceedings, are respected in the United States.  In addition, entry of an order recognizing the Canadian Proceedings is a condition precedent to consummation of the restructuring transactions (the "Restructuring Transactions") contemplated under the stalking horse asset purchase agreement with Acquisition LP and will likely be a condition precedent for any potential purchaser interested in participating in the Debtors' SISP (as defined below).  For the reasons set forth herein, the Foreign Representative submits that the relief requested in this Verified Petition is necessary and appropriate for the benefit of the Debtors, their creditors, and other parties in interest.

6.     The Foreign Representative respectfully requests entry of an order (the "Order"): (a) granting the Verified Petition and recognizing the Canadian Proceedings as "foreign main proceedings," pursuant to section 1517 of the Bankruptcy Code; (b) recognizing the Foreign Representative as a "foreign representative" of the Debtors as defined in section 101(24) of the Bankruptcy Code; (c) recognizing and enforcing the First Day CCAA Order (as defined below) and the Initial CCAA Order (as defined below); (d) applying sections 361, 362, and 365(e) of the Bankruptcy Code in these chapter 15 cases pursuant to sections 105(a), 1507, and 1521 of the Bankruptcy Code; (e) finding that the Verified Petition meets the requirements of section 1515 of the Bankruptcy Code; (f) providing that no action taken by the Foreign Representative in preparing, disseminating, applying for, implementing, or otherwise acting in furtherance of the Canadian Proceedings and Restructuring Transactions, any order entered in respect of this Verified Petition, these chapter 15 cases, any further order for additional relief in these chapter 15 cases, or any adversary proceedings or contested matters in connection therewith, will be deemed to constitute a waiver of any immunity afforded the Foreign Representative, including without limitation pursuant to section 1510 of the Bankruptcy Code; and (g) granting such other relief as the Court deems just and proper.[2]  A proposed form of the Order is attached hereto as **Exhibit A**.

### Jurisdiction and Venue

7.     The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (the "Amended Standing Order").  The Debtors confirm their consent,

---

[2]     The Foreign Representative has also filed the *Motion for Provisional Relief Pursuant of Section 1519 of the Bankruptcy Code* (the "Provisional Relief Motion") concurrently herewith.

pursuant to Bankruptcy Rule 7008, to the entry of a final order by the Court in connection with the Verified Petition to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

8.      These chapter 15 cases have been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of petitions for recognition of the Canadian Proceedings under section 1515 of the Bankruptcy Code.

9.      Venue is proper pursuant to 28 U.S.C. § 1410(1) and (3).  Of the 43 Debtors, 26 are incorporated in Delaware, and the Debtors otherwise have property in Delaware in the form of corporation stock and interests in limited liability companies formed in Delaware or have affiliates whose chapter 15 cases are pending in this district.

10.      The statutory bases for the relief requested herein are sections 105(a), 1504, 1507, 1510, 1515, 1517, and 1521 of the Bankruptcy Code.

## Background

### I.      The CDS Group's Business Operations.

11.      Based in Montreal, Quebec, Canada, Cirque du Soleil has, over the past 35 years, conceptualized, produced, and presented shows to more than 180 million spectators, in approximately 450 cities across 60 countries in six continents.  Cirque du Soleil is most known for its live entertainment shows, which it performs in custom-built, partner-hosted resident venues, through touring in different cities around the world, or through licenses to third parties for performance.  Cirque du Soleil's touring platform allows it to bring creative content to cities across the globe, averaging, up until recently, 3,600 touring performances annually.  In addition to its live entertainment offerings, Cirque du Soleil has also extended its creative approach and leveraged its brand position and creative and operational capabilities into complementary

businesses such as ticketing, hospitality and media.  In 2019, Cirque du Soleil reported, on a consolidated basis, more than approximately $1.04 billion in gross revenue.  Up until recently, Cirque du Soleil employed approximately 5,000 employees, including approximately 1,300 artists, who originated from nearly 90 different countries.

12.     Despite strong historical performances, Cirque du Soleil has been catastrophically affected by the global crisis caused by the ongoing COVID-19 pandemic.  Following government guidance, cities and countries around the world have ordered the closure of public gatherings, which, in turn, has left Cirque du Soleil with no other option but to call for an unprecedented halt in activity until the pandemic is controlled and, importantly, the safety of its performers, employees, and audience members can be assured.

13.     At the time this health crisis started, Cirque du Soleil had 44 productions in its portfolio of active shows.  On January 30, 2020, Cirque du Soleil was forced to cancel performances in China and, between March 12 and March 15, 2020 it announced the indefinite suspension of thirteen touring shows and its seven resident shows in Las Vegas—*Mystère*, "O", *Zumanity*, KÀ, *The Beatles* LOVE, *Michael Jackson ONE*, and Blue Man Group.

14.     On March 19, 2020, following the forced closure of all its shows worldwide to ensure the health, safety, and well-being of its employees, artists and audience, Cirque du Soleil was forced to make significant staff reductions, furloughing 95 percent of its workforce for a total of 4,679 employees, including employees employed at its International Headquarters in Montreal.  Unfortunately, the ongoing global pandemic and social distancing measures imposed around the world are such that the Debtors are unable to predict, with any degree of certainty, when operations will resume in the normal course. Accordingly, Cirque du Soleil has determined that it must formally terminate its previously furloughed workforce to preserve value and best

position itself for a potential sale, and ultimately preserve its ability to re-launch the businesses and rehire as many of its employees as possible in the future.

15.      While the Debtors hope to be able to restart their operations and relaunch the presentation of some of its shows as soon as possible, and potentially before the end of 2020 or early 2021, the Debtors' operations are currently suspended for an indefinite period of time, leaving the Debtors with no revenue stream and no ability to meet their long term obligations as they become due.  Accordingly, the Debtors believe that the commencement of the Canadian Proceedings and these chapter 15 cases constitutes the best option available under the circumstances to preserve the value of their assets for the benefit of their creditors and stakeholders.

### A.    The Creation of a Cirque du Soleil Show.

16.      Cirque du Soleil is primarily engaged in the creation, production, and presentation of live entertainment shows worldwide.  Cirque du Soleil continuously innovates and experiments with new formats and smaller-scale shows, providing for a more agile and efficient production and planning process.

17.      The typical life cycle of a Cirque du Soleil show goes through three key stages:

    a.      the conceptualization or creation phase;

    b.      the production and planning phase; and

    c.      the presentation phase.

18.      Below is a timeline illustrating the typical life cycle of a Cirque du Soleil show, which will typically take between 18–30 months from the conceptualization phase until the start of the presentation phase:

a.      **The Conceptualization and Creation Phase.**

19.     Each Cirque du Soleil branded show, presented either by Cirque du Soleil or by third party licensees, begins with the conceptualization and creation phase, which takes place at Cirque du Soleil's international headquarters in Montreal, Canada.  Some 12 to 24 months preceding the soft opening of a new show, Cirque du Soleil Canada Inc. ("CDS Canada") assembles a team of creators to develop and create the concept of the new show, including the content, music, costumes, acrobatic equipment, makeup, and the set and props.

20.     Before the current unprecedented halt in its activities, the costs related to the conceptualization and creation of a new show were generally shared between CDS Canada, which owned all of Cirque du Soleil's show rights and music rights worldwide (except in the United States) until March 30, 2020 (as discussed further below), and CDS U.S. Intermediate Holdings, Inc. ("CDS U.S."), which owns the show rights and music rights in the U.S.

21.     The cost percentage assumed by each of CDS Canada and CDS U.S. was generally based on the anticipated revenues resulting from the licensing of a portion of their intellectual property rights (mainly show rights and music rights) to those entities who will ultimately be presenting the show, depending on where the show will be presented.  Those

revenues resulting from the licensing of the Cirque du Soleil trademark are usually accounted for separately, again based on where the show will be presented. Show rights will generally include all rights related to costume design, characters, lighting, choreographies, equipment design, acts, etcetera. whereas music rights (or public performance rights) will generally include the original music created for the purpose of the show.

22.     Once the conceptualization and creation phase is completed, these newly developed intellectual property rights, together with the Cirque du Soleil's trademark, are then licensed to those entities that will ultimately be presenting the show, and which, in turn, will be required to pay royalties to the holder of these intellectual property rights.

b.     **The Production and Planning Phase.**

23.     Following or concurrently with the conceptualization and creation phase, a new show will then go through the production and planning phase.  Preceding the soft opening of a new show, Cirque du Soleil Inc. ("CDSI") will assemble a production team to bring the concepts developed by the creation team to life.

24.     It is during this phase that the set, props, costumes, and acrobatic equipment are manufactured, and both the artists and the technical staff are selected, hired, and trained. The various steps of the production phase take place mainly at Cirque du Soleil's international headquarters in Montreal.

25.     Certain costs of production incurred by CDSI during this phase, namely the costs related to the casting and training of the artists, are assumed by the holders of the intellectual property rights (CDS Canada and CDS U.S.), each of which agrees to assume a percentage of those costs based on the numbers of shows expected to be presented in their respective territories.  The calculation of such percentage is generally based on the tour plan, which is made available immediately prior to the soft opening date of the new show.  The other costs of

production incurred by CDSI during this phase, namely the costs related to the manufacturing of the shows' assets are assumed by Cirque du Soleil Vegas, L.L.C. which purchases such assets from CDSI and rents them to the various presentation entities.

            c.      **The Presentation Phase.**

26.      Finally, once the conceptualization and creation phase and the production and planning phase are completed, a new show will commence the presentation phase, in which the newly developed show actually comes to life.

27.      This phase will include the actual delivery of a live performance show, including day-to-day management of the artists, crew and technicians, the technical operations, the general show management, and the marketing and ticket sales for most of the CDS Group's markets. The work performed during this phase is assumed by the various entities forming part of the CDS Group (as defined below) for the specific purpose of presenting this new show.  These entities are commonly referred to as "*presentation entities.*"  In cases where a Cirque du Soleil branded show has been licensed to a third party, Cirque du Soleil is generally not involved in the presentation phase.  The "*presentation entities*" are responsible for presenting the new show live in front of audiences either in arenas, theaters, or in a "*Big Top,*" a large, mobile, tent-covered arena, depending on the specific show.

      **B.**      **CDS Group's Revenue Streams.**

28.      Cirque du Soleil's revenues derive from the presentation of shows (including box office sales, sales of food and beverages, merchandising, and sponsorships), primarily comprised of (a) resident shows, (b) touring shows, and (c) other sources such as its ticketing platform (partially owned) and its experiences and events offering, as further discussed below.

a.    **Resident Shows.**

29.    Cirque du Soleil's resident shows deliver premium entertainment on a permanent basis in venues that are custom-built for each show.  Over the past few years, Cirque du Soleil has become the largest and most reliable provider of high-end entertainment in Las Vegas, accounting for almost half of the total Las Vegas box office sales.

30.    Up until recently, Cirque du Soleil staged seven resident shows in Las Vegas, another resident show at the Walt Disney World Resort in Orlando, Florida, as well as other resident shows, such as The Land of Fantasy in China, Joya in Mexico, and Paramour in Germany.

31.    Resident shows entertain a large audience of approximately 14,000 people per night with approximately 4,000 performances per year.  As Cirque du Soleil's resident shows generate significant foot traffic and ancillary revenues for the venues in which they are hosted, the venue partners have been willing, in recent years, to fund most if not all of the upfront theater construction costs as well as a portion of the show production costs.

32.    Cirque du Soleil's resident show business model mitigates risk through long-term contracts (the average tenure of resident shows being 11 years) combined with, for many of its shows, minimum revenue guarantees from partners.  This structure has historically allowed Cirque du Soleil to have predictable box office revenues and EBITDA annually.

33.    In addition to the Cirque du Soleil branded shows, one of the three groups that were recently acquired by the CDS Group, namely Blue Man Group, also deliver performances on a permanent basis in venues across the globe.

34.    In 2018 and 2019, Cirque du Soleil's resident shows accounted for approximately 38 percent and 30 percent of the total revenues of the CDS Group, and 45 percent and 42 percent of the total EBIDTA of the CDS Group.

b.      **Touring Shows.**

35.      Prior to the COVID-19 pandemic, Cirque du Soleil's touring business was one the largest touring operations in the world, delivering live entertainment in approximately 250 cities over its lifetime on six continents with approximately 3,600 performances annually.  Touring shows target both large and small cities across the world with a schedule optimized to drive demand and maximize profitability.

36.      Cirque du Soleil structures its touring schedules to introduce new shows in traditionally stronger markets first (North America and Europe) before expanding to other geographies later in the show's lifespan.  This strategy results in a shorter payback period and stronger return on investments.

37.      Cirque du Soleil's sophisticated worldwide touring operation is supported by one-of-a-kind operating capabilities and robust logistics that seamlessly and efficiently move more than 1,100 employees and equipment across hundreds of cities around the world.

38.      Cirque du Soleil's touring shows are performed in two formats: "Big Top" (traveling tents) and arena (local stadiums).  A typical Big Top show will have 350 performances in five to eight cities per year for six to ten weeks per city.  Cirque du Soleil typically launches one new Big Top show every two years.  Successful Big Top shows also can be converted to the arena format, thereby expanding the longevity and reach of the show to smaller markets.  Additionally, Cirque du Soleil creates new shows specifically for the arena format.  Arena shows are hosted in local venues for an average of one week per city.

39.      Cirque du Soleil self-promotes its Big Top shows in markets where it has the highest level of expertise, such as Canada, the United States, Europe, and Australia.  However, for arena shows and in other regions (excluding Canada and the United States), Cirque du Soleil works with local partners who possess a thorough understanding of the local markets and who

are often willing to provide full per-show buyouts or minimum guarantees with profit splits, significantly mitigating Cirque du Soleil's downside risk.

40.     Economic arrangements with local partners vary from a fixed fee model in which Cirque du Soleil receives a pre-determined fee per show (zero percent profit sharing) to self-promoted shows in which Cirque du Soleil retains 100 percent of the profits.   To ensure compliance under the fixed fee model, Cirque du Soleil requires prepayments or letters of credit from its local partners.

41.     In addition to the foregoing, three groups that were recently acquired by Cirque du Soleil, namely VStar Entertainment, Blue Man Group, and The Works Entertainment, have touring shows.   The Works Entertainment is a world-class creative and production company known for The Illusionists franchise and other variety shows.   The acquisition allowed Cirque du Soleil to continue its diversification of content offering and consolidate its presence in soft-seat theatres.

42.     In 2018 and 2019, Cirque du Soleil's touring shows respectively accounted for approximately 57 percent and 65 percent of the total revenues of the CDS Group, and 45 percent and 42 percent of the total EBIDTA of the CDS Group.

### c.     **Other Revenue Streams.**

43.     In an effort to leverage its brand, creative strength, and operating capabilities, Cirque du Soleil has also ventured in recent years into new, but related business operations, acquiring, for instance, a 75 percent stake in a ticketing platform named Outbox.   Outbox sells approximately four million live entertainment tickets worldwide annually, with approximately $500 million in transaction volume.

44.     In addition, Cirque du Soleil has leveraged its operational capabilities to expand its entertainment offerings and, ultimately, diversify its revenue stream, with various experiences

and events.  As an example, Cirque du Soleil opened an interactive "acrobat simulation" at the Club Med resort in Punta Cana, Dominican Republic, and in Opio, France, called "Creactive."

45.     Furthermore, Cirque du Soleil operates a wholly-owned events business with various partners to produce and execute live special events, such as Super Bowl halftime shows, EXPO Milano, the Pan AM Opening Ceremony in Toronto in 2015, Futuroscope in France, seasonal shows in Trois-Rivieres, Andorra, and Malta, as well as various shows on MSC vessels sailing around the world.  Organizing and executing live events of this magnitude further drives significant global brand exposure for Cirque du Soleil.

46.     In 2018 and 2019, Cirque du Soleil's other businesses respectively accounted for approximately five percent of the total revenues of the CDS Group, and ten percent and sixteen percent of the total EBIDTA of Cirque du Soleil.

## II.     The CDS Group's Corporate Structure.

47.     An organization chart of the entities forming part of the Cirque du Soleil's group (the "CDS Group"), including the Debtors, is attached to the Lefebvre Declaration as Exhibit A. The CDS Group is a privately held enterprise.

48.     The below table provides an overview of the main function performed by the main operating entities forming part of the CDS Group, including the Debtors.

| Function | Entity Name | |
|---|---|---|
| **Creation/IP Owners** | • Cirque du Soleil Canada Inc.<br>• Cirque du Soleil Holding USA, Inc. | • CDS U.S. Intermediate Holdings, Inc. |
| **Production** | • Cirque du Soleil Inc. | |
| **Presentation** | • Cirque du Soleil Inc.<br>• Cirque du Soleil America Inc.<br>• Cirque du Soleil Nevada, Inc.<br>• Cirque du Soleil (US) Inc.<br>• Cirque du Soleil My Call, LLC<br>• Araxa Espetaculos Circenses | • Cirque du Soleil Orlando, LLC<br>• Gaïa Luxembourg SA<br>• Cirque du Soleil Asia-Pacific Private Ltd<br>• Cirque du Soleil Australia Pty<br>• Cirque du Soleil Rus, LLC |
| **Show Fixed Assets (SFA)/Infrastructure Owner** | • Cirque du Soleil Vegas, LLC | |
| **Corporate Services (IHQ)** | • Cirque du Soleil Canada Inc. | • Cirque du Soleil Inc. |
| **Touring show Services (Show admin)** | • Cirque du Soleil Canada Inc. | • Cirque du Soleil Inc. |
| **Follow-up Production Services** | • Cirque du Soleil Inc. | |
| **Regional Headquarter (Las Vegas)** | • Cirque du Soleil (US), Inc. | |

## III.    The Debtors' Capital Structure.[3]

49.     The Debtors' capital structure consists of three secured term loans facilities, one secured revolving credit facility, and two unsecured term loan facilities.  CDS U.S. and CDS Canada are the borrowers in respect of all such funded debt, and other Debtors have guaranteed the obligations in respect thereof.  As of the date hereof (the "<u>Petition Date</u>"), the Debtors' total amount of principal outstanding funded indebtedness is approximately $1.09 billion.

---

[3]     The summaries provided herein are qualified in their entirety by the provisions of the relevant credit documents.

**A.    The First Lien Credit Agreement.**

50.    Debtors CDS U.S. and CDS Canada are borrowers (the "Borrowers") under a credit agreement (as amended from time to time, the "First Lien Credit Agreement") dated as of July 8, 2015 with a syndicate of lenders (collectively, the "First Lien Lenders"), pursuant to which Royal Bank Canada acts as administrative agent and collateral agent (the "First Lien Loan Agent") for the First Lien Lenders party to the First Lien Credit Agreement.[4]

51.    The First Lien Credit Agreement provides for the provision of the following credit commitments to the Borrowers:

| Term Loan Commitments | $635,000,000 (Initial Term Loans)<br>$85,000,000 (2017 Incremental Term Loans)<br>$95,000,000 (2018 Incremental Term Loans) |
|---|---|
| **Total Term Loan Commitments:** | **$815,000,000** |
| Revolving Credit Commitments | $120,000,000 |
| **Total:** | **$935,000,000** |

52.    The obligations of the Borrowers under and in connection with the First Lien Credit Agreement are guaranteed by each of the Loan Parties (as defined in the First Lien Credit Agreement), several of which are Debtors herein, and are secured by a first priority security interest and hypothec in favor of the First Lien Lenders on, inter alia, substantially all present and future property, equity interests, IP rights of the Borrowers and Loan Parties.

---

[4]    The First Lien Credit Agreement was amended by Amendment No. 1 on June 30, 2017, Amendment No. 2 on June 30, 2017, Amendment No. 3 on June 30, 2017, Amendment No. 4 on July 3, 2018, Amendment No. 5 on March 8, 2019, and Amendment No. 6 on June 5, 2020.

53.    As of the date hereof, the amounts owing by the Borrowers under the First Lien Credit Agreement total approximately $784.725 million, plus accrued interest of approximately $11.296 million.

54.    As of March 31, 2020, the amounts owing by the Borrowers under the revolving credit facility amounted to $100 million.

### B.    The Second Lien Credit Agreement.

55.    The Borrowers are also borrowers under a credit agreement (as amended from time to time, the "Second Lien Credit Agreement") dated as of July 8, 2015 with a syndicate of lenders (collectively, the "Second Lien Lenders"), pursuant to which Bank of America, N.A. acts as administrative agent and collateral agent (the "Second Lien Loan Agent")[5] for the Second Lien Lenders party to the Second Lien Credit Agreement.

56.    The Second Lien Credit Agreement provides for the provision of a term loan in the amount of $150 million.

57.    The obligations of the Borrowers under and in connection with the Second Lien Credit Agreement are guaranteed by each of the Loan Parties (as defined in the Second Lien Credit Agreement), several of which are Debtors herein, and are secured by a second priority security interest and hypothec in favor of the Second Lien Lenders on, inter alia, substantially all present and future property, equity interests, IP rights of the Borrowers and Loan Parties.

58.    As of the date hereof, the amounts owing by the Borrowers under the Second Lien Credit Agreement total $150 million, plus accrued interest of approximately $3.9 million.

---

[5]    Bank of America, N.A. resigned as Second Lien Loan Agent pursuant to a letter dated April 3, 2020 and was replaced by Wilmington Trust, National Association pursuant to an Agency Resignation, Appointment, Assignment and Assumption Agreement dated May 22, 2020 and which currently acts as Second Lien Loan Agent.

C.      **CDPQ Unsecured Loan Agreement.**

59.     The Borrowers are borrowers under an unsecured loan agreement (the "CDPQ Unsecured Loan Agreement") with the CDP Investissements Inc. ("CDPQ").

60.     The CDPQ Unsecured Loan Agreement provides for the provision of a loan of $30 million (the "CDPQ Loan A") as well as a commitment to make available a further loan in an aggregate amount not to exceed $30 million, subject to certain conditions.  The CDPQ Loan A matures on February 1, 2024.

61.     As of the date hereof, the amounts owing by the Borrowers under the CDPQ Unsecured Loan Agreement total $30 million, plus accrued interest of approximately $2 million.

D.      **Fonds Unsecured Loan Agreement.**

62.     The Borrowers are also borrowers under an unsecured loan agreement (the "Fonds Unsecured Loan Agreement") with Fonds de Solidarité des travailleurs du Québec (F.T.Q.) (the "Fonds").

63.     The Fonds Unsecured Loan Agreement provides for a loan of $30 million (the "Fonds Loan A") as well as a commitment to make available a further loan in an aggregate amount not to exceed $30 million, subject to certain conditions.  The Fonds Loan A mature on February 1, 2024.

64.     As of the date hereof, the amounts owing by the Borrowers under the Fonds Unsecured Loan Agreement total $30 million, plus accrued interest of approximately $2 million.

E.      **Trapeze Term Loan Agreement and AHG Replacement Loan**

65.     Unrestricted Subsidiary CDS LP4 (as defined below) is a borrower under a senior secured multi-draw interest bearing term loan facility in the aggregate principal amount of up to $50 million (collectively, the "Trapeze Term Loan").  The Trapeze Term Loan is guaranteed by each of the following Unrestricted Subsidiaries: CDS Canada 3 L.P., 9415-8235 Québec Inc. and

9415-8227 Québec Inc. (collectively the "Trapeze Term Loan Guarantors").  Each of CDS LP4

and the Trapeze Term Loan Guarantors granted a movable hypothec on substantially all of their

respective movable property, as security for the obligations relating to the term loan agreement

with Trapeze LP providing for the Trapeze Term Loan (the "Trapeze Term Loan Agreement").

As further described below, on June 5, 2020, the CDS Group entered into the AHG Replacement

Loan with the AHG (as defined below) to "take-out" the Trapeze Loan, substantially on the same

terms and conditions thereof.

## IV.     Events Leading to the Canadian Proceedings.

### A.     COVID-19 Pandemic.

66.     Like many companies around the world struggling to navigate the COVID-19

pandemic, in recent months, the CDS Group has suffered an acute shortfall in its operating

results, invariably leading to increased liquidity pressure.

67.     CDS Group's current financial difficulties directly stem from the outbreak and

ensuing consequences of a respiratory disease caused by a highly contagious novel coronavirus,

first detected in China, which has now spread to more than 150 locations internationally,

including in the United States.  The virus has been named "*SARS-CoV-2*" and the deadly disease

it causes has been named "coronavirus disease 2019" ("COVID-19").

68.     On January 30, 2020, the International Health Regulations Emergency Committee

of the WHO declared the outbreak a "*public health emergency of international concern.*"  *See*

*Novel Coronavirus (2019-nCoV) Situation Report 10*, World Health Organization (Jan. 30,

2019).  On the same date, Cirque du Soleil was forced to cancel its show in Hong Kong.

Consequently, beginning in early March 2020, the CDS Group was forced to suspend or

postpone numerous Cirque du Soleil shows across its venues.

69.     On March 11, the WHO officially characterized COVID-19 as a pandemic. Sanitary authorities worldwide remain unable to predict the anticipated duration of COVID-19, though it is expected that its pervading effects on the entertainment industry, amongst others, will endure for several months (if not longer).

70.     On March 12 and 15, 2020, given the WHO and the Center for Disease Control (CDC) recommendations for social distancing, as well as the escalation of the COVID-19 pandemic, CDS Group announced the immediate indefinite suspension of all resident and touring shows.  CDS Group also suspended the start of preview performances of the new show "*Drawn to Life*" at Disney Springs, previously planned for March 20, 2020.

71.     As a result of these unprecedented circumstances, the CDS Group continues to suffer material losses, which, in turn, has prevented it from accessing adequate liquidity in the normal course.

**B.      Need for Canadian and U.S. Court Protection.**

72.     In light of the foregoing, the Debtors made the decision to seek relief and protection under the CCAA in Canada and chapter 15 in the United States so as to be able to preserve enterprise value.  The Debtors continue to explore strategic alternatives, including conducting a sale investment and solicitation process so as to maximize the value of its assets, as further described below.

73.     The Debtors believe that the proposed restructuring process described below constitutes the most value-maximizing option under the circumstances.

**C.      Restructuring Efforts Prior to the Commencement of the Canadian Proceedings.**

74.     Over the past months, the CDS Group (including the Debtors) was forced to take drastic measures to mitigate the substantial losses caused by the COVID-19 pandemic.  As

previously mentioned, these drastic measures included the temporary but indefinite suspension of all of its shows worldwide and layoffs on March 15, March 16, and March 19, 2020 of approximately 95 percent of its global workforce.

75.    The CDS Group continues to implement a variety of cost reduction and cash generation measures to address short and long term liquidity needs.  On March 17, 2019, the CDS Group hired National Bank Financial and Greenhill & Co, Inc. as co-financial advisors to assist in exploring various strategic alternatives in order to restructure its capital structure and specifically address its liquidity position under the umbrella of potential indefinite suspensions of its operations.

### a.    **Transfer of Funds.**

76.    On March 24, 2020, CDS Canada transferred $48.6 million from its deposit account at Desjardins bank to CDSI's bank account at HSBC (which is not a lender under either the First Lien Credit Agreement or the Second Lien Credit Agreement), in order to mitigate the risk of potential impediments to a near-term restructuring process.  There are no provisions in the First Lien Credit Agreement or the Second Lien Credit Agreement restricting the CDS Group's ability to effect the above-mentioned transfer.

### b.    **Deferral of Principal and Interest Payments.**

77.    In addition, as part of its liquidity enhancing measures, upon advice of its financial advisors and on recommendation of the CDS Group's senior management and its transaction committee of independent directors (the "Transaction Committee"), the Council of Representatives determined, on March 30, 2020, that it was in the best interest of the CDS Group and its stakeholders to not pay the principal and interest payments due March 31, 2020 under the First Lien Credit Agreement, the Second Lien Credit Agreement, the CDPQ Unsecured Loan and the Fonds Unsecured Loan.

78.    By failing to pay such principal and interest payments totaling approximately $20.63 million, the CDS Group assessed, in consultation with its financial advisors, that it would maintain positive liquidity through the week of April 19 compared to the week of April 5 if it would have made such payments on March 31, 2020.

79.    A notice was communicated to the Administrative Agent under the First Lien Credit Agreement and the Second Lien Credit Agreement on April 1, 2020 notifying such parties of the occurrence of certain Defaults and Events of Default under such agreements (as defined therein), and copies thereof were communicated to CDPQ and Fonds.

c.    **The Drop-Down Transactions.**

80.    In addition to such interim capital preservation solutions, the CDS Group, in consultation with its financial advisors, also considered various additional liquidity enhancement measures.  The CDS Group's primary goal was to take all appropriate measures in order to be able to satisfy its liquidity requirements while reviewing strategic alternatives and engaging with key stakeholders.  On March 20, 2020, in connection with the evaluation of such transactions, the Council of Representatives appointed an independent director to the Transaction Committee and the Transaction Committee subsequently retained legal counsel.

81.    On March 24, 2020, upon advice of its financial advisors and on recommendation of the Transaction Committee and of management, the Council of Representatives determined that it was in the best interest of the CDS Group and its stakeholders to incorporate and create new entities that would be designated as (i) Unrestricted Subsidiaries or (ii) that would be Restricted Subsidiaries that are Foreign Subsidiaries, as applicable, under and in accordance with the terms of the First Lien Credit Agreement and the Second Lien Credit Agreement.

82.    To that end, the CDS Group subsequently incorporated and created several new entities and designated each such entity as an Unrestricted Subsidiary.  A notice dated March 24,

2020 to that effect was sent to the Administrative Agent under the First Lien Credit Agreement and to the Administrative Agent under the Second Lien Credit Agreement, in accordance with each of the Credit Agreements.  The Council of Representatives also appointed an independent director to serve on the board of each Unrestricted Subsidiary.

83.    In addition, each of CDS Canada and CDSI created new subsidiaries, including "Foreign Subsidiaries," in each case in accordance with the terms of the First Lien Credit Agreement and the Second Lien Credit Agreement.  Because such subsidiaries were not designated as "Unrestricted Subsidiaries," such subsidiaries were "Restricted Subsidiaries" as defined in the First Lien Credit Agreement and the Second Lien Credit Agreement.

84.    On March 30, 2020, upon advice of its financial advisors and the recommendation of the CDS Group's senior management and the Transaction Committee (upon the advice of its own counsel), the Council of Representatives determined that it was in the best interest of the CDS Group and its stakeholders to authorize management of the CDS Group to transfer certain intellectual property assets, including the "Cirque du Soleil" trademark and associated trademarks owned by CDS Canada (the "Cirque TMs"), either to the newly created Foreign Subsidiaries that are Restricted Subsidiaries of CDS Canada and/or to the newly created Unrestricted Subsidiaries of CDS Canada, the whole, so long as consummated in accordance with specific terms of the First Lien Credit Agreement and the Second Lien Credit Agreement and solely to the extent that management determines that the fair market value of all assets so being transferred to Unrestricted Subsidiaries does not exceed $155 million representing the aggregate amount of the specific and pre-negotiated asset transfer baskets permitted under the First Lien Credit Agreement.  To that end, the CDS Group retained the services of Ocean Tomo LLC ("Ocean Tomo") to provide a valuation of the assets to be transferred.  Based on the

valuation provided by Ocean Tomo, the CDS Group and the Council of Representatives determined that the aggregate fair market value (within the meaning of the First Lien Credit Agreement and the Second Lien Credit Agreement) of such assets was between $91 million and $113 million.

85.     Effective as of March 30, 2020, and in accordance with transactions specifically permitted by the terms of the First Lien Credit Agreement and the Second Lien Credit Agreement, CDS Canada, through a series of successive transactions, transferred the Cirque TMs to CDS Canada 4 L.P., an Unrestricted Subsidiary limited partnership existing under the laws of Quebec ("CDS LP4").   Given such transfers were completed within the specific and pre-negotiated terms of the First Lien Credit Agreement and the Second Lien Credit Agreement, liens under the First Lien Credit Agreement and Second Lien Credit Agreement that had previously encumbered the Cirque TMs were automatically released (the "Drop-Down Transactions").

d.     **The Debtors' Efforts to Secure Financing.**

86.     Following the creation of the Unrestricted Subsidiaries, the Debtors and their advisors explored various options for maximizing the value of the assets transferred pursuant to the Drop-Down Transactions in light of their liquidity and ultimate restructuring goals.

87.     In this context, the Debtors, together with Greenhill and National Bank Financial (the "Financial Advisors"), initiated a process to canvass the market to solicit financing offers from various parties, including from the First Lien Lenders.

88.     After consideration of all financing offers submitted in the context of the aforementioned solicitation process, the Debtors accepted a financing offer submitted by Trapeze Holdings Limited Partnership ("Trapeze LP"), whose equity sponsors are the shareholders of the CDS Group and Invesstissement Québec ("IQ").

89. As such, and as previously mentioned, on April 24, 2020, Trapeze LP, as lender, entered into the Trapeze Term Loan Agreement, pursuant to which Trapeze LP provided to CDS LP4 the Trapeze Term Loan. The Trapeze Term Loan was guaranteed by the Trapeze Term Loan Guarantors. Each of CDS LP4 and the Trapeze Term Loan Guarantors granted a movable hypothec on substantially all of their respective movable property, as security for the obligations relating to the Trapeze Term Loan Agreement.

### e.    **The Execution of Forbearance Agreements and a Replacement Loan.**

90. In parallel with the above, CDS Group and its advisors engaged in extensive negotiations with certain First Lien Lenders and Second Lien Lenders regarding the terms and conditions of forbearance agreements to be entered into with each of those lender groups.

91. On May 14, 2020, the CDS Group received a proposal from the ad-hoc group of First Lien Lenders and Second Lien Lenders (the "AHG") to refinance or replace the Trapeze Term Loan on substantially the same terms and conditions. The AHG indicated that such replacement of the Trapeze Term Loan would be a condition to move forward with any forbearance agreement.

92. On June 5, 2020, after several weeks of discussions and negotiations between the CDS Group, the AHG, and their respective advisors, the parties reached an agreement on the following:

    a.    the members of the AHG would provide the CDS Group with a replacement loan to "take-out" the Trapeze Term Loan, substantially on the same terms and conditions thereof (the "AHG Replacement Loan");

    b.    a forbearance agreement would be signed with certain First Lien Lenders representing the "*Required Lenders*" under the First Lien Credit Agreement and with certain Second Lien Lenders representing the "*Required Lenders*" under the Second Lien Credit Agreement, respectively (the "First Lien Forbearance Agreement" and the "Second Lien Forbearance Agreement"), the principal terms of which provide, in each case:

(i)     the agreement of the First Lien Lenders party thereto and the Second Lien Lenders party thereto, as the case may be, during the forbearance period, not to enforce any rights and remedies, and not to direct the First Lien Loan Agent or the Second Lien Loan Agent, as applicable, to enforce any rights and remedies, against the CDS Group, as a result of certain Events of Default which existed at the time;

(ii)    the agreement by the CDS Group to pay certain fees and expenses of the First Lien Lenders, the First Lien Loan Agent, the Second Lien Lenders, the Second Lien Loan Agent and the AHG, as applicable;

(iii)   the agreement by the CDS Group to provide additional reporting to the AHG and members thereof who have executed a non-disclosure agreement;

(iv)    the provision by CDS LP4 and the Trapeze Term Loan Guarantors of a guarantee in favor of the First Lien Loan Agent and the Second Lien Loan Agent, as applicable, of the obligations under the First Lien Credit Agreement and the Second Lien Credit Agreement, respectively, together with movable hypothecs on substantially all of their respective movable property, as security for the obligations relating to the First Lien Credit Agreement or the Second Lien Credit Agreement, as the case may be, the whole ranking subsequent to the security granted to and in favour of Trapeze LP under the Term Loan Agreement in accordance with the terms of an intercreditor agreement among such parties;

(v)     a release by the First Lien Lenders, the First Lien Agent, the Second Lien Lenders and the Second Lien Agent party thereto with respect to any claim or purported claim relating to, *inter alia*, the designation of Unrestricted Subsidiaries as described in paragraph 86 above, the Drop-Down Transactions and the execution, delivery and performance of the Term Loan Agreement;

c.      a sixth amendment to the First Lien Credit Agreement would be entered into with First Lien Lenders representing the "*Required Lenders*" under the First Lien Credit Agreement (the "Amendment No. 6") and a first Amendment to the Second Lien Credit Agreement would also be entered into with Second Lien Lenders representing the "*Required Lenders*" under the Second Lien Credit Agreement (the "Amendment No. 1"), which, respectively, would provide as follows:

(i)     the inclusion of CDS LP4 and the Trapeze Term Loan Guarantors as parties to the First Lien Credit Agreement and the Second Lien Credit Agreement in certain respects, as applicable, in each case,

subject to various negative covenants thereunder notwithstanding that such parties are and remain Unrestricted Subsidiaries; and

(ii)     amendments to various covenants in the First Lien Credit Agreement and the Second Lien Credit Agreement further restricting or eliminating various baskets or the ability of the CDS Group to engage in permitted transactions and permitting the AHG Replacement Loan and the security therefor.

93.     On June 5, 2020, the CDS Group entered into the AHG Replacement Loan, the First Lien Forbearance Agreement, the Second Lien Forbearance Agreement and the Amendment No. 6 and Amendment No. 1.

### a.     **The Preliminary Solicitation Process.**

94.     On May 11, 2020, the Debtors, with the assistance of their Financial Advisors, and under the oversight of the Transaction Committee, began an extensive solicitation process to solicit proposals for a potential recapitalization of, equity investment in, or sale of the CDS Group's business and assets (the "Preliminary Process").

95.     As part of the Preliminary Process, the Financial Advisors contacted several potential interested parties who had expressed interest in a potential capital investment in the CDS Group or an acquisition of its assets, and sent out solicitation materials to approximately 97 potentially interested investors or purchasers, including 32 strategic investors and 65 financial investors (including both private equity and family offices) advising them that all non-binding indications of interests were to be submitted by no later than June 8, 2020 (the "Non-Binding Bid Deadline").

96.     The Preliminary Process was validated by Ernst & Young Inc. ("EY" or the "Monitor"), as outlined in the Report of the Proposed Monitor (the "Report"), namely by comparing its own lists of potential strategic investors and potential financial investors against

the Financial Advisors' final lists as at June 8, 2020. Ultimately, the Monitor identified one additional financial investor for consideration.

97.     In addition, the Debtors and the Financial Advisors permitted additional potentially interested parties to participate in the Preliminary Process based on their in-bound interest and their financial wherewithal to consummate a transaction.

98.     In total, 43 parties received non-disclosure agreements of which 34 parties signed such non-disclosure agreements and received confidential information memorandums.

99.     On or prior to the Non-Binding Bid Deadline, the CDS Group received a total of 6 offers for the acquisition of the CDS Group's assets, including (a) a non-binding offer to purchase in the form of a stalking horse bid from Trapeze LP and (b) a non-binding offer from the AHG in the form of a credit-bid.

100.    As further detailed below, although the stalking horse bid received on May 20, 2020 was non-binding, it was accompanied by a draft asset purchase agreement.  The other non-binding offers were received on or about the Non-Binding Bid Deadline and were not accompanied by a draft purchase agreement.

101.    Following the receipt of the stalking horse bid, the Debtors engaged in negotiations with Trapeze LP to determine if they could come to acceptable terms and conditions and also engaged in discussions with AHG in order to assess, with the help of its Financial Advisors, the best strategic option going forward for the CDS Group and all its stakeholders. Both Trapeze LP and AHG were requested to provide commitment letters to confirm their ability to fund the purchase price under their proposed offers as well as the business of the CDS Group on a post-closing basis substantially in accordance with the business plan prepared by the CDS Group.  Although both offers provided commitment letters that were generally satisfactory to the

CDS Group, the CDS Group was substantially further advanced in its negotiation of the definitive terms and conditions of a transaction with Trapeze LP than with the AHG, having submitted a more detailed offer 19 days before the Non-Binding Bid Deadline.

102.    The stalking horse bid from Trapeze LP provides a number of important benefits, including preserving the value of the Debtors' assets during these highly uncertain times, proving the certainty of a transaction that contemplates sufficient funding to restart and grow the business, providing significant benefits to the affected employees and contractors (freelancers and artists), and preserving the Quebec roots of this major cultural assets.  At the same time, the Trapeze LP bid allows other bidders, including the AHG, to continue participating in a solicitation process designed to maximize the value of the Debtors' assets for the benefit of all of the CDS Group's stakeholders. Accordingly, the Debtors decided to enter into a stalking horse asset purchase agreement with Trapeze LP through its affiliate, Trapeze Acquisition Limited Partnership ("Acquisition LP") (as defined below), subject to Court approval and, ultimately, subject to the outcome of the SISP (as defined below) outlined below. Additional details regarding such stalking horse proposal and the SISP are set forth below.

**V.      The Stalking Horse APA and the Sale and Investment Solicitation Process.**

103.    On June 28, 2020, following intensive negotiations between the CDS Group and Trapeze LP as well as the review of the non-binding indications of interest received by the Non-Binding Bid Deadline, the CDS Group, on the recommendation of its Financial Advisors and the Transaction Committee, and with the support of the Monitor, entered into an Asset Purchase Agreement (the "Stalking Horse APA") with Trapeze LP.  As described below, the Stalking Horse APA also contemplates a sale and investment solicitation process under the supervision of the Canadian Court (the "SISP").

104.    The Stalking Horse APA and the SISP described herein are the result of extensive discussions between, on the one hand, Trapeze LP and its legal and financial advisors, and on the other hand, the CDS Group, the Financial Advisors and legal counsel to the CDS Group, and the Monitor and its legal advisors, all of whom have worked tirelessly over the past few months to protect and maximize the value of the CDS Group's assets under the present difficult circumstances for the benefit of all stakeholders.

105.    The Stalking Horse APA provides for the acquisition by Trapeze LP of substantially all of the assets of the CDS Group in exchange for an aggregate consideration of approximately $420.25 million detailed as follows (subject to the consummation of the transactions provided therein):

    a.    the amount of cash that should be sufficient to pay:

        (i)    the outstanding principal amount of approximately $50 million and all interest accrued thereon under the CDS 4 Term Loan in full on the Closing Date and all reasonable and documented fees and expenses then due and payable thereunder (up to a maximum amount of $150,000 (plus taxes) with respect to such fees and expenses);

        (ii)    the cash reserve in the amount agreed to by the Monitor, Trapeze LP, and CDS Group for the payment of administrative costs of the Monitor (the "Monitor Reserve");

        (iii)    the cash reserve in the amount agreed to by the Monitor, Trapeze LP, and CDS Group for paying administrative costs of CDS Group (the "Administrative Seller Reserve"), each of which will be in an amount that will be determined before the Closing Date; and

        (iv)    all amounts necessary to cure any monetary defaults as a condition to assuming the Assigned Agreements;

    b.    the principal amount of $50 million under the New Senior Unsecured Note issued on the Closing Date;

    c.    the value of the New LP Units as of the Closing Date, which represents 45% of the equity of Acquisition LP;

d.     the amount of the Assumed Liabilities, which includes inter alia:

(i)     payables due to critical vendors, including all Québec-based vendors;

(ii)     ticket reimbursements; and

(iii)     letters of credit of the CDS Group in the aggregate amount of approximately $11 million;

e.     the establishment and funding by Acquisition LP of the Employee Fund in the amount of $15 million to provide financial assistance to employees whose employment was terminated either by CDS Group (excluding for just cause) or by mutual agreement effective on or after January 1, 2020 (irrespective of the date on which the notice was given); and

f.     the establishment and funding by Acquisition LP of the Contractor Fund in the amount of $5 million to provide financial assistance to independent contractors whose contracts with the CDS Group are not assigned creator contracts.

106.     The Stalking Horse APA is fully committed, fully financed and not contingent on additional business diligence.

107.     The Stalking Horse APA establishes a valuable baseline of consideration which has the potential to improve with any bids received under the SISP.  The Stalking Horse APA also provides significant value by ensuring that there will be a going concern outcome for the Debtors' business.  Most notably, the Stalking Horse APA provides:

a.     a clear path to restarting operations and maintaining the presence and home of the business of the CDS Group in Québec;

b.     significant consideration for the CDS Group's assets;

c.     material benefits and recoveries for the employees and contractors of the CDS Group;

d.     for the headquarters of the business and strategic decision-making activities of the business to remain in Montréal;

e.     assurance that the chair of the Council of Representatives and the Chief Executive Officer of Trapeze LP will be residents of the Province of Québec; and

f.      that the history of ownership and experience in the business and entertainment industry will continue to benefit the stakeholders.

108.    In addition to the above, should the Stalking Horse APA be deemed the Successful Bid (as defined in the SISP), Trapeze LP has undertaken to use commercially reasonable efforts to offer employment to the employees whose employment was terminated as part of the shutdown due to COVID-19 and restart operations as soon as commercially reasonable taking into account the COVID-19 pandemic and related safety, health, gathering, confinement and other restrictions imposed or measures recommended by governmental authorities.

109.    As such, Trapeze LP's offer embodies TPG, CDPQ, and Fosun's commitment, to mitigate the impact of COVID-19 on CDS Group employees and independent contractors whose employment or contracts with the CDS Group was terminated.  The new capital provided to the CDS Group under the Stalking Horse APA, in the approximate cash amount of $249 million, will be used to fund the recovery and go-forward operations of the business, which, in turn, should position the CDS Group with the financial wherewithal to re-hire as many of its terminated employees and independent contractors as soon as possible.  Separately, by contemplating the establishment of a $15 million special assistance fund for terminated employees and a $5 million fund for independent contractors, the Stalking Horse APA also seeks to alleviate some of the hardships faced by terminated employees and independent contractors of the CDS Group.

110.    The Stalking Horse APA does not include a break fee; however, as part of the negotiation, the CDS Group agreed to reimburse, concurrently with the execution of the Stalking Horse APA, a fixed amount of $3 million plus applicable sales taxes in expenses to Acquisition LP (and of TPG, Fosun, CDPQ, and IQ) regarding the negotiations and preparation of the

documentation relating to the Stalking Horse APA, to the financing to implement and complete the transaction, and to the restart of the Cirque du Soleil business, the whole in connection with and in furtherance of the CDS Group's restructuring efforts pursuant to the CCAA. This represents approximately 0.7% of the Purchase Price and the Debtors were informed that it represents a partial reimbursement of the fees actually incurred by Acquisition LP and its investors TPG, Fosun, CDPQ, and IQ. The closing of the transactions contemplated by the Stalking Horse APA is subject to standard conditions being fulfilled or performed.

111.    Based on facts and circumstances known as of the date hereof, the Stalking Horse APA includes the necessary capital to restart the business in all material respects and allow it to resume providing the first-class worldwide entertainment that is synonymous with the Cirque du Soleil brand while not overleveraging the business, which the Québec government has underscored as being an essential condition for its financing and which is particularly important in light of the ongoing shutdown of operations for an indefinite period of time due to the COVID-19 pandemic.

112.    The SISP, which was agreed to by the Debtors, the Financial Advisors and the Monitor, provides for the procedures contemplated therein, and the achievement of the following milestones:

| Milestones | Key Dates |
| --- | --- |
| Distribution of the Solicitation Notice, the form of NDA and the Required Acknowledgment to the Potential Bidders | By no later than July 10, 2020 at 5:00 p.m. (prevailing Eastern Time) or such later date as may be agreed to by Cirque du Soleil Holdings L.P. in consultation with the Monitor |
| Due date for delivery by Potential Bidders of a Participation Letter, an executed NDA, and an executed Required Acknowledgement | July 17, 2020, at 5:00 p.m. (prevailing Eastern Time) |

| | |
|---|---|
| Due date for Bids and Deposits | August 10, 2020, at 5:00 p.m. (prevailing Eastern Time) |
| Date of Auction (if any) | By no later than August 14, 2020 |
| Hearing of the Approval Motion | No later than seven (7) calendar days following either the conclusion of the Auction or the date on which a determination is made by Cirque du Soleil Holdings L.P. not to proceed with an Auction |
| Deadline for completion of the transaction(s) represented by the Successful Bid(s) | September 14, 2020, or such later date as may be agreed to by Cirque du Soleil Holdings L.P., in consultation with the Monitor |

113.    The SISP sets forth the terms and procedures for a fair and efficient sale process so as to (i) ensure certainty for the restart, the growth and the long-term continuation of the CDS Group's business operations and activities, which ceased due to the COVID-19 crisis, and (ii) obtain the highest or otherwise best offer for the CDS Group's personal, real, movable and immovable assets, rights, undertakings and properties, the whole in the best interest of the CDS Group's stakeholders, including their thousands of employees (those currently employed and those who had to be laid off due to the cessation of operations of the business), their creditors, their suppliers and contracting parties, the Quebec community where it is a key cultural business and a major talent incubator since its creation, their partners in cities around the world, and their shareholders.

114.    To achieve the abovementioned objectives, the SISP provides for, inter alia, the following unique terms and features:

        a.      each bid must state any undertakings in favor of the government and the Province of Québec, including, for example, regarding the location of the business' primary headquarters, and Québec residency requirements for directors and officers;

b.  each bid must set forth the bidder's intentions regarding the offering of employment to the CDS Group's employees whose employment was terminated as a result of the COVID-19 pandemic and this restructuring process;

c.  each bid must provide any relevant details of the previous investments or acquisitions, or any other experience such bidder has and deemed relevant by such bidder, in the entertainment industry, including the date, nature of the investment, amount invested, geography and any other relevant information related to such investment;

d.  each bid must set forth key terms including (A) economic terms, (B) the basis and rationale of the valuation, (C) any major assumptions made, including the financial projections utilized in arriving at the valuation, and (D) any other material terms and conditions required to consummate the transaction; and

e.  if one or more bids other than the Stalking Horse APA are received, then the CDS Group, in consultation with the Monitor and with the assistance of the Financial Advisors, shall conduct an auction to determine the highest or otherwise best bid(s).

115.    Approval of the SISP is a condition to the Stalking Horse APA.  The Debtors believe that the SISP provides for a fair and transparent process that will fairly canvass the market in order to maximize value for the Debtors' assets resulting in the best outcome for the Debtors' stakeholders.  The Debtors submit that the SISP timelines are appropriate, even in the context of the current COVID-19 pandemic.

116.    Given the nature of the assets, the current global context and the limited liquidity of the CDS Group, the Debtors are seeking approval of the proposed SISP by the Canadian Court.

## VI.    The Canadian Proceedings.

117.    On June 29, 2020, Cirque du Soleil commenced the Canadian Proceedings with the Canadian Court pursuant to sections 9, 11, 11.51, 11.52, and 23 of the CCAA with the goal of pursuing the SISP and restructuring operations under the protections offered by the CCAA. On June 30, 2020, the Superior Court of Quebec (Commercial Division) (the "Canadian Court")

entered an interim order (the "<u>First Day CCAA Order</u>").  The First Day CCAA Order includes a "no default" provision and is attached as <u>Exhibit 1</u> to the Provisional Relief Motion.  More specifically paragraph 45 of the First Day CCAA Order provides as follows:

> [T]he First Day Order and any proceeding or affidavit leading to the First Day Order, shall not, in and of themselves, constitute a default or failure to comply by the Debtors under any statute, regulation, licence, permit, contract, permission, covenant, agreement, undertaking or other written document or requirement.

First Day CCAA Order, ¶ 45

118.    In addition, the First Day CCAA Order expressly requests that courts in the United States recognize the Canadian Proceedings to aid and assist the Canadian Court in carrying out the terms of the First Day CCAA Order.  Paragraph 53 of the First Day CCAA Order provides, in relevant part:

> Cirque du Soleil Canada Inc. shall be authorized to apply, on behalf of the Debtors, as it may consider necessary or desirable, with or without notice, to any other court or administrative body, whether in Canada, the United States of America or elsewhere, for orders which aid and complement this First Day Order and any subsequent orders of this Court and, without limitation to the foregoing, an order under Chapter 15 of the U.S. Bankruptcy Code, for which Cirque du Soleil Canada Inc. shall be the foreign representative of the Debtors. All courts and administrative bodies of all such jurisdictions are hereby respectively requested to make such orders and to provide such assistance to Cirque du Soleil Canada Inc. as may be deemed necessary or appropriate for that purpose.

First Day CCAA Order, ¶ 53.

119.    Following entry of the First Day CCAA Order, the Debtors will seek entry by the Canadian Court of an amended and restated initial order (the "<u>Initial CCAA Order</u>"), and an order approving the SISP (the "<u>SISP Order</u>") in each case approximately ten days from the date hereof.  Contemporaneously therewith, the Monitor, if appointed, will seek entry of a receivership order solely for the purpose of allowing employees to benefit from the payments provided under the Wage Earner Protection Program Act.  *See* S.C. 2005 c. 47, s.1.

120.    Although each Debtor's respective management and council of representatives remains in place, each Debtor's assets and affairs are subject to the supervision of the Canadian Court during the pendency of the Canadian Proceedings.

121.    Recognition of the Canadian Proceedings will not undermine the rights that United States creditors typically enjoy in a chapter 11 proceeding, as affected creditors will have the opportunity to the participate in the SISP and the Canadian Proceedings under the supervision of the Canadian Court.

## VII.    The Canadian Proceedings Are Foreign Main Proceedings.

122.    To ensure the effective and economic administration of the Debtors' restructuring efforts, prevent the disruption of business, and recognize the legal effect of the Canadian Proceedings in the United States, the Debtors require the protection afforded to foreign debtors pursuant to chapter 15 of the Bankruptcy Code.

**Basis For Relief**

123.    Chapter 15 of the Bankruptcy Code is designed to protect and maximize the value of a debtor's assets and to facilitate the rehabilitation and reorganization of businesses. The relief afforded to a foreign debtor under chapter 15 is intended to avoid disruptions that could otherwise derail a debtor's restructuring in its home country.

124.    Consistent with these principles, the Foreign Representative commenced ancillary proceedings for the Debtors under chapter 15 of the Bankruptcy Code to obtain recognition of the Canadian Proceedings, and certain related relief.  The Foreign Representative believes that these chapter 15 cases will complement the Debtors' primary proceedings in Canada to ensure the effective and economic administration of the Debtors' restructuring efforts and prevent adverse actions in the United States.  Further, the Foreign Representative submits that recognition of the Canadian Proceedings and the related relief requested herein will not

undermine the rights that United States creditors typically would enjoy in a chapter 11 proceeding, as creditors will have the right to participate in the SISP.

## I.    The Debtors Are Eligible for Chapter 15 Relief.

125.    Section 109(a) of the Bankruptcy Code provides that "only a person that resides or has a domicile, a place of business, or property in the United States . . . may be a debtor under this title."  Courts have applied section 109(a) of the Bankruptcy Code to chapter 15 eligibility. *See, e.g.*, *Drawbridge Special Opp. Fund LP v. Barnett (In re Barnett)*, 737 F.3d 238, 247 (2d Cir. 2013).  Decisions interpreting section 109(a) of the Bankruptcy Code as applied to foreign debtors under other chapters of the Bankruptcy Code unanimously hold that a debtor satisfies the section 109 requirement even when it only has a nominal amount of property in the United States.  *See GMAM Inv. Funds Trust I v. Globo Comunicacoes e Partipacoes S.A. (In re Globo Comunicacoes e Partipacoes S.A.)*, 317 B.R. 253, 249 (S.D.N.Y. 2004) (stating that courts have repeatedly found that there is "'virtually no formal barrier' to having federal courts adjudicate foreign debtors' bankruptcy proceedings") (citing *In re Aerovias Nacionales de Colombia S.A. (In re Avianca)*, 303 B.R. 1, 9 (Bankr. S.D.N.Y. 2003)); *see also In re Global Ocean Carriers Ltd.*, 251 B.R. 31 (Bankr. D. Del. 2000) (holding that approximately $10,000 in a bank account and the unearned portions of retainers provided to local counsel constituted a sufficient property interest for chapter 15 purposes).  Effectively, if a debtor has any property in the United States, section 109(a) of the Bankruptcy Code is satisfied.

126.    Courts have held that debt that is subject to a New York governing law provision and a New York forum selection provision constitute property in the United States sufficient to satisfy section 109(a) of the Bankruptcy Code.  Contracts create intangible property rights.  *See In re Berau Capital Res. Pte Ltd*, 540 B.R. 80, 83 (Bankr. S.D.N.Y. Oct. 28, 2015) ("Contracts create property rights for the parties to the contract.  A debtor's contract rights are intangible

property of the debtor.") (citing *U.S. Bank N.A. v. Am. Airlines, Inc.*, 485 B.R. 279, 295 (Bankr. S.D.N.Y. 2013)).  The situs of such intangible property rights is the location of the governing law.  *See id.* at 84.  Thus, any "debt subject to a New York governing law clause and a New York forum selection clause constitutes property in the United States*." In re Ocean Rig UDW Inc.*, 570 B.R. 687, 699 (Bankr. S.D.N.Y. 2017) (citing *In re U.S. Steel Canada Inc.*, 571 B.R. 600, 609–11 (Bankr. S.D.N.Y. July 31, 2017)), *appeal dismissed*, 2018 WL 1725223 (S.D.N.Y. Apr. 6, 2018); *see also In re Avanti Commc'ns. Grp. Plc*, 582 B.R. 603, 613 (Bankr. S.D.N.Y. Apr. 9, 2018) (noting that bonds with an indenture governed by New York law satisfied the requirements under section 109(a) of the Bankruptcy Code); *In re Cell C Proprietary Ltd.*, 571 B.R. 542, 552 (Bankr. S.D.N.Y. 2017) (holding that the "Euro Notes which are governed by New York law and contain a New York forum selection clause" provided a sufficient basis for jurisdiction); I*n re Inversora Eléctrica de Buenos Aires S.A.*, 560 B.R. 650, 655 (Bankr. S.D.N.Y. 2016) ("[D]ollar-denominated debt subject to New York governing law and a New York forum selection clause is independently sufficient to form the basis for jurisdiction."); *Berau*, 540 B.R. at 82 ("The Court concludes that the presence of the New York choice of law and forum selection clauses in the [indenture] satisfies the section 109(a) 'property in the United States' eligibility requirement.").

127.    Each of the Debtors is eligible to be a debtor under section 109(a) of the Bankruptcy Code because they have property in the United States in the form of tangible assets, corporation stock and interests in limited liability companies.  Additionally, certain of the Debtors have issued or guaranteed certain indebtedness—i.e., the First Lien Credit Agreement and the Second Lien Credit Agreement—that are governed by New York law and contain a New York forum selection clause.  Finally, thirty-three of the Debtors are entities incorporated in the

United States and operating in the United States with their principal assets located in the United States. For these reasons, the Debtors satisfy the requirements under section 109(a) of the Bankruptcy Code.

## II.   The Canadian Proceedings Should Be Recognized as Foreign Main Proceedings.

128.   Section 1517(a) of the Bankruptcy Code provides that, after notice and hearing, a court shall enter the Order recognizing a foreign proceeding as a foreign main proceeding if (a) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of the Bankruptcy Code, (b) the foreign representative applying for recognition is a person or body, and (c) the petition meets the requirements of section 1515 of the Bankruptcy Code. *See* 11 U.S.C. § 1517. As explained below, the Canadian Proceedings, the Foreign Representative, and the Verified Petition satisfy all of the foregoing requirements.

### A.   The Canadian Proceedings Are Foreign Proceedings.

129.   Section 101(23) of the Bankruptcy Code defines a "foreign proceeding" as:

> a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject to control or supervision by a foreign court, for the purpose of reorganization or liquidation.

130.   Courts have held that a "foreign proceeding" is one:

  a. in which "acts and formalities [are] set down in law so that courts, merchants and creditors can know them in advance, and apply them evenly in practice;"

  b. that has either a judicial or an administrative character;

  c. that is collective in nature, in the sense that the proceeding considers the rights and obligations of all creditors;

  d. that is located in a foreign country;

e.     that is authorized or conducted under a law related to insolvency or the adjustment of debt, even if the debtor that has commenced such proceedings is not actually insolvent;

f.     in which the debtor's assets and affairs are subject to the control or supervision of a foreign court or other authority competent to control or supervise a foreign proceeding; and

g.     which proceeding is for the purpose of reorganization or liquidation.

*See In re Ashapura Minechem Ltd.*, 480 B.R. 129, 136 (S.D.N.Y. 2012) (citing *In re Betcorp Ltd.*, 400 B.R. 266, 277 (Bankr. D. Nev. 2009)); *see also In re Overnight and Control Comm'n of Avánzit, S.A.*, 385 B.R. 525, 533 (Bankr. S.D.N.Y. 2008) (discussing factors). As set forth in the Martel Declaration, the Canadian Proceedings satisfy such requirements and, therefore, qualify as "foreign proceedings" for purposes of section 101(23) of the Bankruptcy Code.

131.   **First**, the Canadian Proceedings are proceedings commenced pursuant to the CCAA, a Canadian law that governs corporate reorganizations and provides for an arrangement of a company's financial obligations. *See* CCAA § 44(a–e). For purposes of chapter 15 recognition, "the hallmark of a 'proceeding' is a statutory framework that constrains a company's actions and that regulates the final distribution of a company's assets." *Betcorp*, 400 B.R. at 278. Because the Canadian Proceedings operate under such statutory framework, they satisfy the first factor of section 101(23) of the Bankruptcy Code.

132.   **Second**, the Canadian Proceedings are judicial in character. A reorganization proceeding is judicial in character whenever a "court exercises its supervisory powers." *In re ABC Learning Ctrs. Ltd.*, 445 B.R. 318, 328 (Bankr. D. Del. 2010). Here, the Debtors will petition the Canadian Court for an order approving the SISP and the Stalking Horse APA. After completion of the SISP and proper notice and hearing, the Canadian Court may then sanction the SISP and approve the sale of Cirque du Soleil's assets to the winning bidder, having considered

the statutory requirements under the CCAA, including the adequacy of the marketing process and any related objections thereto.

133.   **Third**, the Canadian Proceedings are collective in nature in that all affected creditors are allowed to participate.  In *Betcorp*, for instance, the bankruptcy court discussed the contrasts between a true collective proceeding, where such proceeding "considers the rights and obligations of all creditors" and a non-collective proceeding, such as a "receivership remedy instigated at the request, and for the benefit, of a single secured creditor."  *See* 400 B.R. at 281. Here, the Debtors have commenced the Canadian Proceedings after consultation with various parties in interest, and execution of the Stalking Horse APA.  In addition, affected creditors are entitled to intervene while the SISP is implemented and the Canadian Court considers the sale of the Debtors' assets.  Importantly, the Canadian Proceedings will not prohibit the Debtors' creditors from participating in the Debtors' restructuring efforts.

134.   **Fourth**, the Canadian Proceedings, including the Canadian Court, are located in a foreign country, namely Quebec, Canada.

135.   **Fifth**, as described above, the CCAA, which governs the Canadian Proceedings, relates to the adjustment of debt.  Here, the Restructuring Transactions to be implemented under the SISP and pursuant to the CCAA will restructure more than approximately $1.09 billion of funded principal indebtedness.

136.   **Sixth**, the Canadian Proceedings subject the Debtors' assets and affairs to the supervision of the Canadian Court during the pendency of the proceedings.

137.   **Finally**, the objective of the Canadian Proceedings is to effectuate a restructuring. The sale of the Debtors' business through the SISP overseen by the Canadian Court pursuant to the CCAA will provide for a deleveraging of the Debtors' balance sheets and will govern the

global financing restructuring of the Debtors' indebtedness.    Therefore, the Foreign Representative submits that the Debtors have commenced the Canadian Proceedings for the purpose of reorganization, as required by section 101(23) of the Bankruptcy Code.

138.    Since the Canadian Proceedings satisfy all of the criteria required by section 101(23) of the Bankruptcy Code, they are foreign proceedings entitled to recognition under chapter 15 of the Bankruptcy Code.    U.S. courts have recognized collective proceedings similar to the Canadian Proceedings as "foreign proceedings" on numerous occasions.    *See, e.g.*, *In re Tervita Corp.*, No. 16-12920 (MEW) (Bankr. S.D.N.Y. Dec. 2, 2016) (recognizing a Canadian arrangement as a foreign proceeding); *In re Essar Steel Algoma,* No. 14-11730 (KJC) (Bankr. D. Del. Jul. 21, 2014) (same); *In re Mega Brands Inc.,* No. 10-10485 (CSS) (Bankr. D. Del. Mar. 23, 2010) (same); *In re Towergate Fin. plc*, No. 15-10509 (Bankr. S.D.N.Y. Mar. 27, 2015) (recognizing a U.K. scheme of arrangement as a foreign proceeding); *In re Hellas Telecom. (Luxembourg) V*, No. 10-13651 (Bankr. D. Del. Dec. 13, 2010) (same).

**B.    The Canadian Proceedings are Foreign Main Proceedings.**

139.    The Canadian Proceedings should be recognized as "foreign main proceedings" as defined in section 1502(4) of the Bankruptcy Code.    A foreign proceeding must be recognized as a "foreign main proceeding" if it is pending in the country where the debtor has its center of its main interests.    11 U.S.C. § 1517(b).    The term "center of main interests" ("COMI") is not defined in the Bankruptcy Code.    COMI, however, has been equated to a debtor's principal place of business.    *See In re Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122, 129 (Bankr. S.D.N.Y. 2007), *aff'd,* 389 B.R. 325 (S.D.N.Y. 2008).    Courts have identified certain factors that are relevant in determining a debtor's COMI, including: (a) the location of the debtor's headquarters; (b) the location of those persons or entities that actually manage the debtor (which, in certain instances, could be the headquarters of a holding

company); (c) the location of the debtor's primary assets; and (d) the location of the majority of the debtor's creditors or of a majority of the creditors who would be affected by the case. *See In re SPhinX, Ltd.*, 351 B.R. 103, 117 (Bankr. S.D.N.Y. 2006).  In the absence of evidence to the contrary, a debtor's registered office is presumed to be the debtor's COMI.  *See* 11 U.S.C. § 1516(c).

140.    Here, under all the relevant criteria, Montreal, Quebec, Canada is the Debtors' COMI.  As set forth in the Lefebvre Declaration:

a.    the Debtors' worldwide operations are overseen by and report to the Chief Executive Officer, located at the Cirque du Soleil international headquarters in Montreal, Quebec, Canada (the "Head Office");

b.    a large part of the Debtors' senior management team is located in Montreal, Quebec, Canada;

c.    all creative, strategic and key operating decisions and key policy decisions are made by and/or subject to approval from CDS Group senior management located in Montreal, Quebec, Canada;

d.    key human resources decisions pertaining to, *inter alia*, payroll budgets and augmentation or reduction of employee headcount as per the approved budget, are subject to the approval of CDS Group's senior management located in Montreal, Quebec, Canada;

e.    key accounting decisions and all plans, budgets and financial projections are subject to the approval of CDS Group's senior management located in Montreal, Quebec, Canada;

f.    planning, budgeting, management of tax, treasury and cash management and preparation of financial projections for CDS Group is done from Montreal, Quebec, Canada;

g.    all material and/or long-term contracts and expenses are subject to the approval of CDS Group's senior management located in Montreal, Quebec, Canada;

h.    marketing and business development initiatives are overseen from the Head Office in Montreal, Quebec, Canada;

i.    corporate governance and regulatory compliance for CDS is overseen from its management team located in Montreal, Quebec, Canada;

j.      meetings for management and senior staff of CDS Group, including council of representative meetings, are regularly held in Montreal, Quebec, Canada;

k.      senior management and all sales, manufacturing and operations staff report to their respective senior executives, who, ultimately, report to CDS Group's Chief Executive Officer, who is based in Montreal, Quebec, Canada;

l.      most directors of the Debtors are based in Montreal, Quebec, Canada, and most council of representative meetings take place there; and

m.     all costumes for the Cirque du Soleil shows are created at the CDS Group's International Headquarters in Montreal, Quebec, Canada.

141.    Based on these factors, the Debtors' COMI is Canada and, as such, the Canadian Proceedings should be recognized as foreign main proceedings.

**C.      The Chapter 15 Cases Have Been Commenced by a Duly Authorized Foreign Representative.**

142.    Section 1517 of the Bankruptcy Code provides that a "foreign representative" shall apply for recognition of the foreign proceeding.  Section 101(24) of the Bankruptcy Code defines "foreign representative":

> The term "foreign representative" means a person or body, including a person or body appointed on an interim basis, authorized in a foreign proceeding to administer the reorganization or the liquidation of the debtor's assets or affairs or to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

143.    Pursuant to the First Day CCAA Order, the Court authorized the appointment of Cirque du Soleil Canada Inc., as the Foreign Representative, authorized and empowered the Foreign Representative to act as a foreign representative in respect of the Canadian Proceedings, and authorized the Foreign Representative to file the chapter 15 cases in the United States for the purpose of having the Canadian Proceedings recognized.  First Day CCAA Order, ¶ 53.

144.    Additionally, on June 28, 2020, the council of representatives of Cirque du Soleil Holdings L.P. (the "Council of Representatives") authorized the appointment of the Foreign Representative for purposes of these chapter 15 cases.  On June 28, 2020, the Council of Representatives authorized the Foreign Representative to commence the Canadian Proceedings and these chapter 15 cases.  Bankruptcy courts have held that a governing body of an entity may authorize a person to act as that entity's foreign representative in a chapter 15 proceeding.  *See In re Vitro, S.A.B. de C.V.*, 470 B.R. 408, 412 (N.D. Tex. 2012), *aff'd sub nom.*, *In re Vitro S.A.B. de CV*, 701 F.3d 1031, 1047 (5th Cir. 2012), *cert. dismissed*, 133 S. Ct. 1862 (2013) (recognizing that the board of directors of a corporation could authorize a person to act as the corporation's foreign representative in a chapter 15 proceeding); *In re OAS S.A.*, 533 B.R. 83, 98 (Bankr. S.D.N.Y. 2015) (holding same); *In re Compania Mexicana de Aviacion, S.A. de C.V.*, No. 10-14182 (MG), 2010 WL 10063842 (Bankr. S.D.N.Y. Nov. 8, 2010) (same).  Copies of the resolutions appointing the Foreign Representative are attached hereto as **Exhibit B**. Accordingly, the Foreign Representative is a proper "foreign representative" within the meaning of section 101(24) of the Bankruptcy Code.

III.    **The Verified Petition Satisfies the Requirements under Section 1515 of the Bankruptcy Code.**

145.    These chapter 15 cases were duly and properly commenced by filing the Verified Petition, accompanied by all fees, documents, and information required by the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure, including:  (a) a corporate ownership statement containing the information described in Bankruptcy Rule 7007.1; (b) a list containing (i) the names and addresses of all persons or bodies authorized to administer foreign proceedings of the Debtors, (ii) all parties to litigation pending in the United States in which the Debtors are a party at the time of the commencement of the chapter 15 cases, attached hereto as **Exhibit C**,

and (iii) all entities against whom provisional relief is being sought under section 1519 of the Bankruptcy Code; (c) a statement identifying all of the Debtors' foreign proceedings that are known to the Foreign Representative; (d) a certified copy of the First Day CCAA Order; and (e) resolutions of the Council of Representatives appointing the Foreign Representative, attached hereto as **Exhibit B**.  Such information is attached as an exhibit to each chapter 15 petition, the Verified Petition or is included in the Lefebvre Declaration.

146.    Because the Verified Petition satisfies section 1517 of the Bankruptcy Code, the Court should recognize the Canadian Proceedings in these chapter 15 cases.  Moreover, granting recognition will promote the United States public policy of respecting foreign proceedings as articulated in, *inter alia*, sections 1501(a) and 1508 of the Bankruptcy Code and further cooperation between courts to the maximum extent possible as mandated by section 1525(a) of the Bankruptcy Code.  Thus, these circumstances satisfy the conditions for mandatory recognition of the Canadian Proceedings under section 1517 of the Bankruptcy Code.

**IV.    The Discretionary Relief Requested Is Necessary and Appropriate to Effect the Restructuring Transactions and Should Be Granted.**

147.    In connection with recognition of the Canadian Proceedings, the Foreign Representative seeks certain related relief, including enforcement of the First Day CCAA Order and the Initial CCAA Order in the United States, and application of sections 361, 362, and 365(e) of the Bankruptcy Code in these chapter 15 cases.  The Foreign Representative respectfully submits that such relief is warranted under sections 105(a), 1507 and 1521 of the Bankruptcy Code and the general principles of comity that underpin chapter 15.

148.    Upon recognition of a foreign proceeding, section 1521(a) authorizes the Court to grant "any appropriate relief" at the request of the recognized foreign representative "where

necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the interests of the creditors."  Such relief may include:

   a. staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a) of the Bankruptcy Code;

   b. staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a) of the Bankruptcy Code;

   c. suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a) of the Bankruptcy Code; and

   d. granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a) of the Bankruptcy Code.

The Court may grant relief under section 1521(a) of the Bankruptcy Code if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C. § 1522(a).  Similarly, section 1507 of the Bankruptcy Code provides that, "if recognition is granted," a court "may provide additional assistance to a foreign representative under this title or under other laws of the United States."  11 U.S.C. § 1507.  Finally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

149.    The Foreign Representative requests the Court exercise its discretion under sections 105, 1507, and 1521 to grant the relief requested insofar as such relief exceeds that which is available by recognizing the Canadian Proceedings as a foreign main proceeding and the Foreign Representative as a "foreign representative" as specified in the Bankruptcy Code. The granting of such relief is consistent with the goals of international cooperation and assistance to foreign courts embodied in chapter 15 of the Bankruptcy Code, and is a necessary to effect the

Canadian Proceedings and Restructuring Transactions.  If granted, such relief would promote all

of the legislatively enumerated objectives of section 1501(a) of the Bankruptcy Code.

150.    Indeed, by the First Day CCAA Order, the Canadian Court expressly requested

the assistance of the courts in the United States in the following provision:

> [The Canadian Court] requests the aid and recognition of any
> Court or administrative body in any Province of Canada and any
> Canadian federal court or administrative body and any federal or
> state court or administrative body in the United States of America
> and any court or administrative body elsewhere, to act in aid of and
> to be complementary to this Court in carrying out the terms of the
> First Day Order.

First Day CCAA Order ¶ 54.  Thus, in addition to the reasons set forth above, this Court should

give full force and effect in the United States to the Initial CCAA Order in the United States

under well-established principles of international comity and specifically pursuant to sections

105(a), 1507, and 1521 of the Bankruptcy Code.

151.    Fair and efficient administration of the Canadian Proceedings that protects all

parties in interest requires that all creditors be bound by the terms of the Canadian Proceedings

and Restructuring Transactions as sanctioned by the Canadian Court.  *See Victrix S.S. Co., S.A. v.

Salen Dry Cargo A.B.*, 825 F.2d 709, 714 (2d Cir. 1987) ("The equitable and orderly distribution

of a debtor's property requires assembling all claims against the limited assets in a single

proceeding; if all creditors could not be bound, a plan of reorganization would fail."); *In re

Energy Coal S.P.A.*, 582 B.R. 619, 626–27 (Bankr. D. Del. 2018) (acknowledging the broad

principles of comity applied by U.S. courts in both recognition of foreign bankruptcies and post-

recognition relief granted to foreign representatives).  If the SISP for the sale of the Debtors'

assets as contemplated by the Canadian Proceedings and First Day CCAA Order, and approved

by the Initial CCAA Order, and Restructuring Transactions thereunder are not fully respected in

the United States, there is a risk that certain of the Debtors' creditors and contract or lease counterparties could bring proceedings in the United States against the Debtors or other parties protected by the First Day CCAA Order and the Initial CCAA Order.  If such creditors can effectively evade the terms of the First Day CCAA Order and the Initial CCAA Order, and attempt to derail the Restructuring Transactions by commencing actions in the United States, the Debtors and others involved in the SISP would be required to defend any such proceedings and deplete the resources of the restructured business and prejudice its reorganized value.  Therefore, relief requested by the Debtors is required to prevent individual creditors acting to frustrate the purposes of the SISP by disregarding the binding First Day CCAA Order and Initial CCAA Order, the foremost of which is the fair and efficient administration of the Canadian Proceedings and Restructuring Transactions to maximize value for all creditors.

## Conclusion

152.   The Foreign Representative respectfully submits that the Verified Petition satisfies the requirements for the recognition of Cirque du Soleil Canada Inc. as the Debtors' "foreign representative" and the Canadian Proceedings as the Debtors' "foreign main proceedings" and further requests entry of the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein.

## Notice

153.   The Foreign Representative will provide notice of this Motion consistent with Bankruptcy Rule 2002(q) and Local Rule 9013-1(m).  The Foreign Representative proposes to notify all creditors and parties in interest of the filing of the Petitions and the Foreign Representative's request for entry of the Order in the form and manner set forth in the *Motion for Order Scheduling Recognition Hearing and Specifying Form and Manner of Service of Notice*,

filed contemporaneously herewith.  The Foreign Representative submits that, in view of the facts and circumstances, such notice is sufficient and no other or further notice need be provided.

### No Prior Request

154.    No prior request for the relief sought in this Verified Petition has been made to this or any other court.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Foreign Representative respectfully requests entry of the Order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested herein and such other and further relief as is just and proper.

| | |
|---|---|
| Dated: July 1, 2020<br>Wilmington, Delaware | */s/ Laura Davis Jones*<br>Laura Davis Jones (DE Bar No. 2436)<br>Timothy P. Cairns (DE Bar No. 4228)<br>**PACHULSKI STANG ZIEHL & JONES LLP**<br>919 North Market Street, 17th Floor<br>P.O. Box 8705<br>Wilmington, Delaware 19899-8705 (Courier 19801)<br>Telephone: (302) 652-4100<br>Facsimile: (302) 652-4400<br>Email: ljones@pszjlaw.com<br>tcairns@pszjlaw.com |

-and-

Aparna Yenamandra  (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone: (212) 446-4800
Facsimile: (212) 446-4900
Email: aparna.yenamandra@kirkland.com

-and-

Chad J. Husnick, P.C. (*pro hac vice* pending)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone: (312) 862-2000
Facsimile: (312) 862-2200
Email: chad.husnick@kirkland.com

*Counsel to the Foreign Representative*

## VERIFICATION OF PETITION

I, Stéphane Lefebvre, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury under the laws of the United States of America as follows:

I am the Chief Financial Officer of Cirque du Soleil Canada Inc., the authorized foreign representative for the Debtors.  As such, I have full authority to verify the foregoing Verified Petition on behalf of the Debtors.

I have read the foregoing Verified Petition, and I am informed and believe that the factual allegations contained therein are true and accurate to the best of my knowledge, information and belief.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: July 1, 2020
Montreal, Canada

*/s/ Stéphane Lefebvre*
By:  Stéphane Lefebvre
Title:  Chief Financial Officer
Cirque du Soleil Canada Inc.