## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 15 |
| | ) | |
| CDS U.S. HOLDINGS, INC., *et al.*,[1] | ) | Case No. 20-11719 (CSS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**FOREIGN REPRESENTATIVE'S MOTION,
PURSUANT TO SECTIONS 105(A), 363, 365, 1501,
1507, 1520, AND 1521 OF THE BANKRUPTCY CODE,
AND BANKRUPTCY RULES 2002, 6004, 6006, AND
9014, FOR ENTRY OF AN ORDER (I) RECOGNIZING
AND ENFORCING THE APPROVAL AND VESTING
ORDER, (II) APPROVING THE SALE OF SUBSTANTIALLY
ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS,
CLAIMS, AND ENCUMBRANCES, (III) RECOGNIZING AND ENFORCING THE
ADMINISTRATIVE RESERVES ORDER AND (IV) GRANTING RELATED RELIEF**

Cirque de Soleil Canada Inc., in its capacity as the authorized foreign representative (the "Foreign Representative") of the above-captioned debtors (collectively, the "Debtors"), which are the subject of jointly-administered proceedings (the "Canadian Proceedings") under the Companies' Creditors Arrangement Act, R.S.C. 1985, c. C-36 (as amended, the "CCAA") in the Superior Court of Quebec, Commercial Division (the "Canadian Court"), respectfully submits this motion (this "Motion") pursuant to sections 105(a) 363, 365, 1501, 1507, 1520, and 1521 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court

---

[1]    The last four digits of Debtor CDS U.S. Holdings, Inc.'s tax identification number are (0086). Due to the large number of debtor entities in these jointly administered chapter 15 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing agent at www.omniagentsolutions.com/cirquedusoleil. The location of the Debtors' service address for purposes of these chapter 15 cases is: 8400, 2e Avenue Montréal, Quebec H1Z 4M6 Canada.

for the District of Delaware (the "Local Rules"), requesting entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Order"):  (a) recognizing and giving effect in the United States to the *Approval and Vesting Order* (the "Approval and Vesting Order"), substantially in the form attached to the Order as Exhibit 1, to be entered by the Canadian Court in the Canadian Proceedings; (b) approving, under section 363 of the Bankruptcy Code, the sale of the Debtors' right, title, and interest in and to the Purchased Assets to the Buyer pursuant to the Spectacle Sale Agreement (each as defined herein), free and clear of all liens, claims, encumbrances, and other interests (other than the Permitted Encumbrances); (c) recognizing and giving effect in the United States to the *Administrative Reserves Order* (the "Administrative Reserves Order"), substantially in the form attached to the Order as Exhibit 2, to be entered by the Canadian Court in the Canadian Proceedings; and (d) granting related relief.[2]

In support of this Motion, the Foreign Representative incorporates by reference the statements contained in the *Declaration of Stéphane Lefebvre in Support of the Foreign Representative's Motion Pursuant to Sections 105(a), 353, 365, 1501, 1507, 1520, and 1521 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, 6006, and 9014, for Entry of an Order (I) Recognizing and Enforcing the Approval and Vesting Order, (II) Approving the Sale of Substantially All of the Debtors' Assets Free and Clear of Liens, Claims, and Encumbrances, (III) Recognizing and Enforcing the Administrative Reserves Order, and (IV) Granting Related*

---

[2]  As of the date hereof, the Approval and Vesting Order and Administrative Reserves Order have not been entered by the Canadian Court.  The application seeking entry of the Approval and Vesting Order and of the Administrative Reserves Order (the "AVO Application") is currently scheduled to be heard by the Canadian Court on October 20, 2020.  To the extent the Approval and Vesting Order or the Administrative Reserves Order entered by the Canadian Court differ from the proposed Approval and Vesting Order attached to the Order, the Foreign Representative will file and serve such Approval and Vesting Order or Administrative Reserves Order, as applicable as entered on the Core Notice Parties (as defined in the *Motion for Order Scheduling Recognition Hearing and Specifying Form and Manner of Service of Notice* [Docket No. 8] (the "Scheduling Motion")).

*Relief* (the "Lefebvre Sale Declaration") filed contemporaneously herewith.  The Foreign Representative further represents as follows:

**Jurisdiction and Venue**

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012 (the "Amended Standing Order").  The Debtors confirm their consent, pursuant to rule 7008 of the Bankruptcy Rules and rule 9013-1(f) of the Local Rules, to the entry of a final order by the Court in connection with this Motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

2.      These chapter 15 cases have been properly commenced pursuant to section 1504 of the Bankruptcy Code by the filing of petitions for recognition of the Canadian Proceedings under section 1515 of the Bankruptcy Code.

3.      Venue is proper pursuant to 28 U.S.C. §1410.

4.      The statutory bases for the relief requested herein are sections 105(a), 363, 365, 1501, 1507, 1520, and 1521 of the Bankruptcy Code.  The relief is also appropriate under Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rule 6004-1.

**Background**

5.      On June 29, 2020, the Debtors commenced the Canadian Proceedings with the Canadian Court pursuant to sections 9, 11, 11.51, 11.52, and 23 of the CCAA with the goal of pursuing a sale and investment solicitation process under the supervision of the Canadian Court (the "SISP") and restructuring operations under the protections offered by the CCAA.

6.      On June 30, 2020, the Canadian Court entered an interim order (the "First Day CCAA Order").  Although each Debtor's respective management and council of representatives remains in place, each Debtor's assets and affairs are subject to the supervision of the Canadian Court during the pendency of the Canadian Proceedings.

7.      On July 1, 2020 (the "Petition Date"), the Foreign Representative filed voluntary petitions for relief under chapter 15 of the Bankruptcy Code for each of the Debtors in this Court. A description of the Debtors' business and the events leading up to the commencement of the Canadian Proceedings and these chapter 15 cases is included in the *Declaration of Foreign Representative Pursuant to 11 U.S.C. § 1515 and Rule 1007(a)(4) of the Federal Rules of Bankruptcy Procedure and in Support of Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [Docket No. 4] (the "Lefebvre Declaration") and the *Declaration of Guy P. Martel in Support of Verified Petition for (I) Recognition of Foreign Main Proceedings, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [Docket No. 5] (the "Martel Declaration"), which are incorporated herein by reference.[3]

8.      On July 2, 2020, the Court granted certain first day relief [Docket Nos. 36, 38] and gave full force and effect on a provisional basis to the First Day CCAA Order [Docket No. 37].

---

[3]     Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the SISP Order, the Approval and Vesting Order, or the Spectacle Sale Agreement (each as defined herein), as applicable.

9.      On July 10, 2020, the Canadian Court entered the *Amended and Restated Initial Order* (the "Initial CCAA Order") extending the relief granted in the First Day CCAA Order, among other relief.

10.     On July 17, 2020, the Court entered the *Order Granting Provisional Recognition of the Initial CCAA Order Pursuant to Section 1519 of the Bankruptcy Code* [Docket No. 53], giving full force and effect on a provisional basis to the Initial CCAA Order, among other relief.

11.     On August 11, 2020, the Court entered the *Order Granting Petition for (I) Recognition as Foreign Main Proceeding, (II) Recognition of Foreign Representative, and (III) Related Relief Under Chapter 15 of the Bankruptcy Code* [Docket No. 90] (the "Recognition Order"), granting the Debtors' verified petition and recognizing the Canadian Proceedings as foreign main proceedings pursuant to section 1517 of the Bankruptcy Code, among other relief.

### Events Leading to a Sale of Substantially All of the Debtors' Assets

12.     The Debtors have undertaken affirmative steps to restructure their operations, as detailed in the Lefebvre Declaration and Martel Declaration.  Such efforts have been focused on a going-concern sale of all or substantially all of the Debtors' assets (the "Assets") pursuant to the CCAA and section 363 of the Bankruptcy Code, or a similarly-structured transaction (the "Sale").

### The Sale and Investor Solicitation Process and Procedures

(a) Sale Process—Phase I

13.     Beginning in May 2020 ("Phase I" of the Sale Process (as defined below)), the Debtors, in conjunction with their advisors, including Greenhill & Co., LLC ("Greenhill") and National Bank Financial Inc. ("National Bank" and together with Greenhill, collectively, the "Financial Advisors"), engaged in a comprehensive and good-faith sale process to sell the Assets

(the "Sale Process").  To that end, the Financial Advisors prepared a list of 97 strategic and financial parties who, in the Financial Advisors' reasonable professional judgment, may have been interested in acquiring the Assets (the "Potential Bidders").  Of the 97 Potential Bidders, 34 signed non-disclosure agreements.  Initial non-binding indications of interest were due on June 8, 2020, and the Debtors received five proposals by the deadline.  One such proposal was from the ad hoc committee of secured lenders (the "Ad Hoc Group") for a credit bid of the full amount outstanding under the First Lien Credit Agreement and the Second Lien Term Loan Agreement.  The existing shareholders, comprised of TPG VII CDS Holdings, L.P., Caisse de Depot et Placement du Quebec, Fosun Industrial Holdings Limited (the "Existing Shareholders"), and Investissement Quebec ("IQ" and together with the Existing Shareholders, the "Shareholder Consortium") submitted a proposal on May 20, 2020 that included a draft acquisition agreement to serve as a stalking horse bid, which was fully negotiated and finalized on June 19, 2020 (the "Shareholder Stalking Horse Bid").  On June 11, 2020, the Transaction Committee (through the Financial Advisors) requested binding commitment letters from the Ad Hoc Group and Shareholder Consortium, which were provided on June 18 and 19, respectively.

14.    Due to liquidity constraints and various other considerations discussed in the Lefebvre Declaration and Martel Declaration, the Debtors determined they needed to commence voluntary insolvency proceedings.  On June 28, 2020, upon the informed recommendation of the Transaction Committee, the Debtors entered into an agreement on the terms of the Shareholder Stalking Horse Bid, which preserved optionality to obtain higher or otherwise better bids at limited additional expense given the lack of any break-up fees or further expense reimbursement requirements.  The following day, on June 29, 2020, the Debtors initiated the Canadian Proceedings.

(b) Sale Process—Phase II

15.     After initiating the Canadian Proceedings ("Phase II" of the Sale Process), all five parties that submitted letters of intent in Phase I of the Sale Process were provided management presentations and the opportunity to make additional diligence requests, which the Debtors fulfilled as received.  Two additional parties entered the Sale Process in Phase II.  These two additional parties received the same diligence items and authority to submit diligence requests as the parties who submitted letters of intent in Phase I.

16.     The Ad Hoc Group submitted a mark-up of the Shareholder Stalking Horse Bid which was subsequently fully negotiated, including revised commitment letters (the "Ad Hoc Group Stalking Horse Bid"), and on July 15, 2020, the Debtors filed to replace the Shareholder Stalking Horse Bid with the Ad Hoc Group Stalking Horse Bid.  At a hearing held on July 17, 2020, the Canadian Court entered the *Order Approving a Sale and Investment Solicitation Process* (the "SISP Order") and approved entry into the Ad Hoc Group Stalking Horse Bid— replacing the Shareholder Stalking Horse Bid.

17.     The SISP Order describes, among other things, (a) the Assets available for sale and the opportunity for an investment in connection with the purchase of such Assets, (b) the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Assets and the sale or investment thereof, and (c) the manner in which bidders and bids become Qualified Bidders, Qualified Bids, and Auction Bidders, as applicable, (d) the evaluation of bids received, (e) the guidelines for the ultimate selection of the Successful Bid(s) and/or Back-Up Bid(s), and (f) the process for obtaining such approvals (including the approval of the Canadian Court) as may be necessary or appropriate in respect of a Successful Bid.

18.     As set out in the SISP Order, the deadline for parties to submit binding bids and deposits was August 18, 2020.  No other bids were received by such deadline.  The remaining parties to the Sale Process withdrew and did not offer a Superior Bid on various grounds, including valuation, cash needs of the business, and uncertainty surrounding relaunch of operations.  Despite attempts by the Financial Advisors to connect Phase II interested parties as potential co-investors, the bidders ultimately could not provide a topping bid following the replacement of the Shareholder Stalking Horse Bid with the Ad Hoc Group Stalking Horse Bid.

## The Spectacle Sale Agreement

19.     Over the course of the past several months, the Debtors and their advisors pursued, in parallel with the conduct of the SISP, as well as following its conclusion, discussions with the Ad Hoc Group in order to determine the optimal transaction structure to be implemented with the Ad Hoc Group, should no Superior Bid be submitted by the Bid Deadline.

20.     As part of these discussions, the Ad Hoc Group expressed a desire to maintain a portion of the corporate structure of the Debtors so as to facilitate the transition upon implementation of the transaction contemplated in the Ad Hoc Group Stalking Horse Bid, as well as to preserve certain tax attributes of the Debtors.

21.     Accordingly, and as permitted under the Ad Hoc Group Stalking Horse Bid, it was determined that the transaction set out thereunder should be implemented as follows:

> (a)     by way of transfer of assets, for the assets owned by most of the U.S. Debtors (the "Non-Acquired Debtors"); and

> (b)     by way of a transfer of the equity interest held by Cirque du Soleil Holdings L.P. directly in CDS Canadian Holdings, Inc., (and indirectly of the entities held by the latter, including the other Canadian Debtors), as well as the equity interests of Cirque du Soleil Vegas, L.L.C. (the Debtors whose equity interest will be transferred directly or indirectly are collectively referred to herein as the "Acquired Debtors"); *provided*, however, that the Acquired Debtors would first be "reverse vested" as described herein.

22.     Accordingly, on October 9, 2020, the parties entered into an amendment agreement with respect to the Ad Hoc Group Stalking Horse Bid so as to reflect the agreed transaction structure (as amended, the "Spectacle Sale Agreement"), pursuant to which Spectacle BidCo Holdings Inc. ("Spectacle Holdings"), as assignee of Spectacle Bidco LP ("Spectacle"), the acquisition vehicle for the Ad Hoc Group, would, directly or indirectly through one or more designated buyers (collectively, with Spectacle Holdings, the "Buyer"), acquire substantially all of the operations of the Debtors through: (a) an acquisition of all or substantially all of the assets of the Non-Acquired Debtors specified in the Spectacle Sale Agreement; and (b) an acquisition of all issued and outstanding shares of CDS Canadian Holdings, Inc. (and indirectly of most of the other Acquired Debtors and the other non-debtor transferred subsidiaries) as well as the equity interests in Cirque du Soleil Vegas L.L.C. (collectively, the "Purchased Assets"). Consistent with the Spectacle Sale Agreement, the Debtors are also adding 9424-9356 Quebec Inc. ("ExcludedCo1") and 9424-9398 Quebec Inc. ("ExcludedCo2") as applicants to the CCAA Proceedings for the purpose of implementing the transactions contemplated in the Spectacle Sale Agreement (collectively, the "Spectacle Transaction").

23.     The Spectacle Transaction provides for, amongst other things, the following:

(a)     the completion of a pre-closing reorganization of certain Debtors in accordance with the Reorganization Step Plan attached to the Spectacle Sale Agreement;

(b)     all of the right, title and interest in and to the Purchased Assets shall vest absolutely and exclusively in the Buyer, free and clear of any and all claims and encumbrances (excluding the Permitted Encumbrances);

(c)     certain contracts set out in the schedules to the Spectacle Sale Agreement and the draft approval and vesting order shall be either retained by the applicable Acquired Debtors or assigned to the Buyer, as the case may be, with the possibility for the Buyer to designate additional contracts to be retained or assigned in accordance with the modus

operandi proposed in the draft Approval and Vesting order or otherwise in accordance with the Spectacle Sale Agreement;

(d)    certain assets set out in the Spectacle Sale Agreement (collectively, the "Excluded Assets") of the Acquired Debtors will be transferred to and vested in ExcludedCo1, while certain contracts prescribed in the Spectacle Sale Agreement and attachments thereto (collectively, the "Excluded Contracts") of the Acquired Debtors will be assigned to and assumed by ExcludedCo1, each in accordance with the sequence set out in the Spectacle Sale Agreement and the step plan attached thereto (the "Reorganization Step Plan");

(e)    all liabilities, other than the "Assumed Liabilities," as defined in the Spectacle Sale Agreement (collectively, the "Assumed Liabilities") of the Acquired Debtors (collectively, the "Transferred Liabilities") will be transferred to and assumed by ExcludedCo2 in accordance with the sequence set out in the Spectacle Sale Agreement and the Reorganization Step Plan such that on the Effective Date the Transferred Liabilities shall be novated and become the exclusive obligations of ExcludedCo2 (and not the obligations of the Acquired Debtors) and the Acquired Debtors and the Purchased Assets shall be forever released and discharged from such Transferred Liabilities; and

24.    Additionally, pursuant to the proposed Approval and Vesting Order, the commencement or prosecution of any demands, claims, or actions with respect to Transferred Liabilities against, among others, the Acquired Debtors and the Buyer shall be permanently enjoined.  Any person who, prior to the Effective Date, had a claim against an Acquired Debtor or the Purchased Assets in respect of any of the Transferred Liabilities shall no longer have such claim against the Acquired Debtor or the Purchased Assets but will instead solely have an equivalent claim against ExcludedCo2 from and after the Effective Date in its place and stead.

25.    The purchase price payable by the Buyer for the Purchased Assets pursuant to the Spectacle Sale Agreement shall consist of the following considerations (collectively, the "Purchase Price"):

(a)    Spectacle Holdings will cause the release of all amounts outstanding and obligations owing under the First Lien Credit Agreement and the Second Lien Credit Agreement as of the Closing Date, including the principal amount of indebtedness and interest accrued as of the

Closing Date, which amount as of (but not including) July 14, 2020, is estimated to be $1,089,497,253.02, plus any fees (defined as the "Credit Bid Consideration" under the Spectacle Sale Agreement), with such release of the First Lien Debt and Second Lien Debt occurring in the manner, order, and sequence prescribed in the Reorganization Step Plan;

(b)    Spectacle Holdings will arrange for the payment of a cash amount sufficient to pay:  (i) all amounts owing under that certain "replacement loan" provided prepetition by the Ad Hoc Group to the Debtors (the "Ad Hoc Group Replacement Loan"), (ii) the amount of the "Administrative Monitor Reserve"[4] and the amount of the "Administrative Seller Reserve"[5] (as described below)_ and (iii) all amounts necessary to cure any monetary defaults as a condition to assuming the Assigned Agreements;

(c)    Spectacle Holdings will assume or cause the relevant designated buyer to assume the Assumed Liabilities (other than those of any Transferred Subsidiary) which are retained by such Transferred Subsidiary; and

26.    Spectacle Holdings will also fund, or cause to be funded, the amounts for:

(a)    a fund (the "Employee Fund") in the amount of $15 million to provide financial assistance to former employees whose employment was terminated either by the Debtors (excluding for just cause) or by mutual agreement effective on or after January 1, 2020 (irrespective of the date on which the notice was given) and ending on the Effective Date, who remained employees in good standing until their services were no longer

---

[4]    Pursuant to the Spectacle Sale Agreement, the "Administrative Monitor Reserve" means the cash reserve, including the Indemnification Amount for the benefit of the Indemnified Parties, to be established in accordance with the Administrative Monitor Reserve Budget for the benefit of the Persons entitled to be paid the Administrative Reserve Costs of the Monitor in an amount to be agreed by the Monitor, the Seller and the Buyer, two (2) Business Days prior to the Administrative Reserve Order, which cash reserve shall be established by the Monitor out of the cash and cash equivalents of the Seller Group as at the Closing Date with the balance, if any, funded, or caused to be funded, by the Buyer, to the Monitor on the Closing Date, as a segregated account held in trust by the Monitor, the whole subject to and in accordance with the terms hereof and with the terms of the Administrative Reserve Order.  Spectacle Sale Agreement, ¶ 1.1.

[5]    Pursuant to the Spectacle Sale Agreement, the "Administrative Seller Reserve" means the cash reserve in an amount to be agreed by the Monitor, the Seller and the Buyer, two (2) Business Days prior to the Administrative Reserve Order, and approved by the CCAA Court pursuant to the Administrative Reserve Order, which reserve shall be established by the Monitor out of the cash and cash equivalents of the Seller Group as at the Closing Date with the balance, if any, funded by the Buyer, or caused to be funded by the Buyer, to the Monitor on the Closing Date, as a segregated account held in trust by the Monitor for the benefit of Persons entitled to be paid the Administrative Reserve Costs of the Seller and the Buyer, subject to the terms hereof and in accordance with the Administrative Seller Reserve Budget for the purpose of paying the Administrative Reserve Costs of the Seller in accordance with the terms hereof and the Administrative Reserve Order. Spectacle Sale Agreement, ¶ 1.1.

required, is not an eligible Contractor on the Contractor Fund, and whose entitlement to receive a severance payment from the applicable Debtors entity has not been paid as a result of the CCAA Proceedings; and

(b)      a fund (the "Contractor Fund") to provide financial assistance to certain contractors who have provided notice of termination of their contract to the applicable Debtor entity and who has not received notice of termination of the contract from the applicable Debtors entity as a result of a material breach of the contract, is not an eligible employee under the Employee Fund, and has had their payments for services provided to the applicable Debtor entity pursuant to the contract stayed as a result of the CCAA Proceedings.

27.      The proposed Approval and Vesting Order also provides that, on the Effective Date, (a) the present and former partners, shareholders, members of the Council of Representatives, directors, officers, employees, legal counsel and advisors of the Debtors (including, for the avoidance of doubt, ExcludedCo1 and ExcludedCo2), (b) the Monitor, (c) the Ad Hoc Group and its members, and (d) the respective affiliates, funds under management, affiliated funds, shareholders, members, equity holders, trustees, directors, officers, managers, employees, partners, legal counsel, advisors and other representatives of the persons specified in (a), (b) and (c) (the persons specified in (a), (b), (c) and (d) being, collectively, the "Released Parties") shall be forever irrevocably and unconditionally released and discharged from any and all present and future claims (including, without limitation, claims for contribution or indemnity), liabilities, indebtedness, demands, actions, causes of action, counterclaims, suits, losses, damages, judgments, executions, recoupments, debts, sums of money, expenses, costs, accounts, liens, taxes, penalties, interests, recoveries, and other obligations, liabilities and encumbrances of any nature or kind whatsoever (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, or due or not yet due, in law or equity and whether based in statute, contract or otherwise) based in whole or in part on any act, omission, transaction, dealing or other occurrence, matter,

circumstance or fact existing or taking place on or prior to the Effective Date or completed pursuant to the terms of the Approval and Vesting Order and/or in connection with the Spectacle Transaction, in respect of or relating to, in whole or in part, directly or indirectly, any of the Debtors (including, for the avoidance of doubt, ExcludedCo1 and ExcludedCo2) or their assets, liabilities, business or affairs wherever or however conducted or governed, the administration and/or management of the Debtors, the Canadian Proceedings, these chapter 15 cases, or the Spectacle Transaction (collectively, the "Released Claims"), which Released Claims are fully, finally, irrevocably, unconditionally and forever waived, discharged, released, cancelled and barred as against the Released Parties, and the commencement, prosecution, continuation or assertion, whether directly, indirectly, derivatively or otherwise, by any Person of any Released Claims against the Released Parties, whether before a court, administrative tribunal, arbitrator, other dispute resolver or otherwise, shall be permanently restrained and enjoined; provided, however, that nothing shall waive, discharge, release, cancel or bar any claim against the present and former directors of the Debtors that is not permitted to be released pursuant to section 5.1(2) of the CCAA.

28.     The closing of the Spectacle Sale Agreement is also subject to a number of customary conditions precedent, including the following:

> (a)     the Approval and Vesting Order and the Order shall have been granted and become final orders;

> (b)     the pre-closing reorganization steps shall have been effected in the manner, order and sequence prescribed in the Reorganization Step Plan.

29.     In connection with the closing of the Spectacle Transaction, the members in the Ad Hoc Group and certain other First Lien Lenders will provide $375 million of new financing to Spectacle Holdings (as guaranteed by its subsidiaries, including, inter alia, the Transferred Subsidiaries) to finance the restart of operations and otherwise fund the operation of the

business, including with respect to the Assumed Liabilities under the Spectacle Transaction. Spectacle Holdings and its subsidiaries will also be liable for debt recovery in the form of a new $300 million take-back second lien loan and assume the obligations thereunder.  This take-back second lien loan will be allocated among the First Lien Lenders based on their respective interests in the pre-filing First Lien Term Loan (including the Revolving Credit Facility).

30.    As things currently stand, and assuming the Approval and Vesting Order is entered by the Canadian Court on October 20, the parties aim at closing the Spectacle Transaction on or before October 30, 2020.  A speedy completion of the Spectacle Transaction, which is supported by the Debtors' senior economic stakeholders, is vital to the future viability of the Debtors' business, as the Applicants require further injections of cash to restart their operations as soon as circumstances permit.  Moreover, the Debtors' liquid resources, including the Ad Hoc Group Replacement Loan obtained to finance these proceedings Sale Process, are nearly exhausted.  It is imperative that the Spectacle Transaction be completed and exit financing obtained in the near future in order for the business to transition as quickly and smoothly as possible.

31.    Additionally, the parties have structured the Spectacle Transaction, in part, as a share transaction in order to preserve tax attributes for the go-forward business.  Preserving these assets is in the best interest of the Debtors' stakeholders as a whole, as it will assist in the recovery of the going concern business that emerges from the CCAA Proceedings.

32.    In short, the proposed structure is necessary to complete the best transaction available to the Debtors under the circumstances, and to ensure the Debtors' business continues as a going concern for a broad array of stakeholders, including transferring employees and continuing suppliers, as well as the numerous former employees and independent contractors

who are expected to be reengaged once normal business operations resume. Any other transaction structure that does not enable a timely and efficient closing while achieving these restructuring objectives would undermine the future viability of the business as a going concern.

33.     The Debtors understand that the Monitor is supportive of the Spectacle Transaction, including its contemplated structure.

### The Spectacle Sale Agreement and Local Rule 6004-1 Disclosures

34.     The following is a summary of certain material provisions of the Spectacle Sale Agreement as required by rule 6004-1 of the Local Rules.[6] The Foreign Representative believes that the Spectacle Sale Agreement is fair and reasonable under the circumstances, is the result of good-faith, arm's-length negotiations, and is in the best interests of the Debtors, their creditors, and other stakeholders.

35.     In accordance with Local Rule 6004-1, set forth below are certain provisions in the Spectacle Sale Agreement and/or the Order that such rule requires the Foreign Representative to highlight in this Motion:[7]

| Provision | Description | Location in Order or Spectacle Sale Agreement |
|---|---|---|
| Sale to Insider | The Buyer is not an insider as defined by Bankruptcy Code section 101(31). | N/A |

---

[6]  Any summary of, or reference to, the terms and conditions of the Spectacle Sale Agreement and/or the Order herein are qualified in their entirety by the actual terms and conditions of the Spectacle Sale Agreement and the Order. To the extent there is any inconsistency between any such summary or reference herein and the actual terms and conditions of the Spectacle Sale Agreement and the Order, the actual terms and conditions of the Spectacle Sale Agreement and/or the Order shall control.

[7]  Pursuant to Local Rule 6004-1(b)(iv), a Sale Motion (as defined in the Local Rules) must highlight certain provisions contained in the proposed form of sale order and/or the underlying sale agreement. The Foreign Representative has highlighted below the relevant provisions of the Spectacle Sale Agreement that implicate Local Rule 6004-1(b)(iv) by providing a citation to the relevant sections of the Spectacle Sale Agreement and/or the Order. In addition, the Foreign Representative highlights that, pursuant to the proposed Order, it is requesting (i) the Sale to be approved under section 363(f) of the Bankruptcy Code, free and clear of any Interest (as defined in the Order) and (ii) a waiver of Bankruptcy Rule 6004(h).

| Provision | Description | Location in Order or Spectacle Sale Agreement |
|---|---|---|
| Management Agreements | The Buyer has entered into the Key Employee Retention Plans described on Schedule 1.1(f) of the Seller's confidential disclosure letter, which includes the material terms of such agreements. | N/A |
| Releases | The sale of the Purchased Assets to the Buyer will be free and clear of all liens, claims, encumbrances and other interests other than the Permitted Encumbrances. | Spectacle Sale Agreement Section 2.1; Order ¶¶ 12–15 |
| Private Sale / No Competitive Bidding | The sale of the Purchased Assets is the result of a lengthy and robust marketing process and a court-approved solicitation and sale process conducted by the Debtors in the Canadian Proceedings.<br><br>Through the Motion, the Foreign Representative seeks approval by this Court of the sale currently set to be heard by the Canadian Court on October 20, 2020. | N/A |
| Closing and Other Deadlines | Buyer may immediately terminate the Spectacle Sale Agreement if the Closing has not occurred on or before November 6, 2020. | Spectacle Sale Agreement ¶ 9.1(c) |
| Good Faith Deposit | Under the Spectacle Sale Agreement, the Debtors transmitted $21,012,648 to the Monitor to be held in trust and released to the Buyer upon the Closing. If there has been a material violation or breach by the Buyer of any covenant, representation or warranty which would prevent the satisfaction of the conditions to Closing, and the Seller terminates the Spectacle Sale Agreement pursuant to such action, the full amount of the Deposit together with all accrued interest earned thereon, if any, shall be forfeited. | Spectacle Sale Agreement Sections 3.1(d)(i) and 3.2(c) |
| Interim Agreements with Buyer | Under the Spectacle Sale Agreement, the Debtors shall use commercially reasonable efforts to assist the Buyer in accomplishing a smooth transition of the business to the Buyer. | Spectacle Sale Agreement Section 7.19 |
| Use of Proceeds | N/A | N/A |
| Tax Exemption | The Order does not seek to have the Sale declared exempt from taxes under section 1146(a) of the Bankruptcy Code. | N/A |
| Record Retention | Buyer shall make all books and records transferred as part of the Purchased Assets reasonably available to the Monitor, the Receiver and any trustee in bankruptcy of any of the Seller Group Members for | Spectacle Sale Agreement Section 7.1(b) |

| Provision | Description | Location in Order or Spectacle Sale Agreement |
|---|---|---|
| | a period of seven (7) years after Closing. | |
| Sale of Avoidance Actions | N/A | N/A |
| Requested Findings as Successor Liability | The Order provides that the Buyer shall not be deemed to be a successor to any of the Debtors. | Order ¶ 16 |
| Sale Free and Clear of Unexpired Leases | N/A | N/A |
| Credit Bid | The Spectacle Sale Agreement release of all amounts outstanding and the "Obligations" owing under (and as defined in each of) the First Lien Credit Agreement and Second Lien Credit Agreement as of the Closing Date, including the principal amount of indebtedness and interest accrued as of the Closing Date. | Spectacle Sale Agreement ¶ 3.1(a) |
| Relief from Bankruptcy Rule 6004(h) | Given the need to obtain final approval of the Sale in the United States by no later than November 6, 2020, the Foreign Representative seeks to waive the 14-day stay under Bankruptcy Rule 6004(h). | Order ¶ 16 |

## The Approval and Vesting Order

36.     Now that the competitive bidding process set forth in the SISP Order has been completed and a Buyer has been selected, the Debtors have sought approval of the Spectacle Transaction through the entry of the Approval and Vesting Order in the Canadian Proceedings. A hearing to consider the Approval and Vesting Order in the Canadian Proceedings is currently scheduled to be held on October 20, 2020.  Subject to entry of the Approval and Vesting Order by the Canadian Court, the Foreign Representative hereby seeks recognition of the Approval and Vesting Order in these chapter 15 cases.

## The Administrative Reserves Order

37.     As part of the Spectacle Transaction, the parties have agreed to establish two separate administrative reserves, the Administrative Monitor Reserve and the Administrative Seller Reserve (collectively, the "Administrative Reserves") by entry of the Administrative

Reserves Order by the Canadian Court to be held by the Monitor in trust for, respectively: (a) the fees and costs of the Monitor and its professional advisors; and (b) the fees and costs of the professional advisors to the Debtors (or the Foreign Representative, as the case may be) and the costs required to wind down the remaining Debtors.  The Administrative Reserves will be funded from the cash and cash equivalents of the Debtors (which would otherwise constitute Purchased Assets), with the balance, if any, being funded by the Buyer.

38.    The Debtors have sought approval of the Administrative Reserves through the entry of the Administrative Reserves Order in the Canadian Proceedings.  The Administrative Reserves Order is currently scheduled to be heard concurrently with the Approval and Vesting Order.  Subject to entry of the Administrative Reserves Order by the Canadian Court, the Foreign Representative hereby seeks recognition of the Administrative Reserves Order in these chapter 15 cases.

## Relief Requested

39.    By this Motion, the Foreign Representative respectfully requests entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to sections 363, 365, 1501, 1507, 1520, 1521, 1525, 1527, and 105(a) of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, and 9014, and Local Rule 6004-1(b):  (a) recognizing and enforcing the Approval and Vesting Order in the United States; (b) approving, under section 363 of the Bankruptcy Code, the sale of the Debtors' right, title, and interest in and to the Purchased Assets to the Buyer pursuant to the Spectacle Sale Agreement (other than the Permitted Encumbrances); (c) recognizing and enforcing the Administrative Reserves Order in the United States; and (d) granting certain related relief.

40.    The Foreign Representative believes that the sale of the Purchased Assets in accordance with the terms and conditions of the Spectacle Sale Agreement, the Approval and

Vesting Order, and the Order represents the best realization of value for the Debtors' creditors and other stakeholders under the circumstances, and this Court's recognition of the Approval and Vesting Order and approval of the sale of the Purchased Assets pursuant to the Spectacle Sale Agreement free and clear is a critical step in achieving that result. Additionally, pursuant to section 9.1(g) of the Spectacle Sale Agreement, entry of the Order, substantially in the form annexed hereto, is a condition precedent to the consummation of the Spectacle Transaction. This Court's recognition and enforcement of the Approval and Vesting Order and approval of the Spectacle Transaction will permit the Debtors to sell the Purchased Assets without disruption and in a timely and efficient manner. Absent the relief requested herein, the Debtors, their creditors, and their employees will potentially suffer significant, if not irreparable, harm due to an inability to close the Spectacle Transaction.

## Basis for Relief

**I.    The Court Should Recognize and Enforce both the Approval and Vesting Order and the Administrative Reserves Order and Authorize the Sale of the Purchased Assets Pursuant to Section 363 of the Bankruptcy Code.**

41.    Upon a bankruptcy court's granting recognition of a foreign representative and of a foreign proceeding as a foreign main proceeding, relief is available to the petitioner under section 1520 of the Bankruptcy Code. *See* 11 U.S.C. § 1520. Section 1520(a)(2) of the Bankruptcy Code provides, in relevant part, that, "upon recognition of a foreign proceeding that is a foreign main proceeding . . . section[] 363 appl[ies] to a transfer of an interest of the debtor in property that is within the territorial jurisdiction of the United States to the same extent that the section[] would apply to property of an estate." 11 U.S.C. § 1520(a)(2). Moreover, section 1520(a)(3) provides that upon recognition of a foreign main proceeding, "unless the court orders otherwise, the foreign representative may operate the debtor's business and may exercise the rights and powers of a trustee under and to the extent provided by section[] 363." 11 U.S.C

§ 1520(a)(3); *see also In re Elpida Memory, Inc.*, 2012 Bankr. LEXIS 5367, at *18 (CSS) (Bankr. D. Del. Nov. 16, 2012) (holding that section 363 of the Bankruptcy Code applies to transfers of assets located within the United States outside of the ordinary course of business in connection with cases commenced under chapter 15 of the Bankruptcy Code); *In re Atrimm, S.r.L.*, 335 B.R. 149, 159 (Bankr. C.D. Cal. 2005) ("[U]nder chapter 15, § 363 (governing sale, use or lease of property of the estate) . . . appl[ies] to any transfer of an interest of the debtor in property within the territorial jurisdiction of the United States to the same extent that the sections would apply to property of a domestic bankruptcy estate.") (citing 11 U.S.C. § 1520(a)(2)).

42.    Section 363(b) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). To approve a sale under section 363(b)(1) of the Bankruptcy Code, the Third Circuit requires a debtor to show that the decision to sell the property outside of the ordinary course of business was based on a sound exercise of the debtor's business judgment and that there is a sound business purpose for the proposed transaction. *See, e.g., In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) ("Under Section 363, the debtor in possession can sell property of the estate . . . if he has an 'articulated business justification' . . . ."); *see also In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (same); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (requiring "some articulated business justification" to approve the use, sale or lease of property outside of the ordinary course of business). In determining whether a sale is a sound exercise of a debtor's business judgment, Delaware Bankruptcy Courts require that the sale satisfy four requirements: "(1) a sound business purpose exists for the sale; (2) the sale price is fair; (3) the debtor has provided adequate and reasonable notice; and (4) the purchaser has acted in good faith." *In re Decora Indus., Inc.*,

20

2002 WL 32332749, at *7−8 (D. Del. May 20, 2002) (citing *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 176 (D. Del. 1991)); *see also In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 150 (3d Cir. 1986); *In re Exaeris Inc.*, 380 B.R. 741, 744 (Bankr. D. Del. 2008); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); *In re Sovereign Estates, Ltd.*, 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989).

43.    In applying the sound business purpose test, a bankruptcy judge must not blindly follow the hue and cry of the most vocal special interest groups; rather, he should consider all salient factors pertaining to the proceeding and, accordingly, act to further the diverse interests of the debtor, creditors and equity holders, alike.  *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del 1999) (quoting *In re Lionel Corp.*, 722 F.2d at 1071).

44.    The business judgment rule shields a debtor's decision to sell assets other than in the ordinary course of business from judicial second-guessing.  *See, e.g*, *In re Bridgeport Holdings., Inc.*, 388 B.R. 548, 567 (Bankr. D. Del. 2008) (stating that directors enjoy a presumption of honesty and good faith with respect to negotiating and approving a transaction involving a sale of assets).  Accordingly, once a debtor articulates a valid business justification for the transaction, the law vests the debtor's decision to use the property outside of the ordinary course with a "presumption that in making the business decision the directors of [the] corporation acted on an informed basis, in good faith, and in the honest belief that the action was in the best interests of the company."  *In re S.N.A. Nut Co.*, 186 B.R. 98, 102 (Bankr. N.D. Ill 1995) (citations omitted); *In re Filene's Basement, LLC*, 2014 WL 1713416, at *12 (KJC) (Bankr. D. Del. Apr. 29, 2014) ("If a valid business justification exists, then a strong presumption follows that the agreement at issue was negotiated in good faith and is in the best interests of the estate.") (citations omitted); *In re Integrated Res.*, 147 B.R. 650,  656 (S.D.N.Y.

1992) (explaining that the business judgment rule applies to a debtor's decisions in bankruptcy and that thus "[c]ourts are loath to interfere with corporate decisions absent a showing of bad faith, self-interest, or gross negligence"); *In re Johns-Manville Corp.*, 60 B.R. 612, 615–16 (S.D.N.Y. 1986) (explaining that "a presumption of reasonableness attaches to a Debtor's management decisions" and courts generally will not entertain objections to the debtor's conduct after a reasonable basis is set forth).   Accordingly, if a debtor's actions satisfy the business judgment rule, then the transaction in question should be approved under section 363(b)(1) of the Bankruptcy Code.   *See In re Culp*, 550 B.R. at 697 ("If the bankruptcy trustee's decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale."); *see also In re Schipper*, 933 F.2d at 515 (same); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986); *Stephens Indus., Inc. v. McClung*, 789 F. 2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d at 1070; *In re Telesphere Commc's, Inc.*, 179 B.R. 544, 552 (Bankr. N.D. Ill. 1999); *In re Delaware & Hudson Railway Co.*, 124 B.R. at 176.   Based on these principles, the Foreign Representative submits that consummating the Spectacle Transaction is a sound exercise of the Debtors' business judgment.

45.    *First*, the "sound business reason" factor is similar to the 'business judgment rule,' which provides great deference to a debtor's determination of its own best interests.   *In re W.A. Mallory Co., Inc.,* 214 B.R. 834, 836 (Bankr. E.D. Va. 1997).   Additionally, a showing of a sound business purpose is determined on the facts and circumstances of each case and need not be unduly exhaustive, but rather, "simply required to justify the proposed disposition with sound business reasons."   *See In re Lionel Corp.,* 722 F.2d at 1071 (2d Cir. 1983); *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984).

46.    Here, the Debtors have concluded that, after expending significant efforts towards their restructuring over several months, the Spectacle Transaction would maximize the value of their estates for the benefit of their creditors and other parties in interest.    Indeed, such conclusion was reached after a months-long marketing process whereby the Debtors, in conjunction with their advisors, engaged with both strategic and financial parties who potentially were interested in participating in a sale.    Accordingly, the Debtors contend that they have presented a sound business reason justifying the sale of the Purchased Assets to the Buyer pursuant to the Spectacle Sale Agreement.

47.    *Second*, the Spectacle Sale Agreement is the result of an extensive marketing process undertaken by the Debtors and their advisors and the product of arm's-length, good-faith negotiations between the parties thereto.    As such, the Debtors contend that the Buyer is a "good faith" purchaser within the meaning of section 363(m) of the Bankruptcy Code.    Moreover, considering that (a) the Buyer is serving as a stalking horse whose bid was subject to higher or otherwise better offers and (b) the Canadian Court-approved SISP is crafted to ensure that the Purchased Assets are sold for the maximum potential price, the Foreign Representative submits that Spectacle Transaction has been proposed in good-faith.

48.    *Third*, the Foreign Representative intends to serve this Motion and, to the extent different than the proposed Approval and Vesting Order attached to the Order, the Approval and Vesting Order entered by the Canadian Court, upon the Core Notice Parties.    The Foreign Representative also intends to serve a notice of sale recognition hearing before this Court (the "Sale Recognition Hearing Notice"), substantially in the form attached hereto as **Exhibit B**, upon the Master Service List (as defined in the Scheduling Motion) which encompasses all of the Debtors' known and potential creditors located in the United States and other parties in interest.

The Foreign Representative will serve this Motion, the Approval and Vesting Order entered by the Canadian Court, as applicable, and the Sale Recognition Hearing Notice by electronic mail to the extent email addresses are available and otherwise by overnight United States mail or Canadian mail, as applicable, within three (3) business days following the filing of the Motion or entry of the Approval and Vesting Order, or as soon thereafter as is reasonably practicable.

49.    The Sale Recognition Hearing Notice will (a) notify parties on the Master Service List of the terms and conditions of the Spectacle Transaction, (b) set forth the time for filing objections thereto, (c) the date, time, and place to attend a hearing on this Motion, (d) notify parties on the Master Service List that copies of this Motion are available and may be examined (i) free of charge at the webpage maintained by the Foreign Representative's noticing agent, Omni Agent Solutions (the "Noticing Agent"), www.omniagentsolutions.com/cirquedusoleil or (ii) downloaded for a fee from the Court's electronic docket at www.deb.uscourts.gov.  As such, this Motion and the Sale Recognition Hearing Notice will provide "notice that is reasonably calculated, under the circumstances, to apprise an interested party of the pendency of an action." *In re Snug Enter., Inc.,* 169 B.R. 31, 33 (Bankr. E.D. Va. 1994) (*citing Mullane v. Central Hanover Bank & Trust Co.,* 339 U.S. 306, 314–15 (1950)).  This notice comes in addition to the notice provided in the Canadian Proceedings in connection with the filing of the AVO Application. Accordingly, the Foreign Representative submits that notice of the Spectacle Transaction and the hearings on approval thereof is sufficient and appropriate.

50.    *Fourth*, the Purchase Price provided in the Spectacle Sale Agreement is fair, reasonable, the result of an extensive marketing process and negotiations between the Debtors and their advisors and the Buyer and its advisors, and is the highest and best offer received to date.  Additionally, the fairness and reasonableness of the consideration to be received by the

Debtors from the Buyer, or any other potentially successful purchaser for that matter, will have been validated by a "market test" and a robust court-approved sale process—the most reliable means for establishing whether a purchase price is fair and reasonable.

51.    In sum, the business justifications for the Spectacle Transaction include, but are not limited to, the following:  (a) the Spectacle Sale Agreement constitutes the highest and best offer received for the Purchased Assets; (b) the Spectacle Sale Agreement presents the best opportunity to maximize the value of the Purchased Assets on a going concern basis and avoid decline and devaluation of the Purchased Assets; (c) unless the sale of the Purchased Assets and all of the other transactions contemplated by the Spectacle Sale Agreement and related agreements are concluded expeditiously, as provided for pursuant to the Spectacle Sale Agreement, recoveries to creditors may be diminished; and (d) the value received for the Purchased Assets will be maximized through the sale pursuant to the Spectacle Sale Agreement and related agreements.  The consideration provided by the Buyer for the Purchased Assets under the Spectacle Sale Agreement constitutes fair consideration and reasonably equivalent value for the Purchased Assets.

52.    Thus, for all of the foregoing reasons, the Debtors have determined that the sale of the Purchased Assets pursuant to the Spectacle Sale Agreement is in the best interests of their estates, creditors and other parties in interest, thereby satisfying the sound business purpose test and section 1520 of the Bankruptcy Code.

53.    Sections 1525 and 1527 of the Bankruptcy Code contemplate cooperation "to the maximum extent possible with the foreign court or a foreign representative," which includes, "coordination of the administration and supervision of the debtor's assets and affairs" and

"approval or implementation of agreements concerning the coordination of proceedings." 11 U.S.C. §§ 1525, 1527.

54.    Courts in this district routinely grant relief similar to that requested in this Motion. *See, e.g., In re Thane Int'l, Inc.*, No. 15-12186 (KG) (Bankr. D. Del. Dec. 1, 2015) (recognizing and enforcing a sale order entered by Canadian court and separately authorizing and approving the sale free and clear of any and all liens, claims, encumbrances and other interests under section 363 of the Bankruptcy Code and approving the assignment of assumed contracts); *Xchange Tech. Group LLC,* No. 13-12809 (KG) (Bankr. D. Del. Nov. 25, 2013) (same); *Arctic Glacier Int'l Inc.,* No. 12-10605 (KG) (Bankr. D. Del. July 17, 2012) (same); *In re EarthRenew IP Holdings LLC,* No. 10-13363 (CSS) (Bankr. D. Del. Feb. 18, 2011) (recognizing and enforcing sale order entered by Canadian court and separately authorizing and approving the sale free and clear of any and all liens, claims, encumbrances and other interests under section 363 of the Bankruptcy Code); *In re Grant Forest Prods.,* No. 10-11132 (PJW) (Bankr. D. Del. April 26, 2010) (same); *In re Destinator Techs. Inc.,* No. 08-11003 (CSS) (Bankr. D. Del. July 8, 2008) (same).

55.    Accordingly, the Foreign Representative respectfully requests that this Court recognize and give effect to Approval and Vesting Order, the Administrative Reserves Order, and approve the sale of the Purchased Assets.  To the extent the Approval and Vesting Order or Administrative Reserves Order entered by the Canadian Court is modified or otherwise deviates from the proposed forms attached to the Order, the Foreign Representative will file with the Court and serve such Approval and Vesting Order or Administrative Reserves Order, as applicable.

II.     **The Court Should Authorize and Approve the Sale of the Purchased Assets Free and Clear of Interests and Successor Liability Pursuant to Section 363(f) of the Bankruptcy Code.**

56.     Under section 363(f) of the Bankruptcy Code, a trustee or a debtor in possession may sell all or any part of a debtor's property free and clear of any and all liens, claims, encumbrances, and other interests in such property if:   (a) such a sale is permitted under applicable non-bankruptcy law; (b) the party asserting such a lien, claim or interest consents to such sale; (c) the interest is a lien and the purchase price for the property is greater than the aggregate amount of all liens on the property; (d) the interest is the subject of a bona fide dispute; or (e) the party asserting the lien, claim or interest could be compelled, in a legal or equitable proceeding, to accept a money satisfaction for such interest.  *See* 11 U.S.C. § 363(f); *In re P.K.R. Convalescent Ctrs., Inc.,* 189 B.R. 90, 93–94 (Bankr. E.D. Va. 1995) ("[Section] 363 covers more situations than just sales involving liens. . . .  Section 363(f) addresses sales free and clear of any interest . . . ."); *Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot),* 94  B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met).  In addition, a court may authorize the sale of a debtor's assets free and clear of any liens, claims or encumbrances under section 105 of the Bankruptcy Code.  *See Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.),* 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales [free and clear of liens] is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

57.     Section 363(f) is drafted in the disjunctive.  Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Purchased Assets free and clear of any and all liens, claims, encumbrances, and other interests.  *See In re Kellstrom Indus.,*

*Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("[I]f any of the five conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.").

58.     With respect to any creditors that may assert liens, claims, encumbrances, or other interests on the Purchased Assets, the Foreign Representative submits that at least one of the subsections of 363(f) of the Bankruptcy Code applies to such creditors and, in most cases, more than one of such subsections is satisfied.  Those holders of such liens, claims, encumbrances, or other interests who did not object, or who withdrew their objections, to the Motion and the sale of the Purchased Assets should be deemed, subject to the terms of the Order and the Approval and Vesting Order, to have consented to such Sale free and clear pursuant to 11 U.S.C. § 363(f)(2).  Accordingly, the Foreign Representative submits that the sale of the Purchased Assets free and clear of all interests, other than as provided in the Order and the Approval and Vesting Order, satisfies the statutory prerequisites of section 363(f) of the Bankruptcy Code.

59.     Additionally, a sale to the Buyer of the Purchased Assets free and clear of all liens, claims, encumbrances, and other interests (other than Permitted Encumbrances) is consistent with the best interest of the estates and their creditors.  A sale of the Purchased Assets other than one free and clear of all liens, claims, encumbrances, and other interests (other than Permitted Encumbrances), would yield substantially less value for the Debtors and their creditors than the sale of the Purchased Assets as contemplated under the Spectacle Sale Agreement. Therefore, a sale free and clear of all interests is in the best interests of the Debtors, their creditors, and other parties in interest, is consistent with the sale to be approved by the Approval and Vesting Order, and should be approved.

60.     Finally, it is well established that a bankruptcy court has the power under section 363(f) of the Bankruptcy Code to approve the sale of a debtor's assets free and clear of

successor liability claims against the debtor.  *In re TWA Airlines, Inc.*, 322  F.3d  283, 288–90 (3d Cir. 2003) (holding that successor liability claims are "interests in property" within the meaning of section 363(f) of the Bankruptcy Code); *United Mine Workers of Am. Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.),* 99 F.3d 573  (4th Cir. 1996) (same).  The Foreign Representative respectfully requests that this Court authorize the sale of the Purchased Assets to the Buyer free and clear of claims based upon successor liability.  In this way, the Buyer will obtain increased certainty concerning any claims associated with the Spectacle Sale Agreement in the United States as it will be assured that it will not be considered a successor.  The Foreign Representative submits that the relief requested herein is an appropriate exercise of this Court's authority under chapter 15 of the Bankruptcy Code and does not conflict with the Approval and Vesting Order.

III.    **The Court Should Afford the Buyer All Protections Under Sections 363(m) and (n) of the Bankruptcy Code as a Good Faith Purchaser.**

61.    The Foreign Representative also requests that the Buyer receive the protections set forth in sections 363(m) and (n) of the Bankruptcy Code.  Specifically, section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).  While the Bankruptcy Code does not define "good faith," courts have stated that "the phrase encompasses one who purchases in 'good faith' and for 'value.'"  *In re Abbots Dairies of Pa.*, 788 F.2d at 147.  Courts have held that in order to demonstrate a lack of

good faith, a party would have to show "fraud or collusion between the purchaser and [seller] or an attempt to take grossly unfair advantage [of other potential purchasers.]"  *Id.*

62.     As described in the Lefebvre Sale Declaration, the Spectacle Sale Agreement was negotiated without fraud or collusion, in good faith, and from an arm's-length bargaining position.   The Spectacle Sale Agreement is the result of an extensive marketing process undertaken by the Debtors and their advisors and the product of arm's-length, good-faith negotiations between the parties thereto.  Considering that (a) the Ad Hoc Group is serving as a stalking horse whose bid was subject to higher or otherwise better offers and (b) the Canadian Court-approved SISP is crafted to ensure that the Purchased Assets are sold for the maximum potential price, the Foreign Representative also submits that Spectacle Sale Agreement has been proposed in good-faith.  The Debtors also did not enter into the Spectacle Sale Agreement for the purpose of hindering, delaying, or defrauding present or future creditors of the Debtors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia.  To the Foreign Representative's knowledge, no party has engaged in any conduct that would cause or permit the Spectacle Sale Agreement to be set aside under section 363(n) of the Bankruptcy Code.

63.     Accordingly, the Foreign Representative seeks a finding that the Buyer is a good faith purchaser under section 363(m) of the Bankruptcy Code and has not violated section 363(n) of the Bankruptcy Code.

**IV.     This Court Should Recognize the Canadian Court's Authorization to Assign the Assigned Agreements to the Buyer**

64.     The Spectacle Sale Agreement provides for, and specifically requires as a condition precedent to the Spectacle Transaction, the assignment of the Debtors' rights, benefits, and interests in, to and under certain agreements (the "Assigned Agreements").  Likewise, the

proposed Approval and Vesting Order expressly provides that the rights and obligations of the Debtors under the Assigned Agreement are assigned to the Buyer, notwithstanding any anti-assignment provision contained therein.

65.    As set forth in further detail *supra,* it is an appropriate exercise of business judgment for the Debtors to assign the Assumed Contracts under the Spectacle Sale Agreement and pursuant to the Spectacle Sale Agreement.  Additionally, the Approval and Vesting Order contemplates that all monetary defaults, if any, of the applicable Debtors in relation so such Assigned Agreements should be cured within 30 days following the Effective Date or such other date as may be agreed to by the Buyer and the applicable counterparty.  Additionally, the Foreign Representative submits that the notice and protections for counterparties set forth in the Canadian orders and implemented in the Canadian Proceeding, including service of the of the Approval and Vesting Order on every Assigned Agreement counterparty, are adequate to protect the rights of counterparties to the contracts from and after the date of assignment and are consistent with the relief typically afforded to debtors and purchasers under sections 363 and 365 of the Bankruptcy Code.  Moreover, the Buyer has indicated that it is able and has agreed to assume and perform the obligations of the Debtors under the Assumed Contracts in accordance with their terms.  As such, the Foreign Representative respectfully submits that recognition and enforcement in the United States of the Approval and Vesting Order, specifically with regard to the assignment of the Assumed Agreements to the Buyer, does not present any public policy conflict or any issue concern protection of the interests of the parties to the Assumed Agreements that would prevent this Court from entering the Order.

## Waiver of Bankruptcy Rules 6004(h) and 6006(d)

66.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the

court orders otherwise." Fed. R. Bankr. P. 6004(h). Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Foreign Representative requests that the Proposed Order, once entered, be effective immediately by providing that, to the extent applicable, the 14-day stay under Bankruptcy Rules 6004(h) and 6006(d) is waived.

67.     The purpose of Bankruptcy Rule 6004(h) is to provide sufficient time for an objecting party to appeal before an order can be implemented. *See* Advisory Committee Notes to Fed. R. Bankr. P. 6004(h). Although Bankruptcy Rule 6004(h) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 14 day stay period, commentators have suggested that the 14 day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 Collier on Bankruptcy, ¶6004.11 (L. King, 16th rev. ed. 2011). Moreover, it has been suggested that if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. *Id.*

68.     Time is of the essence with respect to entry of a final Order. Accordingly, the Foreign Representative hereby requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

### Notice

69.     The Foreign Representative will provide notice of this Motion and, to the extent different than the Approval and Vesting Order, or Administrative Reserves Order, as applicable, attached to the Order, the Approval and Vesting Order, or Administrative Reserves Order, as applicable, entered by the Canadian Court, via overnight mail, facsimile or email (where

available) to the Core Notice Parties in accordance with the notice procedures set forth in the Scheduling Order.  Further, the Foreign Representative will service the Sale Recognition Hearing Notice upon the Master Service List by electronic mail to the extent email addresses are available and otherwise by overnight United States mail or Canadian mail, within three (3) business days following the filing of the Motion or entry of the Approval and Vesting Order, as applicable, or as soon thereafter as is reasonable practicable.  In light of the nature of the relief requested, the Foreign Representative requests that this Court find that no further notice is required.

## **No Prior Request**

70.    No prior request for the relief sought herein has been made to this or any other Court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE, the Foreign Representative respectfully requests entry of the Order, substantially in the form attached hereto as **Exhibit A** granting the relief requested herein and such other and further relief as may be just and proper.

| | |
|---|---|
| Dated: October 14, 2020<br>Wilmington, Delaware | */s/ Laura Davis Jones* |

Laura Davis Jones (DE Bar No. 2436)
Timothy P. Cairns (DE Bar No. 4228)
**PACHULSKI STANG ZIEHL & JONES LLP**
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware 19899-8705 (Courier 19801)
Telephone:    (302) 652-4100
Facsimile:    (302) 652-4400
Email:        ljones@pszjlaw.com
              tcairns@pszjlaw.com

-and-

Aparna Yenamandra  (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
601 Lexington Avenue
New York, New York 10022
Telephone:    (212) 446-4800
Facsimile:    (212) 446-4900
Email:        aparna.yenamandra@kirkland.com

-and-

Chad J. Husnick, P.C. (admitted *pro hac vice*)
**KIRKLAND & ELLIS LLP**
**KIRKLAND & ELLIS INTERNATIONAL LLP**
300 North LaSalle Street
Chicago, Illinois 60654
Telephone:    (312) 862-2000
Facsimile:    (312) 862-2200
Email:        chad.husnick@kirkland.com

*Counsel to the Foreign Representative*