## Exhibit A

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 15 |
|  | ) |  |
| CDS U.S. HOLDINGS, INC., *et al.*,[1] | ) | Case No. 20-11719 (CSS) |
|  | ) |  |
| Debtors. | ) | (Jointly Administered) |
|  | ) |  |

**ORDER GRANTING MOTION OF FOREIGN REPRESENTATIVE, PURSUANT TO SECTIONS 105(A), 363, 365, 1501, 1507, 1520, AND 1521 OF THE BANKRUPTCY CODE, AND BANKRUPTCY RULES 2002, 6004, 6006, AND 9014, FOR ENTRY OF AN ORDER (I) RECOGNIZING AND ENFORCING THE APPROVAL AND VESTING ORDER, (II) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, AND ENCUMBRANCES, (III) RECOGNIZING AND ENFORCING THE ADMINISTRATIVE RESERVES ORDER, AND (IV) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of Cirque du Soleil Canada Inc., in its capacity as the Foreign Representative of the Debtors in the Canadian Proceeding, requesting entry of an order (this "Order") pursuant to sections 105(a) 363, 365, 1501, 1507, 1520, and 1521 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), (a) recognizing and giving effect in the United States to the Approval and Vesting Order, attached hereto as **Exhibit 1**; (b) approving, under section 363 of the Bankruptcy Code, the sale of the Debtors' right, title, and interest in and to the Purchased

---

[1]    The last four digits of Debtor CDS U.S. Holdings, Inc.'s tax identification number are (0086). Due to the large number of debtor entities in these jointly administered chapter 15 cases, a complete list of the debtor entities and the last four digits of their federal tax identification numbers are not provided herein. A complete list of such information may be obtained on the website of the Debtors' noticing agent at www.omniagentsolutions.com/cirquedusoleil. The location of the Debtors' service address for purposes of these chapter 15 cases is: 8400, 2e Avenue Montréal, Quebec H1Z 4M6 Canada.

[2]    Capitalized terms used and not defined herein shall have the meaning ascribed to such terms in the Motion.

Assets to the Buyer, free and clear of all liens, claims, encumbrances, and other interests (other than the Permitted Encumbrances); (c) recognizing and giving effect in the United States to the Administrative Reserves Order, attached hereto as **Exhibit 2**; and (d) granting related relief; and upon the Lefebvre Declaration, the Martel Declaration, and the Lefebvre Sale Declaration; and the Court having jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334; and consideration of the Motion and the relief requested being a core proceeding pursuant to 28 U.S.C. § 157(b); and it appearing that due and proper notice of the Motion has been provided and no other or further notice need be provided; and a hearing (the "Hearing") having been held to consider the relief requested in the Motion; and upon the record of the Hearing and all of the proceedings had before the Court; and the Court having found and determined that the relief sought in the Motion is consistent with the purpose of chapter 15 of the Bankruptcy Code and that the legal and factual bases set forth in the Motion establish just cause for the relief granted herein; and after due deliberation and sufficient cause appearing therefore, IT IS HEREBY FOUND AND DETERMINED THAT:[3]

A.    This Court has jurisdiction and authority to hear and determine the Motion pursuant to 28 U.S.C. §§ 1334 and 157(b).  Venue of these chapter 15 cases and the Motion in this Court and this District is proper under 28 U.S.C. § 1410.

B.    Based on the affidavits of service filed with, and the representations made to, this Court:  (i) notice of the Motion, the Hearing, and the Approval and Vesting Order was proper, timely, adequate, and sufficient under the circumstances of these chapter 15 cases and these proceedings and complied with the various applicable requirements of the Bankruptcy Code, the

---

[3]    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052 made applicable to this proceeding pursuant to Bankruptcy Rule 9014.  To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

Bankruptcy Rules, and the Local Rules; and (ii) no other or further notice of the Motion, the Hearing, the Approval and Vesting Order, or the entry of this Order is necessary or shall be required.

C.    This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).

D.    The relief granted herein is necessary and appropriate, is in the interest of the public, promotes international comity, is consistent with the public policies of the United States, is warranted pursuant to sections 105(a), 363(b), (f), (m) and (n), 365, 1501, 1507, 1520, and 1521 of the Bankruptcy Code, and will not cause any hardship to any parties in interest that is not outweighed by the benefits of the relief granted.

E.    Based on information contained in the Motion, the Lefebvre Declaration, the Martel Declaration, the Lefebvre Sale Declaration, and the record made at the Hearing, the Debtors' advisors conducted a marketing and sale process to solicit interest in the Purchased Assets and such process was non-collusive, duly noticed, and provided a reasonable opportunity to make an offer to purchase the Purchased Assets.    The Foreign Representative has recommended the sale of the Purchased Assets in accordance with the Spectacle Sale Agreement, and it is appropriate that the Purchased Assets be sold, transferred, assigned, and vested in the Buyer on the terms and subject to the conditions set forth in the Spectacle Sale Agreement.

F.    Based on information contained in the Motion, the Lefebvre Declaration, the Martel Declaration, and the Lefebvre Sale Declaration, and the record made at the Hearing, the relief granted herein relates to assets that, under the laws of the United States, should be administered in the Canadian Proceeding.

G.      The Debtors' entry into and performance under the Spectacle Sale Agreement and related agreements (i) constitute a sound and reasonable exercise of the Debtors' business judgment, (ii) provide value and are beneficial to the Debtors, and are in the best interests of the Debtors, their estates, and their stakeholders, and (iii) are reasonable and appropriate under the circumstances.  Business justifications for the sale of the Purchased Assets include, but are not limited to, the following: (a) the Spectacle Sale Agreement constitutes the highest and otherwise best offer received for the Purchased Assets; (b) the Spectacle Sale Agreement presents the best opportunity to maximize the value of the Purchased Assets on a going concern basis and avoid devaluation of the Purchased Assets; (c) unless the sale of the Purchased Assets pursuant to the Spectacle Sale Agreement and all of the other transactions contemplated by the Spectacle Sale Agreement and related agreements are concluded expeditiously, as provided for in the Spectacle Sale Agreement, recoveries to the Debtors' creditors may be diminished; and (d) the value received for the Purchased Assets will be maximized through the transactions under the Spectacle Sale Agreement and related agreements.  The consideration provided by the Buyer for the Purchased Assets under the Spectacle Sale Agreement constitutes fair consideration and reasonably equivalent value for the Purchased Assets under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and other laws of the United States, any state, territory, possession thereof, or the District of Columbia.

H.      The Buyer is not, and shall not be deemed to be, a mere continuation, and is not holding itself out as a mere continuation, of any of the Debtors and there is no continuity between the Buyer and the Debtors.  The Spectacle Transaction does not amount to a consolidation, merger, or *de facto* merger of the Buyer and any of the Debtors.

I.       Time is of the essence in consummating the Sale.  To maximize the value of the Purchased Assets, it is essential that the Spectacle Transaction occur and be recognized and enforced in the United States promptly.  The Foreign Representative on behalf of the Debtors has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale as contemplated by the Spectacle Sale Agreement.  Accordingly, there is cause to waive the stay that would otherwise be applicable under Bankruptcy Rules 6004(h) and 6006(d), and accordingly the transactions contemplated by the Spectacle Sale Agreement and related agreements can be closed as soon as reasonably practicable upon entry of the Approval and Vesting Order and this Order.

J.       Based upon information contained in the Motion, the Lefebvre Declaration, the Martel Declaration, the Lefebvre Sale Declaration, the other pleadings filed in these chapter 15 cases, and the record made at the Hearing, the Spectacle Sale Agreement and each of the transactions contemplated therein were negotiated, proposed and entered into by the Debtors and the Buyer in good faith, without collusion and from arms'-length bargaining positions.  The Buyer is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby.  Neither the Debtors, the Foreign Representative, nor the Buyer has engaged in any conduct that would cause or permit the Spectacle Sale Agreement or the consummation of the Sale to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code.  The Buyer is not an "insider" of any of the Debtors, as that term is defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stockholders exists between the Buyer and the Debtors.

K.      The Spectacle Sale Agreement was not entered into for the purpose of hindering, delaying, or defrauding any present or future creditors of the Debtors.

L.      The Spectacle Sale Agreement requires the assignment of the Assigned Agreements to the Buyer, which assignment is expressly approved by the Approval and Vesting Order.  Such assignments by order of the Canadian Court require that all monetary defaults by the applicable Debtors under such Assigned Agreements be remedied by payment of cure costs (if any).  As such, enforcement in the United States of the assignment of the Assigned Agreements to the Buyer does not present any public policy conflict or any issue concerning protection of the interests of the non-Debtor parties to the Assigned Agreements that would prevent this Court from entering this Order.

M.      The Foreign Representative, on behalf of itself and the Debtors, may sell the Purchased Assets free and clear of all liens, claims (as defined in section 101(5) of the Bankruptcy Code), rights, liabilities, encumbrances and other interests of any kind or nature whatsoever against the Debtors or the Purchased Assets, including, without limitation, security interests (whether contractual, statutory, or otherwise), hypothecs, mortgages, pledges, options, warrants, trusts or deemed trusts (whether contractual, statutory, or otherwise), obligations, liabilities, demands, guarantees, restrictions, contractual commitments, rights, including without limitation, rights of first refusal and rights of set-off, liens, executions, levies, penalties, charges, financial or monetary claims, adverse claims, or rights of use, puts or forced sale provisions exercisable as a consequence of or arising from the closing of the sale of the Purchased Assets, whether arising prior to or subsequent to the commencement of the Canadian Proceeding and these chapter 15 cases, whether or not they have attached or been perfected, registered or filed and whether secured, unsecured, legal, equitable, possessory or otherwise, actual or threatened

civil, criminal, administrative, regulatory, arbitral or investigative inquiry, action, complaint, suit, investigation, dispute, petition or proceeding by or before any governmental authority or Person at law or in equity, whether imposed by agreement, understanding, law, equity or otherwise, and any claim or demand resulting therefrom (collectively, the "Encumbrances"), other than the Permitted Encumbrances, because with respect to each creditor asserting any Encumbrance, one or more of the standards set forth in section 363(f)(l)–(5) of the Bankruptcy Code has been satisfied.  Each creditor that did not object to the Motion is deemed to have consented to the sale of the Purchased Assets free and clear of all Encumbrances pursuant to section 363(f)(2) of the Bankruptcy Code.

N.    The total consideration to be provided under the Spectacle Sale Agreement reflects the Buyer's reliance on this Order to provide it, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, with title to and possession of the Purchased Assets free and clear of all Encumbrances, other than the Permitted Encumbrances.

O.    The transfer of the Debtors' rights under the Assigned Agreements as and to the extent provided in the Approval and Vesting Order is integral to the Spectacle Sale Agreement, is in the best interests of the Debtors and their estates, and represents the reasonable exercise of the Debtors' business judgment.

P.    As of the filing of the Monitor's Certificate in the Canadian Proceeding and the delivery thereof to the Buyer, the transfer of the Purchased Assets to the Buyer will be a legal, valid and effective transfer of the Purchased Assets, and will vest the Buyer with all right, title and interest of the Debtors in and to the Purchased Assets, free and clear of all Encumbrances, other than the Permitted Encumbrances.

Q.    The Foreign Representative and the Debtors (i) have full power and authority to execute the Spectacle Sale Agreement and all other documents contemplated thereby, (ii) have all the power and authority necessary to consummate the transactions contemplated by the Spectacle Sale Agreement, and (iii) upon entry of this Order, other than any consents identified in the Spectacle Sale Agreement (including with respect to antitrust matters, if any), need no consent or approval from any other Person or governmental unit to consummate the Spectacle Transaction.  The Debtors are the sole and rightful owners of the Purchased Assets, no other Person has any ownership right, title, or interest therein, and the Sale has been duly and validly authorized by all necessary corporate action of the Debtors.

R.    The Spectacle Sale Agreement is a valid and binding contract between the Debtors and the Buyer and shall be enforceable pursuant to its terms.  The Spectacle Sale Agreement, the Spectacle Transaction, and the consummation thereof shall be specifically enforceable against and binding upon (without posting any bond) the Debtors and the Foreign Representative in these chapter 15 cases and any trustee that may be appointed in any chapter 7 or chapter 11 successor cases, and shall not be subject to rejection or avoidance by the foregoing parties or any other Person.

S.    The Buyer would not have entered into the Spectacle Sale Agreement and would not consummate the purchase of the Purchased Assets and the related transactions, thus adversely affecting the Debtors, their estates, and their creditors, and other parties in interest, if the sale of the Purchased Assets to the Buyer was not free and clear of all Encumbrances (other than Permitted Encumbrances), or if the Buyer would, or in the future could, be liable on account of any such Encumbrances, including, as applicable, certain liabilities related to the Purchased Assets that will not be assumed by the Buyer, as described in the Spectacle Sale Agreement.

T.      A sale of the Purchased Assets other than free and clear of all Encumbrances (other than Permitted Encumbrances) would yield substantially less value than the sale of the Purchased Assets pursuant to the Spectacle Sale Agreement; thus, the sale of the Purchased Assets free and clear of all Encumbrances, in addition to all of the relief provided herein, is in the best interests of the Debtors, their creditors, and other parties in interest.

U.      The interests of the Debtors' creditors in the United States are sufficiently protected.  The relief granted herein is necessary and appropriate, in the interests of the public and international comity, consistent with the public policies of the United States, and warranted pursuant to section 1521(b) of the Bankruptcy Code.

V.      The legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein.

W.      Any and all findings of fact and conclusions of law announced by this Court at the Hearing are incorporated herein.

IT IS HEREBY ORDERED THAT:

1.      The Motion is granted in its entirety.

2.      The Court recognizes the Approval and Vesting Order, attached hereto as **Exhibit 1**, which is hereby given full force and effect in the United States in its entirety.

3.      The Court recognizes the Administrative Reserves Order, attached hereto as **Exhibit 2**, which is hereby given full force and effect in the United States in its entirety.

4.      The Spectacle Sale Agreement and the Spectacle Transaction contemplated thereunder, including, for the avoidance of doubt, the sale of the Purchased Assets and the transfers and assignments of the Purchased Assets located within the United States on the terms set forth in the Spectacle Sale Agreement, the Approval and Vesting Order, this Order, the

consummation of all transactions contemplated therein and all of the terms and conditions thereof are hereby approved and authorized pursuant to sections 105, 363, 365, 1501, 1520 and 1521 of the Bankruptcy Code.  The failure specifically to include any particular provision of the Spectacle Sale Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Spectacle Sale Agreement be authorized and approved in its entirety.

5.      All objections to the entry of this Order that have not been withdrawn, waived, or settled, or otherwise resolved pursuant to the terms hereof, are denied and overruled on the merits, with prejudice.

6.      Pursuant to sections 105, 363, 365, 1501, 1520, and 1521 of the Bankruptcy Code, the Approval and Vesting Order, and this Order, the Debtors, the Buyer and the Foreign Representative (as well as their respective officers, employees and agents) are authorized to take any and all actions necessary or appropriate to:   (a) consummate the Spectacle Transaction, including the sale of the Purchased Assets to the Buyer, in accordance with the Spectacle Sale Agreement, the Approval and Vesting Order, and this Order; and (b) perform, consummate, implement and close fully the Spectacle Sale Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Spectacle Sale Agreement and the Spectacle Transaction and to take such additional steps and all further actions as may be necessary or appropriate to the performance of the obligations contemplated by the Spectacle Sale Agreement, all without further order of the Court, and are hereby authorized and empowered to cause to be executed and filed such statements, instruments, releases and other documents on behalf of such Person or entity with respect to the Purchased Assets that are necessary or appropriate to effectuate the Sale, any related agreements, the Approval and Vesting

Order and this Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtors or the Buyer may determine are necessary or appropriate, and are hereby authorized and empowered to cause to be filed, registered or otherwise recorded a certified copy of the Approval and Vesting Order, this Order or the Spectacle Sale Agreement, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Encumbrances against the Purchased Assets. The Approval and Vesting Order and this Order are deemed to be in recordable form sufficient to be placed in the filing or recording system of each and every federal, state, or local government agency, department or office.

7.      All Persons that are currently in possession of some or all of the Purchased Assets located in the United States or that are otherwise subject to the jurisdiction of this Court are hereby directed to surrender possession of such Purchased Assets to the Buyer on the Closing Date.

## Treatment of Executory Contracts and Unexpired Leases

8.      Pursuant to, and to the extent allowed by, the Approval and Vesting Order, on the Effective Date, the rights and obligations of the Debtors under the Assigned Agreements shall be, notwithstanding any provision contained in any such Assigned Agreement that prohibits, restricts, or conditions assignment or transfer thereof or requires consent of any party to such assignment or transfer (each, an "Anti-Assignment Provision"), assigned to the Buyer or any Affiliate or designee thereof and shall remain in full force and effect for the benefit of the Buyer or such Affiliate or designee in accordance with their respective terms.

9.       Each non-Debtor counterparty to the Assigned Agreements is prohibited from exercising any right or remedy under the Assigned Agreements by reason of any non-monetary defaults or defaults or events of default arising as a result of the insolvency of any Debtor or the cessation of the Debtors' or their Affiliates' normal course business operations, (b) the insolvency of any Debtor or the fact that the Debtors sought or obtained relief under the CCAA or under the Bankruptcy Code, (c) any releases, discharges, cancellations, transactions or other steps taken or effected pursuant to the Spectacle Sale Agreement, the Spectacle Transaction (including the pre-Closing reorganization of the Debtors), the provisions of this Order or any other Order of the Court in these chapter 15 cases, or (d) any change of control of the Debtors or their Affiliates arising from the implementation of the Spectacle Transaction, or any Anti-Assignment Provision in an Assigned Agreement.

10.      This Court shall retain jurisdiction to enforce any and all terms and provisions of the Spectacle Sale Agreement, the Approval and Vesting Order, and this Order with respect to the Assigned Agreements in the United States.

## Releases

11.      The releases set forth in paragraph 51 of the Approval and Vesting Order (the "Releases") are expressly recognized by this Court and given full force and effect in the United States.  This Court shall retain jurisdiction to enforce any and all terms and provisions of the Spectacle Sale Agreement, the Approval and Vesting Order, and this Order with respect to the Releases in the United States.

## Transfer of the Purchased Assets Free and Clear

12.      Pursuant to sections 105(a), 363, 365, 1501, 1520 and 1521 of the Bankruptcy Code, on the Closing Date, all rights, title, and interest of the Debtors in the Purchased Assets

shall be transferred and absolutely vest in the Buyer, without further instrument of transfer or assignment, and such transfer shall: (a) be a legal, valid, binding and effective transfer of the Purchased Assets to the Buyer; (b) vest the Buyer with all right, title and interest of the Debtors in the Purchased Assets, and (c) be free and clear of all Encumbrances, other than the Permitted Encumbrances.

13.     Pursuant to sections 105(a), 363(f), 365, 1501, 1520 and 1521 of the Bankruptcy Code, upon the closing of the Spectacle Transaction: (a) no holder of an Encumbrance shall interfere, and each and every holder of an Encumbrance is enjoined from interfering, with the Buyer's rights and title to or use and enjoyment of the Purchased Assets; and (b) the sale of the Purchased Assets, the Spectacle Sale Agreement, and any instruments contemplated thereby shall be enforceable against and binding upon, and not subject to rejection or avoidance by, the Debtors or any successor thereof.  All Persons holding an Encumbrance are forever barred and enjoined from asserting such Encumbrance against the Purchased Assets, the Buyer or its Affiliates and their respective officers, directors, employees, managers, partners, members, financial advisors, attorneys, agents, and representatives and their respective Affiliates, successors and assigns from and after closing of the Spectacle Transaction.

14.     Each and every federal, state, and local governmental agency or department is authorized and directed to accept (and not impose any fee, charge, or tax in connection therewith) any and all documents and instruments necessary or appropriate to consummate the sale of the Purchased Assets to the Buyer and the Spectacle Transaction generally.  Effective as of the Closing Date, the Approval and Vesting Order and this Order shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Debtors'

interests in the Purchased Assets to the Buyer free and clear of all Encumbrances, other than the Permitted Encumbrances.

15.    This Order (a) shall be effective as a determination that, as of the Closing Date, all Encumbrances, other than the Permitted Encumbrances, have been unconditionally released, discharged and terminated as to the Buyer and the Purchased Assets, and that the conveyances and transfers described herein have been effected, and (b) is and shall be binding upon and govern the acts of all Persons, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials and all other Persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing Persons is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Spectacle Sale Agreement and effect the discharge of all Encumbrances other than the Permitted Encumbrances pursuant to this Order and the Approval and Vesting Order and not impose any fee, charge, or tax in connection therewith.

16.    The Buyer is not and shall not be deemed to:  (a) be a legal successor, or otherwise be deemed a successor to any of the Debtors; (b) have, de facto or otherwise, merged with or into any or all Debtors; or (c) be a mere continuation or substantial continuation of any or all Debtors or the enterprise or operations of any or all Debtors.

17.    The Spectacle Transaction, including the purchase of the Purchased Assets, is undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy

Code, and accordingly, the reversal or modification on appeal of the authorizations provided herein shall neither affect the validity of the Spectacle Transaction nor the transfer of the Purchased Assets, including the Assigned Agreements, to the Buyer free and clear of all Encumbrances, unless such authorization is duly stayed before the closing of the Spectacle Transaction pending such appeal.

18.     Neither the Debtors nor the Buyer has engaged in any conduct that would cause or permit the Spectacle Sale Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code.

19.     Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Bankruptcy Rules or Local Rules, this Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the fourteen (14) day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply.  The Debtors, the Buyer, and the Foreign Representative are not subject to any stay in the implementation, enforcement or realization of the relief granted in this Order.  For the avoidance of doubt, the Debtors, the Buyer, and the Foreign Representative may, in their discretion and without further delay, take any action and perform any act authorized under the Approval and Vesting Order or this Order.

20.     The terms and provisions of the Spectacle Sale Agreement, the Approval and Vesting Order, and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors, the Buyer, the Foreign Representative, the Debtors' creditors, and all other parties in interest, and any successors of the Debtors, the Buyer, the Foreign Representative, and the Debtors' creditors, including any foreign representative(s) of the Debtors, trustee(s), examiner(s) or receiver(s) appointed in any proceeding, including without limitation any

proceeding under any chapter of the Bankruptcy Code, the CCAA, or any other law, and all such terms and provisions shall likewise be binding on such foreign representative(s), trustee(s), examiner(s), or receiver(s) and shall not be subject to rejection or avoidance by the Debtors, their creditors, or any trustee(s), examiner(s) or receiver(s).

21.    Subject to the terms and conditions of the Approval and Vesting Order, the Spectacle Sale Agreement and any related agreements, documents or other instruments, may be modified, amended or supplemented by the parties thereto, in a writing signed by each party, and in accordance with the terms thereof, without further order of the Court; *provided* that any such modification, amendment, or supplement does not materially change the terms of the Spectacle Transaction, the Spectacle Sale Agreement or any related agreements, documents or other instruments and is otherwise in accordance with the terms of the Approval and Vesting Order.

22.    The provisions of this Order and the Spectacle Sale Agreement are non-severable and mutually dependent.  To the extent that there are any inconsistencies between the terms of this Order and the Approval and Vesting Order, on the one hand, and the Spectacle Sale Agreement, on the other, this Order and the Approval and Vesting Order shall govern.

23.    Nothing in this Order shall be deemed to waive, release, extinguish or estop the Debtors or the Foreign Representative from asserting, or otherwise impair or diminish, any right (including, without limitation, any right of recoupment), claim, cause of action, defense, offset or counterclaim in respect of any asset that is not a Purchased Asset.

24.    Upon the addition of ExcludedCo1 and ExcludedCo2 as applicants in the Canadian Proceeding pursuant to the Approval and Vesting Order and as Debtors in these chapter 15 cases, (a) any and all relief granted by and findings of this Court with respect to the Debtors since the Petition Date shall apply to ExcludedCo1 and ExcludedCo2 to the same extent

as such relief and findings apply to the Debtors and (b) any reference in any order of this Court to a "Debtor" shall be deemed to include a reference to ExcludedCo1 and ExcludedCo2, *mutatis mutandis*.

25.    The Non-Acquired Debtors shall be deemed to be dissolved without any further action pursuant to and subject to the terms of the Approval and Vesting Order.

26.    This Court shall retain jurisdiction with respect to any and all matters, claims, rights, or disputes arising from or related to the implementation or interpretation of this Order or the Approval and Vesting Order in the United States, including without limitation, (i) the interpretation, enforcement, and implementation of the terms and conditions the Spectacle Sale Agreement, all amendments thereto, any waivers and consents thereunder (and of each of the agreements executed in connection therewith), (ii) the adjudication of disputes related to the Spectacle Sale Agreement and the assignment of the Assigned Agreements (and any related agreements, documents or other instruments), and (iii) the enforcement of the injunctions and Releases contained herein and in the Approval and Vesting Order in the United States.

Dated: _____, 2020              _____
         Wilmington, Delaware                    United States Bankruptcy Judge

**<u>Exhibit 1</u>**

**Approval and Vesting Order**

**SUPERIOR COURT**
(Commercial Division)

CANADA
PROVINCE OF QUEBEC
DISTRICT OF MONTREAL

N°:         500-11-058415-205

DATE:       October 20, 2020

---

 **BEFORE THE HONOURABLE LOUIS J. GOUIN J.S.C.**

---

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED:

**CIRQUE DU SOLEIL CANADA INC.**

-and-

**9424-9356 QUEBEC INC.**

-and-

**9424-9398 QUEBEC INC.**

-and-

**THE OTHER APPLICANTS LISTED IN SCHEDULE "A" HEREOF**

        Applicants

-and-

**THE LAND REGISTRAR FOR THE LAND REGISTRY OFFICE FOR THE REGISTRATION DIVISION OF MONTREAL (Québec) / THE REGISTRAR OF THE REGISTER OF PERSONAL AND MOVABLE REAL RIGHTS (Québec)**

        Mis-en-Cause

-and-

**ERNST & YOUNG INC.**

        Monitor

- 2 -

## APPROVAL AND VESTING ORDER

[1]     **ON READING** the *Application for the Issuance of An Approval and Vesting Order, An Order Approving the Establishment of an Employee Fund, an Order Approving the Establishment of a Contractor Fund and An Order Approving the Establishment of Administrative Reserves* (the "**Application**"), the affidavit and the exhibits in support thereof, as well as the Fifth Report of the Monitor dated October **[●]**, 2020 (the "**Report**");

[2]     **SEEING** the service of the Application;

[3]     **SEEING** the submissions of the Applicants' attorneys and those other parties' present at the hearing on the Application, including the attorneys to the *ad hoc* committee of certain First Lien Lenders and Second Lien Lenders (the "**Ad Hoc Committee**");

[4]     **SEEING** that it is appropriate to issue an order approving the transactions (collectively, including the Reorganization Step Plan and the Pre-Closing Reorganization, the "**Transaction**") contemplated by the agreement entitled Asset Purchase Agreement made July 15, 2020, as amended by an Amending Agreement to Asset Purchase Agreement dated October 9, 2020 (as may be further amended in accordance with its terms and the terms hereof, the "**Purchase Agreement**") by and between Cirque du Soleil Holdings L.P. (the "**Seller**"), as vendor, and Spectacle Bidco L.P., as purchaser (the "**Initial Buyer**"), as assigned by the Initial Buyer to Spectacle BidCo Holdings Inc. ("**Buyer**"), copies of which are attached as **Schedule "B"** to this Order and granting the relief specified herein in connection with the Transaction.

**WHEREFORE, THE COURT:**

[5]     **GRANTS** the Application; and

[6]     **ORDERS** that: (i) unless otherwise indicated or defined herein, capitalized terms used in this Order shall have the meanings given to them in the Purchase Agreement (including, as applicable, the Reorganization Step Plan); (ii) references to "Buyer" herein shall be deemed to include any assignee of the Buyer or Designated Buyer designated in accordance with the Purchase Agreement; (iii) the words "including", "includes" and "include" and any derivatives of such words mean "including (or includes or include) without limitation"; (iv) "**Debtors**" shall mean, collectively, the Applicants and Limited Partnerships listed on **Schedule "A"** hereto and from and after the Effective Date shall include 9424-9356 Quebec Inc. ("**ExcludedCo1**") and 9424-9398 Quebec Inc. ("**ExcludedCo2**"); (v) "**Acquired Debtors**" shall mean the Debtors specified on **Schedule "A"** under such heading; (vi) "**Non-Acquired Debtors**" shall mean all of the Debtors (but excluding, for the avoidance of doubt, ExcludedCo1 and ExcludedCo2) that are not Acquired Debtors; and (vii) "**Satisfied Debt**" means, collectively, the First Lien Debt, the Second Lien Debt, the CDS 4 Term Loan, the BMG Debt, the IP Note and the Intercompany Trade Debt (excluding the Intercompany Trade Debt that is transferred to ExcludedCo2 in accordance with the Reorganization Step Plan).

- 3 -

## SERVICE

[7]     **ORDERS** that any prior delay for the presentation of the Application is hereby abridged and validated so that the Application is properly returnable today and hereby dispenses with further service thereof.

[8]     **PERMITS** service of this Order at any time and place and by any means whatsoever.

## EXTENSION OF THE STAY PERIOD

[9]     **ORDERS** that the Stay Period, as defined in the Application, is hereby extended on an indefinite basis, subject to further order of this Court.

## TRANSACTION APPROVAL

[10]    **ORDERS AND DECLARES** that the Transaction is hereby approved, and the execution of the Purchase Agreement by the Seller is hereby authorized and approved *nunc pro tunc*, with such minor alterations, changes, amendments, deletions or additions thereto as may be agreed to by the Seller and the Buyer with the consent of the Monitor.

[11]    **ORDERS AND DECLARES** that, notwithstanding any provision hereof, the steps pertaining to the Closing of the Transaction (including the Pre-Closing Reorganization and related refinancing of the Business), including all those steps described as occurring on the Effective Date herein, shall be deemed to occur in the manner, order and sequence specified in the Reorganization Step Plan attached hereto as **Schedule "C"** with such minor alterations, changes, amendments, deletions or additions thereto as may be agreed to by the Seller and the Buyer with the consent of the Monitor, and that the Monitor shall post any such amended Reorganization Step Plan on the Monitor's website forthwith following agreement in respect of same.

## EXECUTION OF DOCUMENTATION

[12]    **AUTHORIZES** each of the Debtors, the Buyer and the Monitor, as the case may be, to perform all acts, sign all documents and take any necessary action to execute any agreement, contract, deed, provision, transaction or undertaking stipulated in the Purchase Agreement and any other ancillary document which could be required or useful to give full and complete effect thereto, including the Transaction.

## AUTHORIZATION

[13]    **ORDERS AND DECLARES** that this Order shall constitute the only authorization required by the Debtors to proceed with the Transaction, notwithstanding any requirement under applicable law to obtain director, shareholder (or other Equity Interest holder), partner, member or other approval with respect to such Transaction or to deliver any statutory declarations that may otherwise be required under corporate, partnership or other law, and, for greater certainty, no shareholder (or other Equity Interest holder) or regulatory approval, if applicable, shall be required in connection therewith.

**PRE-CLOSING REORGANIZATION APPROVAL**

[14]   **AUTHORIZES** the Debtors to implement and complete the Pre-Closing Reorganization in the manner, order and sequence specified in the Reorganization Step Plan with such minor alterations, changes, amendments, deletions or additions thereto as may be agreed to by the Seller and the Buyer with the consent of the Monitor.

[15]   **AUTHORIZES** the Debtors in completing the transactions contemplated in the Pre-Closing Reorganization:

   (a)   to execute and deliver any documents and assurances governing or giving effect to the Pre-Closing Reorganization as the Debtors, in their discretion in consultation with the Buyer, may deem to be reasonably necessary or advisable to conclude the Pre-Closing Reorganization, including the execution of such deeds, contracts or documents, as may be contemplated in the Purchase Agreement and all such deeds, contracts or documents are hereby ratified, approved and confirmed; and

   (b)   to take such steps as are, in the opinion of the Debtors in consultation with the Buyer, necessary or incidental to the implementation of the Pre-Closing Reorganization.

[16]   **ORDERS AND DECLARES** that the Debtors are hereby permitted to execute and file articles of amendment, amalgamation, continuance or reorganization or such other documents or instruments as may be required to permit or enable and effect the Pre-Closing Reorganization and that such articles, documents or other instruments shall be deemed to be duly authorized, valid and effective notwithstanding any requirement under applicable law to obtain director, shareholder (or other Equity Interest holder), partner, member or other approval with respect to such actions or to deliver any statutory declarations that may otherwise be required under corporate, partnership or other law to effect the Pre-Closing Reorganization.

[17]   **ORDERS AND DECLARES** that this Order shall constitute the only authorization required by the Debtors to proceed with the Pre-Closing Reorganization and that no director, shareholder (or other Equity Interest holder), partner, member or regulatory approval shall be required in connection with any of the steps contemplated pursuant to the Pre-Closing Reorganization save for those contemplated in the Purchase Agreement.

[18]   **ORDERS** the Quebec enterprise registrar and any other applicable administrator of a corporate, partnership or other registry in respect of any of the Debtors to accept and receive any articles of amendment, amalgamation, continuance, reorganization, incorporation, winding-up and dissolution or such other documents or instruments as may be required and filed by any of the Debtors to permit or enable and effect the Pre-Closing Reorganization contemplated in the Purchase Agreement.

**VESTING OF EXCLUDED ASSETS AND EXCLUDED LIABILITIES IN EXCLUDEDCOS AND RELATED RELIEF**

[19]    **ORDERS AND DECLARES** that on the date of the issuance of a Monitor's certificate substantially in the form appended as **Schedule "D"** hereto (the "**Certificate**") to the Buyer (the date of the issuance of such Certificate to the Buyer, the "**Effective Date**"):

(a)    all right, title and interest of the Acquired Debtors in the Excluded Assets shall vest absolutely and exclusively in ExcludedCo1 and all Encumbrances (as defined below) that were attached to the Excluded Assets immediately prior to the transfer of the Excluded Assets to ExcludedCo1(excluding Encumbrances securing the Satisfied Debt, which shall be satisfied as part of the Transaction as contemplated in the Reorganization Step Plan) shall continue to attach to such Excluded Assets with the same nature and priority as they had immediately prior to the transfer of the Excluded Assets;

(b)    all Excluded Contracts of the Acquired Debtors, including any contract, agreement or plan giving rise to any right in connection with any shares or units of any of the Acquired Debtors or any payment in lieu thereof (which, for greater certainty, includes any employee unit appreciation right plan or any commission plan) as well any agreement related thereto (other than any agreement under which amounts are payable to any of the Acquired Debtors), shall be transferred to, assumed by and vest absolutely and exclusively in ExcludedCo1 and all Encumbrances that were attached to the Excluded Contracts immediately prior to the transfer of the Excluded Contracts to ExcludedCo1 (excluding Encumbrances securing the Satisfied Debt, which shall be satisfied as part of the Transaction as contemplated in the Reorganization Step Plan) shall continue to attach to the Excluded Contracts with the same nature and priority as they had immediately prior to the transfer of the Excluded Contracts;

(c)    all Excluded Liabilities of the Acquired Debtors, including any liability (i) under any contract, agreement or plan giving rise to any right in connection with any shares or units of any of the Debtors (which, for greater certainty, includes any employee unit appreciation right plan or any commission plan) as well any payment in lieu thereof or any agreement related thereto; (ii) under the *Act Respecting Industrial Accidents and Occupational Diseases* toward any former employees of the Acquired Debtors; and (iii) under or in connection with those pending suits and other claims listed on **Schedule L** hereto, but excluding the Satisfied Debt, which shall be satisfied as part of the Transaction as contemplated in the Reorganization Step Plan (all Excluded Liabilities of the Acquired Debtors excluding the Satisfied Debt being referred to herein as the "**Transferred Liabilities**") shall be transferred to, assumed by and vest absolutely and exclusively in ExcludedCo2 such that on the Effective Date the Transferred Liabilities shall be novated and become the exclusive obligations of ExcludedCo2 (and not obligations of the Acquired Debtors) and the Acquired Debtors and the Purchased Assets of the Acquired Debtors shall be forever released and discharged from such Transferred Liabilities and any Encumbrances and Claims (as defined below) relating to the Transferred Liabilities shall be forever released and discharged as against the Acquired Debtors and the Purchased Assets of the Acquired Debtors;

- 2 -

(d)   the nature and priority of the Transferred Liabilities, including their amount and their secured or unsecured status, shall not be affected or altered as a result of their transfer to and assumption by ExcludedCo2;

(e)   the commencement, prosecution, continuation or assertion, whether directly, indirectly, derivatively or otherwise, by any Person of any demand, claim, action, counterclaim, cross-claim, suit, arbitration, grievance, judgement or other right or remedy, including set-off (each, a "**Claim**") against the Acquired Debtors, the Purchased Assets of the Acquired Debtors, the Buyer or any of its Affiliates in connection with any of the Excluded Assets, the Excluded Contracts and the Transferred Liabilities, whether before a court, administrative tribunal, arbitrator, other dispute resolver or otherwise, and whether such Claims exists today or arise in the future, shall be permanently restrained and enjoined;

(f)   any Person that, prior to the Effective Date, had a Claim against an Acquired Debtor or the Purchased Assets of the Acquired Debtors in respect of any of the Transferred Liabilities shall no longer have such Claim against the applicable Acquired Debtor or Purchased Assets, but will instead solely have an equivalent Claim against ExcludedCo2 from and after the Effective Date in its place and stead, and, nothing in this Order limits, lessens or extinguishes such a Claim as against ExcludedCo2;

(g)   for the avoidance of doubt (i) all Excluded Assets owned by the Non-Acquired Debtors shall remain the property of such Non-Acquired Debtors and all Encumbrances shall continue to attach to such Excluded Assets with the same nature and priority as they currently have, and (ii) all Excluded Liabilities of the Non-Acquired Debtors shall remain the exclusive liability of such Non-Acquired Debtors and the nature of such Excluded Liabilities, including their amount and their secured or unsecured status, shall not be affected or altered by this Order; and

(h)   for the avoidance of doubt, the Acquired Debtors, the Buyer and their respective Affiliates shall not retain or assume, as applicable, and shall have no liability in respect of, any of the Excluded Assets, the Excluded Contracts and the Transferred Liabilities, or any Claim arising in connection with any of the foregoing.

[20]   **ORDERS** that all Assigned Agreements to which the Acquired Debtors, the other Transferred Subsidiaries and the JV Entities are party on the Effective Date (collectively, the "**Retained Contracts**") shall remain in full force and effect, and that the Acquired Debtors, the other Transferred Subsidiaries and the JV Entities shall remain entitled to all of their rights, benefits and entitlements under such Retained Contracts, and following the Effective Date, no Person who is a counterparty to any such Retained Contract (a "**Retained Contract Counterparty**") may accelerate, terminate, rescind, refuse to perform or otherwise repudiate its obligations thereunder, or enforce or exercise any right, entitlement or remedy (including any right of set-off) or make any demand under or in respect of such Retained Contract and no automatic termination will have any validity or effect, by reason of:

(a)   any circumstance that existed or event that occurred on or prior to the Effective Date that would have entitled such Retained Contract Counterparty to enforce those rights or remedies or caused an automatic termination to occur, including any monetary defaults or defaults or events of default arising as a result of the insolvency of any Debtor or the cessation of the Debtors' or their Affiliates' normal course business operations;

- 3 -

(b)    the insolvency of any Debtor or the fact that the Debtors sought or obtained relief under the CCAA or under the U.S. Bankruptcy Code;

(c)    any releases, discharges, cancellations, transactions or other steps taken or effected pursuant to the Purchase Agreement, the Transaction (including the Pre-Closing Reorganization), the provisions of this Order or any other Order of the Court in these proceedings; or

(d)    any change of control of the Debtors or their Affiliates arising from the implementation of the Transaction (other than any right arising from a change of control under a contract entered into in connection with the Key Employee Retention Plans or any Assumed Employee Contracts), or any anti-assignment or similar provision restricting assignment or requiring the consent of any Person to an assignment or a change of control (an "**Anti-Assignment Provision**") in a Retained Contract and, for greater certainty, the Transaction and its implementation shall be deemed not to constitute a change in ownership or change in control under any Retained Contract (other than a contract entered into in connection with the Key Employee Retention Plans or any Assumed Employee Contracts).

[21]    **ORDERS** that on the Effective Date all Retained Contract Counterparties shall be deemed to have waived any and all defaults then existing or previously committed by the Debtors or caused by the Debtors, directly or indirectly, or non-compliance with any covenant, positive or negative pledge, warranty, representation, term, provision, condition or obligation, express or implied, in any Retained Contract arising from the commencement or existence of these CCAA proceedings or the U.S. Proceedings (including any deferral or interruption of payments and any incurrence of or creation of charges arising from or relating to any such proceedings), the insolvency of the Debtors or the entering into the Purchase Agreement or any other agreement or document in connection with the Transaction, and the completion of the Transaction, including as a result of any of the matters or events listed in paragraph [20] hereof, and any and all notices of default or termination and demands for payment under or in connection with any Retained Contracts shall be deemed to have been rescinded and of no further force nor effect; provided, however, that with respect to any Retained Contract of an Acquired Debtor specified on **Schedule** "**F1**" hereto, paragraph [25] hereof shall be complied with.

[22]    **ORDERS** that (a) nothing herein shall waive, compromise or discharge any obligation of the Acquired Debtors or of the Buyer in respect of any Assumed Liabilities (including with respect to the payment of any "*Cure Cost*" owing under any Assigned Agreement in accordance with paragraph [25] hereof), (b) the designation of any Assumed Liability as such is without prejudice to the  Buyer's and the Acquired Debtors' right to dispute the existence, validity or quantum of any such Assumed Liability, and (c) nothing in this Order or the Purchase Agreement shall affect or waive the Acquired Debtors' and the Buyer's rights and defences, both legal and equitable, with respect to any Assumed Liability, including, but not limited to, all rights with respect to entitlements to set-offs or recoupments against such Assumed Liabilities.

## VESTING OF PURCHASED ASSETS IN BUYER

[23]    **ORDERS AND DECLARES** that on the Effective Date, all rights, title and interest of the Non-Acquired Debtors in and to the Purchased Assets shall vest absolutely and exclusively in and with the Buyer, free and clear of and from any and all claims, liabilities (direct, indirect, absolute or contingent), obligations (including, *inter alia*, any obligations

- 4 -

which any Debtor may have to any of its current or former employees or independent contractors, including for salaries, commissions, bonuses, vacation pay, overtime pay, severance, termination pay, notice of termination or payment in lieu of notice of termination, indemnity, taxes or any other similar or related obligations), interests, prior claims, security interests (whether contractual, statutory or otherwise), liens, charges, hypothecs, mortgages, pledges, trusts or deemed trusts (whether contractual, statutory, or otherwise), assignments, judgments, executions, writs of seizure or execution, notices of sale, options, adverse claims, levies, rights of first refusal or other pre-emptive rights in favour of third parties, restrictions on transfer of title, or other claims or encumbrances (including the claims listed on **Schedule L** hereto), whether or not they have attached or been perfected, registered, published or filed and whether secured, unsecured or otherwise (collectively, "**Encumbrances**"), including, without limiting the generality of the foregoing, all Encumbrances created by any Order of this Court in the within proceedings and all Encumbrances evidenced by registration, publication or filing pursuant to the *Civil Code of Québec,* any *Personal Property Security Act* of a province or territory of Canada (a "**PPSA**") or any other applicable legislation providing for a security interest in personal or movable property, excluding however, the permitted encumbrances, easements and restrictive covenants listed on **Schedule "E"** hereto (the "**Permitted Encumbrances**") and, for greater certainty, **ORDERS** that all of the Encumbrances affecting or relating to such Purchased Assets, other than the Permitted Encumbrances, be expunged and discharged as against such Purchased Assets, in each case effective as of the Effective Date. For the avoidance of doubt, nothing in this paragraph [23] hereof (or any other paragraph of this Order) shall relieve the Buyer or an Acquired Debtor of any Assumed Liability with respect to the Transferred Employees.

## CCAA AGREEMENTS

[24]   **ORDERS AND DECLARES** that on the Effective Date the rights and obligations of the Debtors under the Assigned Agreements listed on **Schedule "F1"** hereto (as such Assigned Agreements may have been amended or amended and restated from time to time, collectively, the "**CCAA Agreements**") are, notwithstanding any Anti-Assignment Provision contained therein, assigned to the Buyer or any Affiliate thereof that may be specified in a notice from the Buyer to the applicable CCAA Agreement Counterparty (as defined below) on or following the Effective Date; it being understood that Buyer may also determine that any CCAA Agreement to which an Acquired Debtor is a party to shall remain and constitute a Retained Contract of such Acquired Debtor (in which case, for the avoidance of doubt, the provisions of paragraphs [20] and [21] of this Order shall be applicable to all such Retained Contracts).

[25]   **ORDERS** that all monetary defaults, if any, of the applicable Debtors in relation to the CCAA Agreements – other than those arising by reason only of the insolvency of the Debtors, the commencement of these CCAA proceedings or the U.S. Proceedings, or the failure to perform non-monetary obligations – shall be remedied on or before the day that is 30 days following the Effective Date or such later date as may be agreed to by the Buyer and the counterparty to the CCAA Agreement (the "**CCAA Agreement Counterparty**"), or ordered by the Court, by payment to the CCAA Agreement Counterparty of the applicable amount, if any, set forth on **Schedule "F1"** under the heading "*Cure Costs*", or where no such amount is specified, such amount as may be agreed to by the Buyer and the CCAA Agreement Counterparty or ordered by the Court.

[26]   **ORDERS** that following the assignment of any CCAA Agreement to Buyer or its Affiliate, as applicable, in accordance with paragraph [24] hereof, all such CCAA Agreements shall

- 5 -

remain in full force and effect, and that the Buyer or its applicable Affiliate shall be entitled to all of the rights, benefits and entitlements of the applicable Debtors under such CCAA Agreements, and following the Effective Date, no CCAA Agreement Counterparty may accelerate, terminate, rescind, refuse to perform or otherwise repudiate its obligations thereunder, or enforce or exercise any right, entitlement or remedy (including any right of set-off) or make any demand under or in respect of such CCAA Agreement and no automatic termination will have any validity or effect, by reason of:

(a)   any circumstance that existed or event that occurred on or prior to the Effective Date that would have entitled such CCAA Agreement Counterparty to enforce those rights or remedies or caused an automatic termination to occur, including any monetary defaults or defaults or events of default arising as a result of the insolvency of any Debtor or the cessation of the Debtors' or their Affiliates normal course business operations;

(b)   the insolvency of any Debtor or the fact that the Debtors sought or obtained relief under the CCAA or under the U.S. Bankruptcy Code;

(c)   any releases, discharges, cancellations, transactions or other steps taken or effected pursuant to the Purchase Agreement, the Transaction (including the Pre-Closing Reorganization), the provisions of this Order or any other Order of the Court in these proceedings; or

(d)   any change of control of the Debtors or their Affiliates arising from the implementation of the Transaction, or any Anti-Assignment Provision in a CCAA Agreement and, for greater certainty, the Transaction and its implementation shall be deemed not to constitute a change in ownership or change in control under any CCAA Agreement.

[27]   **ORDERS** that on the Effective Date, all CCAA Agreement Counterparties shall be deemed to have waived any and all defaults then existing or previously committed by the Debtors or caused by the Debtors, directly or indirectly, or non-compliance with any covenant, positive or negative pledge, warranty, representation, term, provision, condition or obligation, express or implied, in any CCAA Agreement arising from the commencement or existence of these CCAA proceedings or the U.S. Proceedings (including any deferral or interruption of payments and any incurrence of or creation of charges arising from or relating to any such proceeding), the insolvency of the Debtors or the entering into the Purchase Agreement or any other agreement or document in connection with the Transaction, and the completion of the Transaction, including as a result of any of the matters or events listed in paragraph [26] hereof, and any and all notices of default or termination and demands for payment under or in connection with any CCAA Agreements shall be deemed to have been rescinded and of no further force nor effect.

[28]   **ORDERS AND DIRECTS** the Debtors to serve a copy of this Order on every CCAA Agreement Counterparty.

[29]   **ORDERS AND DIRECTS** that, from and after the date hereof until the date that is six (6) months after the Effective Date, the Buyer shall be entitled to notify the Seller from time to time, with a copy to the Monitor, that it seeks the Court-ordered assignment of additional Assigned Agreements and/or Excluded Contracts (a "**Proposed Additional CCAA Assignment**" and each agreement specified therein a "**Proposed Additional CCAA Agreement**").

- 6 -

[30] **ORDERS** that the Monitor shall, within five days of receipt of a notice of a Proposed Additional CCAA Assignment, notify the Buyer and the Seller:

    (a) if it approves of the proposed assignment of a Proposed Additional CCAA Agreement and, if the Monitor so approves, direct the Debtors to send one or more notices of the Proposed Additional CCAA Assignment substantially in the form of the draft notice attached hereto as **Schedule "F2"**, together with a copy of this Order, to the counterparty (or counterparties) to the Proposed Additional CCAA Agreement (a "**Notice of Proposed Additional CCAA Assignment**"); or

    (b) if the Monitor does not approve of Proposed Additional CCAA Assignment, inform the Seller and the Buyer in writing of its decision (a "**Monitor's Notice**").

[31] **DECLARES** that:

    (a) if a counterparty to a Proposed Additional CCAA Agreement notifies the Monitor in writing of its opposition to the Proposed Additional CCAA Assignment (an "**Objection Notice**") within 15 days of the sending of a Notice of Proposed Additional CCAA Assignment by the Debtors to the counterparty (the "**Objection Deadline**"); or

    (b) if the Monitor has issued a Monitor's Notice;

the Debtors or the Buyer shall be entitled to apply to this Court to seek the assignment of such Proposed Additional CCAA Agreement (it being understood that the Debtors or the Buyer shall also be at liberty to apply to this Court at any time to seek the assignment of a Proposed Additional CCAA Agreement).

[32] **ORDERS** the Monitor, if a counterparty to a Proposed Additional CCAA Agreement has not delivered an Objection Notice to the Monitor by the applicable Objection Deadline, to forthwith issue to the Buyer and the counterparty (or counterparties) to the Proposed Additional CCAA Agreement, post on the Monitor's website and file with the Court a certificate substantially in the form appended hereto as **Schedule "F3"** hereto (an "**Additional CCAA Assignment Certificate**").

[33] **ORDERS AND DECLARES that** upon the issuance of an Additional CCAA Assignment Certificate by the Monitor to the Buyer: (i) the rights and obligations of the applicable Debtors under any Proposed Additional CCAA Agreement specified in such Additional CCAA Assignment Certificate (the "**Additional CCAA Agreements**") are, notwithstanding any Anti-Assignment Provision contained in the Additional CCAA Agreements, assigned to the Buyer or its Affiliate (as specified in the Additional CCAA Assignment Certificate); and (ii) all of the provisions of this Order applicable to CCAA Agreements, shall apply to the Additional CCAA Agreements *mutatis mutandis*; provided, however, that, with respect to Additional CCAA Agreements all references to the "Effective Date" in paragraphs [26] and [27] hereof shall instead be construed so as to refer to the date of the delivery of the applicable Additional CCAA Assignment Certificate to the Buyer, and provided further that all monetary defaults, if any, of the applicable Debtors in relation to the Additional CCAA Agreements as specified in the Notice of Proposed Additional CCAA Assignment – other than those arising by reason only of the insolvency of the Debtors, the commencement of these CCAA proceedings or the U.S. Proceedings, or the failure to perform non-monetary obligations – shall be remedied on or before the date that is 30 days following the date the Additional CCAA Assignment Certificate is issued to the Buyer or such later date as may be agreed to by the Buyer and the counterparty to the Additional CCAA Agreement.

- 7 -

**CANCELLATION OF SECURITY REGISTRATIONS**

[34]    **ORDERS** the *Land Registrar of the Land Registry Office for the Registry Division of Montreal*, upon presentation of the Certificate and a certified copy of this Order accompanied by the required application for registration and upon payment of the prescribed fees, to publish this Order and to cancel any and all Encumbrances against the immovable property identified in **Schedule "G"** (other than Permitted Encumbrances), including the registrations published at the said Land Registry Office and listed in **Schedule "H"** hereof; provided, however, that if the sale of the Vacant Land (as defined in **Schedule "G"**) authorized and approved in this Court's order dated August 27, 2020, has closed and the Monitor's certificate contemplated by such order has been issued prior to the Effective Date, this Order shall not be published with respect to the Vacant Land and no Encumbrances shall be cancelled with respect to the Vacant Land.

[35]    **ORDERS** the Quebec Personal and Movable Real Rights Registrar, upon presentation of the required form with a true copy of this Order and the Certificate, to cancel and strike the registrations published at the *Quebec Personal and Moveable Real Rights Registry* in respect of the Debtors, including those registrations listed in **Schedule "I"** hereof.

[36]    **ORDERS** the registrars under the PPSAs, upon presentation of the required form with a true copy of this Order and the Certificate, to cancel and strike the registrations published pursuant to the applicable PPSAs in respect of the Debtors, including those registrations listed in **Schedule "J"** hereof.

[37]    **ORDERS** the Registrar of Trademarks under the *Trademarks Act (Canada)* and the Registrar of Copyrights under the *Copyright Act (Canada),* upon presentation of a true copy of this Order and the Certificate, to cancel and strike any security interests recorded at the Canadian Intellectual Property Office in respect of the Debtors' trademarks and copyrights, including those security interests listed in **Schedule "K"** hereof.

[38]    **ORDERS** that, following the delivery of the Certificate to the Buyer, the Buyer and its counsel shall be authorized to take all steps as may be necessary to effect the discharge of any Encumbrances as against the Purchased Assets and the Acquired Debtors in any applicable jurisdiction, except for any Permitted Encumbrances.

**CERTAIN ADDITIONAL TRANSACTION MATTERS**

[39]    **ORDERS AND DECLARES** that on the Effective Date, the Buyer, any Affiliate thereof and the Acquired Debtors shall be deemed released from any and all Encumbrances with respect to any taxes (including penalties and interest thereon) of, or that relate to, the Debtors, including without limiting the generality of the foregoing all taxes that could be assessed against Buyer, its Affiliates or the Acquired Debtors pursuant to section 160 of the *Income Tax Act* (Canada), or any equivalent.

[40]    **ORDERS AND DECLARES** that on the Effective Date, any agreement, contract, plan, indenture, deed, subscription right, conversion right, pre-emptive right or other document or instrument governing and/or having been created or granted in connection with the Equity Interests of any of the Debtors shall be deemed terminated and cancelled.

[41]    **DECLARES** that on the Effective Date, the Transaction shall be deemed to constitute and shall have the same effect as a sale under judicial authority as per the provisions of the

- 8 -

*Code of Civil Procedure* and the *Act respecting industrial accidents and occupational diseases* and a forced sale as per the provisions of the *Civil Code of Quebec.*

[42]    **ORDERS AND DECLARES** that the Transaction is exempt from the application of any bulk sales legislation in any applicable jurisdiction.

[43]    **ORDERS AND DIRECTS** the Monitor to serve on the service list in the within CCAA proceedings, post on the Monitor's website and file with the Court a copy of the Certificate, as soon as possible after the issuance thereof.

[44]    ORDERS that the Monitor may rely on written notice from the Seller and the Buyer regarding the fulfillment of conditions to closing under the Purchase Agreement and shall have no liability with respect to the delivery of the Certificate.

## ADMINISTRATIVE CASE MATTERS

[45]    **ORDERS** that on the Effective Date:

(a)    ExcludedCo1 and ExcludedCo2shall be companies to which the CCAA applies;

(b)    Each of ExcludedCo1 and ExcludedCo2 shall be added as an Applicant in these CCAA proceedings and any reference in any Order of this Court in respect of these CCAA proceedings to an "Applicant", the "Applicants" or "Debtors" shall, unless otherwise expressly stated, be deemed to include reference to ExcludedCo1 and ExcludedCo2, *mutatis mutandis*, and, for greater certainty, each of the CCAA Charges (as such term is defined in the Initial Order) shall constitute a charge on the property of ExcludedCo1 and ExcludedCo2; and

(c)    Each of the Acquired Debtors shall cease to be Debtors in these CCAA proceedings, shall be deemed to be released from the purview of any Order of this Court granted in the within CCAA Proceedings (save and except for the present Order, the terms of which as they relate to the Acquired Debtors shall continue to apply in all respects), and the Monitor shall be discharged as Monitor of the Acquired Debtors.

[46]    **ORDERS** that on the Effective Date the title of these proceedings is hereby changed to:

**IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED:**

**9424-9356 QUEBEC INC.**

-and-

**9424-9398 QUEBEC INC.**

-and-

**THE OTHER APPLICANTS LISTED IN SCHEDULE "A" HEREOF**

Applicants

-and-

- 9 -

**ERNST & YOUNG INC.**

Monitor

[47]   **ORDERS** that on and following the Effective Date, the Non-Acquired Debtors shall, and shall be authorized to, change their names to remove any use of "Cirque du Soleil", "Cirque", "Blue Man", "Vstar" or any similar names, parts thereof or abbreviations used in their respective names.

## PROTECTION OF PERSONAL INFORMATION

[48]   **ORDERS** that, pursuant to sub-section 7(3)(c) of the *Canada Personal Information Protection and Electronic Documents Act* or any similar provision of any applicable legislation, the Debtors are authorized and permitted to disclose and transfer to the Buyer all human resources and payroll information in the Debtors' records pertaining to their past and current employees. The Buyer shall maintain and protect the privacy of such information and shall be entitled to use the personal information provided to it in a manner which is in all material respects identical to the prior use of such information by the Debtors.

## VALIDITY OF THE TRANSACTION

[49]   **ORDERS** that, notwithstanding:

(a)   the pendency of these proceedings or the U.S. Proceedings;

(b)   any application or petition for a bankruptcy order, receiving order or a receivership order now or hereafter issued pursuant to the *Bankruptcy and Insolvency Act* (Canada) ("**BIA**") or any other applicable legislation and any order issued pursuant to any such application or petition;

(c)   any assignment in bankruptcy made in respect of any of the Debtors; or

(d)   the provisions of any applicable legislation;

the Purchase Agreement and the implementation of the Transaction, including the Pre-Closing Reorganization, the transfer and vesting of the Excluded Assets, Excluded Contracts and Transferred Liabilities of the Acquired Debtors to and in ExcludedCo1 and ExcludedCo2, as applicable, and the vesting of the Purchased Assets of the Non-Acquired Debtors in the Buyer contemplated by this Order (i) shall be binding on any trustee in bankruptcy or receiver that may be appointed in respect of any of the Debtors or their property (including, for the avoidance of doubt, in the U.S. Proceedings), (ii) shall not constitute nor be deemed to be a fraudulent preference, assignment, fraudulent conveyance, transfer at undervalue, or other reviewable transaction under the BIA or any other applicable legislation, and (iii) shall not constitute nor be deemed to be oppressive or unfairly prejudicial conduct pursuant to any applicable legislation.

[50]   **ORDERS** that the Purchase Agreement and the obligations of the Debtors thereunder may not be disclaimed, resilliated, repudiated, rejected or otherwise affected or impacted in these CCAA proceedings.

- 10 -

**RELEASES**

[51]    **ORDERS** that on the Effective Date (i) the present and former partners, shareholders, members of the council of representatives, directors, officers, employees, legal counsel and advisors of the Debtors (including, for the avoidance of doubt, ExcludedCo1 and ExcludedCo2), (ii) the Monitor, (iii) the Ad Hoc Committee and its members, and (iv) the respective affiliates, funds under management, affiliated funds, shareholders, members, equity holders, trustees, directors, officers, managers, employees, partners, legal counsel, advisors and other representatives of the persons specified in (i), (ii) and (iii) (the persons specified in (i), (ii), (iii) and (iv) being, collectively, the "**Released Parties**") shall be forever irrevocably and unconditionally released and discharged from any and all present and future claims (including claims for contribution or indemnity), liabilities, indebtedness, demands, actions, causes of action, counterclaims, suits (including those pending suits and other claims listed in **Schedule L** hereto), losses, damages, judgments, executions, recoupments, debts, sums of money, expenses, costs, accounts, liens, taxes, penalties, interests, recoveries, and other obligations, liabilities and encumbrances of any nature or kind whatsoever (whether direct or indirect, known or unknown, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, matured or unmatured, or due or not yet due, in law or equity and whether based in statute, contract or otherwise) based in whole or in part on any act, omission, transaction, dealing or other occurrence, matter, circumstance or fact existing or taking place on or prior to the Effective Date or completed pursuant to the terms of this Order and/or in connection with the Transaction, in respect of or relating to, in whole or in part, directly or indirectly, any of the Debtors (including, for the avoidance of doubt, ExcludedCo1 and ExcludedCo2) or their assets, liabilities, business or affairs wherever or however conducted or governed, the administration and/or management of the Debtors, these CCAA proceedings, the U.S. Proceedings or the Transaction (collectively, the "**Released Claims**"), which Released Claims are hereby fully, finally, irrevocably, unconditionally and forever waived, discharged, released, cancelled and barred as against the Released Parties, and the commencement, prosecution, continuation or assertion, whether directly, indirectly, derivatively or otherwise, by any Person of any Released Claims against the Released Parties, whether before a court, administrative tribunal, arbitrator, other dispute resolver or otherwise, shall be permanently restrained and enjoined; provided, however, that nothing in this paragraph shall waive, discharge, release, cancel or bar any claim against the present and former directors of the Debtors that is not permitted to be released pursuant to section 5.1(2) of the CCAA.

**THE MONITOR**

[52]    **ORDERS** that on the Effective Date, in addition to its powers and obligations set out in the Initial Order, the Monitor shall be authorized and empowered, but not obligated, to file a voluntary assignment in bankruptcy on behalf of any of ExcludedCo1, ExcludedCo2 and/or the Non-Acquired Debtors and to take any steps incidental thereto or seek and obtain a bankruptcy order against any of them, to the extent deemed necessary or appropriate, notwithstanding any stay of proceedings; provided, however, that (i) the Monitor shall not file a voluntary assignment in bankruptcy on behalf of any of ExcludedCo1, ExcludedCo2 and/or the Non-Acquired Debtors or seek a bankruptcy order against any of them before the date that is not less than six (6) months and one (1) day after the Effective Date (or such earlier date as the Buyer may consent in its sole discretion), and (ii) the trustee in bankruptcy of each of ExcludedCo1, ExcludedCo2 and/or the Non-Acquired Debtors, as applicable, shall be bound by the terms of the Purchase Agreement, including as relates

- 11 -

to any post-Closing obligations which ExcludedCo1, ExcludedCo2 and the Non-Acquired Debtors may have under the Purchase Agreement. Nothing in this Order shall prevent the Monitor from acting as trustee in bankruptcy of any of ExcludedCo1, ExcludedCo2 and the Non-Acquired Debtors.

[53]    **ORDERS** that subject to further Order of the Court, if any, on the date that is six (6) months and one (1) day following the Effective Date, the Non-Acquired Debtors shall be deemed to be dissolved without any further action, including the filing of any documents with the secretary of state or similar official for the state or other jurisdiction in which the Non-Acquired Debtors are formed or incorporated, or any further order of this Court or of any Court which may recognize this Order.

[54]    **ORDERS AND DECLARES** that no provision of this Order is intended to appoint the Monitor as an officer, director or employee of any of the Debtors, *de facto* or otherwise, or to create a fiduciary duty to any party, including any creditor or shareholder of the Debtors. Additionally, nothing in this Order shall constitute or be deemed to constitute the Monitor as a receiver, assignee, liquidator, or receiver and manager of any of the Debtors and any distribution made to the creditors of the Debtors will be deemed to have been made by the Debtors.

[55]    **DECLARES** that the Monitor shall incur no liability as a result of acting in accordance with this Order, other than any liability arising out of or in connection with the gross negligence or wilful misconduct of the Monitor.

[56]    **DECLARES** that no action lies against the Monitor by reason of this Order or the performance of any act authorized by this Order, except by leave of the Court. The entities related to the Monitor or belonging to the same group as the Monitor shall benefit from the protection arising under the present paragraph.

[57]    **DECLARES** that nothing contained herein shall require the Monitor to occupy or to take control, or to otherwise manage all or any part of the assets of the Debtors. The Monitor shall not, as a result of this Order, be deemed to be in possession of any assets of the Debtors within the meaning of environmental legislation, the whole pursuant to the terms of the CCAA.

## DESJARDINS MATTERS

[58]    **ORDERS** that, subject to further Order of this Court, the closing of the Transaction shall be subject to the execution of: (i) an Amended and Restated Cash Management Agreement with the Desjardins Group (as defined hereinafter) satisfactory to each of the Debtors, the Buyer and the Desjardins Group (the "**New Cash Pooling Agreement**"), which shall replace the Cash Management Agreement dated as of July 8, 2015 (as amended, supplemented or restated, from time to time) entered into between the Caisse Centrale Desjardins (now known as Fédération des Caisses Desjardins du Québec) ("**Federation**"), la Caisse d'Économie Solidaire Desjardins ("**CESD**"), Desjardins Bank ("**Desjardins US**" and collectively with Federation and CESD, the "**Desjardins Group**") and certain Applicants and affiliates of the Applicants party thereto, as well as Les Films Lampo Di Vita Inc., Gaïa Luxembourg S.A., Cirque du Soleil HK Limited, Sundust Limited, Cirque du Soleil Australia PTY Ltd., Gestion Cirque du Soleil S.E.C., CDS Luxembourg Holdings, S.A.R.L. and 9553266 Canada Inc. and (ii) a Trust Agreement satisfactory to each of the Debtors, the Buyer and the Desjardins Group which will provide that sufficient funds will be deposited to cover any potential obligations that the Desjardins Group may

- 12 -

have towards third parties pursuant to the various outstanding letters of credit issued by the Desjardins Group at the request of the Debtors or in each case such other arrangements as are satisfactory to each of the Debtors, the Buyer and the Desjardins Group.

## GENERAL

[59]   **DECLARES** that this Order shall have full force and effect in all provinces and territories in Canada.

[60]   **DECLARES** that Cirque du Soleil Canada Inc., as foreign representative of the Debtors, shall be authorized to apply as it may consider necessary or desirable, with or without notice, to any other court or administrative body, whether in Canada, the United States of America or elsewhere, for orders which aid and complement this Order, including an order authorizing the dissolution, winding-up, consolidation, or conversion of one or more of the Debtors, and, without limitation to the foregoing, an order under Chapter 15 of the U.S. Bankruptcy Code. All courts and administrative bodies of all such jurisdictions are hereby respectfully requested to make such orders and to provide such assistance to the Debtors, the Monitor and the Buyer as may be deemed necessary or appropriate to give effect to this Order.

[61]   **REQUESTS** the aid and recognition of any court or administrative body in any Province of Canada and any Canadian federal court or administrative body and any federal or state court, administrative body or similar entity or organization in the United States of America and any court or administrative body elsewhere, to act in aid of and to be complementary to this Court in carrying out the terms of this Order.

[62]   **ORDERS** the provisional execution of the present Order notwithstanding any appeal and without the requirement to provide any security or provision for costs whatsoever.


**THE WHOLE WITHOUT COSTS**.

_____
**The Honourable Louis J. Gouin, J.S.C.**

**SCHEDULE "A"**

**Applicants**

1.  Cirque du Soleil GP Inc.
2.  CDS Canadian Holdings, Inc.
3.  Cirque du Soleil Canada Inc.
4.  Cirque du Soleil Inc.
5.  Cirque du Soleil Images Inc.
6.  Cirque du Soleil Inspiration Inc.
7.  CDS U.S. Holdings, Inc.
8.  CDS U.S. Intermediate Holdings, Inc.
9.  Cirque du Soleil Holding USA, Inc.
10. Cirque du Soleil (US), Inc.
11. Cirque du Soleil America, Inc.
12. VStar Entertainment Group, LLC
13. Cirque Dreams Holdings LLC
14. VStar Merchandising, LLC
15. VStar International, LLC
16. VStar Theatrical, LLC
17. VStar Touring, LLC
18. Cirque du Soleil Orlando, LLC
19. Cirque du Soleil Vegas, LLC
20. Cirque du Soleil Nevada, Inc.
21. Cirque du Soleil My Call, LLC
22. Velsi, LLC
23. Blue Man Inc.
24. Blue Man Group Holdings, LLC
25. Blue Man Group Records, LLC
26. Astor Show Productions, LLC
27. Blue Man Group Publishing, LLC
28. Blue Man Vegas, LLC
29. Blue Man Orlando, LLC
30. Blue Man Productions, LLC
31. Blue Man Chicago, LLC
32. 9415-8185 Québec Inc.
33. 9415-8219 Québec Inc.
34. 9415-8227 Québec Inc.
35. 9415-8235 Québec Inc.
36. Création 4U2C Inc.
37. Blue Man International, LLC
38. Cirque du Soleil Radio CT Holding, LLC
39. Cirque du Soleil Radio CT, LLC
40. The Works Entertainment, LLC
41. Cirque Theatrical, LLC
42. Cirque on Broadway, LLC
43. Joie de Vie, LLC

**Limited Partnerships**

1. Cirque du Soleil Holdings L.P.
2. CDS Canada 3 L.P.
3. CDS Canada 4 L.P.
4. Blue Man Boston Limited Partnership
5. CDS Canada 1 SCSp (Luxembourg special limited partnership)
6. CDS Canada 2 SCSp (Luxembourg special limited partnership)

**Acquired Debtors**

1. CDS Canadian Holdings, Inc.
2. Cirque du Soleil Canada Inc.
3. Cirque du Soleil Inc.
4. Cirque du Soleil Images Inc.
5. Création 4U2C Inc.
6. Cirque du Soleil Inspiration Inc.
7. 9415-8185 Québec Inc.
8. 9415-8219 Québec Inc.
9. 9415-8227 Québec Inc.
10. 9415-8235 Québec Inc.
11. CDS Canada 1 SCSp (Luxembourg special limited partnership)
12. CDS Canada 2 SCSp (Luxembourg special limited partnership)
13. CDS Canada 3 L.P.
14. CDS Canada 4 L.P.
15. Cirque du Soleil Vegas, LLC

**SCHEDULE "B"**

**PURCHASE AGREEMENT**

[ATTACHED]

EXECUTION VERSION

# ASSET PURCHASE AGREEMENT

## CIRQUE DU SOLEIL HOLDINGS L.P.

**as the Seller**

**- and -**

## SPECTACLE BIDCO LP

**as the Buyer**

111971500

## TABLE OF CONTENTS

**Page**

ARTICLE 1 INTERPRETATION ......................................................................... 2
    1.1    Definitions ................................................................................ 2
    1.2    Statutes ................................................................................. 23
    1.3    Headings, Table of Contents, etc. ........................................ 23
    1.4    Gender and Number ............................................................. 23
    1.5    Currency ............................................................................... 23
    1.6    Certain Phrases ..................................................................... 23
    1.7    Invalidity of Provisions ....................................................... 23
    1.8    Knowledge ........................................................................... 24
    1.9    Entire Agreement ................................................................. 24
    1.10   Waiver, Amendment ............................................................ 24
    1.11   Governing Law; Jurisdiction and Venue ............................. 24
    1.12   Incorporation of Disclosure Letter, Schedules and Exhibits ... 24
    1.13   Made Available .................................................................... 25
    1.14   Accounting Terms ................................................................ 25
    1.15   Non-Business Days .............................................................. 25
    1.16   Computation of Time Periods .............................................. 25

ARTICLE 2 PURCHASE AND SALE ............................................................. 25
    2.1    Agreement to Purchase and Sell Purchased Assets ............. 25
    2.2    Excluded Assets ................................................................... 30
    2.3    Assumption of Liabilities .................................................... 32
    2.4    Excluded Liabilities ............................................................. 33
    2.5    Assignment of Purchased Assets ......................................... 35
    2.6    Designated Buyer(s); Local Sale Agreements. ................... 39

ARTICLE 3 PURCHASE PRICE AND RELATED MATTERS ........................... 40
    3.1    Purchase Price and Establishment of Employee Fund and Contractor Fund ....... 40
    3.2    Deposit ................................................................................. 42
    3.3    Purchase Price Allocation .................................................... 44

ARTICLE 4 REPRESENTATIONS AND WARRANTIES BY THE SELLER ...... 45
    4.1    Corporate Existence and Capitalization ............................... 45
    4.2    Due Authorization and Enforceability of Obligations ......... 46
    4.3    Residence of the Seller Group .............................................. 46
    4.4    Absence of Certain Changes or Events................................. 47
    4.5    Absence of Conflicts ............................................................ 48
    4.6    Approvals and Consents ....................................................... 48
    4.7    Taxes .................................................................................... 48
    4.8    Title to Assets ...................................................................... 50
    4.9    Real Property Landlord Leases ............................................ 50
    4.10   Real Property Leases ............................................................ 51
    4.11   Owned Property. ................................................................... 51
    4.12   Environmental Matters......................................................... 51
    4.13   Intellectual Property ............................................................ 52
    4.14   Books and Records; Financial Statements; Bank Accounts. ... 54
    4.15   Information Technology Systems ......................................... 54

# TABLE OF CONTENTS
(continued)

Page

| | | |
|---|---|---|
| 4.16 | Material Contracts | 55 |
| 4.17 | Employees | 55 |
| 4.18 | Employee Plans | 57 |
| 4.19 | Litigation | 59 |
| 4.20 | Brokers; Advisor Fees | 59 |
| 4.21 | Compliance with Laws | 60 |
| 4.22 | No Other Representations, Warranties or Covenants | 60 |

ARTICLE 5 REPRESENTATIONS AND WARRANTIES OF THE BUYER ........ 60

| | | |
|---|---|---|
| 5.1 | Corporate Existence of the Buyer | 60 |
| 5.2 | Corporate Existence of the Buyer Subsidiaries | 61 |
| 5.3 | Absence of Conflicts | 61 |
| 5.4 | Due Authorization and Enforceability of Obligations | 61 |
| 5.5 | Approvals and Consents | 62 |
| 5.6 | Litigation | 62 |
| 5.7 | Required Lenders | 62 |
| 5.8 | Subsidiaries | 63 |
| 5.9 | Compliance with Laws | 63 |
| 5.10 | GST, HST and QST Registration | 63 |
| 5.11 | Financing | 63 |
| 5.12 | As Is, Where Is | 65 |
| 5.13 | Brokers; Advisor Fees | 66 |

ARTICLE 6 CONDITIONS ........ 66

| | | |
|---|---|---|
| 6.1 | Conditions for the Benefit of the Buyer and the Seller | 66 |
| 6.2 | Conditions for the Benefit of the Buyer | 66 |
| 6.3 | Conditions for the Benefit of the Seller | 68 |

ARTICLE 7 ADDITIONAL AGREEMENTS OF THE PARTIES ........ 69

| | | |
|---|---|---|
| 7.1 | Access to Information | 69 |
| 7.2 | Conduct of Business Until Closing Time | 69 |
| 7.3 | Approvals and Consents | 71 |
| 7.4 | Covenants Relating to this Agreement | 73 |
| 7.5 | Tax Matters | 74 |
| 7.6 | Employee Matters | 77 |
| 7.7 | Administrative Reserve | 81 |
| 7.8 | Certain Payments or Instruments Received from Third Persons | 82 |
| 7.9 | Insurance Matters | 83 |
| 7.10 | Intellectual Property Matters | 83 |
| 7.11 | Permits, Surety Bonds or Financial Assurances | 83 |
| 7.12 | Change Names | 83 |
| 7.13 | Financing Cooperation | 84 |
| 7.14 | Alternative Acquisition Structure | 85 |
| 7.15 | Disclosure Schedules Updates | 85 |
| 7.16 | Commitment Letter | 86 |
| 7.17 | No Financing Out | 87 |
| 7.18 | Acquisition Proposals | 87 |
| 7.19 | Transition of Business | 88 |

**TABLE OF CONTENTS**
(continued)

Page

7.20   Bulk Sales ............................................................................................. 88
7.21   Release by the Buyer ............................................................................ 88
7.22   Release by the Seller ............................................................................ 89
7.23   Québec Undertakings ........................................................................... 89
7.24   Contractor ............................................................................................ 89
7.25   Post-Closing Costs and Expenses of the Seller Group Members ...... 90

ARTICLE 8 INSOLVENCY PROVISIONS ............................................................ 90
8.1    Court Orders and Related Matters ...................................................... 90

ARTICLE 9 TERMINATION ................................................................................... 92
9.1    Termination .......................................................................................... 92
9.2    Effect of Termination ........................................................................... 93

ARTICLE 10 CLOSING ........................................................................................... 94
10.1   Location and Time of the Closing ....................................................... 94
10.2   Seller's Deliveries at Closing .............................................................. 94
10.3   Buyer's Deliveries at Closing .............................................................. 95
10.4   Possession of Assets ............................................................................ 96
10.5   Monitor ................................................................................................ 97
10.6   Simultaneous Transactions .................................................................. 97
10.7   Supplemental Assignments .................................................................. 97

ARTICLE 11 GENERAL MATTERS ...................................................................... 97
11.1   Confidentiality ..................................................................................... 97
11.2   Public Notices ...................................................................................... 98
11.3   Injunctive Relief .................................................................................. 98
11.4   Survival ................................................................................................ 99
11.5   Non-Recourse ...................................................................................... 99
11.6   Assignment; Binding Effect ................................................................ 99
11.7   Notices ................................................................................................. 99
11.8   Counterparts; Facsimile Signatures .................................................. 101
11.9   Language ............................................................................................ 101

**EXHIBITS**

Exhibit 5.5     Approvals and Consents
Exhibit 7.3(f)  Special Approvals and Consents
Exhibit A       Form of Counterpart to the Asset Purchase Agreement
Exhibit B       Form of IP Assignment and Assumption Agreement
Exhibit C       Form of Sale and Investment Solicitation Process
Exhibit D       Term Sheet for the Employee Fund
Exhibit E       Forms of Employment Agreement Amendments
Exhibit F       Term Sheet for the Contractor Fund
Exhibit G       Form of Joint Direction
Exhibit H       Form of Direction Letters

## ASSET PURCHASE AGREEMENT

**THIS AGREEMENT** is made as of July 15, 2020

AMONG:

> **CIRQUE DU SOLEIL HOLDINGS L.P.**, a limited partnership formed under the laws of the Province of Québec ("**Holdings LP**", or the "**Seller**"), acting through its general partner, **CIRQUE DU SOLEIL GP INC.**, a corporation existing under the laws of the Province of Québec ("**CDS GP**")
>
> - and -
>
> **SPECTACLE BIDCO LP**, a limited partnership formed under the laws of the Province of Québec (the "**Buyer**"), acting through its general partner, Drivetrain Agency Services, LLC a New York limited liability Company

**RECITALS:**

A.    The Seller Group carries on (i) the business, taken as a whole, consisting primarily of the creation, development, production and presentation of original theatre, big top, arena and resident live entertainment shows, an essential part of which is the display of acrobatic performances, and (ii) the business consisting primarily of the ownership and licensing of certain Intellectual Property that is owned by, licensed to or used by the Seller Group in connection with such business (collectively, the "**Business**").

B.    The Applicants have commenced proceedings under the CCAA before the Superior Court of Québec (Commercial Division) (the "**CCAA Court**") to, among other things, seek creditor protection for, and certain relief in respect of, Holdings LP and other Seller Group Members.

C.    The Applicants have commenced ancillary insolvency proceedings under Chapter 15 of Title 11 of the United States Code (the "**U.S. Proceedings**") in the U.S. Bankruptcy Court.

D.    The Buyer has agreed to act as a "stalking horse bidder" and, if selected or deemed the Successful Bidder in accordance with the terms of the SISP, to purchase from the Seller and the Seller Subsidiaries, and the Seller has agreed to sell, and cause the Seller Subsidiaries to sell to the Buyer, the Purchased Assets, which constitute substantially all of the property and assets owned by the Seller and the Seller Subsidiaries and used in connection with the Business, and the Buyer further wishes to assume from the Seller and the Seller Subsidiaries the Assumed Liabilities, pursuant to and in accordance with the terms of the SISP and subject to and in accordance with the terms and conditions of this Agreement.

**NOW THEREFORE**, the Parties agree as follows:

- 2 -

**ARTICLE 1**
**INTERPRETATION**

1.1    **Definitions**

In this Agreement,

"**Absence of Conflicts**" has the meaning given to such term in Section 4.5.

"**Acquisition Proposal**" means any inquiry, proposal or offer from any Person (other than the Buyer or any of its Affiliates) concerning an Alternative Transaction other than pursuant to the SISP.

"**Administrative Monitor Reserve**" means the cash reserve in an amount to be agreed by the Monitor, the Seller and the Buyer, two (2) Business Days prior to the Administrative Reserve Order, which reserve shall be established by the Monitor out of the cash and cash equivalents of the Seller Group as at the Closing Date with the balance, if any, funded by the Buyer to the Monitor on the Closing Date, as a segregated account held in trust by the Monitor for the benefit of Persons entitled to be paid the Administrative Reserve Costs of the Monitor and the Buyer, subject to the terms hereof and in accordance with the Administrative Monitor Reserve Budget for the purpose of paying the Administrative Reserve Costs of the Monitor in accordance with the terms hereof and the Administrative Reserve Order.

"**Administrative Monitor Reserve Budget**" means the detailed budget to be prepared by the Monitor, agreed to by the Seller and the Buyer, and approved by the CCAA Court pursuant to the Administrative Reserve Order, in respect of the Administrative Reserve Costs of the Monitor.

"**Administrative Reserve Accounts**" means the accounts established by the Monitor in trust to hold distinctly the Administrative Monitor Reserve and the Administrative Seller Reserve in accordance with this Agreement and the Administrative Reserve Order.

"**Administrative Reserve Costs of the Monitor**" means the reasonable and documented fees and costs of the Monitor, the Receiver and their respective professional advisors relating directly or indirectly to the CCAA Proceedings, the Receivership Order, the U.S. Proceedings, this Agreement, the Administrative Reserve Accounts, the Employee Fund and the Contractor Fund.

"**Administrative Reserve Costs of the Seller**" means the reasonable and documented (i) fees and costs of professional advisors of the Seller Group Members for services performed prior to and, other than in respect of the Transferred Subsidiaries, after the Closing Date, (ii) costs incurred by the Seller Group Members (other than the Transferred Subsidiaries) in performing Transition Services requested by the Buyer, to the extent not otherwise funded by the Buyer, (iii) cost of obtaining directors and officers tail insurance in an amount reasonably determined by the Seller, acting reasonably, and in consultation with the Buyer and the Monitor, (iv) costs required to wind down and/or dissolve and/or bankrupt the Seller Group Members, as applicable, including any related

- 3 -

fiscal obligations of the Seller Group Members, (v) costs and expenses required to administer the Excluded Assets, Excluded Liabilities and any Restricted Rights, and (vi) to the extent applicable in accordance with Section 7.3, the costs associated with the retention of the Special Business by the Seller Group Members through the Special Closing.

"**Administrative Reserve Order**" means an Order of the CCAA Court, in form and substance satisfactory to the Buyer, the Seller and the Monitor, each acting reasonably, to be made in connection with the CCAA Proceedings on or before the Closing Date that will set out the amount of the Administrative Seller Reserve, the amount of the Administrative Monitor Reserve and the process for the administration thereof by the Monitor.

"**Administrative Seller Reserve**" means the cash reserve in an amount to be agreed by the Monitor, the Seller and the Buyer, two (2) Business Days prior to the Administrative Reserve Order, and approved by the CCAA Court pursuant to the Administrative Reserve Order, which reserve shall be established by the Monitor out of the cash and cash equivalents of the Seller Group as at the Closing Date with the balance, if any, funded by the Buyer to the Monitor on the Closing Date, as a segregated account held in trust by the Monitor for the benefit of Persons entitled to be paid the Administrative Reserve Costs of the Seller and the Buyer, subject to the terms hereof and in accordance with the Administrative Seller Reserve Budget for the purpose of paying the Administrative Reserve Costs of the Seller in accordance with the terms hereof and the Administrative Reserve Order.

"**Administrative Seller Reserve Budget**" means the detailed budget to be prepared by the Seller, in consultation with the Monitor, agreed to by the Seller and the Buyer, and approved by the CCAA Court pursuant to the Administrative Reserve Order, in respect of the Administrative Reserve Costs of the Seller.

"**Affiliate**" means, with respect to any specified Person, any other Person which, directly or indirectly, through one or more intermediaries controls, or is controlled by, or is under common control with, such specified Person (for the purposes of this definition, "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise); provided that, for purposes of this Agreement, the Seller and the Seller Subsidiaries shall be deemed not to be Affiliates of the limited partners of the Seller and their respective holders of equity interests, CDS GP and the shareholders of CDS GP.

"**Agreement**" means this asset purchase agreement and all attached Exhibits, in each case as the same may be supplemented, amended, restated or replaced from time to time, and the expressions "hereof", "herein", "hereto", "hereunder", "hereby" and similar expressions refer to this asset purchase agreement and all attached Exhibits, and unless otherwise indicated, references to Articles, Sections and Exhibits are to Articles, Sections and Exhibits in this asset purchase agreement.

- 4 -

"**Alternative Acquisition Structure**" has the meaning given to such term in Section 7.13.

"**Alternative Transaction**" means (i) any investment in, financing of, capital contribution or loan to, or restructuring or recapitalization of all or a substantial portion of the Seller Group (including any exchange of all or a substantial portion of outstanding debt obligations of the Seller Group for equity securities of any Seller Group Member), (ii) any merger, consolidation, amalgamation, arrangement, share exchange or other similar transaction to which any Seller Group Member is a party that has the effect of transferring, directly or indirectly, all or a material portion of the assets of, or any issuance, sale or transfer of equity interests in, the Seller Group, the Purchased Assets or the Business (iii) any direct or indirect sale of all or a material portion of the assets of, or any issuance, sale or transfer of equity interests in, the Seller Group, the Purchased Assets or the Business or (iv) any other transaction, including a plan of liquidation or reorganization, that transfers or vests ownership of, economic rights to, or benefits in all or a material portion of the assets of the Seller Group, the Purchased Assets or the Business to any party other than the Buyer or one or more Designated Buyers, in each case excluding the transactions contemplated under this Agreement.

"**Applicable Law**" means any transnational, domestic or foreign, federal, provincial, territorial, state, local or municipal (or any subdivision of any of them) law (including common law and civil law), statute, ordinance, rule, regulation, restriction, limit, by-law (zoning or otherwise), judgment, order, direction or any consent, exemption, Governmental Authorizations, or any other legal requirements of, or agreements with, any Governmental Authority, that applies in whole or in part to the transactions contemplated by this Agreement, the Seller Group, the Buyer, the Business, or any of the Purchased Assets or the Assumed Liabilities.

"**Applicants**" means the Seller and those additional applicants listed on Schedule 1.1(a) or such other Affiliates of Seller as may be determined by the Seller and those reasonably requested by the Buyer in order to effectuate the transactions contemplated herein, in each case in consultation with the Monitor.

"**Approval and Vesting Order**" means an order of the CCAA Court, in form and substance satisfactory to the Buyer, in its sole discretion.

"**Asset Allocation Statement**" has the meaning given to such term in Section 3.3.

"**Assigned Agreements**" means, collectively, the Personal Property Leases, the Real Property Leases, the Real Property Landlord Leases and the Assumed Contracts.

"**Assignment Order**" means an order or orders of the CCAA Court pursuant to section 11.3 of the CCAA (and a corresponding Order of the U.S. Bankruptcy Court, which may be the U.S. Sale Order), in form and substance acceptable to the Buyer, in its sole discretion, authorizing and approving the assignment of the Assigned Agreements and preventing any counterparty to the Assigned Agreement from exercising any right or remedy (including termination right or remedy) under the Assigned Agreement, including by reason of: (i) non-monetary defaults, (ii) the insolvency of any Seller Group Member,

- 5 -

(iii) the CCAA Proceedings, (iv) the U.S. Proceedings or (v) the current global economic context which has led to the insolvency of the Seller Group Members and the commencement by them of the CCAA Proceedings and the U.S. Proceedings.

"**Assignment Order Contracts**" means the Transferred Permits, the IP Contracts, the Material Contracts, any Contracts with Restricted Rights, any other Assigned Agreement which, if terminated, would have a material adverse impact on the Business and such other Contracts which are determined by the Buyer and the Seller (pursuant to good faith discussions to take place prior to the date that materials are served for an Assignment Order) to be material to the Business (and, for this purpose, the definition of "Material Contracts" shall not be deemed to be illustrative for purposes of determining whether a Contract is "material to the Business").

"**Assumed Contracts**" has the meaning given to such term in Section 2.1(i).

"**Assumed Employee Plans**" has the meaning given to such term in Section 7.6(j)(i).

"**Assumed Employment Contracts**" means the employment agreements with Transferred Employees including amendments to such agreements, the Key Employee Retention Plans, Collective Agreements that are automatically transferred to the Buyer by operation of law on Closing, and the Employment Agreements Amendments; *provided that* all Employee Plans not in the categories listed herein (or incorporated by reference in any Assumed Employment Contract) shall be excluded from this definition of "Assumed Employment Contracts".

"**Assumed Liabilities**" has the meaning given to such term in Section 2.3.

"**Audited Financial Statements**" has the meaning given to such term in Section 4.14(b).

"**Back-Up Bid**" has the meaning given to such term in the SISP.

"**Borrowers**" means the Canadian Borrower and the U.S. Borrower.

"**Business**" has the meaning given to such term in Recital A.

"**Business Day**" means any day, other than a Saturday or Sunday, on which the principal commercial banks in Montréal, Québec and New York, New York are open for commercial banking business during normal banking hours.

"**Business Intellectual Property**" has the meaning given to such term in Section 2.1(j).

"**Business Plan**" has the meaning given to such term in the confidential information memorandum of the Seller from May 2020.

"**Buyer**" has the meaning given to such term in the preamble to this Agreement.

"**Buyer Benefit Plan**" has the meaning given to such term in Section 7.6(m).

"**Buyer Equityholders**" has the meaning given to such term in Section 5.7.

"**Buyer Subsidiaries**" means collectively each Person that is controlled by the Buyer (for the purposes of this definition, "control", as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise).

"**Canadian Borrower**" means Cirque Du Soleil Canada Inc., a corporation organized under the laws of the Province of Québec.

"**CCAA**" means the *Companies' Creditors Arrangement Act* (Canada).

"**CCAA Court**" has the meaning given to such term in Recital B.

"**CCAA Proceedings**" means the proceedings commenced under the CCAA by the Applicants pursuant to the Initial CCAA Order.

"**CDPQ Lender**" means the lender under the CDPQ Unsecured Credit Agreement from time to time.

"**CDPQ Unsecured Credit Agreement**" means that certain Unsecured Loan Agreement dated as of February 1, 2019 (as from time to time amended, restated, supplemented or otherwise modified), by and among the Seller and the Borrowers as borrowers and CDP Investissements Inc. as lender.

"**CDPQ Unsecured Debt**" means all indebtedness, liabilities and obligations owing by the Seller Group Members under the CDPQ Unsecured Credit Agreement (and any documents or instruments granted or entered into in connection therewith) to the CDPQ Lender, together with all accrued and accruing interest, fees, costs and expenses.

"**CDS**" means Cirque du Soleil Inc., a Seller Subsidiary.

"**CDS 4 Term Loan**" means that certain term loan agreement dated as of June 5, 2020 by and among CDS Canada 4 L.P., acting by its general partner 9415-8235 Québec Inc., as borrower, the lenders party thereto and Royal Bank of Canada, in its capacity as administrative agent, as collateral agent, as same may be amended, restated, supplemented, replaced or otherwise modified from time to time.

"**CDS 4 Term Loan Consideration**" has the meaning given to such term in Section 3.1(a)(ii).

"**CDS GP**" has the meaning given to such term in the preamble to this Agreement.

"**Claims**" means all claims, demands, complaints, grievances, actions, applications, suits, causes of action, Orders, charges, indictments, prosecutions, informations or other similar processes, assessments or reassessments, judgments, debts, liabilities, expenses, costs, damages or losses, contingent or otherwise, whether liquidated or unliquidated, matured or unmatured, disputed or undisputed, contractual, legal or

equitable, including loss of value, professional fees, including "claims" as defined in the U.S. Bankruptcy Code and including fees and disbursements of legal counsel on a full indemnity basis, and all costs incurred in investigating or pursuing any of the foregoing or any proceeding relating to any of the foregoing.

"**Closing**" means the completion of the sale and purchase of the Purchased Assets pursuant to this Agreement at the Closing Time, and all other transactions contemplated by this Agreement that are to occur contemporaneously with the sale and purchase of the Purchased Assets.

"**Closing Date**" means, subject to Section 7.3(f) and Exhibit 7.3(f), a date no later than five (5) Business Days after the conditions set forth in Article 6 have been satisfied or waived, other than the conditions set forth in Article 6 that by their terms are to be satisfied or waived at the Closing (or such other date agreed to by the Parties in writing); provided that, if there is to be a Closing hereunder, then the Closing Date shall be no later than the Sunset Date.

"**Closing Documents**" means all contracts, agreements, certificates and instruments required by this Agreement to be delivered at or before the Closing.

"**Closing Time**" means 10:00 a.m. (Eastern time) on the Closing Date or such other time on the Closing Date as the Parties agree in writing that the Closing Time shall take place.

"**Co-Existence Agreements**" means all agreements listed on Schedule 1.1(b).

"**COBRA**" has the meaning given to such term in Section 4.18(d).

"**Code**" means the U.S. Internal Revenue Code of 1986.

"**Collective Agreements**" means, collectively, all of the collective bargaining agreements and related documents (including all letters of understanding and agreement) with a Union relating to current and former Employees as well as Contractors to which any Seller Group Member is party, to which any Seller Group Member is otherwise bound, which impose any obligations upon any Seller Group Member, or which set out the understanding of the parties or an interpretation with respect to the meaning of any provisions of such collective agreements, each of which is listed on Schedule 4.17(c) of the Disclosure Letter.

"**Commitment Letter**" has the meaning given to such term in Section 5.11(a).

"**Confidential Information**" means non-public, confidential, personal or proprietary information which is furnished to the Buyer or any of its Affiliates by a Seller Group Member or any of the Seller Group's representatives, including information about identifiable individuals, any information relating to the Seller Group Members, or any customer or supplier of the Seller Group Members, but does not include information that is or becomes generally available to the public other than as a result of disclosure by the Buyer or its representatives in breach of this Agreement or that is received by the Buyer from an independent third party that, to the knowledge of the Buyer, obtained it lawfully

and was under no duty of confidentiality (except to the extent that applicable privacy laws do not exclude such information from the definition of personal information) or that is independently developed by the Buyer or its representatives without reference to any Confidential Information.

"**Contractor Fund**" means the fund in the amount of $5,000,000 to be established by the Buyer effective as of the Closing Date by entering into a trust agreement, the terms and conditions of which are summarized in Exhibit F.

"**Contractors**" means all current or former individual independent contractors, consultants, freelancers, agents or other individual non-employees who have provided or are providing services to any Seller Group Member, whether or not such Persons are or were incorporated or have been properly classified in accordance with Applicable Law.

"**Contracts**" means contracts, deeds, licenses, leases, agreements, obligations, promises, undertakings, understandings, arrangements, documents, commitments, entitlements or engagements to which any Seller Group Member is a party or by which any of the Seller Group Member are bound or under which any of the Seller Group Member has, or will have, any right or any liability or contingent right or liability (in each case, whether written or oral, express or implied) relating to the Business, the Purchased Assets or the Assumed Liabilities and includes quotations, orders, proposals or tenders which remain open for acceptance and warranties and guarantees.

"**Contracts Assignment and Assumption Agreements**" means one or more assignment and assumption agreements for the Assigned Agreements, in a form satisfactory to the Buyer, in its sole discretion.

"**Core Team Employees**" means the Employees who have not been placed on temporary or permanent layoff or furlough and were designated as part of the "core team" or are recalled to work as permitted by this Agreement, but shall not include any such Employees who resigned or were terminated prior to Closing.

"**Corporate Records**" means, with respect to any Person, the corporate records of such Person including (i) all organizational documents and by-laws (or the equivalent governing documents), (ii) all minutes of meetings and resolutions of shareholders, partners, managers and directors (and any committees) and (iii) the stock, share or unit certificate books, securities or interests register, register of transfers and register of directors.

"**COVID-19 Actions**" means all reasonable actions taken, planned or planned to be taken in response to events, occurrences, conditions, circumstances, or developments arising directly or indirectly as a result of the COVID-19 outbreak, its impact on economic conditions, or actions taken by Governmental Authorities or other Persons in response thereto.

"**Creator Contracts**" means any agreement between any Seller Group Member and one or more Contractors pursuant to which such Contractor(s) have assigned, licensed or otherwise granted to any Seller Group Member any right, title or interest in or to any Intellectual Property created (solely or jointly with others) by such Contractor(s),

including those Contracts which are listed in Schedule 1.1(c).

"**Credit Bid Consideration**" has the meaning given to such term in Section 3.1(a)(i).

"**Cure Costs**" means all amounts necessary to cure any monetary defaults as a condition to assuming the Assigned Agreements.

"**Deposit**" has the meaning given to such term in Section 3.1(d)(i).

"**Designated Buyer**" has the meaning given to such term in Section 2.6(a).

"**Direction Letters**" has the meaning given to such term in Section 5.7.

"**Disclosure Letter**" means the disclosure letter dated the date hereof regarding this Agreement that has been executed by the Buyer and the Seller concurrently with the execution of this Agreement as updated, supplemented or amended pursuant to Section 7.15.

"**Disclosure Update Period**" has the meaning given to such term in Section 7.15.

"**Employee Excluded Liabilities**" means, except as provided in Sections 2.3 and 7.6, all (i) payments or entitlements that any Seller Group Member, the entities included in the definition of Excluded Assets or any of their Affiliates owes to any current or former employees, officers, directors, or consultants of the Business, including wages, other remuneration, holiday or vacation pay, bonus, change of control, retention, key employee incentive plan payments, termination or severance pay (statutory or otherwise), commission, post-employment medical or life obligations, pension contributions, insurance premiums, taxes, and any other liability, payment or obligations related to such current or former employees, officers, directors, and consultants (including any liability arising under the Worker Adjustment and Retraining Notification Act of 1988 or any law dealing with "collective", "group" or "mass" termination of employment and any similar federal, state, provincial or local law), to the extent required under COBRA, any liability for COBRA coverage to the extent that the Seller Group or its Affiliates maintains a group health plan after the Closing, labor or similar law, if any, any withdrawal liability related to any Employee Plan that is a "multiemployer plan" (as such term is defined under Section 3(37) of ERISA), and any such liabilities arising out of or resulting in connection with the consummation of the transactions contemplated by this Agreement to the extent that the Seller Group or its Affiliates maintains a group health plan after the Closing, in the case of each of the foregoing, to the extent incurred, accrued or arising on or prior to the Closing, (ii) any liability under Title IV of ERISA on account of an ERISA Affiliate, (iii) any liability relating to a former employee, officer, director or consultant of the Business and his or her employment or service with any Seller Group Member or any ERISA Affiliate, (iv) any liability relating to any Employee that does not become a Listed Employee or a Transferred Employee, (v) any obligation, liability or expense relating to any Collective Agreement in connection with or related to the Business, (vi) any obligation, liability or expense relating to or arising out of the employment practices of any Seller Group Member or any of their Affiliates in connection with or related to the

Business occurring prior to the Closing, including any violation by any Seller Group Member or their Affiliates of any labor or employment agreement in connection with or related to the Business, and (vii) any obligation, liability or expense relating to or arising out of all Employee Plans (except for the Assumed Employee Plans and the Assumed Employment Contracts).

"**Employee Fund**" means the fund in the amount of $15,000,000 to be established by the Buyer effective as of the Closing Date by entering into a trust agreement, the terms and conditions of which are summarized in Exhibit D.

"**Employee Plan**" means any plan, arrangement, agreement, program, policy, practice or undertaking, whether oral or written, formal or informal, funded or unfunded, insured or uninsured, registered or unregistered, that provides any employee benefit, fringe benefit, supplemental unemployment benefit, bonus, retention, severance, incentive, profit sharing, termination, change of control, pension, supplemental pension, retirement, stock option, stock purchase, stock appreciation, share unit, phantom stock, equity or equity based compensation, deferred compensation, health, welfare, medical, dental, disability, life insurance and any similar plans, programmes, arrangements or practices, in each case: (i) for the benefit of Listed Employees (or any spouses, dependants, survivors or beneficiaries of such Persons); (ii) that are maintained, sponsored or funded or contributed to by any Seller Group Member; or (iii) under which any Seller Group Member has, or will have, any liability or contingent liability, and excluding any government sponsored pension, health, medical, prescription drugs, retirement, unemployment, workers compensation or similar plan.

"**Employee Priority Claims**" means any accrued wages and unpaid amounts in respect of the category of Claims contemplated by Subsections 6(5)(a) and 6(6)(a) of the CCAA (up to the maximum amount set forth therein) in respect of Employees up to and including the Closing Date (except for any such amounts in respect of Transferred Employees assumed by the Buyer pursuant to Section 2.3(d)).

"**Employee Schedule**" has the meaning given to such term in Section 4.17(a).

"**Employees**" means any and all: (i) employees of the Seller Group Members who are actively at work (including full-time, part-time, seasonal or temporary employees); and (ii) employees of the Seller Group Members who are on approved leaves of absence (including maternity leave, parental leave, short-term disability leave, workers' compensation and other statutory leaves) or on lay-off or furlough (whether temporary or longer) or have recall rights (pursuant to a Collective Agreement or otherwise).

"**Employment Agreement Amendments**" means the amendments to the employment agreements with all Listed Employees who are (i) RSD Employees and (ii) WDI Employees, in each case that result in a waiver of severance entitlements from such employees and a release of claims in favour of the applicable Seller Group Member in the applicable form (depending on whether such Listed Employee is an artist or a crew member) attached as Exhibit E.

"**Encumbrance**" means any security interest (whether contractual, statutory or

otherwise), lien, prior claim, charge, hypothec, reservation of ownership, pledge, encumbrance, mortgage, trust (including any statutory, deemed or constructive trust), title defect, option or adverse claim or encumbrance of any nature or kind other than non-exclusive licenses of Intellectual Property granted in the ordinary course of business consistent with past practice.

"**Environment**" means the environment or natural environment, including air, surface water and groundwater (including potable water, navigable water and wetlands), soil, the land surface and subsurface strata or other environmental media, natural resources, and as additionally defined in any Environmental Law.

"**Environmental Claim**" shall mean any fine, administrative or environmental penalty, written claim, notice, notice of violation, complaint, demand, direction, Order or directive (conditional or otherwise), action, suit, proceeding, summons, investigation or other written communication by or from any Governmental Authority or any other Person resulting from, related to or arising out of: (i) the presence, Release or threatened Release of Hazardous Materials into the Environment; (ii) any violation or alleged violation of, or liability or alleged liability relating to, any Environmental Law; or (iii) any actual or alleged damage, injury, adverse effect, threat or harm to the Environment.

"**Environmental Law**" means all Applicable Law relating to: (i) any Hazardous Materials; (ii) the protection of the Environment, or the protection of plant, animal, fish or human health; or (iii) otherwise imposing liability or standards of conduct concerning the protection and preservation of the Environment, including all Applicable Law with respect to monitoring, recordkeeping, notification, disclosure and reporting requirements relating to clauses (i), (ii) and/or (iii).

"**Equity Interests**" means any capital share, capital stock, partnership, membership, joint venture or other ownership or equity interest, participation or securities (whether voting or nonvoting, whether preferred, common or otherwise, and including share appreciation, contingent interest or similar rights) of a Person.

"**ERISA**" means the *Employee Retirement Income Security Act of 1974*.

"**ERISA Affiliate**" means any Person that would be considered a single employer with the Seller under Sections 414(b), (c), (m) or (o) of the Code.

"**Excluded Assets**" has the meaning given to such term in Section 2.2.

"**Excluded Contracts**" has the meaning given to such term in Section 2.2(b).

"**Excluded JV Entities**" means the Persons listed on Schedule 1.1(d).

"**Excluded Liabilities**" has the meaning given to such term in Section 2.4.

"**Extended Leave Employee**" means any artist or crew member of (a) the Resident Shows Division of the applicable Seller Group Member based in Las Vegas, Nevada and (b) the show entitled "Drawn to Life" intended to be presented in Orlando, Florida, in each case who, as of the Closing, is on an extended or long-term leave of

absence.

"**Filing Date**" means June 30, 2020.

"**Final**" with respect to any Order of any court of competent jurisdiction, means that such Order shall not have been stayed, appealed, varied (except with the consent of the Buyer and the Seller) or vacated, and all time periods within which such Order could at law be appealed shall have expired (but without giving effect to the possibility that a motion under Rule 60(b) of the Federal Rules of Civil Procedure (or the equivalent) may be filed with respect to such Order).

"**Financing**" has the meaning given to such term in Section 5.11(b).

"**First Lien Credit Agreement**" means that certain First Lien Credit Agreement dated as of July 8, 2015 (as amended by that certain Amendment No. 1 dated as of June 30, 2017, that certain Amendment No. 2 dated as of June 30, 2017, that certain Amendment No. 3 dated as of June 30, 2017, that certain Amendment No. 4 dated as of July 3, 2018, that certain Amendment No. 5 dated as of March 8, 2019, and as from time to time further amended, restated, supplemented or otherwise modified), by and among the Seller, the Borrowers, the lenders party thereto from time to time and Royal Bank of Canada as administrative agent and collateral agent (the "**First Lien Administrative Agent**").

"**First Lien Debt**" means all indebtedness, liabilities and obligations owing by the Seller Group Members under the First Lien Credit Agreements (and any security or other documents or instruments granted or entered into in connection therewith) to the First Lien Lenders, together with all accrued and accruing interest, fees, costs and expenses.

"**First Lien Direction Letter**" has the meaning given to such term in Section 5.7.

"**First Lien Lenders**" means the lenders under the First Lien Credit Agreement from time to time.

"**Fonds Lender**" means the lender under the Fonds Unsecured Credit Agreement from time to time.

"**Fonds Unsecured Credit Agreement**" means that certain Unsecured Loan Agreement dated as of February 1, 2019 (as from time to time amended, restated, supplemented or otherwise modified), by and among the Seller and the Borrowers as borrowers and the Fonds de Solidarité des Travailleurs du Québec (F.T.Q.) as lender.

"**Fonds Unsecured Debt**" means all indebtedness, liabilities and obligations owing by the Seller Group Members under the Fonds Unsecured Credit Agreement (and any documents or instruments granted or entered into in connection therewith) to the Fonds Lender, together with all accrued and accruing interest, fees, costs and expenses.

"**Fundamental Representations and Warranties of the Seller**" means the

representations and warranties of the Seller included in Sections 4.1(a) *[Corporate Existence]*, *4.1(b)(vi)* *[Capitalization Ownership]*, 4.2 *[Due Authorization and Enforceability]*, 4.3 *[Residence of Seller]*, 4.5 *[Absence of Conflicts]* (other than clause (c) thereof), and 4.8 *[Title to Assets]*.

"**GAAP**" has the meaning given to such term in Section 4.14(b).

"**General Assignments and Bills of Sales**" means the general assignments and bills of sales for the Purchased Assets, in a form satisfactory to the Buyer, in its sole discretion.

"**Governmental Authority**" means any applicable transnational, federal, provincial, municipal, state, local, national or other government, regulatory authority, governmental department, agency, commission, board, tribunal, bureau, ministry, court, system operator, judicial body, arbitral body or other law, rule or regulation-making entity, or any entity, officer, inspector, investigator or examiner exercising executive, legislative, judicial, regulatory or administrative functions of or pertaining to any government or any court, in each case:

    (i)    having jurisdiction over the Seller Group Members, the Buyer, the Business, the Purchased Assets or the Assumed Liabilities on behalf of any country, province, state, municipality, locality, or other geographical or political subdivision thereof; or

    (ii)    exercising or entitled to exercise any administrative, judicial, legislative, regulatory or taxing authority or power.

"**Governmental Authorizations**" means any authorization, approval, plan, franchise, order, certificate, consent, directive, notice, license, permit, variance, registration, exemption or other right issued to or required by the Seller Group Members relating to the Business or any of the Purchased Assets by or from any Governmental Authority.

"**GST**" means goods and services tax payable under the GST and HST Legislation.

"**GST and HST Legislation**" means Part IX of the *Excise Tax Act* (Canada).

"**Hazardous Material**" means pollutants, contaminants, waste of any nature, hazardous substances, hazardous materials, toxic substances, prohibited substances, dangerous substances or dangerous goods as defined, judicially interpreted or identified in any Environmental Laws including asbestos, asbestos-containing materials, polychlorinated biphenyls (PCBs), petroleum hydrocarbons, and mould.

"**Holdings LP**" has the meaning given to such term in the preamble to this Agreement.

"**HSR Act**" means the U.S. Hart-Scott-Rodino Antitrust Improvements Act of 1976, and the rules and regulations promulgated thereunder, as amended.

"**HST**" means harmonized sales tax payable under the GST and HST Legislation.

"**Inbound License Agreement**" has the meaning given to such term in Section 4.13(d).

"**Initial Allocation Statement**" has the meaning given to such term in Section 3.3(a).

"**Initial CCAA Order**" means the initial order of the CCAA Court pursuant to the CCAA commencing the CCAA Proceedings, as amended, restated, supplemented and/or modified from time to time.

"**Initial Recognition Order**" means the Order of the U.S. Bankruptcy Court in the U.S. Proceedings recognizing, on a final basis, the CCAA Proceedings as "foreign main proceedings" pursuant to section 1502(4) of the *U.S. Bankruptcy Code*, which shall be acceptable, in form and substance, to the Buyer.

"**Intellectual Property**" means all of the following as they exist in any jurisdiction throughout the world, whether registered or unregistered: (a) patents, industrial designs, patent applications, industrial design applications, patentable inventions, patent applications, and other patent rights, together with all continuations, continuations-in-part, divisions, reissues, extensions and reexaminations thereof; (b) trademarks, service marks, trade dress, logos, brand names, taglines, social media identifiers (such as a Twitter® handle) and related accounts, logos and corporate names and any other indicia of origin, and all registrations of and applications to register the foregoing and associated goodwill therewith (collectively, "**Trademarks**"); (c) any and all copyrightable works of authorship, including registered copyrights in both published works and unpublished works, mask works and designs, unregistered copyrights in both published works and unpublished works, moral rights, designs and all registrations thereof and applications to register the foregoing (collectively, "**Copyrights**"); (d) internet domain names, Internet addresses and other computer identifiers ("**Domain Names**"); (e) trade secrets, including to the extent confidential and proprietary, business information, know-how, concepts, methods, processes, specifications, inventions, formulae, reports, databases, customer lists, mailing lists, or business plans and other proprietary information and rights (collectively, "**Trade Secrets**"); (f) proprietary computer Software; and (g) proprietary rights in know-how and any other intellectual property rights.

"**IP Assignment and Assumption Agreements**" means one or more intellectual property assignment and assumption agreements for the Business Intellectual Property, substantially in the form of Exhibit B.

"**IP Contracts**" means the License Agreements, the Live Show Agreements, the Co-Existence Agreements and the Creator Contracts.

"**IT Assets**" has the meaning given to such term in Section 2.1(k).

"**Joint Direction**" has the meaning given to such term in Section 3.2(d).

"**JV Entities**" means the Persons listed on Schedule 1.1(e) in which one of the Seller Group Members directly or indirectly holds a portion, but not all, of the securities or other ownership, equity or proprietary interests and Persons who are not Seller Group Members directly or indirectly hold the balance, with such Seller Group Members' ownership interests reflected on such Schedule 1.1(e).

"**Key Employee Retention Plans**" means the key employee retention plans described on Schedule 1.1(f) of the Disclosure Letter.

"**Lease Assignment and Assumption Agreements**" means one or more lease assignment and assumption agreements for the Personal Property Leases, Real Property Leases and Real Property Landlord Leases, in form and substance satisfactory to the Buyer, in its sole discretion.

"**Leased Premises**" means the real or immovable property subject to the Real Property Leases.

"**License Agreements**" has the meaning given to such term in Section 4.13(d).

"**Listed Employees**" has the meaning given to such term in Section 4.17.

"**Live Show Agreements**" means all agreements to which any Seller Group Member is a party and which relates to the presentation of a live show, including without limitation the agreements listed on Schedule 1.1(g).

"**Local Sale Agreements**" has the meaning given to such term in Section 2.6(c).

"**Material Adverse Effect**" means any change, event, fact, condition, occurrence or circumstance, individually or in the aggregate that: (i) has, or would reasonably be expected to have, a material adverse effect on the operations, results of operations or condition (financial or otherwise) of the Business, (ii) materially and adversely impairs the Purchased Assets or the Business, taken as a whole, or materially and adversely increases the Assumed Liabilities or (iii) materially delays or impedes the consummation of the transactions contemplated by this Agreement, but excluding, in the case of each of clauses (i), (ii) and (iii) any such change, event, occurrence or circumstance that results from or arises out of (A) changes in general economic conditions or affecting the industries and markets in which the Business operates (except to the extent that such changes have a materially disproportionate effect on the Purchased Assets, the Assumed Liabilities or the Business, in each case, taken as a whole, relative to other comparable companies and entities operating in the industries in which the Seller Group operates), (B) changes in macroeconomic factors, interest rates, currency exchange rates, commodity prices or general financial or credit market conditions (except to the extent that such changes have a materially disproportionate effect on the Purchased Assets, the Assumed Liabilities or the Business, in each case, taken as a whole, relative to other comparable companies and entities operating in the industries in which the Seller Group operates), (C) war or terrorism, (D) the COVID-19 pandemic or other epidemic or pandemic outbreaks including any continuation thereof, (E) any change in law or generally acceptable accounting principles, (F) any announcement of the transactions contemplated by this Agreement, or (G) the pendency of the CCAA Proceedings and the

U.S. Proceedings and any action approved by, or motion made before, the CCAA Court and the U.S. Bankruptcy Court to the extent contemplated herein.

"**Material Contracts**" means, collectively:

(i)     the Real Property Leases;

(ii)    the Real Property Landlord Leases;

(iii)   any Permit that is material to the Business;

(iv)    any Contract that is reasonably likely to involve payment to any Seller Group Member in excess of $1,000,000 in any fiscal year;

(v)     any Contract that is reasonably likely to involve payment by any Seller Group Member in excess of $1,000,000 in any fiscal year;

(vi)    any Contract regarding the formation or participation in an equity partnership, or joint venture or joint product development arrangement, or Contract that involves a sharing of revenues, profits, losses, costs or liabilities with a third Person that is material to the Business;

(vii)   any Contract granting to any Person a first refusal, first offer or similar preferential right to purchase or acquire any of the Purchased Assets that are material to the Business;

(viii)  any Contract (including a letter of intent) related to the acquisition of a business or line of business of another Person (whether by merger, sale of stock, sale of assets or otherwise), other than Contracts in which the applicable transaction has been consummated and there are no material obligations ongoing;

(ix)    any Contract obligating any Seller Group Member to provide or obtain any product or service material to the conduct of the Business exclusively to or from any Person, irrespective of any geographic, market or other restriction;

(x)     other than employment agreements, any Contract between any Seller Group Member, on the one hand, and any Affiliate of any Seller Group Member, any officer or director of any Seller Group Member, or any 5% or greater shareholder of any Seller Group Member, on the other hand;

(xi)    any Contract with a Governmental Authority that is material to the Business;

(xii)   any IP Contracts; and

(xiii)  any Contract, which if terminated, would have a Material Adverse Effect.

"**Monitor**" means Ernst & Young Inc., in its capacity as CCAA Court-appointed

monitor of the Applicants pursuant to the Initial CCAA Order.

"**Monitor's Certificate**" means the certificate delivered to the Buyer and filed with the CCAA Court by the Monitor certifying that the Monitor has received written confirmation in form and substance satisfactory to the Monitor from the Seller and the Buyer that all conditions to Closing have been satisfied or waived by the applicable Parties and the transactions contemplated by this Agreement have been completed.

"**Order**" means any order, directive, judgment, decree, injunction, decision, ruling, award or writ of any Governmental Authority.

"**Outbound License Agreement**" has the meaning given to such term in Section 4.13(d).

"**Owned Property**" means, collectively, the immovable properties known and described as (i) lot numbers 3 237 014 and 3 237 015 of the Cadastre of Quebec, Registration Division of Montreal, and with the building thereon erected bearing civic number 8400, 2nd Avenue, Montreal, Québec, H1Z 4M6, (ii) lot number 2 706 502 of the Cadastre of Quebec, Registration Division of Montreal, and with the building thereon erected bearing civic number 8333, 2nd Avenue, Montreal, Quebec, H1Z 4N9, (iii) lot number 4 281 606 of the Cadastre of Quebec, Registration Division of Montreal, and with the building thereon erected bearing civic number 2525, Jarry East Street, Montreal, Quebec, H1Z 2C2, and (iv) the Vacant Land, as the said properties subsist at the time of entering into this Agreement, with all of their rights and appurtenances.

"**Parties**" means the Seller and the Buyer collectively, and "**Party**" means either the Seller or the Buyer, as the context requires.

"**Payment**" means any bribe, improper rebate, payoff, influence payment, kickback or gift of anything of value.

"**PCBs**" has the meaning given to such term in the definition of "**Hazardous Material**".

"**Permit Transfer Agreements**" means the permit transfer agreements with respect to the Transferred Permits dated as of the Closing Date between the applicable Seller Group Member and the Buyer in a form reasonably satisfactory to the Buyer, acting reasonably.

"**Permits**" has the meaning given to such term in Section 2.1(q).

"**Permitted Encumbrances**" means:

(i)     Encumbrances given by any Seller Group Member as security to a public utility or any Governmental Authority when required in the ordinary course of business but only insofar as they relate to any amounts not due as at the Closing Date;

(ii)    reservations, limitations, provisos and conditions, if any, expressed in any original grants of land from the Crown and any statutory limitations,

111971500

exceptions, reservations and qualifications;

(iii)    any rights of expropriation, access or use or any other similar rights conferred or reserved by Applicable Law;

(iv)    notices registered on title in respect of the Real Property Landlord Leases;

(v)    servitudes or rights-of-way for the passage, ingress and egress of Persons and vehicles over parts of the Owned Property, provided such servitudes or rights-of-way (a) are registered on title to the Owned Property and (b) do not materially interfere with or restrict the current use of the Owned Property;

(vi)    any registered servitudes or rights of way by Hydro-Québec or Bell Canada to occupy a part of the Owned Property to install any circuits, poles and necessary equipment;

(vii)    any title defects, irregularities, encroachments, or other discrepancies in title or possession relating to the Owned Property, provided that they do not materially interfere with or restrict the current use of the Owned Property;

(viii)    any statutory liens, charges or other Encumbrances for assessments or governmental charges or incurred, created and granted in the ordinary course of business to a public utility or Governmental Authority in connection with operations conducted with respect to the Owned Property, but only to the extent those liens relate to costs for which payment is not yet due and owing;

(ix)    Encumbrances associated with, and financing statements evidencing, the rights of equipment lessors under any Personal Property Leases which are assigned to and assumed by the Buyer hereunder; and

(x)    Encumbrances associated with, and financing statements evidencing, the rights of equipment lessors under any Personal Property Leases entered into from the date of this Agreement to the Closing Date in compliance with Section 7.2.

"**Person**" means any individual, partnership, limited partnership, limited liability company, joint venture, syndicate, sole proprietorship, company or corporation with or without share capital, unincorporated association, trust, trustee, executor, administrator or other legal personal representative, Governmental Authority or other entity, however designated or constituted.

"**Personal Property Leases**" has the meaning given to such term in Section 2.1(f).

"**Post-Closing Straddle Tax Period**" has the meaning given to such term in Section 7.5(c).

"**Pre-Closing Straddle Tax Period**" has the meaning given to such term in Section 7.5(c).

"**Purchase Price**" has the meaning given to such term in Section 3.1(a).

"**Purchased Assets**" has the meaning given to such term in Section 2.1.

"**QST**" means the Québec sales tax payable under the QST Legislation.

"**QST Legislation**" means *An Act Respecting the Québec Sales Tax (Québec)*.

"**Real Property**" means all real or immoveable property owned by any Seller Group Member, or in which any Seller Group Member has a freehold interest, and used in or required for the Business, including the Seller Group Members' right, title and interest in all plants, buildings, structures, installations, improvements, appurtenances and fixtures (including fixed machinery and fixed equipment) thereon, forming part thereof, or benefiting such real or immoveable property.

"**Real Property Landlord Leases**" has the meaning given to such term in Section 2.1(g).

"**Real Property Leases**" has the meaning given to such term in Section 2.1(h).

"**Receiver**" means Ernst & Young Inc., in its capacity as court-appointed receiver of certain of the Applicants' assets pursuant to the Receivership Order.

"**Receivership Order**" means an order to be rendered by the court in the context of the Applicants' CCAA proceedings appointing Ernst & Young Inc. as receiver over *de minimis* assets of the Applicants pursuant to section 243 of the *Bankruptcy and Insolvency Act* for the sole purpose of allowing the employees of these Applicants to benefit from those payments provided under the WEPPA.

"**Recognition Order**" means the Order of the U.S. Bankruptcy Court in the U.S. Proceedings recognizing and giving effect to the Approval and Vesting Order, which may be incorporated into the U.S. Sale Order in form and substance acceptable to the Buyer.

"**Registered Intellectual Property**" has the meaning given to such term in Section 4.13(c).

"**Release**" means any release, spill, leak, emission, pumping, injection, deposit, discharge, dispersal, leaching, migration, spraying, abandonment, pouring, emptying, escaping, throwing, dumping, disposal, placing or exhausting of any Hazardous Material into the Environment (including the abandonment or disposal of any storage tanks, barrels, containers or other closed receptacles containing any Hazardous Material).

"**Restricted Rights**" has the meaning given to such term in Section 2.5.

"**RSD Employees**" means artists and crew members of the Resident Shows Division of the applicable Seller Group Member based in Las Vegas, Nevada who will receive and will execute the Employment Agreement Amendments within the applicable

timeframe and the Short-Term Leave Employees. For the avoidance of doubt, the definition of RSD Employees does not include any Extended Leave Employee.

"**Russian Competition Law**" means Federal Law No. 135-FZ dated 26 July 2006.

"**Second Lien Credit Agreement**" means that certain Second Lien Credit Agreement dated as of July 8, 2015, as from time to time amended, restated, supplemented or otherwise modified, by and among the Seller, the Borrowers, the lenders party thereto from time to time and Bank of America, N.A. as administrative agent and collateral agent (the "**Second Lien Administrative Agent**").

"**Second Lien Debt**" means all indebtedness, liabilities and obligations owing by the Seller Group Members under the Second Lien Credit Agreement (and any security or other documents or instruments granted or entered into in connection therewith) to the Second Lien Lenders, together with all accrued and accruing interest, fees, costs and expenses.

"**Second Lien Direction Letter**" has the meaning given to such term in Section 5.7.

"**Second Lien Lenders**" means the lenders under the Second Lien Credit Agreement from time to time.

"**Seller**" has the meaning given to such term in the preamble to this Agreement.

"**Seller Group**" means the Seller and the Seller Subsidiaries.

"**Seller Group Member**" means any Person forming part of the Seller Group.

"**Seller Subsidiaries**" means collectively each Person that is controlled by the Seller (for the purposes of this definition, "control", as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise).

"**Short-Term Leave Employee**" means any artist or crew member of (a) the Resident Shows Division of the applicable Seller Group Member based in Las Vegas, Nevada and (b) the show entitled "Drawn to Life" intended to be presented in Orlando, Florida, in each case who, as of the Closing, is on parental leave, short-term disability leave or other short-term leave of absence.

"**SISP**" means the Sale and Investment Solicitation Process substantially in the form appended as Exhibit C or otherwise in form and substance satisfactory to the Buyer and the Seller, each in its sole discretion.

"**SISP Order**" means the Order of the CCAA Court approving, among other things, the SISP and this Agreement as the Stalking Horse Bid as part of the SISP.

"**SISP Recognition Order**" means the Order of the U.S. Bankruptcy Court

entered in the U.S. Proceedings recognizing and giving effect to the SISP Order, unless the Seller, with the consent of the Buyer not to be unreasonably withheld or conditioned, determines not to seek such SISP Recognition Order.

"**Software**" means all: (a) computer programs, whether in source code, object code or human readable form; (b) databases and compilations, including all data and collections of data, whether machine readable or otherwise; and (c) all documentation including user manuals and other training documentation relating to any of the foregoing.

"**Special Business**" has the meaning given to such term in Exhibit 7.3(f).

"**Special Closing**" has the meaning given to such term in Exhibit 7.3(f).

"**Stalking Horse Bid**" has the meaning given to such term in the SISP.

"**Successful Bid**" has the meaning given to such term in the SISP.

"**Successful Bidder**" has the meaning given to such term in the SISP.

"**Sunset Date**" has the meaning given to such term in Section 9.1(c).

"**Tax**" and "**Taxes**" means taxes, duties, fees, premiums, assessments, imposts, levies and other charges of any kind whatsoever (including withholding on amounts paid to or by any Person) imposed by any Governmental Authority, including all interest, penalties, fines, additions to tax or other additional amounts imposed by any Governmental Authority in respect thereof, and including those levied on, or measured by, or referred to as, income, gross receipts, profits, capital, transfer, land transfer, sales, goods and services, harmonized sales, use, value-added, excise, stamp, withholding, business, franchising, escheat, property, development, occupancy, employer health, payroll, employment, health, disability, severance, unemployment, social services, education and social security taxes, all surtaxes, all customs duties and import and export taxes, countervail and anti-dumping, all license, franchise and registration fees and all employment insurance, health insurance and Canada, Québec and other government pension plan premiums or contributions.

"**Tax Act**" means the *Income Tax Act* (Canada) and shall also include a reference to any applicable and corresponding provisions under the income tax laws of a province or territory of Canada, as applicable.

"**Tax Encumbrance**" means any Encumbrances for Taxes (a) not yet due and payable, (b) that are contested in good faith and for which adequate reserves have been made in the applicable financial statements or (c) the nonpayment of which is permitted or required by the U.S. Bankruptcy Code or other equivalent provisions of other applicable laws.

"**Tax Return**" means any return, declaration, report, statement, information statement, form, election, amendment, claim for refund, schedule or attachment thereto or other document filed or required to be filed with a Governmental Authority with respect to Taxes.

"**Terminated Creator Contracts**" has the meaning given to such term in Section 7.24(b).

"**Transfer Taxes**" means all transfer, documentary, sales, use, stamp, registration, customs duties, import and export taxes, surtaxes, value added, GST/HST, QST, provincial sales/retail Taxes, fees and any other similar Taxes (including any real property transfer Tax and any other similar Tax) and any related penalties and interest.

"**Transferred Employees**" has the meaning given to such term in Section 7.6(b).

"**Transferred Permits**" has the meaning given to such term in Section 2.1(q).

"**Transferred Subsidiaries**" has the meaning given to such term in Section 2.1(v).

"**Transition Services**" has the meaning given to such term in Section 7.19(b).

"**U.S.**" means the United States of America.

"**U.S. Bankruptcy Code**" means title 11 of the United States Code, 11 U.S.C. §§ 101 et seq, as amended.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the District of Delaware, overseeing the U.S. Proceedings.

"**U.S. Borrower**" means CDS U.S. Intermediate Holdings, Inc., a Delaware corporation.

"**U.S. Proceedings**" has the meaning given to such term in Recital C.

"**U.S. Sale Order**" means an order of the U.S. Bankruptcy Court entered in the U.S. Proceedings in form and substance acceptable to the Buyer, which shall, among other things, recognize and give effect to the Approval and Vesting Order and otherwise approve this Agreement and the transactions contemplated hereby.

"**Union**" means an organization of employees, contractors or artists formed for purposes that include the regulation of relations between employees and employers or producers and artists and includes a federal, provincial, state, territorial, national or international union, a certified council of unions, a designated or certified employee bargaining agency, an artists' association or syndicate and any organization which has been declared a union pursuant to applicable labour relations legislation or which may qualify as a union pursuant to applicable labour relations legislation, or which represents artists pursuant to Applicable Law.

"**Vacant Land**" means lot number 3 237 025 of the Cadastre of Quebec, Registration Division of Montreal, a lot located at the intersection of Michel-Jurdant Street and Crémazie Boulevard, Montréal, Québec.

"**WDI Employees**" means artists or crew members of the show entitled "Drawn to Life" intended to be presented in Orlando, Florida, who will receive and will execute

the Employment Agreement Amendments within the applicable timeframe and the Short-Term Leave Employees.  For the avoidance of doubt, the definition of WDI Employees does not include any Extended Leave Employee.

"**WEPPA**" means the *Wage Earner Protection Program Act* (S.C. 2005, c. 47, s. 1).

## 1.2     Statutes

Except as otherwise provided in this Agreement, any reference in this Agreement to a statute refers to such statute and all rules and regulations made under it, as it or they may have been or may from time to time be amended, re-enacted or replaced.

## 1.3     Headings, Table of Contents, etc.

The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenient reference only and do not affect the interpretation of this Agreement. The recitals to this Agreement are an integral part of this Agreement.

## 1.4     Gender and Number

In this Agreement, unless the context otherwise requires, words importing the singular include the plural and *vice versa*, and words importing gender include all genders.

## 1.5     Currency

Except where otherwise expressly provided, all amounts in this Agreement are stated and shall be paid in U.S. dollars. References to "$" are to U.S. dollars. References to "C$" are to Canadian dollars.

## 1.6     Certain Phrases

In this Agreement (i) the words "including", "includes" and "include" and any derivatives of such words mean "including (or includes or include) without limitation"; and (ii) the words "the aggregate of", "the total of", "the sum of", or a phrase of similar meaning means "the aggregate (or total or sum), without duplication, of". The expression "Article", "Section" and other subdivision followed by a number, mean and refer to the specified Article, Section or other subdivision of this Agreement.

## 1.7     Invalidity of Provisions

Each of the provisions contained in this Agreement is distinct and severable and a declaration of invalidity or unenforceability of any such provision or part thereof by a court of competent jurisdiction shall not affect the validity or enforceability of any other provision hereof so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party. Upon (i) such a determination of invalidity or unenforceability or (ii) any change in Applicable Law or other action by any Governmental Authority which materially detracts from the legal or economic rights or benefits, or materially increases the obligations, of any Party or any of its Affiliates under this Agreement,

the Parties shall negotiate to modify this Agreement in good faith so as to effect the original intent of the Parties as closely as possible in an acceptable manner so that the transactions contemplated by this Agreement be consummated as originally contemplated to the fullest extent possible.

**1.8     Knowledge**

Any reference to the knowledge of (i) any Seller Group Member, means the actual knowledge, after reasonable inquiry, of Daniel Lamarre, Stéphane Lefebvre, Jocelyn Côté and Lyne Lamothe, and (ii) the Buyer, means the actual knowledge, after reasonable inquiry, of Marc Rosenberg.

**1.9     Entire Agreement**

This Agreement, the Disclosure Letter, and the agreements and other documents required to be delivered pursuant to this Agreement, constitute the entire agreement among the Parties, and set out all the covenants, promises, warranties, representations, conditions and agreements among the Parties in connection with the subject matter of this Agreement, and supersede all prior agreements, understandings, negotiations and discussions, whether oral or written, pre-contractual or otherwise. There are no covenants, promises, warranties, representations, conditions, understandings or other agreements, whether oral or written, pre-contractual or otherwise, express, implied or collateral among the Parties in connection with the subject matter of this Agreement, except as specifically set forth in this Agreement and any document required to be delivered pursuant to this Agreement.

**1.10     Waiver, Amendment**

Except as expressly provided in this Agreement, no amendment or waiver of this Agreement shall be binding unless executed in writing by all Parties hereto. No waiver of any provision of this Agreement shall constitute a waiver of any other provision nor shall any waiver of any provision of this Agreement constitute a continuing waiver unless otherwise expressly provided.

**1.11     Governing Law; Jurisdiction and Venue**

This Agreement, the rights and obligations of the Parties under this Agreement, and any Claim or controversy directly or indirectly based upon or arising out of this Agreement or the transactions contemplated by this Agreement (whether based on contract, tort or any other theory), including all matters of construction, validity and performance, shall in all respects be governed by, and interpreted, construed and determined in accordance with, the laws of the Province of Québec and the federal laws of Canada applicable therein, without regard to the conflicts of law principles thereof. The Parties consent to the jurisdiction and venue of the courts of Québec for the resolution of any such disputes arising under this Agreement. Each Party agrees that service of process on such Party as provided in Section 11.7 shall be deemed effective service of process on such Party.

**1.12     Incorporation of Disclosure Letter, Schedules and Exhibits**

The Disclosure Letter and any schedule or exhibit attached thereto, and any schedule or exhibit attached to this Agreement, is an integral part of this Agreement.

## 1.13   Made Available

Any reference in this Agreement to "made available" shall mean documents or information provided in that certain Project Circle (External – Third Party) data room hosted by Firmex for the Buyer and its representatives prior to the Filing Date or shall have been provided directly to the Buyer prior to the Filing Date.

## 1.14   Accounting Terms

All accounting terms used in this Agreement are to be interpreted in accordance with GAAP unless otherwise specified.

## 1.15   Non-Business Days

Whenever payments are to be made or an action is to be taken on a day which is not a Business Day, such payment will be made or such action will be taken on or not later than the next succeeding Business Day.

## 1.16   Computation of Time Periods

If any action may be taken within, or any right or obligation is to expire at the end of, a period of days under this Agreement, then the first day of the period is not counted, but the day of its expiry is counted.

## ARTICLE 2
## PURCHASE AND SALE

## 2.1   Agreement to Purchase and Sell Purchased Assets

Upon and subject to the terms and conditions of this Agreement (including the provisions of Section 2.5), at the Closing and effective as of the Closing Time, the Seller shall, and shall cause each of the Seller Subsidiaries other than the Transferred Subsidiaries (if any) to, sell, convey, transfer, assign and deliver, or cause to be sold, conveyed, transferred, assigned and delivered to the Buyer (or the applicable Designated Buyer), and the Buyer (or the applicable Designated Buyer) shall purchase, free and clear of all Encumbrances other than Permitted Encumbrances, all of the Seller Group Members' right, title and interest in, to and under, or relating to, the assets, property and undertaking owned or used or held for use by the Seller Group Members in connection with the Business (collectively, the "**Purchased Assets**"), including the following properties, assets and rights:

(a)     *Cash and Accounts Receivable* – all cash and cash equivalents (except to the extent used to fund the Administrative Reserve Accounts or to pay Cure Costs), accounts receivable (including any disputed receivable) or cash of the Seller Group Members granted by the Seller Group Members as collateral to secure outstanding letters of credit in respect of Purchased Assets, bills receivable, trade accounts, trade debts and book debts due or accruing due, in connection with the

Business (whether current or non-current), any refunds and rebates receivable (other than those specified in Section 2.1(u)) relating to the Business or the Purchased Assets and the full benefit of all security (including cash deposits), guarantees, warranties and other collateral of the Seller Group Members relating to the Business, and amounts receivable (or which may become receivable) by the Seller Group Members under agreements whereby any Seller Group Members have disposed of a business, facility or other assets, or under royalty (or other) agreements or documents related thereto, and any asset-backed commercial paper or other investments, and all bank accounts (to the extent applicable and assignable), in each case, of the Seller Group Members;

(b)    *Prepaid Expenses* – all prepaid expenses, including *ad valorem* Taxes, of the Seller Group Members, and all deposits of the Seller Group Members with any supplier, public utility, lessor under any Personal Property Lease or Real Property Lease, or Governmental Authority;

(c)    *Inventory* – all items that are owned by the Seller Group Members for sale, license, rental, lease or other distribution in the ordinary course of business, or are being produced for sale, or are to be consumed, directly or indirectly, in the production of goods or services to be available for sale, of every kind and nature and wheresoever situated relating to the Business including inventories of raw materials, spare parts, work in progress, finished goods and by-products, operating supplies and packaging materials;

(d)    *Fixed Assets and Equipment* – all machinery, equipment, tents (including "big top tents"), furnishings, artwork, furniture, parts, dies, molds, tooling, tools, computer hardware, supplies, accessories and other tangible personal and moveable property, including "production" and "show" equipment and systems (other than inventory) owned by the Seller Group Members for use in or relating to the Business, whether located on any Seller Group Member's premises or elsewhere, and all rights of the Seller Group Members under warranties, indemnities, licenses, and all similar rights of the Seller Group Members against third Persons with respect to the equipment, fixed assets and tangible assets referenced herein;

(e)    *Vehicles* – all motor vehicles, including all trucks, vans, cars and forklifts owned by the Seller Group Members for use in or relating to the Business, and all rights of the Seller Group Members under warranties, indemnities, licenses, and all similar rights of the Seller Group Members against third Persons with respect to the motor vehicles referenced herein;

(f)    *Personal Property Leases* – subject to Section 2.5(d), all leases of personal or moveable property of the Seller Group Members that relate to the Business, including those listed on Schedule 2.1(f) of the Disclosure Letter, including all benefits, rights and options of the Seller Group Members pursuant to such leases and all leasehold improvements forming part thereof (collectively, the "**Personal Property Leases**");

(g)    *Real Property Landlord Leases* – subject to Section 2.5(d), all of the Seller Group Members' right, title and interest in, to and under the all offers to lease,

agreements to lease, leases, renewals of leases, tenancy agreements, rights of occupation, licenses or other occupancy agreements (including licenses, concessions or occupancy agreements, parking and/or storage agreements and licenses, telecom and/or satellite agreements and licenses and solar panel leases or licenses but excluding rights in the nature of easements) which bind any Seller Group Member as lessor or licensor and which entitle any other Person to possess or occupy any space within the Owned Property, together with all security, letters of credit, deposits, reserves, guarantees and indemnities relating thereto, listed on Schedule 2.1(g) of the Disclosure Letter (collectively, the "**Real Property Landlord Leases**");

(h)    *Real Property Leases* – subject to Section 2.5(d), all of the Seller Group Members' right, title and interest in, to and under all offers to lease, agreements to lease, leases, renewals of leases, subleases, tenancy agreements, rights of occupation, licenses or other occupancy agreements for real or immovable property, including all purchase options, prepaid rents, security deposits, rights to appurtenances and improvements, licenses and permits relating thereto and all leasehold improvements thereon, whether oral or written, relating to the Business where any Seller Group Member is a tenant, subtenant, occupant or licensee, listed on Schedule 2.1(h) of the Disclosure Letter (collectively, the "**Real Property Leases**");

(i)    *Assumed Contracts* – subject to Sections 2.5(d), 2.5(e) and 2.5(f), all other Contracts to which any of the Seller Group Members is a party (including IP Contracts, customer agreements, supply agreements, joint venture agreements, operating and joint operating agreements, government funding agreements, participation agreements, non-compete, non-solicitation, leases, licenses, the Assumed Employment Contracts, and the Assumed Employee Plans) set forth on Schedule 2.1(i) of the Disclosure Letter, together with any Contracts that are entered into by the Seller Group Members in the ordinary course of business from the date of this Agreement to the Closing Date in compliance with Section 7.2 (but excluding (i) any Contracts that are entered into after the date of this Agreement other than in compliance with Section 7.2; and (ii) any Excluded Contracts) and the benefit of any confidentiality agreements with others, including those with respect to the Confidential Information, in each case, to the extent not previously disclaimed by the Seller with the consent of the Buyer (collectively, the "**Assumed Contracts**");

(j)    *Intellectual Property* – all Intellectual Property and rights in Intellectual Property owned by the Seller Group Members that are used or held for use in or otherwise relate to the Business  (the "**Business Intellectual Property**"), including:

(i)    all Trademarks (including "Cirque du Soleil" brand and Trademarks anywhere in the world and all variations and derivatives thereof and logos and designs used in connection therewith or related thereto and all associated marks), trade names, Copyrights, Trade Secrets, Domain Names and other similar property or proprietary rights;

(ii)    the storyline, plot, themes, characters, concept developments, ideas,

costumes, sets, props, choreographies, performances, make-up design, lighting concepts, sound designs, musical composition and staging of any live entertainment program;

(iii)    all registrations and applications for registration thereof;

(iv)    all income, royalties, damages and payments accruing as of and from the date hereof with respect to the Business Intellectual Property, including damages and payments for past, present or future infringement, dilutions or other violations thereof; and

(v)    all claims for and the right to bring an action at law or equity for the infringement, dilution or other violations of the foregoing at, before or after the Closing Time, including the right to receive all proceeds and damages therefrom;

(k)    *Information Technology Systems* – all computer systems, including Software, hardware, firmware, middleware, platforms, interfaces, systems, networks, information technology equipment, facilities, websites, infrastructure, workstations, switches, data communications lines and associated documentation therefor and rights therein owned or held by the Seller Group Members used in the Business, and any other information technology systems owned by the Seller Group Members and used in the Business, including, all electronic data processing systems, program specifications, source codes, object code, input data, report layouts, formats, algorithms, record file layouts, diagrams, functional specifications, narrative descriptions, flow charts, operating manuals, training manuals and other related material (collectively, the "**IT Assets**");

(l)    *Goodwill* – the goodwill of the Business and relating to the Purchased Assets, and information and documents of the Seller Group Members relevant thereto, including lists of customers and suppliers, credit information, telephone and facsimile numbers, email addresses, websites, research materials, research and development files, Confidential Information and the exclusive right of the Buyer to represent itself as carrying on the Business in succession to the Seller Group Members;

(m)    *Employee Records* – personnel and employment records relating to the Transferred Employees to the extent not prohibited by Applicable Laws;

(n)    *Employee Loans* – any loans made by the Seller Group Members to, or other rights to repayment of the Seller Group Members from, any of their Transferred Employees (but excluding any loans associated with any Employee Plans other than Assumed Employee Plans);

(o)    *Business Records* – all business and financial records and files of the Business, including the general ledger and accounting records relating to the Business, marketing materials, market research, all customer lists and lists of suppliers, tax returns, reports and information (and any related documents) relating to any Tax imposed on the Purchased Assets, all operating manuals, plans and specifications

and all of the right, interest and benefit, if any, thereunder and to and in the Domain Names, telephone numbers and facsimile numbers used by the Seller Group Members in the conduct of the Business, and all records, files and information necessary for the Buyer to conduct or pursue the rights described in Section 2.1(s); provided, however, that the Seller Group Members may retain copies of all books and records included in the Purchased Assets to the extent necessary or useful for the administration of the CCAA Proceedings and the U.S. Proceedings or the filing of any Tax Return or compliance with any Applicable Law or the terms of this Agreement or related to the Excluded Assets.

(p)     *Owned Property* – the Owned Property;

(q)     *Permits* – the Governmental Authorizations (including those relating to Environmental Law) of the Seller Group Members required for the Business or the Purchased Assets from any Governmental Authority (collectively, the "**Permits**"), to the extent transferable to the Buyer or its permitted designees (collectively, the "**Transferred Permits**");

(r)     *Insurance* –

    (i)     the interests of the Seller Group Members in all Contracts of insurance, insurance policies and insurance plans of the Seller Group Members, to the extent such interests are transferable;

    (ii)    any receivables with respect to insurance proceeds net of any deductibles and retention recovered or recoverable by the Seller Group Members under all other Contracts of insurance, insurance policies (excluding proceeds paid directly by the insurer to or on behalf of directors and officers under director and officer policies) and insurance plans between the date of this Agreement and the Closing Date; and

    (iii)   the full benefit of the Seller Group Members' rights to insurance claims (excluding proceeds paid directly by the insurer to or on behalf of directors and officers under director and officer policies) relating to the Business and amounts recoverable in respect thereof net of any deductible;

(s)     *Actions, etc.* – any claims, refunds, causes of action, rights of recovery, rights of set-off, subrogation and rights of recoupment of the Seller Group Members related to the Business or any of the Purchased Assets or any of the Assumed Liabilities, including those listed on Schedule 2.1(s) of the Disclosure Letter, and the interest of the Seller Group Members in any litigation and in the proceeds of any judgment, Order or decree issued or made in respect thereof in respect of occurrences, events, accidents or losses suffered prior to the Closing Time (but excluding any of the foregoing solely relating to any of the Excluded Assets or Excluded Liabilities);

(t)     *Loans* – any loans or debts due prior to the Closing Time from any Person to any Seller Group Member relating to the Business or the Purchased Assets;

(u)    *Tax Refunds* – the benefit of the Seller Group Members to any refundable Taxes payable or paid by the Seller Group Members, net of any amounts withheld by any Governmental Authority, having jurisdiction over the assessment, determination, collection, or other imposition of any Tax, and the benefit of the Seller Group Members to any claim or right of any Seller Group Member to any refund, rebate, or credit of Taxes, but for greater certainty, only to the extent that such refundable Taxes, refund, rebate or credit relates to Taxes paid or payable by the Seller Group Members in respect of a period ending on or before the Closing Date or a Pre-Closing Straddle Tax Period (for greater certainty, any amount paid to any of the Seller Group Members on account of a Tax refund referred to in this paragraph 2.1(u) shall be received by this Seller Group Member as agent for and on behalf of the Buyer, and reasonably promptly thereafter paid over to the Buyer);

(v)    *Interest in Subsidiaries* – the Equity Interests in any Seller Subsidiaries as determined by the Buyer in accordance with Section 2.5(g) (the "**Transferred Subsidiaries**");

(w)    *Assumed Employee Plans* – any assets related to any Assumed Employee Plans;

(x)    *Governmental Assistance Refunds and Receivables* – any refunds and receivables relating to governmental assistance programs to the extent such amounts are legally permitted to be transferred and/or the legally mandated use of such refunds or receivables are Assumed Liabilities; and

(y)    *Other Assets* – the Equity Interests of the Seller Group Members in the JV Entities and the other assets of the Seller Group Members specified on Schedule 2.1(y) of the Disclosure Letter.

(z)    *Corporate Records of the Transferred Subsidiaries* – Tax records and returns, and books and records pertaining thereto, minute books, stock ledgers, organizational documents, corporate seals, taxpayer and other identification numbers and other documents, in each case, relating to the organization, maintenance and existence of each Transferred Subsidiary, if any;

(aa)   *Other Collateral* – Any other Collateral (as defined in the First Lien Credit Agreement), regardless of whether such Collateral is owned or used or held for use by the Seller Group Members in connection with the Business, except to the extent such Collateral is an Excluded Asset hereunder; and

(bb)   *Time of Transfer* – Any Transferred Subsidiaries will be transferred to the Buyer (or any Designated Buyer as applicable) immediately prior to the transfer of the Purchased Assets other than Transferred Subsidiaries.

**2.2    Excluded Assets**

Notwithstanding any provision of this Agreement to the contrary but subject to Sections 2.5(d), 2.5(e), 2.5(f) and 2.5(g), the Purchased Assets shall not include any of the following assets of the Seller Group Members (collectively, the "**Excluded Assets**"):

- 31 -

(a)     *Corporate Records* –Tax records and returns, and books and records pertaining thereto, minute books, stock ledgers, organizational documents, corporate seals, taxpayer and other identification numbers and other documents, in each case, relating to the organization, maintenance and existence of each Seller Group Member (other than the Transferred Subsidiaries, if any) as a Person; in each case, that do not primarily or solely relate to any of the Purchased Assets, provided that if they do primarily or solely relate to any of the Purchased Assets, the Seller may redact any confidential or sensitive information that does not relate to the Purchased Assets, and provided further that the Buyer may take copies of all Tax records and books and records pertaining to such records (as redacted, if applicable) to the extent necessary or useful for the carrying on of the Business after Closing, including the filing of any Tax Return, provided, however that the Seller shall retain the original copies of any of the records required to be provided to the Buyer hereunder (and provide the Buyer with a copy thereof) to the extent Seller Group Members are required to do so under Applicable Law;

(b)     *Excluded Contracts* – all Contracts of the Seller Group Members including all Contracts of the Seller Group Members with Contractors, but excluding Contracts which are Assigned Agreements (collectively, the "**Excluded Contracts**");

(c)     *Sale Records* – All records prepared in connection with the sale of the Purchased Assets to the Buyer or the Designated Buyers or in connection with the SISP, or otherwise;

(d)     *Director and Officer Insurance Policies* – all rights of the Seller Group Members and the directors and officers of the Seller Group Members under any director and officer insurance policies in effect immediately prior to the Closing, including any proceeds received or receivable by such Persons thereunder;

(e)     *Certain Securities* – all Equity Interests in the Seller Subsidiaries other than the Transferred Subsidiaries, if any and all Equity Interests in the Excluded JV Entities;

(f)     *Ordinary Course Assets* – any asset of the Seller Group Members that would otherwise constitute a Purchased Asset but for the fact that it is conveyed, leased or otherwise disposed of in the ordinary course of business in compliance with Section 7.2 during the period beginning on the date of this Agreement and ending on the Closing Date;

(g)     *Employee Plans* – any assets associated with any Employee Plans that are not Assumed Employee Plans;

(h)     *Intercompany Accounts Receivable* – other than accounts receivable owed by a Transferred Subsidiary, all accounts receivable owing as between the Seller Group Members;

(i)     *Tax Refunds* – all refundable Taxes, Tax refunds, Tax rebates and Tax credits not specified in Section 2.1(u); and

(j)    *Retainers* – all of the Seller Group Members' rights in any retainers paid to professionals in respect of the CCAA Proceedings and the transactions contemplated under this Agreement, it being understood that such retainers shall be fully accounted for in connection with calculating the Administrative Monitor Reserve and the Administrative Seller Reserve.

**2.3    Assumption of Liabilities**

The Buyer shall assume as of the Closing Time and shall pay, discharge and perform, as the case may be, from and after the Closing Time, the following obligations and liabilities of the Seller Group Members with respect to the Business or the Purchased Assets, other than the Excluded Liabilities (collectively, the "**Assumed Liabilities**"), which Assumed Liabilities shall only consist of:

(a)    *Obligations under Contracts, etc.* – all liabilities and obligations arising under the Assigned Agreements to the extent first arising and relating to the period on or after the Closing Time in each case, which are assigned to the Buyer under this Agreement, and any Cure Costs under such Assigned Agreements to the extent payable by the Buyer under Section 2.5(c);

(b)    *Trade Debt* – (i) pre-Filing Date trade payables relating to the Business in an aggregate amount equal to the aggregate amount at the Closing Date of the trade payables listed on the schedule e-mailed from Milbank LLP to Stikeman Elliott LLP on July 15, 2020, the specific identity of such trade payables shall be agreed between the Buyer and the Seller prior to the Closing and (ii) all trade payables relating to the Business incurred after the Filing Date but prior to the Closing Time that are not in violation of Section 7.2, but excluding all professional fees and expenses;

(c)    *Purchased Assets* – all liabilities to the extent first arising out of the operation of the Purchased Assets for the periods on and after the Closing Time;

(d)    *Employee Matters* – (i) all liabilities and obligations of the Buyer pursuant to Section 7.6 (including any liabilities associated with any Assumed Employee Plans and Assumed Employment Contracts), (ii) all accrued and unpaid vacation pay in respect of Transferred Employees, and (iii) all payment obligations, if any, of the Seller Group Members in respect of the Employee Priority Claims;

(e)    *Environmental* – any liabilities relating to compliance with Environmental Law or remediation of Hazardous Materials located on, in, under or migrating from any of the Purchased Assets solely to the extent relating to acts or omissions of the Buyer occurring on or after the Closing Time, but excluding any conditions, events, acts or omissions existing prior to the Closing Time except to the extent required by Applicable Law;

(f)    *Taxes* – all liabilities for Taxes relating to the Purchased Assets for a tax period (or portion thereof) beginning on or after the Closing Date (including for any Post-Closing Straddle Tax Period);

(g)  *Customer Contracts* – all obligations to refund to customers, if requested, their prepaid tickets and subscriptions to shows relating to the Business incurred prior to the Closing Time and listed in Schedule 2.3(g)(i), but specifically excluding any liabilities and obligations specified on Schedule 2.3(g)(ii);

(h)  *Letters of Credit* – all liabilities and obligations of the Seller relating to those certain letters of credit set forth on Schedule 2.3(h)(i), but specifically excluding any liabilities and obligations specified on Schedule 2.3(h)(ii);

(i)  *Cure Costs* – all Cure Costs to the extent not otherwise paid by the Buyer pursuant to Section 3.2(d); and

(j)  *Promoter Advances* – all obligations to reimburse promoters, if requested, for advances received from such promoters on future shows relating to the Business up to a maximum of $5,700,000.

**2.4    Excluded Liabilities**

Except as expressly assumed pursuant to Section 2.3, all debts, obligations, contracts and liabilities of or relating to the Business, Purchased Assets, Seller Group Members or any predecessors of the Seller Group Members, and the Seller Group Members' Affiliates, of any kind or nature, shall remain the sole responsibility of the Seller Group Members and their Affiliates (excluding Transferred Subsidiaries), and the Buyer shall not assume, accept or undertake, any debt, obligation, duty, contract or liability of the Seller Group Members and their Affiliates of any kind whatsoever, except as expressly assumed pursuant to Section 2.3, whether accrued, contingent, known or unknown, express or implied, primary or secondary, direct or indirect, liquidated, unliquidated, absolute, accrued, contingent or otherwise, and whether due or to become due, and specifically excluding (without limitation) the following liabilities or obligations which shall be retained by, and which shall remain the sole responsibility of, the Seller Group Members (collectively, the "**Excluded Liabilities**"):

(a)  *General* – except as expressly included in Assumed Liabilities, all liabilities, other than with respect to Taxes, to the extent arising out of the operation of Business or the Purchased Assets for periods prior to the Closing Time (including, for the avoidance of doubt, breaches of contract, infringement, violations of law, tortious conduct, indebtedness for borrowed money and intercompany liabilities);

(b)  *Contract Liabilities* – all liabilities of the Seller Group Members under the Assigned Agreements incurred or relating to the period prior to the Closing Time, (excluding any trade payables assumed under Section 2.3(b));

(c)  *Excluded Assets* – all liabilities and obligations relating to the Excluded Assets (including any Excluded Contracts);

(d)  *Employee Matters* – except as included in Section 2.3(d), or as required under Applicable Law in respect of the Transferred Employees, the Assumed Employment Contracts and the Assumed Employee Plans, all Employee Excluded Liabilities;

(e)    *Trade Debt* – all pre-Filing Date trade payables relating to the Business (excluding any trade payables assumed under Section 2.3(b));

(f)    *Warranties* – all liabilities arising out of or relating to services, products or product or service warranties of the Seller Group Members or any predecessors or Affiliates of the Seller Group Members to the extent provided, developed, designed, manufactured, marketed, sold or distributed on or prior to Closing;

(g)    *Environmental* – subject to applicable Law,

(i)    any liabilities or obligations relating to Environmental Law, Hazardous Materials, Releases or Environmental Claims in any way related to the Seller Group Members or their predecessors or Affiliates, the Business or the Purchased Assets, arising from or relating to any condition, event, violation, act, omission or conduct prior to the Closing Time including without limitation, any monetary fines, penalties or judgments imposed in connection with any Environmental Law, Hazardous Materials, Release or Environmental Claim; and

(ii)    any acts or omissions or conduct of any of the Seller Group Members or any of their respective subsidiaries in respect of any matters related to the Environment that are or may become subject to investigation and/or prosecution by any Governmental Authority;

(h)    *Intercompany Accounts Payable* – any debts due or accruing due prior to the Closing Time from the Seller Group Members to any shareholder, director, officer (except amounts owing to any officer for service to the Business as an employee) or Affiliate of the Seller Group Members or to another Seller Group Member;

(i)    *Intellectual Property Claims* – any claims against the Seller Group Members for infringement, misappropriation or other violation of any Intellectual Property of any third Person relating to any period prior to the Closing Time;

(j)    *Pre-Filing Debt* – all liabilities, obligations and related guarantees relating to the First Lien Debt, the Second Lien Debt, the Fonds Unsecured Debt, the CDPQ Unsecured Debt, the CDS 4 Term Loan and any other indebtedness for borrowed money;

(k)    *Taxes* – all liabilities for (A) Taxes of the Seller Group Members for any tax period, (B) Taxes relating to the Purchased Assets for any tax period ending on or before the Closing Date (including any Pre-Closing Straddle Tax Period), and (C) Taxes related to the Excluded Assets, in each case that are not Assumed Liabilities;

(l)    *Brokers Fees or Commissions* – all liabilities and obligations of the Seller Group Members relating to any brokerage, finder's or other similar fee or commission incurred in connection with the transactions contemplated by this Agreement; and

(m)    *Other* – Claims, other than with respect to Taxes, arising from or in relation to

any facts, circumstances, events or occurrences existing, arising or relating to the period prior to the Closing Time, including liabilities relating to any breach of law and product liability claims, except, in each case, as specifically defined in Section 2.3 as an Assumed Liability;

*provided* that, in the event of any conflict between the terms of this Section 2.4 and the terms of Section 2.3, the terms of Section 2.4 will control.

**2.5    Assignment of Purchased Assets**

(a)    Notwithstanding anything in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Purchased Asset or any right thereunder if an attempted assignment or transfer, without the consent of a third Person, would constitute a violation of an Applicable Law, breach or in any way adversely affect the rights of the Buyer thereunder ("**Restricted Rights**"), unless the assignment is subject to an Assignment Order or otherwise excused by operation of Applicable Law or the U.S. Sale Order. The Seller shall use commercially reasonable efforts to take all such action, and use commercially reasonable efforts to do or cause to be done all such things, in each case, as are reasonably necessary or proper, and the Seller shall not be required to incur any costs or expenses in relation thereto unless the Buyer agrees in advance to reimburse the Seller for any such costs and expenses, in order that the obligations of the Seller Group Members under such Restricted Rights may be performed in such manner that, following Closing, the value of such Restricted Rights is preserved and inures to the benefit of the Buyer, and that any amounts due and payable, or which become due and payable, in and under the Restricted Rights by a co-contracting party are received by the Buyer. Subject to payment or performance of all liabilities in respect thereof by the Buyer (other than with respect to any Excluded Liabilities), the Seller shall reasonably promptly pay to the Buyer all amounts collected by or paid to the Seller Group Members in respect of all such Restricted Rights. Subject to Section 7.2, the Seller shall not, without the prior written consent of the Buyer, agree to any modification of any Restricted Rights.

(b)    If, notwithstanding the efforts of the Seller, a consent to transferring the Restricted Rights to the Buyer is required but not obtained by the Closing Time or such assignment is not attainable, neither the Seller nor the Buyer shall be in breach of this Agreement nor shall the Purchase Price be adjusted nor (but subject to the Buyer's termination right set forth in Section 9.1) shall the Closing be delayed in respect of the Assumed Contracts or the Transferred Permits; provided, however, if the Closing occurs, then, with respect to any Restricted Rights for which consent or approval is required but not obtained, from and after the Closing for a period of no more than six (6) months, the Seller Group Members shall cooperate with the Buyer, at the Buyer's cost and expense, in any commercially reasonable arrangement that the Buyer may request to provide the Buyer with all of the benefits related to such Restricted Rights (including enforcement for the benefit of the Buyer of any and all rights of the Seller Group Members against any party to the applicable Restricted Rights arising out of the breach or cancellation thereof by such party) and the Buyer shall be responsible for, and

shall promptly pay and perform all payment and other obligations under such Restricted Rights to the same extent as if such Restricted Rights had been assigned or transferred at Closing; provided, however, that the Buyer and the Seller agree that nothing in this Section 2.5 shall operate to prohibit or diminish in any way the right of any Seller Group Member to dissolve, windup or otherwise cease operations as it may determine in its sole discretion, or require the Seller to take any illegal action or commit fraud on any Person; provided further, however, that, notwithstanding the foregoing, the Seller Group Members shall not dissolve, windup or otherwise cease operations during such six (6) month period following Closing to the extent the Buyer requests that it be provided with the benefits relating to such Restricted Rights pursuant to a transition services agreement or otherwise.

(c)     Subject to the terms and conditions of this Agreement, the Seller hereby agrees to assign, and cause each Seller Group Member to assign, to the Buyer (or the Buyer's assignees) on the Closing Date, effective as of the Closing Time, all of the Seller's and Seller Group Members' rights, benefits and interests in, to and under the Assigned Agreements, in accordance with: (i) this Agreement; (ii) an Assignment Order, (iii) the Approval and Vesting Order; (iv) the Initial Recognition Order; (v) the Recognition Order and (vi) the U.S. Sale Order, as applicable. The Seller shall use commercially reasonable efforts to obtain any necessary consents or approvals in order to assign the Assigned Agreements, and to obtain the waivers and consents contemplated by Section 6.2(g). The Seller shall take such other actions as are commercially reasonable to cause the Assigned Agreements to be assigned by the Seller Group Members to, and assumed by, the Buyer (or the Buyer's assignees) as of the Closing Time. At or prior to the Closing Time, the Seller will comply with the Applicable Laws in its efforts under this Section 2.5(c) to assign the Assigned Agreements to the Buyer (or the Buyer's assignees). The Buyer will use its commercially reasonable efforts to assist the Seller in obtaining any such consents, approvals and waivers. For greater certainty, and notwithstanding anything else herein contained, the Buyer shall be entitled to communicate with the counterparty to any Contract to which a Seller Group Member is a party in connection with the transactions contemplated by this Agreement, in consultation with the Seller, and the Seller shall take all such reasonable actions as are necessary to facilitate such communications by the Buyer. Cure Costs in respect of Assigned Agreements shall be paid by the Seller from cash and cash equivalents of the Seller Group as of the Closing Date (for certainty after funding the Administrative Reserve Accounts) and, to the extent such amount is insufficient to pay all Cure Costs, the Buyer shall pay, or otherwise arrange for payment, of the balance of the Cure Costs, provided for certainty that the Buyer shall not be obligated to pay any Cure Cost in respect of any Contract that is not an Assigned Agreement.

(d)     The Buyer may at its sole cost and expense, at any time prior to seven (7) Business Days before the Administrative Reserve Order, add to or remove from Schedules 2.1(f), 2.1(g), 2.1(h) and 2.1(i) of the Disclosure Letter, a Personal Property Lease, a Real Property Landlord Lease (only to add), a Real Property Lease or an Assumed Contract (other than an Assumed Employment Contract), as

applicable, for any reason and any such Personal Property Lease, Real Property Landlord Lease, Real Property Lease or Assumed Contract shall automatically, upon its addition or deletion from Schedule 2.1(f), 2.1(g), 2.1(h) or 2.1(i) of the Disclosure Letter, become an Assumed Contract or an Excluded Contract, as applicable, provided that, (i) the Seller shall not be required to obtain a consent to assign or an assignment order in respect of any Assumed Contract not listed on Schedules 2.1(f), 2.1(g), 2.1(h) or 2.1(i) of the Disclosure Letter at least seven (7) Business Days prior to the Administrative Reserve Order; (ii) the Purchase Price shall not in any way be reduced as a consequence thereof; and (iii) for greater certainty, any Cure Costs relating to such Assumed Contracts shall be payable in accordance with Section 2.5(c).

(e)     If it is determined, either before or after Closing, that any Seller Group Member has any ownership in any property or assets used in connection with the Business which should be or otherwise should have been transferred and assigned to the Buyer, the Seller Group Members shall, at the request or with the consent of the Buyer, take all such actions necessary to transfer and assign to the Buyer (or the Buyer's assignees) (at, or as soon as practicable after, the Closing), for no additional consideration, such property or assets free and clear of Encumbrances (other than any Permitted Encumbrance), including by obtaining a further vesting Order of the CCAA Court in respect of such property or assets, and to execute and deliver to the Buyer on request by the Buyer from time to time such other instruments of transfer, consents, notices and documents as may be necessary or desirable to effectively transfer to the Buyer (or the Buyer's assignees) such property or assets free and clear of Encumbrances (other than any Permitted Encumbrance).

(f)     If it is determined by the Buyer following Closing that an Excluded Contract is necessary or desirable for the operation of the Business, the Seller Group Members shall take all such commercially reasonable actions necessary to assign such Contract (as soon as reasonably practicable) to the Buyer (or the Buyer's assignees), at the Buyer's cost and expense, for no additional consideration, including by seeking consent of the counterparty to such Contract or pursuant to an Assignment Order, and to execute and deliver to the Buyer on request by the Buyer from time to time such other instruments of transfer, assignments, consents, notices and documents as may be reasonably necessary to effectively assign to the Buyer (or the Buyer's assignees) such Contract.

(g)     The Buyer may, at its sole cost and expense, at any time prior to seven (7) Business Days before the Administrative Reserve Order, add or remove a Transferred Subsidiary for any reason and any Transferred Subsidiary shall automatically, upon its addition or removal, become or cease to be, a Transferred Subsidiary, as applicable, provided that the Purchase Price shall not in any way be reduced as a consequence thereof; and provided further that if a Seller Subsidiary which holds any Equity Interests in any JV Entities is so added as a Transferred Subsidiary (and remains designated as a Transferred Subsidiary), the Equity Interests held by such Transferred Subsidiary shall be removed from Schedule 2.1(y) and will not form part of the Purchased Assets at Closing.

- 38 -

(h)     To the extent that (i) a Seller Group Member owns any right, title or interest in or to any Purchased Asset and is not a party to this Agreement, (ii) a Contract is or becomes an Assumed Contract pursuant to Sections 2.5(d), 2.5(e) or 2.5(f), as applicable, and the Seller Group Member party to such Contract is not a party to this Agreement, or (iii) a Seller Subsidiary becomes a Transferred Subsidiary pursuant to Section 2.5(g), and the applicable Transferred Subsidiary's equityholders, as applicable, are not party to this Agreement, then, in each case, such Seller Group Member or equityholders, as applicable, shall and shall cause such entity to provide a signed counterpart to this Agreement in the form attached hereto as Exhibit A, agreeing to be bound by the terms of this Agreement and authorizing the Seller to act as such Seller Group Member's agent for all purposes hereunder.

(i)      To the extent that a Contract becomes an Excluded Contract pursuant to Sections 2.5(d), 2.5(e) or 2.5(f) or a Seller Subsidiary ceases to be a Transferred Subsidiary pursuant to Section 2.5(g), and the Seller Group Member party to such Contract or each of the applicable Transferred Subsidiary's equityholders, as applicable, is (i) a party to this Agreement; and (ii) not otherwise party to an Assumed Contract or the owner of any Purchased Asset, the parties hereby agree that such Seller Group Member shall no longer be party to this Agreement.

(j)      Notwithstanding anything to the contrary contained herein, the Purchased Assets shall not include any application for registration of a trademark that would be invalidated, canceled, voided or abandoned due to the assignment, transfer or conveyance of the Purchased Assets hereunder, including intent-to-use applications filed with the USPTO pursuant to 15 U.S.C. Section 1051(b) prior to the filing and acceptance of a statement of use or amendment to allege use pursuant to 15 U.S.C. Section 1051(c) or (d), unless and until such time that the assignment, transfer or conveyance of the Purchased Assets hereunder shall not cause such trademark application to be invalidated, cancelled, voided or abandoned. At such time, the Seller agrees to deliver an IP Assignment and Assumption Agreement evidencing the assignment, transfer and conveyance of such trademark application, and/or any other instrument or document as may be reasonably necessary or, in the Buyer's opinion, desirable to perfect the Buyer's ownership interest in each such trademark application. Following Closing, the Seller shall, at the Buyer's sole cost and expense, use all commercially reasonable efforts to provide the Buyer with the benefits under each such trademark application as if such application had been assigned, including executing any necessary licenses to the Buyer; provided, however, that the Buyer and the Seller agree that nothing in this Section 2.5(j) shall operate to prohibit or diminish in any way the right of any Seller Group Member to dissolve, windup or otherwise cease operations as it may determine in its sole discretion, or require the Seller to take any illegal action or commit fraud on any Person; provided further, however, that, notwithstanding the foregoing, the Seller Group Members shall not dissolve, windup or otherwise cease operations during the six (6) month period following Closing to the extent required by the Buyer for the purposes of providing the Buyer with the benefit of any of the aforementioned trademark applications as if such application had been assigned, including executing any necessary licenses to

the Buyer.

(k) Notwithstanding the foregoing, (i) nothing in this Section 2.5 shall require the Seller to renew any Restricted Rights once they have expired and (ii) any efforts required of the Seller pursuant to this Section 2.5 shall (A) in respect of all costs and expenses of the Seller Group Members arising after the Closing Date, be paid directly by the Buyer, to the extent arising in respect of or related to (i) any such arrangement which the Seller would not have otherwise incurred had no assignment intervened or (ii) compliance by the Seller with this Section 2.5, (B) be strictly on an interim basis and in no event required to continue for more than six (6) months following Closing, and (C) to the extent not prohibited, be of an administrative nature only, without any substantive function. The Buyer shall pay all costs and expenses, whether through the Administrative Reserve Accounts or otherwise, as provided for above and indemnify and hold the Seller Group Members harmless from and against all Claims, incurred or asserted, as a result of any actions taken pursuant to this Section 2.5 other than resulting from gross or intentional fault or fraud, as determined by a final non-appealable Order entered by a court of competent jurisdiction.

**2.6    Designated Buyer(s); Local Sale Agreements.**

(a) <u>Designated Buyers</u>. The Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.6, one or more of the Buyer Subsidiaries to (i) purchase specified Purchased Assets (including specified Assigned Agreements), (ii) assume specified Assumed Liabilities, and/or (iii) employ specified Transferred Employees on and after the Closing Date (any such Buyer Subsidiary shall be properly designated by the Buyer in accordance with this clause, a "**Designated Buyer**"), and any reference herein to the Buyer shall be accordingly deemed to include such Designated Buyer as necessary to give effect to such designation; provided, however, that no such designation shall relieve the Buyer of any of its obligations hereunder, but any payment or performance by any Designated Buyer shall be deemed to satisfy such payment or performance obligation of the Buyer hereunder.

(b) <u>Notice of Designation</u>. The designation referred to in Section 2.6(a) shall be made by the Buyer by way of a written notice to be delivered to the Seller prior to the Closing (and in no event later than the tenth (10th) Business Day prior to Closing), which written notice shall identify the applicable Designated Buyer(s) and shall indicate which Purchased Assets, Assumed Liabilities and Transferred Employees (other than Employees which are transferred by operation of Applicable Law) the Buyer intends such Designated Buyer(s) to purchase, assume and/or employ, as applicable, hereunder and include a signed counterpart to this Agreement in the form attached hereto as Exhibit A, agreeing to be bound by the terms of this Agreement and authorizing the Buyer to act as such Designated Buyer(s)' agent for all purposes hereunder.

(c) <u>Local Sale Agreements</u>. On the terms and subject to the conditions set forth herein, to the extent necessary to effect the Closing on the terms hereof, the Seller shall, and the Buyer shall, and shall cause the relevant Designated Buyers to, enter

into such agreements or instruments, including bills of sale and/or assignment and assumption agreements (the "**Local Sale Agreements**"), providing for (i) the sale, transfer, assignment or other conveyance to the Buyer and the relevant Designated Buyers, in accordance with the requirements of Applicable Law and this Agreement, and (ii) the assumption by the Designated Buyers of any Assumed Liability that the Buyer intends to allocate to them. Such Local Sale Agreements shall promptly be negotiated in good faith between the Seller and the Buyer, but the Seller shall not be required to give any representations, warranties or indemnities pursuant to such Local Sale Agreements which are greater in scope or liability than those provided for in this Agreement.

## ARTICLE 3
## PURCHASE PRICE AND RELATED MATTERS

**3.1    Purchase Price and Establishment of Employee Fund and Contractor Fund**

(a)    The purchase price payable by the Buyer for the Purchased Assets (the "**Purchase Price**") shall be:

(i)    the release of the Seller Group from all amounts outstanding and "Obligations" owing under (and as defined in each of) the First Lien Credit Agreement and Second Lien Credit Agreement as of the Closing Date, including the principal amount of indebtedness and interest accrued as of the Closing Date, which amount as of (but not including) July 14, 2020, is estimated to be $1,089,497,253.02, plus any fees (such aggregate amount, the "**Credit Bid Consideration**");

(ii)    the amount of cash that is sufficient to pay (A) all "Obligations" owing under (and as defined in) the CDS 4 Term Loan (as in effect on the date hereof) on the Closing Date (the "**CDS 4 Term Loan Consideration**"); (B) the amount of the Administrative Monitor Reserve and the amount of the Administrative Seller Reserve to be funded by the Buyer in accordance with Section 7.7, as applicable; and (C) the amount of the Cure Costs to be funded or paid by the Buyer pursuant to this Agreement; and

(iii)    the assumption of the Assumed Liabilities that have accrued to, or are payable with respect to a period prior to Closing.

(b)    At the Closing Time, the Buyer shall establish, or cause to be established, the Contractor Fund and shall fund, or cause to be funded, the amount of the Contractor Fund to the Monitor in accordance with Section 3.1(d) and Section 7.24.

(c)    At the Closing Time, the Buyer shall establish, or cause to be established, the Employee Fund and shall fund, or cause to be funded, the amount of the Employee Fund to the Monitor in accordance with Section 3.1(d) and Section 7.6(p).

(d)    The Buyer (alone or together with the Designated Buyers, if any) shall satisfy the

obligations pursuant to Sections (a), 3.1(b) and 3.1(c) and the Purchase Price as follows:

(i)     on or prior to 3:00 p.m. (Montreal time) on the date that is two (2) Business Days following the date hereof, by paying by wire transfer of immediately available funds to the order of the Monitor, in trust, or as the Monitor may otherwise direct in writing, an amount equal to $21,012,648, to be held in trust as a deposit and invested in accordance with the provisions of Section 3.2 below pending the Closing or termination of this Agreement (the "**Deposit**");

(ii)    at the Closing Time, in respect of the Credit Bid Consideration, by causing the release of the Seller Group from all amounts outstanding and "Obligations" owing under (and as defined in each of) the First Lien Credit Agreement and Second Lien Credit Agreement, including the principal amount of indebtedness and interest accrued as of the Closing Date, plus any pre-payment fees, owed under the First Lien Credit Agreement and Second Lien Credit Agreement, and any other documents or agreements entered into therewith in an aggregate amount equal to the Credit Bid Consideration, which amount shall be payable by means of a dollar-for-dollar credit against the amount of such indebtedness, upon which each of the First Lien Credit Agreement and Second Lien Credit Agreement, together with all documents, instruments, agreement, Encumbrances and other related instruments shall, automatically and without any further formality, be released, discharged, terminated and of no further force and effect and the secured parties thereunder shall execute and deliver all necessary discharges and releases in respect thereof;

(iii)   at the Closing Time, (A) as to the obligations referred to in Sections 3.1(b) and 3.1(c), by payment in cash by the release of $20,000,000 of the Deposit from trust to the Monitor on behalf of the Seller in accordance with Section 3.2; (B) as to the amount of the CDS 4 Term Loan Consideration, by payment in cash of such amount to the administrative agent and collateral agent under the CDS 4 Term Loan, to the account designated in writing by the administrative and collateral agent prior to the Closing Date and (C) in respect of the Cure Costs to be funded or paid by the Buyer pursuant to this Agreement, by (1) payment in cash by the release from trust to the Monitor on behalf of the Seller in accordance with Section 3.2 of the remainder of the Deposit, and all interest earned thereon, after giving effect to the payment in Section 3.1(d)(iii)(A), and (2) wire transfer from the Buyer to the counterparties to the applicable Assigned Agreements, as directed by the Monitor;

(iv)    as to the amount of the Administrative Monitor Reserve and the amount of the Administrative Seller Reserve, in accordance with Section 7.7; and

(v)     at the Closing Time, as to the amount of the Assumed Liabilities described in Section 3.1(a)(ii), by assuming such Assumed Liabilities.

(e)     The Parties hereto agree and acknowledge that the Buyer's assumption of the Assumed Liabilities in accordance with the terms of this Agreement shall constitute adequate and sufficient consideration for the Purchased Assets, if any, that do not constitute collateral under the First Lien Credit Agreement or the Second Lien Credit Agreement.

(f)     The Buyer and its Affiliates, on the one hand, and the Seller, any other Seller Group Member, and any of their Affiliates, on the other hand, shall be entitled to deduct and withhold from the Purchase Price or other amounts otherwise payable pursuant to this Agreement such amounts as such Person is required to deduct and withhold under Applicable Law provided, however, that the Buyer and its Affiliates shall not make any such deduction or withholding pursuant to Section 1445 of the Code, as long as (i) at Closing, the Seller shall have delivered to the Buyer certification required by Section 10.2(o) and (ii) the representation in Section 4.7(g) shall be true as of the Closing Date. Before making any such deduction or withholding, the withholding agent shall use commercially reasonable efforts to provide the Person in respect of which deduction or withholding is proposed to be made reasonable advance written notice of the intention to make such deduction or withholding, and the withholding agent shall cooperate with any reasonable request from such Person to obtain reduction of or relief from such deduction or withholding to the extent permitted by Applicable Law. To the extent that amounts are so deducted and withheld, such amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

(g)     The Seller shall direct, and shall cause each Seller Subsidiary to direct, the Buyer (including any Designated Buyer) to pay a portion of the Credit Bid Consideration that is payable in respect of the Purchased Assets sold by such Seller Subsidiary (in accordance with the allocation determined in Section 3.3) by releasing such Seller Subsidiaries from their respective "Obligations" under (and as defined in each of) the First Lien Credit Agreement and Second Lien Credit Agreement, as described in Section 3.1(d).

**3.2     Deposit**

(a)     Following receipt, the Deposit shall be invested by the Monitor, in trust, in an interest bearing account or term deposit or guaranteed investment certificate with or issued by one of the five (5) largest (by asset size) Canadian Schedule I Canadian chartered banks pending Closing or earlier termination or non-completion of the transactions contemplated by this Agreement. In holding and dealing with the Deposit and any interest earned thereon pursuant to this Agreement, the Monitor is not bound in any way by any agreement other than this Section 3.2, and the Monitor shall not and shall not be considered to assume any duty, liability or responsibility other than to hold the Deposit, and any interest earned thereon, in accordance with the provisions of this Section 3.2, and to pay the Deposit, and any interest earned thereon, to the Person becoming entitled thereto in accordance with the terms of this Agreement, except in the event of a dispute between the Parties as to entitlement to the Deposit. In the case of such dispute, the Monitor may, in its sole, subjective and unreviewable discretion, or

shall, if requested by any of the Parties, pay the Deposit and any and all interest earned thereon into the CCAA Court, whereupon the Monitor shall have no further obligations relating to the Deposit or any interest earned thereon. The Monitor shall not, under any circumstances, be required to verify or determine the validity of any notice or other document whatsoever delivered to the Monitor and the Monitor is hereby relieved of any liability or responsibility for any Claims which may arise as a result of the acceptance by the Monitor of any such notice or other document in good faith.

(b)     If the Closing occurs, the Deposit and all accrued interest earned thereon shall be released to the Monitor on behalf of the Seller on Closing in accordance with Section 3.1(d)(iii). Interest on the Deposit shall accrue from the date of deposit with the Monitor until the Closing or other termination or non-completion of the transactions contemplated by this Agreement.

(c)     If this Agreement is terminated by the Seller pursuant to Section 9.1(k), the full amount of the Deposit together with all accrued interest earned thereon, if any, shall become the absolute property of, and may be retained by, the Seller as liquidated damages (and not as a penalty) and as the Seller's sole right and remedy pursuant to this Agreement or at law as a result of the Buyer's default, to compensate the Seller for the expenses incurred and the delay caused and opportunities foregone as a result of the failure of the Closing to occur. If this Agreement is terminated or not completed for any other reason, the Deposit together with all interest accrued thereon, if any, shall be thereupon returned to the Buyer.

(d)     In holding and dealing with the Deposit and any interest earned thereon pursuant to this Agreement, the Monitor shall release the Deposit and any interest earned thereon to the Person becoming entitled thereto in accordance with the provisions of this Section 3.2 as evidenced by a joint direction in writing executed by the Seller and the Buyer substantially in the form appended as Exhibit G (the "**Joint Direction**") except in the event of a dispute between the Parties as to entitlement to the Deposit and any interest earned thereon in which event the Monitor may, in its sole, unfettered and unreviewable discretion, pay the Deposit and any interest earned thereon into the CCAA Court, whereupon the Monitor shall have no further obligations relating to the Deposit and any interest earned thereon or otherwise hereunder.

(e)     The Monitor shall not, under any circumstances, be required to verify or determine the validity of the Joint Direction and the Monitor is hereby relieved of any liability or responsibility for any loss or damage which may arise as the result of the acceptance by the Monitor of the Joint Direction in good faith.

(f)     Notwithstanding the foregoing or anything else contained herein or elsewhere, each of the Seller and the Buyer acknowledges and agrees that: (i) the Monitor's obligations hereunder are and shall remain limited to those specifically set out in this Section 3.2; and (ii) Ernst & Young Inc. is acting solely in its capacity as the CCAA Court-appointed Monitor of the Applicants pursuant to the Initial CCAA Order and not in its personal or corporate capacity, and the Monitor has no

liability in connection with this Agreement whatsoever, in its personal or corporate capacity or otherwise, save and except for and only to the extent of the Monitor's gross or intentional fault.

(g)   The Parties acknowledge that the Monitor may rely upon the provisions of this Section 3.2 notwithstanding that the Monitor is not a party to this Agreement. The provisions of this Section 3.2 shall survive the termination or non-completion of the transactions contemplated by this Agreement.

**3.3   Purchase Price Allocation**

(a)   The allocation of the amount treated as part of the consideration paid for income Tax purposes among the Seller Group Members and among the Purchased Assets shall be agreed between the Buyer and the Seller in the following manner. The Buyer shall, prior to the Closing Date, prepare a written allocation of the amount treated as part of the consideration paid for income Tax purposes among the Seller Group Members (the "**Initial Allocation Statement**"). The Buyer shall afford the Seller with a reasonable opportunity to review and comment on such allocation and the Buyer and the Seller shall negotiate in good faith to resolve any disputed items with respect to the Initial Allocation Statement. If the Seller and the Buyer are unable to agree on such Initial Allocation Statement at least ten (10) Business Days prior to the Closing, then the disputed items with respect to the Initial Allocation Statement shall be resolved by an internationally recognized independent accounting firm mutually agreed upon by the Seller and the Buyer, and the Seller, on the one hand, and the Buyer, on the other, shall each bear 50% of the costs of such accounting firm. The accounting firm shall resolve such dispute at least five (5) Business Days prior to the Closing, and such resolution shall be final and binding on the Buyer and the Seller.

(b)   Within ninety (90) days following the Closing Date, the Buyer shall prepare a written allocation (the "**Asset Allocation Statement**") of the Purchase Price (plus other amounts, if any, that are treated as part of the consideration paid for income Tax purposes, as applicable) allocated to each Seller Group Member pursuant to the Initial Allocation Statement, among the Purchased Assets, including fixed assets and current assets, acquired from the applicable Seller Group Member. The Buyer shall afford the Seller with a reasonable opportunity to review and comment on such allocation, and the Buyer and the Seller shall negotiate in good faith to resolve any disputed items with respect to the Initial Allocation Statement. If the Seller and the Buyer are unable to agree on such Asset Allocation Statement within ninety (90) days following the Closing Date, then the disputed items with respect to the Asset Allocation Statement shall be resolved by an internationally recognized independent accounting firm mutually agreed upon by the Seller and the Buyer (which such firm shall be the same as the firm, if any, selected pursuant to Section 3.3(a)), and the Seller, on the one hand, and the Buyer, on the other, shall each bear 50% of the costs of such accounting firm. The accounting firm shall resolve such dispute in a manner consistent with the principles set forth in this Article 3, and such resolution shall be final and binding on the Buyer and the Seller. With respect to the Purchased Assets that were acquired from Seller Group Members that are "United States persons" within the meaning of Section

7701(a)(30) of the Code, the final Asset Allocation Statement shall be prepared in a manner consistent with Section 1060 of the Code. The Buyer, the Seller Group Members, and their applicable Affiliates shall: (a) report the purchase and sale of the Purchased Assets in any Tax Returns relating to the transactions contemplated in this Agreement in accordance with the final Initial Allocation Statement and the final Asset Allocation Statement; and (b) act in accordance with the final Initial Allocation Statement and the final Asset Allocation Statement in the preparation, filing and audit of any Tax Return (including filing Form 8594 with its U.S. federal income Tax Return).

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES BY THE SELLER

The Seller represents and warrants, on behalf of itself and the other Seller Group Members, to the Buyer as follows, and acknowledges that the Buyer is relying upon the following representations and warranties in connection with its purchase of the Purchased Assets:

**4.1    Corporate Existence and Capitalization**

(a)    *Corporate Existence.* The Seller is a limited partnership duly formed, validly existing and in good standing under the laws of the Province of Québec. CDS GP is a corporation duly incorporated, validly existing and in good standing under the laws of the Province of Québec. Each other Seller Group Member is duly formed, validly existing and in good standing under the laws of its jurisdiction of incorporation or formation. Each Seller Group Member has all governmental licenses, authorizations, qualifications, permits, consents and approvals required to carry on the Business as now conducted by such Seller Group Member, except for those licenses, authorizations, qualifications, permits, consents and approvals the absence of which would not have a Material Adverse Effect.

(b)    *Capitalization Ownership.*

(i)    Schedule 4.1(b)(i) of the Disclosure Letter sets forth the name, jurisdiction of formation or organization (as applicable) and authorized and issued share capital (or other form of equity interest) of each Seller Subsidiary, and sets forth the name of each registered owner of the Equity Interests of each Seller Subsidiary and the number and class or percentage of Equity Interests owned by such Person.

(ii)    Except as set forth on Schedule 4.1(b)(i) or Schedule 4.1(b)(ii) of the Disclosure Letter, the Seller does not directly or indirectly own any Equity Interest in, or any interest convertible into or exchangeable or exercisable for, at any time, any Equity Interest or similar interest in, any Person.

(iii)    Except as set forth on Schedule 4.1(b)(iii) of the Disclosure Letter, all outstanding Equity Interests of each Seller Subsidiary (except to the extent such concepts are not applicable under the applicable Law of such Seller Subsidiary's jurisdiction of formation or other applicable Law) have been

duly authorized and validly issued and are fully paid and non-assessable, are free and clear of any pre-emptive rights, restrictions on transfer or Encumbrances.

(iv)    Except as set forth on Schedule 4.1(b)(i) or Schedule 4.1(b)(iv) of the Disclosure Letter, there are no outstanding or authorized (A) Equity Interests or obligations convertible into or exchangeable for, at any time, Equity Interests or other securities of any Seller Subsidiary, (B) options, warrants or other rights to purchase shares or other securities of any of the Seller Subsidiaries, or (C) repurchase or redemption rights in respect of the Equity Interest or other securities of any of the Seller Subsidiaries.

(v)    Except as set forth on Schedule 4.1(b)(v), there are no voting trusts, proxies or other agreements or understandings with respect to the voting of any Equity Interest of any Seller Subsidiary and the Equity Interest of the Seller Subsidiaries are not subject to the terms of any shareholders agreement.

(vi)    Except as set forth on Schedule 4.1(b)(vi), (x) the Seller is the sole direct or indirect beneficial owner of all of the Equity Interests of each Seller Subsidiary free and clear of all Encumbrances, and (y) the Seller has the exclusive right to dispose of all of the Equity Interests of each Seller Subsidiary that the Buyer designates as a Transferred Subsidiary in accordance with Section 2.5(g).

(vii)    Except as set forth on Schedule 4.1(b)(vii) and subject to obtaining the Recognition Order, the U.S. Sale Order and the Approval and Vesting Order, no disposition of the Equity Interests of any Seller Subsidiary by the Seller in connection with the transactions contemplated under this Agreement will violate, contravene, breach or offend against or result in any default under any Contract, charter or by-law provision, Order, judgment, decree, licence, permit or Applicable Law, to which any Seller Group Member is a party or subject or by which any Seller Group Member is bound or affected.

## 4.2    Due Authorization and Enforceability of Obligations

Subject to the issuance of the Initial Recognition Order (if any), Approval and Vesting Order, the Recognition Order and the issuance of the U.S. Sale Order, the Seller Group Members have all necessary power, authority and capacity to enter into and deliver this Agreement and the Closing Documents, and to carry out the obligations under this Agreement and the Closing Documents. Subject to the issuance of the Approval and Vesting Order, the Initial Recognition Order and the U.S. Sale Order, as applicable, this Agreement and the Closing Documents constitute valid and binding obligations of the Seller Group Members enforceable against them in accordance with its terms. The Seller has the all necessary power, authority and capacity to cause the Seller Group Members to enter into any document contemplated by, and to deliver, this Agreement and the Closing Documents.

## 4.3    Residence of the Seller Group

(a)     The Canadian Borrower is not a non-resident of Canada for the purposes of the Tax Act.

(b)     Any Seller Group Member that is (i) a non-resident of Canada, or (ii) a partnership other than a "Canadian partnership", in each case for the purposes of the Tax Act, is not assigning to the Buyer any Purchased Asset that is "taxable Canadian property" or "taxable Quebec property" as defined for the purposes of the Tax Act and the *Taxation Act* (Quebec).

**4.4     Absence of Certain Changes or Events**

Since December 29, 2019 and through the Filing Date, and except as approved by an Order of the CCAA Court or the U.S. Bankruptcy Court or as specified on Schedule 4.4 of the Disclosure Letter, no Seller Group Member has:

(a)     other than any COVID-19 Actions, incurred any liability which is material to the Business, except normal trade or business obligations incurred in the ordinary course of business;

(b)     created any Encumbrance (other than (i) Permitted Encumbrances or (ii) Tax Encumbrances, provided, however, that in the case of clause (ii), the Purchased Assets are transferred pursuant to this Agreement to the Buyer free and clear of Tax Encumbrances) upon any of the Purchased Assets, except in the ordinary course of business or as described in this Agreement or pursuant to, or as a result of, the CCAA Proceedings or the U.S. Proceeding;

(c)     sold, assigned, transferred, leased or otherwise disposed of any of the material Purchased Assets except any sales, assignments, transfers, leases or dispositions in favour of a Seller Group Member, in the ordinary course of business or as contemplated by this Agreement;

(d)     purchased, leased or otherwise acquired any material properties or assets except any purchases, leases or acquisitions from a Seller Group Member, in the ordinary course of business or as contemplated by this Agreement;

(e)     waived, cancelled or written off any rights, claims, accounts receivable or any amounts payable to any Seller Group Member which alone or together are material to the Business, except in the ordinary course of business;

(f)     suffered any damage, destruction or loss (whether or not covered by insurance) which constitutes a Material Adverse Effect;

(g)     increased any form of compensation or other benefits payable or to become payable to any Listed Employees, except increases (i) made in the ordinary course of business, (ii) provided for in Assumed Employment Contracts or Assumed Employee Plans, (iii) made in order to comply with Applicable Laws, or (iv) that are not material to the Business;

(h)     taken any other action that would have been prohibited under Section 7.2 had

Section 7.2 been in effect as of December 29, 2019; or

(i)    authorized, agreed or otherwise become committed to do any of the foregoing.

**4.5    Absence of Conflicts**

Except as specified on Schedule 4.5 of the Disclosure Letter, no Seller Group Member is a party to, bound or affected by or subject to any: (a) charter or by-law provision; or (b) Applicable Law or Governmental Authorization; in each case, that would be violated or breached, require any consent or other action by any Person, result in the creation or imposition of any Encumbrance (other than (i) a Permitted Encumbrance or (ii) Tax Encumbrance, provided, however, that in the case of clause (ii), the Purchased Assets are transferred pursuant to this Agreement to the Buyer free and clear of Tax Encumbrances) upon any of the Purchased Assets or under which any default would occur or with notice or the passage of time would, be created as a result of the execution and delivery of, or the performance of obligations under, this Agreement or any other agreement or document to be entered into or delivered under the terms of this Agreement, except for any violations, breaches, consents, actions, Encumbrances or defaults or any Applicable Law or Governmental Authorizations that would not have a Material Adverse Effect.

**4.6    Approvals and Consents**

Subject to the issuance of the Approval and Vesting Order, the Initial Recognition Order, and the U.S. Sale Order, and except as otherwise specified on Schedule 4.6 of the Disclosure Letter, no authorization, consent or approval of, or filing with or notice to, any Governmental Authority or court is required in connection with the execution, delivery or performance of this Agreement by the Seller and each of the agreements to be executed and delivered by any Seller Group Member hereunder, or the consummation of the transactions contemplated hereby (including the purchase of any of the Purchased Assets hereunder), except for any authorizations, consents, approvals, filings or notices, the absence of which, would not have a Material Adverse Effect.

**4.7    Taxes**

Except as set forth on Schedule 4.7 of the Disclosure Letter:

(a)    Other than with respect to Taxes the nonpayment of which is permitted or required by the U.S. Bankruptcy Code or other equivalent provisions of other applicable laws, no failure, if any, of any Seller Group Member to duly and timely pay all material amounts of Taxes, including all instalments on account of material amounts of Taxes for the current year as of the Closing Date, that are due and payable by it as of the Closing Date, will result in an Encumbrance (other than (i) a Permitted Encumbrance or (ii) any Tax Encumbrance, provided, however, that in the case of clause (ii), the Purchased Assets are transferred pursuant to this Agreement to the Buyer free and clear of Tax Encumbrances).

(b)    There are no Encumbrances (other than (i) Permitted Encumbrances or (ii) any Tax Encumbrance, provided, however, that in the case of clause (ii), the Purchased Assets are transferred pursuant to this Agreement to the Buyer free and

clear of Tax Encumbrances) for a material amount of Taxes upon any of the Purchased Assets.

(c)     Each Seller Group Member has duly and timely withheld and collected all material amounts of Taxes and other material amounts required by Applicable Law to be withheld or collected by it (including such Taxes and other amounts required to be withheld by it in respect of any amount paid or credited or deemed to be paid or credited by it to or for the account or benefit of any Person, including any Employees, officers or directors and any non-resident Person) and has duly and timely remitted to the appropriate Governmental Authority such Taxes and other amounts required by Applicable Law to be remitted by it.

(d)     The Seller, the Canadian Borrower and each Seller Group Member selling Purchased Assets which, subject to Section 7.5(f), may be subject to tax under the GST and HST Legislation or the QST Legislation are each duly registered under Subdivision (d) of Division V of the GST and HST Legislation with respect to the GST and HST, and under Division I of Chapter VIII of Title I of the QST Legislation with respect to the QST, and will provide their respective registration numbers to the Buyer prior to Closing.

(e)     Each Seller Group Member has filed with the appropriate Governmental Authorities, all material federal, provincial, territorial, state and local Tax Returns relating to the Business or the Purchased Assets required to be filed for all taxable periods ending on or before the Closing Date. All such Tax Returns are true, correct and complete in all material respects. Each Seller Group Member has paid all material amounts of Taxes due and payable owed by it with respect to the Business or the Purchased Assets (whether or not shown on such Tax Returns) and has made adequate provision for any such Taxes that are not yet due and payable, other than Taxes the nonpayment of which is permitted or required by the U.S. Bankruptcy Code or other equivalent provisions of other applicable laws.

(f)     There are no currently pending or threatened-in-writing proceedings, investigations, audits or Claims against any Seller Group Member in respect of any material amounts of Taxes relating to the Business or the Purchased Assets, and there are no ongoing audits or appeals with any Governmental Authority relating to such Taxes.

(g)     No Seller Group Member that is not a "United States person" (as defined in Section 7701(a)(30) of the Code) is, as of the Closing Date, transferring any "United States real property interests" (within the meaning of Section 897(c) of the Code) pursuant to this Agreement.

(h)     No Transferred Subsidiary has requested in writing to enter into or entered into any written agreement, or executed any waiver, providing for any extension of time within which (i) to file any Tax Return covering any Taxes for which any Transferred Subsidiary is or may be liable; or (ii) any Governmental Authority may assess or collect Taxes for which any of the Transferred Subsidiaries is or may be liable, in each case, which time period or extension extends beyond the Closing Date.

(i)    Other than with respect to the Code, none of the Transferred Subsidiaries has acquired property from any  Person with whom any of the Transferred Subsidiaries was not dealing at arm's length, as determined for purposes of the Tax Act, for consideration, the value of which is less than the fair market value of the property acquired in circumstances which could subject it to a liability under section 160 of the *Tax Act*.

(j)    Except if the failure to do so would not result in penalties under section 247 of the *Tax Act*, and other than with respect to the Code, for all transactions between any of the Transferred Subsidiaries and any non-resident Person with whom any of the Transferred Subsidiaries was not dealing at arm's length, each of the Transferred Subsidiaries has made or obtained records or documents that meet the requirements of paragraphs 247(4)(a) to (c) of the *Tax Act*.

No representation or warranty in this Section 4.7 is made with respect to Taxes for any taxable period beginning after the Closing Date or for any Post-Closing Straddle Tax Period. Notwithstanding anything herein to the contrary, this Section 4.7, Section 4.3, Section 4.17(b), Section 4.18(b), Section 4.18(e) and Section 4.18(f) (in each case, to the extent related to Taxes), and any other representation and warranty in this Agreement solely to the extent such representation or warranty specifically references a specific provision of  or definition contained in Tax legislation, constitute the Seller's sole and exclusive representations and warranties pertaining to Taxes. The Parties acknowledge and agree that any representation and warranty with respect to a Transferred Subsidiary under this Section 4.7 shall be made as of the effective time such Seller Group Member becomes a Transferred Subsidiary pursuant to the terms of this Agreement (which, for purposes of this sentence, shall in no event be a date later than the Closing Date).

## 4.8    Title to Assets

The Seller Group Members own, and have good and marketable title to, or have the right to use, the Purchased Assets.

## 4.9    Real Property Landlord Leases

(a)    Schedule 2.1(g) of the Disclosure Letter describes all Real Property Landlord Leases. Except as set out on Schedule 2.1(g) of the Disclosure Letter, complete and correct copies of such Real Property Landlord Leases have been provided to the Buyer. Such Real Property Landlord Leases are in full force and effect and, except as disclosed on Schedule 4.9(a) of the Disclosure Letter, have not been altered or amended. No consent is required from the other parties to the Real Property Landlord Leases in connection with the consummation of the transactions contemplated by this Agreement, other than those that have been obtained.

(b)    Except as set out on Schedule 4.9(b) of the Disclosure Letter, the Seller Group Members are not in default of any of their obligations under the Real Property Landlord Leases and, to the Seller's knowledge, none of the tenants or other parties to the Real Property Landlord Leases are in default of any of their obligations thereunder. There are no disputes by any tenant or other party to the

Real Property Landlord Leases relating to the provisions of a Real Property Landlord Lease that would, have a Material Adverse Effect.

**4.10    Real Property Leases**

(a)    Schedule 2.1(h) of the Disclosure Letter describes all Real Property Leases. Except as set out on Schedule 2.1(h) of the Disclosure Letter, complete and correct copies of such Real Property Leases have been provided to the Buyer. Such Real Property Leases are in full force and effect and, except as disclosed on Schedule 2.1(h) of the Disclosure Letter, have not been altered or amended. Except as disclosed in Schedule 4.6 of the Disclosure Letter, no consent is required from the other parties to the Real Property Leases in connection with the assignment of such Real Property Leases to the Buyer or the consummation of the transactions contemplated by this Agreement.

(b)    The applicable Seller Group Members are exclusively entitled to all rights and benefits as lessee, subtenant, occupant or licensee under the Real Property Leases, and the Seller Group Members have not sublet, assigned, licensed or otherwise conveyed any rights in the Leased Premises or in the Real Property Leases to any other Person.

(c)    Except as set out on Schedule 4.10 of the Disclosure Letter, no Seller Group Member is in default of any of its obligations under the Real Property Leases and, to the Seller's knowledge, none of the landlords or other parties to the Real Property Leases are in default of any of their obligations thereunder.

(d)    The Seller Group Members have not received any written notice that the use by the Seller Group Members, or occupants, of the Owned Property or the Leased Premises is in violation of Applicable Law in any material respect.

**4.11    Owned Property.**

Except as set forth in Schedule 4.11 of the Disclosure Letter, CDS has good and marketable title to the Owned Property, subject to (i) Permitted Encumbrances and (ii) Tax Encumbrances, provided, however, that in the case of clause (ii), the Owned Property is transferred pursuant to this Agreement to the Buyer free and clear of Tax Encumbrances. None of the Seller Group Members is the owner of, or subject to any agreement or option to own, any material immovable or real property or any interest in any material immovable or real property, other than the Owned Property.

**4.12    Environmental Matters**

Except as disclosed in Schedule 4.12 of the Disclosure Letter:

(a)    all Permits related to Environmental Laws have been obtained, are valid and in full force and effect, have been and are being complied with in all material respects, and there have been and are no applications made or proceedings commenced or threatened to revoke, suspend, amend or alter any such Permits;

(b)     the Business and the Purchased Assets have been and are in compliance, in all material respects, with all Environmental Laws;

(c)     there has been no Release at, in, on, under, about or from any Real Property or any other property for which responsibility may be alleged or attributed to the Business or the Purchased Assets;

(d)     none of the Seller Group Member has received any written directive, inquiry, notice, Order, warning or other written communication from any Governmental Authority or other Person that relates to any liability with respect to Hazardous Materials or any alleged, actual or potential violation or failure to comply with any Environmental Laws, or of any alleged, actual or potential obligation to undertake or bear the cost of any Environmental Claims nor, to the knowledge of the Seller, do any facts or circumstances exist which would reasonably be expected to form the basis for any such directive, inquiry, notice, Order, warning, other communication or obligation;

(e)     there are no pending or, to the knowledge of the Seller, threatened Environmental Claims, proceedings or restrictions of any nature against or involving any of the Seller Group Members or relating to the Business or the Purchased Assets nor, to the knowledge of the Seller, do any facts or circumstances exist which would reasonably be expected to form the basis for any such Environmental Claims, proceedings or restrictions; and

(f)     true and complete copies of all material environmental data and studies (including the results of any environmental audit assessment or environmental management system) relating to the Business or the Purchased Assets have been delivered or made available to the Buyer.

## 4.13   Intellectual Property

(a)     Except as set forth in Schedule 4.13(a)(i) of the Disclosure Letter, the Seller Group Members are the sole and exclusive owners of all right and title in and to, or have been granted sufficient rights to use, the material Business Intellectual Property free and clear of all Encumbrances (other than (i) Permitted Encumbrances or (ii) Tax Encumbrances, provided, however, that in the case of clause (ii), the Business Intellectual Property is transferred pursuant to this Agreement to the Buyer free and clear of Tax Encumbrances). The Business Intellectual Property and the Intellectual Property owned or held by the JV Entities constitutes all material Intellectual Property used in and necessary for the operation of the Business by the Seller Group Members.

(b)     The Seller has taken all commercially reasonable actions to maintain and protect all material Business Intellectual Property, including the confidentiality of their Trade Secrets and other confidential information. To the Seller's knowledge, there has been no unauthorized access to or loss, theft or misuse of any such Trade Secrets or other confidential information.

(c)     Schedule 4.13(c) of the Disclosure Letter contains a complete and accurate list of

all (i) active Trademark registrations and applications, (ii) active Copyright registrations in the United States of America and Canada, (iii) Domain Name registrations (collectively, the "<u>Registered Intellectual Property</u>") and (iv) all material unregistered Trademarks within the Business Intellectual Property. Except as set forth in Schedule 4.13(c) of the Disclosure Letter, all material Registered Intellectual Property is valid, in full force and effect and has not expired or been cancelled, abandoned or otherwise terminated, and payment of all renewal and maintenance fees and expenses in respect thereof, and all filings related thereto, have been duly made.

(d)     Schedule 4.13(d) of the Disclosure Letter contains a complete and accurate list of all Contracts under which (a) a third party has licensed or provided material Intellectual Property to a Seller Group Member (except for commercially available off-the-shelf Software) (the "**Inbound License Agreements**"), and (b) a Seller Group Member has licensed or provided material Business Intellectual Property to a third party, other than in favour or benefit of another Seller Group Member, but including a JV Entity (the "**Outbound License Agreements**", and together with the Inbound License Agreements, the "**License Agreements**"). Prior to the date hereof, the Buyer either has been supplied with, or has been given access to, a true, correct and complete (i) copy of each written IP Contract, and (ii) summary of all of the material terms and conditions of each oral IP Contract, in each case together with all amendments, supplements, waivers or other changes thereto.

(e)     Except as set forth in Schedule 4.13(e) of the Disclosure Letter, no Seller Group Member is party to or bound by any Contract, suit, action, Order or settlement or other obligation that limits or impairs its ability to use, modify, license, exploit, sell, transfer, assign or convey, any of the Business Intellectual Property owned by such Seller Group Member except where such limitation or impairment would not have a material adverse impact on any material Business Intellectual Property.

(f)     Other than pursuant to the Outbound License Agreements or as set forth in Schedule 4.13(f) of the Disclosure Letter, no Seller Group Member has granted to any Person any right, license or permission to use all or any portion of, or otherwise encumbered any of its rights in, or to, any of the material Business Intellectual Property owned by, licensed to or used by such Seller Group Member, other than (a) in favour or to the benefit of a Seller Group Member or a JV Entity, or (b) in the ordinary course of business.

(g)     The Business as currently conducted and as conducted in the past twelve (12) months does not infringe upon, misappropriate or otherwise violate any material Intellectual Property or other proprietary rights of any third party. Except as set forth in Schedule 4.13(g) of the Disclosure Letter, there is no action, suit, demand, Claim, arbitration, litigation, hearing, examination, complaint, indictment, litigation, investigation or other proceeding pending or threatened by any Person in writing (a) alleging that the conduct of the Business, including the use of the Business Intellectual Property, infringes upon, misappropriates or otherwise violates any of such Person's Intellectual Property rights; or (b) challenging the validity or enforceability of, registration of, ownership of, or continued use of any

Business Intellectual Property.

(h)     To the knowledge of the Seller, no Person is currently infringing upon, misappropriating or otherwise violating any of the Business Intellectual Property or any rights of the Seller in any Business Intellectual Property in any material respect.

(i)     Except as set out in Schedule 4.13(i) of the Disclosure Letter, each Employee, Contractor or any other Person who developed any material Business Intellectual Property (including any Software used in the Business) has executed a valid and enforceable contract with the Seller or a Seller Group Member that (i) conveys to (or waives in favour of) the Seller or a Seller Group Member any and all right, title and interest in and to all Intellectual Property developed by such Person in connection with such Person's employment or engagement by the Seller or any Seller Group Member, and (ii) obligates such Person to keep any confidential documents and information concerning the Seller and Seller Group Members, including Trade Secrets and other proprietary or confidential processes, formulas, methodologies and technology, confidential both during and after the term of employment or contract.

**4.14    Books and Records; Financial Statements; Bank Accounts.**

(a)     All accounting and financial books and records of the Seller Group Members have been fully, properly and accurately kept and are complete and accurate, in each case in all material respects.

(b)     The Seller has made available to the Buyer the consolidated balance sheets of the Seller Group as of, and consolidated statements of operations, comprehensive loss, changes in accumulated other comprehensive income, changes in equity and cash flows for, the fiscal year ended December 29, 2019 (collectively, the "**Audited Financial Statements**"). The Audited Financial Statements have been prepared in accordance with generally accepted accounting principles ("**GAAP**") consistently applied in accordance with the Seller's past practice throughout the periods indicated. The Audited Financial Statements (i) were prepared based on the books and records of the Seller and (ii) fairly present in all material respects the financial position of the Seller Group at and as of the dates specified and the results of their operations for the period covered, subject to customary year-end adjustments. The copies of the Audited Financial Statements made available to the Buyer are true and complete copies of such Audited Financial Statements.

(c)     Schedule 4.14(c) of the Disclosure Letter sets forth a complete list of all bank accounts (including any deposit accounts, securities accounts and any sub-accounts) of the Seller Group Members.

**4.15    Information Technology Systems**

(a)     The IT Assets (i) do not contain any material defects, (ii) provide the operations of the Business with sufficient redundancy and speed to meet the needs of the Business and (iii) during the past twenty-four (24) months, have not experienced

any material failures, breakdowns, Software defects or other adverse events that have caused material disruption or interruption to the business or operations of the Seller or any Seller Group Member that has not been fully resolved and, to the knowledge of the Seller, no Person has gained unauthorized access to any of the IT Assets.

(b)     The Seller and Seller Group Members maintain commercially reasonable backup and data recovery, disaster recovery and business continuity plans, procedures and facilities and act in material compliance therewith.

**4.16    Material Contracts.**

(a)     Schedule 4.16(a) of the Disclosure Letter identifies all of the Material Contracts.

(b)     Except as contemplated by or resulting from the CCAA Proceedings or the U.S. Proceeding or as disclosed in Schedule 4.16(b) of the Disclosure Letter: (A) the Seller is not, nor to the Seller's knowledge, is any other party to any such Material Contract, in default under any such Material Contract and there has not occurred any event which, with the lapse of time or giving of notice or both, would constitute a default under any such Material Contract by the Seller or any other party to any such Material Contract, in each case, except where such default is not material to the Business or as disclosed in writing to the Buyer prior to the date hereof; (B) each such Material Contract is in full force and effect, unamended by written or oral agreement, except as set out on Schedule 2.1(i) of the Disclosure Letter, and the Seller is entitled to the full benefit and advantage of each such Material Contract in accordance with its terms; and (C) no written notice of default, cancellation or termination has been received by the Seller under any such Material Contract, nor does there exist any material dispute between the Seller and any other Person in respect of any such Material Contract.

(c)     Since January 1, 2017, the Seller has not received: (i) any written notification from any Governmental Authority threatening to revoke, suspend, cancel, or modify any Permits that are material to the Business; or (ii) any written notice from any Governmental Authority stating that any Permits that are material to the Business held or being sought, amended or renewed will be denied, revoked, restricted or suspended by the applicable Governmental Authority, and the Seller is not currently a party to any proceedings involving the possible appeal, denial, revocation, restriction or suspension of any Permits that are material to the Business or any of the privileges granted thereunder. All of the Permits are final, unappealed, valid, in good standing and in full force and effect, except where the failure to be final, unappealed, valid, in good standing and in full force and effect would not reasonably be expected to have a Material Adverse Effect.

**4.17    Employees**

(a)     Schedule 4.17(a) of the Disclosure Letter sets out a list of all Employees, on a no-name basis, that is complete and accurate in all material respects and such list includes each Employee's (A) division or department, (B) work location, and (C) hire date. Schedule 4.17(a) of the Disclosure Letter separately sets out, as of the

date of this Agreement and on a no-name basis, a complete and accurate list of (i) the 213 Core Team Employees, (ii) the 461 RSD Employees, (iii) the 129 WDI Employees (collectively, the "**Listed Employees**"), and such list includes each Listed Employee's (A) title or position, (B) hire date, (C) annual base salary or hourly wages, commissions and incentive compensation, (D) annual vacation entitlement, (E) unionized or non-unionized status, (F) employing entity and (G) work location (the "**Employee Schedule**"). Schedule 4.17(a) of the Disclosure Letter also contains the Listed Employees (by employee number) who are on inactive status, including lay-off or furlough, short-term disability leave, long-term disability leave, pregnancy and parental leave or other extended absences, or receiving benefits pursuant to workers' compensation legislation, and specifies the last date of active employment, the reason for the absence and the expected date of return of each such Employee, if known.

(b)     Each Seller Group Member is, and for the past three (3) years has been, in compliance with all Applicable Laws in all material respects relating to the employment of its Listed Employees, including any provision relating to wages, hours of work, withholdings and deductions, payment of employees, vacation pay, pay equity, employment equity, overtime pay, occupational health and safety, workers' compensation, immigration, human rights and freedoms and any other conditions of employment except for acts of noncompliance which would not reasonably be expected to be material to the Business. There are no outstanding or, to the knowledge of the applicable Seller Group Member, threatened material Claims, audits, reviews, investigations, or Orders under any such Applicable Laws and in relation to such Listed Employees. To the knowledge of the Seller, nothing has occurred which might lead to a Claim, investigation or Order under any such Applicable Laws with respect to the Listed Employees.

(c)     Except as set forth in Schedule 4.17(c) of the Disclosure Letter:

(i)      there is no Collective Agreement in force, or currently being negotiated with respect to the Listed Employees, no Union has bargaining rights in respect of the Business and its Listed Employees and there are no current or, to the knowledge of any Seller Group Member, threatened attempts to organize or establish any Union with respect to any Seller Group Member, nor have there been for the past three (3) years;

(ii)     there is no unfair labour practice complaint, grievance or arbitration proceeding pending or, to the knowledge of the Seller, threatened against any Seller Group Member with respect to the Listed Employees, which would, if determined adversely to any Seller Group Member, be material to the Business, nor has there been for the past three (3) years;

(iii)    there is no labour strike, organized labour slow down, organized labour work stoppage or lockout in effect or, to the knowledge of any Seller Group Member, threatened against any Seller Group Member, nor has there been for the past three (3) years;

(iv)     to the knowledge of the applicable Seller Group Member, all current

assessments under workers' compensation legislation in relation to each Seller Group Member's Listed Employees have been paid or accrued by the Seller in all material respects, and no Seller Group Member is subject to any additional or penalty assessment for its Listed Employees under such legislation which has not been paid and has not been given notice of any workers' compensation audit;

(v)     to the knowledge of the applicable Seller Group Member, each Seller Group Member's accident cost experience that relates to its Listed Employees is such that there are no pending potential assessments, experience rating charges or claims on such Seller Group Member's premium payments or accident cost experience that would reasonably be expected to be material to the Business or result in any material additional payments;

(vi)    to the knowledge of the applicable Seller Group Member, there are no outstanding inspection orders or written equivalent made under any occupational health and safety legislation which relate to any Seller Group Member's Listed Employees, and there have been no work related fatal accidents in the last three (3) years at the establishments of any Seller Group Member or at the performance venues of any Seller Group Member (while such venues where occupied by the Seller Group Member);

(vii)   in accordance with Seller Group Member's standard practices and Applicable Law, all amounts due and owing or accrued due but not yet owing to the Listed Employees for all salary, wages, bonuses, commissions, vacation pay, pension benefits have been paid or, if accrued, are accurately reflected in the books and records of the Seller Group Members in all material respects; and

(viii)  there are no outstanding material loans made by any Seller Group Member to any Listed Employee of any Seller Group Member.

(d)     The applicable Seller Group Member provided the Buyer with standard templates of the written employment agreements that relate to the Listed Employees and a summary of the terms and conditions of the written employment agreements with the Listed Employees that materially deviate from those set out in the standard templates, only to the extent that such terms and conditions would not have been already disclosed under Schedule 4.17(a) or 4.18(a).

(e)     Schedule 4.17(e) of the Disclosure Letter sets forth a list of Contractors who are owed any form of compensation from a Seller Group Member based on invoices received by the Seller Group Members as of the Closing Date that is complete and accurate in all material respects and indicates, on the basis of invoices received by the Seller Group Members, for each such Contractor, the amount of compensation which is due and unpaid as of the Closing Date.

**4.18    Employee Plans.**

(a)     Schedule 4.18(a) of the Disclosure Letter contains a complete list of all material Employee Plans, provided, however, that Schedule 4.18(a) shall not require the listing of any employment agreements with annual base salary of less than $125,000. With respect to each Employee Plan, the Buyer has been furnished or had access to true, current and complete copies of (i) the governing plan documents and all amendments thereto (or if unwritten, a summary of all material terms), (ii) the most recent financial or asset statements, (iii) the most recent non-discrimination test results, (iv) the current summary plan description and any summary of material modifications thereto, (v) the most recent annual regulatory report or return that was filed with a Governmental Authority, (vi) the most recent United States Internal Revenue Service determination or opinion letter, and (vii) all trust or funding agreements relating to such Employee Plans.

(b)     All of the Employee Plans are and have been established, registered, amended, funded, maintained, administered and invested, in all material respects, in accordance with their terms, any applicable Collective Agreement and all Applicable Laws, including COBRA, 409A, PPACA and all tax Applicable Laws. Each Employee Plan intended to be qualified under Section 401(a) of the Code and each such Employee Plan and trust which is a part of any such Employee Plan is currently covered by a favorable determination letter or opinion letter from the United States Internal Revenue Service, and, to the knowledge of the Seller, nothing has occurred since the issuance of any such letter that would reasonably be expected to cause the revocation of the tax-qualified status of any such plan. There have been no non-exempt prohibited transactions (as described in Section 406 of ERISA or Section 4975 of the Code) with respect to any Assumed Employee Plan that have not been corrected in full or with respect to which any material Tax or penalty is due.

(c)     All employer and employee contributions, payments or premiums required to be paid or remitted by any Seller Group Member under the terms of each Assumed Employee Plan, any applicable Collective Agreement or by Applicable Law have been paid or remitted in a timely fashion, except for defaults which would not reasonably be expected to be material to the Business.

(d)     Except as required by Applicable Law (including, in the U.S., the *Consolidated Budget Reconciliation Act of 1985* ("**COBRA**") with respect to mandatory employment group health plan continuation coverage) at the participant's sole expense, none of the Employee Plans provides life, health or other welfare benefits to retired or former employees or to the beneficiaries or dependants of retired or former employees.

(e)     Except as listed in Schedule 4.18(e) of the Disclosure Letter, none of the Employee Plans is (A) a "registered pension plan" or a "retirement compensation arrangement" as these terms are defined in the Tax Act, (B) an Employee Plan which is a pension plan to which any Seller Group Member is required to contribute pursuant to a Collective Agreement or participation agreement and which is not maintained or administered by a Seller Group Member, (C) a multi-employer pension plan, or (D) a defined benefit pension plan. No Seller Group Member nor any of its ERISA Affiliates has incurred or could be reasonably

expected to incur any direct or indirect liability under Title IV of ERISA or Section 412 of the Code with respect to any "pension plan" (within the meaning of Section 3(2) of ERISA).

(f)     Except as listed in Schedule 4.18(f) of the Disclosure Letter, the Closing (either alone or together with any other event) will not result in or otherwise give rise to (A) the payment to any Person of any amount of money, benefits or other property, (B) accelerated or increased securing or funding requirements for any Employee Plan or the setting aside of any assets to fund any compensation or benefits, (C) the vesting, acceleration of vesting, or provision of any other increased or enhanced rights or benefits to any Person, (D) the forgiveness in whole or in part of any outstanding loan, or (E) any "excess parachute payment" under Section 280G of the Code.

(g)     There is no pending or, to the knowledge of the Seller, threatened investigation, audit or inquiry by a Governmental Authority or Claim relating to an Assumed Employee Plan or its assets, other than routine claims in the ordinary course for benefits provided for by the Assumed Employee Plan and no facts exist which could reasonably be expected to give rise to any such investigation, audit or inquiry by a Governmental Authority or Claim (other than routine claims for payment of benefits).

(h)     To the knowledge of the Seller Group, all data necessary to administer each Assumed Employee Plan is in the possession of the Seller Group or its agents and is in a form which is sufficient for the proper administration of the Assumed Employee Plan in accordance with its terms and all Applicable Laws and such data is materially complete and correct.

(i)     The Seller Group Members have no formal plan or obligation to create any additional benefit plans for Listed Employees which would be considered to be an Employee Plan once created or, except as may be required by Applicable Law, to improve or change the benefits provided under any Assumed Employee Plan.

## 4.19    Litigation

Except as described in Schedule 4.19 of the Disclosure Letter, there are no (i) actions, Claims, suits, grievances, or proceedings by any Person (including the Seller Group Members), (ii) arbitration or alternative dispute resolution processes or (iii) administrative or other proceedings by or before (or, to the knowledge of the Seller, any investigation by) any Governmental Authority, pending or, to the knowledge of the Seller, threatened against any Seller Group Member, the Business or the assets of any Seller Group Member, which if determined adversely to the Seller, any Seller Group Member or the Business, would have a Material Adverse Effect. None of the Seller Group Member is subject to any material Order entered in any lawsuit or proceeding.

## 4.20    Brokers; Advisor Fees

Except for fees and commissions that will be paid or otherwise settled or provided for by the Seller, including the commission payable to Greenhill & Co., LLC and National Bank

Financial (which shall not be Assumed Liabilities), no broker, finder or investment banker is entitled to any brokerage, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of any Seller Group Member.

## 4.21    Compliance with Laws

Other than as set forth in Schedule 4.21 of the Disclosure Letter, each Seller Group Member is, and for the past three (3) years has been, conducting its business and activities in compliance with all Applicable Laws in all material respects. To the knowledge of the Seller, each Seller Group Member is not, and for the past three (3) years has not been, the subject of any material investigation by a Governmental Authority, other than routine investigations by Tax authorities.

## 4.22    No Other Representations, Warranties or Covenants

Unless and solely to the extent expressly set forth in this Agreement or in any document required to be delivered pursuant to this Agreement, no representation, warranty or covenant is expressed or implied by the Seller, including any warranties as to title, Encumbrance, description, merchantability or fitness for a particular purpose, environmental compliance, condition, quantity or quality, or in respect of any other matter or thing whatsoever concerning the Business, the Purchased Assets, the Assumed Liabilities or the right of the Seller to sell or assign the same, as applicable. The disclaimer in this Section 4.22 is made notwithstanding the delivery or disclosure to the Buyer or its directors, officers, employees, agents or representatives of any documentation or other information (including any financial projections or other supplemental data not included in this Agreement). Without limiting the generality of the foregoing and unless and solely to the extent expressly set forth in this Agreement or in any document required to be delivered pursuant to this Agreement, any and all conditions, warranties or representations, express or implied, pursuant to Applicable Law (including applicable sale of goods legislation) do not apply hereto and are hereby expressly waived by the Buyer.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF THE BUYER

The Buyer represents and warrants to the Seller as follows, and acknowledges that the Seller is relying upon the following representations and warranties in connection with its sale of the Purchased Assets (it being understood that any representation and warranty with respect to a Buyer Subsidiary shall be made as of the effective time of its formation (without giving effect to the transactions contemplated hereby)):

## 5.1    Corporate Existence of the Buyer

(a)    The Buyer is a limited partnership, duly formed, validly existing and in good standing under the laws of the Province of Québec;

(b)    Except as provided for in this Agreement and in the Commitment Letter,

(i)    the Buyer is a single purpose limited partnership governed by the laws of Québec, Canada that does not carry on, and has never carried on, any

business, does not and has never had, any employees, does not own, and has never owned, any property or assets or any interests of any nature or kind whatsoever, and has never entered into any transaction;

(ii)    the Buyer has no obligations, liabilities (whether actual or contingent) or indebtedness to any Person, including any liabilities in respect of any judgements, orders, fines, interests, penalties, awards or decrees of any Governmental Authority; and

(c)    Except as provided for in this Agreement, the Buyer is not a party to any contract of any nature or kind whatsoever.

**5.2    Corporate Existence of the Buyer Subsidiaries**

(a)    Each of the Buyer Subsidiaries is duly formed, validly existing and in good standing under the laws of its jurisdiction of incorporation or formation;

(b)    Except as provided for in this Agreement and in the Commitment Letter,

(i)    Each of the Buyer Subsidiaries is a single purpose entity that does not carry on, and has never carried on, any business, does not and has never had, any employees, does not own, and has never owned, any property or assets or any interests of any nature or kind whatsoever, and has never entered into any transaction;

(ii)    None of the Buyer Subsidiaries has any obligations, liabilities (whether actual or contingent) or indebtedness to any Person, including any liabilities in respect of any judgements, orders, fines, interests, penalties, awards or decrees of any Governmental Authority; and

(c)    Except as provided for in this Agreement, the Buyer Subsidiaries are not a party to any contract of any nature or kind whatsoever.

**5.3    Absence of Conflicts**

The Buyer is not a party to, bound or affected by or subject to any charter or bylaw provision or Applicable Law or governmental authorizations, approvals, franchises, Orders, certificates, consents, directives, notices, licenses, permits, variances, registrations or other rights issued, granted or given by or from any Governmental Authority that would be violated, breached by, or under which any default would occur or with notice or the passage of time would, be created as a result of the execution and delivery of, or the performance of obligations under, this Agreement or any other agreement or document to be entered into or delivered under the terms of this Agreement, except for any violations, breaches or defaults or any Applicable Law or any Governmental Authorizations, approvals, franchises, Orders, certificates, consents, directives, notices, licenses, permits, variances, registrations or other rights issued, granted or given by or from any Governmental Authority, that would not have a material effect on the ability of the Buyer to consummate the transactions hereunder.

**5.4    Due Authorization and Enforceability of Obligations**

Each of the Buyer and the Buyer Subsidiaries will have as of Closing, all necessary corporate power, authority and capacity to enter into and deliver this Agreement and the Closing Documents, and to carry out its obligations under this Agreement and the Closing Documents. The execution, delivery and performance of this Agreement and the Closing Documents, and the consummation of the transactions contemplated by this Agreement and the Closing Documents, have been duly authorized by all necessary corporate action of the Buyer, and will be duly authorized by all necessary corporate action of the Buyer Subsidiaries as of Closing. This Agreement and the Closing Documents constitute valid and binding obligations of the Buyer enforceable against it in accordance with its terms.

**5.5     Approvals and Consents**

Except for (a) the issuance of the Approval and Vesting Order, the Initial Recognition Order and the U.S. Sale Order, (b) the approvals and consents set forth on Exhibit 5.5 attached hereto and (c) any consent that may be required in connection with the assignment of a Purchased Asset, including any Assigned Agreement, no authorization, consent or approval of, or filing with or notice to, any Governmental Authority, court or other Person is required in connection with the execution, delivery or performance of this Agreement by the Buyer, and each of the agreements to be executed and delivered by the Buyer hereunder or the purchase of any of the Purchased Assets hereunder, except for any authorizations, consents, approvals, filings or notices of any Governmental Authority, court or Person that would not have a material effect on the ability of the Buyer to consummate the transactions hereunder.

**5.6     Litigation**

There are no (i) actions, Claims, suits, grievances, or proceedings by any Person, (ii) arbitration or alternative dispute resolution processes or (iii) administrative or other proceedings by or before (or, to the knowledge of the Buyer, any investigation by) any Governmental Authority, pending or, to the knowledge of the Buyer, threatened against the Buyer or any Buyer Subsidiary. None of the Buyer or the Buyer Subsidiaries is subject to any Order entered in any lawsuit or proceeding.

**5.7     Required Lenders**

As of the date hereof, the Buyer is controlled by, and as of the Closing Date, the holders of all of the equity securities of the Buyer (the "**Buyer Equityholders**") will collectively constitute, (a) at least the Required Lenders (as defined in the First Lien Credit Agreement); and (b) at least the Required Lenders (as defined in the Second Lien Credit Agreement). The Buyer Equityholders have entered into that certain (i) irrevocable direction letter to the First Lien Administrative Agent (the "**First Lien Direction Letter**") and (ii) irrevocable direction letter to the Second Lien Administrative Agent (the "**Second Lien Direction Letter**" and together with the First Lien Direction Letter, the "**Direction Letters**") in the forms attached hereto as **Exhibit H** pursuant to which the Buyer Equityholders have directed the First Lien Administrative Agent and the Second Lien Administrative Agent (collectively, the "**Administrative Agents**") to take any and all necessary and appropriate action to effectuate a credit bid of all of the "Obligations" (as defined in each of the First Lien Credit Agreement and the Second Lien Credit Agreement) for the Purchased Assets in accordance with this Agreement, which direction is irrevocable and allows the Buyer to complete the transactions contemplated under this Agreement, in each case subject to and in accordance with the terms hereof. The Buyer has delivered to the Seller true,

complete and accurate copies of the Direction Letters. There are no side letters or other agreements, contracts, arrangements or understandings that adversely affect the availability, enforceability or termination of, or impose any additional conditions on the availability of, the Direction Letters. The Direction Letters are in full force and effect and are legal, valid, binding and enforceable obligations, in accordance with their terms. There are no conditions precedent or other contractual contingencies related to the Direction Letters. As of the date hereof, no event has occurred that would constitute a breach or default (or with notice or lapse of time or both would constitute a breach or default) under the Direction Letters.

## 5.8   Subsidiaries

Except for the Buyer Subsidiaries, as of the date hereof, the Buyer does not own or hold, directly or indirectly, shares or other ownership equity or other property interest in any other Person.

## 5.9   Compliance with Laws

Each of the Buyer and the Buyer Subsidiaries is, and has always been, conducting its business and activities in compliance with all Applicable Laws in all material respects. To the knowledge of the Buyer, each of the Buyer and the Buyer Subsidiaries is not, and has not been, the subject of any material investigation by a Governmental Authority.

## 5.10   GST, HST and QST Registration

Prior to Closing, the Buyer or the Designated Buyers acquiring the Purchased Assets (except a Buyer or any Designated Buyer that is acquiring Purchased Assets the transfer of which is not subject to GST, HST or QST) will be duly registered under subdivision (d) of Division V of the GST and HST Legislation with respect to the GST and HST, and under Division I of Chapter VIII of Title I of the QST Legislation with respect to the QST, and will provide its registration numbers to the Seller prior to Closing.

## 5.11   Financing

(a)   As of the date hereof, the Buyer is a party to and accepted fully executed commitment letters in effect on the date hereof (as amended, supplemented or replaced in compliance with this Agreement and together with all exhibits and schedules thereto, collectively, the "*Commitment Letter*") from certain lenders party to the First Lien Credit Agreement (the "*Commitment Parties*"),  pursuant to which the Commitment Parties have agreed, subject to the terms and conditions thereof, to provide debt financing to or for the benefit of the Buyer for purposes of the transactions contemplated herein in the amounts set forth therein. The debt financing committed pursuant to the Commitment Letter is collectively referred to in this Agreement as the "Financing."

(b)   The Buyer has delivered to the Seller a copy of the executed Commitment Letter and any fee letters related thereto which are true and complete except that certain schedules have been redacted from the Commitment Letter.

(c)   Except as expressly set forth in the unredacted portions of the Commitment Letter

or any fee letter, there are no conditions precedent to the obligations of the Commitment Parties to provide the Financing to the Buyer, assuming the conditions set forth in Article 6 are satisfied. There are no side letters, understandings or other agreements, contracts or arrangements of any kind to which the Buyer or the Commitment Parties is a party relating to the Commitment Letter that would reasonably be expected to adversely affect the availability of the full amount of the Financing to the Buyer on the Closing Date as contemplated by the Commitment Letter.

(d)     As of the date hereof, assuming (x) the Financing is funded in accordance with the terms of the Commitment Letter and (y) the satisfaction of the conditions set forth in Article 6, the Financing will provide the Buyer with committed cash proceeds sufficient to fund the cash funding contemplated by this Agreement and, based on facts and circumstances known as of the date hereof, the restart and growth of the Business in accordance with the Business Plan in all material respects, subject to any changes and impact on the Business Plan resulting from the COVID-19 pandemic evolution and related safety, health, gathering, confinement and other restrictions imposed or relaxed, as the case may be, from time to time, or measures recommended by Governmental Authorities.

(e)     As of the date hereof, the Commitment Letter is valid, in full force and effect and binding on the Buyer and the Commitment Parties (except, in each case, to the extent limited by bankruptcy, insolvency, reorganization, moratorium or other similar Applicable Laws now or hereafter in effect relating to or affecting the enforcement of creditors' rights in general and subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law)). As of the date hereof, assuming that the conditions set forth in Article 6 are satisfied as of the Closing Date, no event has occurred which (with or without notice, lapse of time or both) would constitute a breach on the part of the Buyer or, to the knowledge of the Buyer, the Commitment Parties, or failure to satisfy a condition by the Buyer or, to the knowledge of the Buyer, the Commitment Parties under the terms and conditions of the Commitment Letter, and the Buyer does not have any reason to believe that any of the conditions to the Financing will not be satisfied by the Buyer or, to the knowledge of the Buyer, the Commitment Parties on a timely basis or that the Financing will not be available to the Buyer on the Closing Date. There are no commitment fees or other fees that are owing and payable pursuant to the terms of the Commitment Letter.  As of the date hereof, the Commitment Letter has not been modified, amended, reduced or altered and none of the commitments under the Commitment Letter has been withdrawn or rescinded in any respect, and no withdrawal, modification, amendment, alteration, reduction or rescission thereof is contemplated; provided that the parties to the Commitment Letter may enter one or more definitive agreements in a manner consistent with the terms of the Commitment Letter and any other matters related to the Financing, this Agreement and the investment in the Buyer by the parties to the Commitment Letter, so long as such agreements do not (A) reduce the aggregate amount of the Financing, (B) impose new or additional conditions to the availability of the Financing, (C) increase the fees, costs or pricing to the Buyer, (D) materially delay or prevent the Closing, (E) adversely

impact the ability of the Buyer to enforce its rights against the other parties to the Commitment Letter, or (F) change the parties that are subject to the obligations contained in the Commitment Letter (other than as specifically permitted pursuant to the Commitment Letter).

(f)     In no event shall the receipt or availability of any funds or financing (including, for the avoidance of doubt, the Financing) by the Buyer or any of its Affiliates be a condition to the Buyer's obligation to effect the Closing.

## 5.12    As Is, Where Is

The Buyer acknowledges and agrees that it has conducted to its satisfaction an independent investigation and verification of the Business, the Purchased Assets, the Assumed Liabilities and all related operations of the Seller Group Members, and, based solely thereon, has determined to proceed with the transactions contemplated by this Agreement. The Buyer has relied solely on the results of its own independent investigation and verification, and the representations and warranties of the Seller expressly and specifically set forth in Article 4 or in any Closing Document, and the Buyer understands, acknowledges and agrees that all other representations, warranties, conditions and statements of any kind or nature, expressed or implied (including any relating to the future or historical financial condition, results of operations, prospects, assets or liabilities of the Seller Group Members or the Business, or the quality, quantity or condition of the Purchased Assets) are specifically disclaimed by the Seller. Except for the representations and warranties of the Seller expressly and specifically set forth in Article 4 or in any Closing Document, the Seller does not make or provide any warranty or representation, express or implied, as to the quality, merchantability, fitness for a particular purpose, conformity to samples or condition of the Purchased Assets, or any part thereof. THE BUYER SPECIFICALLY ACKNOWLEDGES AND AGREES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES OF THE SELLER EXPRESSLY AND SPECIFICALLY SET FORTH IN Article 4 OR IN ANY CLOSING DOCUMENT: (A) THE BUYER IS ACQUIRING THE PURCHASED ASSETS ON AN "AS IS, WHERE IS" BASIS AT THE BUYER'S OWN RISK AND PERIL WITHIN THE MEANING OF ARTICLE 1733 OF THE CIVIL CODE OF QUÉBEC; AND (B) NEITHER THE SELLER NOR ANY OTHER PERSON (INCLUDING ANY REPRESENTATIVE OF THE SELLER, WHETHER IN ANY INDIVIDUAL, CORPORATE OR ANY OTHER CAPACITY) IS MAKING, AND THE BUYER IS NOT RELYING ON, ANY REPRESENTATIONS, WARRANTIES, CONDITIONS OR OTHER STATEMENTS OF ANY KIND WHATSOEVER, WHETHER ORAL OR WRITTEN, EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE, AS TO ANY MATTER CONCERNING THE SELLER GROUP MEMBERS, THE BUSINESS, THE PURCHASED ASSETS, THE ASSUMED LIABILITIES, THE EXCLUDED ASSETS, THE EXCLUDED LIABILITIES, THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THE AGREEMENT, OR THE ACCURACY OR COMPLETENESS OF ANY INFORMATION PROVIDED TO (OR OTHERWISE ACQUIRED BY) THE BUYER OR ANY OF ITS RESPECTIVE REPRESENTATIVES, INCLUDING WITH RESPECT TO MERCHANTABILITY, PHYSICAL OR FINANCIAL CONDITION, DESCRIPTION, FITNESS FOR A PARTICULAR PURPOSE, SUITABILITY FOR DEVELOPMENT, TITLE, DESCRIPTION, USE OR ZONING, ENVIRONMENTAL CONDITION, EXISTENCE OF LATENT DEFECTS, QUALITY, QUANTITY OR ANY OTHER THING AFFECTING THE BUSINESS, ANY OF THE PURCHASED ASSETS OR

Case 20-11719-CSS    Doc 97-1    Filed 10/14/20    Page 108 of 358
- 66 -

THE ASSUMED LIABILITIES, OR IN RESPECT OF ANY OTHER MATTER OR THING WHATSOEVER, INCLUDING ANY AND ALL CONDITIONS, WARRANTIES OR REPRESENTATIONS, EXPRESS OR IMPLIED, PURSUANT TO ANY APPLICABLE LAW IN ANY JURISDICTION, WHICH THE BUYER CONFIRMS DO NOT APPLY TO THIS AGREEMENT, AND ARE HEREBY WAIVED IN THEIR ENTIRETY BY THE BUYER.

**5.13    Brokers; Advisor Fees**

No broker, finder or investment banker is entitled to any brokerage, finder's or other similar fee or commission payable by Seller Group Members in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Buyer.

## ARTICLE 6
## CONDITIONS

**6.1    Conditions for the Benefit of the Buyer and the Seller**

The respective obligations of the Buyer and of the Seller to consummate the transactions contemplated by this Agreement are subject to the satisfaction of, or compliance with, at or prior to the Closing Time, each of the following conditions:

(a)    *No Law* – no provision of any Applicable Law and no judgment, injunction or Order that prohibits the consummation of the purchase of the Purchased Assets or any of the other transactions pursuant to this Agreement shall be in effect;

(b)    *Approval and Vesting Order* – the Approval and Vesting Order shall have been issued and entered and shall be Final; and

(c)    *U.S. Approval Orders* – each of the U.S. Sale Order, the Initial Recognition Order and the Recognition Order shall have been issued and entered by the U.S. Bankruptcy Court and shall be Final.

The Parties acknowledge that the foregoing conditions are for the mutual benefit of the Seller and the Buyer. Any condition in this Section 6.1 may be waived by the Seller or by the Buyer, in whole or in part, without prejudice to any of their respective rights of termination in the event of non-fulfillment of any other condition in whole or in part. Any such waiver will be binding on the Seller or the Buyer, as applicable, only if made in writing.

**6.2    Conditions for the Benefit of the Buyer**

The obligation of the Buyer to consummate the transactions contemplated by this Agreement is subject to the satisfaction of, or compliance with, or waiver by the Buyer of, at or prior to the Closing Time, each of the following conditions (each of which is acknowledged to be for the exclusive benefit of the Buyer):

(a)    *Performance of Covenants* – the covenants contained in this Agreement to be performed or complied with by the Seller at or prior to the Closing Time shall have been performed or complied with in all material respects as at the Closing Time;

(b)  *Truth of Representations and Warranties* – (i) the Fundamental Representations and Warranties of the Seller shall be true and correct in all but *de minimis* respects (other than the representations and warranties contained in Section 4.1(b)(vi) which shall be true and correct in all respects) on and as of the date of this Agreement and on and as of the Closing Date, as if made at and as of such date (except for representations and warranties made as of a specified date, the accuracy of which shall be determined as of such specified date) and (ii) all other representations and warranties of the Seller contained in Article 4 shall be true and correct in all respects on and as of the date of this Agreement and on and as of the Closing Date, as if made at and as of such date (except for representations and warranties made as of specified date, the accuracy of which shall be determined as of such specified date) except where the failure to be so true and correct would not, individually or in the aggregate, have a Material Adverse Effect (and, for this purpose, any reference to "material", "Material Adverse Effect" or other concepts of materiality in such representation and warranties shall be ignored);

(c)  *Officer's Certificates* – the Buyer shall have received a certificate confirming the satisfaction of the conditions contained in Sections 6.2(a) (*Performance of Covenants*) and 6.2(b) (*Truth of Representations and Warranties*), signed for and on behalf of the Seller without personal liability by an executive officer of the Seller or other Persons acceptable to the Buyer, in each case in form and substance reasonably satisfactory to the Buyer;

(d)  *Encumbrances* – releases or discharges of all Encumbrances against the Purchased Assets, including any court ordered charges in the CCAA Proceedings or U.S. Proceedings, other than the Permitted Encumbrances;

(e)  *Name Changes* – all documents required to effect the change of names contemplated in Section 7.12 shall be delivered to the Buyer in form and substance satisfactory to the Buyer, acting in a commercially reasonable manner;

(f)  *No Material Adverse Effect* – no Material Adverse Effect shall have occurred since the Filing Date;

(g)  *Consents and Waivers* – an Assignment Order shall have been obtained and shall be Final with respect to each of the Material Contracts, the Equity Interests and other agreements described on Schedule 6.2(g)(i), or, if not obtained, all waivers and/or consents with respect to the Material Contracts, the Equity Interests and other agreements described on Schedule 6.2(g)(i) shall have been obtained at or before the Closing Time on the terms set out on Schedule 6.2(g)(i); and subject to Section **Erreur ! Source du renvoi introuvable.** and Exhibit 7.3(f), all necessary Governmental Authorizations set forth on Exhibit 5.5. attached hereto shall have been obtained at or before the Closing Time on terms acceptable to the Buyer, acting in a commercially reasonable manner; and

(h)  *Seller's Deliverables* – the Seller shall have delivered to the Buyer all of the deliverables contained in Section 10.2 in form and substance satisfactory to the Buyer, acting in a commercially reasonable manner.

**6.3    Conditions for the Benefit of the Seller**

The obligation of the Seller to consummate the transactions contemplated by this Agreement is subject to the satisfaction of, or compliance with, or waiver where applicable by the Seller of, at or prior to the Closing Time, each of the following conditions (each of which is acknowledged to be for the exclusive benefit of the Seller):

(a)    *Truth of Representations and Warranties* – The representations and warranties of the Buyer contained in Sections 5.1, 5.2(a), 5.4 and 5.7 shall be true and correct in all but *de minimis* respects on and as of the date of this Agreement and on and as of the Closing Date, as if made at and as of such date (except for representations and warranties made as of a specified date, the accuracy of which shall be determined as of such specified date) and all other representations and warranties of the Buyer contained in Article 5 will be true and correct in all respects on and as of the date of this Agreement and on and as of the Closing Date as if made on and as of such date (except for representations and warranties made as of specified date, the accuracy of which shall be determined as of such specified date) except where the failure to be so true and correct would not reasonably be expected to have a material and adverse effect on the Buyer's ability to consummate the transactions contemplated by this Agreement;

(b)    *Performance of Covenants* – the covenants contained in this Agreement to be performed by the Buyer at or prior to the Closing Time shall have been performed in all material respects as at the Closing Time;

(c)    *Officer's Certificate* – the Seller shall have received a certificate confirming the satisfaction of the conditions contained in Sections 6.3(a) and 6.3(b) signed for and on behalf of the Buyer without personal liability by an executive officer of the Buyer or other Persons acceptable to the Seller, acting in a commercially reasonable manner, in each case, in form and substance satisfactory to the Seller, each acting in a commercially reasonable manner; and

(d)    *Buyer's Deliverables* – the Buyer shall have delivered to the Seller all of the deliverables contained in Section 10.3 in form and substance satisfactory to the Seller, acting in a commercially reasonable manner.

(e)    *Administrative Reserve* – the Administrative Reserve Order shall have been issued and entered and shall be Final.

(f)    *Employee Fund* – the Employee Fund shall have been established in accordance with Section 7.6(p).

(g)    *Contractor Fund* – the Contractor Fund shall have been established in accordance with Section 7.24.

- 69 -

## ARTICLE 7
## ADDITIONAL AGREEMENTS OF THE PARTIES

**7.1    Access to Information**

(a)    Until the Closing Time, the Seller Group shall give to the Buyer's personnel engaged in the transactions contemplated by this Agreement and their accountants, legal advisers, consultants, financial advisors and representatives during normal business hours reasonable access to its premises and to all of the books and records relating to the Business, the Purchased Assets, the Assumed Liabilities and the Listed Employees, and shall furnish them with all such information relating to the Business, the Purchased Assets, the Assumed Liabilities and the Listed Employees as the Buyer may reasonably request in connection with the transactions contemplated by this Agreement; provided that such access shall be conducted at the Buyer's expense, in accordance with Applicable Law and under supervision of the Seller's personnel and in such a manner as to maintain confidentiality, and the Seller will not be required to provide access to or copies of any such books and records if (a) the provision thereof would cause the Seller to be in contravention of any Applicable Law or (b) making such information available would (A) result in the loss of any lawyer-client or other legal privilege, or (B) cause the Seller to be found in contravention of any Applicable Law, or contravene any fiduciary duty or agreement (including any confidentiality agreement to which the Seller or any of its affiliates are a party). Such access shall include access for such environmental investigations deemed appropriate by the Buyer, acting reasonably, provided that any intrusive environmental investigation shall be subject to the prior approval of the Seller Group, acting reasonably. Notwithstanding anything in this Section 7.1 to the contrary, any such investigation shall be conducted upon reasonable advance notice and in such manner as does not materially disrupt the conduct of the Business or the possible sale thereof to any other Person. The Seller shall use its commercially reasonable efforts to also deliver to the Buyer authorizations to Governmental Authorities necessary to permit the Buyer to obtain information in respect of the Purchased Assets from the files of such Governmental Authorities.

(b)    The Buyer shall make all books and records transferred as part of the Purchased Assets reasonably available to the Monitor, the Receiver and any trustee in bankruptcy of any of the Seller Group Members upon at least five (5) Business Days prior notice, for a period of seven (7) years after Closing, and shall, at such party's expense, permit any of the foregoing persons to take copies thereof as they may determine to be necessary or useful to accomplish their respective roles; provided that the Buyer shall not be obligated to make such books and records available to the extent that doing so would (a) violate Applicable Law, (b) jeopardize the protection of a solicitor-client privilege, or (c) unreasonably interfere with the ongoing business and operations of the Buyer and its Affiliate, as determined by the Buyer, acting reasonably.

**7.2    Conduct of Business Until Closing Time**

Except: (1) as required by this Agreement, including any restructuring pursuant to

Section 7.14; (2) as provided for in any Orders granted in the CCAA Proceedings or the U.S. Proceedings prior to the Closing Time; (3) as required by Applicable Law (provided that; the Seller Group shall (x) not, without the prior written consent of the Buyer, seek any Order of the CCAA Court or the U.S. Bankruptcy Court requiring any Seller Group Member to refrain from taking any action described in this Section 7.2 or to compel such Seller Group Member to take any action described in this Section 7.2(a), and (y) use its commercially reasonable efforts to oppose any motion or other request seeking such an Order of the CCAA Court or the U.S. Bankruptcy Court); or (4) as set forth on Schedule 7.2, the Seller Group Members shall, and shall cause each other Seller Group Member to:

(a)     (i) other than any COVID-19 Actions, operate the Business only in the ordinary course of business in all material respects consistent with past practice taking into account the Seller Group Members financial condition and the cessation of most business operations; (ii) use commercially reasonable efforts to preserve its business organization and its business relationships and goodwill with customers, suppliers and others having business dealings with it taking into account any COVID-19 Actions; (iii) pay and discharge the debts authorized by the CCAA Court; (iv) use commercially reasonable efforts to maintain in full force and effect all material insurance policies and binders relating to the Business taking into account any COVID-19 Actions; (v) seek to collect the receivables of the Business in the ordinary course of business and in the same manner as previously collected taking into account any COVID-19 Actions; and  (vi) other than any COVID-19 Actions, maintain accounting policies consistent with those in place as of the date hereof; and

(b)     not, without the prior written consent of the Buyer (the granting of such consent to be in the Buyer's sole discretion) or as otherwise required by Applicable Law or as provided by any Assumed Employment Contract or as permitted under Section 7.6: (i) transfer, lease, license, sell, abandon, fail to maintain, enforce and protect, create any Encumbrance on or otherwise dispose of any of the Purchased Assets, except in the ordinary course of business consistent with past practice taking into account any COVID-19 Actions; (ii) increase the compensation or benefits of any Listed Employee except as permitted herein or if the value of such increase is not material to the Business; (iii) pay any severance or termination pay to any Listed Employee if the value of the severance or termination pay would result in a material increased liability to the Business; (iv) materially increase the terms of employment of any Listed Employee, establish, adopt, enter into, amend or terminate any Employee Plan or any plan, agreement, program, policy, trust, fund or other arrangement that would be an Employee Plan if it were in existence as of the date of this Agreement if any such action would result in a material increased liability to  the Business; (v) amend any Collective Agreement, or enter into any new collective bargaining agreement, it being understood that the Buyer consents to the continued negotiation of a Collective Agreement with *La Société professionelle des auteurs et des compositeurs du Québec* in the ordinary course consistent with past practice, provided that the Buyer shall be consulted if such negotiation would result in a material increased liability to the Business; (vi) waive, release or settle any material Claims held by it related to the Business that are included in the Purchased Assets; (vii) (A) amend, terminate or assign any

Personal Property Lease, Real Property Lease, Real Property Landlord Lease, Assumed Contract or Contract that is included in the Purchased Assets and material to the Business, (B) waive, release, permit the lapse of, relinquish or assign any material rights of the Business under any Personal Property Lease, Real Property Lease, Real Property Landlord Lease, Assumed Contract or Contract included in the Purchased Assets, or (C) enter into any lease, Contract, license or other commitment related to the Business that would constitute a Personal Property Lease, Real Property Lease, Real Property Landlord Lease, Assumed Contract or Contract except, in each case, for non-material Contracts or non-material liabilities entered into in the ordinary course of business; (viii) enter into any Contract which materially restricts the ability of the Business to engage in any business in any geographic area or channel of distribution; (ix) other than any COVID-19 Actions, accelerate the delivery or sale of services or products, or offer discounts or price protection on the sale of services or products or premiums on the purchase of raw materials, except in the ordinary course of business, consistent with past practice; (x) other than any COVID-19 Actions, make any changes in the selling, distribution, advertising, promotion, terms of sale or collection practices of the Business, except in the ordinary course of business; (xi) issue any shares or ownership interests or securities convertible or exchangeable for shares or ownership interests; (xii) incur any indebtedness other than trade debt incurred in the ordinary course of business taking into account any COVID-19 Actions; (xiii) (A) file any material amended claim for refund of Taxes, or (B) knowingly surrender any right to claim a material refund of Taxes; (xiv) with respect to the Transferred Subsidiaries, (A) settle or compromise any liability for material Taxes, or make, revoke or modify any Tax election (with respect to Tax elections, in each case, outside the ordinary course of business), or (B) file any income or other material Tax Return other than on a basis consistent with past practice; (xv) acquire any businesses or assets outside of the ordinary course of business; (xvi) agree or make a commitment, whether in writing or otherwise, to do any of the foregoing; or (xvii) take any action that would make any representation or warranty of the Seller hereunder, or omit to take any action necessary to prevent any representation or warranty of the Seller hereunder from being, inaccurate in any respect at, or as of any time before, the Closing Date.

## 7.3    Approvals and Consents

(a)    As soon as reasonably possible following the date hereof and until the Closing Date, the Seller and the Buyer shall make all such filings and seek all such consents, approvals, permits and authorizations with any other Governmental Authorities whose consent is required for consummation of the transactions contemplated by this Agreement, and the Buyer will request any expedited processing available.

(b)    From the date hereof until the Closing Date, the Seller shall use its commercially reasonable efforts to obtain all consents, waivers, approvals and Governmental Authorizations with respect to, and provide any notices under, any Permits or Contracts required in connection with the completion of the transactions contemplated by this Agreement at or before the Closing Time on terms

acceptable to the Buyer, acting reasonably. The Buyer shall use its commercially reasonable efforts to cooperate with the Seller in connection with the foregoing.

(c)     Each of the Parties shall, and the Buyer shall cause its Affiliates to, cooperate with each other and shall use, and the Buyer shall cause its Affiliates to use, their respective reasonable best efforts to prepare and file as soon as practicable following the date of this Agreement the Notification and Report Forms under the HSR Act and all required filings pursuant to the Russian Competition Law (in each case, if applicable; and in no event later than twelve (12) Business Days after the date of this Agreement absent mutual agreement by the Parties). Each of the Parties shall make, and the Buyer shall cause its Affiliates to make, any other filings and submissions in other jurisdictions as are mutually agreed by the Parties, if any, as soon as practicable and shall promptly provide any supplemental information or documentation requested by any Governmental Authority relating thereto. The Buyer shall request early termination of the HSR waiting period (if applicable) and shall pay all required fees and expenses incurred in connection with the notifications, filings, registrations, submissions or other materials contemplated by this Section 7.3(c). Subject to applicable confidentiality obligations, Applicable Laws or Orders, the Parties shall, and the Buyer shall cause its Affiliates to, coordinate and cooperate fully and promptly with each other in exchanging such information and providing such assistance as the other parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods under the HSR Act. Neither Party shall take any action to extend the HSR waiting period or otherwise extend the time period for review by any Governmental Authority or agree to delay closing (such as by entering into a timing agreement) without the prior written consent of the other Party (which may be provided via email).

(d)     Each Party shall promptly notify the other Parties of the substance of any submission, correspondence, communication, or meeting between it or its representatives and any Governmental Authority that relate to the subject matter of this Section 7.3 or the transactions contemplated by this Agreement (which shall be provided on an outside counsel basis to the extent that the information is competitively sensitive). Each Party shall consult with the other Parties in advance regarding any such submission, correspondence, communication or meeting, shall consider in good faith the views and comments of such Party, and shall provide the other Parties with the opportunity to participate in any such communication or meeting unless prohibited by the Governmental Authority.

(e)     Notwithstanding anything in this Agreement to the contrary, the Parties shall, and the Buyer shall cause its Affiliates to, take any and all actions necessary or advisable to obtain expiration or termination of the required waiting periods and any consents, clearances or approvals required under or in connection with the HSR Act and to observe all review periods and obtain all consents, clearances or approvals required under the Russian Competition Law (collectively, "**Antitrust Laws**") and to avoid or eliminate each and every impediment under any Antitrust Law, in each case, to cause the Closing and the other transactions contemplated hereby to occur as soon as practicable following the date of this Agreement and,

in any event, prior to the Sunset Date, including (i) expeditiously complying with or modifying any requests or inquiries for additional information or documentation (including any second request) by any Governmental Authority, (ii) offering, negotiating, committing to and effecting, by consent decree, hold separate order or otherwise, the sale, divestiture, license or other disposition of any and all of the capital stock, assets, rights, products or businesses of the Buyer, the entrance into, and the amendment, modification or termination of, any Contracts or other arrangements, and any other restrictions on the activities of the Buyer or the Seller Group and (iii) contesting, defending and appealing any threatened or pending action or preliminary or permanent injunction or other Order that would adversely affect the ability of any party hereto to consummate, or otherwise delay the consummation of, the transactions contemplated hereby and taking any and all other actions to prevent the entry, enactment or promulgation thereof.

(f)     The Parties hereby agree to the covenants set forth in Exhibit 7.3(f).

(g)     From the date of this Agreement through the date (i) of termination of the required waiting periods under the HSR Act and (ii) any consents of any other applicable Governmental Authority are obtained, the Buyer shall not directly or indirectly (A) effect or enter into any discussions or negotiations with respect to any transaction, including entering into any joint venture or acquiring or agreeing to acquire, by merging with or into or consolidating with, or purchasing a substantial portion of the assets of or any equity in, or by any other manner, any assets or Person, if such transaction is in a line of business that is related to the Business, or (B) take (or fail to take) any other action that would reasonably be expected to delay or make more difficult the obtaining of clearance or the expiration of the required waiting periods under the HSR Act, or the obtaining of such consents from any applicable Governmental Authorities.

## 7.4     Covenants Relating to this Agreement

(a)     Each of the Parties shall perform, and shall cause their Affiliates to perform, all obligations required to be performed by the applicable Party under this Agreement, co-operate with the other Parties in connection therewith and, subject to the directions of any applicable courts to the Seller Group, do all such other acts and things as may be necessary or desirable in order to consummate and make effective, as soon as reasonably practicable, the transactions contemplated by this Agreement and, without limiting the generality of the foregoing, from the date hereof until the Closing Date, each Party shall and, where appropriate, shall cause each of its Affiliates to:

(i)     negotiate in good faith and use its commercially reasonable efforts to take or cause to be taken all actions and to do, or cause to be done, all things necessary, proper or advisable to satisfy the conditions precedent to the obligations of such Party hereunder (including, where applicable, negotiating in good faith with the applicable Governmental Authorities and/or third Persons in connection therewith), and to cause the fulfillment at the earliest practicable date of all of the conditions precedent to the

other Party's obligations to consummate the transactions contemplated hereby; and

(ii)    not take any action, or refrain from taking any action, or permit any action to be taken or not taken, which would reasonably be expected to prevent, materially delay or otherwise impede the consummation of the transactions contemplated by this Agreement.

(b)    From the date hereof until the Closing Date, the Buyer hereby agrees, and hereby agrees to cause its representatives to, keep the Seller informed on a reasonably current basis, and no less frequently than on a weekly basis through teleconference or other meeting, and as reasonably requested by the Seller or the Monitor, as to the Buyer's progress in terms of the satisfaction of the conditions precedent contained herein.

(c)    From the date hereof until the Closing Date, the Seller hereby agrees, and hereby agrees to cause its representatives to, keep the Buyer informed on a reasonably current basis, and no less frequently than on a weekly basis through teleconference or other meeting, and as reasonably requested by the Buyer or the Monitor, as to the Seller's progress in terms of the satisfaction of the conditions precedent contained herein.

(d)    The Seller and the Buyer agree to execute and deliver such other documents, certificates, agreements and other writings, and to take such other actions to consummate or implement as soon as reasonably practicable, the transactions contemplated by this Agreement.

**7.5    Tax Matters**

(a)    The Buyer and the Seller agree to furnish or cause to be furnished to each other, as promptly as practicable, such information and assistance relating to the Purchased Assets and the Assumed Liabilities as is reasonably necessary for the preparation and filing of any Tax Return, claim for refund or other required filings relating to Tax matters, for the preparation for and proof of facts during any Tax audit, for the preparation for any Tax protest, for the prosecution of any suit or other proceedings relating to Tax matters and for the answer to any governmental or regulatory inquiry relating to Tax matters.

(b)    The Buyer and each Seller Group Member shall each be responsible for the preparation of their own statements required to be filed under the Tax Act, the GST and HST Legislation, the QST Legislation, and the Code and other similar forms and returns in accordance with Applicable Law.

(c)    All real property Taxes, personal property Taxes and similar *ad valorem* obligations levied with respect to the Purchased Assets for a taxable period which includes (but does not end on) the Closing Date (a "**Straddle Period**") shall be apportioned between the Seller and the Buyer based on the number of days of such taxable period up to and including the Closing Date (such portion of such Straddle Period, the "**Pre-Closing Straddle Tax Period**") and the number of days

of such taxable period after the Closing Date (such portion of such Straddle Period, the "**Post-Closing Straddle Tax Period**"). Except as otherwise provided herein, the Seller shall be liable for the proportionate amount of such real property Taxes, personal property Taxes and similar *ad valorem* obligations that is attributable to the Pre-Closing Straddle Tax Period, and the Buyer shall be liable for the proportionate amount of such real property Taxes, personal property Taxes and similar *ad valorem* obligations that is attributable to the Post-Closing Straddle Tax Period. For all purposes under this Agreement, in the case of any Tax based upon or related to income, receipts, sales, use, payroll, or withholding, in respect of any Straddle Period, the portion of such Tax allocable to the Pre-Closing Straddle Tax Period shall be deemed to be the amount that would be payable if the relevant Straddle Period ended on and included the Closing Date.

(d)     Subject to Section 7.5(f), the Buyer shall be responsible for and shall pay, or cause to be paid, any Transfer Tax in respect of the purchase and sale of the Purchased Assets under this Agreement (including for greater certainty, any Transfer Tax related with the importation, or change of importation classification, of Purchased Assets) and such Transfer Tax shall be remitted to the appropriate Governmental Authority as provided for under Applicable Law (except any Transfer Tax which, under Applicable Law, is collectible by the Seller or applicable Seller Group Member, in which case such Transfer Tax shall be collected by the Seller or Seller Group Member, as the case may be, and remitted by the Seller or Seller Group Member to the appropriate Governmental Authority as provided for under the Applicable Law but, for the avoidance of doubt, the Buyer shall remain economically responsible for and shall pay to or reimburse, or cause to be paid or reimbursed, as the case may be, the Seller or the applicable Seller Group Member for any such Transfer Tax). The Seller and the Buyer shall reasonably cooperate to (i) mitigate and/or eliminate the amount of Transfer Taxes resulting from the transactions contemplated herein and (ii) timely prepare and file any Tax Returns relating to such Transfer Taxes, including any claim for exemption or exclusion from the application or imposition of any such Transfer Taxes. The Buyer shall be responsible for preparing and filing all necessary Tax Returns or other documents with respect to such Transfer Taxes (other than any GST, HST and QST returns required to be filed by any Seller Group Member); provided, however, that in the event any such Tax Return requires execution by any Seller Group Member, the Buyer shall deliver it to such Seller Group Member not less than ten (10) Business Days before the due date thereof, and the Seller Group Member shall reasonably promptly execute such Tax Return and return it to the Buyer.

(e)     Subject to Section 7.5(f), the Seller and the Buyer declare that, in accordance with sections 221(2), 228(4) and 228(6) of the GST and HST Legislation and sections 423, 438 and 441 of the QST Legislation, the Buyer shall not be required to pay to the Seller and the Seller is relieved of its obligation to collect from the Buyer the GST, HST and/or QST imposed, if any, in respect of the sale of the Real Property. The responsibility for the payment thereof, if any, will be exclusively assumed by the Buyer and the Buyer shall, subject to Section 7.5(f), self-assess and remit directly to the appropriate Governmental Authority any GST, HST and/or QST

payable, if any, in connection with the sale and transfer of the Real Property, all in accordance with the GST and HST Legislation and the QST Legislation, respectively. The Buyer shall indemnify and save the Seller Group Members (and any current or former directors and officers of any Seller Group Members) harmless with respect to any GST, HST and/or QST, penalties, interests and costs which may become payable as a result of the failure by the Buyer to comply with the obligations set out in this Section 7.5(e).

(f)     The Buyer and the Seller shall respectively cause each Designated Buyer acquiring the Purchased Assets and each Seller Group Member selling the Purchased Assets, to the extent permitted by the applicable Tax legislation, to jointly elect, pursuant to subsection 167(1) of the GST and HST Legislation, Sections 75 and 75.1 of the QST Legislation and any equivalent or corresponding provision under any applicable provincial legislation imposing a similar value added or multi-staged Tax, that no such Tax be payable with respect to the purchase and sale of the Purchased Assets under this Agreement. For greater certainty, the Buyer and the Seller agree under this Section 7.5(f) to file (or cause to be filed) any election(s) or to pursue any administrative procedure(s) which, to the extent permitted by the applicable non-U.S. Tax legislation, may reduce or eliminate any other Transfer Taxes under any applicable provincial legislation with respect to the purchase and sale of the Purchased Assets under this Agreement. Each such Designated Buyer and each such Seller Group Member shall make such election(s) in prescribed form containing prescribed information and the relevant Designated Buyer shall file such election(s) in compliance with the requirements of the applicable legislation. Notwithstanding such election(s), in the event it is determined by the Canada Revenue Agency or Revenue Quebec (or another applicable provincial Governmental Authority) that there is a liability of the Buyer or a Designated Buyer to pay, or of any Seller Group Member to collect and remit, any Taxes payable under the GST and HST Legislation or the QST Legislation (or under any applicable provincial legislation) in respect of the sale and transfer of the Purchased Assets, such Taxes shall be paid by the Buyer (or the Designated Buyer, as the case may be) and the Buyer shall indemnify and save the Seller Group Members (and any current or former directors and officers of any Seller Group Members) harmless with respect to any such Taxes and costs payable resulting from such determination or assessment.

(g)     To the extent permitted by the applicable Tax legislation, each Seller Group Member selling the Purchased Assets and the each Designated Buyer acquiring the Purchased Assets will jointly execute, and each of them will file promptly following the Closing Date, an election under Section 22 of the *Tax Act*, and any corresponding provisions of any applicable provincial income Tax legislation. For the purposes of such elections, the Buyer and the Seller will, acting reasonably, jointly determine the amount that the parties will designate as the portion of the Purchase Price allocable to the debts in respect of which such elections are made. For greater certainty, each Seller Group Member and each Designated Buyer agree to prepare and file their respective Tax Returns in a manner consistent with such election(s).

(h)  To the extent permitted by the applicable Tax legislation, each Seller Group Member selling the Purchased Assets and each Designated Buyer acquiring the Purchased Assets will jointly execute an election in the prescribed manner and within the prescribed time limits, to have the rules in subsection 20(24) of *the Tax Act*, and any equivalent or corresponding provision under applicable provincial or territorial Tax legislation, apply to the obligations of such Seller Group Member in respect of undertakings which arise from the operation of the Business and to which paragraph 12(1)(a) and 12(1)(e) of the Tax Act apply. For the purposes of such election(s), the Buyer and the Seller will, acting reasonably, jointly determine the elected amount and the Buyer and the Seller acknowledge that the applicable Seller Group Member is transferring assets to the Designated Buyer which have a value equal to such elected amount as consideration for the assumption by the Designated Buyer of such obligations of the Seller Group Member.

## 7.6    Employee Matters

(a)  From the date hereof until the Closing Date, the Employee Schedule will be updated at least every two (2) weeks, as reasonably requested by the Buyer, to reflect any changes to the information provided in the Employee Schedule occurring between delivery of the Employee Schedule and Closing; provided, that any increase of more than 10% in the number of Listed Employees in the Employee Schedule shall be subject to the approval of the Buyer. No Employee shall be added in the Employee Schedule in excess of the thresholds set out in this Section 7.6(a) or an increased threshold approved by the Buyer, and no Employee in excess of such thresholds shall be a Listed Employee without the consent of the Buyer, which consent shall not be withheld unreasonably.

(b)  At least four (4) Business Days prior to the Closing Date (or such other date as is mutually agreed to by the Seller and the Buyer, each acting reasonably), the Seller shall provide to the Buyer the final Employee Schedule that contains the final list of Listed Employees. The Buyer shall recognize the periods of employment of the Listed Employees (for any employment purposes) with the Seller Group Members and any of their predecessors and Affiliates and offer continued employment to each Listed Employee effective as of the Closing Date on terms and conditions of employment, and Employee Plans, that are substantially comparable in the aggregate to those terms and conditions of employment currently available to each such Listed Employee immediately prior to the Closing Date (including the Key Employee Retention Plan, if applicable). The term "**Transferred Employees**" means (i) those Listed Employees: (a) who expressly accept the Buyer's offer of continued employment prior to the Closing Date and for those Short-Term Leave Employees who have executed an employment agreement amendment in a form similar to the Employment Agreement Amendments (any changes to the terms of such form from the Employment Agreement Amendments shall be as reasonably determined by the Buyer) prior to the date on which they are able to return to active employment with Buyer if such Short-Term Leave Employee is subject to a then- effective employment agreement; and (b) whose employment continues by operation of Applicable Law in the employment of the

Buyer, and (ii) those Extended Leave Employees who expressly accept the Buyer's offer of continued employment and who have executed an employment agreement amendment in a form similar to the Employment Agreement Amendments (any changes to the terms of such form from the Employment Agreement Amendments shall be as reasonably determined by the Buyer) prior to the date on which they are able to return to active employment, provided that any Extended Leave Employee shall be offered employment in accordance with the terms and conditions of this Section 7.6(b) provided such employee can return to active employment within 6 months following the Closing Date. Any such Extended Leave Employee shall not become a Transferred Employee prior to the date such individual returns to active employment. The Buyer shall provide a welcome letter to those Listed Employees whose employment continues by operation of Applicable Law in the employment of the Buyer. For the avoidance of doubt, the Parties intend that the transactions contemplated by this Agreement for Listed Employees that become Transferred Employees shall not result in any severance, termination or redundancy payment or similar payment in connection with the consummation of the transactions. Except as disclosed under Schedule 7.6(b), the Seller Group Members shall terminate the employment of all Employees who are not Listed Employees (other than Extended Leave Employees) and any Listed Employee (other than Short-Term Leave Employees) who fails to execute an applicable Employment Agreement Amendment or other required employment agreement amendment within 48 hours of the Filing Date (in which case such employee will not be considered a Listed Employee for any purpose). Prior to the Closing Date, but subject to the selection of the Successful Bidder in accordance with the SISP, the applicable Seller Group Members shall terminate with effect on a date prior to the Closing Date the employment of (i) any remaining Employees who are not Listed Employees (other than Extended Leave Employees); and (ii) any Listed Employee (other than Short-Term Leave Employees) whose employment does not continue by operation of Applicable Law with the Buyer or who does not expressly accept the Buyer's offer of employment. For the avoidance of doubt, the Seller Group Members have the discretion to continue to employ the Extended Leave Employees and the Short-Term Leave Employees who do not expressly accept the Buyer's offer of continued employment, including after the execution of this Agreement and after the Closing Date, provided that the Seller Group will cooperate in good faith with the Buyer, including as set forth in Section 7.6(q).

(c)     From the date hereof until the Closing Date, the Seller Group will cooperate with the Buyer in giving notice to the Employees concerning such matters referred to in this Section 7.6 as are reasonable under the circumstances. For the Listed Employees who are RSD Employees and WDI Employees, the Seller Group and the Buyer shall exercise reasonable efforts steps to persuade such Listed Employees to accept such offers of employment. The Parties shall jointly plan and co-ordinate any notices, announcements or communications to Employees to be issued or made by or on behalf of any Seller Group Member with respect to the transactions contemplated by this Agreement, it being understood, for the avoidance of doubt, that the Seller Group Members will consult with and give prior notice to the Buyer and a reasonable opportunity for the Buyer to review and

comment on the disclosure prior to issuance, distribution or publication.

(d)     Without limiting the scope of the other provisions referred to in Sections 2.3(d) and 7.6, the Buyer agrees to perform, discharge and fulfil its obligations as successor employer as required by Applicable Law solely with respect to the Transferred Employees whose employment is transferred to the Buyer by operation of law on Closing.

(e)     The Buyer agrees to perform, discharge and fulfil its obligations as successor employer under the Assumed Employment Contracts.

(f)     From and after the Closing Date, the Buyer recognizes that the Transferred Employees shall be entitled to use and obtain their unused and accrued vacation time accruals. Without limiting the generality of the foregoing, the Seller Group shall pay in a timely fashion all accrued but unused vacation or paid time off where required by Applicable Law to be paid out upon termination of employment to any Transferred Employee.

(g)     The Buyer shall assume Collective Agreements that are transferred to the Buyer by operation of law on Closing and recognize any Union that represents employees of the Business to the extent required by Applicable Law it being understood that this paragraph is not applicable in respect of Collective Agreements governed by U.S. laws.

(h)     The Buyer will use commercially reasonable efforts in its discretion to cause the Business to offer employment to Employees who are not Listed Employees and whose employment with the Business was terminated by the applicable Seller Group Member for reasons related to the COVID-19 pandemic or in connection with any reduction in force implemented between November 1, 2019 and the Closing Date, any such offers to be on terms and conditions determined by the Buyer in its reasonable discretion and based on the needs of the Business and the applicable Employee's skills and abilities, as well as restart operations as soon as commercially reasonable based on the Buyer's business plan and taking into account the COVID-19 pandemic and related safety, health, gathering, confinement and other restrictions imposed or measures recommended by Governmental Authorities and other factors. For greater certainty, any Employees hired pursuant to this Section 7.6(h) is not a Transferred Employee for the purpose of this Agreement and the transactions contemplated by this Agreement.

(i)     The Buyer hereby assumes, and agrees to pay, perform, discharge, fulfil and be liable for all liabilities relating to the Assumed Employee Plans.

(j)     The Buyer shall, as part of complying with the Buyer's obligations to Transferred Employees, including under this Section 7.6(b):

        (i)     provide written notice to the Seller prior to the Closing Date that the Buyer wishes to assume one or more Employee Plans (the "**Assumed Employee Plans**"); or

(ii)    provide benefits to the Transferred Employees (or any spouse, beneficiary or dependent of such Persons) through new employee plans established effective as of the Closing Date.

(k)    Effective as of the Closing Date, each Transferred Employee shall cease to actively participate in and accrue benefits under the Employee Plans (other than the Assumed Employee Plans). The applicable Seller Group Member shall retain responsibility, as sponsor and administrator, for all benefits, entitlements, obligations and liabilities under the Employee Plans (other than the Assumed Employee Plans and the Assumed Employment Contracts).

(l)    If the Buyer provides a notice under Section 7.6(j)(i), effective as of the Closing Date, the Seller and the Buyer shall take commercially reasonable efforts to cause the applicable Seller Group Member to, assign to the Buyer, and the Buyer shall assume, the Assumed Employee Plans and all agreements and policies forming part of or relating to any Assumed Employee Plans. The Buyer shall from the Closing Date be responsible for funding the Assumed Employee Plans in accordance with the requirements of Applicable Law and shall assume all of the Seller's rights, obligations and liabilities under and in relation to all agreements and policies with third parties relating to any Assumed Employee Plans with respect to the period from and after the Closing Date. The Seller shall make such amendments to the Assumed Employee Plans and shall file such amendments with the applicable Governmental Authority as are necessary to give effect to the assignment of the Assumed Employee Plans to the Buyer. The Seller and the Buyer agree to co-operate to take all reasonable steps to effect the assignment contemplated in this Section 7.6(l).

(m)    Periods of employment with the Seller Group Members and any of their predecessors and Affiliates, as of the Closing Date, shall be taken into account for purposes of determining eligibility, vesting, and, with respect to any vacation or paid time off and severance benefits only, level of benefits for each Transferred Employee under all employee benefit plans, programs, policies or arrangements (other than any equity based compensation and defined benefit plan benefits) of the Buyer or its Affiliates in which such Transferred Employee is eligible to participate on or following the Closing Date (each, a "**Buyer Benefit Plan**"), in each case, to the same extent and for the same purpose such service was recognized under a comparable Employee Plan prior to the Closing Date; provided, however, that no such crediting of service shall result in duplication of benefits for the same period of service.

(n)    With respect to each Buyer Benefit Plan that is a group health plan which replaces coverage under a comparable Employee Plan in which any Transferred Employee participated immediately prior to the Closing Date, the Buyer shall, or shall cause its Affiliates to use commercially reasonable efforts to waive all pre-existing condition exclusions, evidence of insurability or good health, waiting periods, actively-at-work exclusions or other limitations with respect to participation and coverage requirements applicable to each Transferred Employee to the extent waived or satisfied under the comparable Employee Plan in which such Transferred Employee participated immediately prior to the Closing Date, and

credit each Transferred Employee for any applicable amounts paid or eligible expenses paid (whether in the nature of co-payments or coinsurance amounts, amounts applied toward deductibles or other out-of-pocket expenses) by such Transferred Employee (and his or her covered spouses, dependents or beneficiaries) under the terms of the comparable Employee Plan toward satisfying any applicable deductible, co-payment, coinsurance, maximum out-of-pocket requirements and like adjustments or limitations under the applicable Buyer Benefit Plan that replaces such Employee Plan for the portion of the plan year in which the Closing Date occurs.

(o)    For purposes of payroll taxes with respect to Transferred Employees, the Seller and the Buyer, and their respective Affiliates, shall use commercially reasonable efforts to treat the transaction contemplated by this Agreement as a transaction described in Treasury Regulation Sections 31.3121(a)(1)-1(b)(2) and 31.3306(b)(1)-1(b)(2), and the parties further agree to implement this treatment by utilizing Section 5 of Revenue Procedure 2004-53.

(p)    The Buyer shall establish the Employee Fund on the Closing Date, by wire transfer of immediately available funds to the order of the Monitor, in trust, or as the Monitor may otherwise direct in writing, of an amount equal to $15,000,000, to be held in trust and distributed in accordance with the provisions of the trust agreement for the Employee Fund. Any residual balance in the Employee Fund after the final distribution amounts from the Employee Fund shall be an asset of and owned by the Buyer. The Seller Group Members shall cooperate with the trustee and administrator of the Employee Fund and use commercially reasonable efforts to assist them in carrying out their duties under the trust agreement for the Employee Fund.

(q)    Promptly following the date hereof, the Parties shall work together in good faith in order to reach a binding agreement on options and alternatives with respect to medical coverage, disability coverage and /or workers compensation with respect to those current and former Employees as well as Contractors that are currently on disability or a leave of absence as of the date hereof.

## 7.7    Administrative Reserve

(a)    The Monitor shall establish the Administrative Monitor Reserve and the Administrative Seller Reserve on the Closing Date in accordance with the Administrative Reserve Order. The Administrative Reserve Accounts shall be funded first, by applying cash and cash equivalents of the Seller Group as at the Closing Date. No more than two (2) Business Days prior to the Closing Date, the Seller will certify to the Buyer the estimated cash and cash equivalents of the Seller Group as of the Closing Date and, to the extent such amount is less than the aggregate amount of the Administrative Monitor Reserve and the Administrative Seller Reserve, the Buyer shall, at the Closing Time, fund the difference which shall make up the balance of the Administrative Reserve Accounts. From time to time after the Closing Date, the Monitor may (i) pay from the Administrative Monitor Reserve the Administrative Reserve Costs of the Monitor at its sole discretion and without further authorization, (ii) pay from the Administrative

Seller Reserve the Administrative Reserve Costs of the Seller based on written instructions received from the Seller, (iii) reduce, at its sole discretion, the amount of the Administrative Monitor Reserve as and to the extent it is no longer required to satisfy the Administrative Reserve Costs of the Monitor by distributing to the Buyer the amount of such reductions and (iv) reduce, based upon written instructions received from the Seller, the amount of the Administrative Seller Reserve as and to the extent it is no longer required to satisfy the Administrative Reserve Costs of the Seller by distributing to the Buyer the amount of such reductions, in each case in accordance with the Administrative Reserve Order. Any residual balance in the Administrative Monitor Reserve after the payment of all Administrative Reserve Costs of the Monitor shall be an asset of and owned by the Buyer and any residual balance in the Administrative Seller Reserve after the payment of all Administrative Reserve Costs of the Seller shall be an asset of and owned by the Buyer. Upon written request of the Buyer or its advisors from time to time, the Monitor shall update the Buyer regarding the Administrative Monitor Reserve and the Administrative Seller Reserve, including providing an accounting of all payments made therefrom.

(b)     The Monitor shall not, under any circumstances, be required to verify or determine the validity of any written instructions delivered by the Seller to the Monitor with respect to the Administrative Seller Reserve and the Monitor is hereby relieved of any liability or responsibility for any Claims which may arise as a result of the acceptance by the Monitor of any such written instructions in good faith.

(c)      Notwithstanding the foregoing or anything else contained herein or elsewhere, each of the Seller and the Buyer acknowledges and agrees that: (i) the Monitor's obligations hereunder are and shall remain limited to those specifically set out in this Section 7.7; and (ii) Ernst & Young Inc. is acting solely in its capacity as the CCAA Court-appointed Monitor of the Applicants pursuant to the Initial CCAA Order and not in its personal or corporate capacity, and the Monitor has no liability in connection with this Agreement whatsoever, in its personal or corporate capacity or otherwise, save and except for and only to the extent of the Monitor's gross negligence or intentional fault.

(d)     The Parties acknowledge that the Monitor may rely upon the provisions of this Section 7.7 notwithstanding that the Monitor is not a party to this Agreement. The provisions of this Section 7.7 shall survive the termination or non-completion of the transactions contemplated by this Agreement.

## 7.8    Certain Payments or Instruments Received from Third Persons

(a)     To the extent that, after the Closing Date: (a) the Buyer or any of its Affiliates receives any payment or instrument that is for the account of any Seller Group Member according to the terms of any Closing Document, the Buyer shall, and shall cause its Affiliates to, promptly deliver such amount or instrument to the relevant Seller Group Member; or (b) any of the Seller Group Members or any of their controlled Affiliates receives any payment or instrument that is for the account of the Buyer according to the terms of any Closing Document or that

relates to the Business, including any governmental assistance refunds received by any Seller Group Member after the Closing Date, the Seller shall, and shall cause the Seller Group Members to, promptly deliver such amount or instrument to the Buyer.

(b)     All amounts due and payable under this Section 7.8(a) shall be due and payable by the applicable Party in immediately available funds, by wire transfer to the account designated in writing by the relevant Party. Notwithstanding the foregoing, each Party hereby undertakes to use its commercially reasonable efforts to direct or forward all bills, invoices or like instruments to the appropriate Party.

## 7.9     Insurance Matters

The Buyer and its Affiliates shall have the right to make claims (or to cause the Seller to make, or cause any applicable Seller Group Member to make, claims), recover proceeds and otherwise continue to pursue against the Seller Group Members' insurance policies with respect to matters existing or arising on or prior to the Closing Date, and prior to the Closing the Seller shall take all actions necessary so that the Buyer shall be named as additional insured and loss payee under such policies.

## 7.10     Intellectual Property Matters

The Seller Group Members shall, with reasonable diligence, and at the Buyer's sole cost and expense, cooperate with and assist the Buyer with the registration of the assignment of the Business Intellectual Property by executing whatever documentation is required, including, without limitation, assignment documents and powers of attorney.

## 7.11     Permits, Surety Bonds or Financial Assurances

The Seller Group Members shall use commercially reasonable efforts to cooperate with and assist the Buyer as reasonably requested to transfer or replace all Permits, including Permits related to or issued pursuant to Environmental Laws, and surety bonds or other financial assurances, and to maintain and comply with, in each case, at the Buyer's sole cost and expense, all required Permits or surety bonds or financial assurances during any transfer or replacement period after the Closing Time provided, however, that the Buyer acknowledges and agrees that nothing in this Section 7.11 shall operate to prohibit or diminish in any way the right of the Seller to dissolve, windup or otherwise cease operations as it may determine in its sole discretion following the Closing Time, subject to the Seller's obligations pursuant to this Agreement.

## 7.12     Change Names

As soon as reasonably practicable on or following the Closing Date (and, in any event, within five (5) Business Days of the Closing Date), each of the Seller Group Members shall discontinue use of the name "Cirque du Soleil" and the acronym "CDS" and any variation thereof, including any names confusingly similar thereto or any similar names indicating affiliation with the Buyer or the Business, except where legally required to advise that its name has been changed to another name or to refer to the historical fact that the Seller Group Members previously conducted the Business under the "Cirque du Soleil" name, and the Seller shall cause

each applicable Seller Group Member as soon as reasonably practicable following Closing to file articles of amendment to change the corporate names of the Seller Group Members to another name if requested by the Buyer, acting in a commercially reasonably manner, and otherwise not confusingly similar to its present name. To the extent necessary as determined by the Buyer, acting in a commercially reasonable manner, the Approval and Vesting Order shall authorize and direct the appropriate Governmental Authority to accept such articles of amendment notwithstanding the insolvency of the Seller.

**7.13    Financing Cooperation**

(a)    Prior to and up to the Closing Time, the Seller shall, and shall cause the Seller Subsidiaries and their respective representatives to, use commercially reasonable efforts to provide all cooperation to the Buyer in connection with the arrangement, syndication and documentation of the debt financing under the Financing as may be reasonably requested by the Buyer; provided, that notwithstanding the foregoing, (a) (i) prior to Closing, neither the Seller nor any of the Seller Subsidiaries; and (ii) as of and following Closing, neither the Seller nor any of the Seller Subsidiaries that are not Transferred Subsidiaries, shall be required to become subject to any obligations or liabilities with respect to such agreements or documents, and (b) neither the Seller nor any of the Seller Subsidiaries shall be required to provide cooperation to the extent that such cooperation: (A) would unreasonably interfere with the ongoing business or operations of the Seller and the Seller Subsidiaries; (B) would cause any representation or warranty of the Seller or the Seller Subsidiaries in this Agreement to be breached (unless such breach is waived in writing by the Buyer); (C) would cause any Closing condition applicable to the Buyer to fail to be satisfied by the Seller (unless such Closing condition is waived in writing by the Buyer); or (D) would require the Seller, its Affiliates or their respective directors, officers, managers or employees to execute, deliver or enter into, or perform any agreement, document or instrument with respect to the Financing that is not contingent upon the Closing or that would be effective prior to the Closing or, other than with respect to Transferred Subsidiaries, following the Closing (it being acknowledged and agreed that no obligation of the Transferred Subsidiaries under any agreements or documents provided for in or contemplated by this Section 7.13 shall be effective until the Closing occurs and none of the Transferred Subsidiaries shall be required to take any action under any such agreement or document that is not contingent upon the Closing or that would be effective prior to the Closing); (y) the directors and managers of the Seller Group Members and their respective Affiliates shall not be required to adopt resolutions approving the agreements, documents and instruments pursuant to which the Financing is obtained, in each case which are effective prior to the Closing; and (z) no personal liability shall be imposed on the representatives of the Seller or any of its subsidiaries involved in the cooperation required by this Section 7.13.

(b)    The Buyer shall, promptly on written demand by the Seller, reimburse the Seller (and its Affiliates) for all reasonable out-of-pocket costs excluding legal costs incurred by any such Person in connection with such Person's cooperation pursuant to this Section 7.13. The Buyer acknowledges and agrees that the Seller

and its Affiliates shall not have any responsibility for or incur any liability to any Financing source under or in connection with, the arrangement or consummation of the Financing that the Buyer may raise in connection with the transaction contemplated by this Agreement. The Buyer shall indemnify, defend and hold the Seller and its Affiliates harmless from and against any and all actual losses suffered or incurred by such Persons in connection with the arrangement of the Financing and any information utilized in connection therewith, except to the extent of fraud, gross or intentional fault on the part of the Seller or such Affiliate, and this provision shall survive any termination of this Agreement.

(c)     The Seller hereby consents to the use of the Seller Group Members' logos solely in connection with the Buyer's efforts to obtain the Financing; provided that such logos are used in a manner that is not intended to or reasonably likely to harm or disparage the Seller's reputation or goodwill.

## 7.14    Alternative Acquisition Structure

Prior to the Closing Date, the Buyer shall, in its sole discretion, be entitled to structure the acquisition of the Purchased Assets in an alternative manner to the manner otherwise set forth in this Agreement, including pursuant to an acquisition of the shares or equity interests of any or all Seller Subsidiaries (an "**Alternative Acquisition Structure**"); provided that (a) the Buyer shall provide reasonable notice to the Seller of its determination to implement such acquisition pursuant to an Alternative Acquisition Structure; (b) any reasonable, documented out-of-pocket incremental costs and expenses incurred (including by the Seller Group) in implementing the Alternative Acquisition Structure (as compared to the acquisition structure otherwise contemplated by this Agreement) shall be the responsibility of the Buyer; and (c) such Alternative Acquisition Structure shall not (i) materially delay or impede the completion of the transactions contemplated by this Agreement; (ii) be adverse in any material respect to the Seller Group (as determined by the Seller in its reasonable and good faith discretion); (iii) require any member of the Seller Group to take any action in violation of Applicable Law; or (iv) reduce the Purchase Price. The Alternative Acquisition Structure shall be implemented on substantially the same terms as set forth in this Agreement, with any necessary amendments as the Alternative Acquisition Structure and implementation thereof may reasonably require or as may otherwise be determined to be necessary by the Buyer acting reasonably and in accordance with this Section 7.14. Each party hereto shall consider and negotiate in good faith any such amendments required by, or to otherwise implement, the Alternative Acquisition Structure.

## 7.15    Disclosure Schedules Updates

From time to time from the date hereof and up to July 31, 2020 (the "**Disclosure Update Period**"), the Seller will have the right to update, supplement or amend the Schedules to the Disclosure Letter (i) which relate to the representations and warranties of the Seller in Article 4 and are denoted with a "4.__" on the Disclosure Letter, (x) other than Schedule 4.16(a), except to add disclosure against the related representation and warranty only, which such additional disclosure will not otherwise update, supplement or amend any of the other Schedules to this Agreement that cross reference such Schedule 4.16(a), all of which will continue to reference such Schedule 4.16(a) as in effect on the date hereof and prior to such update, supplement or amendment, unless otherwise consented to in writing by the Buyer, and (y) provided that the Purchased Assets and Excluded Liabilities will not be removed from the Schedules and Assumed

Liabilities and Excluded Assets will not be added to such Schedules, other than in any case, (A) pursuant to the following clause (ii); or (B) by the Buyer pursuant to Section 2.5 or Section 7.24(b), and (ii) to add to the list of Assumed Contracts, in each case with respect to any fact, change, event, circumstance or condition that existed as of the date hereof and should have been set forth on one or more schedules to the Disclosure Letter, including in respect of representations and warranties set forth in Article 4 that did not prior thereto refer to the Disclosure Letter (each, a "**Disclosure Letter Update**"). Any disclosure in any such Disclosure Letter Update will be deemed to have been made and disclosed on the date hereof, and to have cured any breach or inaccuracy of any representation or warranty contained in Article 4 existing prior to the date of delivery of such Disclosure Letter Update for all purposes under this Agreement. Upon expiry of the Disclosure Update Period, the Disclosure Letter, as updated, supplemented and amended as at such date shall be deemed to be the final Disclosure Letter as at the date hereof for all purposes of this Agreement, including Article 4 and Section 6.2(b). Notwithstanding the foregoing, the Buyer shall have the right to terminate this Agreement in its sole discretion by written notice to that effect no later than five (5) Business Days after a Disclosure Letter Update is made if (i) a Disclosure Letter Update relates to any Fundamental Representations and Warranties of the Seller (other than de minimis changes that do not relate to the representations and warranties contained in Section 4.1(b)(vi)), or (ii) the information contained in any Disclosure Letter Update (on its own or when considered with other Disclosure Letter Updates), had no Disclosure Letter Updates been made and therefore the absence of such updates would have represented a breach by the Seller of its representations and warranties in Article 4, would, individually or in the aggregate, have a Material Adverse Effect for purposes of Section 6.2(b) (applied at the time of the Disclosure Letter Update and ignoring all references to "Material Adverse Effect" or "material" or other concepts of materiality in the representations and warranties of the Seller to which such disclosure relates).

**7.16    Commitment Letter**

(a)     The Buyer and the Commitment Parties shall maintain in effect the Commitment Letter, subject to automatic termination thereof in accordance with Article 5 thereof in accordance with its terms.

(b)     The Buyer shall not amend, assign, supplement, modify or replace the Commitment Letter; provided that the Buyer shall be permitted to (i) assign its rights and obligations under the Commitment Letter to a Designated Buyer, and (ii) amend the Commitment Letter in a manner that would not (and would not reasonably be expected to) (A) reduce the aggregate amount of the Financing, (B) impose new or additional conditions to the availability of the Financing or otherwise amend, modify or expand any conditions to the availability of the Financing, (C) materially increase the fees, costs or pricing to the Buyer, (D) materially delay or prevent the Closing, or (E) adversely impact the ability of the Buyer to enforce its rights against the other parties to the Commitment Letter; provided, further, that the Buyer shall not permit the Commitment Parties to transfer any of their obligations under the Commitment Letters unless (I) the transferee is another Commitment Party or a fund or commercial bank that is of substantially similar size and financial capability of such Commitment Party that is being replaced as reasonably determined by the Administrative Agents under the First Lien Credit Agreement or the Second Lien Credit Agreement, as

applicable, and (x) has "assets under management" (as defined in Section 203A(a)(3) of the Investment Advisers Act of 1940, as amended) of not less than, (1) for an individual fund, $1,000,000,000 and (2) for all funds that are Affiliates with each other, in the aggregate, $2,500,000,000, and (y) has uncalled capital commitments of not less than $100,000,000 (or if the transferee is a commercial bank, has capital and surplus of not less than $500,000,000 in the case of U.S. banks and Canadian banks and $100,000,000 (or the U.S. dollar equivalent as of the date of determination) in the case of other banks) and (II) the transferee assumes all obligations of the transferring Commitment Party under the applicable Commitment Letter and Direction Letters.

(c)     Upon any amendment, alteration or other modification of the Commitment Letter, the Buyer shall provide a copy of the documents evidencing the same to the Seller.  In the event that any portion of the Financing becomes unavailable on the terms and conditions contemplated in the Commitment Letter, the Buyer shall (A) promptly so notify the Seller and (B) use its reasonable best efforts to arrange to obtain and to negotiate and enter into definitive agreements with respect to alternative financing from (a) other Commitment Parties, (b) other lenders under the First Lien Credit Agreement or the Second Lien Credit Agreement, or (c) financial institutions or other investors that in the case of this clause (c), are reasonably satisfactory to the Seller and the Buyer in the same amounts on terms and conditions, including structure, covenants and pricing, not less beneficial to the Buyer taken as a whole (as reasonably determined by the Buyer) than those contained in the Commitment Letter.  The Buyer shall notify the Seller promptly, and in any event within five (5) Business Days after it becomes aware thereof, (x) of any breach by any party to the Commitment Letter that would permit the termination of the Commitment Letter, or (y) of the receipt by the Buyer of any written notice or other written communication from any financing source with respect to any default that would permit the termination of the Commitment Letter or termination or repudiation by any party to the Commitment Letter.

## 7.17    No Financing Out

The Buyer acknowledges and agrees that (i) its obligations to consummate the transactions contemplated by this Agreement are not conditioned or contingent in any way upon receipt of financing from a third party, and (ii) failure to consummate the transactions contemplated herein as a result of the failure to obtain financing shall constitute a material breach of this Agreement by the Buyer which may give rise, inter alia, to the Sellers' recourse under Section 3.2(c).

## 7.18    Acquisition Proposals

Other than in accordance with the SISP, the Seller shall not, and shall not authorize or permit any of its Affiliates or their respective representatives to, directly or indirectly, (i) encourage, solicit, initiate, facilitate or continue inquiries regarding an Acquisition Proposal; (ii) enter into discussions or negotiations with, or provide any information to, any Person concerning a possible Acquisition Proposal; or (iii) enter into any agreements or other instruments (whether or not binding) regarding an Acquisition Proposal.

**7.19    Transition of Business**

(a)     From and after the Filing Date, the Seller shall use commercially reasonable efforts to assist the Buyer in accomplishing a smooth transition of the Business from the Seller Group to the Buyer, including, holding discussions with respect to personnel policies and procedures, and other operational matters relating to the Business; provided, that the Buyer shall pay for all of the Seller Group Members' reasonable costs and expenses in connection therewith for periods following the Closing.

(b)     The Seller shall provide, or cause to be provided by the Seller Group, to the Buyer or any applicable Designated Buyer, at the Buyer's sole cost and expense, for a period not exceeding 120 days after the Closing Date the services reasonably requested by the Buyer in connection with the smooth transition of the Business from the Seller Group to the Buyer or the applicable Designated Buyer (the services referred to in this sentence being the "**Transition Services**"). The Seller shall and/or shall cause its Affiliates to perform such Transition Services provided hereunder on a commercially reasonable basis to the Buyer or the applicable Designated Buyer; provided, however, that notwithstanding anything to the contrary in this Agreement the Seller shall have no liability to the Buyer or its Affiliates for any acts or omissions of the Seller or of any its Affiliates in connection with this Section 7.19 and the Transition Services, except to the extent of fraud, gross or intentional fault on the part of the Seller or such Affiliate. The Transition Services will be provided on an "as-is where-is" basis.

(c)     The Buyer shall pay all amounts as are necessary to cover all reasonable costs or expenses of the Seller or its Affiliates for the provision of Transition Services.

**7.20    Bulk Sales**

The Approval and Vesting Order and the U.S. Sale Order, as applicable, shall provide either that (i) the Seller Group Members have complied with the requirements of any Applicable Law relating to bulk sales and transfer or (ii) compliance with the Applicable Law relating to bulk sales and transfers is not necessary or appropriate under the circumstances.

**7.21    Release by the Buyer**

Except in connection with any obligations of the Seller, the Seller Group Members or the Monitor contained in this Agreement and any Closing Documents, effective as of the Closing, the Buyer hereby releases and forever discharges the Seller Group Members, the Monitor and their respective affiliates, and each of their respective successors and assigns, and all officers, directors, partners, members, shareholders, limited partners, employees, agents, financial and legal advisors of each of them, from any and all actual or potential Claims which such Person had, has or may have in the future to the extent relating to the Purchased Assets or the Assumed Liabilities, save and except for Claims arising out of fraud, bad faith or illegal acts (unless such Person believed in good faith that its conduct was legal).

**7.22    Release by the Seller**

Except in connection with any obligations of the Buyer, each Designated Buyer and the Monitor contained in this Agreement and any Closing Documents, effective as of the Closing, the Seller (on behalf of itself and each Seller Group Member) hereby releases and forever discharges the Buyer, each Designated Buyer, the Monitor and their respective affiliates, and each of their respective successors and assigns, and all officers, directors, partners, members, shareholders, limited partners, employees, agents, financial and legal advisors of each of them, from any and all actual or potential Claims which such Person had, has or may have in the future to the extent relating to (i) the Purchased Assets, (ii) the Assumed Liabilities, (iii) the Excluded Assets or (iv) the Excluded Liabilities, save and except for Claims arising out of fraud, bad faith or illegal acts (unless such Person believed in good faith that its conduct was legal).

**7.23    Québec Undertakings**

If the Buyer is selected or deemed as the Successful Bidder in accordance with the terms of the SISP and subject to the consummation of the transactions contemplated under the terms and conditions of this Agreement, the Buyer hereby agrees to the following undertakings in favour of the Government of Québec: (i) the Buyer will maintain the international headquarters and strategic decision-making activities of the Business in Montréal, Québec (including actual creative, production and administrative activities and operations and centre for creative and artistic services) for a period of not less than five (5) years from the date of Closing, and thereafter subject to the best interests of the Buyer following the acquisition of the Business as determined by the then in place Board of Directors or similar governing body of the Buyer; (ii) the Chief Executive Officer of the Buyer following the acquisition of the Business will be ordinarily resident in the Province of Québec; and (iii) the Buyer will use commercially reasonable efforts to cause the Business to offer employment to Québec workers whose employment with the Business was terminated by the applicable Seller Group Member for reasons related to the COVID-19 pandemic or in connection with any reduction in force implemented between November 1, 2019 and the Closing Date, any such offers to be on terms and conditions determined by the Buyer in its reasonable discretion and based on the needs of the Business and the applicable Employee's skills and abilities and restart operations as soon as commercially reasonable taking into account the COVID-19 pandemic and related safety, health, gathering, confinement and other restrictions imposed or measures recommended by Governmental Authorities.

**7.24    Contractor**

(a)    Except with respect to the Creator Contracts, the Seller Group Members shall terminate the written Contracts with the Contractors prior to the Closing Date.

(b)    The Seller Group shall provide copies of the Creator Contracts to the Buyer as soon as reasonably practicable after the date hereof but no later than twenty (20) Business Days from the date hereof, following which the Buyer shall notify the Seller Group in writing which Creator Contracts, if any, the Buyer does not consider necessary, acting in a commercially reasonable manner as determined by the Buyer, for the operation of the Purchased Assets on and after Closing (the "**Terminated Creator Contracts**"). As soon as practicable following the selection of the Buyer as the Successful Bidder in accordance with the SISP, the

Seller Group shall terminate the Terminated Creator Contracts and provide the Buyer with evidence of same. The Terminated Creator Contracts shall be removed from the list of Creator Contracts in Schedule 1.1(c). For greater certainty, any Creator Contracts which are removed from the list of Creator Contracts in accordance with this paragraph shall not be included in the IP Contracts or the Assumed Contracts.

(c)     The Buyer shall establish the Contractor Fund on the Closing Date, by wire transfer of immediately available funds to the order of the Monitor, in trust, or as the Monitor may otherwise direct in writing, of an amount equal to $5,000,000, to be held in trust and distributed in accordance with the provisions of the trust agreement for the Contractor Fund.   Any residual balance in the Contractor Fund after the final distribution amounts from the Contractor Fund shall be an asset of and owned by the Buyer. The Seller Group Members shall cooperate with the trustee and administrator of the Contractor Fund and use commercially reasonable efforts to assist them in carrying out their duties under the trust agreement for the Contractor Fund.

**7.25    Post-Closing Costs and Expenses of the Seller Group Members**

To the extent provided for in this Article 7, the Buyer shall be responsible for and shall pay, whether from the Administrative Reserve Accounts or otherwise, all reasonable costs and expenses of the Seller Group Members, as required following the Closing Time, for the Seller to comply with its obligations pursuant to Sections 7.4(a), 7.4(d), 7.5, 7.6, 7.8, 7.9, 7.10, 7.11, 7.12 and 7.19, and the Seller Group Members shall not be required to pay any amounts or incur any costs or expenses in connection therewith.

**ARTICLE 8**
**INSOLVENCY PROVISIONS**

**8.1    Court Orders and Related Matters**

(a)     No later than July 16, 2020, the Applicants shall file a motion seeking the issuance of the SISP Order in the CCAA Proceedings.

(b)     No later than three (3) Business Days from the granting of the SISP Order, the Applicants shall file a motion seeking entry of the SISP Recognition Order.

(c)     As soon as practicable if the Buyer is selected as, or deemed to be, the Successful Bidder in accordance with the SISP, the Seller shall (i) file motions seeking the issuance of the Approval and Vesting Order, and following the entry of the Approval and Vesting Order, the U.S. Sale Order and the Recognition Order; (ii) advise the Buyer in writing of the Assignment Order Contracts for which the Seller is required to seek an Assignment Order; and (iii) file motions with the CCAA Court and in the U.S. Proceedings, as applicable, seeking the issuance of any Assignment Order.

(d)     From and after the date of this Agreement and until the Closing Date, the Seller shall deliver to the Buyer drafts of any and all pleadings, motions, notices,

statements, applications, schedules, reports, and other papers to be filed or submitted by any Seller Group Member in connection with or related to this Agreement, including with respect to the Initial CCAA Order, the Initial Recognition Order, the SISP Order, the Approval and Vesting Order, the U.S. Sale Order, the Recognition Order, the SISP Recognition Order and any Assignment Order, for the Buyer's prior review at least three (3) days in advance of service and filing of such materials. The Seller acknowledges and agrees (i) that any such pleadings, motions, notices, statements, applications, schedules, reports, or other papers shall be in form and substance satisfactory to the Buyer, acting reasonably, and (ii) to consult and cooperate with the Buyer regarding any discovery, examinations and hearing in respect of any of the foregoing, including the submission of any evidence, including witnesses testimony, in connection with such hearing.

(e)     Notice of the motions seeking the issuance of the Approval and Vesting Order, the U.S. Sale Order, the Initial Recognition Order, the Recognition Order, any Assignment Order, the SISP Order and the SISP Recognition Order shall be served by the Seller on all Persons required to receive notice under Applicable Law and the requirements of the CCAA, the CCAA Court, the U.S. Bankruptcy Code, the U.S. Bankruptcy Court and any other Person determined necessary by the Seller or the Buyer.

(f)     Notwithstanding any other provision herein, it is expressly acknowledged and agreed that in the event that (i) the SISP Order has not been issued and entered by the CCAA Court by July 17, 2020 or such later date agreed to in writing by the Buyer in its sole discretion; (ii) the SISP Recognition Order, if any, has not been issued and entered by the U.S. Bankruptcy Court within five (5) Business Days of the SISP Order being entered by the CCAA Court or such later date agreed to in writing by the Buyer in its sole discretion; (iii) the Initial Recognition Order has not been issued and entered by the U.S. Bankruptcy Court within thirty (30) days of the commencement of the U.S. Proceedings or such later date agreed to in writing by the Buyer in its sole discretion; (iv) the Approval and Vesting Order has not been issued and entered by the CCAA Court by September 1, 2020 or such later date agreed to in writing by the Buyer in its sole discretion; (v) the U.S. Sale Order has not been issued and entered by the U.S. Bankruptcy Court within fourteen (14) Business Days of the Approval and Vesting Order being entered by the CCAA Court or such later date agreed to in writing by the Buyer in its sole discretion; or (vi) the Recognition Order has not been issued and entered by the U.S. Bankruptcy Court within fourteen (14) Business Days of the Approval and Vesting Order being entered by the CCAA Court or such later date agreed to in writing by the Buyer in its sole discretion, the Buyer may terminate this Agreement.

(g)     The Seller Group Members covenant and agree that if the Approval and Vesting Order (and the U.S. Sale Order, as applicable) is issued and entered, the terms of any plan submitted by the Seller Group to the CCAA Court and the U.S. Bankruptcy Court for sanction or confirmation, as applicable, shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement,

the obligations of the Seller Group hereunder or the rights of the Buyer hereunder, or in any way prevent or interfere with the consummation or performance of the transactions contemplated by this Agreement, including any transaction that is contemplated by or approved pursuant to the Initial Recognition Order, the Approval and Vesting Order, or the U.S. Sale Order.

(h)     If the Approval and Vesting Order, or the U.S. Sale Order, the Initial Recognition Order, or any other Orders of the CCAA Court or the U.S. Bankruptcy Court, as applicable, relating to this Agreement is appealed or a motion for rehearing or reargument is filed with respect thereto, the Seller Group agrees to take all action as may be commercially reasonable and appropriate to defend against such appeal, petition or motion.

(i)     The Seller Group acknowledges and agrees, and the Approval and Vesting Order, and the U.S. Sale Order shall provide that, on the Closing Date and concurrently with the Closing, the Purchased Assets shall be transferred to the Buyer free and clear of all Encumbrances except for the Permitted Encumbrances.

**ARTICLE 9**
**TERMINATION**

**9.1     Termination**

This Agreement may be terminated at any time prior to Closing as follows:

(a)     by mutual written consent of the Seller and the Buyer;

(b)     by the Buyer or the Seller, if (i) this Agreement is not the Successful Bid or the Back-Up Bid (as determined pursuant to, the SISP) or (ii) this Agreement is the Back-Up Bid and the transaction contemplated by the Successful Bid is closed;

(c)     by the Buyer or the Seller, if Closing has not occurred on or before September 30, 2020 or such later date agreed to by both the Seller and the Buyer in writing in consultation with the Monitor (the "**Sunset Date**"), provided that the terminating Party is not in breach of any representation, warranty, covenant or other agreement in this Agreement which would prevent the satisfaction of the conditions in Article 6 by the Sunset Date;

(d)     by the Buyer, upon the appointment of a receiver, trustee in bankruptcy or similar official in respect of any Seller Group Member or any of the property of any Seller Group Member, other than the Receivership Order or with the prior written consent of the Buyer;

(e)     by the Buyer, pursuant to Sections 7.15 or 8.1(f);

(f)     by the Buyer or the Seller, upon the dismissal or conversion of the CCAA Proceedings or the U.S. Proceedings;

(g)     by the Buyer or the Seller, upon denial of the SISP Order, the Approval and Vesting Order, the SISP Recognition Order, the Initial Recognition Order, the

Recognition Order, the U.S. Sale Order or the Assignment Orders;

(h)     by the Buyer or the Seller, if after the SISP Order is granted, a court of competent jurisdiction or other Governmental Authority has issued an Order or taken any other action permanently restraining, enjoining or otherwise prohibiting the consummation of Closing and such Order or action has become final and non-appealable;

(i)     by the Seller, if after the SISP Order is granted, it is required under any Order of a court of competent jurisdiction including the CCAA Court and the U.S. Bankruptcy Court;

(j)     by the Buyer, if any of the SISP Order, the SISP Recognition Order, the Approval and Vesting Order, the Assignment Order, the Initial Recognition Order, the Recognition Order or the U.S. Sale Order has been stayed, vacated or varied without the Buyer's prior written consent;

(k)     by the Seller, if there has been a material violation or breach by the Buyer of any covenant, representation or warranty which would prevent the satisfaction of the conditions set forth in Section 6.1 or Section 6.3, as applicable, by the Sunset Date and such violation or breach has not been waived by the Seller or cured within five (5) Business Days after written notice thereof from the Seller, unless the Seller is in material breach of their obligations under this Agreement which would prevent the satisfaction of the conditions set forth in Section 6.1 or Section 6.2, as applicable, by the Sunset Date; and

(l)     by the Buyer, if there has been a material violation or breach by the Seller of any covenant, representation or warranty which would prevent the satisfaction of the conditions set forth in Section 6.1 or Section 6.2, as applicable, by the Sunset Date and such violation or breach has not been waived by the Seller or cured within five (5) Business Days after written notice thereof from the Buyer, unless the Buyer is in material breach of its obligations under this Agreement which would prevent the satisfaction of the conditions set forth in Section 6.1 or Section 6.3, as applicable, by the Sunset Date.

The Party desiring to terminate this Agreement pursuant to this Section 9.1 (other than pursuant to Section 9.1(a)) shall give written notice of such termination to the other Party or Parties, as applicable, specifying in reasonable detail the basis for such Party's exercise of its termination rights.

## 9.2     Effect of Termination

In the event of termination of this Agreement pursuant to Section 9.1, this Agreement shall become void and of no further force or effect without liability of any Party to any other Party to this Agreement except that (a) Article 1, Section 3.2, this Section 9.2 and Section 11.1, Section 11.3, Section 11.5, Section 11.6, Section 11.7 and Section 11.8 shall survive and (b) subject to the limitations set forth in Section 3.2(c), no termination of this Agreement shall relieve any Party of any liability for any wilful breach by it of this Agreement, or impair the right of any Party to compel specific performance by any other Party of its obligations under this

Agreement in accordance with Section 11.3.

## ARTICLE 10
## CLOSING

**10.1    Location and Time of the Closing**

The Closing shall take place at the Closing Time on the Closing Date at the Montréal, Québec offices of Stikeman Elliott LLP, Suite 4100, 1155 Boulevard René-Lévesque West, Montréal, Québec H3B 3V2, or at such other location as may be agreed upon by the Parties.

**10.2    Seller's Deliveries at Closing**

At Closing, the Seller shall deliver to the Buyer the following:

(a)    an executed copy of the Joint Direction regarding payment of the Deposit;

(b)    a true copy of each of the Approval and Vesting Order, the Initial CCAA Order, the Recognition Order, and the U.S. Sale Order, each of which shall be Final;

(c)    true copies of any Assignment Orders;

(d)    evidence of payment of all Cure Costs;

(e)    documentation evidencing that the Seller Group Members' bank accounts, including cash contained thereon, have been transferred to the Buyer;

(f)    the General Assignments and Bills of Sale for the Purchased Assets duly executed by the applicable Seller Group Members;

(g)    the Lease Assignment and Assumption Agreements for the Personal Property Leases, Real Property Leases and Real Property Landlord Leases duly executed by the applicable Seller Group Members;

(h)    the Contracts Assignment and Assumption Agreements for the Assigned Agreements duly executed by the applicable Seller Group Members;

(i)    all documents of title and instruments of conveyance (duly executed by the applicable Seller Group Members) necessary to transfer record and/or beneficial ownership to the Buyer of all automobiles, trucks and trailers, tents and other production and show assets and equipment owned by the Seller Group Members (and any other Purchased Assets owned by the Seller Group Members which require execution, endorsement and/or delivery of a document in order to vest legal or beneficial ownership thereof in the Buyer) which are included in the Purchased Assets;

(j)    the Permit Transfer Agreements duly executed by the applicable Seller Group Members;

(k)    the IP Assignment and Assumption Agreements duly executed by the applicable

Seller Group Members;

(l)     executed copy of the Monitor's Certificate;

(m)     a certificate of a senior officer or director of each Seller Group Member that sells, conveys, transfers, assigns or delivers any Purchased Assets to the Buyer (or a Designated Buyer), or where such Seller Group Member is a limited partnership, a certificate of a senior officer or director of each such Seller Group Member's general partner (in either case, in such capacity and without personal liability), in form and substance reasonably satisfactory to the Buyer: (a) certifying that the board of directors of such Seller Group Member, or where such Seller Group Member is a limited partnership, such Seller Group Member's general partner, has adopted resolutions (in a form attached to such certificate) authorizing the execution, delivery and performance of this Agreement and the transactions contemplated herein, as applicable, which resolutions are in full force and effect and have not been superseded, amended or modified as of the Closing Date; and (b) certifying as to the incumbency and signatures of the officers and directors of such Seller Group Member;

(n)     the certificates contemplated by Section 6.2(c);

(o)     with respect to each Seller Group Member that is a transferor of one or more Purchased Assets under this Agreement for U.S. federal income tax purposes and is a "United States person" (as defined in Section 7701(a)(30) of the Code), a certification of non-foreign status pursuant to U.S. *Treasury Regulation* Section 1.1445-2(b);

(p)     the shares or equivalent equity interests of the Transferred Subsidiaries if any;

(q)     duly executed elections pursuant to GST and HST Legislation and QST Legislation, and any certificates, elections or other documents required to be delivered pursuant to Section 7.5, as applicable;

(r)     evidence of Terminated Creator Contracts; and

(s)     all other documents required to be delivered by the Seller on or prior to the Closing Date pursuant to this Agreement or Applicable Law or as reasonably requested by the Buyer in good faith.

**10.3    Buyer's Deliveries at Closing**

At Closing, the Buyer shall deliver to the Seller:

(a)     an executed copy of the Joint Direction regarding payment of the Deposit;

(b)     the payment contemplated by Sections 3.1(d)(ii)(B) and 3.1(d)(ii)(C);

(c)     a certificate of an authorized signatory of the Buyer's general partner (in such capacity and without personal liability), in form and substance reasonably satisfactory to the Seller: (a) certifying that the general partner has adopted

resolutions (in a form attached to such certificate) authorizing the execution, delivery and performance of this Agreement and the transactions contemplated herein, as applicable, which resolutions are in full force and effect and have not been superseded, amended or modified as of the Closing Date; and (b) certifying as to the incumbency and signature of the authorized signatory of Buyer executing this Agreement and the other transaction documents contemplated herein, as applicable;

(d)     the General Assignments and Bills of Sale for the Purchased Assets duly executed by the Buyer and/or the Designated Buyer(s);

(e)     the Lease Assignment and Assumption Agreements for the Personal Property Leases, Real Property Leases and Real Property Landlord Leases duly executed by the Buyer and/or the Designated Buyer(s);

(f)     the Contracts Assignment and Assumption Agreements for the Assigned Agreements duly executed by the Buyer;

(g)     the Permit Transfer Agreements duly executed by the Buyer;

(h)     the IP Assignment and Assumption Agreements duly executed by the Buyer and/or the Designated Buyer(s);

(i)     the certificate contemplated by Section 6.3(c);

(j)     duly executed elections pursuant to GST and HST Legislation and QST Legislation, and any certificates, elections or other documents required to be delivered pursuant to Section 7.5, as applicable;

(k)     evidence reasonably satisfactory to the Seller of the full release and satisfaction of the First Lien Debt and Second Lien Debt;

(l)     a payout and release letter (subject to the Closing) from the Administrative Agents (for and on behalf of the Secured Parties) under the First Lien Credit Agreement, the Second Lien Credit Agreement and the CDS 4 Term Loan; and

(m)     all other documents required to be delivered by the Buyer on or prior to the Closing Date pursuant to this Agreement or Applicable Law or as reasonably requested by the Seller in good faith.

## 10.4    Possession of Assets

The Seller will remain in possession of the Purchased Assets until Closing. On Closing, the Buyer will take possession of the Purchased Assets wheresoever situated at Closing. In no event will the Purchased Assets be sold, assigned, transferred or set over to the Buyer until the conditions set out in the Approval and Vesting Order, and the U.S. Sale Order, as applicable, have been satisfied, and the Buyer has satisfied all delivery requirements outlined in Section 10.3.

**10.5    Monitor**

The Parties hereby acknowledge and agree that the Monitor will be entitled to file the Monitor's Certificate with the CCAA Court without independent investigation upon receiving written confirmation from the Seller and the Buyer that all conditions to Closing have been satisfied or waived, and the Monitor will have no liability to the Seller or the Buyer or any other Person as a result of filing the Monitor's Certificate.

**10.6    Simultaneous Transactions**

All actions taken and transactions consummated at the Closing shall be deemed to have occurred simultaneously (subject to Sections 2.5(e) and 2.5(f) and the terms of any escrow agreement or arrangement among the Parties relating to the Closing), and no such transaction shall be considered consummated unless all are consummated.

**10.7    Supplemental Assignments**

As reasonably required by a Party in order to effectuate the transactions contemplated by this Agreement, the Buyer and the Seller shall (and the Seller shall cause the Seller Group Members to) execute and deliver at (and after) the Closing such other assignments, bills of sale, certificates of title and other documents, and shall take such other actions, as are necessary or appropriate, to transfer the Purchased Assets to the Buyer and otherwise implement and make effective the transactions contemplated by this Agreement.

**ARTICLE 11**
**GENERAL MATTERS**

**11.1    Confidentiality**

After the Closing Time, the Seller shall, and shall cause each Seller Group Member to, maintain the confidentiality of all confidential information relating to the Business and the Purchased Assets, including the Confidential Information, except any disclosure of such information and records as may be required by Applicable Law. If the Seller or any Seller Group Member, or any of its or their respective representatives, becomes legally compelled by deposition, interrogatory, request for documents, subpoena, civil investigative demand, or similar judicial or administrative process, to disclose any such information, the Seller shall, or shall cause the applicable Seller Group Member or representative to, provide the Buyer with reasonably prompt prior oral or written notice of such requirement (including any report, statement, testimony or other submission to such Governmental Authority) to the extent legally permissible and reasonably practicable, and cooperate with the Buyer, at the Buyer's expense, to obtain a protective order or similar remedy to cause such information not to be disclosed; provided, that in the event that such protective order or other similar remedy is not obtained, the Seller shall, or shall cause the applicable Seller Group Member or representative to, furnish only that portion of such information that has been legally compelled, and shall, or shall cause such Affiliate or representative to, exercise its commercially reasonable efforts to obtain assurance that confidential treatment will be accorded such disclosed information. The Seller shall instruct the other Seller Group Members and representatives having access to such information of such obligation of confidentiality and shall be responsible for any breach of the terms of this Section 11.1 by any of the Seller Group Members or representatives.

**11.2  Public Notices**

No press release or other announcement concerning the transactions contemplated by this Agreement shall be made by the Seller or the Buyer without the prior consent of the other Party (such consent not to be unreasonably withheld, conditioned or delayed); provided, however, that subject to the last sentence of this Section 11.2, any Party may, without such consent, make such disclosure if the same is required by Applicable Law (including the CCAA Proceedings and the U.S. Proceedings) or by any stock exchange on which any of the securities of such Party or any of its Affiliates are listed, or by any insolvency or other court or securities commission, or other similar Governmental Authority having jurisdiction over such Party or any of its Affiliates, and, if such disclosure is required, the Party making such disclosure shall use commercially reasonable efforts to give prior oral or written notice to the other Party to the extent legally permissible and reasonably practicable, and if such prior notice is not legally permissible or reasonably practicable, to give such notice reasonably promptly following the making of such disclosure. Notwithstanding the foregoing: (i) this Agreement may be filed by the Seller with the CCAA Court and the U.S. Bankruptcy Court; and (ii) the transactions contemplated in this Agreement may be disclosed by the Seller to the CCAA Court and the U.S. Bankruptcy Court, subject to redacting confidential or sensitive information as permitted by Applicable Law. The Parties further agree that:

(a)     the Monitor may prepare and file reports and other documents with the CCAA Court and the U.S. Bankruptcy Court containing references to the transactions contemplated by this Agreement and the terms of such transactions; and

(b)     the Seller, the Buyer and their respective professional advisors may prepare and file such reports and other documents with the CCAA Court and the U.S. Bankruptcy Court containing references to the transactions contemplated by this Agreement and the terms of such transactions as may reasonably be necessary to complete the transactions contemplated by this Agreement or to comply with their obligations in connection therewith.

The Buyer shall be afforded an opportunity to review and comment on such materials prior to their filing. The Parties may issue a joint press release announcing the execution and delivery of this Agreement, in form and substance mutually agreed to by them.

**11.3  Injunctive Relief**

(a)     The Parties agree that irreparable harm would occur for which money damages would not be an adequate remedy at law in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the Parties shall be entitled to seek specific performance, injunctive and other equitable relief to prevent breaches or threatened breaches of this Agreement, and to enforce compliance with the terms of this Agreement, without any requirement for the securing or posting of any bond in connection with the obtaining of any such specific performance, injunctive or other equitable relief, this being in addition to any other remedy to which the Parties may be entitled at law or in equity.

(b)     Each Party hereby agrees not to raise any objections to the availability of the

equitable remedies provided for herein and the Parties further agree that by seeking the remedies provided for in this Section 11.3, a Party shall not in any respect waive its right to seek any other form of relief that may be available to a Party under this Agreement.

(c) Notwithstanding anything herein to the contrary herein, under no circumstances shall a Party be permitted or entitled to receive both monetary damages and specific performance and election to pursue one shall be deemed to be an irrevocable waiver of the other.

## 11.4    Survival

None of the representations, warranties, covenants (except the covenants in Article 2, Article 3, Article 11 and Sections 7.1(b), 7.4(b), 7.5, 7.6, 7.7, 7.8, 7.9, 7.10, 7.11, 7.12, 7.19, 7.21, 7.22, 7.23, 7.24, and 7.25 to the extent they are to be performed after the Closing) of any of the Parties set forth in this Agreement, in any Closing Document to be executed and delivered by any of the Parties (except any covenants included in such Closing Documents, which, by their terms, survive Closing) or in any other agreement, document or certificate delivered pursuant to or in connection with this Agreement or the transactions contemplated hereby shall survive the Closing.

## 11.5    Non-Recourse

No past, present or future director, officer, employee, incorporator, member, partner, securityholder, Affiliate, agent, lawyer or representative of the respective Parties, in such capacity, shall have any liability for any obligations or liabilities of the Buyer or the Seller, as applicable, under this Agreement, or for any Claim based on, in respect of or by reason of the transactions contemplated hereby.

## 11.6    Assignment; Binding Effect

No Party may assign its right or benefits under this Agreement without the consent of each of the other Parties, except that without such consent the Buyer may, upon prior notice to the Seller: (a) assign this Agreement, or any or all of its rights and obligations hereunder, to one or more of its Affiliates including a Designated Buyer; or (b) direct that title to all or some of the Purchased Assets be transferred to, and the corresponding Assumed Liabilities be assumed by, one or more of its Affiliates including a Designated Buyer; provided, that no such assignment or direction shall relieve the Buyer of its obligations hereunder. This Agreement shall be binding upon and inure to the benefit of the Parties and their respective permitted successors and permitted assigns. Except as provided in Section 7.5(f), nothing in this Agreement shall create or be deemed to create any third Person beneficiary rights in any Person not a Party to this Agreement.

## 11.7    Notices

Any notice, request, demand or other communication required or permitted to be given to a Party pursuant to the provisions of this Agreement will be in writing and will be effective and deemed given under this Agreement on the earliest of: (a) the date of personal delivery; (b) the date of transmission by facsimile, with confirmed transmission and receipt (if sent during normal

business hours of the recipient, if not, then on the next Business Day); (c) two (2) days after deposit with a nationally-recognized courier or overnight service such as Federal Express; or (d) five (5) days after mailing via certified mail, return receipt requested. All notices not delivered personally or by facsimile will be sent with postage and other charges prepaid and properly addressed to the Party to be notified at the address set forth for such Party:

    (a)    If to the Buyer at:

Spectacle BidCo LP
c/o Drivetrain Administrative Services, LLC
PO Box 1863
70 Commercial Street, Suite 302
Concord, NH 03302-1863

and to:

Milbank LLP
55 Hudson Yards
New York, NY 10001
Attention: Evan Fleck
           Nelly Almeida
           Robert Kennedy
Telephone: 212-530-5567
           212-530-5271
           212-530-5087
Email: efleck@milbank.com
      nalmeida@milbank.com
      rkennedy@milbank.com

and to:

Goodmans LLP
333 Bay Street, Suite 3400
Toronto, ON M5H 2S7
Attention: Joseph Pasquariello
           Christopher Armstrong
Telephone: 416-597-4216
           416-849-6013
Email: jpasquariello@goodmans.ca
      carmstrong@goodmans.ca

    (b)    If to the Seller at:

Cirque du Soleil Holdings L.P.
8400 av. du Cirque
Montréal, Québec
H1Z 4M6

```
Attention:    President and Chief Legal Officer
Telephone:  (514)723-7646
Email:        j.cote@cirquedusoleil.com
```

and to:

Stikeman Elliott LLP

Suite 4100
1155 Boulevard René-Lévesque West
Montréal, Québec
H3B 3V2

```
Attention:    Sidney Horn
              Claire Zikovsky
Telephone:  (514) 397-3342
              (514) 397-3340
Email:        smhorn@stikeman.com;
              czikovsky@stikeman.com
```

and to:

Kirkland & Ellis LLP

```
Attention:    Chad J. Husnick
              Rick C. Madden
Telephone:  (312) 862-2009
              (213) 680-8106
Facsimile:    (312) 862-2200 / (213) 808-8106
Email:        chad.husnick@kirkland.com;
              rick.madden@kirkland.com
```

Any Party may change its address for service from time to time by notice given in accordance with the foregoing and any subsequent notice shall be sent to such Party at its changed address.

**11.8    Counterparts; Facsimile Signatures**

This Agreement may be signed in counterparts and each of such counterparts shall constitute an original document and such counterparts, taken together, shall constitute one and the same instrument. Execution of this Agreement may be made by facsimile signature or by electronic image scan which, for all purposes, shall be deemed to be an original signature.

**11.9    Language**

*Les Parties aux présentes ont expressément exigé que la présente convention et tous les documents et avis qui y sont afférents soient rédigés en anglais.* The Parties have expressly required that this Agreement and all documents and notices relating hereto be drafted in English.

- 102 -

*[Signature pages follow]*

**IN WITNESS WHEREOF** the Parties have executed this Agreement as of the date first written above.

**CIRQUE DU SOLEIL HOLDINGS L.P.,** acting through its general partner, **CIRQUE DU SOLEIL GP INC.**

By: _____
    Name:  Stéphane Lefebvre
    Title:   CFO

By: _____
    Name:  Jocelyn Côté
    Title:   CLO

**SPECTACLE BIDCO LP**

By: Drivetrain Agency Services, LLC
Its: General Partner


By: _____
      Name: Marc Rosenberg
      Title:   Authorized Signatory

*[Signature Page to the Asset Purchase Agreement]*

**EXHIBIT 5.5**

## <u>APPROVALS AND CONSENTS</u>

1.    The HSR Act

2.    The Russian Competition Law

**EXHIBIT A (Designated Buyer)**

**FORM OF COUNTERPART TO THE ASSET PURCHASE AGREEMENT**

**TO:**          **Cirque du Soleil Holdings L.P.** and its general partner (the "**Seller**")

**AND TO:**     **Spectacle Bidco LP** and its general partner (the "**Buyer**")


Reference is made to the asset purchase agreement dated as of July 15, 2020 (the "**Purchase Agreement**") among the Seller and the Buyer, in connection with the purchase and assumption by the Buyer or the Designated Buyers of the Purchased Assets and the Assumed Liabilities from the Seller. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

In accordance with the Purchase Agreement, in executing this counterpart to the Purchase Agreement, the undersigned hereby:

(a)     acknowledges receipt of a copy of the Purchase Agreement;

(b)     covenants and agrees to join, become a party to and be bound, as a "Designated Buyer", by the Purchase Agreement, as the same may be amended from time to time in accordance with the provisions thereof;

(c)     authorizes the Buyer to act as its agent for all purposes under the Purchase Agreement;

(d)     agrees to purchase, assume and/or employ, as applicable, the Purchased Assets, Assumed Liabilities and Transferred Employees indicated in Appendix A hereto; and

(e)     agrees to enter into such agreements or instruments, including Local Sale Agreements, providing for (i) the sale, transfer, assignment and other conveyance to the undersigned of the Purchased Assets indicated in Appendix A hereto, in accordance with Applicable Law and the Purchase Agreement, (ii) the assumption by the undersigned of the Assumed Liability indicated in Appendix A hereto, and (iii) the employment by the undersigned of the Transferred Employees indicated in Appendix A hereto.

For the purposes of Section 11.7 of the Purchase Agreement, copies of notices to the Buyer should also be delivered to:

[●]


*[Remainder of Page Intentionally Blank]*

- A1 -

**DATED** as of this _____ day of _____, 202____

**[DESIGNATED BUYER]**

By: _____
         Name: ●
         Title: ●

**<u>Appendix A</u>**

## EXHIBIT A (Seller Group Member)

## FORM OF COUNTERPART TO THE ASSET PURCHASE AGREEMENT

**TO:**  **Spectacle Bidco LP** and its general partner (the "**Buyer**")

**AND TO:**  **Cirque du Soleil Holdings L.P.** and its general partner (the "**Seller**")

Reference is made to the asset purchase agreement dated as of July 15, 2020 (the "**Purchase Agreement**") among the Seller and the Buyer, in connection with the sale and transfer by a Seller Group Member of a Purchased Asset (including an Assumed Contract or Transferred Subsidiary) or a Seller Subsidiary becoming a Transferred Subsidiary. Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Purchase Agreement.

In accordance with the Purchase Agreement, in executing this counterpart to the Purchase Agreement, the undersigned hereby:

(a)    acknowledges receipt of a copy of the Purchase Agreement;

(b)    covenants and agrees to join, become a party to and be bound by, as a "Seller Group Member", the Purchase Agreement, as the same may be amended from time to time in accordance with the provisions thereof;

(c)    authorizes the Seller to act as its agent for all purposes under the Purchase Agreement;

(d)    agrees to sell and/or transfer, as applicable, the Purchased Assets, Assumed Liabilities indicated in Appendix A hereto; and

(e)    agrees to enter into such agreements or instruments, including Local Sale Agreements, providing for (i) the sale, transfer, assignment and other conveyance by the undersigned of the Purchased Assets indicated in Appendix A hereto, in accordance with Applicable Law and the Purchase Agreement, (ii) the assignment by the undersigned of the Assumed Liability indicated in Appendix A hereto, and (iii) the transfer of employment by the undersigned of the Transferred Employees indicated in Appendix A hereto.

For the purposes of Section 11.7 of the Purchase Agreement, copies of notices to the Seller should also be delivered to:

[●]

*[Remainder of Page Intentionally Blank]*

**DATED** as of this _____ day of _____, 202____

[SELLER GROUP MEMBER]

By: _____
        Name: ●
        Title: ●

**<u>Appendix A</u>**

**EXHIBIT B**

**FORM OF IP ASSIGNMENT AND ASSUMPTION AGREEMENT**

**TRADEMARK ASSIGNMENT AGREEMENT[1]**

This TRADEMARK ASSIGNMENT AGREEMENT (the "**Agreement**") is made as of ●, 2020 (the "**Effective Date**") by ●, a **[corporation]** incorporated pursuant to the laws of ● with its registered address at ● ("**Assignor**"), in favor of ●, a **[corporation]** incorporated pursuant to the laws of ● with its registered address at ● ("**Assignee**", with each of Assignee and Assignor, a "**Party**", and both of them, the "**Parties**").

WHEREAS, **[Assignor and Assignee]** entered into an asset purchase agreement effective as of July 15, 2020 (the "**APA**"), under which Assignor agreed to sell, convey, transfer, assign and deliver, or cause to be sold, conveyed, transferred, assigned and delivered, to Assignee the Purchased Assets (as defined in the APA), which assets include the trademark registrations and applications of Assignor listed in Schedule "A" hereto (the "**Assigned Trademarks**");

NOW, THEREFORE, in consideration of the premises, the mutual covenants and agreements contained in the APA and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged:

1.      Assignor does hereby sell, convey, transfer, assign and deliver unto Assignee all of Assignor's worldwide right, title and interest in and to the Assigned Trademarks, together with all associated goodwill, the same to be held by Assignee as fully and entirely as the same could have been held and enjoyed by Assignor if this assignment had not been made, together with the rights to (a) all income, royalties, damages or payments accruing as of and from the Effective Date with respect to the Assigned Trademarks, including, without limitation, all damages and payments by reason of past, present or future infringement, dilution or other violations or unauthorized use of the Assigned Trademarks, (b) all claims for and the right to bring an action at law or equity for the infringement, dilution or other violations of the foregoing at, before or after the Effective Date, including the right to receive all proceeds and damages therefrom, and (c) obtain renewals, extensions, substitutions, continuations, continuations-in-part, divisions, re-issues, re-examinations or similar legal protections related thereto.

2.      Assignor hereby acknowledges and agrees that from and after the date hereof, as between the Parties, Assignee shall be the exclusive owner of the Assigned Trademarks. Assignor hereby authorizes the Canadian Intellectual Property Office and all other relevant governmental Intellectual Property Offices to transfer and record the assignment of the Assigned Trademarks to Assignee, as assignee thereof, or otherwise as Assignee may direct. Concurrent with the execution of this Agreement, Assignor agrees to execute the separate country-specific short-form assignment documents and any necessary powers of attorney provided by Assignee (collectively, the "**Short-Form Assignment Documents**") solely for purposes of recording with the relevant governmental Intellectual Property Offices the change in title and assignment of the Assigned Trademarks to Assignee. Assignee will be responsible for submitting the Short-Form

---

[1] NTD: To the extent any US copyright registrations will transfer by way of assignment, a comparable copyright assignment agreement will also need to be executed.

Assignment Documents to the relevant governmental Intellectual Property Offices.

3.      Assignor further agrees, from time to time, to make, do, and execute, or cause to be made, done, or executed all such further acts, deeds, assurances, or things that may reasonably be required to give effect to the foregoing provisions including the execution of any further country-specific assignment documents, power of attorney documents and other documents necessary to effect the recordal of the assignments at the various relevant governmental Intellectual Property Offices. Assignor further agrees that, pursuant to Assignee's request, and without further consideration, it shall execute, deliver, acknowledge and record such other instruments and documents of conveyance and transfer or assumption and shall take such other actions and shall execute and deliver such other documents, certifications and further assurances as Assignee may reasonably request in order to vest and confirm in Assignee title to or to put Assignee in full legal possession of, or to enable Assignee to use, any of the Assigned Trademarks, including, without limitation, to record Assignee's ownership of the Assigned Trademarks in relevant Canadian and foreign local, state and national trademark offices.

4.      In order to provide Assignee with the full authority to execute all documents necessary to confirm, file and record in any appropriate registry Assignee's legal title in and to the Assigned Trademarks with full power of substitution and delegation, Assignor hereby agrees to execute, simultaneously with the execution of this Agreement, the power of attorney set forth as Exhibit A hereto.

5.      The terms and covenants of this Agreement shall inure to the benefit of Assignee, its successors and assigns and other legal representatives, and shall be binding upon Assignor, its successors, legal representatives and assigns.

6.      In the event of any conflict or contradiction between the terms and conditions of this Agreement and the terms and conditions of the APA, the terms and conditions of the APA shall prevail.

7.      This Agreement shall be construed and interpreted in accordance with and governed by the laws of the Province of Quebec and the laws of Canada applicable therein, without regard to the conflicts of law principles thereof.

8.      This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Agreement, but all of which together shall constitute one and the same Agreement.

**[SIGNATURE PAGE FOLLOWS]**

**IN WITNESS WHEREOF**, Assignor has caused this Trademark Assignment Agreement to be duly executed and delivered by its duly authorized representative as of the date first written above.

**[Assignor]**

By: _____

    Name:
    Title:

**[Assignee]**

By: _____

    Name:
    Title:

**Schedule "A"**

**Assigned Trademarks**

See Attached.

## EXHIBIT A

### Power of Attorney

KNOW ALL PERSONS BY THESE PRESENTS, that ●, a **[corporation]** existing under the laws of ● ("Assignor") hereby appoints ●, a **[corporation]** existing under the laws of ● ("Assignee"), and any and all officers thereof as its true and lawful mandatary and attorney-in-fact, with full mandate and power of substitution, for its use and benefit as follows:

A.  To execute and sign all power of attorney documents, assignment documents, agreements or other documents relating to the registration, application, opposition, cancellation or assignment of all worldwide rights in and to the trademark applications and registrations forming part of the Purchased Assets (as such term is defined in that certain Asset Purchase Agreement dated as of July 15, 2020, by and between Cirque du Soleil Holdings L.P. and Spectacle Bidco LP), with full irrevocable power and authority in the place of **[Assignor]** and in the name of **[Assignor]** or in its own name as nominee for **[Assignor]**, to take any and all appropriate action and to execute any and all documents and instruments which may be necessary or desirable to accomplish the foregoing; and

B.  To sign its name upon all filings and to do all things necessary to prosecute, maintain and register all trademarks included in the Purchased Assets with the applicable trademark offices, agencies, and registrars in all applicable jurisdictions throughout the world.

This Power of Attorney is coupled with an interest and, as such, is irrevocable. This Power of Attorney is governed by the laws of the Province of Québec, and the laws of Canada applicable in Québec, applicable to powers of attorney made and to be exercised wholly within such province.

Dated:

**[Assignor]**

By:_____
    Name:
    Title:

PROVINCE OF QUÉBEC                              )

                                       : ss.:

CITY/TOWN OF        MONTRÉAL           )

On the ____ day of _____, before me the undersigned, personally appeared, personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Commissioner for Oaths
[●]

**EXHIBIT C**

**FORM OF SALE AND INVESTMENT SOLICITATION PROCESS**

## SALE AND INVESTMENT SOLICITATION PROCESS

### Introduction

A.      On June 30, 2020 (the "**Filing Date**"), Cirque du Soleil Canada Inc. and the other entities listed in Schedule A hereto (collectively, the "**CDS Entities**") obtained an initial order (as amended, supplemented or amended and restated from time to time, the "**Initial Order**") under the *Companies' Creditors Arrangement Act* ("**CCAA**" and the proceedings commenced thereby, the "**CCAA Proceedings**") from the Superior Court of Québec for the District of Montréal (Commercial Division) (the "**CCAA Court**").

B.      Pursuant to the Initial Order, Ernst & Young Inc. was appointed as monitor in the CCAA Proceedings (in such capacity, the "**Monitor**").

C.      Following the Filing Date, Cirque du Soleil Canada Inc. as foreign representative of the CDS Entities also filed a verified petition for an order recognizing the CCAA Proceedings as a "foreign main proceeding" and granting related relief under Chapter 15 of title 11 of the United States Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Delaware (the "**Bankruptcy Court**").

D.      Prior to the Filing Date, the CDS Entities engaged National Bank Financial and Greenhill & Co, Inc. (together, the "**Financial Advisors**") to solicit non-binding proposals for a potential recapitalization of, equity investment in or sale of the assets of, the CDS Entities (the "**Preliminary Process**").

E.      On July 17, 2020, the CCAA Court granted an Order (the "**SISP Approval Order**"), among other things, approving the sale and investment solicitation process ("**SISP**") described herein and the Asset Purchase Agreement dated as of July 15, 2020 (the "**Stalking Horse APA**") entered into by Cirque Du Soleil Holdings L.P., as seller, and Spectacle Bidco LP (the "**Stalking Horse Bidder**"), as buyer, pursuant to which the Stalking Horse Bidder has agreed to purchase substantially all of the assets of the CDS Entities (the "**Stalking Horse Transaction**").

F.      The purpose of this SISP is to set out terms and procedures for a fair and efficient sale process so as to (i) obtain the highest and best offer for the CDS Entities' business operations and activities (the "**Business**"), including all of their personal, real, movable and immovable assets, rights, undertakings and properties (collectively, the "**Property**"), and (ii) ensure certainty for the restart, the growth and the long-term continuation of the Business, which ceased due to the COVID-19 crisis, the whole in the best interest of the CDS Entities' stakeholders, including their thousands of employees (those currently employed and those who had to be laid off due to the cessation of operations of the Business), their creditors, their suppliers and contracting parties, and the Québec community where it is a key cultural business and a major talent incubator since its creation.

G.      Accordingly, this SISP describes, among other things: (a) the Property available for sale and the opportunity for an investment in the Business, (b) the manner in which prospective bidders may gain access to or continue to have access to due diligence materials concerning the Property and the Business, (c) the manner in which bidders and bids become Qualified Bidders, Qualified Bids, and Auction Bidders, as applicable, (d) the evaluation of bids received, (e) the guidelines for the ultimate selection of the Successful Bid(s) and/or Back-Up Bid(s), and (f) the process for obtaining such approvals (including the approval of the CCAA Court) as may be necessary or appropriate in respect of a Successful Bid.

- 2 -

H.    Capitalized terms used in this SISP and not otherwise defined have the meanings given to them in paragraph 1 below.

**<u>Defined Terms</u>**

1.    The following capitalized terms have the following meanings when used in this SISP:

(a)    "**Aggregated Auction Bidder**" is defined in paragraph 26(b).

(b)    "**Aggregated Overbid**" is defined in paragraph 26(b).

(c)    "**Approval Motion**" is defined in paragraph 27.

(d)    "**Approval Motion Date**" is defined in paragraph 2.

(e)    "**Auction**" is defined in paragraph 24.

(f)    "**Auction Bidders**" is defined in paragraph 25.

(g)    "**Auction Date**" is defined in paragraph 2.

(h)    "**Back-Up Bid**" is defined in paragraph 26(i).

(i)    "**Back-Up Bidder**" is defined in paragraph 26(i).

(j)    "**Bankruptcy Code**" is defined in paragraph C of the introduction.

(k)    "**Bankruptcy Court**" is defined in paragraph C of the introduction.

(l)    "**Bid**" is defined in paragraph 18.

(m)    "**Bid Deadline**" is defined in paragraph 2.

(n)    "**Business**" is defined in paragraph F of the introduction.

(o)    "**Business Day**" means a day (other than Saturday or Sunday) on which banks are generally open for business in Montréal, Québec and New York, New York.

(p)    "**CA**" means the *Competition Act*, R.S.C., 1985, c. C-34, as amended.

(q)    "**CCAA**" is defined in paragraph A of the introduction.

(r)    "**CCAA Court**" is defined in paragraph A of the introduction.

(s)    "**CCAA Proceedings**" is defined in paragraph A of the introduction.

(t)    "**CDS**" means Cirque du Soleil Holdings L.P. (by its general partner Cirque du Soleil GP Inc.).

(u)    "**CDS Entities**" is defined in paragraph A of the introduction.

(v)    "**Closing**" means the completion of the transaction contemplated by the Successful Bid.

(w)    "**Confidential Information Memorandum**" is defined in paragraph 11.

- 3 -

(x)     "**Data Room**" is defined in paragraph 11.

(y)     "**Deposit**" is defined in paragraph 18(c)(xx).

(z)     "**Filing Date**" is defined in paragraph A of the introduction.

(aa)    "**Financial Advisors**" is defined in paragraph D of the introduction.

(bb)    "**HSR Act**" means the *Hart-Scott-Rodino Antitrust Improvements Act of 1976*, as amended.

(cc)    "**ICA**" means the *Investment Canada Act*, R.S.C., 1985, c. 28 (1st Supp.), as amended.

(dd)    "**Initial Order**" is defined in paragraph A of the introduction.

(ee)    "**Monitor**" is defined in paragraph B of the introduction.

(ff)    "**Monitor's Website**" means www.ey.com/ca/cirque.

(gg)    "**NDA**" means a non-disclosure agreement in form and substance satisfactory to CDS and the Monitor, which will inure to the benefit of any Successful Bidder at Closing.

(hh)    "**Opening Bid**" is defined in paragraph 26(b).

(ii)    "**Outside Date**" is defined in paragraph 2.

(jj)    "**Overbid**" is defined in paragraph 26(e).

(kk)    "**Participation Deadline**" is defined in paragraph 2.

(ll)    "**Participation Letter**" is defined in paragraph 7(a).

(mm)    "**Potential Bidder**" is defined in paragraph 4.

(nn)    "**Preliminary Process**" is defined in paragraph D of the introduction.

(oo)    "**Property**" is defined in paragraph F of the introduction.

(pp)    "**Qualified Bid**" is defined in paragraph 18.

(qq)    "**Qualified Bidder**" is defined in paragraph 9.

(rr)    "**Required Acknowledgment**" is defined in paragraph 6.

(ss)    "**Secured Lenders**" means the First Lien Lenders and the Second Lien Lenders (each as defined in the initial application of the CDS Entities filed in the CCAA Proceedings dated June 29, 2020).

(tt)    "**SISP**" is defined in paragraph E of the introduction.

(uu)    "**SISP Approval Order**" is defined in paragraph E of the introduction.

(vv)    "**Solicitation Materials Distribution Date**" is defined in paragraph 2.

- 4 -

(ww)    "**Solicitation Notice**" is defined in paragraph 6.

(xx)    "**Stalking Horse APA**" is defined in paragraph E of the introduction.

(yy)    "**Stalking Horse Bid**" is defined in paragraph 19.

(zz)    "**Stalking Horse Bidder**" is defined in paragraph E of the introduction.

(aaa)    "**Stalking Horse Transaction**" is defined in paragraph E of the introduction.

(bbb)    "**Successful Bid**" is defined in paragraph 26(i).

(ccc)    "**Successful Bidder**" is defined in paragraph 26(i).

(ddd)    "**Superior Offer**" mean a credible and fully financed offer made by a Qualified Bidder that (i) provides for consideration in excess of the aggregate purchase price contemplated by the Stalking Horse Transaction plus U.S.$1,500,000, including cash consideration in an amount equal to no less than the Credit Bid Consideration plus the CDS 4 Term Loan Consideration (each as defined in the Stalking Horse APA) and (ii) CDS, with the assistance of the Financial Advisors and its legal advisors, and with the consent of the Monitor, considers to be better than the Stalking Horse Transaction. Solely with respect to the definition of "Superior Offer" herein, the purchase price under the Stalking Horse Transaction shall be calculated as at the Bid Deadline, such amount to be agreed between the Monitor and the Stalking Horse Bidder and communicated to all Qualified Bidders no less than seven (7) days prior to the Bid Deadline, it being understood that nothing herein shall impair the ability of the Stalking Horse Bidder to credit bid any additional obligations owing to the Secured Lenders, including interest or any other obligations accruing on or after the Bid Deadline. For reference purposes, as at the date of the Stalking Horse APA, the aggregate purchase price payable under the Stalking Horse Transaction is approximately U.S.$1,214,707,855.03.

(eee)    "**U.S. Website**" means https://www.omniagentsolutions.com/cirquedusoleil.

**Key Dates**

2.    The key dates for the SISP are as follows:

| | |
|---|---|
| By no later than July 20, 2020 at 5:00 p.m. (prevailing Eastern Time) or such later date as may be agreed to by CDS with the consent of the Monitor ("**Solicitation Materials Distribution Date**") | Distribution of the Solicitation Notice, form of NDA and the Required Acknowledgment to the Potential Bidders |
| July 27, 2020 at 5:00 p.m. (prevailing Eastern Time)<br><br>("**Participation Deadline**") | Due date for delivery by Potential Bidders of a Participation Letter, an executed NDA, and an executed Required Acknowledgment (subject to the terms of paragraph 8) |
| August 18, 2020 at 5:00 p.m. (prevailing Eastern Time)<br><br>("**Bid Deadline**") | Due date for Bids and Deposits |

- 5 -

| | |
|---|---|
| August 25, 2020<br><br>("**Auction Date**") | Date of the Auction (if any) |
| No later than seven (7) calendar days following either the conclusion of the Auction, or the date on which a determination is made by CDS, with the consent of the Monitor, not to proceed with an Auction in accordance with paragraph 23<br><br>("**Approval Motion Date**") | Hearing of the Approval Motion |
| September 30, 2020, or such later date as may be agreed to by CDS and the Successful Bidder, with the consent of the Monitor<br><br>("**Outside Date**") | Deadline for completion of the transaction(s) represented by the Successful Bid(s) |

**Supervision of the SISP**

3.      The Monitor shall supervise the CDS Entities' conduct of the SISP as outlined herein and any resulting sales or investments, including having the consent rights provided for herein. In the event that there is disagreement or clarification is required as to the interpretation or application of this SISP or the responsibilities of the Monitor, the Financial Advisors or the CDS Entities hereunder, the CCAA Court will have jurisdiction to hear such matter and provide advice and directions, upon application of the Monitor, the CDS Entities or any other party with a hearing on not less than five (5) Business Days' notice.

**Solicitation of Interest**

4.      For all purposes of this SISP, the following persons shall be considered as potential bidders (each, a "**Potential Bidder**"): (i) any party that was not identified as a potential bidder as part of the Preliminary Process and that, in the reasonable opinion of CDS, with the assistance of the Financial Advisors, and with the consent of the Monitor, is capable of submitting a purchase or investment offer regarding the Property or the Business, (ii) each party that has submitted a bid in the Preliminary Process that is selected by CDS, with the assistance of the Financial Advisors, and with the consent of the Monitor, to participate in the SISP, and (iii) any other party permitted by CDS, with the consent of the Monitor.

5.      As soon as reasonably practicable after the granting of the SISP Approval Order:

(a)      the Monitor will post the SISP Approval Order and the SISP on the Monitor's Website and CDS shall cause such notice to be posted on the U.S. Website;

(b)      CDS will cause a notice of the SISP (and such other relevant information which CDS, in consultation with the Monitor and the Financial Advisors, considers appropriate) to be published in The Wall Street Journal, The Globe and Mail (National Edition), and La Presse; and

- 6 -

(c)     CDS will issue a press release setting out notice of the SISP (and such other relevant information which CDS, in consultation with the Monitor and the Financial Advisors, considers appropriate) with Canada Newswire designating dissemination in Canada and major financial centres in the United States.

6.     By no later than the Solicitation Materials Distribution Date, the Financial Advisors, on behalf of CDS, shall distribute a solicitation notice describing the opportunity and inviting Potential Bidders to submit a bid pursuant to these SISP procedures (the "**Solicitation Notice**"), the form of NDA, and a form of written acknowledgement whereby a Potential Bidder confirms receipt of a copy of the SISP Approval Order and agrees to be bound by the provisions contained therein (including the SISP) (the "**Required Acknowledgment**") to each Potential Bidder.

## Participation Requirements

7.     Subject to paragraph 8, in order to participate in the SISP, by the Participation Deadline, each Potential Bidder must deliver the following information and executed documents to the Financial Advisors, on behalf of the CDS Entities, and the Monitor at their email address(es) specified in Schedule B hereto:

(a)     a letter (a "**Participation Letter**") setting forth (i) the identity, the type and the jurisdiction of organization of the Potential Bidder, (ii) the contact information for such Potential Bidder, (iii) full disclosure of the direct and indirect owners and principals of the Potential Bidder, and (iv) such financial disclosure and credit quality support or enhancement that allows CDS, in consultation with the Financial Advisors and the Monitor, to make a reasonable determination as to the Potential Bidder's financial and other capabilities to consummate a transaction pursuant to a Superior Offer;

(b)     an executed NDA; and

(c)     a copy of the Required Acknowledgment executed by the Potential Bidder.

8.     Any Potential Bidder that, prior to the granting of the SISP Approval Order, (a) disclosed to CDS the information set out in paragraph 7(a), and/or (b) entered into a non-disclosure agreement with CDS that imposes confidentiality, non-use, and non-disclosure obligations on such Potential Bidder no less stringent than the form of NDA and that inures to the benefit of any Successful Bidder at Closing may be deemed by CDS, with the consent of the Monitor, to satisfy the requirements set forth in paragraphs 7(a) and 7(b), as applicable.

9.     A Potential Bidder that has delivered the necessary documents and information in accordance with paragraphs 7 and 8 and that CDS, in its reasonable business judgment, in consultation with the Financial Advisors, and with the consent of the Monitor, determines is likely, based on the availability of financing, to be able to consummate a transaction on or before the Outside Date will be deemed a "**Qualified Bidder**", and will be promptly notified of such determination by the Financial Advisors with a copy to the Monitor.

10.    Notwithstanding paragraphs 7 to 9, the Stalking Horse Bidder shall be deemed to be a Qualified Bidder for all purposes under, and at all times in connection with, this SISP.

## Distribution of Confidential Information Memorandum and Access to Data Room

11.    Contemporaneously with the determination that a Potential Bidder is a Qualified Bidder, CDS, with the assistance of the Financial Advisors and the Monitor, shall provide such Qualified Bidder with a confidential information memorandum describing the opportunity to acquire the Property and the Business (the "**Confidential Information Memorandum**"), it being understood

- 7 -

that Qualified Bidders who submitted a bid in the Preliminary Process have already been provided with the Confidential Information Memorandum, and with access to a secure online electronic data room (the "**Data Room**") containing due diligence information regarding:

(a)     the Property and the Business; and

(b)     the debt of, and equity interests in, the CDS Entities.

12.     CDS, with the assistance of the Financial Advisors and the Monitor, shall coordinate all reasonable requests from Qualified Bidders for additional information and due diligence access; provided CDS may decline to provide (or elect to withdraw access to) due diligence information to any Qualified Bidder who, at such time and in the reasonable business judgment of CDS, after consultation with the Financial Advisors and with the consent of the Monitor, has not established (or there is otherwise a reasonable basis to doubt), that such Qualified Bidder intends in good faith to, or has the capacity to, consummate a transaction.

13.     The CDS Entities also reserve the right, in consultation with the Financial Advisors and with the consent of the Monitor, to withhold any diligence materials that the CDS Entities determine are sensitive or otherwise not appropriate for disclosure to a Qualified Bidder that the CDS Entities determine is (or is affiliated with) a competitor or is otherwise an entity to which the disclosure of sensitive or competitive information, in the CDS Entities' exercise of their reasonable business judgment (in consultation with the Financial Advisors and with the consent of the Monitor), may risk unduly placing the CDS Entities at a competitive disadvantage or subject them to regulatory scrutiny.

14.     All due diligence and information requests must be directed to the Monitor and to the Financial Advisors at their email address(es) specified in Schedule B hereto.

15.     The CDS Entities, the Financial Advisors, the Monitor and their respective employees, officers, directors, agents, advisors and other representatives make no promise, representation, warranty, condition or guarantee of any kind, nature or description as to the information (a) contained in the Confidential Information Memorandum or the Data Room, or (b) otherwise made available in connection with this SISP, except, in the case of the CDS Entities only, to the extent expressly contemplated in any executed definitive sale or investment agreement with a Successful Bidder.

16.     Without limiting the generality of any term or condition of any NDA between CDS and any Potential Bidder or Qualified Bidder, unless otherwise agreed by CDS and the Monitor or ordered by the CCAA Court, no Potential Bidder or Qualified Bidder (other than the Stalking Horse Bidder) shall be permitted to have any discussions with (a) any counterparty to any contract with any of the CDS Entities, any current or former director, manager, shareholder, officer, member or employee of any of the CDS Entities, other than in the normal course of business and wholly unrelated to the CDS Entities, the potential transaction, the Confidential Information (as defined in the NDA), the SISP or the CCAA Proceedings, and (b) any other Potential Bidder or Qualified Bidder regarding the SISP or any bids submitted or contemplated to be submitted pursuant thereto. In the case of the Stalking Horse Bidder, it shall not be permitted to have any communications (verbal and in written form) with (a) any counterparty to any contract with any of the CDS Entities (except in accordance with the terms of the Stalking Horse APA), and (b) any other Potential Bidder or Qualified Bidder regarding the SISP or any bids submitted or contemplated to be submitted pursuant thereto, unless the Monitor and CDS's counsel are parties to any and all such communications.

- 8 -

**Qualified Bids**

17.    A Qualified Bidder that wishes to make a bid must deliver its bid to the Financial Advisors, on behalf of the CDS Entities, and the Monitor at their email address(es) specified in Schedule B hereto so as to be actually received by them not later than the Bid Deadline.

18.    All offers submitted to the CDS Entities and the Monitor ("**Bids**") for consideration in accordance with paragraph 17 must comply with all of the following requirements (any such complying Bid, a "**Qualified Bid**"):

(a)    <u>Asset Sales</u>: In the case of an offer to purchase some or all of the Property:

 (i)    <u>Purchase Price</u>: Each Bid must clearly set forth the purchase price in U.S. dollars, stated on a total enterprise value basis (including the cash and any non-cash components thereof, the sources of such capital, evidence of the availability of such capital and the steps necessary and associated timing to obtain the capital and consummate the proposed transaction and any related contingencies, as applicable);

 (ii)    <u>Assets</u>: Each Bid must clearly state the Property to be included in the transaction and any Property to be excluded or divested or disclaimed prior to Closing (including the contracts and leases not to be assumed);

 (iii)    <u>Assumption of Obligations</u>: Each Bid must clearly state which liabilities and obligations of the CDS Entities are to be assumed; and

 (iv)    <u>Mark-up</u>: Each Bid must include a full mark-up of the Stalking Horse APA to be included in the Data Room, and not only an issues list or comments of a conceptual nature.

(b)    <u>Investments</u>: In the case of an offer to make an investment in the Business:

 (i)    <u>Amount/Type of Investment</u>: Each Bid must clearly state the aggregate amount of the equity and/or debt investment in U.S. dollars (including the sources of such capital, evidence of the availability of such capital and the steps necessary and associated timing to obtain the capital and consummate the proposed transaction and any related contingencies, as applicable) to be made; and

 (ii)    <u>Treatment of Obligations</u>: Each Bid must include the proposed treatment of the liabilities and obligations of the CDS Entities.

(c)    <u>All Bids</u>: In the case of all offers to purchase some or all of the Property and/or to make an investment in the Business:

 (i)    <u>Bid Deadline</u>: Each Bid must be received by the Bid Deadline as set forth herein;

 (ii)    <u>Superior Offer</u>: Each Bid must represent a Superior Offer;

 (iii)    <u>Key Terms:</u> Each Bid must set forth key terms including (A) economic terms, (B) the basis and rationale of the valuation, (C) any major assumptions made, including the financial projections utilized in arriving at the valuation, and (D) any other material terms and conditions required to consummate the transaction;

- 9 -

(iv)     Capital Structure: Each Bid must include a pro forma capital structure and the underlying assumptions regarding the pro forma capital structure (including the anticipated debt levels, debt service fees, interest, maturity, amortization, and other key terms);

(v)     Corporate Governance: Each Bid must include the proposed corporate governance structure of the entity or entities owning/operating the Business, following implementation of the purchase or investment;

(vi)     Irrevocable Offer: Each Bid must be irrevocable until the earlier of (A) the approval by the CCAA Court of a Successful Bid (and the Back-Up Bid) and (B) 45 days following the Bid Deadline, provided that if such bidder is selected as the Successful Bidder or the Back-Up Bidder, its offer will remain irrevocable until the Closing (or ten (10) days after the Outside Date as set forth herein);

(vii)     Executed Documents: Each Bid must be accompanied by a duly authorized and executed asset purchase agreement or investment commitment, as applicable, and an electronic copy of such agreement, as well as duly authorized and executed transaction documents necessary to effectuate the transactions contemplated thereby;

(viii)     Financial Wherewithal: Each Bid must include (A) written evidence of a firm, irrevocable commitment for financing, or other evidence of ability to consummate the proposed transaction, that will allow CDS, in consultation with the Monitor and the Financial Advisors, to make a reasonable determination as to the Qualified Bidder's financial and other capabilities to consummate the transaction, and (B) the identification of any person or entity who may provide debt or equity financing for the Bid and any material conditions to be satisfied in connection with such financing;

(ix)     Authorization: Each Bid must include evidence, in form and substance reasonably satisfactory to CDS, in consultation with the Monitor, of authorization and approval from the bidder's board of directors (or comparable governing body) with respect to the submission, execution, delivery and closing of the transaction contemplated by the Bid;

(x)     No Other Authorization, Diligence, Financing Conditions: Each Bid must not be conditional upon the following:

   A.     any internal approval(s);

   B.     the outcome of unperformed due diligence by the Qualified Bidder; or

   C.     obtaining financing;

(xi)     "As Is, Where Is"; Other Acknowledgements: Each Bid must include an acknowledgement and representation that the Qualified Bidder:

   A.     is making its offer to purchase the Property or make an investment in the Business on an "as is, where is" basis and without surviving representations or warranties of any kind, nature, or description by the CDS Entities, the Monitor or any of their respective employees, officers, directors, agents, advisors, other representatives and estates, except to the extent set forth in the definitive sale or investment agreement;

- 10 -

B.    has had an opportunity to conduct any and all due diligence regarding the Business and the Property prior to making its Bid;

C.    has relied solely upon its own independent review, investigation and inspection of any documents and the assets to be acquired and liabilities to be assumed in making its Bid; and

D.    is not relying upon any written or oral statements, representations, promises, warranties, conditions, or guaranties whatsoever, whether express or implied (by operation of law or otherwise), made by any person or party, including the CDS Entities, the Financial Advisors, the Monitor and their respective employees, officers, directors, agents, advisors and other representatives, regarding the Business, the Property, the assets to be acquired or liabilities to be assumed, the Auction, this SISP, or any information (or the completeness of any information) provided in connection therewith, except as expressly stated in the definitive sale or investment agreement.

(xii)    <u>Identity</u>: Each Bid must fully disclose the identity of each entity that will be sponsoring or participating in the Bid, and the complete terms of such participation;

(xiii)    <u>Contact Information</u>: Each Bid must contain contact information for any business, financial or legal advisors retained or to be retained in connection with the proposed transaction;

(xiv)    <u>Regulatory Approvals</u>: Each Bid must outline any anticipated regulatory and other approvals required to close the transaction, including any approvals under the CA, ICA, and HSR Act, and the anticipated time frame and any anticipated impediments for obtaining such approvals and confirms that the Qualified Bidder will make and submit all necessary and applicable regulatory filings and pay all fees associated therewith;

(xv)    <u>Disclaimer of Fees</u>: Each Bid must disclaim any right to receive a fee analogous to a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, it being understood that nothing herein shall impact any fee letter between the CDS Entities and the advisors to the Secured Lenders;

(xvi)    <u>Treatment of Employees</u>: Each Bid must include full details of the Qualified Bidder's intention towards offering continued employment to the CDS Entities' employees and provide details on the terms and conditions of employment that will be offered to any continuing employees. For greater certainty, each Bid must include the proposed approximate number of employees of the CDS Entities who will become employees of the bidder or remain employees of the Business. Each Bid must also include details on how the Qualified Bidder intends to address CDS Entities' contemplated actions towards its employee population in the context of the restructuring process;

(xvii)    <u>Québec Undertakings</u>: Each Bid must state any undertakings in favor of the government and the province of Québec, including, for example, regarding the location of the Business' primary headquarters, the Québec residency requirements for directors and officers and, where applicable, the Qualified

- 11 -

Bidder's intention to offer employment to employees whose employment with any of the CDS Entities was terminated as part of the restructuring process;

(xviii)  <u>Cure Costs</u>: To the extent applicable, each Bid must contain full details of the Qualified Bidder's proposal for the treatment of related cure costs (including the Qualified Bidder's ability to perform under any assigned agreements) and identify with particularity any executory contract or unexpired lease the assumption and assignment of which is a condition to closing;

(xix)  <u>Timeline</u>: Each Bid must provide a timeline to Closing with critical milestones with a closing date not exceeding the Outside Date;

(xx)  <u>Deposit</u>: Each Bid must be accompanied by a refundable deposit (the "**Deposit**") in the form of a wire transfer to the account specified on Schedule C hereto (or such other form acceptable to CDS with the consent of the Monitor), payable to the order of the Monitor, on behalf of the CDS Entities, in trust, in an amount equal to two percent (2%) of the total consideration contemplated by the Bid, to be held and dealt with in accordance with the terms of this SISP; provided, however, that in the case of the Stalking Horse Bid, the Deposit shall be U.S.$21,012,648;

(xxi)  <u>Terms of Court Order(s)</u>: Each Bid must describe the key terms and provisions to be included in any order of the CCAA Court approving the contemplated transaction, including, in the case of an asset sale, whether the transaction requires that all of the rights, title and interests of the CDS Entities in and to the subject Property to be acquired will be sold free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options, and interests thereon and there against (except to the extent otherwise set forth in the definitive sale or investment agreement);

(xxii)  <u>Precedent Investments in the Entertainment Industry</u>: Each Bid must provide any relevant details of the previous investments or acquisitions, or any other experience a Qualified Bidder has and deemed relevant by such Qualified Bidder, in the entertainment industry, including the date, nature of the investment, amount invested, geography and any other relevant information related to such investment;

(xxiii)  <u>Prospective Plans</u>: Each Bid should include the Qualified Bidder's proposed plans for the Business following consummation of a potential transaction, including intentions for the re-start of operations as well as for management, employees (including financial compensation in relation with potential termination entitlements of employees whose employment was permanently terminated and the Qualified Bidder's intention towards freelancers and employees that were furloughed due to CDS's financial position), facilities and the location of the Business' primary headquarters; and

(xxiv)  <u>Other Information</u>: Each Bid must contain such other information as may be reasonably requested by CDS, the Financial Advisors, or the Monitor in writing from time to time.

19.  Notwithstanding anything herein to the contrary, the offer represented by the Stalking Horse APA (the "**Stalking Horse Bid**") shall be deemed to be a Qualified Bid for all purposes under, and at all times in connection with, this SISP.

- 12 -

20.    Notwithstanding anything herein to the contrary, CDS and the Monitor, with the assistance of the Financial Advisors, will review and assess each Bid to determine whether such Bid is a Qualified Bid. In performing such review and assessment, CDS and the Monitor shall evaluate the following as primary considerations: (a) the purchase price and net value (including assumed liabilities and other obligations to be performed by the bidder); (b) the firm, irrevocable commitment for financing of the transaction; (c) the closing conditions and other factors affecting the speed, certainty and value of the transaction (including any regulatory approvals required to close the transaction); and (d) the terms of transaction documents, including, if applicable, the proposed revisions to the Stalking Horse APA. In addition, they may consider the following non-exhaustive list of considerations: (i) the claims likely to be created by such Bid in relation to other Bids; (ii) the counterparties to the transaction; (iii) planned treatment of stakeholders; (iv) the assets included or excluded from the Bid; (v) any transition services required from the CDS Entities post-closing and any related restructuring costs; (vi) the likelihood and timing of consummating the transaction; (vii) the financing or cash pro forma available post-closing to fund the Business; (viii) the capital sufficient post-closing for the wind-down of the applicable CDS Entities; (ix) proposed treatment of the employees (including plans regarding financial compensation in relation with potential termination entitlements of employees whose employment was permanently terminated and freelancers and employees that were furloughed due to CDS's financial position); and (x) the location of the Business' primary headquarters, the Québec residency requirements for directors and officers, and any other undertakings in favor of the government and the province of Québec.

21.    CDS, in consultation with the Financial Advisors, and with the consent of the Monitor may reject any Bid that is (i) inadequate or insufficient; (ii) not in conformity with the requirements pursuant to these SISP procedures; (iii) contrary to the best interest of the CDS Entities; or (iv) not a Qualified Bid.

**Right of Secured Lenders to Credit Bid**

22.    The Stalking Horse Bidder, for and on behalf of the Secured Lenders, has the right to credit bid for all of the Property subject to the security granted in favour of the Secured Lenders (including their agents), up to the full face value amount of the Secured Lenders' claims, including principal, interest and any other obligations owing to the Secured Lenders. For the avoidance of doubt, each U.S.$1.00 of credit bid of the Stalking Horse Bidder shall be equal to U.S.$1.00 of cash.

**Auction; Successful Bid**

23.    In the event that no Qualified Bid other than the Stalking Horse Bid is received, then (a) there will be no auction, (b) the Stalking Horse Bid will be deemed to be the Successful Bid, and (c) the CDS Entities shall seek approval of, and authority and direction for the CDS Entities to consummate, the Stalking Horse APA and the transactions provided for therein at the Approval Motion.

24.    If one or more Qualified Bids other than the Stalking Horse Bid are received, then CDS, in consultation with the Monitor and with the assistance of the Financial Advisors, shall conduct an auction to determine the highest and best Qualified Bid(s) (the "**Auction**").

25.    If the Auction is to take place, then as soon as practicable and no later than 10:00 am (Montreal time) (3) Business Days prior to the Auction, CDS shall provide the Stalking Horse Bidder and all Qualified Bidders having submitted a Qualified Bid ("**Auction Bidders**") with a copy of the Opening Bid for the Auction together with a copy of the mark-up of the Stalking Horse APA.

- 13 -

26. The Auction shall commence on the Auction Date by videoconference and shall be conducted according to the following procedures:

(a) <u>Participation</u>: CDS, in consultation with the Monitor (except where the consent of the Monitor is required by the terms hereof) and with the assistance of the Financial Advisors, shall direct and preside over the Auction. Only Auction Bidders are eligible to participate in the Auction. Each Auction Bidder must have present or available the individual or individuals with the necessary decision-making authority to submit Overbids and to make such necessary and ancillary decisions as may be required during the Auction. Only the authorized representatives, including counsel and other advisors, of the CDS Entities, the Monitor and each of the Auction Bidders shall be permitted to attend the Auction.

(b) <u>Rounds</u>. Bidding at the Auction shall be conducted in rounds. The Qualified Bid that is the highest and best bid shall constitute the "**Opening Bid**" for the first round of bidding. The highest and best Overbid at the end of each round shall constitute the "**Opening Bid**" for the following round. CDS, with the consent of the Monitor, shall determine what constitutes the Opening Bid for each round in accordance with the assessment criteria set out in paragraph 26(d) below. Non-overlapping Qualified Bids may together constitute an Opening Bid in the opening round. A combination of non-overlapping Overbids (an "**Aggregated Overbid**" and the parties that submitted an Aggregated Overbid, the "**Aggregated Auction Bidder**") may also be an Opening Bid in any subsequent round, if such Aggregated Overbid is determined to be the highest and best bid. In each round, an Auction Bidder may submit no more than one Overbid. CDS, with the consent of the Monitor, may impose such time limits for the submission of Overbids as it deems reasonable. For clarity, the Stalking Horse Bidder may submit an Overbid and such bid may form part of an Aggregated Overbid.

(c) <u>Failure to Submit an Overbid</u>. If, at the end of any round of bidding, an Auction Bidder or Aggregated Auction Bidder (other than the Auction Bidder or Aggregated Auction Bidder that submitted the Opening Bid for such round) fails to submit an Overbid, then such Auction Bidder may not participate in the next or any subsequent round of bidding at the Auction. Any Auction Bidder or Aggregated Auction Bidder that submits an Overbid or Aggregated Overbid during a round (including the Auction Bidder or Aggregated Auction Bidder that submitted the Opening Bid for such round) shall be entitled to participate in the next round of bidding at the Auction.

(d) <u>Bid Assessment Criteria</u>. CDS, with the assistance of the Financial Advisors and with the consent of the Monitor, shall determine which Qualified Bid constitutes the Opening Bid for the first round of bidding and the determination of which Overbid or Aggregated Overbid constitutes the Opening Bid for each subsequent round of bidding, taking into account all factors that CDS, with the assistance of its advisors, and the Monitor reasonably deem relevant to the value of such bid, including, among other things, those considerations listed in paragraph 20, above.

(e) <u>Overbids</u>. All Bids made during the Auction must be Overbids and shall be submitted in a form to be determined by CDS, with the consent of the Monitor, which form shall be provided to all Auction Bidders no later than two (2) Business Days prior to the start of the Auction. The identity of each Auction Bidder and all material terms of each Overbid must be fully disclosed by CDS and the Monitor to all other Auction Bidders participating in the Auction. The Monitor shall maintain a transcript of the Opening Bid and all Overbids made and announced at the Auction, including the Successful Bid(s) (as

- 14 -

defined below) and the Back-Up Bid(s). To be considered an "**Overbid**", a Bid made during the Auction must satisfy the following criteria:

(i)    <u>Minimum Consideration</u>. The overall amount of consideration of any Overbid shall not be less than the value of the Opening Bid of the applicable round of bidding, plus a minimum amount of U.S.$1,500,000 (which, in the case of the Stalking Horse Bidder, may be by way of credit bid) or such higher amount as CDS, with the consent of the Monitor may determine in advance of such round of bidding in order to facilitate the Auction; and

(ii)    <u>Remaining terms are the same as for Qualified Bids</u>. Except as modified herein, an Overbid must comply with the conditions for a Bid set forth in paragraph 18 above (provided, for greater certainty, that the Bid Deadline shall not apply and Overbids need not be accompanied by additional cash deposits (subject to subsection (h) hereof)). To the extent not previously provided (which shall be determined by CDS and the Monitor), an Auction Bidder submitting an Overbid must submit, as part of its Overbid, evidence acceptable to CDS and the Monitor demonstrating such Auction Bidder's ability (including financial ability) to close the transaction contemplated by its Overbid;

(f)    <u>Overbid Alterations</u>: An applicable Overbid may contain alterations, modifications. additions, or deletions of any terms of the prior Overbid so long as, after giving effect to the same, the terms of the new Overbid are no less favorable than any prior Overbid of such Auction Bidder, as determined by CDS with the consent of the Monitor.

(g)    <u>Announcing Highest Overbids</u>. At the end of each round of bidding, CDS, in consultation with and with the consent of the Monitor, shall (i) immediately review each Overbid made in such round; (ii) identify the highest and best Overbid or Aggregated Overbid; and (iii) announce the terms of such highest and best Overbid or Aggregated Overbid to all Auction Bidders entitled to participate in the next round of bidding. Such highest and best Overbid or Aggregated Overbid shall be the Opening Bid for the next round of the Auction.

(h)    <u>Adjournments</u>. CDS may, in its reasonable business judgment and with the consent of the Monitor, make one or more adjournments in the Auction (other than for adjournments at the end of an Auction day to the next morning, such adjournments not to exceed two (2) Business Days in the aggregate) to, among other things: (i) facilitate discussions with individual Auction Bidders, including any discussion, negotiation or clarification of any Overbid; (ii) allow individual Auction Bidders to consider how they wish to proceed; (iii) consider and determine the current highest and best Overbid or Aggregated Overbid at any given time during the Auction; (iv) give Auction Bidders the opportunity to provide such additional evidence as CDS and the Monitor may require, in their reasonable business judgment, that the Auction Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed transaction at the Overbid amount; and (v) subject to such rules and guidelines as the Monitor may consider appropriate, facilitate any appropriate consultation by Auction Bidders with third party stakeholders.

(i)    <u>Closing the Auction</u>. If, in any round of bidding, no Overbid or Aggregated Overbid is made, the Auction shall be closed and CDS, with the assistance of the Financial Advisors and its legal advisors and with the consent of the Monitor, shall: (i) declare the last Opening Bid(s) as the successful Bid(s) (the "**Successful Bid(s)**" and the party or parties submitting such Successful Bid(s), the "**Successful Bidder(s)**"); (ii) immediately review

the other Overbids or Aggregated Overbids made in the previous round (or the Qualified Bid(s) if no Overbids were made at the Auction) and identify and record the next highest and best Overbid or Aggregated Overbid (or Qualified Bid) (the "**Back-Up Bid(s)**" and the party or parties submitting such Back-Up Bid(s), the "**Back-Up Bidder(s)**"); and (iii) advise the Successful Bidder(s) and the Back-Up Bidder(s) of such determinations and all other Auction Bidders that they are not a Successful Bidder or a Back-Up Bidder. If a Back-Up Bid is identified in accordance with this SISP, then such Back-Up Bid shall remain open until the earlier of (i) the consummation of the transaction contemplated by the Successful Bid, and (ii) ten (10) days after the Outside Date.

(j)     <u>Executed Documentation</u>: The Successful Bidder and the Back-Up Bidder (if any) shall, within two (2) Business Days after the conclusion of the Auction, or such longer delay acceptable to CDS and the Monitor, submit to the CDS Entities and the Monitor executed revised documentation memorializing the terms of the Successful Bid and the Back-Up Bid (if any). Subject to the terms of the Successful Bid documentation, the Successful Bid and the Back-Up Bid may not be assigned to any party without the consent of CDS.

(k)     <u>Reservation of Rights</u>.

    (i)     Notwithstanding anything herein to the contrary, CDS shall be under no obligation to accept the highest and best Overbid or Aggregated Overbid or any Qualified Bid (other than the Stalking Horse Bid if no higher or better Qualified Bid is accepted) or to pursue or hold an Auction or to select any Successful Bid(s) and/or Back-Up Bid(s).

    (ii)    Subject to the maximum length of adjournments contemplated by Section 26(h), the CDS Entities, with the consent of the Monitor, reserve their rights to modify the conduct of the Auction at any time, acting reasonably, in any manner that would best promote the goals of the Auction process, including to select the Successful Bid(s) and/or Back-Up Bid(s) prior to the completion of the Auction.

(l)     <u>No Collusion.</u> Each Auction Bidder shall be required to confirm that it has not engaged in any discussions or any other collusive behavior with respect to the submission of Overbids. The Monitor may permit discussions between Auction Bidders at the Auction, subject to such rules and guidelines as the Monitor considers appropriate and on notice to all of the Auction Bidders.

## **Approval Motion**

27.    The CDS Entities shall apply to the CCAA Court (the "**Approval Motion**") for an order approving the Successful Bid(s) and authorizing and directing the CDS Entities to enter into any and all necessary agreements with respect to the Successful Bid(s) and to undertake such other actions as may be necessary or appropriate to give effect to the Successful Bid(s). Such order shall also approve the Back-Up Bid(s), if any, should the Successful Bid(s) not close for any reason.

28.    The hearing of the Approval Motion will be held on the Approval Motion Date. The Approval Motion may be adjourned or rescheduled by the CDS Entities, with the consent of the Monitor and the Successful Bidder, without further notice by an announcement of the adjourned date at the Approval Motion.

29.    All Qualified Bids (other than the Successful Bid(s) and the Back-Up Bid(s)) will be deemed rejected on the date of approval of the Successful Bid(s) by the CCAA Court.

- 16 -

30.     Following the approval by the CCAA Court of the Successful Bid(s), the CDS Entities shall file a motion with the Bankruptcy Court seeking recognition of such order of the CCAA Court.

**Closing the Successful Bid**

31.     The CDS Entities and the Successful Bidder(s) shall take all reasonable steps to complete the transaction contemplated by the Successful Bid(s) as soon as possible after the Successful Bid(s) are approved by the CCAA Court and such order is recognized by the Bankruptcy Court. Notwithstanding the foregoing, in the event that there is more than one Successful Bid, CDS reserves the right to impose a condition in each Successful Bid that the obligation of the CDS Entities to complete the transaction contemplated by each Successful Bid is conditional upon the completion of the transaction(s) contemplated by each other Successful Bid. The CDS Entities will be deemed to have accepted the Successful Bid(s) only when the Successful Bid(s) has/have been approved by the CCAA Court, provided that following designation of the Successful Bid(s) by the CDS Entities and the Monitor, neither the CDS Entities (including the Financial Advisors and its legal advisors) nor the Monitor shall be entitled to solicit any further bids or engage with any bidder (other than the Successful Bidder(s) and, solely with respect to the Back-Up Bid(s), the Back-Up Bidder(s)) and shall seek approval of the Successful Bid(s) as contemplated hereby. If the transaction(s) contemplated by the Successful Bid(s) has/have not closed by the Outside Date or the Successful Bid(s) is/are terminated for any reason prior to the Outside Date, CDS may elect, with the consent of the Monitor, on not less than two (2) Business Day's notice to the CCAA Service List, to seek to complete the transaction(s) contemplated by the Back-Up Bid(s), and will promptly seek to close the transaction(s) contemplated by the Back-Up Bid(s). The Back-Up Bid(s) will be deemed to be the Successful Bid(s) and the CDS Entities will be deemed to have accepted the Back-Up Bid(s) only when CDS has made such election with the consent of the Monitor.

**General**

32.     All Deposits will be retained by the Monitor and invested in an interest-bearing trust account. If there is a Successful Bid and/or Back-Up Bid, the Deposit (plus accrued interest) paid by the Successful Bidder and/or Back-Up Bidder whose bid(s) is/are approved at the Approval Motion will be applied to the purchase price to be paid or investment amount to be made by the Successful Bidder and/or Back-Up Bidder, as applicable upon closing of the approved transaction and will be non-refundable. The Deposits (plus applicable interest) of Qualified Bidders and Auction Bidders not selected as the Successful Bidder and/or Back-Up Bidder will be returned to such bidders within five (5) Business Days of the date upon which the Successful Bid is approved by the CCAA Court or any earlier date as may be determined by the CDS Entities, in consultation with the Financial Advisors and with the consent of the Monitor. The Deposit of the Back-Up Bidder shall be returned to such Back-Up Bidder no later than 5 Business Days after Closing.

33.     All bidders (including Auction Bidders and Qualified Bidders) shall be deemed to have consented to the exclusive jurisdiction of the CCAA Court and the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to the SISP, including the qualification of bids, the Auction, if any, the construction and enforcement of the SISP, the transaction documents and the Closing, as applicable.

34.     There will be no amendments to this SISP without the consent of the Monitor, CDS and the Stalking Horse Bidder or, in the absence of consent, the approval of the CCAA Court.

35.     This SISP does not, and will not be interpreted to, create any contractual or other legal relationship between the CDS Entities and any Qualified Bidder or Auction Bidder, or any obligation to enter into any contractual or other legal relationship between the CDS Entities and

- 17 -

any Qualified Bidder or Auction Bidder, other than as specifically set forth in a definitive agreement that may be signed with the CDS Entities.

36.     Neither the CDS Entities nor the Monitor shall be liable for any claim for a brokerage commission, finder's fee or like payment in respect of the consummation of any of the transactions contemplated under the SISP arising out of any agreement or arrangement entered into by the parties that submitted the Successful Bid(s) and Back-Up Bid(s).

**SCHEDULE A**

**CDS Entities**

<u>**Applicants**</u>

1.  Cirque du Soleil GP Inc.
2.  CDS Canadian Holdings, Inc.
3.  Cirque du Soleil Canada Inc.
4.  Cirque du Soleil Inc.
5.  Cirque du Soleil Images Inc.
6.  Cirque du Soleil Inspiration Inc.
7.  CDS U.S. Holdings, Inc.
8.  CDS U.S. Intermediate Holdings, Inc.
9.  Cirque du Soleil Holding USA, Inc.
10. Cirque du Soleil (US), Inc.
11. Cirque du Soleil America, Inc.
12. VStar Entertainment Group, LLC
13. Cirque Dreams Holdings LLC
14. VStar Merchandising, LLC
15. VStar International, LLC
16. VStar Theatrical, LLC
17. VStar Touring, LLC
18. Cirque du Soleil Orlando, LLC
19. Cirque du Soleil Vegas, LLC
20. Cirque du Soleil Nevada, Inc.
21. Cirque du Soleil My Call, LLC
22. Velsi, LLC
23. Blue Man Inc.
24. Blue Man Group Holdings, LLC
25. Blue Man Group Records, LLC
26. Astor Show Productions, LLC
27. Blue Man Group Publishing, LLC
28. Blue Man Vegas, LLC
29. Blue Man Orlando, LLC
30. Blue Man Productions, LLC
31. Blue Man Chicago, LLC
32. 9415-8185 Québec Inc.
33. 9415-8219 Québec Inc.
34. 9415-8227 Québec Inc.
35. 9415-8235 Québec Inc.
36. Création 4U2C Inc.
37. Blue Man International, LLC
38. Cirque du Soleil Radio CT Holding, LLC
39. Cirque du Soleil Radio CT, LLC
40. The Works Entertainment, LLC
41. Cirque Theatrical, LLC
42. Cirque on Broadway, LLC
43. Joie de Vie, LLC

- 2 -

**<u>Limited Partnerships</u>**

1. Cirque du Soleil Holdings L.P.
2. CDS Canada 3 L.P.
3. CDS Canada 4 L.P.
4. Blue Man Boston Limited Partnership
5. CDS Canada 1 SCSp (Luxembourg special limited partnership)
6. CDS Canada 2 SCSp (Luxembourg special limited partnership)

## SCHEDULE B

## Contact Information

| Greenhill | National Bank |
|---|---|
| 300 Park Avenue | 1155 Metcalfe St., 23nd Floor |
| New York, NY 10022 USA | Montreal, QC H3B 4S9 Canada |
| **Neil Augustine** | **David Savard** |
| **Vice Chairman and Co-Head of Financing** | **Managing Director, Head of M&A and** |
| **Advisory and Restructuring** | **Financial Sponsors** |
| Phone (212) 389-1539 | Phone (514) 390-7429 |
| neil.augustine@greenhill.com | david.savard@nbc.ca |
| | |
| **Jonathan Brownstein** | **Nicolas Jacob** |
| **Managing Director** | **Managing Director** |
| Phone (212) 389-1596 | Phone (514) 390-7841 |
| jonathan.brownstein@greenhill.com | nicolas.jacob@nbc.ca |
| **Ernst & Young Inc.** | |
| 900 Boulevard de Maisonneuve West, Suite 2300 | |
| Montreal, Quebec, H3A 0A8, Canada | |
| **Martin Rosenthal** | |
| **Senior Vice President** | |
| **Strategy & Transactions** | |
| Phone (514) 879-6549 | |
| martin.rosenthal@ca.ey.com | |
| | |
| **Martin Daigneault** | |
| **Senior Vice President** | |
| **Strategy & Transactions** | |
| Phone (514) 874-4333 | |
| martin.daigneault@ca.ey.com | |
| | |
| **Todd Caluori** | |
| **Senior Vice President** | |
| **Strategy & Transactions** | |
| Phone (514) 879-2793 | |
| todd.caluori@ca.ey.com | |

**SCHEDULE C**

**Wire Instructions**

**INSTRUCTIONS FOR :  PAYMENT IN CAD**

**SWIFT MT103**
**NATIONAL BANK OF CANADA**
**MONTREAL**
SWIFT code: BNDC CAMM INT

| **(57)** | **PAYMENT TO:** | |
|---|---|---|
| | *Branch number:* | //CC0006 0 0 0 1 1 |
| | | NATIONAL BANK OF CANADA |
| | *Branch address:* | 600 de la Gauchetière Ouest |
| | | Montreal, Quebec |
| | | H3B 4L2 |
| | | Canada |

| **(59)** | **IN FAVOR OF:** | |
|---|---|---|
| | *Account number:* | / 1 3 4 0 2 2 3 |
| | *Beneficiary Name:* | Ernst & Young Inc., General Trust |
| | *Beneficiary address:* | 900, boul. De Maisonneuve Ouest |
| | | Bureau 2300 |
| | | Montreal, Quebec |
| | | H3A 0A8 |
| | | Canada |

| **(70)** | **DETAILS:** | |
|---|---|---|
| *(Ex. Invoice number)* | | |
| | *:* | |
| | *:* | |
| | | |
| | | |
| | | |

- 2 -

## INSTRUCTIONS FOR : DIRECT PAYMENT TO NATIONAL BANK OF CANADA IN USD

**SWIFT MT103**
**NATIONAL BANK OF CANADA**
Montreal
SWIFT code: BNDC CAMM INT

| BENEFICIARY BANK: | |
|---|---|
| *Branch number:* | //CC0006 0 0 0 1 1 |
| | NATIONAL BANK OF CANADA |
| *Branch address:* | 600 de la Gauchetière West |
| | Montréal, Québec |
| | H3B 4L2 |
| | Canada |
| | |

| BENEFICIARY: | |
|---|---|
| *Account number:* | / 0 0 2 9 3 6 2 |
| *Beneficiary name:* | Ernst & Young Inc., General Trust |
| *Beneficiary address:* | 900, boul. De Maisonneuve Ouest |
| | Suite 2300 |
| | Montreal, Quebec |
| | H3A 0A8 |
| | Canada |

| DETAILS OF PAYMENT: | |
|---|---|
| | |
| | |
| | |
| | |

| U.S. CORRESPONDENT: | JPMORGAN Chase Bank, New York |
|---|---|
| *ABA #:* | 021000021 |
| *SWIFT Code:* | CHASUS33 |

7073003

**EXHIBIT D**

**THE EMPLOYEE FUND**

*This summary of terms and conditions has been prepared for convenience of reference purposes only. This summary is not an exhaustive description of the terms which will be set out in the Trust Agreement (as defined below) and the terms remain subject to ongoing discussions between the Buyer, the Seller Group and the Monitor. In the event of a conflict between this summary and the Trust Agreement, the latter shall govern. All monetary amounts in this summary refer to Canadian dollars unless otherwise specified.*

| | |
|---|---|
| **1. Creation of the Employee Fund** | Subject to the conditions precedent set out below, the Buyer (the "Settlor") shall establish a trust fund to provide financial assistance to former Employees (other than Transferred Employees) (the "Employee Fund"). |
| | The Settlor shall fund an aggregate, maximum amount of USD$15M to the Employee Fund. No further contribution may be required from the Settlor. |
| | Monitor to act as administrator of the Employee Fund. |
| | No Seller Group monies to be used to fund the Employee Fund. |
| | The Employee Fund will be settled on a gratuitous, without prejudice basis, and may not be used in any way to deem the Settlor or any of its Affiliates a related or common employer with any of the Seller Group Members. |
| **2. Eligibility Criteria** | a) Eligible Employees |
| | Former Employees (other than Transferred Employees) who: |

    a) whose employment relationship with the applicable Seller Group Member were terminated either by the applicable Seller Group Member (excluding for just cause) or by mutual agreement effective on or after January 1, 2020 (irrespective of the date on which the notice was given), and remained employees in good standing until their services were no longer required;

    b) is not an Eligible Contractor as defined in the Contractor Fund;

    c) whose entitlement to receive a severance payment from the applicable Seller Group Member has not been paid as a result of the CCAA proceedings.

(collectively, the "Eligible Employees").

b) Excluded Employees

Transferred Employees and Employees who do not meet the eligibility requirements in paragraph a).

**3. Benefits**

The Settlor is seeking to treat Eligible Employees in a fair, equitable and consistent manner.

The Employee Fund would be designed to provide for a one-time lump sum payment to each Eligible Employee based on parameters to be determined but the benefit will to be structured as a flat benefit per individual (the "Benefit").

All distributions to be subject to all applicable tax and other withholdings.

The Settlor will make reasonable efforts to secure an agreement with the federal government after CCAA filing so that Benefits from the Employee Fund will not result in a reduction or claw back of government benefits (EI / WEPP benefits / CERB), but there can be no guarantee that this result can be achieved.

**4. Application Process**

The administrator will be identifying Eligible Employees based on Seller Group records and proceed with the payment of the Benefits. The mechanics of the application process remain to be determined.

Payments of Benefits will be made directly through existing Seller Group payroll system or by the administrator with the assistance of Seller Group Members.

Seller Group Members will cooperate with the administrator for the purposes of the Employee Fund.

**5. Release**

Payment of the Benefit to be conditional on the execution of a release. Mechanics by which each Eligible Employee accepts a distribution amount and grants release/other condition to be determined.

**6. Conditions Precedent**

The Employee Fund will not be settled until (i) the successful Closing of the transactions contemplated by the Asset Purchase Agreement; (ii) a Court order is granted which (x) approves the Employee Fund on the terms and conditions set out in the trust agreement, (y) declares that the Settlor shall not be or be deemed to be an employer or a common, related or successor employer with respect to any Employee as a result of settling the trust, and (iii) the court order survives any challenges and/or the applicable appeal periods have expired. Unless and until all conditions precedent are met, there is no obligation for the Settlor to establish the Employee Fund.

**7.  Termination**   The Employee Fund shall terminate upon the date on which the Settlor and administrator agree the Employee Fund should terminate. Any remaining assets in the Employee Fund are to be returned to the Settlor.

**EXHIBIT E**

**FORMS OF EMPLOYMENT AGREEMENT AMENDMENTS**
**(See attached)**



LE GROUPE
CIRQUE DU SOLEIL
ENTERTAINMENT GROUP

**[RSD Show Staff - Revised Terms of Employment letter – CDS Nevada]**

xxx, 2020

**ELECTRONICALLY DELIVERED**

[Name]

[Address]

Re:       Revised Terms of Employment

Dear [●],

This letter agreement (this "Agreement") provides an update on your employment with Cirque du Soleil Nevada, Inc. ("Cirque"), including revised terms and the offer of a retention bonus.

On March 19, 2020, you received notice of your temporary layoff due to the Coronavirus ("COVID-19") pandemic (the "Notice").  You agree that the Notice satisfies any obligation that may exist in respect of your employment or its future termination under (a) the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. and any other similar state or local law (the "WARN Act"), and (b) any offer letter, contract of employment or other agreement or arrangement with Cirque or any of its affiliates (collectively, your "Employment Agreement").

Retention Bonus.  Subject to your execution of this Agreement, Cirque will pay you a one-time retention bonus in an amount equal to USD $1,000, less all applicable withholdings and deductions (the "Retention Bonus").  The Retention Bonus shall be payable as a lump sum amount (a) in the pay period that includes the date you are called back for rehearsals in anticipation of the reopening of your show provided that you have returned to active employment for such rehearsals, or (b) within ten (10) days following the date that Cirque notifies you that (i) you will not be called back for rehearsals and instead your employment will be terminated and (ii) you have not been offered employment by a successor employer.  For the avoidance of doubt, you will not be entitled to a Retention Bonus upon termination of your employment in the event that you are offered employment by a successor employer and you refuse such offer for any reason, regardless of the terms or conditions you are offered and regardless of whether you choose to accept such offer of employment.  You must  electronically execute and deliver this Agreement to Cirque within 48 hours following the date of this letter (the "Execution Deadline").  Failure to do so within the Execution deadline shall be deemed a refusal of this Agreement and will lead to the immediate termination of your employment with Cirque.

Amendments to Existing Arrangements.

**Schedule:** Moving forward, you hereby acknowledge and agree that (i) any performances, shows, rehearsals, or other events, days or periods of work that require compensation, shall be set at the sole discretion of Cirque, which will also depend on the Cirque's ability to reopen performance and rehearsal venues and put on performances, which is outside of Cirque's control.

**Waiver of Severance**: To the extent you are party to any Employment Agreement which provides you with any rights or contains any agreements regarding severance or other remuneration upon termination of employment (collectively, "Severance"), such Severance rights or agreements are hereby null and void and of no further force or effect.  You also hereby acknowledge and agree that no Severance obligations have been triggered or are owed.

Your Employment Agreement shall be deemed amended in accordance with the foregoing and this Agreement.

Release.

You, on behalf of yourself and your heirs, executors, administrators, successors and assigns, hereby voluntarily, unconditionally, irrevocably and absolutely release and discharge Cirque, and its parents, and each of their respective subsidiaries and affiliates, and all of their respective past, present and future employees, officers, directors, managers, agents, owners, shareholders, representatives, members, attorneys, insurers, benefit plans and plan administrators, and all of their respective predecessors, successors and assigns (collectively, the "Released Parties"), from all claims, demands, causes of action, suits, controversies, actions, demands, debts, promises, agreements, rights, compensatory damages, liquidated damages, punitive or exemplary damages, any other damages, claims for costs and attorneys' fees, losses or liabilities of any nature whatsoever in law and in equity and any other liabilities, known or unknown, suspected or unsuspected of any nature whatsoever (hereinafter, "Claims") that you have or may have against the Released Parties: (i) arising from or in any way related to your employment, termination of employment, or temporary or permanent layoff with any of the Released Parties; (ii) arising from or in any way related to any Employment Agreement, layoff notice or other agreement with any of the Released Parties; and/or (iii) arising from or in any way related to awards, policies, plans, programs or practices of any of the Released Parties that may apply to you or in which you may participate, or any allegation, Claim or violation, arising under any federal, state or local law, including, but not limited to, under the WARN Act.

In addition to the foregoing, you agree that you have waived any Claims related to the WARN Act, including Cirque's provision of notice to you, the exceptions claimed by Cirque, and any damages related to any Claim that Cirque is not able to bring you back to work at any point in the future or is not able to return you to similar employment conditions which you enjoyed prior to your temporary layoff.  You agree that this waiver of WARN Act Claims relates to any actual or deemed future termination of your employment relating to your layoff, and return, or inability to return, to work.  You agree that you will not accrue a WARN Act Claim at any point in the future, and that any such WARN Act Claim has already accrued and been released by this Agreement.

You understand that you may later discover Claims or facts that may be different than, or in addition to, those which you now know or believe to exist with regards to the subject matter of this Agreement, and which, if known at the time of executing this Agreement, may have materially affected this Agreement or your decision to enter into it.  You hereby waive any right or Claim that might arise as a result of such different or additional Claims or facts. This Agreement is not intended to bar any Claims that may not be waived by private agreement under applicable law.

Nothing in this Agreement is intended to prohibit or restrict your right to file a charge with or participate in a charge by the Equal Employment Opportunity Commission, or any other local, state, or federal administrative body or government agency that is authorized to enforce or administer laws related to employment; provided that you hereby waive the right to recover any monetary damages or other relief against any Released Parties; provided, however, that nothing in this Agreement shall prohibit you from receiving any monetary award to which you become entitled pursuant to Section 922 of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

Voluntary Agreement.  You have carefully read and fully understand all of the provisions of this Agreement.  You are entering into this Agreement, knowingly, freely and voluntarily in exchange for good and valuable consideration to which you would not be entitled in the absence of executing this Agreement.  You acknowledge that you have been given an adequate opportunity from your receipt of this Agreement to consider the terms of this Agreement and to determine whether you wish to sign it.  You must electronically sign and return this Agreement by the Execution Deadline, otherwise the offer of this Agreement is null and void.

Savings Clause.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision of this Agreement is invalid, illegal or unenforceable, this Agreement shall be enforceable as closely as possible to its original intent, which is to provide the Released Parties with a full release of all legally releasable Claims through the date upon which you sign this Agreement.

<u>Miscellaneous</u>.  You acknowledge and agree that all Released Parties are third-party beneficiaries of this Agreement and have the right to enforce this Agreement.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Nevada, without regard to the application of any choice-of-law rules that would result in the application of another state's laws. This Agreement sets forth your entire agreement with Cirque with respect to the subject matter hereof and shall supersede all prior and contemporaneous communications, negotiations, agreements and understandings, written or oral, with respect thereto.  This Agreement may not be modified, amended or waived unless mutually agreed to in writing by you and an authorized representative of Cirque.  This Agreement and the Employment Agreement may be assigned by Cirque and upon such assignment, the rights and obligations of Cirque hereunder shall become the rights and obligations of such assigned party. This Agreement does not modify your at-will employment status with Cirque.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

**Cirque du Soleil Nevada, Inc.**

By: _____

Name:   Eric Grilly

Title:    Senior Vice-President - Resident Shows Division

**Employee**

1. _____

Name:  NAME

2. Signed on: date of signature



LE GROUPE
CIRQUE DU SOLEIL
ENTERTAINMENT GROUP

**[RSD Show Staff - Revised Terms of Employment letter – CDS Orlando]**


xxx, 2020

**ELECTRONICALLY DELIVERED**

[Name]

[Address]


Re:      Revised Terms of Employment

Dear [●],

This letter agreement (this "Agreement") provides an update on your employment with Cirque du Soleil Orlando, L.L.C. ("Cirque"), including revised terms and the offer of a retention bonus.

On March 19, 2020, you received notice of your temporary layoff due to the Coronavirus ("COVID-19") pandemic (the "Notice").  You agree that the Notice satisfies any obligation that may exist in respect of your employment or its future termination under (a) the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. and any other similar state or local law (the "WARN Act"), and (b) any offer letter, contract of employment or other agreement or arrangement with Cirque or any of its affiliates (collectively, your "Employment Agreement").

Retention Bonus.  Subject to your execution of this Agreement, Cirque will pay you a one-time retention bonus in an amount equal to USD $1,000, less all applicable withholdings and deductions (the "Retention Bonus").  The Retention Bonus shall be payable as a lump sum amount (a) in the pay period that includes the date you are called back for rehearsals in anticipation of the reopening of your show provided that you have returned to active employment for such rehearsals, or (b) within ten (10) days following the date that Cirque notifies you that (i) you will not be called back for rehearsals and instead your employment will be terminated and (ii) you have not been offered employment by a successor employer.  For the avoidance of doubt, you will not be entitled to a Retention Bonus upon termination of your employment in the event that you are offered employment by a successor employer and you refuse such offer for any reason, regardless of the terms or conditions you are offered and regardless of whether you choose to accept such offer of employment.  You must  electronically execute and deliver this Agreement to Cirque within 48 hours following the date of this letter (the "Execution Deadline").  Failure to do so within the Execution deadline shall be deemed a refusal of this Agreement and will lead to the immediate termination of your employment with Cirque.

Amendments to Existing Arrangements.

**Schedule:** Moving forward, you hereby acknowledge and agree that (i) any performances, shows, rehearsals, or other events, days or periods of work that require compensation, shall be set at the sole discretion of Cirque, which will also depend on the Cirque's ability to reopen performance and rehearsal venues and put on performances, which is outside of Cirque's control.

**Waiver of Severance**: To the extent you are party to any Employment Agreement which provides you with any rights or contains any agreements regarding severance or other remuneration upon termination of employment

(collectively, "<u>Severance</u>"), such Severance rights or agreements are hereby null and void and of no further force or effect.  You also hereby acknowledge and agree that no Severance obligations have been triggered or are owed.

Your Employment Agreement shall be deemed amended in accordance with the foregoing and this Agreement.

<u>Release</u>.

You, on behalf of yourself and your heirs, executors, administrators, successors and assigns, hereby voluntarily, unconditionally, irrevocably and absolutely release and discharge Cirque, and its parents, and each of their respective subsidiaries and affiliates, and all of their respective past, present and future employees, officers, directors, managers, agents, owners, shareholders, representatives, members, attorneys, insurers, benefit plans and plan administrators, and all of their respective predecessors, successors and assigns (collectively, the "<u>Released Parties</u>"), from all claims, demands, causes of action, suits, controversies, actions, demands, debts, promises, agreements, rights, compensatory damages, liquidated damages, punitive or exemplary damages, any other damages, claims for costs and attorneys' fees, losses or liabilities of any nature whatsoever in law and in equity and any other liabilities, known or unknown, suspected or unsuspected of any nature whatsoever (hereinafter, "<u>Claims</u>") that you have or may have against the Released Parties: (i) arising from or in any way related to your employment, termination of employment, or temporary or permanent layoff with any of the Released Parties; (ii) arising from or in any way related to any Employment Agreement, layoff notice or other agreement with any of the Released Parties; and/or (iii) arising from or in any way related to awards, policies, plans, programs or practices of any of the Released Parties that may apply to you or in which you may participate, or any allegation, Claim or violation, arising under any federal, state or local law, including, but not limited to, under the WARN Act.

In addition to the foregoing, you agree that you have waived any Claims related to the WARN Act, including Cirque's provision of notice to you, the exceptions claimed by Cirque, and any damages related to any Claim that Cirque is not able to bring you back to work at any point in the future or is not able to return you to similar employment conditions which you enjoyed prior to your temporary layoff.  You agree that this waiver of WARN Act Claims relates to any actual or deemed future termination of your employment relating to your layoff, and return, or inability to return, to work.  You agree that you will not accrue a WARN Act Claim at any point in the future, and that any such WARN Act Claim has already accrued and been released by this Agreement.

You understand that you may later discover Claims or facts that may be different than, or in addition to, those which you now know or believe to exist with regards to the subject matter of this Agreement, and which, if known at the time of executing this Agreement, may have materially affected this Agreement or your decision to enter into it.  You hereby waive any right or Claim that might arise as a result of such different or additional Claims or facts. This Agreement is not intended to bar any Claims that may not be waived by private agreement under applicable law.

Nothing in this Agreement is intended to prohibit or restrict your right to file a charge with or participate in a charge by the Equal Employment Opportunity Commission, or any other local, state, or federal administrative body or government agency that is authorized to enforce or administer laws related to employment; provided that you hereby waive the right to recover any monetary damages or other relief against any Released Parties; provided, however, that nothing in this Agreement shall prohibit you from receiving any monetary award to which you become entitled pursuant to Section 922 of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

<u>Voluntary Agreement</u>.  You have carefully read and fully understand all of the provisions of this Agreement.  You are entering into this Agreement, knowingly, freely and voluntarily in exchange for good and valuable consideration to which you would not be entitled in the absence of executing this Agreement.  You acknowledge that you have been given an adequate opportunity from your receipt of this Agreement to consider the terms of this Agreement and to determine whether you wish to sign it.  You must electronically sign and return this Agreement by the Execution Deadline, otherwise the offer of this Agreement is null and void.

Savings Clause.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision of this Agreement is invalid, illegal or unenforceable, this Agreement shall be enforceable as closely as possible to its original intent, which is to provide the Released Parties with a full release of all legally releasable Claims through the date upon which you sign this Agreement.

Miscellaneous.  You acknowledge and agree that all Released Parties are third-party beneficiaries of this Agreement and have the right to enforce this Agreement.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Nevada, without regard to the application of any choice-of-law rules that would result in the application of another state's laws. This Agreement sets forth your entire agreement with Cirque with respect to the subject matter hereof and shall supersede all prior and contemporaneous communications, negotiations, agreements and understandings, written or oral, with respect thereto.  This Agreement may not be modified, amended or waived unless mutually agreed to in writing by you and an authorized representative of Cirque.  This Agreement and the Employment Agreement may be assigned by Cirque and upon such assignment, the rights and obligations of Cirque hereunder shall become the rights and obligations of such assigned party. This Agreement does not modify your at-will employment status with Cirque.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

 **Cirque du Soleil orlando, l.l.c.**

By: _____
Name:    Eric Grilly

Title:      Senior Vice-President - Resident Shows Division

**Employee**

        3.      **_____**
**Name:  NAME**

        4.        Signed on: date of signature



LE GROUPE
CIRQUE DU SOLEIL
ENTERTAINMENT GROUP

**[RSD Artists- Revised Terms of Employment letter – CDS Nevada]**

xxx, 2020

**ELECTRONICALLY DELIVERED**

[Name]

[Email Address]

Re:        Revised Terms of Employment

Dear [●],

This letter agreement (this **Agreement**) provides an update on your employment with Cirque du Soleil Nevada, Inc. (**Cirque**), including revised terms and the offer of a retention bonus.

On March 19, 2020, you received notice of your temporary layoff due to the coronavirus pandemic (**Notice**). You agree that the Notice satisfies any obligation that may exist in respect of your employment or its future termination under (a) the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. and any other similar state or local law (**WARN Act**), and (b) any offer letter, contract of employment or other agreement or arrangement with Cirque or any of its affiliates (collectively, your **Employment Agreement**).

Retention Bonus.  Subject to your execution of this Agreement, Cirque will pay you a one-time retention bonus in an amount equal to US$1,000, less all applicable withholdings and deductions (**Retention Bonus**).  The Retention Bonus shall be payable as a lump sum amount (a) in the pay period that includes the date you are called back for rehearsals in anticipation of the reopening of your show provided that you have returned to active employment for such rehearsals, or (b) within 10 days following the date that Cirque notifies you that (i) you will not be called back for rehearsals and instead your employment will be terminated and (ii) you have not been offered employment by a successor employer.  For the avoidance of doubt, you will not be entitled to a Retention Bonus upon termination of your employment in the event that you are offered employment by a successor employer and you refuse such offer for any reason, regardless of the terms or conditions you are offered and regardless of whether you choose to accept such offer of employment.  You must electronically execute and deliver this Agreement to Cirque within 48 hours following the date of this letter (**Execution Deadline**).  Failure to do so within the Execution Deadline shall be deemed a refusal of this Agreement and will lead to the immediate termination of your employment with Cirque.

Amendments to Employment Agreement.  Your Employment Agreement shall be deemed amended in accordance with the following and this Agreement:

***Annulment of Guarantees***: Any guarantee or premium (annual, weekly or otherwise) mentioned in your Employment Agreement related to the number of performances, shows, rehearsals, or other events, days or periods of work that require compensation or any circumstances which require compensation in lieu thereof (collectively, **Guarantees**) are hereby null and void and of no further force or effect. Moving forward, you hereby acknowledge and agree that (i) any performances, shows, rehearsals, or other events, days or periods of work that require compensation including premiums, shall be set at the sole discretion of Cirque, which will also depend on the Cirque's ability to reopen performance and rehearsal venues and put on performances, which is outside of Cirque's control.

- E8 -

**Waiver of Severance**: You agree that moving forward, the severance provisions of your Employment Agreement (collectively, **Severance**), are hereby null and void and of no further force or effect.  You also acknowledge that no Severance obligations have been triggered, are owed, or will be owed at any point in the future.

**Extension**: Should your Employment Agreement expire during your temporary layoff, you acknowledge and agree that such Employment Agreement has been extended (subject to this Agreement) for a period of six months following the date it would have otherwise expired at the same remuneration as was in effect prior to the renewal without the benefit of any increased renewal-based amounts, rights or benefits.

Release.

You, on behalf of yourself and your heirs, executors, administrators, successors and assigns, hereby voluntarily, unconditionally, irrevocably and absolutely release and discharge Cirque, and its parents, and each of their respective subsidiaries and affiliates, and all of their respective past, present and future employees, officers, directors, managers, agents, owners, shareholders, representatives, members, attorneys, insurers, benefit plans and plan administrators, and all of their respective predecessors, successors and assigns (collectively, **Released Parties**), from all claims, demands, causes of action, suits, controversies, actions, demands, debts, promises, agreements, rights, compensatory damages, liquidated damages, punitive or exemplary damages, any other damages, claims for costs and attorneys' fees, losses or liabilities of any nature whatsoever in law and in equity and any other liabilities, known or unknown, suspected or unsuspected of any nature whatsoever (hereinafter, **Claims**) that you have or may have against the Released Parties: (i) arising from or in any way related to your employment, termination of employment, or temporary or permanent layoff with any of the Released Parties; (ii) arising from or in any way related to any Employment Agreement, layoff notice or other agreement with any of the Released Parties; and/or (iii) arising from or in any way related to awards, policies, plans, programs or practices of any of the Released Parties that may apply to you or in which you may participate, or any allegation, Claim or violation, arising under any federal, state or local law, including, but not limited to, under the WARN Act.

In addition to the foregoing, you agree that you have waived any Claims related to the WARN Act, including Cirque's provision of notice to you, the exceptions claimed by Cirque, and any damages related to any Claim that Cirque is not able to bring you back to work at any point in the future or is not able to return you to similar employment conditions which you enjoyed prior to your temporary layoff.  You agree that this waiver of WARN Act Claims relates to any actual or deemed future termination of your employment relating to your layoff, and return, or inability to return, to work.  You agree that you will not accrue a WARN Act Claim at any point in the future, and that any such WARN Act Claim has already accrued and been released by this Agreement.

You understand that you may later discover Claims or facts that may be different than, or in addition to, those which you now know or believe to exist with regards to the subject matter of this Agreement, and which, if known at the time of executing this Agreement, may have materially affected this Agreement or your decision to enter into it.  You hereby waive any right or Claim that might arise as a result of such different or additional Claims or facts. This Agreement is not intended to bar any Claims that may not be waived by private agreement under applicable law.

Nothing in this Agreement is intended to prohibit or restrict your right to file a charge with or participate in a charge by the Equal Employment Opportunity Commission, or any other local, state, or federal administrative body or government agency that is authorized to enforce or administer laws related to employment; provided that you hereby waive the right to recover any monetary damages or other relief against any Released Parties; provided, however, that nothing in this Agreement shall prohibit you from receiving any monetary award to which you become entitled pursuant to Section 922 of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

Voluntary Agreement.  You have carefully read and fully understand all of the provisions of this Agreement.  You are entering into this Agreement, knowingly, freely and voluntarily in exchange for good and valuable consideration to which you would not be entitled in the absence of executing this Agreement.  You acknowledge that you have been given an adequate opportunity from your receipt of this Agreement to consider the terms of

this Agreement and to determine whether you wish to sign it.  You must electronically sign and return this Agreement by the Execution Deadline, otherwise the offer of this Agreement is null and void.

Savings Clause.  If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction.  Upon such determination that any term or other provision of this Agreement is invalid, illegal or unenforceable, this Agreement shall be enforceable as closely as possible to its original intent, which is to provide the Released Parties with a full release of all legally releasable Claims through the date upon which you sign this Agreement.

Miscellaneous.  You acknowledge and agree that all Released Parties are third-party beneficiaries of this Agreement and have the right to enforce this Agreement.  This Agreement shall be governed by, and construed in accordance with, the laws of the State of Nevada, without regard to the application of any choice-of-law rules that would result in the application of another state's laws. This Agreement sets forth your entire agreement with Cirque with respect to the subject matter hereof and shall supersede all prior and contemporaneous communications, negotiations, agreements and understandings, written or oral, with respect thereto.  This Agreement may not be modified, amended or waived unless mutually agreed to in writing by you and an authorized representative of Cirque. This Agreement and the Employment Agreement may be assigned by Cirque and upon such assignment, the rights and obligations of Cirque hereunder shall become the rights and obligations of such assigned party.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

**Cirque du Soleil Nevada, Inc.**

By: _____
Name:   Eric Grilly

Title:      Senior Vice-President - Resident Shows Division

**Employee**

      5.       _____
**Name:  NAME**

      6.       Signed on: date of signature



LE GROUPE
CIRQUE DU SOLEIL
ENTERTAINMENT GROUP

**[RSD Artists- Revised Terms of Employment letter – Extension Expired Contracts -CDS Nevada]**

XXX, 2020

<u>**ELECTRONICALLY DELIVERED**</u>

[Name]

[Email Address]

Re:      <u>Revised Terms of Employment</u>

Dear [●],

This letter agreement (this **Agreement**) provides an update on your employment with Cirque du Soleil Nevada, Inc. (**Cirque**), including revised terms and the offer of a retention bonus.

On March 19, 2020, you received notice of your temporary layoff due to the coronavirus pandemic (**Notice**).  You agree that the Notice satisfies any obligation that may exist in respect of your employment or its future termination under (a) the Worker Adjustment and Retraining Notification Act, 29 U.S.C. § 2101 et seq. and any other similar state or local law (**WARN Act**), and (b) any offer letter, contract of employment or other agreement or arrangement with Cirque or any of its affiliates (collectively, your **Employment Agreement**).

<u>Retention Bonus</u>.  Subject to your execution of this Agreement, Cirque will pay you a one-time retention bonus in an amount equal to US$1,000, less all applicable withholdings and deductions (**Retention Bonus**).  The Retention Bonus shall be payable as a lump sum amount (a) in the pay period that includes the date you are called back for rehearsals in anticipation of the reopening of your show provided that you have returned to active employment for such rehearsals, or (b) within 10 days following the date that Cirque notifies you that (i) you will not be called back for rehearsals and instead your employment will be terminated and (ii) you have not been offered employment by a successor employer.  For the avoidance of doubt, you will not be entitled to a Retention Bonus upon termination of your employment in the event that you are offered employment by a successor employer and you refuse such offer for any reason, regardless of the terms or conditions you are offered and regardless of whether you choose to accept such offer of employment.  You must electronically execute and deliver this Agreement to Cirque within 48 hours following the date of this letter (**Execution Deadline**).  Failure to do so within the Execution Deadline shall be deemed a refusal of this Agreement and will lead to the immediate termination of your employment with Cirque.

<u>Amendments to Employment Agreement</u>.  Your Employment Agreement shall be deemed amended in accordance with the following and this Agreement:

***Annulment of Guarantees***: Any guarantee or premium (annual, weekly or otherwise) mentioned in your Employment Agreement related to the number of performances, shows, rehearsals, or other events, days or periods of work that require compensation or any circumstances which require compensation in lieu thereof (collectively, **Guarantees**) are hereby null and void and of no further force or effect. Moving forward, you hereby acknowledge and agree that (i) any performances, shows, rehearsals, or other events, days or periods of work that require compensation including premiums, shall be set at the sole discretion of Cirque, which will also depend on the Cirque's ability to reopen performance and rehearsal venues and put on performances, which is outside of Cirque's control.

**Waiver of Severance**: You agree that moving forward, the severance provisions of your Employment Agreement (collectively, **Severance**), are hereby null and void and of no further force or effect.  You also acknowledge that no Severance obligations have been triggered, are owed, or will be owed at any point in the future.

**Extension**: As your Employment Agreement has expired during your leave, it is hereby agreed that it is extended to _____2020 at the same remuneration as was in effect prior to the expiry without the benefit of any increased renewal-based amounts, rights or benefits. Furthermore, should your Employment Agreement subsequently expire during your temporary layoff, you acknowledge and agree that such Employment Agreement has been extended (subject to this Agreement) for a period of six months following the date it would have otherwise expired, at the same remuneration as was in effect prior to the renewal without the benefit of any increased renewal-based amounts, rights or benefits.

Release.

You, on behalf of yourself and your heirs, executors, administrators, successors and assigns, hereby voluntarily, unconditionally, irrevocably and absolutely release and discharge Cirque, and its parents, and each of their respective subsidiaries and affiliates, and all of their respective past, present and future employees, officers, directors, managers, agents, owners, shareholders, representatives, members, attorneys, insurers, benefit plans and plan administrators, and all of their respective predecessors, successors and assigns (collectively, **Released Parties**), from all claims, demands, causes of action, suits, controversies, actions, demands, debts, promises, agreements, rights, compensatory damages, liquidated damages, punitive or exemplary damages, any other damages, claims for costs and attorneys' fees, losses or liabilities of any nature whatsoever in law and in equity and any other liabilities, known or unknown, suspected or unsuspected of any nature whatsoever (hereinafter, **Claims**) that you have or may have against the Released Parties: (i) arising from or in any way related to your employment, termination of employment, or temporary or permanent layoff with any of the Released Parties; (ii) arising from or in any way related to any Employment Agreement, layoff notice or other agreement with any of the Released Parties; and/or (iii) arising from or in any way related to awards, policies, plans, programs or practices of any of the Released Parties that may apply to you or in which you may participate, or any allegation, Claim or violation, arising under any federal, state or local law, including, but not limited to, under the WARN Act.

In addition to the foregoing, you agree that you have waived any Claims related to the WARN Act, including Cirque's provision of notice to you, the exceptions claimed by Cirque, and any damages related to any Claim that Cirque is not able to bring you back to work at any point in the future or is not able to return you to similar employment conditions which you enjoyed prior to your temporary layoff.  You agree that this waiver of WARN Act Claims relates to any actual or deemed future termination of your employment relating to your layoff, and return, or inability to return, to work.  You agree that you will not accrue a WARN Act Claim at any point in the future, and that any such WARN Act Claim has already accrued and been released by this Agreement.

You understand that you may later discover Claims or facts that may be different than, or in addition to, those which you now know or believe to exist with regards to the subject matter of this Agreement, and which, if known at the time of executing this Agreement, may have materially affected this Agreement or your decision to enter into it.  You hereby waive any right or Claim that might arise as a result of such different or additional Claims or facts. This Agreement is not intended to bar any Claims that may not be waived by private agreement under applicable law.

Nothing in this Agreement is intended to prohibit or restrict your right to file a charge with or participate in a charge by the Equal Employment Opportunity Commission, or any other local, state, or federal administrative body or government agency that is authorized to enforce or administer laws related to employment; provided that you hereby waive the right to recover any monetary damages or other relief against any Released Parties; provided, however, that nothing in this Agreement shall prohibit you from receiving any monetary award to which you become entitled pursuant to Section 922 of the Dodd-Frank Wall Street Reform and Consumer Protection Act.

Voluntary Agreement.  You have carefully read and fully understand all of the provisions of this Agreement.  You are entering into this Agreement, knowingly, freely and voluntarily in exchange for good and valuable

consideration to which you would not be entitled in the absence of executing this Agreement. You acknowledge that you have been given an adequate opportunity from your receipt of this Agreement to consider the terms of this Agreement and to determine whether you wish to sign it. You must electronically sign and return this Agreement by the Execution Deadline, otherwise the offer of this Agreement is null and void.

Savings Clause. If any term or provision of this Agreement is invalid, illegal or unenforceable in any jurisdiction, such invalidity, illegality or unenforceability shall not affect any other term or provision of this Agreement or invalidate or render unenforceable such term or provision in any other jurisdiction. Upon such determination that any term or other provision of this Agreement is invalid, illegal or unenforceable, this Agreement shall be enforceable as closely as possible to its original intent, which is to provide the Released Parties with a full release of all legally releasable Claims through the date upon which you sign this Agreement.

Miscellaneous. You acknowledge and agree that all Released Parties are third-party beneficiaries of this Agreement and have the right to enforce this Agreement. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Nevada, without regard to the application of any choice-of-law rules that would result in the application of another state's laws. This Agreement sets forth your entire agreement with Cirque with respect to the subject matter hereof and shall supersede all prior and contemporaneous communications, negotiations, agreements and understandings, written or oral, with respect thereto. This Agreement may not be modified, amended or waived unless mutually agreed to in writing by you and an authorized representative of Cirque. This Agreement and the Employment Agreement may be assigned by Cirque and upon such assignment, the rights and obligations of Cirque hereunder shall become the rights and obligations of such assigned party.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement.

**Cirque du Soleil Nevada, Inc.**


By: _____
Name:   Eric Grilly

Title:    Senior Vice-President - Resident Shows Division

**Employee**


_____
Name:  NAME

Signed on:

**EXHIBIT F**

**THE CONTRACTOR FUND**

*This summary of terms and conditions has been prepared for convenience of reference purposes only. This summary is not an exhaustive description of the terms which will be set out in the Trust Agreement (as defined below) and the terms remain subject to ongoing discussions between the Buyer, the Seller Group and the Monitor. In the event of a conflict between this summary and the Trust Agreement, the latter shall govern. All monetary amounts in this summary refer to Canadian dollars unless otherwise specified.*

| | |
|---|---|
| **1. Creation of the Contractor Fund** | Subject to the conditions precedent set out below, the Settlor shall establish a trust fund to provide financial assistance to Contractors (the "<u>Contractor Fund</u>"). |
| | Subject to any provisions to the contrary, the Settlor shall fund an aggregate, maximum amount of USD 5,000,000 to the Contractor Fund. No further contribution may be required from the Settlor. |
| | Monitor to act as administrator of the Contractor Fund. |
| | No Seller Group monies to be used to fund the Contractor Fund. |
| | The Contractor Fund will be settled on a gratuitous, without prejudice basis, and may not be used in any way to deem the Settlor or any of its Affiliates an employer, a related or common employer with any of the Seller Group Members, or a client of the Settlor or any of its Affiliates. |
| **2. Eligibility Criteria** | a) Eligible Contractors |
| | The Contractors who: |

a) have not provided notice of termination of their service agreement to the applicable Seller Group Member and have not received notice of termination of their service agreement from the applicable Seller Group Member as a result of a material breach of such agreement;

b) are not Eligible Employees pursuant to the Employee Fund; and

c) had their payments for services provided to the applicable Seller Group Member suspended as a result of the CCAA Proceedings

(collectively, the "<u>Eligible Contractors</u>").

b) Excluded Contractors

Contractors who do not meet the eligibility requirements in paragraph

a) and Contractors whose Contract is a Creator Contract.

Notwithstanding the maximum amount described herein, if the Buyer require the Seller Group to terminate certain Creator Contracts prior to the Closing pursuant to Section 7.24(b), the Contractors affected by such terminations will become Eligible Contractors upon termination and the Settlor shall make an additional contribution to the Contractor Fund in an amount that is sufficient to provide the Benefit (as defined below).

**3. Benefits**

The Settlor is seeking to treat Eligible Contractors in a fair, equitable and consistent manner.

The Contractor Fund would be designed to provide for a one-time lump sum payment to each Eligible Contractor equal to the amount owed by the applicable Seller Group Member to such Contractor as of the Filing (the "Benefit").

All distributions to be subject to all applicable tax and other withholdings.

**4. Application Process**

The administrator will be indemnifying Eligible Contractors based on Seller Group records and proceed with the payment of the Benefits. The mechanics of the application process remain to be determined.

Payments of Benefits will be made by the administrator (monitor).

Seller Group Members will cooperate with the administrator for the purposes of the Contractor Fund.

**5. Release**

Payment of the Benefit to be conditional on the execution of a release. Mechanics by which each Eligible Contractors accepts a distribution amount and grants release/other condition to be determined.

**6. Conditions Precedent**

The Contractor Fund will not be settled until (i) the successful Closing of the transactions contemplated by the Asset Purchase Agreement; (ii) a Court order is granted which (x) approves the Contractor Fund on the terms and conditions set out in the trust agreement, (y) declares that the Settlor shall not be or be deemed to be a client, an employer or a common, related or successor employer or client with respect to any Contractor as a result of settling the trust, and (iii) the court order survives any challenges and/or the applicable appeal periods have expired. Unless and until all conditions precedent are met, there is no obligation for the Settlor to establish the Contractor Fund.

**7. Termination**

The Contractor Fund shall terminate upon the date on which the Settlor and administrator agree the Contractor Fund should terminate. Any remaining assets in the Contractor Fund are to be returned to the Settlor.

**EXHIBIT G**

**FORM OF JOINT DIRECTION**

**TO :   ERNST & YOUNG INC., in its capacity as CCAA Court-appointed monitor of the Applicants pursuant to the Initial CCAA Order (the "Monitor")**

Reference is made to the Asset Purchase Agreement dated as of July 15, 2020 among CIRQUE DU SOLEIL HOLDINGS L.P. and SPECTACLE BIDCO LP (the **APA**"). All capitalized terms and expressions used in this notice have the meaning ascribed to them in the APA.

Whereas pursuant to the APA, an amount equal to $● (the "**Deposit**") was paid to the order of the Monitor, in trust. In accordance with Section 3.2 of the APA, the undersigned  hereby irrevocably direct, instruct and authorize you to release an amount equal to the Deposit together with all interest accrued thereon to _____ by wire transfer of immediately available funds to the following account, and this shall be your good and sufficient authority for doing so:

●
[Name of financial institution]
[Address]
Transit #: ●, Swift Code: ●
Bank Code ●
Account #: ●

This Joint Direction may be executed in any number of counterparts and transmitted electronically with the same effect as if all parties to this Joint Direction had signed and delivered the same document and all counterparts will be construed together as an original and will constitute one and the same agreement.

Dated _____, ●.

**CIRQUE DU SOLEIL HOLDINGS L.P.**
acting through its general partner, **CIRQUE DU SOLEIL GP INC.**

**SPECTACLE BIDCO LP** acting through its general partner, **DRIVETRAIN AGENCY SERVICES, LLC**

Per: _____        Per: _____
       Name:                                                      Name:
       Title:                                                         Title:

**EXHIBIT H**

**<u>FORM OF DIRECTION LETTERS</u>**

Execution Version

July 15, 2020

Royal Bank of Canada, as Administrative Agent and Collateral Agent
4th Floor, 20 King Street West
Toronto, Ontario
M5H 1C4

Re:   CDS U.S. Intermediate Holdings, Inc. and Cirque du Soleil Canada Inc.

Ladies and Gentlemen:

Reference is made to (a) that certain First Lien Credit Agreement, dated as of July 8, 2015 (as amended by that certain Amendment No. 1, dated as of June 30, 2017, that certain Amendment No. 2, dated as of June 30, 2017, that certain Amendment No. 3, dated as of June 30, 2017, that certain Amendment No. 4, dated as of July 3, 2018, that certain Amendment No. 5, dated as of March 8, 2019, that certain Amendment No. 6, dated as of June 5, 2020 and as further amended, supplemented, amended and restated or otherwise modified from time to time, the "Credit Agreement"), by and among CIRQUE DU SOLEIL HOLDINGS LP, a limited partnership formed under the laws of the Province of Québec ("Holdings"), CDS U.S. INTERMEDIATE HOLDINGS, INC., a Delaware corporation (the "U.S. Borrower" and "Borrower Representative"), CIRQUE DU SOLEIL CANADA INC., a corporation organized under the laws of the Province of Québec (the "Canadian Borrower" and together with the U.S. Borrower, the "Borrowers"), ROYAL BANK OF CANADA, as administrative agent and collateral agent (in such capacity, the "Administrative Agent"), and (b) the Collateral Documents. Unless otherwise specified herein, capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Credit Agreement.

The Borrowers and certain of their affiliates have commenced (i) proceedings under the *Companies' Creditors Arrangement Act* (Canada) before the Superior Court of Québec (Commercial Division) to, among other things, seek creditor protection for, and certain relief in respect of, the Borrowers and certain of their affiliates (the "Canada Proceedings") and (ii) ancillary insolvency proceedings under Chapter 15 of Title 11 of the United States Code in the U.S. Bankruptcy Court (the "U.S. Proceedings", and, together with the Canada Proceedings, the "Restructuring Proceedings"). Pursuant to Section 8.01(f) of the Credit Agreement, commencement of such Restructuring Proceedings constitute an Event of Default. Commencement of such Restructuring Proceedings constitutes a termination event under the First Lien Forbearance Agreement, dated as of June 5, 2020, among Holdings, the Borrowers and the other Parties party thereto.

Each of the undersigned Lenders (collectively, the "Directing Lenders") represents and warrants to the Administrative Agent that, as of the date hereof, (a) it holds, beneficially owns or has discretionary authority with respect to, as applicable, (i) the outstanding principal Dollar Amount of Loans, (ii) Dollar Amount of risk participation and funded participation in L/C Obligations and Swing Line Loans, (iii) amount of unused Term Commitments, and (iv) amount of unused Revolving Commitments indicated opposite its name on the signature pages hereto (collectively, the "Holdings Information") and (b) it has received notice that one or more Events of Default have occurred and are continuing beyond any applicable grace period under the Credit Agreement. The undersigned hereby acknowledge and agree that the Administrative Agent can and will rely upon the representations and warranties of the undersigned in acting upon the directions and authorizations given by the Directing Lenders under this letter of direction

(the "Letter of Direction"). The Administrative Agent shall, and shall direct its employees, representatives, counsel, and other agents who receive access to this Letter of Direction or the information contained herein to, maintain this Letter of Direction, including the existence and content hereof and the identities of the Directing Lenders and their respective Holdings Information strictly confidential and no such disclosure shall be made to any Loan Party or any Subsidiary or Affiliate unless such disclosure is permitted pursuant to Section 10.09 of the Credit Agreement.

Section 8.02 of the Credit Agreement provides, among other things, that if any Event of Default occurs and is continuing, the Administrative Agent may and, at the request of the Required Lenders, shall exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law. Section 5.1(a) of the Security Agreement provides, among other things, that upon the occurrence and during the continuation of an Event of Default, the Administrative Agent shall have "those rights and remedies available to a secured party under the UCC (whether or not the UCC applies to the affected Collateral) or under any other applicable Law (including, without limitation, any Law governing the exercise of a bank's right of setoff or bankers' Lien) when a debtor is in default under a security agreement." Section 5.1(c) of the Security Agreement further provides that "the Agent shall have the right upon any public sale or sales and, to the extent permitted by law, upon any private sale or sales, to purchase for the benefit of the Agent and the Secured Parties, the whole or any part of the Collateral so sold, free of any right of equity redemption, which equity redemption each Grantor hereby expressly releases."

By this Letter of Direction and pursuant to Sections 8.02, 10.01 and 10.24(d) of the Credit Agreement, each of the Directing Lenders party hereto hereby directs the Administrative Agent and the Collateral Agent to:

<blockquote>

(i)    bid for any and all Collateral and other assets of the Loan Parties (the "Purchased Assets"), and to make payment thereof by using the Obligations as a credit against the purchase price, on substantially the terms and conditions set forth in the Asset Purchase Agreement with Holdings and certain Subsidiaries of Holdings, as Seller (the "Seller"), attached hereto as Exhibit A (the "APA") (the "Credit Bid");

(ii)    cause the Credit Bid to be made in the name of Spectacle Bidco LLC ("Buyer") and any Designated Buyer (as defined in the APA);

(iii)    carry out all such other lawful requests, directions or instructions delivered to it in writing signed by the Required Lenders (or their representatives) to enable the Buyer and any Designated Buyer (as defined in the APA) to acquire and assume from Seller all of the Purchased Assets in accordance with the APA;

(iv)    carry out all such other lawful requests, directions or instructions delivered to it in writing signed by the Required Lenders (or their representatives) in connection with the Credit Bid and the APA or otherwise ((i) through (iv) collectively the "Credit Bid Directions"); and

(v)    execute and deliver that certain Limited Waiver of First Lien/Second Lien Intercreditor Agreement.

</blockquote>

The Administrative Agent and the Collateral Agent shall enjoy all rights and benefits under the Credit Agreement (including, without limitation, Section 9.03 of the Credit Agreement) and the Collateral Documents (including, without limitation, Section 6.4 of the Security Agreement and any similar

provision of any other Collateral Document) in connection with any act or omission whatsoever taken pursuant to or in connection with this Letter of Direction, the APA, the Credit Bid or any Loan Document. Without limiting the foregoing, it is understood and agreed that the obligations of the Administrative Agent and the Collateral Agent pursuant to this Letter of Direction remain subject to Article 9 of the Credit Agreement and any court order or direction from any receiver, trustee, custodian, conservator, liquidator, rehabilitator, administrator, administrative receiver or similar officer in connection with the Restructuring Proceedings.

Each Directing Lender hereby (a) represents and warrants to the Administrative Agent that this Letter of Direction has been duly authorized, executed and delivered by such Directing Lender and constitutes the legal, valid and binding obligations of such Directing Lender and is enforceable against such Directing Lender in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and (ii) general principles of equity and (b) waives any defenses based upon the invalidity of such representations and warranties. Each Directing Lender agrees that this Letter of Direction and the directions given hereunder are subject to the indemnities provided in the Loan Documents, including pursuant to Sections 9.08 and 10.05 of the Credit Agreement.

This Letter of Direction and the representations and warranties contained herein, to the extent made by a Directing Lender, shall be binding upon such Directing Lender and its successors and permitted assigns and shall inure to the benefit of the Administrative Agent and its respective successors and assigns. This Letter of Direction shall not be amended, modified or waived without the prior written consent of the Required Lenders and, in the case of an amendment, modification or waiver that adversely affects the rights, benefits, protections or obligations of any Agent, such Agent.

This Letter of Direction is solely for the benefit of the parties hereto, and no other person, firm or corporation shall have any right, benefit or interest under, or because of, the existence of this Letter of Direction. The rights and remedies conferred hereunder shall be cumulative and the exercise or waiver of any such right or remedy shall not preclude or inhibit the exercise of additional rights or remedies under the Loan Documents or the subsequent exercise of such right or remedy.

This Letter of Direction shall be irrevocable and binding and shall not be modified so long as the APA remains irrevocable and binding pursuant to the terms thereof.

If any provision of this Letter of Direction is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Letter of Direction will remain in full force and effect. Any provision of this Letter of Direction held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

This Letter of Direction may be executed in any number of counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Letter of Direction by facsimile or other electronic imaging (including in .pdf format) means shall be effective as delivery of a manually executed counterpart of this Letter of Direction. The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Letter of Direction and the transactions contemplated hereby shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Administrative Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National

Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.16 (Governing Law) and Section 10.17 (Waiver of Right to Trial By Jury) of the Credit Agreement are hereby incorporated by reference *mutatis mutandis*.

[Signature Pages Follow]

_____,
as a Lender (type name of the legal entity)


By: _____
    Name:
    Title:


If a second signature is necessary:


By: _____
    Name:
    Title:


Principal Amount of Loans: $_____

## EXHIBIT A

**Asset Purchase Agreement**

**Execution Version**

July 15, 2020

Wilmington Trust, National Association,
as Administrative Agent and Collateral Agent
1100 North Market Street
Wilmington, DE 19890
Attn: Joseph B. Feil

    Re:  <u>CDS U.S. Intermediate Holdings, Inc. and Cirque du Soleil Canada Inc.</u>

Ladies and Gentlemen:

    Reference is made to (a) that certain Second Lien Credit Agreement, dated as of July 8, 2015 (as modified by that certain Agency Resignation, Appointment, Assignment and Assumption Agreement, dated as of May 22, 2020, as amended by that certain Amendment No. 1, dated as of June 5, 2020, and as further amended, supplemented, amended and restated or otherwise modified from time to time, the "<u>Credit Agreement</u>"), by and among CIRQUE DU SOLEIL HOLDINGS LP, a limited partnership formed under the laws of the Province of Québec ("<u>Holdings</u>"), CDS U.S. INTERMEDIATE HOLDINGS, INC., a Delaware corporation (the "<u>U.S. Borrower</u>" and "<u>Borrower Representative</u>"), CIRQUE DU SOLEIL CANADA INC., a corporation organized under the laws of the Province of Québec (the "<u>Canadian Borrower</u>" and together with the U.S. Borrower, the "<u>Borrowers</u>"), the lenders from time to time party thereto (the "<u>Lenders</u>") and Wilmington Trust, National Association, as administrative agent and collateral agent (as successor to Bank of America, N.A. in such capacities) (in such capacities, the "<u>Agent</u>"), (b) the Collateral Documents and (c) that certain Asset Purchase Agreement attached hereto as <u>Exhibit A</u> (the "<u>APA</u>") among Holdings and certain of its Subsidiaries party thereto, as sellers (collectively, the "<u>Seller</u>"), and Spectacle Bidco LP, an entity that will be newly formed and that will, upon consummation of the Sale (as defined below), be beneficially owned by the Lenders and the First Lien Lenders (the "<u>Buyer</u>"), pursuant to which the Seller will sell and transfer to the Buyer certain Collateral and other assets of the Seller as specified   in the APA (the "<u>Assets</u>") in accordance with, and subject to the terms and condition of, the APA (such sale and transfer being referred to herein as the "<u>Sale</u>"). Unless otherwise specified herein, capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Credit Agreement.

    The Borrowers and certain of their affiliates have commenced (i) proceedings under the *Companies' Creditors Arrangement Act* (Canada) before the Superior Court of Québec (Commercial Division) to, among other things, seek creditor protection for, and certain relief in respect of, the Borrowers and certain of their affiliates (the "<u>Canada Proceedings</u>") and (ii) ancillary insolvency proceedings under Chapter 15 of Title 11 of the United States Code in the U.S. Bankruptcy Court (the "<u>U.S. Proceedings</u>", and, together with the Canada Proceedings, the "<u>Restructuring Proceedings</u>"). Pursuant to <u>Section 8.01(f)</u> of the Credit Agreement, commencement of the Restructuring Proceedings constitutes an Event of Default. In addition, commencement of the Restructuring Proceedings constitutes a termination event under the Second Lien Forbearance Agreement, dated as of June 5, 2020, among Holdings, the Borrowers, the Lenders party thereto, the Agent and the other Persons party thereto.

Each of the undersigned Lenders (collectively, the "Directing Lenders") represents and warrants to the Agent that, as of the date hereof, it holds, beneficially owns, or has discretionary authority with respect to, as applicable (i) the outstanding principal amount of Loans and (ii) the amount of unused Commitments indicated opposite its name on the signature pages hereto (collectively, the "Holdings Information"). The undersigned hereby acknowledge and agree that the Agent can and will rely upon the representations and warranties of the undersigned in acting upon the directions and authorizations given by the Directing Lenders under this letter of direction (the "Letter of Direction"). The Agent shall, and shall direct its employees, representatives, counsel, and other agents who receive access to this Letter of Direction or the information contained herein, to maintain the identities of the Directing Lenders and their respective Holdings Information strictly confidential unless such disclosure is permitted pursuant to Section 10.09 of the Credit Agreement (assuming for this purpose that the identities of the Directing Lenders and their respective Holdings Information is "Information" as defined in Section 10.09 of the Credit Agreement).

Section 8.02 of the Credit Agreement provides, among other things, that if any Event of Default occurs and is continuing, the Administrative Agent may with the consent of the Required Lender and shall, at the request of the Required Lenders, exercise on behalf of itself and the Lenders all rights and remedies available to it and the Lenders under the Loan Documents or applicable Law. Section 5.1(a) of the Security Agreement provides, among other things, that upon the occurrence and during the continuation of an Event of Default, the Agent shall have "those rights and remedies available to a secured party under the UCC (whether or not the UCC applies to the affected Collateral) or under any other applicable Law (including, without limitation, any Law governing the exercise of a bank's right of setoff or bankers' Lien) when a debtor is in default under a security agreement." Section 5.1(c) of the Security Agreement further provides that "the Agent shall have the right upon any public sale or sales and, to the extent permitted by law, upon any private sale or sales, to purchase for the benefit of the Agent and the Secured Parties, the whole or any part of the Collateral so sold, free of any right of equity redemption, which equity redemption each Grantor hereby expressly releases." Furthermore, Section 10.24(d) of the Credit Agreement provides that: "Notwithstanding the foregoing or anything in the Loan Documents to the contrary, at the direction of the Required Lenders, the Administrative Agent may, in exercising remedies, take any and all necessary and appropriate action to effectuate a credit bid of all Loans (or any lesser amount thereof) for the Borrowers' assets in a bankruptcy, foreclosure or other similar proceeding…"

By this Letter of Direction and pursuant to Sections 8.02 and 10.24 of the Credit Agreement and the applicable provisions of the Security Agreement and other Collateral Documents, the Directing Lenders, constituting the Required Lenders, hereby instruct and direct the Agent to:

(i)     submit, on behalf of the Lenders, a credit bid for the Assets in an aggregate amount of $150,000,000 of the Loans, together with all accrued interest thereon, or in such other amount as may be requested by the Required Lenders to the Agent in writing (the "Credit Bid") (it being understood and agreed by the Directing Lenders that (i) prior to the consummation of the Sale, the Agent will assign and transfer to the Buyer and any Designated Buyer (as defined in the APA), and the Directing Lenders (in their capacities as Lenders, First Lien Lenders and/or direct or indirect equity owners of the Buyer and any such Designated Buyer, as applicable) will cause the Buyer and any such Designated Buyer to accept and assume from the Agent, any and all rights, duties and obligations of the Agent to (x) receive title to and ownership of the Assets and all other rights and interests thereto (such assignment and transfer being referred to herein as the "Buyer Assignment") and (y) consummate the Sale in accordance with the APA and the Credit Bid and (ii) notwithstanding the Credit Bid, in no

event shall title or any other ownership interest in and to any of the Assets or other assets or property of Holdings or any Subsidiary thereof be (or be deemed to be) transferred to the Agent pursuant to the APA, as a result of the Credit Bid or otherwise (and, in the absence of the Buyer Assignment becoming effective, the Sale will not be consummated);

(ii)     carry out all such other requests, directions or instructions delivered to it in writing signed by the Required Lenders (or their representatives) to facilitate the Buyer and any Designated Buyer acquiring and assuming from Seller all of the Purchased Assets in accordance with the APA;

(iii)    carry out all such other requests, directions or instructions delivered to it in writing signed by the Required Lenders (or their representatives) in connection with the Credit Bid (clauses (i) through (iii) of this paragraph, collectively, the "Specified Directions"); and

(iv)    execute and deliver that certain Limited Waiver to First Lien/Second Lien Intercreditor Agreement attached as Exhibit B hereto (the "Intercreditor Waiver").

The Directing Lenders hereby acknowledge and agree, on behalf of all Lenders, that the Agent shall not have any obligation, duty or responsibility to the Lenders or any other Person in respect of (a) (i) the suitability, sufficiency, contents or enforceability of the APA or any transfer documents evidencing the Sale, (ii) any order or other action taken in the Restructuring Proceedings to approve the Sale, the Credit Bid and/or the APA, (iii) any equity issued by the Buyer or any Designated Buyer and distributed to the Lenders, or (iv) the suitability, sufficiency, contents or enforceability of any other document or agreement entered into in connection with, or action directed in writing by the Required Lenders related to, the Sale, the Credit Bid or the Specified Directions or (b) any actions (or inactions) taken by the Buyer or any Designated Buyer.

Each Directing Lender hereby acknowledges, agrees and confirms that the exculpatory, indemnification and reimbursement provisions set forth in the Credit Agreement and other Loan Documents (including, without limitation, those set forth in Sections 9.03, 9.08 and 10.05 of the Credit Agreement) apply to the Agent and its Related Persons, and the performance of the Agent's duties and obligations under, in connection with, or arising in any way from (i) the matters contemplated (and directions set forth) in this Letter of Direction and (ii) the matters contemplated by, and the actions taken (or not taken) by the Agent under or in connection with, the APA, the Credit Bid, the Intercreditor Waiver and the Specified Directions. In addition, the Directing Lenders hereby acknowledge and agree that (i) regardless of whether or not the Sale is consummated, the Agent shall be paid all of its reasonable out-of-pocket costs and expenses (including the reasonable fees, disbursements and charges of Arnold & Porter Kaye Scholer LLP, as counsel to the Agent) incurred in connection with the Credit Agreement, the other Loan Documents, the Obligations, the Restructuring Proceedings, this Letter of Directions and the matters contemplated hereby and thereby (collectively, the "Agent Expenses"), (ii) on or prior to consummation of the Sale, all of the Agent Expenses shall be paid in full (and the Directing Lenders hereby agree not to permit the Sale to be consummated without payment of the Agent Expenses) and (iii) they shall pay, or cause to be paid, the Agent Expenses.

Each Directing Lender hereby (a) represents and warrants to the Agent that this Letter of Direction has been duly authorized, executed and delivered by such Directing Lender and constitutes the legal, valid and binding obligations of such Directing Lender and is enforceable against such Directing Lender in accordance with its terms, except as such enforceability may be limited by (i) bankruptcy,

insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and (ii) general principles of equity and (b) waives any defenses based upon the invalidity of such representations and warranties.

This Letter of Direction and the representations and warranties contained herein, to the extent made by a Directing Lender, shall be binding upon such Directing Lender and its successors and permitted assigns and shall inure to the benefit of the Agent and its respective successors and assigns. This Letter of Direction shall not be amended, modified or waived without the prior written consent of the Required Lenders and, in the case of an amendment, modification or waiver that adversely affects the rights, benefits, protections or obligations of the Agent, the Agent.

If any provision of this Letter of Direction is held invalid or unenforceable by any court of competent jurisdiction, the other provisions of this Letter of Direction will remain in full force and effect. Any provision of this Letter of Direction held invalid or unenforceable only in part or degree will remain in full force and effect to the extent not held invalid or unenforceable.

This Letter of Direction may be executed in any number of counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract. Delivery of an executed counterpart of a signature page to this Letter of Direction by facsimile or other electronic imaging (including in .pdf format) means shall be effective as delivery of a manually executed counterpart of this Letter of Direction. The words "execution," "execute", "signed," "signature," and words of like import in or related to any document to be signed in connection with this Letter of Direction and the transactions contemplated hereby shall be deemed to include electronic signatures, the electronic matching of assignment terms and contract formations on electronic platforms approved by the Agent, or the keeping of records in electronic form, each of which shall be of the same legal effect, validity or enforceability as a manually executed signature or the use of a paper-based recordkeeping system, as the case may be, to the extent and as provided for in any applicable law, including the Federal Electronic Signatures in Global and National Commerce Act, the New York State Electronic Signatures and Records Act, or any other similar state laws based on the Uniform Electronic Transactions Act.

Section 10.16 (Governing Law) and Section 10.17 (Waiver of Right to Trial By Jury) of the Credit Agreement are hereby incorporated by reference *mutatis mutandis*.

[Signature Pages Follow]

_____,
as a Lender (type name of the legal entity)


By:  _____
       Name:
       Title:


If a second signature is necessary:


By:  _____
       Name:
       Title:


Principal Amount of Loans: $_____

4819-0475-3601v3

[Signature Page to Credit Bid Direction Letter]

**<u>EXHIBIT A</u>**

**APA**

**(See attached)**

EXECUTION VERSION

AMENDING AGREEMENT
TO ASSET PURCHASE AGREEMENT

**THIS AMENDING AGREEMENT** is made as of the 9th day of October, 2020.

**BETWEEN:**

> **CIRQUE DU SOLEIL HOLDINGS L.P.**, a limited partnership formed under the laws of the Province of Québec ("**Holdings LP**", or the "**Seller**"), acting through its general partner, **CIRQUE DU SOLEIL GP INC.**, a corporation existing under the laws of the Province of Québec ("**CDS GP**")
>
> - and -
>
> **SPECTACLE BIDCO LP**, a limited partnership formed under the laws of the Province of Québec (the "**Initial Buyer**"), acting through its general partner, Drivetrain Agency Services, LLC a New York limited liability company
>
> - and -
>
> **SPECTACLE BIDCO HOLDINGS INC.** (the "**Buyer**"), a corporation incorporated under the laws of the Province of Québec

**RECITALS:**

A.    The Seller and the Initial Buyer entered into an asset purchase agreement dated as of July 15, 2020 (the "**Purchase Agreement**") pursuant to which, among other things, the Initial Buyer agreed to purchase and assume from the Seller, and the Seller agreed to sell and assign to the Initial Buyer the Purchased Assets and the Assumed Liabilities (as defined therein), subject to the terms and conditions set forth therein.

B.    Pursuant to, and subject to the conditions of, Section 7.14 of the Purchase Agreement, the Initial Buyer has sole discretion to structure the acquisition of the Purchased Assets in an alternative manner, and the Parties shall consider and otherwise negotiate in good faith any amendments required by, or to otherwise implement, any such Alternative Acquisition Structure.

C.    The Parties have agreed to implement the acquisition of the Purchased Assets substantially pursuant to and in accordance with the steps, including in such manner, order and sequence, prescribed in the Reorganization Step Plan, including the Pre-Closing Reorganization and the Post-Closing Reorganization (as such terms are defined herein).

D.    The Parties wish to enter into this Amending Agreement in order to amend certain terms and conditions of the Purchase Agreement to implement and effect the foregoing, including the assignment of the Purchase Agreement by the Initial Buyer to the Buyer.

**NOW, THEREFORE**, in consideration of the mutual covenants and agreements hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I**
**INTERPRETATION**

**1.1      Definitions**

Capitalized terms used in this Amending Agreement and not otherwise defined herein shall have the meanings given to them in the Purchase Agreement.

**1.2      Certain Rules of Interpretation**

In this Amending Agreement, the provisions of Article 1 of the Purchase Agreement shall apply, *mutatis mutandis*, to this Amending Agreement.

**ARTICLE II**
**AMENDMENTS TO PURCHASE AGREEMENT**

**2.1      Definitions.**

(1)     The defined term "Administrative Monitor Reserve" in Section 1.1 of the Purchase Agreement is deleted in its entirety and replaced with the following:

""**Administrative Monitor Reserve**" means the cash reserve, including the Indemnification Amount for the benefit of the Indemnified Parties, to be established in accordance with the Administrative Monitor Reserve Budget for the benefit of the Persons entitled to be paid the Administrative Reserve Costs of the Monitor in an amount to be agreed by the Monitor, the Seller and the Buyer, two (2) Business Days prior to the Administrative Reserve Order, which cash reserve shall be established by the Monitor out of the cash and cash equivalents of the Seller Group as at the Closing Date with the balance, if any, funded, or caused to be funded,  by the Buyer, to the Monitor on the Closing Date, as a segregated account held in trust by the Monitor, the whole subject to and in accordance with the terms hereof and with the terms of the Administrative Reserve Order.".

(2)     The defined term "Administrative Reserve Costs of the Monitor" in Section 1.1 of the Purchase Agreement is deleted in its entirety and replaced with the following:

""**Administrative Reserve Costs of the Monitor**" means the reasonable and documented fees and costs of the Monitor, the Receiver and their respective professional advisors relating directly or indirectly to the CCAA Proceedings, the Receivership Order, the U.S. Proceedings, this Agreement, the Administrative Reserve Accounts, the Employee Fund and the Contractor Fund (including the Fund Agreements and the indemnity thereunder)."

(3)     The defined term "Administrative Seller Reserve" in Section 1.1 of the Purchase Agreement is deleted in its entirety and replaced with the following:

""**Administrative Seller Reserve**" means the cash reserve in an amount to be agreed by the Monitor, the Seller and the Buyer, two (2) Business Days prior to the Administrative Reserve Order, and approved by the CCAA Court pursuant to the Administrative Reserve Order, which

reserve shall be established by the Monitor out of the cash and cash equivalents of the Seller Group as at the Closing Date with the balance, if any, funded by the Buyer, or caused to be funded by the Buyer, to the Monitor on the Closing Date, as a segregated account held in trust by the Monitor for the benefit of Persons entitled to be paid the Administrative Reserve Costs of the Seller and the Buyer, subject to the terms hereof and in accordance with the Administrative Seller Reserve Budget for the purpose of paying the Administrative Reserve Costs of the Seller in accordance with the terms hereof and the Administrative Reserve Order.".

(4)     The defined term "Applicants" in Section 1.1 of the Purchase Agreement is amended by adding the following sentence at the end:

"For the avoidance of doubt, the term Applicants as used herein shall include the partnerships listed on Schedule 1.1(a) hereof.".

(5)     The defined term "Assumed Employment Contracts" in Section 1.1 of the Purchase Agreement is deleted in its entirety and replaced with the following:

""**Assumed Employment Contracts**" means the employment agreements with Transferred Employees including amendments to such agreements, the Key Employee Retention Plans, Collective Agreements that are automatically transferred to the Buyer, a Designated Buyer or a Transferred Subsidiary by operation of law on Closing, and the Employment Agreements Amendments; provided that all Employee Plans not in the categories listed herein (or incorporated by reference in any Assumed Employment Contract) and all Excluded Contracts with Contractors shall be excluded from this definition of "Assumed Employment Contracts".".

(6)     The defined term "Buyer" in Section 1.1 of the Purchase Agreement is deleted in its entirety and replaced with the following:

""**Buyer**" means, subject to Section 2.6, Spectacle BidCo Holdings Inc., a corporation incorporated under the laws of the laws of the Province of Québec;"

(7)     The defined term "Claims" in Section 1.1 of the Purchase Agreement is deleted in its entirety and replaced with the following:

""**Claims**" means all claims, demands, complaints, grievances, proceedings, actions, applications, suits, arbitration or alternative dispute resolution processes, administrative or other proceedings, litigation, hearings, examinations, investigations, causes of action, Orders, charges, indictments, prosecutions, informations or other similar processes, assessments or reassessments, judgments, debts, liabilities, expenses, costs, damages or losses, contingent or otherwise, whether liquidated or unliquidated, matured or unmatured, disputed or undisputed, contractual, legal or equitable, including loss of value, professional fees, including "claims" as defined in the U.S. Bankruptcy Code and including fees and disbursements of legal counsel on a full indemnity basis, and all costs incurred in investigating or pursuing any of the foregoing or any proceeding relating to any of the foregoing."

(8)     The defined term "Closing" in Section 1.1 of the Purchase Agreement is deleted in its entirety and replaced with the following:

""**Closing**" means the completion of the sale and purchase of the Purchased Assets pursuant to this Agreement on the Closing Date at the time specified in the Reorganization Step Plan, and all other transactions contemplated by this Agreement or the Reorganization Step Plan that occur

contemporaneously with or shortly after the sale and purchase of the Purchased Assets on the Closing Date at the times set out in the Reorganization Step Plan."

(9)  The defined term "Closing Date" in Section 1.1 of the Purchase Agreement is deleted in its entirety and replaced with the following:

""**Closing Date**" means, subject to Section 7.3(f) and Exhibit 7.3(f), November 6, 2020, or such other date as may be agreed to by both the Seller and the Buyer in writing (including via exchange of email by counsel to the Seller and counsel to the Buyer) in consultation with the Monitor; provided that, if there is to be a Closing hereunder, then the Closing Date shall be no later than the Sunset Date.".

(10)  The defined term "Closing Time" in Section 1.1 of the Purchase Agreement is deleted in its entirety and replaced with the following:

""**Closing Time**" means such time on the Closing Date that all of the then-issued and outstanding Equity Interests in CDS Canadian Holdings, Inc. have been duly transferred to Buyer (or applicable Designated Buyer) (for greater certainty, including that all of the steps set out in the Reorganization Step Plan to occur and be effected prior to such transfer of Equity Interests have also been duly completed), or such other time on the Closing Date as the Parties may agree in writing in consultation with the Monitor.".

(11)  The defined term "Contractor Fund" in Section 1.1 of the Purchase Agreement is deleted in its entirety and replaced with the following:

""**Contractor Fund**" means one or more funds in the aggregate amount of $5,000,000 (or such lesser amount as is required to pay a Benefit (as such term is defined in Exhibit F) to each Eligible Contractor) to be, or caused to be, established (and aggregate funds allocated or caused to be allocated) by the Buyer effective as of the Closing Date by entering into one or more escrow agreements, the terms and conditions of which are summarized in Exhibit F.".

(12)  The defined term "Employee Excluded Liabilities" in Section 1.1 of the Purchase Agreement is amended as follows:

(a)  the term "and" at the end of paragraph (vi) is deleted;

(b)  paragraph (vii) is deleted in its entirety and replaced with the following:

"(vii)  any obligation, liability or expense relating to or arising out of all Employee Plans (except for the Assumed Employee Plans, the Transferred Subsidiary Employee Plans, the Assumed Employment Contracts and as provided under Section 7.6(q), Exhibits 7.6(q)(i) and 7.6(q)(ii)); and"; and

(c)  a new paragraph (viii) is added as follows:

"(viii)  any obligation, liability or expense relating to or arising out of any Excluded Contract.".

(13)  The defined term "Employee Fund" in Section 1.1 of the Purchase Agreement is deleted in its entirety and replaced with the following:

""**Employee Fund**" means one or more funds in the aggregate amount of $15,000,000 to be, or caused to be, established (and aggregate funds allocated or caused to be allocated) by the Buyer effective as of the Closing Date by entering into one or more escrow agreements, the terms and conditions of which are summarized in Exhibit D.".

(14)    The defined term "Employment Agreement Amendments" in Section 1.1 of the Purchase Agreement is deleted in its entirety and replaced with the following:

""**Employment Agreement Amendments**" means the amendments to the employment agreements with all Listed Employees who are (i) RSD Employees. (ii) WDI Employees and (iii) Special Leave Employees, in each case that result in a waiver of severance entitlements from such employees and a release of claims in favour of the applicable Seller Group Member in the applicable form (depending on whether such Listed Employee is an artist or a crew member) attached as Exhibit E."

(15)    The defined term "Extended Leave Employee" in Section 1.1 of the Purchase Agreement is deleted in its entirety.

(16)    The defined term "Initial Allocation Statement" in Section 1.1 of the Purchase Agreement is deleted in its entirety.

(17)    The defined term "RSD Employees" in Section 1.1 of the Purchase Agreement is deleted in its entirety and replaced with the following:

""**RSD Employees**" means active artists and crew members of the Resident Shows Division of the applicable Seller Group Member based in Las Vegas, Nevada who received and who executed the Employment Agreement Amendments within the applicable timeframe. For greater certainty, the RSD Employees definition includes Employees on lay-off or furlough, but excludes Employees who are on leaves of absence (including maternity leave, parental leave, short-term or long-term disability leave, workers' compensation and other statutory leaves, with the exception of vacation or statutory holiday leaves)."

(18)    The defined term "Seller Group" in Section 1.1 of the Purchase Agreement is amended by adding to the end ", including, for greater certainty, the Transferred Subsidiaries".

(19)    The defined term "Seller Subsidiaries" in Section 1.1 of the Purchase Agreement is deleted in its entirety and replaced with the following:

""**Seller Subsidiaries**" means collectively each Person that is controlled by the Seller (for the purposes of this definition, "control", as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of such Person, whether through the ownership of voting securities, by agreement or otherwise), including each Applicant other than the Seller, its general partner, ExcludedCo and Joie de Vie.".

(20)    The defined term "Short-Term Leave Employee" in Section 1.1 of the Purchase Agreement is deleted in its entirety.

(21)    The defined term "Transferred Subsidiaries" in Section 1.1 of the Purchase Agreement is deleted in its entirety and replaced with the following:

"**Transferred Subsidiaries**" means CDS Canadian Holdings, Inc., each of the Seller Subsidiaries directly or indirectly owned by it on the Closing Date (for greater certainty, including as a result of the Pre-Closing Reorganization), Cirque du Soleil Vegas, L.L.C., and any other Seller Subsidiary designated as a "Transferred Subsidiary" pursuant to Section 2.5(g), but excluding any Seller Subsidiaries expressly excluded pursuant to Section 2.5(g).".

(22)   The defined "Terminated Creator Contracts" in Section 1.1 of the Purchase Agreement is deleted in its entirety.

(23)   The defined term "WDI Employees" in Section 1.1 of the Purchase Agreement is deleted in its entirety and replaced with the following:

"**WDI Employees**" means active artists and crew members of the show entitled "Drawn to Life" intended to be presented in Orlando, Florida, who received and who executed the Employment Agreement Amendments within the applicable timeframe. For greater certainty, the WDI Employees definition includes Employees on lay-off or furlough, but excludes Employees who are on leaves of absence (including maternity leave, parental leave, short-term or long-term disability leave, workers' compensation and other statutory leaves, with the exception of vacation or statutory holiday leaves)."

(24)   The following new defined terms are added to Section 1.1 of the Purchase Agreement in the appropriate alphabetical order:

"**CDS Non-U.S. Contractor Escrow Fund Agreement**" means the escrow agreement to be established on the Closing Date between the Monitor and the Buyer or an Affiliate thereof for purposes of holding and disbursing the portion of the Contractor Fund to certain Contractors of a Seller Group Member who were engaged by a non-United States resident Seller Group Member."

"**CDS Non-U.S. Employee Escrow Fund Agreement**" means the escrow agreement to be established on the Closing Date between the Monitor and the Buyer or an Affiliate thereof for purposes of holding and disbursing the portion of the Employee Fund to certain former employees of a Seller Group Member who were employed by a non- United States resident Seller Group Member immediately before the termination of his or her employment."

"**CDS U.S. Contractor Escrow Fund Agreement**" means the agreement to be established on the Closing Date between the Monitor and the Buyer or an Affiliate thereof for purposes of holding and disbursing the portion of the Contractor Fund to certain Contractors of a Seller Group Member who were engaged by a United States resident Seller Group Member."

"**CDS U.S. Employee Escrow Fund Agreement**" means the agreement to be established on the Closing Date between the Monitor and the Buyer or an Affiliate thereof for purposes of holding and disbursing the portion of the Employee Fund to certain former employees of a Seller Group Member who were employed by a United States resident Seller Group Member immediately before the termination of his or her employment."

"**Desjardins Group**" has the meaning given to such term in Section 10.2(e)."

"**Excluded Creator Contracts**" has the meaning given to such term in Section 7.24(b)."

"**ExcludedCo**" means one or more corporations incorporated under the laws of Québec by and as a wholly-owned subsidiary of the Seller solely for the purposes of accepting the transfer of the Excluded Assets of the Transferred Subsidiaries that are Applicants, and assuming all Excluded Liabilities (excluding the First Lien Debt, the Second Lien Debt, the CDS 4 Term Loan and certain intercompany debts owing by, owing to or of such Transferred Subsidiaries as provided for in the

Reorganization Step Plan) of the Transferred Subsidiaries that are Applicants, and to be added as an Applicant, effective at the Effective Time (as defined in the Approval and Vesting Order)."

""**Fund Agreements**" means, collectively, the CDS Non-U.S. Employee Escrow Fund Agreement, the CDS U.S. Employee Escrow Fund Agreement, the CDS Non-U.S. Contractor Escrow Fund Agreement and the CDS U.S. Contractor Escrow Fund Agreement"

""**Indemnification Amount**" means an amount for the benefit of the Indemnified Parties entitled to an indemnity pursuant to the Fund Agreements to be agreed as part of the Administrative Monitor Reserve Budget."

""**Indemnified Parties**" means, collectively, the Escrow Agent Indemnified Parties as defined in the Fund Agreements."

""**Post-Closing Reorganization**" means the transactions, acts or events prescribed in the Reorganization Step Plan, each of which is to occur and be effected on or following the Closing in accordance with the order, manner and sequence set out in the Reorganization Step Plan, all of which are, and shall be deemed to be, an integral part of the transactions contemplated hereby."

""**Pre-Closing Reorganization**" means the transactions, acts or events prescribed in the Reorganization Step Plan, each of which is to occur and be effected prior to the Closing Time in accordance with the order, manner and sequence set out in the Reorganization Step Plan."

""**Reorganization Step Plan**" means the transactions, acts and events set out on the reorganization step plan in Exhibit I and posted to the Monitor's website, as amended from time to time by the Buyer and the Seller in consultation with the Monitor and posted to the Monitor's website."

""**Special Leave Employees**" means the Employees listed on Schedule 1.1(h)."

""**Transferred Subsidiary Employee Plans**" has the meaning given to such term in Section 7.6(j)(iii)."

## 2.2  Interpretation

(1)  Section 1.6 of the Purchase Agreement is amended by adding the following at the end:

"As a result of the Alternative Acquisition Structure and in connection with employment matters in Section 7.6, where the context requires, any reference in Section 7.6 to the "Buyer" shall be deemed to include or be, as applicable, a reference to the applicable "Designated Buyer" and/or "Transferred Subsidiary", provided that notwithstanding the foregoing, no such reference or deemed reference shall create any right or entitlement of any Employee or Contractor against any Buyer, any Designated Buyer or any Transferred Subsidiary that is not such Person's employer pursuant to Applicable Law, direct contractual counterparty, benefit provider or policyholder."

## 2.3  Purchase and Sale.

(1)  The preamble of Section 2.1 of the Purchase Agreement is deleted in its entirety and replaced as follows:

"For the purposes of this Agreement, and subject to the terms and conditions of this Agreement, all of the right, title and interest in, to and under, or relating to, the assets, property and undertaking owned or used or held for use by the Seller Group Members in connection with the Business, including the following properties, assets and rights, shall constitute the "**Purchased Assets**":".

(2)     Paragraphs (f), (g) and (h) of Section 2.1 of the Purchase Agreement are each amended by deleting the words "subject to Section 2.5(d)," and replacing them with the words "subject to Sections 2.5(a), 2.5(b) and 2.5(d), and for greater certainty, excluding all Excluded Contracts".

(3)     Section 2.1(i) of the Purchase Agreement is amended:

    (a)     by deleting the words "subject to Sections 2.5(d), 2.5(e) and 2.5(f)" and replacing them with the words "subject to Sections 2.5(a), 2.5(b), 2.5(d), 2.5(e) and 2.5(f) for greater certainty, excluding all Excluded Contracts"; and

    (b)     by adding after the words "Assumed Employment Contracts", ", the Transferred Subsidiary Employee Plans and as provided under Section 7.6(q) and Exhibits 7.6(q)(i) and 7.6(q)(ii)".

(4)     Section 2.1(m) of the Purchase Agreement is deleted in its entirety and replaced as follows:

    "(m)     *Employee Records* – personnel and employment records relating to (i) the Transferred Employees and (ii) as required in order for the Buyer to comply with its obligations under this Agreement, the current and former Employees, the whole subject to complying with Applicable Laws."

(5)     Section 2.1(v) of the Purchase Agreement is deleted in its entirety and replaced as follows:

    "(v)     *Interest in Subsidiaries* – all of the Equity Interests in CDS Canadian Holdings, Inc., Cirque du Soleil Vegas, L.L.C. and the Equity Interests held, directly or indirectly, by the Seller in any other Seller Subsidiaries designated as Transferred Subsidiaries pursuant to Section 2.5(g);".

(6)     Section 2.1 of the Purchase Agreement is further amended by:

    (a)     at the end of paragraph (n), deleting the words "(but excluding any loans associated with any Employee Plans other than Assumed Employee Plans)";

    (b)     at the end of paragraph (t), adding the words ", including, for greater certainty, all accounts receivable owing to any Transferred Subsidiary, or as otherwise provided in the Reorganization Step Plan";

    (c)     at the end of paragraph (w), adding the words "and to any Transferred Subsidiary Employee Plans and any plans referenced in Section 7.6(q), Exhibits 7.6(q)(i) or 7.6(q)(ii).";

    (d)     at the end of paragraph (z), deleting the words ", if any;" after the words "Transferred Subsidiary", and adding the word "; and";

    (e)     deleting "; and" at the end of paragraph (aa) and adding a ".";

    (f)     deleting paragraph (bb) in its entirety; and

    (g)     adding an ending paragraph as follows:

    "Upon and subject to the terms and conditions of this Agreement (including the provisions of Section 2.5), on the Closing Date and in the manner, order and sequence prescribed in

the Reorganization Step Plan, the Seller shall, and shall cause each of the Seller Subsidiaries other than the Transferred Subsidiaries to, sell, convey, transfer, assign and deliver, or cause to be sold, conveyed, transferred, assigned and delivered to the Buyer (or the applicable Designated Buyer), and the Buyer (or the applicable Designated Buyer) shall purchase, free and clear of all Encumbrances other than Permitted Encumbrances, all of such Seller Group Members' right, title and interest in, to and under, or relating to, their respective Purchased Assets.".

(7)     Paragraphs (a) and (e) of Section 2.2 of the Purchase Agreement are each amended by deleting the words ", if any" after the words "Transferred Subsidiaries".

(8)     Section 2.2(b) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(b)     *Excluded Contracts* – all Contracts of the Seller Group Members including (i) all Contracts set out on Schedule 2.2(b), (ii) all Contracts of the Seller Group Members with Contractors, (iii) all Excluded Creator Contracts and (iv) all Contracts excluded or deemed to be excluded pursuant to Section 2.5, but in the case of clauses (ii) and (iii) only, excluding Contracts which are Assigned Agreements (collectively, the "**Excluded Contracts**");".

(9)     Section 2.2(d) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(b)     *Director and Officer Insurance Policies* – all rights of the Seller Group Members (other than the Transferred Subsidiaries) under any director and officer insurance policies in effect immediately prior to, but that cease to be in effect at or upon, the Closing, including any proceeds received or receivable by such Persons thereunder.".

(10)     Section 2.2(e) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(e)     *Certain Securities* – all Equity Interests in the Seller Subsidiaries other than the Transferred Subsidiaries, all Equity Interests in the Excluded JV Entities and all Equity Interests in the ExcludedCo;".

(11)     Section 2.2(g) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(g)     *Employee Plans* – Except for assets associated with the plans referenced in Section 7.6(q), Exhibits 7.6(q)(i) or 7.6(q)(ii), any assets associated with any Employee Plans that are not Assumed Employee Plans or Transferred Subsidiary Employee Plans".

(12)     Section 2.2(h) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(h)     *Intercompany Accounts Receivable* – other than accounts receivable owed by or owing to a Transferred Subsidiary, all accounts receivable owing as between the Seller Group Members, in each case, unless otherwise provided in the Reorganization Step Plan.".

(13)     Section 2.2(i) of the Purchase Agreement is amended by deleting the word "and" at the end of the paragraph.

(14)     Section 2.2(j) of the Purchase Agreement is amended by deleting the "." and adding the words "; and" at the end of the paragraph.

(15)     A new Section 2.2(k) is added as follows:

"(k)     *Data* – any data or information of the Seller Group Members that, notwithstanding the Approval and Vesting Order or other Orders of the CCAA Court, is prohibited by or whose transfer would otherwise contravene applicable Law governing privacy and protection of personal information".

(16)    The preamble of Section 2.3 of the Purchase Agreement is deleted in its entirety and replaced as follows:

"In each case in the manner, order and sequence prescribed in the Reorganization Step Plan, the Buyer (or the relevant Designated Buyer) shall assume, the Transferred Subsidiaries shall retain, and the Buyer (or the relevant Designated Buyer) and the applicable Transferred Subsidiary shall pay, discharge and perform from and after the Closing Time, the following obligations and liabilities of the Seller Group Members that are not Transferred Subsidiaries and of the Transferred Subsidiaries, respectively, with respect to the Business or the Purchased Assets, in each case other than the Excluded Liabilities (collectively, the "**Assumed Liabilities**"), which Assumed Liabilities shall only consist of:".

(17)    Section 2.3(d) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(d)     *Employee Matters* – (i) all liabilities and obligations of the Buyer, a Designated Buyer and/or a Transferred Subsidiary  pursuant to Section 7.6 (including any liabilities associated with any Assumed Employee Plans, Transferred Subsidiary Employee Plans, Assumed Employment Contracts, Section 7.6(q) and Exhibits 7.6(q)(i) and 7.6(q)(ii)), (ii) all accrued and unpaid vacation pay in respect of Transferred Employees, and (iii) all payment obligations, if any, of the Seller Group Members in respect of the Employee Priority Claims;".

(18)    The preamble of Section 2.4 of the Purchase Agreement is deleted in its entirety and replaced as follows:

"Except as expressly assumed pursuant to Section 2.3, and in accordance with Section 2.8, all debts, obligations, contracts and liabilities of or relating to the Business, Purchased Assets, Seller Group Members or any predecessors of the Seller Group Members, and the Seller Group Members' Affiliates, of any kind or nature, shall remain (or, in the case of ExcludedCo, become) the sole responsibility of the Seller Group Members and their Affiliates (excluding Transferred Subsidiaries), and the Buyer, the Transferred Subsidiaries and their respective Affiliates shall not assume, accept, undertake, retain or otherwise be liable, obligated or responsible for, as the case may be, any debt, obligation, duty, contract or liability of the Seller Group Members, ExcludedCo and their Affiliates of any kind whatsoever, except as expressly assumed pursuant to Section 2.3, whether accrued, contingent, known or unknown, express or implied, primary or secondary, direct or indirect, liquidated, unliquidated, absolute, accrued, contingent or otherwise, and whether due or to become due, and specifically excluding (without limitation) the following liabilities or obligations, all of which shall be retained by, and which shall remain (or, in the case of ExcludedCo, become) the sole responsibility, liability and obligation of, the Seller Group Members (excluding Transferred Subsidiaries) and ExcludedCo (collectively, the "**Excluded Liabilities**"):".

(19)    Section 2.4(b) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(b)     *Contract Liabilities* – all liabilities of the Seller Group Members under the Assigned Agreements incurred or relating to the period prior to the Closing Time (excluding any trade payables assumed under Section 2.3(b));

(b.1) *Change of Control Liabilities* – all liabilities under the Assigned Agreements relating to any change of control provision that may arise in connection with the change of control contemplated by the acquisition of the Transferred Subsidiaries that are Applicants or any of the steps of the Reorganization Step Plan other than those relating to the Assumed Employment Contracts and the Key Employee Retention Plans;"

(20) Section 2.4(d) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(d) *Employee Matters* – except as included in Section 2.3(d), or as required under Applicable Law in respect of the Transferred Employees, the Assumed Employment Contracts, the Transferred Subsidiary Employee Plans, the Assumed Employee Plans, Section 7.6(q) and Exhibits 7.6(q)(i) and 7.6(q)(ii), all Employee Excluded Liabilities;".

(21) Section 2.4(g)(ii) of the Purchase Agreement is deleted in its entirety and replaced as follows:

""(ii) any acts or omissions or conduct of any of the Seller Group Members (except for any acts or omissions of any Transferred Subsidiary occurring on or after the Closing Time) or any of their respective subsidiaries in respect of any matters related to the Environment that are or may become subject to investigation and/or prosecution by any Governmental Authority;"

(22) Section 2.4(h) of the Purchase Agreement is amended by adding the following words to the end and before the semi-colon, ", other than such debts otherwise designated as Assumed Liabilities by the Buyer in writing, in its sole discretion (but, for the avoidance of doubt, subject to the Reorganization Step Plan), prior to the Closing".

(23) Section 2.4(k) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(k) *Taxes* – all liabilities for (A) Taxes of the Seller Group Members for any tax period (except for any liabilities for Taxes of the Transferred Subsidiaries for a tax period (or portion thereof) beginning on or after the Closing Date (including for any Post-Closing Straddle Tax Period)), (B) Taxes relating to the Purchased Assets for any tax period ending on or before the Closing Date (including any Pre-Closing Straddle Tax Period), and (C) Taxes related to the Excluded Assets, in each case that are not Assumed Liabilities;"

(24) Section 2.4 of the Purchase Agreement is amended by:

(a) in paragraph (l), deleting the word "and" at the end of the paragraph;

(b) at the end of paragraph (m), deleting the "." and adding the words "including, for greater certainty, all Claims described in Schedules 4.13(g) and 4.19 of the Disclosure Letter); and";

(c) adding the following new Section 2.4(n):

"(n) *Dissolved Entities* – all liabilities and obligations of any kind whatsoever of those Seller Group Members that are dissolved, wound up or whose existence or status is otherwise terminated or expired, in each case prior to the Closing."; and

(d) adding the following at the end:

"For greater certainty, for the purposes of this Agreement, including this Section 2.4, references to Excluded Liabilities and any debts, obligations, contracts or liabilities of any Seller Group Member shall, and shall be deemed to, include all debts, obligations, contracts and liabilities of ExcludedCo."

(25)    Section 2.5(a) of the Purchase Agreement is amended by adding the following at the end:

"Prior to obtaining any third Person consent or Assignment Order that is required to assign or transfer a Restricted Right, Buyer may, upon written notice to Seller, declare any such Restricted Right to be an Excluded Asset hereunder and Buyer shall not assume or otherwise have any liability in respect of same.".

(26)    Section 2.5(b) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(b)    If notwithstanding the efforts of the Seller, a consent to transferring the Restricted Rights to the Buyer is required but not obtained by the Closing Time or such assignment is not attainable, neither the Seller nor the Buyer shall be in breach of this Agreement nor shall the Purchase Price be adjusted nor (but subject to the Buyer's termination right set forth in Section 9.1 and for greater certainty, Buyer's rights and entitlements pursuant to Sections 8.1(c) and 6.2(g)) shall the Closing be delayed in respect of the Assumed Contracts or the Transferred Permits; provided, however, if the Closing occurs, then, with respect to any Restricted Rights for which consent or approval is required but not obtained, from and after the Closing for a period of no more than six (6) months, the Seller Group Members and ExcludedCo shall cooperate with the Buyer, at the Buyer's cost and expense, in any commercially reasonable arrangement that the Buyer may request to provide the Buyer with all of the benefits related to such Restricted Rights (including enforcement for the benefit of the Buyer of any and all rights of the Seller Group Members and ExcludedCo against any party to the applicable Restricted Rights arising out of the breach or cancellation thereof by such party) and the Buyer shall be responsible for, and shall promptly pay and perform all payment and other obligations under such Restricted Rights to the same extent as if such Restricted Rights had been assigned or transferred at Closing; provided, however, that the Buyer and the Seller agree that nothing in this Section 2.5 shall operate to prohibit or diminish in any way the right of any Seller Group Member or ExcludedCo to dissolve, windup or otherwise cease operations as it may determine in its sole discretion, or require the Seller to take any illegal action or commit fraud on any Person; provided further, however, that, notwithstanding the foregoing, the Seller Group Members (including, for greater certainty, Seller Subsidiaries incorporated or otherwise created in connection with Pre-Closing Reorganization or pursuant to the Reorganization Step Plan) and ExcludedCo shall not dissolve, windup or otherwise cease operations during such six (6) month period following Closing to the extent the Buyer requests that it be provided with the benefits relating to such Restricted Rights pursuant to a transition services agreement or otherwise. Any Restricted Rights for which any required third Person consent or Assignment Order is not obtained during such six (6) month period following the Closing shall, subject to Buyer providing written notice to the contrary to the Seller on or before the expiry of such six (6) month period, be deemed an Excluded Asset hereunder and Buyer shall not assume or otherwise have any liability in respect of same."

(27)    Section 2.5(c) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(c)    Subject to the terms and conditions of this Agreement, the Seller hereby agrees to assign, and cause each Seller Group Member to assign, to the Buyer (or the Buyer's assignees or the Designated Buyer(s)) on the Closing Date, effective as of the Closing Time (or, in

respect of Assigned Agreements with Restricted Rights that do not become and are not deemed to be Excluded Assets pursuant to this Section 2.5, such other date and/or time after Closing determined by the Buyer), all of the Seller's and Seller Group Members' rights, benefits and interests in, to and under the Assigned Agreements, in accordance with: (i) this Agreement; (ii) an Assignment Order, (iii) the Approval and Vesting Order; (iv) the Initial Recognition Order; (v) the Recognition Order and (vi) the U.S. Sale Order, as applicable. The Seller shall use commercially reasonable efforts to obtain any necessary consents or approvals in order to assign the Assigned Agreements, and to obtain the waivers and consents contemplated by Section 6.2(g). The Seller shall take such other actions as are commercially reasonable to cause the Assigned Agreements to be assigned by the Seller Group Members to, and assumed by, the Buyer (or the Buyer's assignees or the Designated Buyer(s)) as of the Closing Time. At or prior to the Closing Time, the Seller will comply with the Applicable Laws in its efforts under this Section 2.5(c) to assign the Assigned Agreements to the Buyer (or the Buyer's assignees or the Designated Buyer(s)). The Buyer will use its commercially reasonable efforts to assist the Seller in obtaining any such consents, approvals and waivers. For greater certainty, and notwithstanding anything else herein contained, the Buyer shall be entitled to communicate with the counterparty to any Contract to which a Seller Group Member is a party in connection with the transactions contemplated by this Agreement, in consultation with the Seller, and the Seller shall take all such reasonable actions as are necessary to facilitate such communications by the Buyer. Cure Costs in respect of Assigned Agreements shall be paid by the Seller from cash and cash equivalents of the Seller Group as of the Closing Date (for certainty after funding the Administrative Reserve Accounts) and, to the extent such amount is insufficient to pay all Cure Costs, the Buyer shall pay, or otherwise arrange for payment of, the balance of the Cure Costs, provided for certainty that the Buyer shall not be obligated to pay any Cure Cost in respect of any Contract that is not an Assigned Agreement, including any Restricted Rights."

(28)     Section 2.5(d) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(d)     The Buyer may at its sole cost and expense, at any time prior to two (2) Business Days prior to the Closing Date or any other date that the Parties may agree to in writing (including via exchange of email by counsel to the Seller and counsel to the Buyer), each acting reasonably and cooperatively with the other, add to or remove from Schedules 2.1(f), 2.1(g), 2.1(h), 2.1(i) and 2.2(b) of the Disclosure Letter, a Personal Property Lease, a Real Property Landlord Lease (only to add), a Real Property Lease, an Assumed Contract (other than an Assumed Employment Contract, a Transferred Subsidiary Employee Plan, an Assumed Employee Plan, as provided under Section 7.6(q) as well as under Exhibits 7.6(q)(i) and 7.6(q)(ii)) or an Excluded Contract, as applicable, for any reason and any such Personal Property Lease, Real Property Landlord Lease, Real Property Lease, Assumed Contract or Excluded Contract shall automatically, upon its addition or deletion from Schedule 2.1(f), 2.1(g), 2.1(h), 2.1(i)  or 2.2(b) of the Disclosure Letter, become an Assumed Contract or an Excluded Contract, as applicable, provided that, (i) the Seller shall not be required to obtain a consent to assign or an assignment order in respect of any Assumed Contract not listed on Schedules 2.1(f), 2.1(g), 2.1(h) or 2.1(i) of the Disclosure Letter at least two (2) Business Days prior to the Closing Date or any other date that the Parties may agree to in writing (including via exchange of email by counsel to the Seller and counsel to the Buyer), each acting reasonably and cooperatively with the other; (ii) the Purchase Price shall not in any way be reduced as a consequence thereof; and (iii) for greater certainty, any Cure Costs relating to such Assumed Contracts shall be payable in accordance with Section 2.5(c)."

(29)    Section 2.5(e) of the Purchase Agreement is amended by adding the words "and/or ExcludedCo" after each reference to "Seller Group Member" or "Seller Group Members", as applicable.

(30)    Section 2.5(f) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(f)    If it is determined by the Buyer following Closing that an Excluded Contract is necessary or desirable for the operation of the Business, and for Assigned Agreements with Restricted Rights that are not assigned to the Buyer (or Buyer's assignee(s) or the Designated Buyer(s)) on the Closing Date, the Seller Group Members (including, for the avoidance of doubt, ExcludedCo) shall take all such commercially reasonable actions necessary to assign such Contract and Assigned Agreements (as soon as reasonably practicable) to the Buyer (or the Buyer's assignees or the Designated Buyer(s)), at the Buyer's cost and expense, for no additional consideration, including by seeking consent of the counterparty to such Contract or Assigned Agreement, or pursuant to an Assignment Order, and to execute and deliver to the Buyer on request by the Buyer from time to time such other instruments of transfer, assignments, consents, notices and documents as may be reasonably necessary to effectively assign to the Buyer (or the Buyer's assignees or the Designated Buyer(s)) such Contract and Assigned Agreements.".

(31)    Section 2.5(g) of the Purchase Agreement is amended by replacing the reference to "seven (7) Business Days before the Administrative Reserve Order" with "five (5) Business Days prior to the Closing Date or any other date that the Parties may agree to in writing (including via exchange of email by counsel to the Seller and counsel to the Buyer), each acting reasonably and cooperatively with the other,".

(32)    Section 2.5(j) of the Purchase Agreement is amended:

(a)    by adding the words "or ExcludedCo" after the words "Seller Group Member" in the first proviso; and

(b)    by adding the words "(including, for greater certainty, Seller Subsidiaries incorporated or otherwise created in connection with Pre-Closing Reorganization or pursuant to the Reorganization Step Plan) and ExcludedCo" after the words "Seller Group Members" in the proviso at the end.

(33)    The following is added as new Section 2.5(l) of the Purchase Agreement:

"(l)    Nothing in this Section 2.5 shall have the effect of affecting the Buyer's obligations in Section 2.3(b)."

(34)    Section 2.6(a) of the Purchase Agreement shall be deleted in its entirety and replaced as follows:

"(a)    Designated Buyers. The Buyer shall be entitled to designate, in accordance with the terms and subject to the limitations set forth in this Section 2.6, or pursuant to and in the order, manner and sequence set out in the Reorganization Step Plan, one or more of the Buyer Subsidiaries, or such other Persons as set out in the Reorganization Step Plan, to (i) purchase specified Purchased Assets (including specified Assigned Agreements), (ii) assume specified Assumed Liabilities, and/or (iii) employ specified Transferred Employees on and after the Closing Date (any such Buyer

Subsidiary or Person shall be properly designated by the Buyer in accordance with this clause, a "**Designated Buyer**"), and any reference herein to the Buyer shall be accordingly deemed to include such Designated Buyer as necessary to give effect to such designation; provided, however, that no such designation shall relieve the Buyer of any of its obligations hereunder, but any payment or performance by any Designated Buyer shall be deemed to satisfy such payment or performance obligation of the Buyer hereunder."

(35)   Section 2.6(b) of the Purchase Agreement is amended by replacing the words "tenth (10th) Business Day prior to Closing" with the words "fifth (5th) Business Day prior to Closing or any other date that the Parties may agree to in writing (including via exchange of email by counsel to the Seller and counsel to the Buyer), each acting reasonably and cooperatively with the other".

(36)   The following is added as new Section 2.7 of the Purchase Agreement:

"**2.7**      **Transfer of Excluded Assets of Transferred Subsidiaries to ExcludedCo**

In the manner, order and sequence prescribed in the Reorganization Step Plan and pursuant to the Approval and Vesting Order, the Transferred Subsidiaries that are Applicants shall retain all of the assets, property and undertaking owned or used or held for use by them in connection with the Business immediately prior to the Closing Time, except for the Excluded Assets which such Transferred Subsidiaries shall transfer to and same shall be vested in ExcludedCo.  Notwithstanding anything herein to the contrary, the terms of the Approval and Vesting Order shall govern with respect to the transfer of such Excluded Assets as prescribed by this Section 2.7 and prevail to the extent of any inconsistency with this Agreement.".

(37)   The following is added as new Section 2.8 of the Purchase Agreement:

"**2.8**      **Assumption of Excluded Liabilities of Transferred Subsidiaries by ExcludedCo**

In the manner, order and sequence prescribed in the Reorganization Step Plan and pursuant to the Approval and Vesting Order, all of the Excluded Liabilities (excluding the First Lien Debt, the Second Lien Debt, the CDS 4 Term Loan and certain intercompany debts owing by, owing to or of such Transferred Subsidiaries as provided for in the Reorganization Step Plan) of the Transferred Subsidiaries that are Applicants shall be transferred to and assumed by ExcludedCo. Notwithstanding anything herein to the contrary, the terms of the Approval and Vesting Order shall govern with respect to the transfer and assumption of such Excluded Liabilities as prescribed by this Section 2.8 and prevail to the extent of any inconsistency with this Agreement.".

(38)   The following is added as new Section 2.9 of the Purchase Agreement:

"**2.9**      **Reorganization Step Plan**

Notwithstanding anything herein to the contrary, to the extent any intercompany debts, loans, notes, payables and receivables owing by, owed to, or of the Seller Group Members would otherwise be classified as a Purchased Asset, Excluded Asset, Assumed Liability, or Excluded Liability, as the case may be, and such classification is inconsistent with the treatment of such asset or liability in the Reorganization Step Plan, the treatment described in the Reorganization Step Plan shall govern in respect of such intercompany debts, loans, notes, payables and receivables."

**2.4**      **Purchase Price.**

(1)     Section 3.1(a) of the Purchase Agreement shall be deleted in its      entirety and replaced as follows:

"(a)     The purchase price payable by the Buyer for the Purchased Assets (the "**Purchase Price**") shall be satisfied in accordance with the transactions set out in the Reorganization Step Plan, and in particular the Buyer shall:

(i)     cause the release of all amounts outstanding and the "Obligations" owing under (and as defined in each of) the First Lien Credit Agreement and Second Lien Credit Agreement as of the Closing Date, including the principal amount of indebtedness and interest accrued as of the Closing Date (such aggregate amount, the "**Credit Bid Consideration**"), it being understood and agreed that the release of the First Lien Debt and Second Lien Debt shall occur in the manner, order and sequence prescribed in the Reorganization Step Plan;

(ii)     arrange for the payment of that amount of cash that is sufficient to pay (A) all "Obligations" owing under (and as defined in) the CDS 4 Term Loan on the Closing Date (the "**CDS 4 Term Loan Consideration**"); (B) the amount of the Administrative Monitor Reserve and the amount of the Administrative Seller Reserve to be funded by the Buyer, or caused to be funded by the Buyer, in accordance with Section 7.7, as applicable; and (C) the amount of the Cure Costs to be funded or paid by the Buyer, or caused to be funded by the Buyer, pursuant to this Agreement; and

(iii)     assume, or cause the relevant Designated Buyer to assume, the Assumed Liabilities (other than those retained by any Transferred Subsidiaries) that have accrued to, or are payable with respect to a period prior to Closing.".

(2)     Section 3.1(d)(ii) of the Purchase Agreement is deleted in its entirety and replaced with the following:

"(ii)     in respect of the Credit Bid Consideration, in the manner, order and sequence prescribed in the Reorganization Step Plan.".

(3)     Section 3.1(d)(iii) of the Purchase Agreement is deleted in its entirety and replaced with the following:

"(iii)     in respect of the obligations referred to in Section 3.1(b) and 3.1(c), the CDS 4 Term Loan Consideration and the Cure Costs, each in the manner, order and sequence prescribed in the Reorganization Step Plan;".

(4)     Section 3.1(d)(v) of the Purchase Agreement is deleted in its entirety and replaced with the following:

"(v)     as to the amount of the Assumed Liabilities described in Section 3.1(a)(ii), by assuming, or causing the relevant Designated Buyer to assume, such Assumed Liabilities in the manner, order and sequence prescribed in the Reorganization Step Plan.".

(5)     Section 3.1(g) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(g)     [Intentionally Omitted.]."

(6)     Section 3.2(b) of the Purchase Agreement is deleted in its entirety and replaced with the following:

> "(b)    If the Closing occurs, the Deposit and all accrued interest earned thereon shall be released by the Monitor in accordance with the Reorganization Step Plan. Interest on the Deposit shall accrue from the date of deposit  with the Monitor until the Closing or other termination or non-completion of the transactions contemplated by this Agreement.".

(7)     Section 3.3 of the Purchase Agreement is deleted in its entirety and replaced with the following:

> "**3.3     Purchase Price Allocation**
>
> Within ninety (90) days following the Closing Date, the Buyer shall prepare a written allocation (the "**Asset Allocation Statement**") of the amount treated as consideration for income tax purposes among each Seller Group Member, and further, among the Purchased Assets, including fixed assets and current assets, acquired from each Seller Group Member. The Buyer shall afford the Seller with a reasonable opportunity to review and comment on such allocation, and the Buyer and the Seller shall negotiate in good faith to resolve any disputed items with respect to the Asset Allocation Statement. If the Seller and the Buyer are unable to agree on such Asset Allocation Statement within ninety (90) days following the Closing Date, then the disputed items with respect to the Asset Allocation Statement shall be resolved by an internationally recognized independent accounting firm mutually agreed upon by the Seller and the Buyer, and the Buyer shall bear 100% of the costs of such accounting firm. The accounting firm shall resolve such dispute in a manner consistent with the principles set forth in this Article 3, and such resolution shall be final and binding on the Buyer and the Seller. With respect to the Purchased Assets that were acquired from Seller Group Members that are "United States persons" within the meaning of Section 7701(a)(30) of the Code, the final Asset Allocation Statement shall be prepared in a manner consistent with Section 1060 of the Code. The Buyer, the Seller Group Members, and their applicable Affiliates shall: (a) report the purchase and sale of the Purchased Assets in any Tax Returns relating to the transactions contemplated in this Agreement in accordance with the final Asset Allocation Statement; and (b) act in accordance with the final Asset Allocation Statement in the preparation, filing and audit of any Tax Return (including filing Form 8594 with its U.S. federal income Tax Return).".

(8)     The following is added as new Section 3.4 of the Purchase Agreement:

> "**3.4.    Payment**
>
> Any obligation for the Buyer to make any payment or fund any obligation under this Agreement may, in the sole discretion of the Buyer, be paid or funded directly or indirectly by Buyer provided that Buyer shall remain principally liable to make such payment and fund such obligation."

## 2.5     Representations and Warranties by the Seller

(1)     Section 4.1(b)(vi) of the Purchase Agreement is deleted in its entirety and replaced as follows:

> "(vi)    Except as set forth on Schedule 4.1(b)(vi), (x) the Seller and each of the other Seller Group Members identified in Schedule 4.1(b)(i) is the sole direct or indirect beneficial owner of all of the Equity Interests of the corresponding Seller Subsidiary set out therein, free and

clear of all Encumbrances, and (y) the Seller has the exclusive right to dispose of all of the Equity Interests of each Transferred Subsidiary.".

(2)     Section 4.17(a) of the Purchase Agreement is amended by adding the words "(iv) the Special Leave Employees" after "(iii) the 129 WDI Employees".

**2.6     Representations and Warranties by the Buyer**

(1)     Section 5.1(a) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(a)     The Buyer is a corporation, duly incorporated, validly existing and in good standing under the laws of the Province of Quebec;".

(2)     Section 5.1(b)(i) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(i)     the Buyer is a corporation incorporated under the laws of Quebec, Canada that does not carry on, and has never carried on, any business, does not and has never had, any employees, does not own, and has never owned, any property or assets or any interests of any nature or kind whatsoever, and has never entered into any transaction (except for the transaction(s) contemplated by and in connection with this Agreement);".

(3)     Section 5.3 of the Purchase Agreement is deleted in its entirety and replaced as follows:

"**5.3     Absence of Conflicts**

None of the  Buyer nor any of the Designated Buyer(s) is a party to, bound or affected by or subject to any charter or bylaw provision or Applicable Law or governmental authorizations, approvals, franchises, Orders, certificates, consents, directives, notices, licenses, permits, variances, registrations or other rights issued, granted or given by or from any Governmental Authority that would be violated, breached by, or under which any default would occur or with notice or the passage of time would, be created as a result of the execution and delivery of, or the performance of obligations under, this Agreement or any other agreement or document to be entered into or delivered under the terms of this Agreement, except for any violations, breaches or defaults or any Applicable Law or any Governmental Authorizations, approvals, franchises, Orders, certificates, consents, directives, notices, licenses, permits, variances, registrations or other rights issued, granted or given by or from any Governmental Authority, that would not have a material effect on the ability of the Buyer or any of the Designated Buyer(s) to consummate the transactions hereunder.".

(4)     Section 5.5 of the Purchase Agreement is deleted in its entirety and replaced as follows:

"**5.5     Approvals and Consents**

Except for (a) the issuance of the Approval and Vesting Order, the Initial Recognition Order and the U.S. Sale Order, (b) the approvals and consents set forth on Exhibit 5.5 attached hereto and (c) any consent that may be required in connection with the assignment of a Purchased Asset, including any Assigned Agreement, no authorization, consent or approval of, or filing with or notice to, any Governmental Authority, court or other Person is required in connection with the execution, delivery or performance of this Agreement by the Buyer, and each of the agreements to be executed and delivered by the Buyer and/or any Designated Buyer(s) hereunder or the purchase of any of the Purchased Assets hereunder, except for any authorizations, consents, approvals, filings

or notices of any Governmental Authority, court or Person that would not have a material effect on the ability of the Buyer to consummate the transactions hereunder.".

**2.7    Closing Conditions.**

Section 6.2 of the Purchase Agreement is amended by:

(1)    in paragraph (g), fixing the 'error' cross reference to a cross reference to Section 7.3(f) and deleting the word "and" at the end of the paragraph;

(2)    at the end of paragraph (h), deleting the "." and adding the words "; and"; and

(3)    adding the following new Section 6.2(i):

"(i)    *Pre-Closing Reorganization* – the Pre-Closing Reorganization shall have been effected in the manner, order and sequence prescribed in the Reorganization Step Plan and pursuant to the Approval and Vesting Order.".

**2.8    Covenants.**

(1)    Clause (1) in the preamble of Section 7.2 of the Purchase Agreement is deleted in its entirety and replaced with "(1) as required by this Agreement, including the Pre-Closing Reorganization, the Post-Closing Reorganization and any other restructuring pursuant to Section 7.14;".

(2)    Section 7.5(g) of the Purchase Agreement is amended by deleting the word "the" before "each Designated Buyer".

(3)    Section 7.6(b) is deleted in its entirety and replaced with the following:

"(b)        At least four (4) Business Days prior to the Closing Date (or such other date as is mutually agreed to in writing (including via exchange of email by counsel to the Seller and counsel to the Buyer) by the Seller and the Buyer, each acting reasonably), the Seller shall provide to the Buyer the final Employee Schedule that contains the final list of Listed Employees. The Buyer shall recognize the periods of employment of the Listed Employees (for all employment purposes) with the Seller Group Members and any of their predecessors and Affiliates and, for Listed Employees with Seller Group Members that are not Transferred Subsidiaries, offer continued employment to, or for Listed Employees with Transferred Subsidiaries, continue the employment of, each such Listed Employee effective as of the Closing Date on terms and conditions of employment, and Employee Plans, that are substantially comparable in the aggregate to those terms and conditions of employment currently available to each such Listed Employee immediately prior to the Closing Date (including the Key Employee Retention Plan, if applicable). The term "**Transferred Employees**" means those Listed Employees: (a) who accept the Buyer's offer of continued employment prior to the Closing Date; and (b) whose employment continues by operation of Applicable Law in the employment of a Transferred Subsidiary. For the avoidance of doubt, a Transferred Employee shall be deemed to have accepted Buyer's offer of continued employment where required to be made pursuant to this Section 7.6(b) by satisfying the conditions set forth in Buyer's offer letter to them indicating that their employment agreements, Employment Agreement Amendments and Key Employee Retention Plans (each, as applicable) have been assumed by Buyer or its affiliates. The

Buyer shall provide a welcome letter to those Listed Employees whose employment continues by operation of Applicable Law in the employment of a Transferred Subsidiary. For the avoidance of doubt, the Parties intend that the transactions contemplated by this Agreement for Listed Employees that become Transferred Employees shall not result in any severance, termination or redundancy payment or similar payment in connection with the consummation of the transactions. Except as disclosed under Schedule 7.6(b), the Seller Group Members shall terminate the employment of all Employees who are not Listed Employees and any Listed Employee who fails to execute an applicable Employment Agreement Amendment within 48 hours of the Filing Date, or prior to the Closing Date (in which case such employee will not be considered a Listed Employee for any purpose). Prior to the Closing Date, except as disclosed under Schedule 7.6(b), the applicable Seller Group Members (including, for certainty, the Transferred Subsidiaries) shall terminate with effect on a date prior to the Closing Date the employment of (i) any remaining Employees who are not Listed Employees; and (ii) any Listed Employee whose employment does not continue by operation of Applicable Law with the Buyer, a Designated Buyer or a Transferred Subsidiary, or who does not accept the Buyer's offer of employment."

(4)     Section 7.6(g) is deleted in its entirety and replaced with the following:

"(g)     The  Buyer confirms that applicable Transferred Subsidiaries remain bound by their respective Collective Agreements that continue by operation of law on Closing and recognize any Union that represents employees of the Business to the extent required by Applicable Law it being understood that this paragraph is not applicable in respect of Collective Agreements governed by U.S. laws ;".

(5)     Section 7.6(i) is deleted in its entirety and replaced with the following:

"(i)     The Buyer (or the relevant Designated Buyer) shall assume as of the Closing Time, the Transferred Subsidiaries shall retain, and the Buyer (or the relevant Designated Buyer) and the applicable Transferred Subsidiary shall agree to pay, perform, discharge, fulfil and be liable for all liabilities relating to the Assumed Employee Plans, the Transferred Subsidiary Employee Plans and as provided by Section 7.6(q) and under Exhibits 7.6(q)(i) and 7.6(q)(ii)."

(6)     Section 7.6(j) is deleted in its entirety and replaced with the following:

"(j)     The Buyer shall, as part of complying with the Buyer's obligations to Transferred Employees, including under Section 7.6(b):

(i)     provide written notice to the Seller prior to the Closing Date that the Buyer wishes to assume one or more Employee Plans (the "**Assumed Employee Plans**");

(ii)     provide benefits to the Transferred Employees (or any spouse, beneficiary or dependent of such Persons) through new employee plans established effective as of the Closing Date; and/or

(iii)     confirm that benefits to Transferred Employees (or any spouse, beneficiary or dependent of such Persons) will continue to be provided through one or more Employee Plans of a Transferred Subsidiary (for greater certainty, including multiemployer plans, the "**Transferred Subsidiary Employee Plans**"). For greater certainty, the Cirque du Soleil Holdings LP 2015 Unit Appreciation Right Plan shall not be a Transferred Subsidiary Employee Plan.

        (iv)      provide benefits to current and former Employees as well as Contractors that are on disability or a leave of absence as of the date hereof, the whole in accordance with Section 7.6(q) and as provided under Exhibits 7.6(q)(i) and 7.6(q)(ii))."

(7)      Section 7.6(k) is deleted in its entirety and replaced with the following:

"(k)      Effective as of the Closing Date, each Transferred Employee shall cease to actively participate in and accrue benefits under the Employee Plans (other than the Assumed Employee Plans, the Transferred Subsidiary Employee Plans or as provided under Section 7.6(q)(i) and Exhibits 7.6(q)(i) and 7.6(q)(ii)). The applicable Seller Group Member (or the relevant designated entity) shall retain responsibility, as sponsor and administrator, for all benefits, entitlements, obligations and liabilities under the Employee Plans (other than the Assumed Employee Plans, the Transferred Subsidiary Employee Plans, the Assumed Employment Contracts and as provided under Section 7.6(q) and under Exhibits 7.6(q)(i) and 7.6(q)(ii))."

(8)      Section 7.6(l) is deleted in its entirety and replaced with the following:

"(l)      If the Buyer provides a notice under Section 7.6(j)(i), effective as of the Closing Date, the Seller and the Buyer shall take commercially reasonable efforts to cause the applicable Seller Group Member to, assign to the Buyer, and the Buyer shall assume, the Assumed Employee Plans and all agreements and policies forming part of or relating to any Assumed Employee Plans. The Buyer or the applicable Transferred Subsidiary shall from the Closing Date be responsible for funding the Assumed Employee Plans and Transferred Subsidiary Employee Plans and as provided under Section 7.6(q) and under Exhibits 7.6(q)(i) and 7.6(q)(ii), in accordance with the requirements of Applicable Law and shall assume or continue to be responsible for all of the applicable Seller Group Member's rights, obligations and liabilities under and in relation to all agreements and policies with third parties relating to any Assumed Employee Plans and Transferred Subsidiary Employee Plans and as provided under Section 7.6(q) and Exhibits 7.6(q)(i) and 7.6(q)(ii), with respect to the period from and after the Closing Date. The Seller shall make such amendments to the Assumed Employee Plans, the Transferred Subsidiary Employee Plans and in connection with Section 7.6(q) and Exhibits 7.6(q)(i) and 7.6(q)(ii) and shall file such amendments with the applicable Governmental Authority as are necessary to give effect to the assignment of the Assumed Employee Plans, the Transferred Subsidiary Employee Plans and in connection with Section 7.6(q) and Exhibits 7.6(q)(i) and 7.6(q)(ii) to the Buyer. The Seller and the Buyer agree to co-operate to take all reasonable steps to effect the assignment contemplated in this Section 7.6(l)."

(9)      Section 7.6(p) is deleted in its entirety and replaced with the following:

"(p)      The Buyer shall establish, or shall cause to be established, the Employee Fund on the Closing Date, by wire transfer of immediately available funds to the order of the Monitor, in escrow, or as Monitor may otherwise direct in writing, of an amount equal to $15,000,000 to be held in escrow and distributed in accordance with the provisions of the escrow agreements for the Employee Fund. Any residual balance in the Employee Fund after the final distribution amounts from the Employee Fund shall be an asset of and owned by the Buyer or its Affiliate specified in the escrow agreements for the Employee Fund. The Seller Group Members shall cooperate with the escrow agent of the Employee Fund and use commercially reasonable efforts to assist them in carrying out their duties under the escrow agreements for the Employee Fund.".

(10)    Section 7.6(q) is deleted in its entirety and replaced with the following:

"(q)    Parties reached an agreement on options and alternatives with respect to medical coverage, disability coverage and /or, where applicable, workers compensation with respect to those current and former Employees as well as Contractors that are on disability or a leave of absence as of the date hereof. The binding agreement reached by the Parties in relation with this Section 7.6(q) is contained in Exhibits 7.6(q)(i) and 7.6(q)(ii) of the Agreement. The Buyer or the applicable Transferred Subsidiary hereby agrees to assume all liabilities and obligations contained with this Section 7.6(q) and under Exhibits 7.6(q)(i) and 7.6(q)(ii))".

(11)    Section 7.7(a) is deleted in its entirety and replaced with the following:

"(a)    The Monitor shall establish the Administrative Monitor Reserve and the Administrative Seller Reserve on the Closing Date in accordance with the Administrative Reserve Order. The Administrative Reserve Accounts shall be funded first, by applying cash and cash equivalents of the Seller Group (other than the Acquired Debtors) as at the Closing Date. No more than two (2) Business Days prior to the Closing Date, the Seller will certify to the Buyer the estimated cash and cash equivalents of the Seller Group as of the Closing Date and, to the extent such amount is less than the aggregate amount of the Administrative Monitor Reserve and the Administrative Seller Reserve, the Buyer shall, at the Closing Time, fund, or cause to be funded, in the manner, order and sequence prescribed in the Reorganization Step Plan, the difference which shall make up the balance of the Administrative Reserve Accounts. From time to time after the Closing Date, the Monitor may (i) pay from the Administrative Monitor Reserve the Administrative Reserve Costs of the Monitor at its sole discretion and without further authorization, (ii) pay from the Indemnification Amount included in the Administrative Monitor Reserve any amount required to satisfy the indemnity in favour of the Indemnified Parties under the Fund Agreements (subject to and in accordance with the terms of the Fund Agreements), (iii) pay from the Administrative Seller Reserve the Administrative Reserve Costs of the Seller based on written instructions received from the Seller, (iv) reduce, at its sole discretion, the amount of the Administrative Monitor Reserve as and to the extent it is no longer required to satisfy the indemnity under the Fund Agreements or the Administrative Reserve Costs of the Monitor by distributing to the Buyer, or as the Buyer may direct in writing, the amount of such reductions and (v) reduce, based upon written instructions received from the Seller, the amount of the Administrative Seller Reserve as and to the extent it is no longer required to satisfy the Administrative Reserve Costs of the Seller by distributing to the Buyer, or as the Buyer may direct in writing, the amount of such reductions, in each case in accordance with the Administrative Reserve Order. The Monitor shall distribute to the Buyer, or as the Buyer may direct, in writing, any residual balance of the Indemnification Amount at the latest of the following dates to occur: (y) the date that is three years from the Termination Date (as defined in the Fund Agreements) of the Fund Agreements, and (z) the date on which there is no alleged or pending Claims against any of the Indemnified Parties for which they are entitled to indemnity under the Fund Agreements. Any other residual balance in the Administrative Monitor Reserve after the payment of all Administrative Reserve Costs of the Monitor shall be an asset of and owned by the Buyer (or Designated Buyer, as applicable) and any residual balance in the Administrative Seller Reserve after the payment of all Administrative Reserve Costs of the Seller shall be an asset of and owned by the Buyer (or Designated Buyer, as applicable). Upon written request of the Buyer or its advisors from time to time, the Monitor shall update the Buyer regarding the Administrative Monitor Reserve and the Administrative Seller Reserve, including providing an accounting of all payments made therefrom.".

(12)    Section 7.24(b) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(b)    The Seller Group shall provide copies of the Creator Contracts to the Buyer as soon as reasonably practicable after the date hereof, following which the Buyer shall notify the Seller Group in writing at any time prior to two (2) Business Days prior to the Closing Date or any other date that the Parties may agree to in writing (including via exchange of email by counsel to the Seller and counsel to the Buyer) which Creator Contracts, if any, the Buyer does not consider necessary, acting in a commercially reasonable manner as determined by the Buyer, for the operation of the Purchased Assets on and after Closing (the "**Excluded Creator Contracts**").  Prior to the Closing, the Excluded Creator Contracts shall be removed from the list of Creator Contracts in Schedule 1.1(c). For greater certainty, any Creator Contracts which are removed from the list of Creator Contracts in accordance with this paragraph shall not be included in the IP Contracts or the Assumed Contracts and shall constitute Excluded Contracts, subject to the terms and provisions of Section 2.5, including Section 2.5(f).".

(13)    Section 7.24(c) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(c)    The Buyer shall establish, or shall cause to be established, the Contractor Fund on the Closing Date, by wire transfer of immediately available funds to the order of the Monitor, in escrow, or as the Monitor may otherwise direct in writing, of an amount equal to $5,000,000 (or such lesser amount as is required to pay a Benefit (as such term is defined in Exhibit F) to each Eligible Contractor), to be held in escrow and distributed in accordance with the provisions of the escrow agreements for the Contractor Fund. Any residual balance in the Contractor Fund after the final distribution amounts from the Contractor Fund shall be an asset of and owned by the Buyer. The Seller Group Members shall cooperate with the escrow agent of the Contractor Fund and use commercially reasonable efforts to assist them in carrying out their duties under the escrow agreements for the Contractor Fund."

(14)    The following is added as new Section 7.26 of the Purchase Agreement:

"**7.26    Pre-Closing Reorganization and Post-Closing Reorganization**

(a)    Subject to the other terms of this Agreement, the Seller agrees that the Seller shall, and shall cause the Seller Subsidiaries (including, prior to the Closing, the Transferred Subsidiaries and, both prior to and subsequent to the Closing, ExcludedCo) to, use commercially reasonable efforts to:

(i)    effect the Pre-Closing Reorganization and the Post-Closing Reorganization; and

(ii)    cooperate with the Buyer and its advisors to determine the nature and terms of any Pre-Closing Reorganization and Post-Closing Reorganization that might be undertaken and the manner, order and sequence in which they may most effectively be undertaken.

(b)    The Buyer and the Seller shall work cooperatively and use commercially reasonable efforts to prepare, at all relevant or applicable times, all documentation necessary and do such other acts and things as are reasonably necessary to give effect to the Pre-Closing Reorganization and the Post-Closing Reorganization.

(c)    The Buyer may provide written notice to the Seller of any proposed change to the Pre-Closing Reorganization and the Post-Closing Reorganization at least five (5) Business Days before the Closing Date or any other date that the Parties may agree to in writing (including via exchange of email by counsel to the Seller and counsel to the Buyer), each acting reasonably and cooperatively with the other. Upon receipt of such notice, the Buyer and the Seller shall work cooperatively and use commercially reasonable efforts to prepare, before the Closing Date, all documentation necessary and do such other acts and things as are reasonably necessary to give effect to any such change to the Pre-Closing Reorganization and the Post-Closing Reorganization.".

## 2.9    Court Orders and Related Matters

(1)    Section 8.1(d) of the Purchase Agreement is amended by adding "(or, in respect of any Assignment Order for Excluded Contracts and Assigned Agreements with Restricted Rights contemplated in Section 2.5(f), the date such Assignment Order is Final)", after "and until the Closing Date".

## 2.10    Termination

(1)    Section 9.1(c) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(c)    by the Buyer or the Seller, if Closing has not occurred on or before November 6, 2020 or such later date agreed to by both the Seller and the Buyer in writing (including via exchange of email by counsel to the Seller and counsel to the Buyer) in consultation with the Monitor (the "**Sunset Date**"), provided that the terminating Party is not in breach of any representation, warranty, covenant or other agreement in this Agreement which would prevent the satisfaction of the conditions in Article 6 by the Sunset Date;".

## 2.11    Closing Matters.

(1)    Section 10.2(e) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(e)    documentation evidencing and implementing the amended and restated cash management arrangements with Fédération des caisses Desjardins du Québec (and its affiliates, collectively the "**Desjardins Group**"), including the transitioning of all cash and the transitioning or repayment of negative balances in the bank accounts subject to the existing cash management arrangements with the Desjardins Group and such other bank accounts with the Desjardins Group as are listed on a summary of accounts provided to the Buyer on the date hereof on terms acceptable to the Desjardins Group, the Buyer and the Seller;".

(2)    Section 10.2(p) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(p)    the shares or equivalent interests of CDS Canadian Holdings, Inc., Cirque du Soleil Vegas, L.L.C. as well as any other Transferred Subsidiaries designated by the Buyer pursuant to Section 2.5(g) of this Agreement, in each case endorsed for transfer to the Buyer or such entity as may be designated by the Buyer (or, alternatively, instruments of transfer of all such shares and equity interests in favour of the Buyer or such entity as may be designated by the Buyer);".

(3)    Section 10.2(r) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(r)      [Intentionally Omitted.]; and"

(4)      Section 10.3(b) of the Purchase Agreement is deleted in its entirety and replaced as follows:

"(b)      the payment contemplated by Section 3.1(d)(iii);".

(5)      The following is added as new Section 10.3(b.1) of the Purchase Agreement

"(b.1)   documentation evidencing and implementing the amended and restated cash management arrangements with the Desjardins Group, including the transitioning of all cash and the transitioning or repayment of negative balances in the bank accounts subject to the existing cash management arrangements with the Desjardins Group and such other bank accounts with the Desjardins Group as are listed on a summary of accounts provided to the Buyer on the date hereof on terms acceptable to the Desjardins Group, the Buyer and the Seller;".

(6)      Section 10.3(f) of the Purchase Agreement is amended by adding the words "and/or the Designated Buyer(s)" after the word "Buyer".

(7)      Section 10.3(g) of the Purchase Agreement is amended by adding the words "and/or the Designated Buyer(s)" after the word "Buyer".

(8)      The following is added as new Section 10.3(c.1) of the Purchase Agreement:

"(c.1)   a certificate of a senior officer or director of each Designated Buyer, or where such Designated Buyer is a limited partnership, a certificate of a senior officer or director of each such Designated Buyer's general partner (in either case, in such capacity and without personal liability), in form and substance reasonably satisfactory to the Seller: (a) certifying that the board of directors of such Designated Buyer, or where such Designated Buyer is a limited partnership, such Designated Buyer's general partner, has adopted resolutions (in a form attached to such certificate) authorizing the execution, delivery and performance each agreement to which it is a party delivered pursuant to this Agreement and the transactions contemplated therein, as applicable, which resolutions are in full force and effect and have not been superseded, amended or modified as of the Closing Date; and (b) certifying as to the incumbency and signatures of the officers and directors of such Designated Buyer or general partner;".

(9)      Section 10.6 of the Purchase Agreement is deleted in its entirety and replaced as follows:

"**10.6   Simultaneous Transactions**

All actions taken and transactions consummated at the Closing shall be deemed to have occurred simultaneously (subject to, as applicable, Sections 2.5(e) and 2.5(f), the prescribed steps and the manner, order and sequence set out in the Reorganization Step Plan, and the terms of any escrow agreement or arrangement among the Parties relating to the Closing), and (subject to as otherwise expressly prescribed in the Reorganization Step Plan) no such transaction shall be considered consummated unless all are consummated.".

## 2.12   General Terms

Section 11.4 of the Purchase Agreement is amended by adding a reference to Section 7.26 as another provision whose covenants shall survive the Closing.

**2.13    Disclosure Letter**

The Disclosure Letter is amended by adding new Schedule 2.2(b), the content of which is set out therein.

**2.14    Exhibits**

(1)    Exhibit F is amended as follows:

    (a)    the second paragraph of Section 1 amended by adding the words "(or such lesser amount as is required to pay a Benefit to each Eligible Contractor)" after the words "USD 5,000,000";

    (b)    the last paragraph of Section 2 is deleted in its entirety and replaced as follows:

        "Notwithstanding the maximum amount described herein, if the Buyer designates certain Creator Contracts as Excluded Creator Contracts prior to the Closing pursuant to Section 7.24(b), the Contractors under such Excluded Creator Contracts will, to the extent owed a payment that has been stayed as a result of the CCAA Proceedings, become Eligible Contractors and the Settlor shall, to the extent necessary, make an additional contribution to the Contractor Fund in an amount that is sufficient to provide the Benefit (as defined below) to such additional Eligible Contractors."

    (c)    in Section 4, the word "indemnifying" is deleted and replaced with the word "identifying"; and

    (d)    in Section 5, the following is added at the end:

        ", provided that each Eligible Contractor shall acknowledge, confirm and agree that any payment received shall be credited against any obligation that may otherwise be or become due or owing to such Eligible Contractor pursuant to its service contract, agreement or arrangement."

(2)    Schedule A of this Amending Agreement is added to the Purchase Agreement as new Exhibit I of the Purchase Agreement.

(3)    Schedule B of this Amending Agreement is added to the Purchase Agreement as new Exhibit 7.6(q)(i) of the Purchase Agreement.

(4)    Schedule C of this Amending Agreement is added to the Purchase Agreement as new Exhibit 7.6(q)(ii) of the Purchase Agreement.

**ARTICLE III**
**ASSIGNMENT**

**3.1    Assignment by Initial Buyer.**

The Initial Buyer hereby irrevocably transfers, assigns, conveys and delivers to the Buyer, effective as of the date hereof, all of the Initial Buyer's right, title and interest in, to and under the Purchase Agreement and the confirmation and acknowledgment re: sale of vacant land dated

August 28, 2020 by CDS, the Seller and the Initial Buyer (the "**Confirmation and Acknowledgment**"), including all of the Initial Buyer's rights, benefits and advantages whatsoever to be derived from the representations, warranties, covenants and indemnities of the Seller Group Members contained in the Purchase Agreement and Confirmation and Acknowledgment.

**3.2    Acceptance by Buyer.**

Buyer hereby accepts the transfer, assignment, conveyance and delivery from Initial Buyer set out in Section 3.1, effective from and after the date of this Amending Agreement. Buyer assumes all of the obligations, covenants and indemnities of the Initial Buyer contained in the Purchase Agreement in favour of the Seller Group Members.

**3.3    Further Assurances.**

Each of the Seller Group Members and Initial Buyer agrees that it will from time to time and at all times hereafter upon every reasonable request of Buyer make, do, execute and perform or cause to be made, done, executed and performed all such further acts, deeds, documents or assurances and give all such further assurances as may be reasonably required by Buyer to consummate, make effective, confirm or evidence the transactions contemplated by this Amending Agreement, the Purchase Agreement, the Confirmation and Acknowledgment or otherwise.

**3.4    Consent by Seller Group Members.**

The Seller (on its own behalf and on behalf of the other Seller Group Members) hereby consents to the assignment by the Initial Buyer and assumption by the Buyer contemplated by this Amending Agreement provided that, until Closing, the Initial Buyer remains solidarily liable with the Buyer for all of the obligations, covenants and indemnities of the Buyer contained in the Purchase Agreement in favour of the Seller Group Members .

**ARTICLE IV**
**MISCELLANEOUS**

**4.1    Ratification, Confirmation and Effect.**

The Purchase Agreement, as amended by this Amending Agreement, remains in full force and effect and is hereby ratified and confirmed.  Provisions of the Purchase Agreement that have not been amended or terminated by this Amending Agreement remain in full force and effect, unamended.  All rights and liabilities that have accrued to any Party under the Purchase Agreement up to the date of this Amending Agreement remain unaffected by this Amending Agreement.  This Amending Agreement shall not, except as expressly provided herein, operate as an amendment or waiver of any right or remedy of any Party under the Purchase Agreement nor constitute a waiver of any provision thereof.

**4.2    References and Effect**

On and after the date hereof, any reference to the Purchase Agreement (including in other related documents, instruments or agreements made between the Parties) shall be construed as a reference

to the Purchase Agreement as acknowledged, confirmed, and amended, modified and supplemented by this Amending Agreement.

### 4.3    Further Assurances

Each of the Parties hereby agrees to promptly do, make, execute or deliver, or cause to be done, made, executed or delivered, all such further acts, documents and things as they reasonably require from time to time for the purpose of giving effect to this Amending Agreement, and shall take all such steps as may be reasonably within its respective power to implement to the full extent the provisions of this Amending Agreement and the Purchase Agreement.

### 4.4    Counterparts and Effective Date.

This Amending Agreement may be executed in counterparts (by original, PDF or other electronic means), each of which shall be deemed an original, but all of which together shall be deemed to be one and the same agreement.  A signed copy of this Amending Agreement delivered by email or other means of electronic transmission shall be deemed to have the same legal effect as delivery of an original signed copy of this Amending Agreement.  Notwithstanding the date of execution or transmission of any counterpart, each counterpart shall be deemed to have the effective date first written above, and the amendments contained in this Amending Agreement are and shall be effective on the date first above written.

**[Remainder of page left intentionally blank.]**

**IN WITNESS WHEREOF**, the parties hereto have caused this Amending Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**CIRQUE DU SOLEIL HOLDINGS L.P.,**
by its general partner,
**CIRQUE DU SOLEIL GP INC.**

By: _____
    Name:  Jocelyn Côté
    Title:  Chief Legal Officer

By: _____
    Name:  Stéphane Lefebvre
    Title:  Chief Financial Officer

**SPECTACLE BIDCO LP**, by its general partner,
**DRIVETRAIN AGENCY SERVICES, LLC**

By: _____
    Name:
    Title:

**SPECTACLE BIDCO HOLDINGS INC.**

By: _____
    Name:
    Title:

**IN WITNESS WHEREOF**, the parties hereto have caused this Amending Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

**CIRQUE DU SOLEIL HOLDINGS L.P.,**
by its general partner,
**CIRQUE DU SOLEIL GP INC.**


By:    _____
　　　　Name:
　　　　Title:

By:    _____
　　　　Name:
　　　　Title:


**SPECTACLE BIDCO LP**, by its general partner,
**DRIVETRAIN AGENCY SERVICES, LLC**


By:    *Marc Rosenberg*_____
　　　　Name: Marc Rosenberg
　　　　Title:  Authorized Signatory


**SPECTACLE BIDCO HOLDINGS INC.**


By:    *Marc Rosenberg*_____
　　　　Name:  Marc Rosenberg
　　　　Title:  President and Secretary

## SCHEDULE A

## EXHIBIT I OF THE PURCHASE AGREEMENT

**[See attached]**

# EXHIBIT I

## REORGANIZATION STEP PLAN

This Schedule sets out the transaction steps to be implemented in respect of the acquisition of the Purchased Assets, including the acquisition of the shares of CDS Canadian Holdings, Inc. ("**CDS Holdings**"), by Spectacle BidCo Holdings Inc. (together with its assignee(s) and designee(s), and as the context requires, each, the **"Buyer"**) by way of credit bid pursuant to the Asset Purchase Agreement, as may be amended, modified, supplemented and/or restated from time to time (collectively, the "**APA**") entered into on July 15, 2020 between Cirque du Soleil Holdings LP (the "**Seller**") and Spectacle Bidco LP ("**Spectacle LP**"), and an Approval and Vesting Order of the Superior Court of Quebec (the "**Order**").

All dollar amounts referred to herein are in US dollars unless otherwise noted, and all defined terms not defined herein are as defined in the APA or the Order, as applicable.

The following transactions shall occur, and shall be deemed to occur, in the order set out herein, at the particular times set out herein. The Effective Time is that time on the Effective Date as agreed to by the Buyer, the Seller and the Monitor.

### Pre-Closing Transactions

*Transactions to Occur at Least 5 Days Prior to the Effective Date*

1.  The Buyer is incorporated under the laws of Province of Quebec. On incorporation, the initial shareholders of the Buyer subscribe for common shares (the "**Initial Shares**") in the capital of the Buyer for $1.00 per share.

2.  The rights and obligations of Spectacle LP under the APA are assigned to, and assumed by, the Buyer.

3.  A new corporation, CDS U.S. Holdings Newco, Inc. ("**New US Topco**") is incorporated under the laws of the State of Delaware. On formation, Buyer subscribes for one common share in the capital of New US Topco for nominal consideration.

4.  A new limited liability company, Spectacle Bidco, LLC ("**New LLC**") is organized under the laws of the State of Delaware. The initial equityholder of New LLC (the "**Initial Buyer GP**") subscribes for one Class A unit of New LLC (the "**New LLC Class A Common Equity**") for nominal consideration. New LLC elects to be treated as a corporation for U.S. income tax purposes. New LLC incorporates CDS U.S. Intermediate Holdings Newco, Inc. under the laws of the State of Delaware ("**New US Intermediary**"). On formation, New LLC subscribes for common shares in the capital of New US Intermediary for nominal consideration.

5.  New US Intermediary incorporates Cirque du Soleil Holdings USA Newco, Inc. under the laws of the State of Delaware ("**New US Holdings**"). On formation, New US Intermediary subscribes for common shares in the capital of New US Holdings for nominal consideration.

- 2 -

6.    New US Holdings incorporates or organizes one or more new subsidiary entities (the "**US Buyer Subsidiaries**").

7.    The Seller incorporates two new subsidiary corporations under the laws of the Province of Quebec being 9424-9356 Quebec Inc ("**ExcludedCo 1**") and 9424-9398 Quebec Inc ("**ExcludedCo 2**"). On incorporation, the Seller subscribes for one common share in the capital of each of ExcludedCo 1 and ExcludedCo 2 for $1.00 each.

8.    CDS Canada 1 SCSP is wound up, and proportionate undivided interests in all of its assets including (i) its limited partnership interests in CDS Canada 2 SCSP; (ii) its shares of 9415-8219 Quebec Inc; and (iii) certain show rights and interests, are distributed to its partners, 9415-8185 Quebec Inc and Cirque du Soleil Canada Inc ("**CDS Canada**").

9.    CDS Canada 2 SCSP is wound up, and proportionate undivided interests in all of its assets including (i) its limited partnership interests in CDS Canada 3 LP; (ii) its shares of 9415-8227 Quebec Inc; and (iii) certain show rights and interests, are distributed to its partners 9415-8219 Quebec Inc, 9415-8185 Quebec Inc and CDS Canada.

10.   CDS Canada 3 LP is wound up, and undivided interests in all of its assets including (i) its limited partnership interests in CDS Canada 4 LP ("**CDS Partnership**"); (ii) its shares of 9415-8235 Quebec Inc; and (iii) certain show rights and interests, are distributed to its partners 9415-8219 Quebec Inc, 9415-8185 Quebec Inc, 9415-8227 Quebec Inc and CDS Canada.

11.   Cirque du Soleil Inc. ("**CSI**") and 9415-8243 Quebec Inc ("**CSI Sub**") establish a new general partnership ("**CSI Partnership**") under the laws of the Province of Quebec. CSI acquires a 99.99% general partnership interest and CSI Sub acquires a 0.01% general partnership interest.

12.   Cirque du Soleil Images Inc. ("**CDS Images**") incorporates 9425-1055 Quebec Inc as a new subsidiary corporation under the laws of the Province of Quebec ("**Images Newco**"). CDS Images subscribes for one common share in the capital of Images Newco for $1.00.

13.   Creation 4U2C Inc. ("**4U2C**") incorporates 9425-1089 Quebec Inc as a new subsidiary corporation under the laws of the Province of Quebec ("**4U2C Newco**"). 4U2C subscribes for one common share in the capital of 4U2C Newco for $1.00.

14.   CDS Canada incorporates 9425-1121 Quebec Inc as a new subsidiary corporation under the laws of the Province of Quebec ("**CDS/CSI Newco**"). CDS Canada subscribes for one common share in the capital of CDS/CSI Newco for $1.00.

15.   CDS Canada incorporates 9425-1154 Quebec Inc as a new subsidiary corporation under the laws of the Province of Quebec ("**CDS/955 Newco**"). CDS Canada subscribes for one common share in the capital of CDS/955 Newco for $1.00.

16.   The existing promissory note issued by CDS Canada to CSI (the "**CDS Note**") is amended and restated (without novation) by adding the right of CSI to convert to CDS Note into an interest bearing promissory note, bearing interest at a rate of 5%. The CDS Note is then converted into an interest-bearing promissory note (the "**New CDS Note**").

- 3 -

17.  A demand non-interest bearing promissory note (the "**955 Note**") is issued by CDS Canada to 9553266 Canada Inc. ("**955**") to evidence the non-interest bearing intercompany debt owing by CDS Canada (other than any portion of the debt which is an Intercompany Trade Debt or any portion which CDS Canada and 955 agree will not be evidenced by the 955 Note). The 955 Note is amended and restated (without novation) by adding the right of 955 to convert the 955 Note into an interest bearing promissory note, bearing interest at a rate of 5%. The 955 Note is then converted into an interest bearing promissory note (the "**New 955 Note**"). For the purposes of this document, a "Intercompany Trade Debt" is an intercompany debt owing by or owing to an Acquired Debtor which arose in the ordinary course of business, the issuance of which gave rise to an income inclusion to the creditor (where the creditor is an Acquired Debtor), or an income deduction to the debtor (where the debtor is an Acquired Debtor).

18.  The stated capital of the common shares of 955 is reduced to $1.00 in the aggregate (without any payment thereon).

19.  The authorized capital of CDS Canada is amended to create Class C Preferred Shares.

20.  The 0.01% interest in Cirque du Soleil Rus LLC ("**Rus LLC**") (the "**RUS LLC Interest**") is transferred by CDS Canada to CSI as a capital contribution.

20A. The debt owing by CDS Canada to Cirque du Soleil HK, Limited ("**CDS HK**") (the "**HK Debt**") is transferred by CDS HK to ExcludedCo 1 for no consideration.

20B. The debt owing by Gaia Luxembourg S.A ("**Gaia Lux**") to CSI and the debt owing by CSI to Gaia Lux are set off, such that only a net debt owing by Gaia Lux to CSI will remain outstanding (the "**Gaia Debt**").

*Transactions to Occur At Least 3 Days Prior to the Effective Date*

21.  CDS Images pays all accrued and unpaid interest owing to CDS Canada in respect of the intercompany debt payable by CDS Images to CDS Canada (other than any portion of the debt which is an Intercompany Trade Debt) (the "**Images Debt**").

22.  Immediately following Step 21, CDS Canada transfers the Images Debt to Images Newco in consideration for a demand promissory note, bearing interest at the rate of 5% and having a principal amount equal to the fair market value of the Images Debt, being $1.00 (subject to a price adjustment clause).

23.  Immediately following Step 22, Images Newco winds up into CDS Images and the Images Debt is extinguished. An election pursuant to subsection 80.01(4) of the ITA is made.

24.  4U2C pays all accrued and unpaid interest owing to CDS Canada in respect of the promissory note issued by 4U2C to CDS Canada (the "**4U2C Note**").

25.  Immediately following Step 24, CDS Canada transfers the 4U2C Note to 4U2C Newco in consideration for a demand promissory note, bearing interest at the rate of 5%, and having a principal amount equal to the fair market value of the 4U2C Note, being $1.00 (subject to a price adjustment clause).

- 4 -

26.    Immediately following Step 25, 4U2C Newco winds up into 4U2C and the 4U2C Note is extinguished. An election pursuant to subsection 80.01(4) of the ITA is made.

27.    CDS Canada pays all accrued and unpaid interest owing to CSI in respect of the New CDS Note.

28.    Immediately following Step 27, CSI transfers the New CDS Note to CDS/CSI Newco in consideration for a demand promissory note, bearing interest at the rate of 5%, and having a principal amount equal to the fair market value of the New CDS Note, being $1.00 (subject to a price adjustment clause).

29.    Immediately following Step 28, CDS/CSI Newco winds up into CDS Canada, and the New CDS Note is extinguished. An election pursuant to subsection 80.01(4) of the ITA is made.

30.    CDS Canada pays all accrued and unpaid interest owing to 955 in respect of the New 955 Note.

31.    Immediately following Step 30, 955 transfers the New 955 Note to CDS/955 Newco in consideration for demand promissory note, bearing interest at a rate of 5% and having a principal amount equal to the fair market value of the New 955 Note, being $1.00 (subject to a price adjustment clause).

32.    Immediately following Step 31, CDS/955 Newco winds up into CDS Canada, and the New 955 Note is extinguished. An election pursuant to subsection 80.01(4) of the ITA is made.

33.    All of the shares in the capital of the following entities held by CDS Luxembourg Holdings SARL ("**CDS Lux**") are transferred to CDS Canada in consideration for one Class C Preferred Share in the capital of CDS Canada (the "**CDS Preferred Share**"): (i) 955; (ii) Gaia Lux; (iii) Cirque du Soleil Asia-Pacific Private Limited ("**CDS AP**"); (iv) CDS HK; (v) Sundust Limitada; and (vi) Rus LLC.

34.    The CDS Preferred Share is distributed by CDS Lux to the Seller. Following this distribution, the CDS Preferred Share is transferred by the Seller to CDS Holdings in consideration for 100 additional common shares in capital of CDS Holdings.

*Transactions to Occur At Least 1 Day Prior to Effective Date*

35.    All of the common shares in the capital of CDS Holdings (all of which are owned by the Seller) are consolidated into one common share (the "**CDS Holdings Share**"). The stated capital of the CDS Holdings Share is reduced to $1.00 (without any payment thereon).

36.    The CDS Preferred Share is exchanged for one Class A share, and all of the Class A shares in the capital of CDS Canada (all of which are owned by CDS Holdings) are consolidated into one Class A Share. The stated capital of the Class A Share of CDS Canada is reduced to $1.00 (without any payment thereon).

- 5 -

**Transactions to Occur on the Effective Date**

37.   On the Effective Date, at least one hour prior to the Effective Time, contemporaneously, and pursuant to subsection 97(2) of the ITA:

   (a)   CDS Canada transfers all of its assets (including (i) the Canadian Intercompany Payables payable to CDS Canada, (ii) the debt owing by Araxa Espetaculas Circenses Ltda ("**Araxa**") to CDS Canada (the "**Araxa Debt**"), (iii) the debt owing by Rus LLC to CDS Canada (the "**RUS Debt**") and (iv) those Intercompany Trade Debts and accounts receivable owing to CDS Canada as set out in a Schedule prepared by CDS Canada) other than (i) the debt owing by CDS Partnership to CDS Canada, (ii) the shares of CSI; (iii) the shares of 9415-8219 Quebec Inc; (iv) the shares of 9415-8185 Quebec Inc; (v) the shares of 9415-8227 Quebec Inc; (vi) the shares of 9415-8235 Quebec Inc; (vii) the shares of RUS LLC; (viii) the shares of Inspiracao Organizacao de Espetaculos Ltda; (ix) the shares of Araxa; (x) the shares of CDS Images; (xi) the shares of 4U2C; (xii) the shares of Cirque du Soleil Germany Gmbh; (xiii) the shares of Cirque du Soleil Inspiration Inc; (xiv) the shares of The Works Creative Pte. Ltd; (xv)  the shares of 955; (xvi) the shares of Gaia Lux; (xvii) the shares of CDS AP; (xviii) the shares of Sundust Limitada; (xix) the shares of CDS HK; and (xx) the shares of Illusionists Live UK Limited; and (xxi) the Excluded Assets, Excluded Contracts, and Excluded JV Interests (including the shares of Paramour Produktiongesellesschaft mbH) owned by CDS Canada, to CDS Partnership in consideration for (i) the assumption by CDS Partnership of the Assumed Liabilities owing by CDS Canada (other than any Intercompany Trade Debts owing by CDS Canada); and (ii) the issuance of additional units of, or an addition to the capital amount maintained in respect of, CDS Partnership;

   (b)   CSI transfers all of its assets (including (i) the Canadian Intercompany Payables payable to CSI, (ii) the Gaia Debt, (iii) the debt owing by CDS AP to CSI (the "**Asia-Pacific Debt**"), (iv) those Intercompany Trade Debts and accounts receivable owing to CSI as set out in a Schedule prepared by CSI, and (v) the Real Property held by it) other than (i) the shares of CSI Sub; (ii) the shares of Araxa Espetaculos Circenses Ltda; (iii) the shares of Sundust Limitada; (iv) the shares of Inspiracao Organizacao de Espetaculos Ltda; (v) the shares of CDS Images; (vi) the RUS LLC Interest; and (vii) the Excluded Assets, Excluded Contracts, and Excluded JV Interests owned by CSI, to CSI Partnership in consideration for (i) the assumption by CSI Partnership of the Assumed Liabilities owing by CSI (other than any Intercompany Trade Debts owing by CSI); and (ii) an addition to the capital amount maintained in respect of CSI's partnership interest in CSI Partnership; and

   (c)   CDS U.S. Intermediate Holdings, Inc. ("**Old CDS US Holdings**") transfers certain rights under contracts to use intellectual property (the "**Purchased IP Rights**") to CDS Partnership in consideration for a demand promissory note (the "**IP Note**") having a principal amount equal to the fair market value of the Purchased IP Rights (subject to a price adjustment clause), and the IP Note is issued in absolute payment of the purchase price payable for the Purchased IP Rights.

- 6 -

38.   On the Effective Date, but prior to the immediately following Step, intercompany claims which are solely between Seller Group Members who are "United States persons" (as defined in 26 U.S.C. 8 7701(a)(30)) (such intercompany claims, "**U.S. Intercompanies**") are distributed and contributed, set off, or cancelled, in each case, as set forth in the books and records of the applicable Seller Group Members or New US Topco or any of its Subsidiaries or entities that will become its Subsidiaries following the Effective Time pursuant to this Schedule; *provided, that,* unless an alternative treatment is specified in any such books and records, all U.S. Intercompanies shall be deemed to have been cancelled.

39.   On the Effective Date, at least one hour prior to the Effective Time, the following transactions occur in the following order:

(a)   New LLC contributes units of its Class B common equity ("**New LLC Class B Common Equity**") and Class C common equity ("**New LLC Class C Common Equity**" and, together with the New LLC Class B Common Equity, the "**New LLC Equity**") to New US Intermediary;

(b)   New US Intermediary contributes the New LLC Equity received in Step 39(a) to New US Holdings; and

(c)   immediately after Step 39(b) and in connection with and for the consideration described in the immediately following sentence, all right, title and interest of the Seller Group Members (other than Cirque du Soleil Vegas, LLC) that are United States Persons (the "**US Asset Sellers**") in the applicable Purchased Assets (which does not include the CDS Holdings Share, but includes the equity of Cirque du Soleil Vegas, LLC and certain JV Entities, the IP Note, the debt owing by CDS Canada to Blue Man Group Holding, LLC (the "**BMG Debt**") and any Intercompany Trade Debts owing by an Acquired Debtor) vests absolutely and exclusively in New US Holdings and the US Buyer Subsidiaries (as designated by New US Holdings), pursuant to the terms of the APA. In consideration for the applicable Purchased Assets described in the immediately preceding sentence, (i) New US Holdings (on behalf of itself and the US Buyer Subsidiaries) (A) transfers and delivers the New LLC Equity to Old CDS US Holdings in Old CDS US Holdings' individual capacity as a Seller and in its capacity as agent for the other US Asset Sellers under the APA; (B) agrees to pay cash to Old CDS US Holdings in an amount sufficient to pay amounts to be paid by Old CDS US Holdings in respect of Cure Costs payable by the US Asset Sellers (the "**US Cash Payment**"); and (C) issues the US TB Debt Percentage of the Takeback Debt (the "**US Takeback Debt**"), to Old CDS US Holdings in its individual capacity as a Seller and in its capacity as agent for the other US Asset Sellers under the APA, and (ii) New US Holdings and the US Buyer Subsidiaries assume (A) certain liabilities including amounts payable to CDS Holdings or its subsidiaries (the "**Canadian Intercompany Payables**") as set out in a Schedule prepared by New US Holdings; (B) any negative balances in the bank accounts of the US Asset Sellers subject to the existing cash management arrangements with Fédération des caisses Desjardins du Québec (and its affiliates, collectively the "**Desjardins**") and such other negative balances in bank accounts with Desjardins as are listed on a summary of accounts provided to New US Holdings on the date hereof; and (C) the Assumed

- 7 -

Liabilities owing by the US Asset Sellers (which for greater certainty does not include any Intercompany Trade Debts owing to an Acquired Debtor, other than those listed in a Schedule. For the purposes of this Schedule C, the "**Takeback Debt**" means the $300,000,000 of Second Lien Loans to be issued ratably to the First Lien Lenders; and the "**US TB Debt Percentage**" means the percentage of the Takeback Debt in respect of which New US Holdings will be the primary obligor, as agreed to between CDS Canada and New US Holdings.

40.    On the Effective Date, immediately prior to the time which is immediately prior to the Effective Time:

(a)    as described in Paragraph 18 of the Order, all right, title and interest of the Acquired Debtors in the Excluded Assets, the Excluded Contracts and the Excluded JV Interests, vest absolutely and exclusively in ExcludedCo 1 (for greater certainty, the Intercompany Trade Debts, the Canadian Intercompany Payables, the RUS Debt, the Araxa Debt, the Asia-Pacific Debt, the Gaia Debt and any other intercompany debts described in Step 46 will not be Excluded Assets and will not vest in ExcludedCo 1);

(b)    the Excluded Liabilities owing by CDS Canada (including (i) the First Lien Debt other than the Preserved 1L Claim, (ii) the HK Debt, and (iii) any Intercompany Trade Debts owing by CDS Canada as set out in a Schedule prepared by CDS Canada) are deemed to be, considered to be, and shall be one debt obligation;

(c)    the Excluded Liabilities owing by CSI (including (i) the debt owing by CSI to Cirque du Soleil (Shanghai) Culture and Arts Co., Ltd. (the "**Shanghai Debt**") and (ii) any Intercompany Trade Debts owing by CSI as set out in a Schedule prepared by CSI) are deemed to be, considered to be, and shall be one debt obligation; and

(d)    the Excluded Liabilities owing by each other Acquired Debtor (including any Intercompany Trade Debts owing by such Acquired Debtor, as set out in a Schedule prepared by that Acquired Debtor) are deemed to be, considered to be, and shall be one debt obligation.

The "**Preserved 1L Claim**" shall be that amount of principal owing under the First Lien Debt in respect of which CDS Canada is the primary obligor, equal to the amount which would be the fair market value of the CDS Holdings Share at the Effective Time assuming the Preserved 1L Claim were nil; *provided, that,* notwithstanding anything herein to the contrary, for applicable tax purposes, no claim in respect of the First Lien Debt in respect of which CDS Canada is the primary obligor will be treated as being exchanged for any of the assets described in Step 39(c), and no claim in respect of the First Lien Debt in respect of which Old CDS US Holdings is the primary obligor shall be treated as being exchanged for the equity or assets of the Acquired Debtors.

41.    On the Effective Date, immediately prior to the Effective Time:

(a)    as described in Paragraph 18 of the Order, the Excluded Liabilities of the Acquired Debtors (which for greater certainty includes the HK Debt and the Shanghai Debt), other than the IP Note, the First Lien Debt, the Second Lien Debt, the CDS 4 Term

- 8 -

Loan, the BMG Debt and the Intercompany Trade Debts set out in a Schedule prepared by the Acquired Debtors, are transferred to, assumed by and vest absolutely and exclusively in ExcludedCo 2, with novation;

(b)     all "Obligations" owing under and as defined in the First Lien Debt in respect of which CDS Canada is the primary obligor (other than the Preserved 1L Claim) is fully satisfied, extinguished, and settled for no consideration;

(c)     the Intercompany Trade Debts set out in a Schedule prepared by the Acquired Debtors, are fully satisfied, settled and extinguished for no consideration; and

(d)     Old US CDS Holdings transfers (i)(A) the New LLC Class B Common Equity to the First Lien Lenders,[1] or to the agent on behalf of the First Lien Lenders (the "**First Lien Agent**") and (B) the New LLC Class C Common Equity to the Second Lien Lenders, pro rata based on their interest in the Second Lien Debt or to the agent on behalf of the Second Lien Lenders (the "**Second Lien Agent**"); and (ii) the US Takeback Debt to the First Lien Lenders, pro rata based on their interest in the First Lien Debt or the First Lien Agent on behalf of the First Lien Lenders, in full satisfaction, extinguishment and settlement of (x) in the case of clause (i)(A) and clause (ii) of this sentence, all "Obligations" owing under and as defined in the First Lien Debt in respect of which Old CDS US Holdings was the primary obligor; and (y) in the case of clause (i)(B) of this sentence, all "Obligations" owing under and as defined in the Second Lien Debt.

42.     At the Effective Time, the Seller transfers the CDS Holdings Share, along with any other Purchased Assets of the Seller, to the Buyer, and all right, title and interest in the CDS Holdings Share and such other Purchased Assets vests absolutely and exclusively in the Buyer, and the Seller is released from any liability or obligation with respect to the Preserved 1L Claim. An election pursuant to subsection 256(9) of the ITA is made.

43.     Immediately after the Effective Time, and contemporaneously:

(a)     the First Lien Lenders exchange their Preserved 1L Claim in consideration for (i) the issuance to the First Lien Lenders[2] of the Canadian Portion of 100 million common shares of the Buyer, which shares are issued and delivered by the Buyer on behalf and for the benefit of CDS Canada; and (ii) the issuance of the Canadian TB Debt Percentage of the Takeback Debt (the "Canadian Takeback Debt") to the First Lien Lenders by CDS Canada, and on such exchange the Preserved 1L Claim is fully satisfied, extinguished and settled (upon which, for certainty, all "Obligations" under and as defined in the First Lien Debt shall have been fully

---

[1] Nothing in this Exhibit "I" shall, or shall be deemed to, have any impact on the allocation of the equity of New LLC, the shares in Buyer, the Canadian Takeback Debt or the US Takeback Debt as amongst the First Lien Lenders.

[2] Nothing in this Exhibit "I" shall, or shall be deemed to, have any impact on the allocation of the equity of New LLC, the shares in Buyer, the Canadian Takeback Debt or the US Takeback Debt as amongst the First Lien Lenders.

- 9 -

satisfied, settled and extinguished by virtue of the operations under Steps 41(a), 41(d) and this Step 43(a);

(b) CDS Holdings issues 99,999,999 common shares to the Buyer in consideration for the Buyer issuing shares to the First Lien Lenders pursuant to Step 43(a)(i);

(c) CDS Canada issues 99,999,999 Class A shares to CDS Holdings in consideration for CDS Holdings issuing shares to the Buyer pursuant to Step 43(b);

(d) the Initial Shares in the capital of the Buyer are cancelled for $1.00 per share; and

(e) New LLC and New US Topco merge, with New US Topco surviving, and on such merger: (i) the New LLC Class A Common Equity is cancelled for no consideration; (ii) the US Portion of 100 million common shares of the Buyer is issued directly to the holders of the New LLC Class B Common Equity (provided, if the First Lien Agent holds the New LLC Class B Common Equity as a result of Step 41(d), such shares may be issued directly to the First Lien Lenders, pro rata based on their interests in the First Lien Debt) (iii) warrants to acquire Buyer equity (the "**Buyer Warrants**") are issued directly to the holders of the New LLC Class C Common Equity (provided, if the Second Lien Agent holds the New LLC Class C Common Equity as a result of Step 41(d), such Buyer Warrants may be issued directly to the Second Lien Lenders, pro rata based on their interests in the Second Lien Debt); and (iv) New US Topco issues additional common shares to the Buyer to compensate the Buyer for issuing its common shares and the Buyer Warrants as set out in (ii) and (iii) above.

The "Canadian Portion" is equal to the ratio determined by dividing (i) the fair market value of the shares of CDS Holdings following the implementation of these transactions by (ii) the aggregate fair market value of the shares of New US Topco and CDS Holdings following the implementation of these transactions, and the "US Portion" is equal to 1 minus the Canadian Portion.

The Canadian TB Debt Percentage is that percentage of the Takeback Debt in respect of which CDS Canada will be the primary obligor, as agreed to between CDS Canada and New US Holdings.

44. Upon the issuance of the shares as set out in Step 43, the Buyer adds an amount to the stated capital account maintained in respect of its common shares equal to the lesser of (i) the fair market value of the 100 million common shares issued by it in Steps 43(a) and (d); and (ii) the aggregate fair market value of shares of CDS Holdings and New US Topco acquired by it in Steps 43(b) and (d) (other than the shares of New US Topco transferred by the Second Lien Lenders); and CDS Holdings adds an amount to the stated capital account maintained in respect of its common shares equal to the lesser of (i) the fair market value of the 99,999,999 common shares issued by it in Step 43(b); and (ii) the fair market value of the Class A shares of CDS Canada issued to it in Step 43(c); and CDS Canada adds an amount to the stated capital account maintained in respect of its Class A Shares equal to the lesser of (i) the fair market value of the 99,999,999 Class A Shares issued by

- 10 -

it in Step 43(c); and (ii) the amount of the Preserved 1L Claim less the principal amount of the Canadian Takeback Debt.

45.     Immediately after the time which is immediately after the Effective Time:

(a)     the amount of the Deposit is released by the Monitor to the Buyer, and the Buyer uses the Deposit to repay an amount equal to the Deposit to the Administrative Agent on behalf of the Loaning Lenders who funded the Deposit (the "**Deposit Lenders**") in partial repayment of the principal amount of the loans made by the Deposit Lenders to fund the Deposit (the "**Deposit Loans**"), which Deposit Loans will, at the several election of each Deposit Lender, either be (a) immediately repaid by the Administrative Agent to such Deposit Lender or (b) applied by the Administrative Agent to fund a portion of the New Term Loan required to be lent by such Deposit Lender as contemplated by Step 45(c);

(b)     the Monitor releases the interest earned in respect of the Deposit to the Seller to be used by the Seller to fund the Administrative Reserve Accounts;

(c)     the First Lien Lenders (the "**Loaning Lenders**") who have agreed to fund up to $375,000,000 of new money first lien loans under (i) a $300,000,000 senior secured term loan facility (the "**New Term Loan**") and (ii) a $75,000,000 delayed draw term loan facility, loan the US Term Loan Percentage of the New Term Loan to New US Holdings (the "**New US Loan**") and the Cdn Term Loan Percentage of the New Term Loan to CDS Canada (the "**New Cdn Loan**") as co-borrowers;

(d)     CDS Canada directs the Administrative Agent on behalf of the Loaning Lenders to pay the amount of $20,000,000, otherwise payable to it under Step 45(c) as part of the New Cdn Loan, to the Buyer (or as directed by the Buyer) in respect of a demand interest-bearing loan to be made by CDS Canada to the Buyer;

(e)     the Buyer directs the Administrative Agent on behalf of the Loaning Lenders to pay the amount of $20,000,000, otherwise payable to it under Step 45(d), to the Monitor as escrow agent for the Employee Fund and Contractor Fund;

(f)     CDS Canada directs the Administrative Agent on behalf of the Loaning Lenders to pay an amount equal to the shortfall in the Administrative Reserve Accounts (the "**Reserve Shortfall**"), otherwise payable to it under Step 45(c) as part of the New Cdn Loan, to the Buyer (or as directed by the Buyer) in respect of a demand interest-bearing loan to be made by CDS Canada to the Buyer;

(g)     the Buyer directs the Administrative Agent on behalf of the Loaning Lender to pay an amount equal to the Reserve Shortfall, otherwise payable to it under Step 45(f), to the Monitor in respect of its obligations in respect of the Administrative Reserve Accounts;

(h)     CDS Canada directs the Administrative Agent on behalf of the Loaning Lenders to pay an amount, otherwise payable to it under Step 45(c) as part of the New Cdn Loan, equal to all "Obligations" (as defined in the CDS 4 Term Loan) which are

- 11 -

owing by CDS Partnership under the CDS 4 Term Loan to the CDS 4 Term Loan Lenders (the "**CDS 4 Loan Amount**"), to CDS Partnership in respect of a capital contribution to be made to CDS Partnership by CDS Canada;

(i)      CDS Partnership directs the Administrative Agent on behalf of the Loaning Lenders to pay the CDS 4 Loan Amount, otherwise payable to it under Step 45(h), directly to the CDS 4 Term Loan Lenders in repayment of the CDS 4 Term Loan;

(j)      New US Holdings directs the Administrative Agent on behalf of the Loaning Lenders to pay an amount equal to the US Cash Payment, otherwise payable to it under Step 45(c) as part of the New US Loan, directly to Old CDS US Holdings in satisfaction of the US Cash Payment;

(k)      CDS Canada directs the Administrative Agent on behalf of the Loaning Lenders to pay an amount equal to (i) the aggregate amount of interest owing by the Buyer to the Deposit Lenders under the Deposit Loans; (ii) the aggregate original issue discount in respect of the Deposit Loans; and (iii) the Deposit Expenses (as set out in the Co-operation Agreement dated as of July 15, 2020) (collectively, the "**Deposit Loans Payment**"), otherwise payable to it under Step 45(c) as part of the New Cdn Loan, directly to the Buyer in respect of a demand interest-bearing loan to be made by CDS Canada to the Buyer;

(l)      the Buyer directs the Administrative Agent on behalf of the Loaning Lenders to pay an amount equal to the Deposit Loans Payment, otherwise payable to it under Step 45(k), directly to the Deposit Lenders, in satisfaction of the Deposit Loans Payment owed by the Buyer to the Deposit Lenders; and

(m)      the Deposit Lenders acknowledge that the payments in Steps 45(a) and (l) fully satisfy the repayment of the principal amount, interest and expenses in respect of the Deposit Loans owed by the Buyer to the Deposit Lenders.

The US Term Loan Percentage means the percentage of the New Term Loan in respect of which New US Holdings will be the primary obligor, and the Cdn Term Loan Percentage means the percentage of the New Term Loan in respect of which CDS Canada will be the primary obligor, as agreed to between CDS Canada and New US Holdings.

46.      The following intercompany debts are fully repaid: (i) the RUS Debt; (ii) the Gaia Debt; (iii) the Araxa Debt; (iv) the Asia-Pacific Debt; (v) the Canadian Intercompany Payables; (vi) the BMG Debt; and (vii) any other intercompany debts as are determined by the Buyer. For greater certainty, none of the debts described in this Step 46 will be Excluded Assets or Excluded Liabilities.

47.      One day after the Effective Date, CDS Partnership transfers the Purchased IP to New US Holdings in full repayment of the IP Note.

48.      In January, 2021, each of 9415-8219 Quebec Inc, 9415-8185 Quebec Inc, and 9415-8227 Quebec Inc are sequentially wound-up into CDS Canada or amalgamated with CDS Canada, as determined by CDS Canada.

## **SCHEDULE B**

## **EXHIBIT 7.6(Q)(i) OF THE PURCHASE AGREEMENT**

**[See attached]**

## SCHEDULE C

## EXHIBIT 7.6(Q)(ii) OF THE PURCHASE AGREEMENT

**[See attached]**

# EXHIBIT B

**INTERCREDITOR AMENDMENT**

**(See attached)**

**<u>SCHEDULE "C"</u>**

**<u>REORGANIZATION STEP PLAN</u>**

[ATTACHED]

October 8, 2020

## Schedule "C"
## Reorganization Step Plan

This Schedule sets out the transaction steps to be implemented in respect of the acquisition of the Purchased Assets, including the acquisition of the shares of CDS Canadian Holdings, Inc. ("**CDS Holdings**"), by Spectacle BidCo Holdings Inc. (together with its assignee(s) and designee(s), and as the context requires, each, the "**Buyer**") by way of credit bid pursuant to the Asset Purchase Agreement, as may be amended, modified, supplemented and/or restated from time to time (collectively, the "**APA**") entered into on July 15, 2020 between Cirque du Soleil Holdings LP (the "**Seller**") and Spectacle Bidco LP ("**Spectacle LP**"), and an Approval and Vesting Order of the Superior Court of Quebec (the "**Order**").

All dollar amounts referred to herein are in US dollars unless otherwise noted, and all defined terms not defined herein are as defined in the APA or the Order, as applicable.

The following transactions shall occur, and shall be deemed to occur, in the order set out herein, at the particular times set out herein. The Effective Time is that time on the Effective Date as agreed to by the Buyer, the Seller and the Monitor.

### Pre-Closing Transactions

*Transactions to Occur at Least 5 Days Prior to the Effective Date*

1.     The Buyer is incorporated under the laws of Province of Quebec. On incorporation, the initial shareholders of the Buyer subscribe for common shares (the "**Initial Shares**") in the capital of the Buyer for $1.00 per share.

2.     The rights and obligations of Spectacle LP under the APA are assigned to, and assumed by, the Buyer.

3.     A new corporation, CDS U.S. Holdings Newco, Inc. ("**New US Topco**") is incorporated under the laws of the State of Delaware. On formation, Buyer subscribes for one common share in the capital of New US Topco for nominal consideration.

4.     A new limited liability company, Spectacle Bidco, LLC ("**New LLC**") is organized under the laws of the State of Delaware. The initial equityholder of New LLC (the "**Initial Buyer GP**") subscribes for one Class A unit of New LLC (the "**New LLC Class A Common Equity**") for nominal consideration. New LLC elects to be treated as a corporation for U.S. income tax purposes. New LLC incorporates CDS U.S. Intermediate Holdings Newco, Inc. under the laws of the State of Delaware ("**New US Intermediary**"). On formation, New LLC subscribes for common shares in the capital of New US Intermediary for nominal consideration.

5.     New US Intermediary incorporates Cirque du Soleil Holdings USA Newco, Inc. under the laws of the State of Delaware ("**New US Holdings**"). On formation, New US Intermediary subscribes for common shares in the capital of New US Holdings for nominal consideration.

- 2 -

6.     New US Holdings incorporates or organizes one or more new subsidiary entities (the "**US Buyer Subsidiaries**").

7.     The Seller incorporates two new subsidiary corporations under the laws of the Province of Quebec being 9424-9356 Quebec Inc ("**ExcludedCo 1**") and 9424-9398 Quebec Inc ("**ExcludedCo 2**"). On incorporation, the Seller subscribes for one common share in the capital of each of ExcludedCo 1 and ExcludedCo 2 for $1.00 each.

8.     CDS Canada 1 SCSP is wound up, and proportionate undivided interests in all of its assets including (i) its limited partnership interests in CDS Canada 2 SCSP; (ii) its shares of 9415-8219 Quebec Inc; and (iii) certain show rights and interests, are distributed to its partners, 9415-8185 Quebec Inc and Cirque du Soleil Canada Inc ("**CDS Canada**").

9.     CDS Canada 2 SCSP is wound up, and proportionate undivided interests in all of its assets including (i) its limited partnership interests in CDS Canada 3 LP; (ii) its shares of 9415-8227 Quebec Inc; and (iii) certain show rights and interests, are distributed to its partners 9415-8219 Quebec Inc, 9415-8185 Quebec Inc and CDS Canada.

10.     CDS Canada 3 LP is wound up, and undivided interests in all of its assets including (i) its limited partnership interests in CDS Canada 4 LP ("**CDS Partnership**"); (ii) its shares of 9415-8235 Quebec Inc; and (iii) certain show rights and interests, are distributed to its partners 9415-8219 Quebec Inc, 9415-8185 Quebec Inc, 9415-8227 Quebec Inc and CDS Canada.

11.     Cirque du Soleil Inc. ("**CSI**") and 9415-8243 Quebec Inc ("**CSI Sub**") establish a new general partnership ("**CSI Partnership**") under the laws of the Province of Quebec. CSI acquires a 99.99% general partnership interest and CSI Sub acquires a 0.01% general partnership interest.

12.     Cirque du Soleil Images Inc. ("**CDS Images**") incorporates 9425-1055 Quebec Inc as a new subsidiary corporation under the laws of the Province of Quebec ("**Images Newco**"). CDS Images subscribes for one common share in the capital of Images Newco for $1.00.

13.     Creation 4U2C Inc. ("**4U2C**") incorporates 9425-1089 Quebec Inc as a new subsidiary corporation under the laws of the Province of Quebec ("**4U2C Newco**"). 4U2C subscribes for one common share in the capital of 4U2C Newco for $1.00.

14.     CDS Canada incorporates 9425-1121 Quebec Inc as a new subsidiary corporation under the laws of the Province of Quebec ("**CDS/CSI Newco**"). CDS Canada subscribes for one common share in the capital of CDS/CSI Newco for $1.00.

15.     CDS Canada incorporates 9425-1154 Quebec Inc as a new subsidiary corporation under the laws of the Province of Quebec ("**CDS/955 Newco**"). CDS Canada subscribes for one common share in the capital of CDS/955 Newco for $1.00.

16.     The existing promissory note issued by CDS Canada to CSI (the "**CDS Note**") is amended and restated (without novation) by adding the right of CSI to convert to CDS Note into an interest bearing promissory note, bearing interest at a rate of 5%. The CDS Note is then converted into an interest-bearing promissory note (the "**New CDS Note**").

- 3 -

17.   A demand non-interest bearing promissory note (the "**955 Note**") is issued by CDS Canada to 9553266 Canada Inc. ("**955**") to evidence the non-interest bearing intercompany debt owing by CDS Canada (other than any portion of the debt which is a Trade Debt or any portion which CDS Canada and 955 agree will not be evidenced by the 955 Note). The 955 Note is amended and restated (without novation) by adding the right of 955 to convert the 955 Note into an interest bearing promissory note, bearing interest at a rate of 5%. The 955 Note is then converted into an interest bearing promissory note (the "**New 955 Note**"). For the purposes of this document, a "Trade Debt" is an intercompany debt owing by or owing to an Acquired Debtor which arose in the ordinary course of business, the issuance of which gave rise to an income inclusion to the creditor (where the creditor is an Acquired Debtor), or an income deduction to the debtor (where the debtor is an Acquired Debtor).

18.   The stated capital of the common shares of 955 is reduced to $1.00 in the aggregate (without any payment thereon).

19.   The authorized capital of CDS Canada is amended to create Class C Preferred Shares.

20.   The 0.01% interest in Cirque du Soleil Rus LLC ("**Rus LLC**") (the "**RUS LLC Interest**") is transferred by CDS Canada to CSI as a capital contribution.

20A.   The debt owing by CDS Canada to Cirque du Soleil HK, Limited ("**CDS HK**") (the "**HK Debt**") is transferred by CDS HK to ExcludedCo 1 for no consideration.

20B.   The debt owing by Gaia Luxembourg S.A ("**Gaia Lux**") to CSI and the debt owing by CSI to Gaia Lux are set off, such that only a net debt owing by Gaia Lux to CSI will remain outstanding (the "**Gaia Debt**").

*Transactions to Occur At Least 3 Days Prior to the Effective Date*

21.   CDS Images pays all accrued and unpaid interest owing to CDS Canada in respect of the intercompany debt payable by CDS Images to CDS Canada (other than any portion of the debt which is a Trade Debt) (the "**Images Debt**").

22.   Immediately following Step 21, CDS Canada transfers the Images Debt to Images Newco in consideration for a demand promissory note, bearing interest at the rate of 5% and having a principal amount equal to the fair market value of the Images Debt, being $1.00 (subject to a price adjustment clause).

23.   Immediately following Step 22, Images Newco winds up into CDS Images and the Images Debt is extinguished. An election pursuant to subsection 80.01(4) of the ITA is made.

24.   4U2C pays all accrued and unpaid interest owing to CDS Canada in respect of the promissory note issued by 4U2C to CDS Canada (the "**4U2C Note**").

25.   Immediately following Step 24, CDS Canada transfers the 4U2C Note to 4U2C Newco in consideration for a demand promissory note, bearing interest at the rate of 5%, and having a principal amount equal to the fair market value of the 4U2C Note, being $1.00 (subject to a price adjustment clause).

- 4 -

26.    Immediately following Step 25, 4U2C Newco winds up into 4U2C and the 4U2C Note is extinguished. An election pursuant to subsection 80.01(4) of the ITA is made.

27.    CDS Canada pays all accrued and unpaid interest owing to CSI in respect of the New CDS Note.

28.    Immediately following Step 27, CSI transfers the New CDS Note to CDS/CSI Newco in consideration for a demand promissory note, bearing interest at the rate of 5%, and having a principal amount equal to the fair market value of the New CDS Note, being $1.00 (subject to a price adjustment clause).

29.    Immediately following Step 28, CDS/CSI Newco winds up into CDS Canada, and the New CDS Note is extinguished. An election pursuant to subsection 80.01(4) of the ITA is made.

30.    CDS Canada pays all accrued and unpaid interest owing to 955 in respect of the New 955 Note.

31.    Immediately following Step 30, 955 transfers the New 955 Note to CDS/955 Newco in consideration for demand promissory note, bearing interest at a rate of 5% and having a principal amount equal to the fair market value of the New 955 Note, being $1.00 (subject to a price adjustment clause).

32.    Immediately following Step 31, CDS/955 Newco winds up into CDS Canada, and the New 955 Note is extinguished. An election pursuant to subsection 80.01(4) of the ITA is made.

33.    All of the shares in the capital of the following entities held by CDS Luxembourg Holdings SARL ("**CDS Lux**") are transferred to CDS Canada in consideration for one Class C Preferred Share in the capital of CDS Canada (the "**CDS Preferred Share**"): (i) 955; (ii) Gaia Lux; (iii) Cirque du Soleil Asia-Pacific Private Limited ("**CDS AP**"); (iv) CDS HK; (v) Sundust Limitada; and (vi) Rus LLC.

34.    The CDS Preferred Share is distributed by CDS Lux to the Seller. Following this distribution, the CDS Preferred Share is transferred by the Seller to CDS Holdings in consideration for 100 additional common shares in capital of CDS Holdings.

*Transactions to Occur At Least 1 Day Prior to Effective Date*

35.    All of the common shares in the capital of CDS Holdings (all of which are owned by the Seller) are consolidated into one common share (the "**CDS Holdings Share**"). The stated capital of the CDS Holdings Share is reduced to $1.00 (without any payment thereon).

36.    The CDS Preferred Share is exchanged for one Class A share, and all of the Class A shares in the capital of CDS Canada (all of which are owned by CDS Holdings) are consolidated into one Class A Share. The stated capital of the Class A Share of CDS Canada is reduced to $1.00 (without any payment thereon).

- 5 -

**Transactions to Occur on the Effective Date**

37.    On the Effective Date, at least one hour prior to the Effective Time, contemporaneously, and pursuant to subsection 97(2) of the ITA:

(a)    CDS Canada transfers all of its assets (including (i) the Canadian Intercompany Payables payable to CDS Canada, (ii) the debt owing by Araxa Espetaculas Circenses Ltda ("**Araxa**") to CDS Canada (the "**Araxa Debt**"), (iii) the debt owing by RUS LLC to CDS Canada (the "**RUS Debt**") and (iv) those Trade Debts and accounts receivable owing to CDS Canada as set out in a Schedule prepared by CDS Canada) other than (i) the debt owing by CDS Partnership to CDS Canada, (ii) the shares of CSI; (iii) the shares of 9415-8219 Quebec Inc; (iv) the shares of 9415-8185 Quebec Inc; (v) the shares of 9415-8227 Quebec Inc; (vi) the shares of 9415-8235 Quebec Inc; (vii) the shares of RUS LLC; (viii) the shares of Inspiracao Organizacao de Espetaculos Ltda; (ix) the shares of Araxa; (x) the shares of CDS Images; (xi) the shares of 4U2C; (xii) the shares of Cirque du Soleil Germany Gmbh; (xiii) the shares of Cirque du Soleil Inspiration Inc; (xiv) the shares of The Works Creative Pte. Ltd; (xv) the shares of 955; (xvi) the shares of Gaia Lux; (xvii) the shares of CDS AP; (xviii) the shares of Sundust Limitada; (xix) the shares of CDS HK; and (xx) the shares of Illusionists Live UK Limited; and (xxi) the Excluded Assets, Excluded Contracts, and Excluded JV Interests (including the shares of Paramour Produktiongesellesschaft mbH) owned by CDS Canada, to CDS Partnership in consideration for (i) the assumption by CDS Partnership of the Assumed Liabilities owing by CDS Canada (other than any Trade Debts owing by CDS Canada); and (ii) the issuance of additional units of, or an addition to the capital amount maintained in respect of, CDS Partnership;

(b)    CSI transfers all of its assets (including (i) the Canadian Intercompany Payables payable to CSI, (ii) the Gaia Debt, (iii) the debt owing by CDS AP to CSI (the "**Asia-Pacific Debt**"), (iv) those Trade Debts and accounts receivable owing to CSI as set out in a Schedule prepared by CSI, and (v) the Real Property held by it) other than (i) the shares of CSI Sub; (ii) the shares of Araxa Espetaculos Circenses Ltda; (iii) the shares of Sundust Limitada; (iv) the shares of Inspiracao Organizacao de Espetaculos Ltda; (v) the shares of CDS Images; (vi) the RUS LLC Interest; and (vii) the Excluded Assets, Excluded Contracts, and Excluded JV Interests owned by CSI, to CSI Partnership in consideration for (i) the assumption by CSI Partnership of the Assumed Liabilities owing by CSI (other than any Trade Debts owing by CSI); and (ii) an addition to the capital amount maintained in respect of CSI's partnership interest in CSI Partnership; and

(c)    CDS U.S. Intermediate Holdings, Inc. ("**Old CDS US Holdings**") transfers certain rights under contracts to use intellectual property (the "**Purchased IP Rights**") to CDS Partnership in consideration for a demand promissory note (the "**IP Note**") having a principal amount equal to the fair market value of the Purchased IP Rights (subject to a price adjustment clause), and the IP Note is issued in absolute payment of the purchase price payable for the Purchased IP Rights.

- 6 -

38.     On the Effective Date, but prior to the immediately following Step, intercompany claims which are solely between Seller Group Members who are "United States persons" (as defined in 26 U.S.C. 8 7701(a)(30)) (such intercompany claims, "**U.S. Intercompanies**") are distributed and contributed, set off, or cancelled, in each case, as set forth in the books and records of the applicable Seller Group Members or New US Topco or any of its Subsidiaries or entities that will become its Subsidiaries following the Effective Time pursuant to this Schedule; *provided, that,* unless an alternative treatment is specified in any such books and records, all U.S. Intercompanies shall be deemed to have been cancelled.

39.     On the Effective Date, at least one hour prior to the Effective Time, the following transactions occur in the following order:

(a)     New LLC contributes units of its Class B common equity ("**New LLC Class B Common Equity**") and Class C common equity ("**New LLC Class C Common Equity**" and, together with the New LLC Class B Common Equity, the "**New LLC Equity**") to New US Intermediary;

(b)     New US Intermediary contributes the New LLC Equity received in Step 39(a) to New US Holdings; and

(c)     immediately after Step 39(b) and in connection with and for the consideration described in the immediately following sentence, all right, title and interest of the Seller Group Members (other than Cirque du Soleil Vegas, LLC) that are United States Persons (the "**US Asset Sellers**") in the applicable Purchased Assets (which does not include the CDS Holdings Share, but includes the equity of Cirque du Soleil Vegas, LLC and certain JV Entities, the IP Note, the debt owing by CDS Canada to Blue Man Group Holding, LLC (the "**BMG Debt**") and any Trade Debts owing by an Acquired Debtor) vests absolutely and exclusively in New US Holdings and the US Buyer Subsidiaries (as designated by New US Holdings), pursuant to the terms of the APA. In consideration for the applicable Purchased Assets described in the immediately preceding sentence, (i) New US Holdings (on behalf of itself and the US Buyer Subsidiaries) (A) transfers and delivers the New LLC Equity to Old CDS US Holdings in Old CDS US Holdings' individual capacity as a Seller and in its capacity as agent for the other US Asset Sellers under the APA; (B) agrees to pay cash to Old CDS US Holdings in an amount sufficient to pay amounts to be paid by Old CDS US Holdings in respect of Cure Costs payable by the US Asset Sellers (the "**US Cash Payment**"); and (C) issues the US TB Debt Percentage of the Takeback Debt (the "**US Takeback Debt**"), to Old CDS US Holdings in its individual capacity as a Seller and in its capacity as agent for the other US Asset Sellers under the APA, and (ii) New US Holdings and the US Buyer Subsidiaries assume (A) certain liabilities including amounts payable to CDS Holdings or its subsidiaries (the "**Canadian Intercompany Payables**") as set out in a Schedule prepared by New US Holdings; (B) any negative balances in the bank accounts of the US Asset Sellers subject to the existing cash management arrangements with Fédération des caisses Desjardins du Québec (and its affiliates, collectively the "**Desjardins**") and such other negative balances in bank accounts with Desjardins as are listed on a summary of accounts provided to New US Holdings on the date hereof; and (C) the Assumed Liabilities owing by the US

- 7 -

Asset Sellers (which for greater certainty does not include any Trade Debts owing to an Acquired Debtor, other than those listed in a Schedule). For the purposes of this Schedule C, the "**Takeback Debt**" means the $300,000,000 of Second Lien Loans to be issued ratably to the First Lien Lenders; and the "**US TB Debt Percentage**" means the percentage of the Takeback Debt in respect of which New US Holdings will be the primary obligor, as agreed to between CDS Canada and New US Holdings.

40.     On the Effective Date, immediately prior to the time which is immediately prior to the Effective Time:

(a)     as described in Paragraph 18 of the Order, all right, title and interest of the Acquired Debtors in the Excluded Assets, the Excluded Contracts and the Excluded JV Interests, vest absolutely and exclusively in ExcludedCo 1 (for greater certainty, the Trade Debts, the Canadian Intercompany Payables, the RUS Debt, the Araxa Debt, the Asia-Pacific Debt, the Gaia Debt and any other intercompany debts described in Step 46 will not be Excluded Assets and will not vest in ExcludedCo 1);

(b)     the Excluded Liabilities owing by CDS Canada (including (i) the First Lien Debt other than the Preserved 1L Claim, (ii) the HK Debt, and (iii) any Trade Debts owing by CDS Canada as set out in a Schedule prepared by CDS Canada) are deemed to be, considered to be, and shall be one debt obligation;

(c)     the Excluded Liabilities owing by CSI (including (i) the debt owing by CSI to Cirque du Soleil (Shanghai) Culture and Arts Co., Ltd. (the "**Shanghai Debt**") and (ii) any Trade Debts owing by CSI as set out in a Schedule prepared by CSI) are deemed to be, considered to be, and shall be one debt obligation; and

(d)     the Excluded Liabilities owing by each other Acquired Debtor (including any Trade Debts owing by such Acquired Debtor, as set out in a Schedule prepared by that Acquired Debtor) are deemed to be, considered to be, and shall be one debt obligation.

The "**Preserved 1L Claim**" shall be that amount of principal owing under the First Lien Debt in respect of which CDS Canada is the primary obligor, equal to the amount which would be the fair market value of the CDS Holdings Share at the Effective Time assuming the Preserved 1L Claim were nil; *provided, that,* notwithstanding anything herein to the contrary, for applicable tax purposes, no claim in respect of the First Lien Debt in respect of which CDS Canada is the primary obligor will be treated as being exchanged for any of the assets described in Step 39(c), and no claim in respect of the First Lien Debt in respect of which Old CDS US Holdings is the primary obligor shall be treated as being exchanged for the equity or assets of the Acquired Debtors.

41.     On the Effective Date, immediately prior to the Effective Time:

(a)     as described in Paragraph 18 of the Order, the Excluded Liabilities of the Acquired Debtors (which for greater certainty includes the HK Debt and the Shanghai Debt), other than the IP Note, the First Lien Debt, the Second Lien Debt, the CDS 4 Term

- 8 -

Loan, the BMG Debt and the Trade Debts set out in a Schedule prepared by the Acquired Debtors, are transferred to, assumed by and vest absolutely and exclusively in ExcludedCo 2, with novation;

(b)    all "Obligations" owing under and as defined in the First Lien Debt in respect of which CDS Canada is the primary obligor (other than the Preserved 1L Claim) is fully satisfied, extinguished, and settled for no consideration;

(c)    the Trade Debts set out in a Schedule prepared by the Acquired Debtors, are fully satisfied, settled and extinguished for no consideration; and

(d)    Old US CDS Holdings transfers (i)(A) the New LLC Class B Common Equity to the First Lien Lenders,[1] or to the agent on behalf of the First Lien Lenders (the "**First Lien Agent**") and (B) the New LLC Class C Common Equity to the Second Lien Lenders, pro rata based on their interest in the Second Lien Debt or to the agent on behalf of the Second Lien Lenders (the "**Second Lien Agent**"); and (ii) the US Takeback Debt to the First Lien Lenders, pro rata based on their interest in the First Lien Debt or the First Lien Agent on behalf of the First Lien Lenders, in full satisfaction, extinguishment and settlement of (x) in the case of clause (i)(A) and clause (ii) of this sentence, all "Obligations" owing under and as defined in the First Lien Debt in respect of which Old CDS US Holdings was the primary obligor; and (y) in the case of clause (i)(B) of this sentence, all "Obligations" owing under and as defined in the Second Lien Debt.

42.    At the Effective Time, the Seller transfers the CDS Holdings Share, along with any other Purchased Assets of the Seller, to the Buyer, and all right, title and interest in the CDS Holdings Share and such other Purchased Assets vests absolutely and exclusively in the Buyer, and the Seller is released from any liability or obligation with respect to the Preserved 1L Claim. An election pursuant to subsection 256(9) of the ITA is made.

43.    Immediately after the Effective Time, and contemporaneously:

(a)    the First Lien Lenders exchange their Preserved 1L Claim in consideration for (i) the issuance to the First Lien Lenders[2] of the Canadian Portion of 100 million common shares of the Buyer, which shares are issued and delivered by the Buyer on behalf and for the benefit of CDS Canada; and (ii) the issuance of the Canadian TB Debt Percentage of the Takeback Debt (the "Canadian Takeback Debt") to the First Lien Lenders by CDS Canada, and on such exchange the Preserved 1L Claim is fully satisfied, extinguished and settled (upon which, for certainty, all "Obligations" under and as defined in the First Lien Debt shall have been fully

---

[1] Nothing in this Schedule "C" shall, or shall be deemed to, have any impact on the allocation of the equity of New LLC, the shares in Buyer, the Canadian Takeback Debt or the US Takeback Debt as amongst the First Lien Lenders.

[2] Nothing in this Schedule "C" shall, or shall be deemed to, have any impact on the allocation of the equity of New LLC, the shares in Buyer, the Canadian Takeback Debt or the US Takeback Debt as amongst the First Lien Lenders.

- 9 -

satisfied, settled and extinguished by virtue of the operations under Steps 41(a), 41(d) and this Step 43(a);

(b)     CDS Holdings issues 99,999,999 common shares to the Buyer in consideration for the Buyer issuing shares to the First Lien Lenders pursuant to Step 43(a)(i);

(c)     CDS Canada issues 99,999,999 Class A shares to CDS Holdings in consideration for CDS Holdings issuing shares to the Buyer pursuant to Step 43(b);

(d)     the Initial Shares in the capital of the Buyer are cancelled for $1.00 per share; and

(e)     New LLC and New US Topco merge, with New US Topco surviving, and on such merger: (i) the New LLC Class A Common Equity is cancelled for no consideration; (ii) the US Portion of 100 million common shares of the Buyer is issued directly to the holders of the New LLC Class B Common Equity (provided, if the First Lien Agent holds the New LLC Class B Common Equity as a result of Step 41(d), such shares may be issued directly to the First Lien Lenders, pro rata based on their interests in the First Lien Debt) (iii) warrants to acquire Buyer equity (the "**Buyer Warrants**") are issued directly to the holders of the New LLC Class C Common Equity (provided, if the Second Lien Agent holds the New LLC Class C Common Equity as a result of Step 41(d), such Buyer Warrants may be issued directly to the Second Lien Lenders, pro rata based on their interests in the Second Lien Debt); and (iv) New US Topco issues additional common shares to the Buyer to compensate the Buyer for issuing its common shares and the Buyer Warrants as set out in (ii) and (iii) above.

The "Canadian Portion" is equal to the ratio determined by dividing (i) the fair market value of the shares of CDS Holdings following the implementation of these transactions by (ii) the aggregate fair market value of the shares of New US Topco and CDS Holdings following the implementation of these transactions, and the "US Portion" is equal to 1 minus the Canadian Portion.

The Canadian TB Debt Percentage is that percentage of the Takeback Debt in respect of which CDS Canada will be the primary obligor, as agreed to between CDS Canada and New US Holdings.

44.     Upon the issuance of the shares as set out in Step 43, the Buyer adds an amount to the stated capital account maintained in respect of its common shares equal to the lesser of (i) the fair market value of the 100 million common shares issued by it in Steps 43(a) and (d); and (ii) the aggregate fair market value of shares of CDS Holdings and New US Topco acquired by it in Steps 43(b) and (d) (other than the shares of New US Topco transferred by the Second Lien Lenders); and CDS Holdings adds an amount to the stated capital account maintained in respect of its common shares equal to the lesser of (i) the fair market value of the 99,999,999 common shares issued by it in Step 43(b); and (ii) the fair market value of the Class A shares of CDS Canada issued to it in Step 43(c); and CDS Canada adds an amount to the stated capital account maintained in respect of its Class A Shares equal to the lesser of (i) the fair market value of the 99,999,999 Class A Shares issued by

- 10 -

it in Step 43(c); and (ii) the amount of the Preserved 1L Claim less the principal amount of the Canadian Takeback Debt.

45.    Immediately after the time which is immediately after the Effective Time:

(a)    the amount of the Deposit is released by the Monitor to the Buyer, and the Buyer uses the Deposit to repay an amount equal to the Deposit to the Administrative Agent on behalf of the Loaning Lenders who funded the Deposit (the "**Deposit Lenders**") in partial repayment of the principal amount of the loans made by the Deposit Lenders to fund the Deposit (the "**Deposit Loans**"), which Deposit Loans will, at the several election of each Deposit Lender, either be (a) immediately repaid by the Administrative Agent to such Deposit Lender or (b) applied by the Administrative Agent to fund a portion of the New Term Loan required to be lent by such Deposit Lender as contemplated by Step 45(c);

(b)    the Monitor releases the interest earned in respect of the Deposit to the Seller to be used by the Seller to fund the Administrative Reserve Accounts;

(c)    the First Lien Lenders (the "**Loaning Lenders**") who have agreed to fund up to $375,000,000 of new money first lien loans under (i) a $300,000,000 senior secured term loan facility (the "**New Term Loan**") and (ii) a $75,000,000 delayed draw term loan facility, loan the US Term Loan Percentage of the New Term Loan to New US Holdings (the "**New US Loan**") and the Cdn Term Loan Percentage of the New Term Loan to CDS Canada (the "**New Cdn Loan**") as co-borrowers;

(d)    CDS Canada directs the Administrative Agent on behalf of the Loaning Lenders to pay the amount of $20,000,000, otherwise payable to it under Step 45(c) as part of the New Cdn Loan, to the Buyer (or as directed by the Buyer) in respect of a demand interest-bearing loan to be made by CDS Canada to the Buyer;

(e)    the Buyer directs the Administrative Agent on behalf of the Loaning Lenders to pay the amount of $20,000,000, otherwise payable to it under Step 45(d), to the Monitor as escrow agent for the Employee Fund and Contractor Fund;

(f)    CDS Canada directs the Administrative Agent on behalf of the Loaning Lenders to pay an amount equal to the shortfall in the Administrative Reserve Accounts (the "**Reserve Shortfall**"), otherwise payable to it under Step 45(c) as part of the New Cdn Loan, to the Buyer (or as directed by the Buyer) in respect of a demand interest-bearing loan to be made by CDS Canada to the Buyer;

(g)    the Buyer directs the Administrative Agent on behalf of the Loaning Lender to pay an amount equal to the Reserve Shortfall, otherwise payable to it under Step 45(f), to the Monitor in respect of its obligations in respect of the Administrative Reserve Accounts;

(h)    CDS Canada directs the Administrative Agent on behalf of the Loaning Lenders to pay an amount, otherwise payable to it under Step 45(c) as part of the New Cdn Loan, equal to all "Obligations" (as defined in the CDS 4 Term Loan) which are

- 11 -

owing by CDS Partnership under the CDS 4 Term Loan to the CDS 4 Term Loan Lenders (the "**CDS 4 Loan Amount**"), to CDS Partnership in respect of a capital contribution to be made to CDS Partnership by CDS Canada;

(i)    CDS Partnership directs the Administrative Agent on behalf of the Loaning Lenders to pay the CDS 4 Loan Amount, otherwise payable to it under Step 45(h), directly to the CDS 4 Term Loan Lenders in repayment of the CDS 4 Term Loan;

(j)    New US Holdings directs the Administrative Agent on behalf of the Loaning Lenders to pay an amount equal to the US Cash Payment, otherwise payable to it under Step 45(c) as part of the New US Loan, directly to Old CDS US Holdings in satisfaction of the US Cash Payment;

(k)    CDS Canada directs the Administrative Agent on behalf of the Loaning Lenders to pay an amount equal to (i) the aggregate amount of interest owing by the Buyer to the Deposit Lenders under the Deposit Loans; (ii) the aggregate original issue discount in respect of the Deposit Loans; and (iii) the Deposit Expenses (as set out in the Co-operation Agreement dated as of July 15, 2020) (collectively, the "**Deposit Loans Payment**"), otherwise payable to it under Step 45(c) as part of the New Cdn Loan, directly to the Buyer in respect of a demand interest-bearing loan to be made by CDS Canada to the Buyer;

(l)    the Buyer directs the Administrative Agent on behalf of the Loaning Lenders to pay an amount equal to the Deposit Loans Payment, otherwise payable to it under Step 45(k), directly to the Deposit Lenders, in satisfaction of the Deposit Loans Payment owed by the Buyer to the Deposit Lenders; and

(m)    the Deposit Lenders acknowledge that the payments in Steps 45(a) and (l) fully satisfy the repayment of the principal amount, interest and expenses in respect of the Deposit Loans owed by the Buyer to the Deposit Lenders.

The US Term Loan Percentage means the percentage of the New Term Loan in respect of which New US Holdings will be the primary obligor, and the Cdn Term Loan Percentage means the percentage of the New Term Loan in respect of which CDS Canada will be the primary obligor, as agreed to between CDS Canada and New US Holdings.

46.    The following intercompany debts are fully repaid: (i) the RUS Debt; (ii) the Gaia Debt; (iii) the Araxa Debt; (iv) the Asia-Pacific Debt; (v) the Canadian Intercompany Payables; (vi) the BMG Debt; and (vii) any other intercompany debts as are determined by the Buyer. For greater certainty, none of the debts described in this Step 46 will be Excluded Assets or Excluded Liabilities.

47.    One day after the Effective Date, CDS Partnership transfers the Purchased IP to New US Holdings in full repayment of the IP Note.

48.    In January, 2021, each of 9415-8219 Quebec Inc, 9415-8185 Quebec Inc, and 9415-8227 Quebec Inc are sequentially wound-up into CDS Canada or amalgamated with CDS Canada, as determined by CDS Canada.

## SCHEDULE "D"

## DRAFT CERTIFICATE OF THE MONITOR

**CANADA**

**PROVINCE OF QUEBEC
DISTRICT OF MONTRÉAL**

**File: No: 500-11-058415-205**

**S U P E R I O R    C O U R T**
Commercial Division

IN THE MATTER OF the *COMPANIES'
CREDITORS ARRANGEMENT ACT*, R.S.C.
1985, c. C 36, AS AMENDED:

**CIRQUE DU SOLEIL CANADA INC.**

-and-

**THE OTHER APPLICANTS LISTED IN
SCHEDULE "A" HERETO**

Applicants

-and-

**ERNST & YOUNG INC.**

Monitor

### CERTIFICATE OF THE MONITOR

**RECITALS:**

**WHEREAS** On June 30, 2020, the Superior Court of Quebec (the "**Court**") issued an initial order (as amended and restated, the "**Initial Order**") pursuant to the *Companies' Creditors Arrangement Act* (the "**Act**") in respect of Cirque du Soleil Canada Inc. and the other applicants and partnerships listed in Schedule "A" hereto (the "**Debtors**);

**WHEREAS** pursuant to the terms of the Initial Order, Ernst & Young Inc. (the "**Monitor**") was named Monitor of the Debtors;

**WHEREAS** on ●, the Court issued an Approval and Vesting Order (the "**Vesting Order**") thereby, *inter alia*, authorizing and approving an agreement entitled Asset Purchase Agreement dated July 15, 2020, as amended by an Amending Agreement to Asset Purchase Agreement dated September ●, 2020 (as may be further amended in accordance with its terms, the "**Purchase Agreement**") by and between Cirque du Soleil Holdings L.P. (the "**Seller**"), as vendor, and Spectacle BidCo L.P., as purchaser, as assigned to Spectacle BidCo Holdings Inc. ("**Buyer**") a

copy of which was filed in the Court record, and entry into all of the transactions contemplated therein (collectively, the "**Transaction**") with such alterations, changes, amendments, deletions or additions thereto, as may be agreed to by the Seller and the Buyer with the consent of the Monitor;

**WHEREAS** the Vesting Order contemplates the vesting of certain assets and liabilities and the granting of certain other relief in connection with the Transaction upon the issuance of this Certificate to the Buyer; and

**WHEREAS** unless otherwise indicated or defined herein capitalized terms used herein have the meaning given to them in the Purchase Agreement.

**THE MONITOR CERTIFIES THAT IT HAS BEEN ADVISED BY THE SELLER AND THE BUYER AS TO THE FOLLOWING:**

    (a) the Purchase Price has been paid or otherwise satisfied in accordance with the Purchase Agreement;

    (b) all conditions to the Closing of the Transaction have been satisfied or waived in accordance with their terms; and

    (c) the Transaction has been completed to the satisfaction of the Seller and the Buyer, respectively.

This Certificate was issued by the Monitor to the Buyer on _____ **[DATE]**, being the Effective Date (as defined in the Vesting Order).

        Ernst & Young Inc. in its capacity as court-appointed Monitor of Cirque du Soleil Canada Inc. and the other Debtors and not in its personal capacity

        Name: _____

        Title: _____

## SCHEDULE "E"

## PERMITTED ENCUMBRANCES

Permitted Encumbrances means:

(i)     Encumbrances[1] given by any Seller Group Member as security to a public utility or any Governmental Authority when required in the ordinary course of business but only insofar as they relate to any amounts not due as at the Closing Date;

(ii)    reservations, limitations, provisos and conditions, if any, expressed in any original grants of land from the Crown and any statutory limitations, exceptions, reservations and qualifications;

(iii)   any rights of expropriation, access or use or any other similar rights conferred or reserved by Applicable Law;

(iv)    notices registered on title in respect of the Real Property Landlord Leases;

(v)     servitudes or rights-of-way for the passage, ingress and egress of Persons and vehicles over parts of the Owned Property, provided such servitudes or rights-of-way (a) are registered on title to the Owned Property and (b) do not materially interfere with or restrict the current use of the Owned Property;

(vi)    any registered servitudes or rights of way by Hydro-Québec or Bell Canada to occupy a part of the Owned Property to install any circuits, poles and necessary equipment;

(vii)   any title defects, irregularities, encroachments, or other discrepancies in title or possession relating to the Owned Property, provided that they do not materially interfere with or restrict the current use of the Owned Property;

(viii)  any statutory liens, charges or other Encumbrances for assessments or governmental charges or incurred, created and granted in the ordinary course of business to a public utility or Governmental Authority in connection with operations conducted with respect to the Owned Property, but only to the extent those liens relate to costs for which payment is not yet due and owing;

(ix)    Encumbrances associated with, and financing statements evidencing, the rights of equipment lessors under any Personal Property Leases which are assigned to and assumed by the Buyer under the Purchase Agreement; and

(x)     Encumbrances associated with, and financing statements evidencing, the rights of equipment lessors under any Personal Property Leases entered into from the date of this Agreement to the Closing Date in compliance with Section **Erreur ! Source du renvoi introuvable.** of the Purchase Agreement.

---

[1] "Encumbrances" as used in this Schedule shall have the meaning given to it in the Purchase Agreement.

**<u>SCHEDULE "F1"</u>**

**<u>CCAA AGREEMENTS</u>**

| | # | Counterparty (ies) | Name of Agreement and Date | Cure Costs (USD) |
|---|---|---|---|---|
| KA | 1 | Les Productions du Piano Sauvage Inc. | Convention de Services Créatifs et de Cession dated April 29, 2004 | 4,752.00 |
| | 2 | Michael Curry Design Inc. | Creative Services and Assignment Agreement dated February 17, 2004 | 6,048.00 |
| | 3 | Without a Paddle, LLC | Creative Services and Assignment Agreement dated March 2, 2004 | 56,826.10 |
| | 4 | Mark Fisher Studio LTD | Creative Services and Assignment Agreement dated May 26, 2005 | 3,960.00 |
| | 5 | Holger Forterer | Creative Services and Assignment Agreement dated April 13, 2011 | 1,188.00 |
| | 6 | Jacques Heim | Creative Services and Assignment Agreement dated June 7, 2002 | 2,376.00 |
| | 7 | Patricia Ruel | Convention de Services Créatifs et de Cession dated March 15, 2004 | 2,393.07 |
| | 8 | 9048-4551 Québec Inc. | Convention de Services Créatifs et de Cession dated July 22, 2005 | 42,855.43 |
| | 9 | Marie-Chantale Vaillancourt | Convention de Services Créatifs et de Cession dated April 21, 2004 | 19,606.06 |
| | 10 | Robert Lepage Inc. | Convention de Services Créatifs et de Licence dated November 15, 2004 | 155,010.58 |
| | 11 | Joe De Paul | Creative Services and Assignment of Intellectual Property Rights Agreement dated November 16, 2004 | 4,027.66 |
| | 12 | Nino D'Introna | Convention de Services et de Cession de Droits de Propriété Intellectuelle dated October 23, 2003 | 1,584.00 |
| | 13 | Nathalie Gagné | Lettre de Prime à la réalisation de mandat dated October 3, 2005 and modifications dated February 6, 2009 | 0.00 |
| | 14 | Jacque Paquin | Lettre de confirmation des conditions de fin d'emploi et du paiement des primes à la réalisation des mandat créatif dated December 10, 2008  and Lettre de confirmation de bonis annuels dated June 18, 2004 | 0.00 |
| | 15 | André Simard | Lettre de modifications à vos primes à la réalisation de mandat créatif dated February 6, 2009 and Lettre de Prime à la réalisation de mandat dated May 30, 2006 | 0.00 |
| | 16 | Les Productions René Dupéré Inc. | Contrat d'édition musicale dated April 1, 2004 | 50,337.97 |
| LOVE | 17 | Nathalie Gagné | Lettre prime à la réalisation du mandat dated October 3, 2005, amended on February 6, 2009, January 6, 2010 and May 12 2010 | 0.00 |
| | 18 | André Simard | Lettre prime à la réalisation du mandat dated May 30, 2006 | 0.00 |
| | 19 | Daniel Cola | Lettre prime à la réalisation du mandat dated February 6, 2009 | 0.00 |
| | 20 | 9156-1159 Québec Inc. | Convention de services créatifs et de cession dated January 1, 2005 | 0.00 |
| O | 21 | Audio Concepts Inc. | Service and License Agreement dated September 20, 1999 | 4,968.00 |
| | 22 | 3389154 Canada Inc (Le Groupe Apogée) | Convention de Services et de Licences dated February 22, 1999 | 34,945.56 |
| | 23 | Michel Crête | Convention de Services et de Licences dated April 3, 1998 | 30,011.72 |
| | 24 | Jonathan Deans | Service and Licence Agreement dated February 23, 1999 | 0.00 |
| | 25 | Monticchio Services & Licensing LLC | Convention de Licences dated January 16, 1996 | 58,845.00 |
| | 26 | 9079-0171 Québec Inc. | Convention de Services et de Licences dated September 28, 1998 | 0.00 |
| | 27 | 9048-4551 Québec Inc. | Convention de Services et de Licences dated July 17, 1998 | 0.00 |
| | 28 | Michael Brown | Exclusive License and Assignment Agreement dated April 15, 2005 | 2,232.00 |
| | 29 | Leonid Leykin | License Agreement dated January 1, 2005 | 15,552.00 |
| | 30 | Valery Keft | License Agreement dated January 1, 2015 | 775.00 |
| | 31 | Monticchio Services & Licensing LLC Dominique Lemieux Michel Crête Production Alexis Le Trotteur Inc | Convention de Services et de Licences dated January 16, 1996 | |
| | 32 | Jaque Paquin | Lettre de prime annuel dated June 18, 2004 Lettre de conditions de fins d'emplois et paiement des primes dated December 10, 2008 | 0.00 |

| | # | Counterparty (ies) | Name of Agreement and Date | Cure Costs (USD) |
|---|---|---|---|---|
| | 33 | Nathalie Gagné | Lettre prime à la réalisation du mandat dated October 3, 2005<br>Lettre prime à la réalisation du mandat dated May 14, 2009 | 0.00 |
| | 34 | André Simard | Lettre prime à la réalisation du mandat dated May 30, 2006<br>Lettre prime à la réalisation du mandat dated February 6, 2009 | 0.00 |
| | 35 | Anja Wyttenbach | Exclusive License and Assignment Agreement dated January 1, 2008 | 0.00 |
| | 36 | Sipinut Inc. | Music Publishing Agreement dated January 1, 1996 | 104,993.87 |
| **MJ ONE** | 37 | Robert Bollinger | Prime à la réalisation de mandat créatif, dated August 13, 2012 | 0.00 |
| | 38 | Germain Guillemot | Prime à la réalisation de mandat créatif, dated August 13, 2012 | 0.00 |
| | 39 | Pierre Masse | Prime à la réalisation de mandat créatif, dated March 19, 2012 | 0.00 |
| | 40 | Benoit Potvin | Prime à la réalisation de mandat créatif, dated October 3, 2012 | 0.00 |
| | 41 | Altidor Welby | Prime à la réalisation de mandat créatif, dated February 6, 2012 | 0.00 |
| **MYSTERE** | 42 | Monticchio Services & Licensing LLC<br>Dominique Lemieux<br>Michel Crête<br>Productions Alexis Le Trotteur Inc | Convention de Licence dated October 1, 1992 | 0.00 |
| | 43 | 3389154 Canada Inc | Convention de Services, de Licence et de Cession dated October 1, 1992 | 0.00 |
| | 44 | Nathalie Gagné | Lettre de Prime à la réalisation de mandat dated October 3, 2005 and modifications dated February 6, 2009 | 0.00 |
| | 45 | Michel Crête | Convention de Services, de Licence et de Cession dated October 1, 1992 | 0.00 |
| | 46 | Without a Paddle LLC | Service and Licence Agreement dated August 25, 1992 | 0.00 |
| | 47 | Monticchio Services & Licensing LLC | Convention de Services et de Licence dated August 19, 1994 | 0.00 |
| | 48 | Monticchio Services & Licensing LLC | Convention de Licence et de Cession dated October 1, 1992 | 0.00 |
| | 49 | 9048-4551 Quebec Inc | Convention de Services, de Licence et de Cession dated February 1, 1994 | 0.00 |
| | 50 | 9079-0171 Quebec Inc | Convention de Services, de Licence et de Cession dated October 1, 1992 | 0.00 |
| | 51 | The Estate of François Dupuis | License Agreement dated November 21, 1998 | 3,176.64 |
| | 52 | Wayne Hronek | License Agreement dated March 2, 1998 | 2,676.00 |
| | 53 | Mikhail Matorin | License Agreement dated November 20, 1998 | 0.00 |
| | 54 | Strapeze Creations Inc. | Service and License Agreement dated November 1, 2001 | 0.00 |
| | 55 | Pavel Brun | Services and assignment of rights agreement dated June 1, 1992 | 0.00 |
| | 56 | CREATIONS DU DRAGON | Convention de Licence et de Cession dated October 1, 1992 between Créations Méandres Inc. and Créations du Dragon, to which interves Francesco Dragone, assigned to Monticchio Services & Licensing LLC (Staging-World) | 12,354.00 |
| | 57 | Sipinut Inc. | Music Publishing Agreement dated January 1, 1996 | 11,958.43 |
| | 58 | Les Productions René Dupéré Inc. | Contrat d'édition musicale dated October 24, 1989 | 7,310.31 |
| | 59 | La Pelle Méchanik Inc. | Contrat d'édition musicale dated October 1, 2005 | 917.08 |
| | 60 | Pierre Dubé | Contrat d'édition musicale dated November 17, 2000 | 755.97 |
| | 61 | Productions Mon Love Inc. | Contrat d'édition musicale dated October 1, 2005 | 917.08 |
| | 62 | Les Productions René Dupéré Inc. | Contrat d'édition musicale dated May 11, 2006 | 1,374.80 |
| **ALEGRIA** | 63 | Francesca Gagnon | Contrat d'édition musciale  dated July 1, 2001 | 805.06 |
| | 64 | Productions Manuel Tadros Inc. | Contrat d'édition musicale dated July 1, 1994 | 5,492.34 |
| | 65 | Productions Mon Love Inc. | Contrat d'édition musicale dated October 1, 2005 | 873.03 |

| | # | Counterparty (ies) | Name of Agreement and Date | Cure Costs (USD) |
|---|---|---|---|---|
| | 66 | Les Productions René Dupéré Inc. | Contrat d'édition musicale dated October 24, 1989 | 38,683.35 |
| | 67 | Viatcheslav I. Polunin | Convention de Services, de Licence et de Cession dated February 1, 1994 | 4,608.00 |
| | 68 | Claude Amesse | Contrat d'édition musicale dated July 1, 1994 | 892.08 |
| | 69 | 9079-0171 Québec Inc. | Convention de Services, de licence et de cession dated October 1, 1993 (as amended on June 1, 2018) (Costumes) | 16,027.67 |
| | 70 | CREATIONS DU DRAGON | Convention de licence et de cession dated October 1, 1993 between Créations Méandres Inc. and Francesco Dragone (Création du Dragon) (Metteur en scène) | 0.00 |
| | 71 | Cairno Limited Company (Monticchio Services & Licensing LLC) | Convention de services et de licence dated August 19, 1994 | 0.00 |
| | 72 | Cairno Limited Company (Monticchio Services and Licensing LLC) | Convention de services et de licence dated January 1, 1996 | 0.00 |
| | 73 | Cairno Limited Company (Monticchio Services and Licensing LLC) | Convention de services et de licence dated April 1, 1994 | 0.00 |
| | 74 | Cairno Limited Company (Monticchio Services and Licensing LLC) | Convention de services et de licence dated March 6, 1997 | 0.00 |
| | 75 | 9048-4551 Québec Inc. | Convention de Services, de Licence et de Cession dated October 1, 1993 (œuvre spécifique) as amended on June 1, 2018 | 0.00 |
| | 76 | Debra Brown | Convention de Services, de licence et de cession dated October 1, 1993 (œuvre spécifique) as amended on June 1, 2018 | 0.00 |
| | 77 | Michel Crête | Convention de Services, de Licence et de Cession dated October 1, 1993 (œuvre spécifique) as amended on June 1, 2018 | 0.00 |
| | 78 | Nathalie Gagné Inc | Contrat de services créatifs et de cession dated May 8, 2018 | 494.93 |
| | 79 | Andrei Lev | License Agreement dated April 18, 2019 | 0.00 |
| | 80 | Gilles Ste-Croix (Alexis le Trotteur) | Convention de license et de cession dated October 1, 1993 (œuvre commune), as amended on October 13, 2017 | 0.00 |
| Totem | 81 | Kync, Inc. | Creative Services and Assignment of Rights Agreement dated November 3, 2008 | 4,320.00 |
| | 82 | Carl Fillion | Contrat de services créatifs et de cession de droits dated April 1, 2008 | 4,050.37 |
| | 83 | Gregory Kennedy | License Agreement dated July 6, 2014 | 1,477.44 |
| | 84 | Jacques Boucher | Contrat de services créatifs et de cession de droits intervenus dated January 18, 2009 | 20,025.26 |
| | 85 | National Snare Museum Inc. | Contrat d'édition musicale dated March 1, 2009 | 55,171.73 |
| | 86 | Guy Dubuc Inc. | Contrat d'édition musicale dated March 1, 2009 | 55,171.73 |
| | 87 | Christian Laveau | Contrat d'édition musicale dated April 1, 2010 | 1,379.80 |
| | 88 | Robert Lepage Inc. | Contrat de services créatifs et de cession de droits intervenus dated February 15, 2008 | 0.00 |
| | 89 | Créations Ruelle Inc. | Contrat de services créatifs et de cession de droits dated July 1, 2008 | 2,700.24 |
| | 90 | Kromatik Peinture Corporelle Inc. | Convention de services créatifs et de cession de droits de propriété intellectuelle dated May 25, 2009 | 440.31 |
| | 91 | Étienne Boucher | Contrat de services créatifs et de cession de droits intervenus dated July 13, 2008 | 10,047.84 |
| | 92 | Pedro Pires Inc. | Contrat de services créatifs et de cession de droits dated January 18, 2009 | 2,430.22 |
| Luzia | 93 | Eugenio Caballero | Creative and Assignment of Rights Agreement dated July 27, 2014 | 1,600.00 |
| | 94 | Simon Carpentier Musique et Son Inc. | Contrat d'édition musicale dated October 3, 2014 | 159,502.97 |
| | 95 | Laura Rebellosso | Licence Agreement dated April 15, 2016 | 0.00 |
| | 96 | Giovanna Buzzi | Contrat de Services créatifs et de cession de droits dated October 1, 2014, as amended on October 1, 2014 | 927.82 |
| | 97 | Jean Ranger | Contrat de Services créatifs et de cession de droits dated September 15, 2015, between Cirque du Soleil Canada Inc. and Jean Ranger | 905.92 |
| | 98 | Inlevitas Productions SAGL | Contrat de Services créatifs et de cession de droits dated June 13, 2014 | 156,109.55 |

| | # | Counterparty (ies) | Name of Agreement and Date | Cure Costs (USD) |
|---|---|---|---|---|
| | 99 | Jacques Boucher | Contrat de services créatifs et de cession de droits intervenus dated January 18, 2009 | 0.00 |
| | 100 | Max Humphries | Creative Services and Assignment of Rights Agreement dated December 19, 2014; Services Agreement dated October 13, 2015, between Cirque du Soleil Inc and Max Humphries | 434.92 |
| | 101 | Brigitte Poupart | Contrat de Services créatifs et de cession de droits dated January 20, 2016, between Cirque du Soleil Canada Inc. and Brigitte Poupart | 7,580.43 |
| | 102 | Dzmitry Zhukau | License Agreement dated April 15, 2015 between Cirque du Soleil Canada Inc. and Dzmitry Zhukau as renewed on June 9, 2017 and September 22, 2019 (Swing to Swing Act); License Agreement dated February 13, 2020, between Cirque du Soleil Canada Inc. and Dzmitry Zhukau (Swing to Swing Act) | 200.00 |
| | 103 | Karen Lizbeth Bernal Méndez | Creative and Assignment of Rights Agreement dated February 19, 2015 | 86.98 |
| | 104 | 9156-3601 Québec Inc. | Contrat de Services créatifs et de cession de droits dated October 14, 2014 | 0.00 |
| | 105 | Patricia Ruel | Contrat de Services créatifs et de cession de droits dated September 1, 2014 | 0.00 |
| | 106 | 3389154 Canada Inc. (Debra Brown) | Contrat de services créatifs et de cession dated January 29, 2015 | 0.00 |
| | 107 | Eric Koller | License Agreement dated December 16, 2016, as renewed on September 1, 2017 and June 26, 2019 | 0.00 |
| Corteo | 108 | Daniele Finzi Pasca | Contrat d'édition musicale dated April 1, 2005 | 14,810.80 |
| | 109 | Jean-François Côté Productions Inc. | Contrat d'édition musicale dated April 1, 2005 | 9,606.53 |
| | 110 | Maria Bonzanigo | Contrat d'édition musicale dated September 27, 2004 | 20,647.07 |
| | 111 | Michel A. Smith | Contrat d'édition musicale dated April 1, 2005 | 2,117.65 |
| | 112 | Productions de l'Encrier Ltée  (P. Leduc) | Contrat d'édition musicale dated December 1, 2004 | 15,317.86 |
| | 113 | Roger Hewett | Contrat d'édition musicale dated April 1, 2005 | 3,017.95 |
| | 114 | Stephane beauregard | Contrat de Licence dated January 20, 2008 | 0.00 |
| | 115 | Jeremie Robert | Contrat de Licence dated January 20, 2008 | 0.00 |
| | 116 | Claude Chaput | Convention de services créatifs et de cession de droits de propriété intellectuelle dated November 1, 2006 | 1,220.12 |
| | 117 | 9079-0171 Québec Inc. (Dominique Lemieux) | Convention de services créatifs et de cession dated January 1, 2004,  as amended on September 1, 2017 | 0.00 |
| | 118 | Without A Paddle LLC (Jonathan Deans) | Creative services and assignment agreement dated February 10, 2002,), as amended on December 15, 2016 | 0.00 |
| | 119 | 9151-3556 Québec Inc. | Convention de services créatifs et de cession dated June 20, 2003 (as amended on July 12, 2005) | 17,370.64 |
| | 120 | Jean Rabasse | Convention de services créatifs et de cession dated October 22, 2003, as amended on September 20, 2016 | 7,665.77 |
| | 121 | Daniel Cyr | Convention de services créatifs et de cession de droits de propriété intellectuelle dated October 5, 2004 | 2,550.85 |
| | 122 | 3389154 Canada Inc. (Debra Brown - Le Groupe Apogée | Convention de services créatifs et de cession de droits de propriété intellectuelle, dated September 2, 2005, | 0.00 |
| | 123 | MAXIM DOBROVITSKIY | License Agreement dated March 2, 2018, between Cirque du Soleil Canada Inc. and Maxim Dobrovitskiy | 5,040.00 |
| | 124 | Core Plus Marketing Ltd (Daniele Finzi) | Convention de services créatifs et de cession dated February 9, 2004, as amended February 24, 2010 | 0.00 |
| | 125 | Nathalie Gagné | Lettre de Prime à la réalisation de mandat dated October 3, 2005 | 0.00 |
| | 126 | Labrecque Martin | Convention de services créatifs et de cession dated February 20, 2004as amended on June 27, 2005 and October 10, 2016 | 0.00 |
| | 127 | Jaque Paquin | Lettre de boni annuel dated June 18, 2004 | 0.00 |
| | 128 | Danny Zen | Lettre de modifcations à vos primes à la réalisation dated February 6, 2009 | 0.00 |

| | # | Counterparty (ies) | Name of Agreement and Date | Cure Costs (USD) |
|---|---|---|---|---|
| | 129 | Teatro Sunil | Convention de Services Créatifs et de Cession effective as of September 27, 2004 | 0.00 |
| | 130 | Boris Verkhovsky | Changes to your bonus for the completion of a creative assignment dated January 27, 2009 | 0.00 |
| Volta | 131 | 9156-3601 Quebec Inc | Contrat de services créatifs et de cession de droits dated October 23, 2015 | 0.00 |
| | 132 | Tribe | Creative Services and Assignment of Rights dated November 19, 2015 | 2,109.11 |
| | 133 | 9376-8539 Québec Inc. | Contrat de services créatifs et de cession de droits dated November 15, 2015 as amended on April 24, 2018 | 2,025.00 |
| | 134 | T-Shirt Inc. | Contrat de services créatifs et de cession de droits dated June 13, 2018 | 1,752.52 |
| | 135 | Danila Bim | License Agreement dated August 1, 2019 | 1,387.50 |
| | 136 | Anne-Séguin Poirier | Entente de confidentialité et de cession de droits dated November 30, 2015 | 15,441.70 |
| | 137 | Julie Perron | Contrat de services créatifs et de cession de droits dated November 9, 2015 | 761.10 |
| | 138 | Jaque Paquin Design Inc | Entente de confidentialité et de cession de droits dated November 17, 2015 | 0.00 |
| | 139 | Hallucination Collective Inc. | Contrat de services créatifs et de cession de droits dated March 10, 2016as amended on May 27, 2019 | 12,606.04 |
| | 140 | JMC Audio Design (9277-3100 Quebec Inc) | Entente de confidentialité et de cession de droits dated November 30, 2015 | 11,050.21 |
| | 141 | Les Productions Insalto Inc. | Contrat de services créatifs et de cession de droits dated April 4, 2016 | 750.00 |
| | 142 | M83 Recording Inc. | Music Publishing Agreement dated October 22, 2015 | 69,566.24 |
| | 143 | Nestor S. Goco (Zaldy Goco) | Creative Services and Assignment of Rights dated January 26, 2016 | 2,400.00 |
| | 144 | Manon Beaudoin | Creative Services and Assignment of Rights dated November 23, 2015 | 543.65 |
| Kooza | 145 | Laurence O'Keefe | Music Publishing Agreement dated January 1, 2006 | 1,930.28 |
| | 146 | Laurence O'Keefe | Music Publishing Agreement dated January 1, 2006 | 2,443.58 |
| | 147 | Seth Stachowski | Music Publishing Agreement dated April 1, 2007 | 3,838.91 |
| | 149 | Roger Francoeur | Convention de Services Créatifs et de Cession effective as of March 3, 2006 | 826.34 |
| | 150 | Marie-Chantale Vaillancourt | Convention de Services Créatifs et de Cession dated November 1, 2006 | 0.00 |
| | 151 | Klaxon Sound, LLC | Creative Services and Assignment Agreement effective as of October 1, 2005 | 3,888.00 |
| | 152 | Stéphane Roy | Convention de Services Créatifs et de Cession effective as of July 15, 2005 | 72,649.89 |
| | 153 | David Shiner | Creative Services and Assignment Agreement effective as of January 1, 2005 | 67,500.00 |
| | 154 | Without a Paddle, LLC | Creative Services and Assignment Agreement dated February 1, 2007 | 0.00 |
| | 155 | Ford Entertainment Inc. | Creative Services and Assignment Agreement effective as of January 1, 2007 | 9,113.82 |
| | 156 | 9156-3601 Québec Inc. | Convention de Services Créatifs et de Cession effective as of September 1, 2005 | 0.00 |
| | 157 | Serge Roy | Convention de Service Créatifs et de Cession effective as of June 20, 2005 between Créations Méandres Inc. and 9166-7881 Québec Inc. to which intervenes Serge Roy | 5,948.04 |
| | 158 | James Keylon | Offer for Services dated October 20, 2004 | 2,184.53 |
| Kurios | 159 | T-Shirt Inc. | Contrat de Services Créatifs et de Cession de Droits dated October 10, 2013 | 0.00 |
| | 160 | Melissa Thompson | Music Publishing Agreement, dated february 3, 2014 | 928.58 |
| | 161 | Raphaël Beau | Contrat d'édition musicale dated April 12, 2013 | 31,710.32 |
| | 162 | National Snare Museum Inc. | Contrat d'édition musicale dated February 28, 2014 | 8,126.81 |
| | 163 | Guy Dubuc Inc. | Contrat d'édition musicale dated February 28, 2014 | 8,126.81 |

| | # | Counterparty (ies) | Name of Agreement and Date | Cure Costs (USD) |
|---|---|---|---|---|
| | 164 | Véronique Thibeault | Contrat de Services Créatifs et de Cession de Droits dated May 21, 2013; Quittance, Convention de Cession et de Confidentialité dated November 19, 2013 | 724.86 |
| | 165 | Ateliers Stéphane Roy Inc. (Stéphane Roy) | Convention de Services Créatifs et de Cession effective as of October 16, 2012 | 0.00 |
| | 166 | David-Alexandre Desprès | Contrat de Licence dated March 23, 2015 | 255.00 |
| | 167 | Nicolas Baixas Calafell | License Agreement dated July 29, 2019 | 150.00 |
| | 168 | Mathieu Poirier | Contrat de services créatifs et de cession de droits dated July 13, 2018 | 0.00 |
| | 169 | Philippe Guillotel | Contrat de Services Créatifs et de Cession de Droits dated October 16, 2012 | 0.00 |
| | 170 | Cherkaoui BVBA | Creative Services and Assignment of Rights Agreement dated June 3, 2013 | 115.93 |
| | 171 | Yaman Okur | Contrat de Services Créatifs et de Cession de Droits dated September 15, 2013 | 65.24 |
| | 172 | Andrea Ziegler | Creative Services and Assignment Agreement dated March 7, 2014 | 60.00 |
| | 173 | 9156-3601 Québec Inc. | Contrat de Services Créatifs et de Cession de Droits dated November 26, 2012 | 0.00 |
| | 174 | Susan Gaudreau | Creative Services and Assignment of Rights Agreement dated December 2, 2013 | 0.00 |
| | 175 | Maria Terentieva | License Agreement dated February 7, 2018 | 0.00 |
| | 176 | Firebird Productions | Lcense Agreement date July 21, 2011 | 180.00 |
| | 177 | Jacques Boucher | Contrat de Services Créatifs et de Cession de Droits dated October 16, 2012 | 0.00 |
| | 178 | Michel Laprise | Énoncé des termes, modalités et conditions spécifiques applicables à la production dated August 13, 2012 | 0.00 |
| | 179 | Chantal Tremblay | Énoncé des termes, modalités et conditions spécifiques applicables à la production dated August 13, 2012 | 0.00 |
| | 180 | Jean-François Bouchard | Lettre de prime | 0.00 |
| Crystal | 181 | Les 7 Doigts de la Main (2003) Inc. | Contrat de Services Créatifs et de Cession de Droits dated September 5, 2016 | 0.00 |
| | 182 | WARNER/CHAPPELL Music, Inc. | License Agreement dated October 19, 2017 | 250.00 |
| | 183 | Downtown Music UK Ltd | Live Performance License and Invoice dated August 7, 2017 (Halo) | 0.00 |
| | 184 | EMI Blackwood Music (Canada) | License Agreement dated August 16, 2017 (Chandelier and Halo) | 0.00 |
| | 185 | Sony/ATV Music Publishing LLC | License Agreement (Stage) dated August 18, 2017, (Halo) | 0.00 |
| OVO | 186 | Mummenschanz Foundation Inc. | License and Services Agreement dated September 24, 2008 | 1,428.00 |
| | 187 | 9391-7219 Québec Inc.–Clair Obscur Design | Contrat de services créatifs et de cession de droits, effective as of November 30, 2007 | 1,339.54 |
| | 188 | Levantador Baile Composiçao Musical e exploraçao de marca ltda | Music Publishing Agreement, dated November 21, 2007 | 41,402.02 |
| | 189 | David Shiner | Creative Services and Assignment of Intellectual Property Rights Agreement relating to clownish moments for the show entitled OVO dated July 29, 2009 | 0.00 |
| | 190 | Mesosfera Producoes Artisticas Ltda | Creative Services and Assignment dated December 11, 2007 | 2,940.00 |
| | 191 | Without a Paddle LLC. (Jonathan Deans) | Creative Services and Assignment of Rights Agreement effective as of April 1, 2008, dated October 29, 2008 | 0.00 |
| | 192 | J.E. Producoes Ltda to which intervenes Deborah Colker | Creative Services and Assignement Agreement dates December 24, 2007 | 48,468.00 |
| | 193 | Vandal SENC | Contrat de services créatifs et de cession de droits, effective as of February 15, 2008 | 2,131.09 |
| | 194 | Jonathan Deans | Service and Licence Agreement dated February 23, 1999, as amended on October 30, 2008 and March 24, 2011 | 0.00 |
| | 195 | VANDAL SENC | Contrat de services créatifs et de cession de droits, effective as of February 15, 2008 | 0.00 |
| | 196 | Frédéric Gérard | Lettre de Modification à votre prime à la réalisation de mandat créatif dated February 6, 2009 | 0.00 |
| | 197 | Philippe Aubertin | Lettre de Modification à votre prime à la réalisation de mandat créatif dated February 6, 2009 | 0.00 |

| | # | Counterparty (ies) | Name of Agreement and Date | Cure Costs (USD) |
|---|---|---|---|---|
| | 198 | Chantal Tremblay | Énoncé des termes, modalités et conditions spécifiques applicables à la production dated April 27, 2007 | 0.00 |
| Under the Same Sky | 199 | Jérôme Delapierre | Contrat de services créatifs et de cession de droits dated January 11, 2019 | 9,804.84 |
| | 200 | Jaque Paquin Design inc. | Contrat de services créatifs et de cession de droits dated June 22, 2017 (Acrobatic Equipment Designer) | 19,246.25 |
| | 201 | Daniel Cola | Contrat de services créatifs et de cession de droits dated August 31, 2018 (Acrobatic Designer) | 16,341.40 |
| | 202 | Jonathan Clark | Creative Services and Assignement of Rights Agreement dated February 26, 2019 | 26,592.31 |
| | 203 | Jaques Boucher | Contrat de services créatifs et de cession de droits dated May 9, 2018, as amended | 0.00 |
| | 204 | Nicolas Vaudelet | Contrat de services créatifs et de cession de droits dated June 22, 2017, as amended on September 19, 2019 | 0.00 |
| | 205 | Yoann Benhamou | Contrat de Licence dated August 17, 2020 | 0.00 |
| | 206 | Polyphonia Ltd. | Musical Works Commission Agreement dated June 13, 2019 | 0.00 |
| | 207 | Es Devlin Design Ltd. | Creative Services and Assignment of Rights Agreement dated October 16, 2018 | 32,559.00 |
| VSTAR | 208 | Viacom International Inc. | Strategic Alliance Agreement, dated September 1, 2018 | TO BE AGREED |
| | 209 | Eight Ball Pricing Solutions LLC (Pricemaster) | Software License Agreement effective as of January 1, 2020 | 0.00 |
| Paw Patrol Live!Race to the Rescue & Paw Patrol Live! Great Pirate Adventure | 210 | VIMN Netherlands B.V. | Amended and Restated Live Event License Agreement, dated January 1, 2019 | TO BE AGREED |
| | 211 | VIMN Netherlands B.V. | Live Event Master Agreement, dated June 1, 2016, by and between VIMN Netherlands B.V. [and any valid term sheets] | TO BE AGREED |
| | 212 | Viacom Media Networks, a division of Viacom International Inc. | Investment Agreement entered into as of May 1 2017 | TO BE AGREED |
| | 213 | The Life Like Touring (Australia) Pty Ltd | Live Event Master Agreement dated June 11, 2018 | 0.00 |
| | 214 | Producciones Tycoon Gou | Live Event License Agreement, effective as of August 1, 2016, as supplemented through a Supplement effective as of September 9, 2018 | 0.00 |
| | 215 | CCS Rights Management Corp DBA Spin Master Ltd | Music License Agreement dated August 25, 2016 | 0.00 |
| | 216 | CCS Rights Management Corp DBA Spin Master Ltd | Music License Agreement dated October 10, 2017 | 0.00 |
| | 217 | CCS Rights Management Corp DBA Spin Master Ltd | Music License Agreement dated September 7, 2019 | 0.00 |
| Paw Patrol Mighty Pups | 218 | Viacom International Inc. | License Agreement, dated August 1, 2019 | TO BE AGREED |
| Nick Jr. Live! Move to the Music | 219 | Viacom International Inc. | License Agreement dated September 1,  2018   [Multiproperty license] | TO BE AGREED |
| Cirque Dreams | 224 | East Bank Entertainment | Booking Services Agreement East Bank Entertainment dated July 18, 2018 | 0.00 |
| DRAWN TO LIFE (DISNEY) | 225 | Walt Disney Parks and Resorts U.S., Inc. | Services and License Agreement, dated September 28, 2017 | TO BE AGREED |
| | 226 | Walt Disney Parks and Resorts U.S., Inc. | Guaranty, dated September 28, 2017 | TO BE AGREED |
| | 227 | Saulo Sarmiento Godoy | License Agreement dated April 17, 2019 (Aerial Pole Act) | 0.00 |
| | 228 | Benois Jutras | Music Publishing Agreement, dated September 1, 2017 | 0.00 |
| | 229 | Benois Jutras | Musical Works Commission Agreement, dated September 1, 2017 | 0.00 |
| | 230 | Ateliers Stéphane Roy Inc. | Contrat de Services Créatifs et de Cession de Droits dated April 5, 2016 | 5,629.66 |
| | 231 | 9156-3601 Québec Inc. | Contrat de Services Créatifs et de Cession de Droits dated March 24, 2017 | 37,914.86 |
| | 232 | Philippe Guillotel | Contrat de Services Créatifs et de Cession de Droits dated April 10, 2019 | 39,743.40 |
| | 233 | Without A Paddle LLC | Creative Services and Assignment of Rights Agreement dated March 25, 2017 | 0.00 |
| | 234 | Johanna Ehlert | Contrat de Services Créatifs et de Cession de Droits dated April 14, 2017 | 407.70 |
| | 235 | Les Créations du 22h22 | Creative Services and Assignment of Rights Agreement dated April 30, 2017 | 0.00 |
| | 236 | Normal Studio Inc. | Contrat de Services Créatifs et de Cession de Droits dated April 3, 2017 | 0.00 |
| | 237 | Raphael Navarro | Contrat de Services Créatifs et de Cession de Droits dated April 13, 2016 | 36,360.14 |

| | # | Counterparty (ies) | Name of Agreement and Date | Cure Costs (USD) |
|---|---|---|---|---|
| JOYA | 238 | Kostyantyn Tomilchenko | Creative Services and Assignment of Rights Agreement dated February 7, 2018 | 0.00 |
| | 239 | Joe de Paul | Creative Services and Assignment of Rights dated April 11, 2018 | 0.00 |
| | 240 | Andrew Skeels | Creative Services and Assignment of Rights Agreement dated March 1, 2018 | 22,829.80 |
| | 241 | James Lavoie | Contrat de services créatifs et de cession de droits, dated July 12, 2013 | 7,522.35 |
| | 242 | Jacques Boucher | Contrat de services créatifs et de cession de droits, dated septembre 12, 2013 | 0.00 |
| | 243 | Les 7 doigts de la Main (2003) Inc. Shana Carroll (intervenant) Sébastien Soldevila (intervenant) | Quittance, cession de droit et confidentialité, dated September 19, 2013 | 1,500.13 |
| | 244 | Susan Gaudreau | Contrat de services créatifs et de cession de droits, dated March 20, 2015 | 29,856.63 |
| | 245 | Cinthia Beranek | Creation Services and Assignment of Intellectual Property Rights Agreement, as amended, dated January 16, 2019 | 3,670.70 |
| | 246 | National Snare Museum Inc. Guy Dubuc Inc. Marc Lessard (intervenant) Guy Dubuc (intervenant) | Contrat de commande d'œuvres musicales, dated October 10, 2013 | 0.00 |
| Pattaya | 247 | The Worldmark Grand Hospitality Company Limited | Term Sheet, dated September 6, 2018 between Cirque du Soleil Canada Inc. and The Worldmark Grand Hospitality Company Limited | 0.00 |
| MSC Cruises (6 different shows presented on 4 different cruiseships) | 248 | MSC Cruises, S.A. | Services and License Agreement dated March 4, 2015 | 0.00 |
| | 249 | MSC Cruises, S.A. | Creation, Production and Operations Services Agreement for Phase a, dated September 10, 2015, effective as of August 1, 2014 | 0.00 |
| BMG Boston | 250 | American Artists Limited, Inc. (dba Broadway Across America) | Limited Partnership Agreement dated June 30, 1995 | 0.00 |
| BMG NYC | 251 | RU Management, LLC | Amended and Restated Theatre License Agreement, dated April 26, 2010 | 10,000.00 |
| BMG Chicago | 252 | Fox Associates, L.L.C | Theatre License and Service Agreement, dated August 1, 1997, as amended and supplemented through addendum dated December 20, 2000, first Amendment dated April 12, 2017, Second Amendment dated January 1, 2018 and Third Amendment dated January 18, 2019 | 0.00 |
| BMG Boston | 253 | Warrenton Street Theater Corp. | License Agreement, dated October 11, 1996 | 0.00 |
| BMG Berlin | 254 | Stage Entertainment Productions B.V. | Original Agreement dated January 27, 2004 | 0.00 |
| BMG Orlando | 255 | Universal City Development Partners, Ltd. | Universal Orlando Stage/Support Facilities and Equipment Lease dated November 1, 2006 | TO BE AGREED |
| BMG Orlando | 256 | Universal City Development Partners, Ltd. | Operating Agreement for UniMan, LLC dated November 1, 2006 | TO BE AGREED |
| BMG Orlando | 257 | Christopher Wink; Matthew Goldman; Philip Stanton; | Blue Man Group License Agreement Universal Orlando dated November 1, 2006 | 0.00 |
| BMG Orlando | 258 | UniMan, LLC | Guarantee dated November 1, 2006 | 0.00 |
| BMG Orlando | 259 | Universal City Development Partners, Ltd. | Blue Man Group Store Merchandise Management Agreement dated November 1, 2006 | TO BE AGREED |
| BMG Orlando | 260 | UniMan, LLC | Equipment Lease dated November 1, 2006 | 0.00 |
| BMG Orlando | 261 | UniMan, LLC | Sublicense Agreement dated November 1, 2006 | 300,000.00 |
| BMG Orlando | 262 | Universal City Development Partners, Ltd.; Christopher Wink; Matthew Goldman; Philip Stanton | Transaction Documents Amendment One dated January 1, 2011 | 0.00 |

| | # | Counterparty (ies) | Name of Agreement and Date | Cure Costs (USD) |
|---|---|---|---|---|
| BMG Orlando | 263 | Universal City Studios LLC; Universal City Development Partners, Ltd.; Universal Studios Water Parks Florida LLC; NBC West LLC; NBC Universal Media, LLC | Merchandise Vendor Agreement dated March 13, 2019 | 0.00 |
| BMG Event Leases | 264 | Executive Speaker Bureau | Agreement dated October 23, 2019 | 0.00 |
| | 265 | McFarlane Properties LLC | Standard Industrial/Commercial Mutli-Tenant Lease-Net dated May 23, 2016 | 0.00 |
| | 266 | Boston Redevelopment Authority | License Agreement dated september 13, 2016 | 0.00 |
| | 267 | Cité Industrielle Lasalle Inc. | Lease Agreement dated October 10, 2018 | 0.00 |
| | 269 | Dream Studios, LLC | Lease Agreement dated December 15, 2016 | 0.00 |
| | 270 | Narcoosee Acres Storage LLC | Rental Agreement -NC-Metro Self Storage-Orlando/Narcoossee dated February 20, 2020 | 0.00 |
| | 271 | Ohio Industrial Cleveland, LP | Lease Agreement Industrial (Triple Net) dated January 11, 2018 | 59,979.27 |
| | 272 | Public Storage | Rental Agreement dated July 6, 2019 | 0.00 |
| | 273 | Public Storage | Rental Agreement dated July 6, 2019 | 0.00 |
| | 274 | Reel NV, LLC | Commercial Lease dated March 4, 2020 | 0.00 |
| | 276 | Ru Management, LLC | Standard Form of Office Lease dated August 7, 2015 | 0.00 |
| | 277 | Sunchoice Corporate Properties | Guest Registration Lease Agreement dated January 5, 2020 | 0.00 |
| | 278 | Sunchoice Corporate Properties | Guest Registration Lease Agreement dated January 5, 2020 | 0.00 |
| | 279 | Sunchoice Corporate Properties | Guest Registration Lease Agreement dated January 5, 2020 | 0.00 |
| | 280 | Sunchoice Corporate Properties | Guest Registration Lease Agreement dated January 5, 2020 | 0.00 |
| | 281 | Sunchoice Corporate Properties | Guest Registration Lease Agreement dated January 5, 2020 | 0.00 |
| | 282 | Sunchoice Corporate Properties | Guest Registration Lease Agreement dated January 5, 2020 | 0.00 |
| | 283 | The Realty Associates Fund IX, LP | Industrial Real Estate Lease dated November 26, 2008 | 0.00 |
| | 284 | Y. C. Hsu CPAs Firm | Lease Agreement dated February 1, 2020 | 0.00 |
| | 285 | Williams Scotsman, Inc. | Lease Agreement dated December 4, 2015 | 136,344.18 |
| Critical suppliers & miscellaneous | 286 | UNION PAYROLL AGENCY INC. | No contract  - POs | 87,305.00 |
| | 287 | ORANGE BUSINESS SERVICES CANADA INC. (f/k/a Equant Canada Inc.) | Master Services Agreement no. MSA/CA/CIRQUE/05/06/06 dated May 1, 2003, as amended fom time to time, including on June 17, 2020 | 85,663.00 |
| | 290 | ADIRONDACK SCENIC INC | PO | 17,637.20 |
| | 291 | LAWLOGIX | Invoice dated June 30, 2020 (services post filing) | 13,688.87 |
| | 292 | Guard-X inc. | Invoices - no contract | 11,000.89 |
| | 293 | CORTLAND COMPANY INC | PO#4500350266; 4500356426; 4500357304; 4500358463 | 1,381.77 |
| | 294 | BLOOMBERG FINANCE L.P  *** | Bloomberg Datalicense Agreement dated November 13, 2017 ; and- Bloomberg Agreement dated October 2, 2010 | 1,149.75 |
| | 295 | EXTRAVISION VIDEO TECHNOLOGIES | invoices - no contract | 783.62 |
| | 296 | CHRISTIE DIGITAL SYSTEMS USA INC | PO# 8000006810 | 7,362.00 |
| | 300 | Fédération des Caisses Desjardins du Québec | Contracts#  092, C4981, 207877, 241746, 208976, 241700, 238653, 214144, 241743, 236537, 245028, 234503, 232770, 202092, 219866, 226940, 227089, 209853, 230137, C4814, 217633, 207251, C4596, 245026, 245845, 241744, 244193, 246719, 234553, C5581 | 0.00 |
| | 301 | Fédération des Caisses Desjardins du Québec | Contracts # 245465, 217534, 244800, 238878, 236123, 234552, 204940, 222961, 230451, 228374, 212950, 235138 | 0.00 |
| | 302 | Fédération des Caisses Desjardins du Québec | Contracts # 226014, 226013 | 0.00 |
| | 303 | Fédération des Caisses Desjardins du Québec | Contract # 227818 | 0.00 |
| | 304 | Fédération des Caisses Desjardins du Québec | Contract # 232128 | 0.00 |
| | 305 | Thomson Reuter (tax & Accounting) Inc. | Master Products and Services Agreement dated September 7, 2015; OneSource Tax Information Reporting Services and Pricing Addendum dated September 7, 2015; | 0.00 |
| | 306 | Guy Laliberté | Restricted Activities Agreement dated July 8, 2015, as amended by First Amendment to Restricted Activities Agreement dated February 14, 2020 | 0.00 |
| | 308 | OneTrust | Renewal Order Form dated October 1, 2020 | 0.00 |
| | 309 | Jessica Ippersiel-Despatie | Entente de Services de Consultation dated September 14, 2020. | 0.00 |
| | 310 | VISIONAP INC. | Services en lien avec l'application STAR (Système de Trésorerie, d'Analyse et de Reporting) dated January 30, 2013 | 0.00 |
| | 312 | Microsoft Licensing, GP | Business and Services Agreement # U1511441 (evergreen) dated August 31, 2015 | 0.00 |

| | # | Counterparty (ies) | Name of Agreement and Date | Cure Costs (USD) |
|---|---|---|---|---|
| | 313 | Microsoft Licensing, GP | Enterprise Agreement # E7201896 (evergreen) dated August 31, 2015, including: <br> - Server and Cloud Enrollment Agreement #56239509 (renewed on Jan 1, 2019); <br> - Enterprise Enrollment Agreement #56239509 (renewed on Jan 1, 2019); <br> - Unified Support Agreement #145242025; | 0.00 |
| | 314 | Trane Canada ULC | Convention de Service Privilège Trane (for Les Résidences 8333 2e Avenue) dated October 17, 2016; <br> Convention de Service Privilège Trane (for 8400 2e Avenue) dated October 17, 2016; | 37,000.00 |
| | 315 | BFL CANADA RISQUES ET ASSURANCE INC | BFL Canada Contract | 0.00 |
| | 316 | BFL CANADA RISQUES ET ASSURANCE INC | Contracts #: 337065 and 358536 | |
| | 317 | BFL CANADA RISQUES ET ASSURANCE INC | Contracts #: 285098, 334519, 334523, 335046-49, 335079-82, 351994, 498562, 351995, 356620 and 358264 | |
| | 318 | DATROX NEXENTA (IT) | PO #4500354035 - IT Infra Support | 0.00 |
| | 319 | DXM TECHNOLOGIE (IT) | PO #4500348980 - Audiovisuel | 0.00 |
| | 320 | ORACLE CANADA ULC (IT) | Invoice #1241744 | 0.00 |
| | 323 | COACHMEPLUS (IT) | Invoice - License Agreement | 0.00 |
| | 324 | CVENT (IT) | Contract 283570 | 0.00 |
| | 325 | DOCUSIGN (IT) | Invoice - License Agreement | 0.00 |
| | 327 | ELASTICSEARCH (IT) | PO #4500352052 | 0.00 |
| | 328 | JOBSCIENCE (IT) | ANNUAL CONTRACT | 0.00 |
| | 329 | MICRO LOGIC (IT) | PO #4500352052 | 0.00 |
| | 332 | Sitecore (IT) | Sitecore Subscription Agreement dated November 17, 2017; <br> Sitecore Subscription License Agreement dated November 17, 2017 | 0.00 |
| | 333 | Solidxperts (IT) | PO #4500340794 | 0.00 |
| | 334 | Telus (carbonblack) (IT) | PO #4500338917 | 0.00 |
| | 337 | WIDEN ENTERPRISES INC. (IT) | Master Service Agreement dated September 13, 2018; <br> Statement of Work dated September 13, 2018; | 0.00 |
| | 338 | Forensik (IT) | Agreement # P-CDS18001 | 0.00 |
| | 340 | Allegiance Benefit (MEDICAL) | Agreement Benefit Plan | 0.00 |
| | 341 | AON (Insurance) | Contrat #: 347_111928 and 347_124365 | 0.00 |
| | 344 | Cision Quebec Inc. | Master Subscription Agreement and Order Form dated October 5, 2020 | 0.00 |
| | 345 | Maerix Inc. | Offre de service #4664 (Synapse) dated October 29, 2019,  #46 | 0.00 |
| | | LEVER INC. | Order Form dated March 23, 2020 / Settlement Agreement | |
| | 346 | Return Path | Renewal Order dated February 22, 2020 | 0.00 |
| THE WORKS ENTERTAINMENT SPONSORSHIP | 347 | Circus 1903 UK Limited | **CIRCUS 1903:** Licence Agreement dated March 22, 2019 | 0.00 |
| | 348 | Skoda Auto A.S. | Marketing Services Agreement, dated May 15, 2017 | 0.00 |
| | 349 | SAP Global Marketing Inc. and | Official Supplier Agreement, dated January 1, 2012 | 0.00 |
| | 350 | Sun Life Assurance Company of Canada and | Presenting Sponsorship Agreement, dated November 29, 2016 | 0.00 |
| | 351 | Mastercard Canada ULC | Official Sponsorship Agreement | 0.00 |
| | 352 | (1)Air Canada; <br> (2) Aeroplan Inc. | Sponsorship Agreement dated November 1, 2019 | 0.00 |
| | 353 | Aimia Proprietary Loyalty Canada Inc. | Gift Certificate Vendor Agreement | 0.00 |
| | 354 | Consejo de Promocion Turistica de Mexico S.A. de C.V. | Marketing Services Agreement, dated May 7, 2014 | 0.00 |
| | 355 | Make-Up Art Cosmetics Inc. | Sponsorship Agreement dated October 1, 2018 | 0.00 |
| | 356 | Move Sales, Inc. and | Official Sponsorship Agreement dated March 26, 2018 | 0.00 |
| | 357 | Aggreko International Projects Limited | Official Sponsorship Agreement dated June 1, 2013, as amended on | 0.00 |
| LICENSING | 358 | Aristocrat Technologies, Inc | License Agreement dated December 19, 2018 | 0.00 |
| | 359 | Wines that Rock, LLC | License Agreement, dated January 1, 2018 | 0.00 |
| | 360 | Scientific Games Corporation | License Agreement, dated March 10, 2015, as amended on June 5, 2015 and on April 26, 2016 | 0.00 |
| | 361 | Yamaha Corporation of America | Distribution Agreement dated January 1, 2020 | 0.00 |
| Special/Seasonal Events | 362 | Andorra Turism SAU | Services agreement dated December 11, 2019 | 0.00 |

| | # | Counterparty (ies) | Name of Agreement and Date | Cure Costs (USD) |
|---|---|---|---|---|
| | 363 | Saudi General Authority Entertainment | Services Agreement dated May 1, 2019 | 0.00 |
| | 364 | Corporation des Évènements de Trois-Rivières | Contrat de Services et de Création et de Production de Spectacle dated May 25, 2015 | 0.00 |
| | 365 | Société du Parc Futuroscope, SA | Contrat de production de spectacle et de licence de marque de commerce et de droits d'auteur dated February 16, 2015 | 0.00 |
| | 366 | (1) 356 Entertainment Group Limited (2) Malta tourism authority | Services Agreement dated December 14, 2018 | 0.00 |
| | 367 | Vidafel SA de CV | Term Sheet dated January 9, 2020 | 0.00 |
| | 368 | Club Med SAS and SVV (société des villages de vacances) | Convention de Services Créatifs et de Services de Production et Licence de Marque et de Droits d'auteur dated September 1, 2016 (Opio) | 0.00 |
| | 369 | Club Med Management Services | Trademark and Copyright License Agreement dated August 22, 2014 | 0.00 |
| **AUDIOVISUAL** | 370 | Pavilion Events Pte Ltd. | License Agreement, dated October 31, 2019 | 0.00 |
| | 371 | SGS Luna Petunia LLC | Luna Petunia  Agreement dated June 7, 2016 | 0.00 |
| | 372 | Félix & Paul Studios Inc. | Contrat de Co-production de Contenu de Réalité Virtuelle Amendé et Refondu dated October 13, 2014 | 0.00 |
| | 373 | Félix & Paul Studios Inc. and LG UPLUS Corporation | License Agreement dated September 5, 2018 | 0.00 |
| | 374 | Félix & Paul Studios Inc. and LG UPLUS Corporation | Distribution Agreement dated February 24, 2020 | 0.00 |
| | 375 | Félix & Paul Studios Inc. and LG UPLUS Corporation | License Agreement dated November 18, 2019 | 0.00 |
| | 376 | Félix & Paul Studios Inc. and LG UPLUS Corporation | Alegria LG Distribution Agreement dated December 4, 2019 | 0.00 |
| | 377 | ZDF Enterprises GMBH | Addendum to the Agreement on Cirque du Soleil Programs dated September 21, 2017 ( "O" distribution) | 0.00 |
| | 378 | Bell Canada | Bell TV1, Conditions de Base – Convention de Licence de Diffusion Captation dated May 18, 2017 as amended on July 18, 2017 | 0.00 |
| | 379 | Bell Canada | Bell TV1, Conditions de Base – Convention de Licence de Diffusion Captation dated August 8, 2016 as amended on July 18, 2017 | 0.00 |
| | 380 | Bell Canada | Bell TV1, Conditions de Base – Convention de Licence de Diffusion Captation dated September 30, 2016as amended on July 18, 2017 | 0.00 |
| | 381 | Bell Canada | Bell TV1, Conditions de Base – Convention de Licence de Diffusion Captation dated September 25, 2017 | 0.00 |
| | 382 | ITV Studios Limited of The London Television Centre | Confirmation Letter dated November 28, 2017 | 0.00 |
| | 383 | Atomic Cartoons Inc. | Collaboration and Shopping Term Sheet dated April 20, 2020 | 0.00 |
| | 384 | ITV Global Entertainment Limited | First Look and Distribution Agreement dated April 4, 2017 | 0.00 |
| | 385 | Verizon Corporate Services Group, Inc. | Content License Agreement dated July 20, 2020 | 0.00 |
| | 386 | Apartment 11 Productions Inc. | License Agreement dated January 30, 2017 and as amended on April 11, 2018 | 0.00 |
| | 387 | Hailey Productions Inc. Apartment 11 Productions Inc. Discovery Corporate Services Limited | Omnibus Agreement dated January 30, 2017 between  , and | 0.00 |
| | 388 | Filmbank Distributor Limited | Studio Non Theatrical License Agrmt dated August 15, 2017 as amended on June 10, 2020 | 0.00 |
| | 389 | DWTS Productions LLC | License and Services Agreement dated September 10, 2016 | 0.00 |
| | 390 | UAMG Content, LLC (MGM) | "UNT Cirque du Soleil Competition Program" Collaboration and Shopping Agreement, dated December 6, 2019 | 0.00 |
| | 391 | Skybound LLC | Untitled Cirque du Soleil Anthology Series Letter Agreement, dated October 18, 2019 | 0.00 |
| | 392 | Rhino Entertainment Company, a Warner Music Group Company | Distribution Agreement dated December 20, 2002 as amended from time to time | 0.00 |
| | 393 | Orchard Entreprises NY, Inc. (successor in title of RED Distribution, LLC) | Distribution Agency Agreement dated July 1, 2004 renewed on gentlemen's agreement | 0.00 |
| | 394 | Universal/MCA Music Holland BV. (Mechanical Rights) | Agreement dated October 8, 1998 | 0.00 |
| | 395 | Mathieu Vachon | Independent Contractor Agreement dated August 19, 2020 | 0.00 |
| | 396 | Zoom Video Communications, Inc. | Mutual Non-Disclosure Agreement dated October 5, 2020 | 0.00 |
| | 397 | CSM Properties Inc. | Agency Agreement dated July 2, 2020 | 0.00 |
| **Big Top Promoters** | 398 | Mast Entertainment Ltd | Performance Services Agreement, dated January 23, 2020 | 0.00 |
| | 399 | Royal Albert Hall Developments Limited | Venue Hire Agreement for the Royal Albert Hall executed on April 23, 2018 | 0.00 |
| **Arena Promoters and partners** | 400 | Anschutz Entertainment Group Inc. (AEG) | Umbrella Agreement effective as of August 31, 2019 | 0.00 |
| | 401 | AC Orange Co./Little Orange Castle Co. | Letter of Intent dated November 11, 2019 | 0.00 |
| | 402 | Live Nation Austria Gmbh | Performance Services Agreement effective as of November 22, 2018 | 0.00 |

| | # | Counterparty (ies) | Name of Agreement and Date | Cure Costs (USD) |
|---|---|---|---|---|
| Site Licenses | 403 | Metropolitan Exposition Recreation Commission (MERC) | Site License Agreement dated September 30, 2019 | 0.00 |
| | 404 | McClellan Highway Development Company LLC | Site Lease Agreement effective as of November 25, 2019 | 0.00 |
| | 405 | The Crestmark Developments Limited Partnership | Site Lease Agreement dated February 11, 2019 | 0.00 |
| | 406 | Tysons II Land Company LLC | License Agreement dated June 9 2016 | 0.00 |
| | 407 | Kroenke Sports & Entertainment LLC | Site License Agreement dated May 10, 2013 | 0.00 |
| | 408 | Glasmacher GmbH & Co KG | Site Lease Agreement dated November 21, 2018 | 0.00 |
| | 409 | South Florida Stadium LLC | Site Lease Agreement dated December 21, 2012 | 0.00 |
| | 410 | Brussels Expo NPO | Agreement dated April 21, 2015 | 0.00 |
| | 411 | Windmill Dream Quebec Holdings LP | Site Lease Agreement dated December 21, 2016 | 0.00 |
| | 412 | American Expo Corp | Site Lease Agreement dated February 23, 2018 | 0.00 |
| TICKETING | 413 | Ingresso Group Limited | Agency Agreement between dated March 27, 2019 | 0.00 |
| | 414 | Entertainment Benefits Group, LLC (EBG) | Individual Ticket Sales and Marketing Agreement, effective as of December 16, 2019 | 0.00 |
| | 415 | Action Travel Corp | Individual Ticket Sales and Marketing Agreement effective as of February 7, 2020 | 0.00 |
| | 416 | ATD Travel Services Ltd | Individual Ticket Sales and Marketing Agreement effective as of February 7, 2020 | 0.00 |
| | 417 | Hotelbeds Beyond the Bed | Individual Ticket Sales and Marketing Agreement effective as of January 27, 2020 | 0.00 |
| | 418 | Kaluah Tours | Individual Ticket Sales and Marketing Agreement effective as of February 7, 2020 | 0.00 |
| | 419 | New World Travel | Individual Ticket Sales and Marketing Agreement  effective as of February 7, 2020 | 0.00 |
| | 420 | Personal RGE | Individual Ticket Sales and Marketing Agreement  effective as of February 7, 2020 | 0.00 |
| | 421 | Ticketcorner SA | Contrat d'organisateur dated November 11, 2019 | 0.00 |
| | 422 | Ticketmaster Belgium SA | Individual Ticket Sales and Marketing Agreement effective as of March 3, 2020 | 0.00 |
| | 423 | MGM Resorts International Operations Inc.  and Tix Corporation (Tix4Tonight Las Vegas) | Letter Agreement re: Ticket Brokerage Agreement dated January 25, 2019 | 0.00 |
| | 424 | Travel Republic | Individual Ticket Sales and Marketing Agreement effective as of February 7, 2020 | 0.00 |
| | 425 | Virgin Holidays Incoming Service | Individual Ticket Sales and Marketing Agreement effective as of February 7, 2020 | 0.00 |
| | 426 | IRSNet CZ s.r.o. (dba Ticket Portal) | Individual and Group Ticket Sales and Distribution Agreement dated November 11, 2019 | 0.00 |
| | 427 | NEIL DORWARD | Letter Agreement | 300,000.00 |

## SCHEDULE "F2"

## NOTICE OF PROPOSED ADDITIONAL CCAA ASSIGNMENT

**DATE**: ●

**TO**:  ● ("**you**")

**Re: CCAA Proceedings of [Holdings new name] (formerly Cirque du Soleil Holdings L.P.)** *et al.*

We represent the above referenced debtors (collectively, the "**Debtors**") in proceedings under the *Companies' Creditors Arrangement Act* (the "**CCAA Proceedings**") before the Quebec Superior Court (Commercial Division), District of Montreal (the "**Court**"), Court File No 500-11-058415-205, which CCAA Proceedings have been recognized in proceedings pending under Chapter 15 of the United States Bankruptcy Code before the United States Bankruptcy Court for the District of Delaware (the "**U.S. Proceedings**").

We refer to the attached Approval and Vesting Order dated October 20, 2020 (the "**Approval and Vesting Order**") rendered by the Court approving the transactions contemplated by the agreement entitled Asset Purchase Agreement made July 15, 2020, as amended, by and between Cirque du Soleil Holdings L.P., as vendor, and Spectacle Bidco L.P., as purchaser, as assigned to Spectacle BidCo Holdings Inc. ("**Buyer**"), and the following agreement(s) (collectively, the "**Agreement**") to which you and one or more Debtors are parties:

**[NTD Specify Agreement(s).]**

We have been notified by the Buyer that it seeks the assignment of the rights, benefits, obligations and interests of the applicable Debtor(s) under the Agreement, and Ernst & Young Inc. (the "**Monitor**") has approved such assignment as the Monitor of the Debtors (the "**Proposed Additional CCAA Assignment**"). The Agreement is proposed to be assigned to the following affiliate of the Buyer: **[NTD: Specify Buyer assignee.]** (the "**Buyer Assignee**").

**[NTD: Insert as applicable "In connection with the Proposed Additional CCAA Assignment, the Debtors or the Buyer, as applicable, propose to pay [CAD/USD]$[specify amount] (the "Cure Amount**") **to you to cure all outstanding monetary defaults under the Agreement, other than those defaults arising by reason only of the insolvency of the Debtors, the commencement of the CCAA Proceedings or the U.S. Proceedings, or the failure to perform non-monetary obligations. The Cure Amount will be paid to you in accordance with the terms of the Approval and Vesting Order or as you and the Buyer may otherwise agree."]**

If you oppose the Proposed Additional CCAA Assignment, you must inform the Monitor in writing by email at **[NTD: Insert Monitor email address]** of your grounds for opposition by no later than 15 days from the date hereof, failing which the rights and obligations of the applicable Debtor(s) under the Agreement shall be automatically and irrevocably assigned to the Buyer Assignee without any further consents or approvals in accordance with the terms of the Approval and Vesting Order.

If you do not oppose the Proposed Additional CCAA Assignment you have nothing to do. The rights and obligations of the applicable Debtor(s) under the Agreement will be automatically and irrevocably assigned to the Buyer Assignee following such 15 day period in accordance with the terms of the Approval and Vesting Order.

More information can be obtained on the CCAA Proceedings at: www.ey.com/ca/cirque .

To the extent you wish to discuss these matters you may contact the Monitor at the following address: cds@ca.ey.com .

Sincerely,

**[signatory]**

cc.

**[Buyer representative]**
**[Monitor representative]**

Encl. – Approval and Vesting Order

## SCHEDULE "F3"

## DRAFT ADDITIONAL CCAA ASSIGNMENT CERTIFICATE

**CANADA**

**PROVINCE OF QUEBEC**
**DISTRICT OF MONTRÉAL**

**File: No: 500-11-058415-205**

**S U P E R I O R    C O U R T**
Commercial Division

IN THE MATTER OF the *COMPANIES'*
*CREDITORS ARRANGEMENT ACT*, R.S.C.
1985, c. C 36, AS AMENDED:

**[CIRQUE DU SOLEIL CANADA INC.]**

-and-

**THE OTHER APPLICANTS LISTED IN
SCHEDULE "A" HERETO**

Applicants

-and-

**ERNST & YOUNG INC.**

Monitor

## CERTIFICATE OF THE MONITOR
## (ADDITIONAL CCAA ASSIGNMENT CERTIFICATE)

**RECITALS:**

**WHEREAS** on October 20, 2020, the Superior Court (Commercial Division), District of Montréal (the "**Court**"), rendered an Approval and Vesting Order in Court file No 500-11-058415-205 (the "**Order**"), which orders the issuance and filing by the Monitor of this Additional CCAA Assignment Certificate in accordance with the terms of paragraph **[32]** of the Order.

**WHEREAS** unless otherwise indicated or defined herein capitalized terms used herein have the meaning given to them in the Order.

**THE MONITOR CERTIFIES AS TO THE FOLLOWING:**

(a) The Monitor has received copy of a notice in writing from the Buyer to the Seller within six

(xi)

(6) months and 1 (day) of the Effective Date that it seeks the Court-ordered assignment of the rights, benefits, obligations and interests of the Debtors under the Assigned Agreements to which one or more Debtors are party to as specified on Schedule "1" hereto to the Buyer or its Affiliate as specified on Schedule "1" hereto under the heading "Buyer Assignee" (the "**Proposed Additional CCAA Assignments**" and each Assigned Agreement specified on Schedule "1" hereto a "**Proposed Additional CCAA Agreement**").

(b)  The Monitor has reviewed and approved the Proposed Additional CCAA Assignments.

(c)  The Monitor has received a copy of one or more Notices of Proposed Additional CCAA Assignment sent by the Debtors to the counterparties to the Proposed Additional CCAA Assigned Agreements.

(d)  No counterparty to the Proposed Additional CCAA Agreements has delivered an Objection Notice to the Monitor by the applicable Objection Deadline.

(e)  Accordingly, the Monitor delivers this Additional CCAA Assignment Certificate to the Buyer in accordance with paragraph **[32]** of the Order.

This Certificate was issued by the Monitor to the Buyer at _____ **[TIME]** on _____ **[DATE]**.

Ernst & Young Inc. in its capacity as court-appointed Monitor of **[Holdings new name]** and the other Debtors and not in its personal capacity

Name: _____

Title: _____

### SCHEDULE "1" TO ADDITIONAL CCAA ASSIGNMENT CERTIFICATE
### LISTING OF ADDITIONAL CCAA AGREEMENTS

| Counterparty Name | Agreement | Buyer Assignee |
|---|---|---|
| ● | ● | ● |

**SCHEDULE "G"**

**QUEBEC REAL PROPERTY**

Collectively, the immovable properties known and described as:

(i) lot numbers 3 237 014 and 3 237 015 of the Cadastre of Quebec, Registration Division of Montreal, and with the building thereon erected bearing civic number 8400, 2nd Avenue, Montreal, Québec, H1Z 4M6;

(ii) lot number 2 706 502 of the Cadastre of Quebec, Registration Division of Montreal, and with the building thereon erected bearing civic number 8333, 2nd Avenue, Montreal, Quebec, H1Z 4N9;

(iii) lot number 4 281 606 of the Cadastre of Quebec, Registration Division of Montreal, and with the building thereon erected bearing civic number 2525, Jarry East Street, Montreal, Quebec, H1Z 2C2; and

(iv) lot number 3 237 025 of the Cadastre of Quebec, Registration Division of Montreal, a lot located at the intersection of Michel-Jurdant Street and Crémazie Boulevard, Montréal, Québec (the "**Vacant Land**").[2]

[2] In the case of the Vacant Land, Encumbrances to be cancelled only if the sale of the Vacant Land contemplated by the Court's Approval and Vesting Order (Sale of Vacant Land) dated August 27, 2020, has not closed.

**SCHEDULE "H"**

**REGISTRATIONS PUBLISHED AT THE LAND REGISTRY OFFICE**

**TO BE CANCELLED AND STRUCK**

**2525 Rue Jarry Est, Montreal** (lot number 4 281 606 of the Cadastre of Quebec, Registration Division of Montreal, and with the building thereon erected bearing civic number 2525, Jarry East Street, Montreal, Quebec, H1Z 2C2)

| Debtor(s) | Secured Party | Type of Rights | Registration Number |
|---|---|---|---|
| *TPG VII CDS Holdings, L.P.* <br> CDS U.S. Holdings, Inc. <br> CDS Canadian Holdings, Inc. <br> CDS U.S. Intermediate Holdings, Inc. <br> Cirque du Soleil Canada Inc. <br> BGE Holdings Inc. <br> Burlesco, L.L.C. <br> Cirque du Soleil (US), Inc. <br> Cirque du Soleil Holding USA, Inc. <br> Cirque du Soleil America, Inc. <br> Cirque du Soleil Illusion, L.L.C. <br> Cirque du Soleil My Call, L.L.C. <br> Cirque du Soleil Nevada, Inc. <br> Cirque du Soleil Orlando, L.L.C. <br> Cirque du Soleil Vegas, L.L.C. <br> Velsi, L.L.C. <br> 45 Degrees Events Inc. <br> 9104-3448 Quebec Inc. <br> 9318-2426 Quebec Inc. <br> Cirque du Soleil Inc. <br> Cirque du Soleil Images Inc. <br> Cirque du Soleil Inspiration Inc. <br> Cirque du Soleil Musique Inc. <br> Créations Musca Inc. <br> Groupe Constellation Inc. <br> Productions Conte Inc. <br> Productions Conte II Inc. <br> Productions Conte III Inc. <br> Productions Conte IV Inc. <br> Productions Dosul Inc. | Wilmington Trust, National Association <br> (replaced Bank of America, N.A. on May 22, 2020 by registration number 25 395 446) | Deed of hypothec | 21 682 795 |
| *TPG VII CDS Holdings, L.P.* <br> CDSU.S. Holdings, Inc. <br> CDS Canadian Holdings, Inc. <br> CDS U.S. Intermediate Holdings, Inc. <br> Cirque du Soleil Canada Inc. <br> BGE Holdings Inc. <br> Burlesco, L.L.C. <br> Cirque du Soleil (US), Inc. <br> Cirque du Soleil Holding USA, Inc. <br> Cirque du Soleil America, Inc. <br> Cirque du Soleil Illusion, L.L.C. <br> Cirque du Soleil My Call, L.L.C. <br> Cirque du Soleil Nevada, Inc. | Royal Bank of Canada <br> (replaced Deutsche Bank AG New York Branch on July 8, 2015 by registration number 23 212 014) | Deed of hypothec | 21 682 710 |

| Debtor(s) | Secured Party | Type of Rights | Registration Number |
|---|---|---|---|
| Cirque du Soleil Orlando, L.L.C.<br>Cirque du Soleil Vegas, L.L.C.<br>Velsi, L.L.C.<br>45 Degrees Events Inc.<br>9104-3448 Quebec Inc.<br>9318-2426 Quebec Inc.<br>Cirque du Soleil Inc.<br>Cirque du Soleil Images Inc.<br>Cirque du Soleil Inspiration Inc.<br>Cirque du Soleil Musique Inc.<br>Créations Musca Inc.<br>Groupe Constellation Inc.<br>Productions Conte Inc.<br>Productions Conte II Inc.<br>Productions Conte III Inc.<br>Productions Conte IV Inc.<br>Productions Dosul Inc. | | | |

**8400 2e Avenue, Montreal** (lot numbers 3 237 014 and 3 237 015 of the Cadastre of Quebec, Registration Division of Montreal, and with the building thereon erected bearing civic number 8400, 2nd Avenue, Montreal, Québec, H1Z 4M6);

| Debtor(s) | Secured Party | Type of Right | Registration Number |
|---|---|---|---|
| *TPG VII CDS Holdings, L.P.*<br>CDS U.S. Holdings, Inc.<br>CDS Canadian Holdings, Inc.<br>CDS U.S. Intermediate Holdings, Inc.<br>Cirque du Soleil Canada Inc.<br>BGE Holdings Inc.<br>Burlesco, L.L.C.<br>Cirque du Soleil (US), Inc.<br>Cirque du Soleil Holding USA, Inc.<br>Cirque du Soleil America, Inc.<br>Cirque du Soleil Illusion, L.L.C.<br>Cirque du Soleil My Call, L.L.C.<br>Cirque du Soleil Nevada, Inc.<br>Cirque du Soleil Orlando, L.L.C.<br>Cirque du Soleil Vegas, L.L.C.<br>Velsi, L.L.C.<br>45 Degrees Events Inc.<br>9104-3448 Quebec Inc.<br>9318-2426 Quebec Inc.<br>Cirque du Soleil Inc.<br>Cirque du Soleil Images Inc.<br>Cirque du Soleil Inspiration Inc.<br>Cirque du Soleil Musique Inc.<br>Créations Musca Inc.<br>Groupe Constellation Inc.<br>Productions Conte Inc.<br>Productions Conte II Inc.<br>Productions Conte III Inc. | Wilmington Trust, National Association<br>(replaced Bank of America, N.A. on May 22, 2020 by registration number 25 395 446) | Deed of hypothec | 21 682 795 |

| Debtor(s) | Secured Party | Type of Right | Registration Number |
|---|---|---|---|
| Productions Conte IV Inc.<br>Productions Dosul Inc. | | | |
| *TPG VII CDS Holdings, L.P.*<br>CDSU.S. Holdings, Inc.<br>CDS Canadian Holdings, Inc.<br>CDS U.S. Intermediate Holdings, Inc.<br>Cirque du Soleil Canada Inc.<br>BGE Holdings Inc.<br>Burlesco, L.L.C.<br>Cirque du Soleil (US), Inc.<br>Cirque du Soleil Holding USA, Inc.<br>Cirque du Soleil America, Inc.<br>Cirque du Soleil Illusion, L.L.C.<br>Cirque du Soleil My Call, L.L.C.<br>Cirque du Soleil Nevada, Inc.<br>Cirque du Soleil Orlando, L.L.C.<br>Cirque du Soleil Vegas, L.L.C.<br>Velsi, L.L.C.<br>45 Degrees Events Inc.<br>9104-3448 Quebec Inc.<br>9318-2426 Quebec Inc.<br>Cirque du Soleil Inc.<br>Cirque du Soleil Images Inc.<br>Cirque du Soleil Inspiration Inc.<br>Cirque du Soleil Musique Inc.<br>Créations Musca Inc.<br>Groupe Constellation Inc.<br>Productions Conte Inc.<br>Productions Conte II Inc.<br>Productions Conte III Inc.<br>Productions Conte IV Inc.<br>Productions Dosul Inc. | Royal Bank of Canada (replaced Deutsche Bank AG New York Branch on July 8, 2015 by registration number 23 212 014) | Deed of hypothec | 21  682 710 |

**8333 2e Avenue, Montreal** (lot number 2 706 502 of the Cadastre of Quebec, Registration Division of Montreal, and with the building thereon erected bearing civic number 8333, 2nd Avenue, Montreal, Quebec, H1Z 4N9);

| Debtor(s) | Secured Party | Type of Right | Registration Number |
|---|---|---|---|
| *TPG VII CDS Holdings, L.P.*<br>CDSU.S. Holdings, Inc.<br>CDS Canadian Holdings, Inc.<br>CDS U.S. Intermediate Holdings, Inc.<br>Cirque du Soleil Canada Inc.<br>BGE Holdings Inc.<br>Burlesco, L.L.C.<br>Cirque du Soleil (US), Inc.<br>Cirque du Soleil Holding USA, Inc.<br>Cirque du Soleil America, Inc.<br>Cirque du Soleil Illusion, L.L.C.<br>Cirque du Soleil My Call, L.L.C.<br>Cirque du Soleil Nevada, Inc. | Wilmington Trust, National Association (replaced Bank of America, N.A. on May 22, 2020 by registration number 25 395 446) | Deed of hypothec | 21 682 795 |

| Debtor(s) | Secured Party | Type of Right | Registration Number |
|---|---|---|---|
| Cirque du Soleil Orlando, L.L.C.<br>Cirque du Soleil Vegas, L.L.C.<br>Velsi, L.L.C.<br>45 Degrees Events Inc.<br>9104-3448 Quebec Inc.<br>9318-2426 Quebec Inc.<br>Cirque du Soleil Inc.<br>Cirque du Soleil Images Inc.<br>Cirque du Soleil Inspiration Inc.<br>Cirque du Soleil Musique Inc.<br>Créations Musca Inc.<br>Groupe Constellation Inc.<br>Productions Conte Inc.<br>Productions Conte II Inc.<br>Productions Conte III Inc.<br>Productions Conte IV Inc.<br>Productions Dosul Inc. | | | |
| *TPG VII CDS Holdings, L.P.*<br>CDSU.S. Holdings, Inc.<br>CDS Canadian Holdings, Inc.<br>CDS U.S. Intermediate Holdings, Inc.<br>Cirque du Soleil Canada Inc.<br>BGE Holdings Inc.<br>Burlesco, L.L.C.<br>Cirque du Soleil (US), Inc.<br>Cirque du Soleil Holding USA, Inc.<br>Cirque du Soleil America, Inc.<br>Cirque du Soleil Illusion, L.L.C.<br>Cirque du Soleil My Call, L.L.C.<br>Cirque du Soleil Nevada, Inc.<br>Cirque du Soleil Orlando, L.L.C.<br>Cirque du Soleil Vegas, L.L.C.<br>Velsi, L.L.C.<br>45 Degrees Events Inc.<br>9104-3448 Quebec Inc.<br>9318-2426 Quebec Inc.<br>Cirque du Soleil Inc.<br>Cirque du Soleil Images Inc.<br>Cirque du Soleil Inspiration Inc.<br>Cirque du Soleil Musique Inc.<br>Créations Musca Inc.<br>Groupe Constellation Inc.<br>Productions Conte Inc.<br>Productions Conte II Inc.<br>Productions Conte III Inc.<br>Productions Conte IV Inc.<br>Productions Dosul Inc. | Royal Bank of Canada (replaced Deutsche Bank AG New York Branch on July 8, 2015 by registration number 23 212 014) | Deed of hypothec | 21 682 710 |

**Vacant Land** (lot number 3 237 025 of the Cadastre of Quebec, Registration Division of Montreal, a lot located at the intersection of Michel-Jurdant Street and Crémazie Boulevard, Montréal, Québec)[3]

| Debtor(s) | Secured Party | Type of Right | Registration Number |
|---|---|---|---|
| *TPG VII CDS Holdings, L.P.*<br>CDSU.S. Holdings, Inc.<br>CDS Canadian Holdings, Inc.<br>CDS U.S. Intermediate Holdings, Inc.<br>Cirque du Soleil Canada Inc.<br>BGE Holdings Inc.<br>Burlesco, L.L.C.<br>Cirque du Soleil (US), Inc.<br>Cirque du Soleil Holding USA, Inc.<br>Cirque du Soleil America, Inc.<br>Cirque du Soleil Illusion, L.L.C.<br>Cirque du Soleil My Call, L.L.C.<br>Cirque du Soleil Nevada, Inc.<br>Cirque du Soleil Orlando, L.L.C.<br>Cirque du Soleil Vegas, L.L.C.<br>Velsi, L.L.C.<br>45 Degrees Events Inc.<br>9104-3448 Quebec Inc.<br>9318-2426 Quebec Inc.<br>Cirque du Soleil Inc.<br>Cirque du Soleil Images Inc.<br>Cirque du Soleil Inspiration Inc.<br>Cirque du Soleil Musique Inc.<br>Créations Musca Inc.<br>Groupe Constellation Inc.<br>Productions Conte Inc.<br>Productions Conte II Inc.<br>Productions Conte III Inc.<br>Productions Conte IV Inc.<br>Productions Dosul Inc. | Wilmington Trust, National Association (replaced Bank of America, N.A. on May 22, 2020 by registration number 25 395 446) | Deed of hypothec | 21 682 795 |
| *TPG VII CDS Holdings, L.P.*<br>CDSU.S. Holdings, Inc.<br>CDS Canadian Holdings, Inc.<br>CDS U.S. Intermediate Holdings, Inc.<br>Cirque du Soleil Canada Inc.<br>BGE Holdings Inc.<br>Burlesco, L.L.C.<br>Cirque du Soleil (US), Inc.<br>Cirque du Soleil Holding USA, Inc.<br>Cirque du Soleil America, Inc.<br>Cirque du Soleil Illusion, L.L.C.<br>Cirque du Soleil My Call, L.L.C.<br>Cirque du Soleil Nevada, Inc.<br>Cirque du Soleil Orlando, L.L.C. | Royal Bank of Canada (replaced Deutsche Bank AG New York Branch on July 8, 2015 by registration number 23 212 014) | Deed of hypothec | 21 682 710 |

---

[3] In the case of the Vacant Land, these Encumbrances will have already been cancelled if the sale of the Vacant Land contemplated by the Court's Approval and Vesting Order (Sale of Vacant Land) dated August 27, 2020, has closed.

| Debtor(s) | Secured Party | Type of Right | Registration Number |
|---|---|---|---|
| Cirque du Soleil Vegas, L.L.C.<br>Velsi, L.L.C.<br>45 Degrees Events Inc.<br>9104-3448 Quebec Inc.<br>9318-2426 Quebec Inc.<br>Cirque du Soleil Inc.<br>Cirque du Soleil Images Inc.<br>Cirque du Soleil Inspiration Inc.<br>Cirque du Soleil Musique Inc.<br>Créations Musca Inc.<br>Groupe Constellation Inc.<br>Productions Conte Inc.<br>Productions Conte II Inc.<br>Productions Conte III Inc.<br>Productions Conte IV Inc.<br>Productions Dosul Inc. | | | |

## SCHEDULE "I"

## REGISTRATIONS PUBLISHED AT THE QUEBEC PERSONAL AND MOVEABLE REAL RIGHTS REGISTRY TO BE CANCELLED AND STRUCK

I.  **QUEBEC**

1.  *QUEBEC PERSONAL AND MOVEABLE REAL RIGHTS REGISTRY* (Quebec)

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Type of Rights | Notes |
|---|---|---|---|---|
| 1.  Royal Bank of Canada, as Collateral Agent (replaced Deutsche Bank AG New York Branch on July 3, 2017) | *TPG VII CDS Holdings, L.P. (has been removed as of July 14, 2015)* CDS U.S. Holdings, Inc. CDS Canadian Holdings, Inc. Holding Canadien CDS, Inc. CDS U.S. Intermediate Holdings, Inc. Cirque du Soleil Canada Inc. BGE Holdings Inc. Burlesco, L.L.C. Cirque du Soleil (US), Inc. Cirque du Soleil Holding USA, Inc. Cirque du Soleil America, Inc. Cirque du Soleil Illusion, L.L.C. Cirque du Soleil My Call, L.L.C. Cirque du Soleil Nevada, Inc. Cirque du Soleil Orlando, L.L.C. Cirque du Soleil Vegas, L.L.C. Velsi, L.L.C. 45 Degrees Events Inc. Événements 45 Degrees Inc. 9104-3448 Quebec Inc. 9318-2426 Quebec Inc. Cirque du Soleil Inc. Cirque du Soleil Images Inc. Cirque du Soleil Inspiration Inc. Cirque du Soleil Musique Inc. | 15-0639746-0001 | Conventional hypothec without delivery | Cirque Du Soleil Canada Inc., Groupe Constellation Inc. and Productions Dosul Inc. amalgamated on January 2, 2017 under the name CIRQUE DU SOLEIL CANADA INC. Cirque Du Soleil Images Inc., Productions Conte Inc., Productions Conte II Inc., Productions Conte III Inc., Productions Conte IV Inc., 9104-3448 Québec Inc., Créations Musca Inc. and Cirque Du Soleil Music Inc./Cirque Du Soleil Musique Inc. amalgamated on December 28, 2015 under the name CIRQUE DU SOLEIL IMAGES INC. |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Type of Rights | Notes |
|---|---|---|---|---|
| | Créations Musca Inc. Groupe Constellation Inc. Productions Conte Inc. Productions Conte II Inc. Productions Conte III Inc. Productions Conte IV Inc. Productions Dosul Inc. | | | |
| 2. Wilmington Trust, National Association (replaced Bank of America, N.A. on May 22, 2020) | *TPG VII CDS Holdings, L.P. (as been removed as of July 14, 2015)* CDSU.S. Holdings, Inc. CDS Canadian Holdings, Inc. Holding Canadien CDS, Inc. CDS U.S. Intermediate Holdings, Inc. Cirque du Soleil Canada Inc. BGE Holdings Inc. Burlesco, L.L.C. Cirque du Soleil (US), Inc. Cirque du Soleil Holding USA, Inc. Cirque du Soleil America, Inc. Cirque du Soleil Illusion, L.L.C. Cirque du Soleil My Call, L.L.C. Cirque du Soleil Nevada, Inc. Cirque du Soleil Orlando, L.L.C. Cirque du Soleil Vegas, L.L.C. Velsi, L.L.C. 45 Degrees Events Inc. Événements 45 Degrees Inc. 9104-3448 Quebec Inc. 9318-2426 Quebec Inc. Cirque du Soleil Inc. Cirque du Soleil Images Inc. Cirque du Soleil Inspiration Inc. Cirque du Soleil Musique Inc. Créations Musca Inc. Groupe Constellation Inc. Productions Conte Inc. | 15-0639750-0001 | Conventional hypothec without delivery | Cirque Du Soleil Canada Inc., Groupe Constellation Inc. and Productions Dosul Inc. amalgamated on January 2, 2017 under the name CIRQUE DU SOLEIL CANADA INC. Cirque Du Soleil Images Inc., Productions Conte Inc., Productions Conte II Inc., Productions Conte III Inc., Productions Conte IV Inc., 9104-3448 Québec Inc., Créations Musca Inc. and Cirque Du Soleil Music Inc./Cirque Du Soleil Musique Inc. amalgamated on December 28, 2015 under the name CIRQUE DU SOLEIL IMAGES INC. |

(xxii)

| | Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Type of Rights | Notes |
|---|---|---|---|---|---|
| 3. | HSBC Bank Canada | Productions Conte II Inc. Productions Conte III Inc. Productions Conte IV Inc. Productions Dosul Inc. Cirque du Soleil Canada Inc. | 20-0437128-0001 | Conventional hypothec without delivery | |
| 4. | Xerox Canada Ltd BNP Paribas (further to assignments of rights) | Cirque du Soleil Canada Inc. | 15-1251328-0001 | Rights resulting from a lease | |
| 5. | Xerox Canada Ltd BNP Paribas (further to assignments of rights) | Cirque du Soleil Canada Inc. | 15-1205510-0002 | Rights resulting from a lease | |
| 6. | Action Trailer Leasing Limited | Cirque du Soleil Inc. | 20-0346270-0002 | Rights resulting from a lease | |
| 7. | Trailer Wizards Ltd. | Cirque du Soleil Inc. | 20-0982262-0013 | Rights resulting from a lease | |
| 8. | Action Trailer Leasing Limited | Cirque du Soleil Inc. | 19-0787077-0011 | Rights resulting from a lease | |
| 9. | Action Trailer Leasing Limited | Cirque du Soleil Inc. | 19-0779830-0020 | Rights resulting from a lease | |
| 10. | Trailer Wizards Ltd. | Cirque du Soleil Inc. | 19-0238048-0013 | Rights resulting from a lease | |
| 11. | Xerox Canada Ltd BNP Paribas (further to assignments of rights) | Cirque du Soleil Inc. | 15-1253492-0003 | Rights resulting from a lease | |

(xxiii)

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | Type of Rights | Notes |
|---|---|---|---|---|
| 12. Wilmington Trust, National Association | CDS Canada 3 L.P.<br>CDS Canada 3 s.e.c.<br>9415-8227 Québec Inc.<br>9415-8235 Québec Inc. | 20-0498253-0002 | Conventional hypothec without delivery | |
| 13. Royal Bank of Canada | CDS Canada 3 L.P.<br>CDS Canada 3 s.e.c.<br>9415-8227 Québec Inc.<br>9415-8235 Québec Inc. | 20-0498250-0002 | Conventional hypothec without delivery | |
| 14. Royal Bank of Canada | CDS Canada 3 L.P.<br>CDS Canada 3 s.e.c.<br>9415-8227 Québec Inc.<br>9415-8235 Québec Inc. | 20-0498239-0001 | Conventional hypothec without delivery | |
| 15. Wilmington Trust, National Association (replaced Bank of America, N.A. on May 22, 2020) | Cirque du Soleil Holdings LP Gestion Cirque du Soleil s.e.c. | 15-0658306-0001 | Conventional hypothec without delivery | |
| 16. Royal Bank of Canada (replaced Deutsche Bank AG New York Branch on July 3, 2017) | Cirque du Soleil Holdings LP Gestion Cirque du Soleil s.e.c. | 15-0658129-0001 | Conventional hypothec without delivery | |
| 17. Wilmington Trust, National Association | CDS Canada 4 L.P.<br>CDS Canada 4 s.e.c. | 20-0498253-0003 | Conventional hypothec without delivery | |
| 18. Royal Bank of Canada | CDS Canada 4 L.P.<br>CDS Canada 4 s.e.c. | 20-0498250-0001 | Conventional hypothec without delivery | |
| 19. Royal Bank of Canada | CDS Canada 4 L.P.<br>CDS Canada 4 s.e.c. | 20-0498239-0002 | Conventional hypothec without delivery | |

(xxiv)

**SCHEDULE "J"**

**PPSA REGISTRATIONS TO BE CANCELLED AND STRUCK**

**I.    ONTARIO**

**1.    PERSONAL PROPERTY SECURITY ACT (Ontario)**

| | Secured Party(ies) | Debtor(s) | Reference File No. & Registration Number (Registration Period) | Collateral Classification | General Collateral Description | Amendments / Assignments Discharges / Renewals Transfers / Subordinations |
|---|---|---|---|---|---|---|
| 1. | Transit Trailer Limited | Cirque du Soleil America Inc. | 763228674 - 20200702 0807 1793 3473 (2 years) | Equipment, Amount Secured: $70,000, Date of Maturity: 02JUL2022 | 2016 Lode King 48' Quad Axle Flatdecks, PFL48-4 VIN #2LDPF4826GR062142 VIN #2LDPF482XGR062144 | |
| 2. | Royal Bank of Canada, as Collateral Agent | TPG VII CDS Holdings, L.P. TPG Genpar VII-AIV, L.P. TPG Genpar VII-AIV Advisors, Inc. CDS U.S. Intermediate Holdings, Inc. Cirque du Soleil Canada Inc. (listed twice) CDS U.S. Holdings, Inc. CDS Canadian Holdings, Inc. BGE Holdings, Inc. Burlesco, L.L.C. Cirque du Soleil (US), Inc. Cirque du Soleil Illusion, L.L.C. Cirque du Soleil My Call, L.L.C. Cirque du Soleil Nevada, Inc. Cirque du Soleil Orlando, L.L.C. Cirque du Soleil Vegas, L.L.C. | 707796567 - 20150707 1459 1590 9341 (10 years) | Inventory, Equipment, Accounts, Other | With respect to each debtor, all of the debtor's present and after-acquired personal property. | Amended by 20150708 0835 1590 9374 Amendment to remove "9324-4218 Quebec Inc." as a debtor. Amended by 20150709 1602 1590 9576 Amendment to include the following as additional debtors: Holding Canadien CDS, Inc., CDS Canadian Holdings, Inc. / Holding Canadien CDS, Inc., Holding Canadien CDS, Inc. / CDS Canadian Holdings, Inc., Evenements 45 Degrees Inc., 45 Degrees Events Inc. / Evenements 45 Degrees Inc. and Evenements 45 |

| Secured Party(ies) | Debtor(s) | Reference File No. & Registration Number (Registration Period) | Collateral Classification | General Collateral Description | Amendments / Assignments Discharges / Renewals Transfers / Subordinations |
|---|---|---|---|---|---|
| | Velsi, L.L.C. Cirque du Soleil Holding USA, Inc. Cirque du Soleil America, Inc. Cirque du Soleil Inc. 9318-2426 Quebec Inc. Cirque du Soleil Inspiration Inc. 45 Degrees Events Inc. *(listed twice)* Cirque du Soleil Images Inc. *(listed twice)* Holding Canadien CDS, Inc. CDS Canadian Holdings, Inc. / Holding Canadien CDS, Inc. Holding Canadien CDS, Inc. / CDS Canadian Holdings, Inc. Evenements 45 Degrees Inc. *(listed twice)* 45 Degrees Events Inc. / Evenements 45 Degrees Inc. *(listed twice)* Evenements 45 Degrees Inc. / 45 Degrees Events Inc. *(listed twice)* Cirque du Soleil Holdings LP / Gestion Cirque du Soleil S.E.C. Gestion Cirque du Soleil S.E.C. / Cirque du Soleil Holdings LP Cirque du Soleil Holdings LP Gestion Cirque du Soleil S.E.C. | | | | Degrees Inc. / 45 Degrees Events Inc. Amended by 20150710 0813 1590 9589 Amendment to include the following as additional debtors: Cirque du Soleil Holdings LP / Gestion Cirque du Soleil S.E.C., Gestion Cirque du Soleil S.E.C. / Cirque du Soleil Holdings LP, Cirque du Soleil Holdings LP, Gestion Cirque du Soleil S.E.C., Cirque du Soleil GP Inc. / Commandite Cirque du Soleil Inc., Commandite Cirque du Soleil Inc. / Cirque du Soleil GP Inc., Cirque du Soleil GP Inc. and Commandite Cirque du Soleil Inc. Amended by 20170302 0814 9234 0827 Amendment to include a general collateral description and to change the names of "9104-3448 Quebec Inc.", "Cirque du Soleil Music Inc." "Cirque du Soleil Musique Inc." "Creations Musca Inc." "Productions Conte Inc.", "Productions Conte II Inc." "Productions Conte III Inc." and "Productions Conte IV Inc." to "Cirque du Soleil |

(xxvi)

| Secured Party(ies) | Debtor(s) | Reference File No. & Registration Number (Registration Period) | Collateral Classification | General Collateral Description | Amendments / Assignments Discharges / Renewals Transfers / Subordinations |
|---|---|---|---|---|---|
| | Cirque du Soleil GP Inc. / Commandite Cirque du Soleil Inc. Commandite Cirque du Soleil Inc. / Cirque du Soleil GP Inc. Cirque du Soleil GP Inc. Commandite Cirque du Soleil Inc. | | | | Images Inc." pursuant to a December 28, 2015 amalgamation and to change the names of "Productions Dosul Inc." and "Groupe Constellation Inc." to "Cirque du Soleil Canada Inc." pursuant to a January 2, 2017 amalgamation <u>Assigned by 20170704 0907 1590 7374</u> Assignor: Deutsche Bank AG New York Branch, as Collateral Agent Assignee: Royal Bank of Canada, as Collateral Agent <u>Amended by 20170704 1633 1590 7432</u> Amendment to reflect an amalgamation of one of the debtors |
| 3. Wilmington Trust, National Association, as Collateral Agent | TPG VII CDS Holdings, L.P. TPG Genpar VII-AIV, L.P. TPG Genpar VII-AIV Advisors, Inc. CDS U.S. Intermediate Holdings, Inc. Cirque du Soleil Canada Inc. *(listed twice)* CDS U.S. Holdings, Inc. CDS Canadian Holdings, Inc. BGE Holdings, Inc. Burlesco, L.L.C. Cirque du Soleil (US) Inc. | 707809068 - 20150707 1507 1590 9344 (10 years) | Inventory, Equipment, Accounts, Other | With respect to each debtor, all of the debtor's present and after-acquired personal property. | <u>Amended by 20150708 0835 1590 9375</u> Amendment to remove "9324-4218 Quebec Inc." as a debtor. <u>Amended by 20150709 1610 1590 9577</u> Amendment to include the following as additional debtors: Holding Canadien CDS, Inc., CDS Canadian Holdings, Inc. / Holding Canadien CDS, Inc., Holding |

| Secured Party(ies) | Debtor(s) | Reference File No. & Registration Number (Registration Period) | Collateral Classification | General Collateral Description | Amendments / Assignments Discharges / Renewals Transfers / Subordinations |
|---|---|---|---|---|---|
| | Cirque du Soleil Illusion, L.L.C. Cirque du Soleil My Call, L.L.C. Cirque du Soleil Nevada, Inc. Cirque du Soleil Orlando, L.L.C. Cirque du Soleil Vegas, L.L.C. Velsi, L.L.C. Cirque du Soleil Holding USA, Inc. Cirque du Soleil America, Inc. Cirque du Soleil Inc. 9318-2426 Quebec Inc. Cirque du Soleil Inspiration Inc. 45 Degrees Events Inc. (listed twice) Cirque du Soleil Images Inc. (listed twice) Holding Canadien CDS, Inc. CDS Canadian Holdings, Inc. / Holding Canadien CDS, Inc. Holding Canadien CDS, Inc. / CDS Canadian Holdings, Inc. Evenements 45 Degrees Inc. (listed twice) 45 Degrees Events Inc. / Evenements 45 Degrees Inc. (listed twice) Evenements 45 Degrees Inc. / 45 Degrees Events Inc. (listed twice) Cirque du Soleil Holdings LP / Gestion Cirque du Soleil S.E.C. | | | | Canadien CDS, Inc. / CDS Canadian Holdings, Inc., Evenements 45 Degrees Inc., 45 Degrees Events Inc. / Evenements 45 Degrees Inc. and Evenements 45 Degrees Inc. / 45 Degrees Events Inc. Amended by 20150710 0815 1590 9590 Amendment to include the following as additional debtors: Cirque du Soleil Holdings LP / Gestion Cirque du Soleil S.E.C., Gestion Cirque du Soleil S.E.C. / Cirque du Soleil Holdings LP, Cirque du Soleil Holdings LP, Gestion Cirque du Soleil S.E.C., Cirque du Soleil GP Inc. / Commandite Cirque du Soleil Inc., Commandite Cirque du Soleil Inc. / Cirque du Soleil GP Inc., Cirque du Soleil GP Inc. and Commandite Cirque du Soleil Inc. Amended by 20170302 0814 9234 0828 Amendment to include a general collateral description and to change the names of "9104-3448 Quebec Inc.", "Cirque du Soleil Music Inc.", "Cirque du Soleil Musique |

(xxviii)

| Secured Party(ies) | Debtor(s) | Reference File No. & Registration Number (Registration Period) | Collateral Classification | General Collateral Description | Amendments / Assignments Discharges / Renewals Transfers / Subordinations |
|---|---|---|---|---|---|
|  | Gestion Cirque du Soleil S.E.C. / Cirque du Soleil Holdings LP<br>Cirque du Soleil Holdings LP<br>Gestion Cirque du Soleil S.E.C.<br>Cirque du Soleil GP Inc. / Commandite Cirque du Soleil Inc.<br>Commandite Cirque du Soleil Inc. / Cirque du Soleil GP Inc.<br>Cirque du Soleil GP Inc.<br>Commandite Cirque du Soleil Inc. |  |  |  | Inc." "Creations Musca Inc." "Productions Conte Inc.", "Productions Conte II Inc.", "Productions Conte III Inc." and "Productions Conte IV Inc." to "Cirque du Soleil Images Inc." pursuant to a December 28, 2015 amalgamation and to change the names of "Productions Dosul Inc." and "Groupe Constellation Inc." to "Cirque du Soleil Canada Inc." pursuant to a January 2, 2017 amalgamation<br>Amended by 20170704 16341 9234 1262<br>Amendment to reflect an amalgamation of one of the debtors<br>Assigned by 20200522 1340 9234 1977<br>Assignor: Bank of America, N.A., as Collateral Agent<br>Assignee: Wilmington Trust, National Association, as Collateral Agent |

(xxix)

**II.    BRITISH COLUMBIA**

**1.    *PERSONAL PROPERTY SECURITY ACT* (British Columbia)**

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| 1. Royal Bank of Canada, as Collateral Agent | TPG VII CDS Holdings LP<br>TPG Genpar VII-AIV LP<br>TPG Genpar VII-AIV Advisors Inc.<br>CDS US Intermediate Holdings Inc.<br>Cirque du Soleil Canada Inc. *(listed twice)*<br>CDS US Holdings Inc.<br>CDS Canadian Holdings Inc.<br>Cirque du Soleil Images Inc. *(listed twice)*<br>BGE Holdings Inc.<br>Burlesco LLC<br>Cirque du Soleil (US) Inc.<br>Cirque du Soleil Illusion LLC<br>Cirque du Soleil My Call LLC<br>Cirque du Soleil Nevada Inc.<br>Cirque du Soleil Orlando LLC<br>Cirque du Soleil Vegas LLC<br>Velsi LLC<br>Cirque du Soleil Holding USA Inc.<br>Cirque du Soleil America Inc.<br>9104-3448 Quebec Inc.<br>Cirque du Soleil Inc.<br>Cirque du Soleil Musique Inc.<br>Creations Musca Inc.<br>Productions Conte Inc.<br>Productions Conte II Inc.<br>Productions Conte III Inc.<br>Productions Conte IV Inc.<br>9318-2426 Quebec Inc.<br>Cirque du Soleil Inspiration Inc.<br>Group Constellation Inc. | Regn No.: 710389I<br>Regn Date: July 8, 2015<br>Expiry Date: July 8, 2025 | General Collateral:<br>With respect to each debtor, all of the debtor's present and after-acquired personal property, including without limitation fixtures (and terms used herein that are defined in the *Personal Property Security Act* of British Columbia or the regulations made thereunder have those defined meanings).<br>The full address for Debtor D0001 is: c/o TPG Advisors VII-AIV, Inc., 301 Commerce Street, Suite 3300, Fort Worth, TX 76102<br>The full address for Debtor D0002 is: c/o TPG Advisors VII-AIV, Inc., 301 Commerce Street, Suite 3300, Fort Worth, TX 76102<br>The full address for Debtor D0003 is: c/o TPG Advisors VII-AIV, Inc., 301 Commerce Street, Suite 3300, Fort Worth, TX 76102<br>The full address for Debtor D0009 is: c/o Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301<br>The debtor "45 Degrees Events Inc. / Evenements 45 Degrees Inc." has amalgamated with one or more other corporations, and the name of the amalgamated corporation is "45 Degrees Events Inc. / Evenements | Amended on Jul. 9, 2015 by 714186I<br>Amendment to include the following as additional debtors: Holding Canadien CDS Inc., CDS Canadian Holdings Inc./Holding Canadien CDS Inc., Holding Canadien CDS Inc./CDS Canadian Holdings Inc., Evenements 45 Degrees Inc., 45 Degrees Events Inc./Evenements 45 Degrees Inc. and Evenements 45 Degrees Inc./45 Degrees Events Inc.<br>Amended on Jul. 10, 2015 by 714974I<br>Amendment to include an additional general collateral description *(which appears to be the same collateral description as included originally)* and to include the following as additional debtors: Cirque du Soleil Holdings LP, Gestion Cirque du Soleil SEC, Cirque du Soleil Holdings LP/Gestion Cirque du Soleil SEC, Gestion Cirque du Soleil SEC/Cirque du Soleil Holdings LP, Cirque du Soleil GP Inc., Commandite Cirque du Soleil |

(xxx)

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| | Productions DOSUL Inc. 45 Degrees Events Inc. *(listed twice)* Holding Canadien CDS Inc. CDS Canadian Holdings Inc./Holding Canadien CDS Inc. Holding Canadien CDS Inc./CDS Canadian Holdings Inc. Evenements 45 Degrees Inc. *(listed twice)* 45 Degrees Events Inc./Evenements 45 Degrees Inc. 45 Degrees Inc. *(listed twice)* Evenements 45 Degrees Inc./45 Degrees Events Inc. *(listed twice)* Cirque du Soleil Holdings LP Gestion Cirque du Soleil SEC Cirque du Soleil Holdings LP/Gestion Cirque du Soleil SEC Gestion Cirque du Soleil SEC/Cirque du Soleil Holdings LP Cirque du Soleil GP Inc. Commandite Cirque du Soleil Inc. Cirque du Soleil GP Inc./Commandite Cirque du Soleil Inc. Commandite Cirque du Soleil Inc./Cirque du Soleil GP Inc. | | 45 Degrees Inc.", Additional Debtors: 45 Degrees Events Inc. Evenements 45 Degrees Inc. 45 Degrees Events Inc. / Evenements 45 Degrees Inc. Evenements 45 Degrees Inc. / 45 Degrees Events Inc. Additional Collateral: All of the debtor's present and after-acquired personal property | Inc., Cirque du Soleil GP Inc./Commandite Cirque du Soleil Inc. and Commandite Cirque du Soleil Inc./Cirque du Soleil GP Inc. Amended on Mar. 1, 2017 by 852623J Amendment to record the December 28, 2015 amalgamation of Cirque du Soleil Images Inc., 9104-3448 Quebec Inc., Cirque du Soleil Musique Inc., Creations Musca Inc., Productions Conte Inc., Productions Conte II Inc., Productions Conte III Inc. and Productions Conte IV Inc. to continue as Cirque du Soleil Images Inc. Amended on Mar. 1, 2017 by 852640J Amendment to record the January 2, 2017 amalgamation of Cirque du Soleil Canada Inc., Productions DOSUL Inc. and Group Constellation Inc. to continue as Cirque du Soleil Canada Inc. Amended on Jun. 29, 2017 by 109743K Amendment to include an additional general collateral description *(please note that it appears that the intention of this amendment was instead to add the following entities as* |

(xxxi)

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| 2. Wilmington Trust, National | TPG VII CDS Holdings LP<br>TPG Genpar VII-AIV LP<br>TPG Genpar VII-AIV Advisors Inc.<br>CDS US Intermediate Holdings Inc. | Regn No.: 7104371<br>Regn Date: July 8, 2015<br>Expiry Date: July 8, 2025 | General Collateral:<br>With respect to each debtor, all of the debtor's present and after- | *additional debtors - which had already been added previously 45 Degrees Events Inc., Evenements 45 Degrees Inc., 45 Degrees Events Inc./Evenements 45 Degrees Inc., and Evenements 45 Degrees Inc./45 Degrees Events Inc. Please note that this amendment was not filed correctly)*<br><u>Amended on Jun. 29, 2017 by 110344K</u><br>Amendment to include the following as additional debtors (which entities had been added as debtors previously): 45 Degrees Events Inc., Evenements 45 Degrees Inc., 45 Degrees Events Inc./Evenements 45 Degrees Inc., and Evenements 45 Degrees Inc./45 Degrees Events Inc.<br><u>Secured Party Transfer on Jul. 4, 2017 by 115681K</u><br>Amendment to delete "Deutsche Bank AG New York Branch, as Collateral Agent" as secured party and to add "Royal Bank of Canada, as Collateral Agent"<br><u>Amended on Jul. 9, 2015 by 714228I</u> |

(xxxii)

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| Association, as Collateral Agent | Cirque du Soleil Canada Inc. *(listed twice)* <br> CDS US Holdings Inc. <br> CDS Canadian Holdings Inc. <br> Cirque du Soleil Images Inc. *(listed twice)* <br> BGE Holdings Inc. <br> Burlesco LLC <br> Cirque du Soleil (US) Inc. <br> Cirque du Soleil Illusion LLC <br> Cirque du Soleil My Call LLC <br> Cirque du Soleil Nevada Inc. <br> Cirque du Soleil Orlando LLC <br> Cirque du Soleil Vegas LLC <br> Velsi LLC <br> Cirque du Soleil Holding USA Inc. <br> Cirque du Soleil America Inc. <br> 9104-3448 Quebec Inc. <br> Cirque du Soleil Inc. <br> Cirque du Soleil Musique Inc. <br> Creations Musca Inc. <br> Productions Conte Inc. <br> Productions Conte II Inc. <br> Productions Conte III Inc. <br> Productions Conte IV Inc. <br> 9318-2426 Quebec Inc. <br> Cirque du Soleil Inspiration Inc. <br> Group Constellation Inc. <br> Productions DOSUL Inc. <br> 45 Degrees Events Inc. *(listed twice)* <br> Holding Canadien CDS Inc. <br> CDS Canadian Holdings Inc./Holding Canadien CDS Inc. <br> Holding Canadien CDS Inc./CDS Canadian Holdings Inc. | | acquired personal property, Including without limitation fixtures (and terms used herein that are defined in the *Personal Property Security Act* of British Columbia or the regulations made thereunder have those defined meanings). <br> The full address for Debtor D0001 is: c/o TPG Advisors VII-AIV, Inc., 301 Commerce Street, Suite 3300, Fort Worth, TX 76102 <br> The full address for Debtor D0002 is: c/o TPG Advisors VII-AIV, Inc., 301 Commerce Street, Suite 3300, Fort Worth, TX 76102 <br> The full address for Debtor D0003 is: c/o TPG Advisors VII-AIV, Inc., 301 Commerce Street, Suite 3300, Fort Worth, TX 76102 <br> The full address for Debtor D0009 is: c/o Corporation Service Company, 1201 Hays Street, Tallahassee, FL 32301 | Amendment to Include the following as additional debtors: Holding Canadien CDS Inc., CDS Canadian Holdings Inc./Holding Canadien CDS Inc., Holding Canadien CDS Inc./CDS Canadian Holdings Inc., Evenements 45 Degrees Inc., 45 Degrees Events Inc./Evenements 45 Degrees Inc. and Evenements 45 Degrees Inc./45 Degrees Events Inc. <br> *Amended on Jul. 10, 2015 by 715038* <br> Amendment to Include an additional general collateral description *(which appears to be the same collateral description as Included originally)* and to Include the following as additional debtors: Cirque du Soleil Holdings LP, Cirque du Soleil Holdings LP, Gestion Cirque du Soleil SEC, Cirque du Soleil Holdings LP/Gestion Cirque du Soleil SEC, Gestion Cirque du Soleil SEC/Cirque du Soleil Holdings LP, Cirque du Soleil GP Inc., Commandite Cirque du Soleil Inc., Cirque du Soleil GP Inc./Commandite Cirque du Soleil Inc. and Commandite Cirque du Soleil Inc./Cirque du Soleil GP Inc. |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| | Evenements 45 Degrees Inc. *(listed twice)* 45 Degrees Events Inc./Evenements 45 Degrees Inc. *(listed twice)* Evenements 45 Degrees Inc./45 Degrees Events Inc. *(listed twice)* Cirque du Soleil Holdings LP Gestion Cirque du Soleil SEC Cirque du Soleil Holdings LP/Gestion Cirque du Soleil SEC Gestion Cirque du Soleil SEC/Cirque du Soleil Holdings LP Cirque du Soleil GP Inc. Commandite Cirque du Soleil Inc. Cirque du Soleil GP Inc./Commandite Cirque du Soleil Inc. Commandite Cirque du Soleil Inc./Cirque du Soleil GP Inc. | | | Amended on Mar. 1, 2017 by 852633J<br><br>Amendment to record the December 28, 2015 amalgamation of Cirque du Soleil Images Inc., 9104-3448 Quebec Inc., Cirque du Soleil Musique Inc., Creations Musca Inc., Productions Conte Inc., Productions Conte II Inc., Productions Conte III Inc. and Productions Conte IV Inc. to continue as Cirque du Soleil Images Inc.<br><br>Amended on Mar. 1, 2017 by 852644J<br><br>Amendment to record the January 2, 2017 amalgamation of Cirque du Soleil Canada Inc. Productions DOSUL Inc. and Group Constellation Inc. to continue as Cirque du Soleil Canada Inc.<br><br>Amended on Jun. 29, 2017 by 110409K<br><br>Amendment to Include the following as additional debtors *(which entities had been added as debtors previously)*: 45 Degrees Events Inc., Evenements 45 Degrees Inc., 45 Degrees Events Inc./Evenements 45 Degrees Inc., and Evenements 45 |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| | | | | Degrees Inc./45 Degrees Events Inc. _Secured Party Transfer on May 22, 2020 by 230951M_ Amendment to delete "Bank of America, N.A., as Collateral Agent" as secured party and to add "Wilmington Trust, National Association, as Collateral Agent" |
| 3. ATCO Structures & Logistics Ltd. | Cirque du Soleil | Regn No.: 879793L Regn Date: Nov. 7, 2019 Expiry Date: Nov. 7, 2020 | _Vehicle Collateral:_ 2015 10X40 Office 140154745 2017 10X40 Office 140176980 2018 10X40 Office 140187354 2007 10X40 Office 140073361 2007 10X40 Office 140073363 2017 10X40 Office 140176978 2016 8X20 Office 020166313 2016 8X20 Office 020166427 | |

## III.  ALBERTA

### 1.  PERSONAL PROPERTY SECURITY ACT (Alberta)

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| 1. Royal Bank of Canada, as Collateral Agent | TPG Genpar VII-AIV, L.P. TPG Genpar VII-AIV Advisors, Inc. CDS U.S. Intermediate Holdings, Inc. Cirque du Soleil Canada Inc. CDS U.S. Holdings, Inc. CDS Canadian Holdings, Inc. | Regn No.: 15080622878 Regn Date: August 6, 2015 Expiry Date: August 6, 2025 | _General Collateral:_ All present and after acquired personal property. _Additional Information:_ The complete address for Debtor 0001 is: c/o TPG Advisors VII-AIV, Inc., 301 Commerce Street, Suite | Amended on Jun. 21, 2017 by 17062129457 Amendment to Include Additional Information and to delete the following entities as debtors: 9104-3448 Quebec Inc., Cirque du Soleil Musique |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| | Cirque du Soleil Images Inc. BGE Holdings, Inc. Burlesco, L.L.C. Cirque du Soleil (US), Inc. Cirque du Soleil Illusion, L.L.C. Cirque du Soleil My Call, L.L.C. Cirque du Soleil Nevada, Inc. Cirque du Soleil Orlando, L.L.C. Cirque du Soleil Vegas, L.L.C. Velsi, L.L.C. Cirque du Soleil Holding USA, Inc. Cirque du Soleil America, Inc. Cirque du Soleil Inc. 9318-2426 Quebec Inc. Cirque du Soleil Inspiration Inc. 45 Degrees Events Inc. Evenements 45 Degrees Inc. 45 Degrees Events Inc. / Evenements 45 Degrees Inc. Evenements 45 Degrees Inc. / 45 Degrees Events Inc. Holding Canadien CDS, Inc. CDS Canadian Holdings, Inc. / Holding Canadien CDS, Inc. Holding Canadien CDS, Inc. / CDS Canadian Holdings, Inc. Cirque du Soleil Holdings LP Gestion Cirque du Soleil S.E.C. Cirque du Soleil Holdings LP / Gestion Cirque du Soleil S.E.C. Gestion Cirque du Soleil S.E.C. / Cirque du Soleil Holdings LP Cirque du Soleil GP Inc. Commandite Cirque du Soleil Inc. Cirque du Soleil GP Inc. / Commandite Cirque du Soleil Inc. | | 3300 Fort Worth TX 76102 The complete address for Debtor 0002 is: c/o TPG Advisors VII-AIV, Inc., 301 Commerce Street, Suite 3300 Fort Worth TX 76102 The complete address for Debtor 0046 is: c/o TPG Advisors VII-AIV, Inc., 301 Commerce Street, Suite 3300 Fort Worth TX 76102 To record the amalgamation of Productions Conte II Inc., Productions Conte III Inc., Productions Conte IV Inc., 9104-3448 Quebec Inc., Productions Conte Inc., Creations Musca Inc., Cirque du Soleil Musique Inc. and Cirque du Soleil Images Inc. to continue as Cirque du Soleil Images Inc. To record the amalgamation of Cirque du Soleil Canada Inc., Productions Dosul Inc. and Groupe Constellation Inc. to continue as Cirque du Soleil Canada Inc. | Inc., Creations Musca Inc., Productions Conte Inc., Productions Conte II Inc., Productions Conte III Inc., Productions Conte IV Inc., Group Constellation Inc. and Productions Dosul Inc. Amended on Jul. 6, 2017 by 17070606933 Amendment to delete "Deutsche Bank AG New York Branch, as Collateral Agent" as secured party and to add "Royal Bank of Canada, as Collateral Agent" |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| | Commandite Cirque du Soleil Inc. / Cirque du Soleil GP Inc. / TPG VII CDS Holdings, L.P. | | | |
| 2. Wilmington Trust, National Association, as Collateral Agent | TPG Genpar VII-AIV, L.P. TPG Genpar VII-AIV Advisors, Inc. CDS U.S. Intermediate Holdings, Inc. Cirque du Soleil Canada Inc. CDS U.S. Holdings, Inc. CDS Canadian Holdings, Inc. Cirque du Soleil Images Inc. BGE Holdings, Inc. Burlesco, L.L.C. Cirque du Soleil (US), Inc. Cirque du Soleil Illusion, L.L.C. Cirque du Soleil My Call, L.L.C. Cirque du Soleil Nevada, Inc. Cirque du Soleil Orlando, L.L.C. Cirque du Soleil Vegas, L.L.C. Velsi, L.L.C. Cirque du Soleil Holding USA, Inc. Cirque du Soleil America, Inc. Cirque du Soleil Inc. 9318-2426 Quebec Inc. Cirque du Soleil Inspiration Inc. 45 Degrees Events Inc. Evenements 45 Degrees Inc. 45 Degrees Events Inc. / Evenements 45 Degrees Inc. Evenements 45 Degrees Inc. / 45 Degrees Events Inc. Holding Canadien CDS, Inc. CDS Canadian Holdings, Inc. / Holding Canadien CDS, Inc. | Regn No.: 15080622922 Regn Date: August 6, 2015 Expiry Date: August 6, 2025 | General Collateral: All present and after acquired personal property. Additional Information: The complete address for Debtor 0001 is: c/o TPG Advisors VII-AIV, Inc., 301 Commerce Street, Suite 3300 Fort Worth TX 76102 The complete address for Debtor 0002 is: c/o TPG Advisors VII-AIV, Inc., 301 Commerce Street, Suite 3300 Fort Worth TX 76102 The complete address for Debtor 0046 is: c/o TPG Advisors VII-AIV, Inc., 301 Commerce Street, Suite 3300 Fort Worth TX 76102 To record the amalgamation of Productions Conte II Inc., Productions Conte III Inc., Productions Conte IV Inc., 9104-3448 Quebec Inc., Productions Conte Inc., Creations Musca Inc., Cirque du Soleil Musique Inc. and Cirque du Soleil Images Inc. to continue as Cirque du Soleil Images Inc. To record the amalgamation of Cirque du Soleil Canada Inc., Productions Dosul Inc. and Groupe Constellation Inc. to continue as Cirque du Soleil Canada Inc. | Amended on Jun. 21, 2017 by 17062129485 Amendment to Include Additional Information and to delete the following entities as debtors: 9104-3448 Quebec Inc., Cirque du Soleil Musique Inc., Creations Musca Inc., Productions Conte Inc., Productions Conte II Inc., Productions Conte III Inc., Productions Conte IV Inc., Group Constellation Inc. and Productions Dosul Inc. Amended on May 22, 2020 by 20052217959 Amendment to delete "Bank of America, N.A., as Collateral Agent" as secured party and to add "Wilmington Trust, National Association, as Collateral Agent" |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| | Holding Canadien CDS, Inc. / CDS Canadian Holdings, Inc. Cirque du Soleil Holdings LP Gestion Cirque du Soleil S.E.C. Cirque du Soleil Holdings LP / Gestion Cirque du Soleil S.E.C. Gestion Cirque du Soleil S.E.C. / Cirque du Soleil Holdings LP Cirque du Soleil GP Inc. Commandite Cirque du Soleil Inc. Cirque du Soleil GP Inc. / Commandite Cirque du Soleil Inc. Commandite Cirque du Soleil Inc. / Cirque du Soleil GP Inc. TPG VII CDS Holdings, L.P. | | | |

## IV.    SASKATCHEWAN

### 1.    *PERSONAL PROPERTY SECURITY ACT* (Saskatchewan)

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| 1. Royal Bank of Canada, as Collateral Agent | Cirque du Soleil Holdings LP Gestion Cirque du Soleil S.E.C. Cirque du Soleil Holdings LP / Gestion Cirque du Soleil S.E.C. Gestion Cirque du Soleil S.E.C./Cirque du Soleil Holdings LP Cirque du Soleil GP Inc. Commandite Cirque du Soleil Inc. Cirque du Soleil GP Inc. / Commandite Cirque du Soleil Inc. Commandite Cirque du Soleil Inc. / Cirque du Soleil GP Inc. TPG Genpar VII-AIV, L.P. | Regn No.: 301374001 Regn Date: August 6, 2015 Expiry Date: August 6, 2025 | General Collateral: All of the Debtors' present and after-acquired personal property. Transaction Description: 45 Degrees Events Inc. / Événements 45 Degrees Inc. amalgamated with Sandbox Group Inc. / Groupe Sandbox Inc. under the name 45 Degrees Events Inc. / Événements 45 Degrees Inc. | Amended on Jun. 21, 2017 Amendment to Include a Transaction Description and to update a number of debtors Amended on Jul. 5, 2017 Amendment to replace the Transaction Description and to delete "Deutsche Bank AG New York Branch, as Collateral Agent" as secured party and to add "Royal Bank of Canada, as Collateral Agent" Amended on Aug. 1, 2017 |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| | TPG Genpar VII-AIV Advisors, Inc. CDS U.S. Intermediate Holdings, Inc. Cirque du Soleil Canada Inc. *(listed five times)* CDS U.S. Holdings, Inc. CDS Canadian Holdings, Inc. Cirque du Soleil Images Inc. *(listed nine times)* BGE Holdings, Inc. Burlesco, L.L.C. Cirque du Soleil (US), Inc. Cirque du Soleil Illusion, L.L.C. Cirque du Soleil My Call, L.L.C. Cirque du Soleil Nevada, Inc. Cirque du Soleil Orlando, L.L.C. Cirque du Soleil Vegas, L.L.C. Velsi, L.L.C. Cirque du Soleil Holding USA, Inc. Cirque du Soleil America, Inc. Cirque du Soleil Inc. 9318-2426 Quebec Inc. Cirque du Soleil Inspiration Inc. 45 Degrees Events Inc. *(listed twice)* Holding Canadien CDS, Inc. CDS Canadian Holdings, Inc. / Holding Canadien CDS, Inc. Holding Canadien CDS, Inc. / CDS Canadian Holdings, Inc. Evenements 45 Degrees Inc. *(listed twice)* 45 Degrees Events Inc. / Evenements 45 Degrees Inc. *(listed twice)* Evenements 45 Degrees Inc. / 45 Degrees Events Inc. *(listed twice)* | | | Amendment to replace the Transaction Description and to update a number of debtors |

(xxxix)

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| 2. Wilmington Trust, National Association, as Collateral Agent | TPG VII CDS Holdings, L.P.<br>Cirque du Soleil Holdings LP<br>Gestion Cirque du Soleil S.E.C.<br>Cirque du Soleil Holdings LP /<br>Gestion Cirque du Soleil S.E.C.<br>Gestion Cirque du Soleil<br>S.E.C./Cirque du Soleil Holdings LP<br>Cirque du Soleil GP Inc.<br>Commandite Cirque du Soleil Inc.<br>Cirque du Soleil GP Inc. /<br>Commandite Cirque du Soleil Inc.<br>Commandite Cirque du Soleil Inc. /<br>Cirque du Soleil GP Inc.<br>TPG Genpar VII-AIV, L.P.<br>TPG Genpar VII-AIV Advisors, Inc.<br>CDS U.S. Intermediate Holdings, Inc.<br>CDS U.S. Holdings, Inc.<br>CDS Canadian Holdings, Inc.<br>Cirque du Soleil Canada Inc. *(listed four times)*<br>Cirque du Soleil Images Inc. *(listed nine times)*<br>BGE Holdings, Inc.<br>Burlesco, L.L.C.<br>Cirque du Soleil (US), Inc.<br>Cirque du Soleil Illusion, L.L.C.<br>Cirque du Soleil My Call, L.L.C.<br>Cirque du Soleil Nevada, Inc.<br>Cirque du Soleil Orlando, L.L.C.<br>Cirque du Soleil Vegas, L.L.C.<br>Velsi, L.L.C.<br>Cirque du Soleil Holding USA, Inc.<br>Cirque du Soleil America, Inc.<br>Cirque du Soleil Inc.<br>9318-2426 Quebec Inc. | Regn No.: 30137400\2<br>Regn Date: August 6, 2015<br>Expiry Date: August 6, 2025 | General Collateral:<br>All of the Debtors' present and after-acquired personal property.<br>Transaction Description:<br>Assignment by secured party | Amended on Jun. 21, 2017 Amendment to include a Transaction Description and to update a number of debtors<br>Amended on May 22, 2020 Amendment replace the Transaction Description and to delete "Bank of America, N.A., as Collateral Agent" as secured party and to add "Wilmington Trust, National Association, as Collateral Agent" |

(xl)

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| | Cirque du Soleil Inspiration Inc. 45 Degrees Events Inc. Holding Canadien CDS, Inc. CDS Canadien Holdings, Inc. / Holding Canadien CDS, Inc. Holding Canadien CDS, Inc. / CDS Canadian Holdings, Inc. Evenements 45 Degrees Inc. 45 Degrees Events Inc. / Evenements 45 Degrees Inc. Evenements 45 Degrees Inc. / 45 Degrees Events Inc. TPG VII CDS Holdings, L.P. | | | |

**V.    MANITOBA**

**1.    *PERSONAL PROPERTY SECURITY ACT* (Manitoba)**

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| 1. Wilmington Trust, National Association, as Collateral Agent | Velsi, L.L.C. TPG VII CDS Holdings, LP TPG Genpar VII-AIV, L.P. Holding Canadien CDS, Inc. Holding Canadien CDS, Inc. / CDS Canadian Holdings, Inc. Evenements 45 Degrees Inc. Evenements 45 Degrees Inc. / 45 Degrees Events Inc. Cirque du Soleil GP Inc. / Commandite Cirque du Soleil Inc. CDS Canadian Holdings, Inc. / Holding Canadien CDS, Inc. 45 Degrees Events Inc. / Evenements 45 Degrees Inc. Cirque du Soleil Holdings LP | Regn No.: 201514927206 Regn Date: August 6, 2015 Expiry Date: August 6, 2025 | General Collateral: With respect to each debtor, all of the debtors' present and after-acquired personal property, Including without limitation fixtures (and terms used herein that are defined in the *Personal Property Security Act* of Manitoba or the regulations made thereunder have those defined meanings). | Amended on Jun. 21, 2017 by 201711127912 Sections Changed: Business Debtors, General Collateral Description Amended on May 22, 2020 by 20200767618 Sections Changed: Secured Parties |

(xli)

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| | Gestion Cirque du Soleil S.E.C.<br>Cirque du Soleil Holdings LP /<br>Gestion Cirque du Soleil S.E.C.<br>Gestion Cirque du Soleil S.E.C. /<br>Cirque du Soleil Holdings LP<br>Cirque du Soleil GP Inc.<br>45 Degrees Events Inc.<br>Cirque du Soleil My Call, L.L.C.<br>Cirque du Soleil Nevada, Inc.<br>Cirque du Soleil Orlando, L.L.C.<br>Cirque du Soleil Vegas, L.L.C.<br>Cirque du Soleil Holding USA, Inc.<br>Cirque du Soleil America, Inc.<br>Cirque du Soleil Inc.<br>Cirque du Soleil Inspiration Inc.<br>Cirque du Soleil Illusion, L.L.C.<br>Cirque du Soleil Canada Inc.<br>CDS Canadian Holdings, Inc.<br>Cirque du Soleil Images Inc.<br>Cirque du Soleil (US), Inc.<br>CDS U.S. Intermediate Holdings, Inc.<br>BGE Holdings Inc.<br>Burlesco, L.L.C.<br>9318-2426 Quebec Inc.<br>TPG Genpar VII-AIV Advisors, Inc.<br>CDS U.S. Holdings, Inc.<br>Commandite Cirque du Soleil Inc.<br>Commandite Cirque du Soleil Inc. /<br>Cirque du Soleil GP Inc. | | | |
| 2.   Royal Bank of Canada, as Collateral Agent | Holding Canadien CDS, Inc.<br>Evenements 45 Degrees Inc. / 45 Degrees Events Inc.<br>Evenements 45 Degrees Inc.<br>Cirque du Soleil Holdings LP<br>Gestion Cirque du Soleil S.E.C. | Regn No.: 201514926609<br>Regn Date: August 6, 2015<br>Expiry Date: August 6, 2025 | <u>General Collateral:</u><br>With respect to each debtor, all of the debtors' present and after-acquired personal property, Including without limitation fixtures (and terms used herein that are | <u>Amended on Jun. 21, 2017 by 20171127513</u><br>Sections Changed: Business Debtors, General Collateral Description |

(xlii)

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
|  | Cirque du Soleil (US), Inc.<br>Cirque du Soleil Illusion, L.L.C.<br>CDS Canadian Holdings, Inc.<br>Cirque du Soleil Images Inc.<br>Cirque du Soleil Canada Inc.<br>Cirque du Soleil Inc.<br>Cirque du Soleil Orlando, L.L.C.<br>Cirque du Soleil Vegas, L.L.C.<br>Cirque du Soleil Holding USA, Inc.<br>Cirque du Soleil America, Inc.<br>Cirque du Soleil GP Inc. /<br>Commandite Cirque du Soleil Inc.<br>Cirque du Soleil Inspiration Inc.<br>CDS Canadian Holdings, Inc. /<br>Holding Canadien CDS, Inc.<br>45 Degrees Events Inc. /<br>Evenements 45 Degrees Inc.<br>Cirque du Soleil My Call, L.L.C.<br>Cirque du Soleil Holdings LP /<br>Gestion Cirque du Soleil S.E.C.<br>Gestion Cirque du Soleil S.E.C. /<br>Cirque du Soleil Holdings LP<br>Cirque du Soleil GP Inc.<br>Cirque du Soleil Nevada, Inc.<br>45 Degrees Events Inc.<br>BGE Holdings Inc.<br>Burlesco, L.L.C.<br>CDS U.S. Intermediate Holdings, Inc.<br>9318-2426 Quebec Inc.<br>Velsi, L.L.C.<br>TPG VII CDS Holdings, LP<br>TPG Genpar VII-AIV, L.P.<br>Holding Canadien CDS, Inc. / CDS Canadian Holdings, Inc.<br>TPG Genpar VII-AIV Advisors, Inc. |  | defined in the *Personal Property Security Act* of Manitoba or the regulations made thereunder have those defined meanings). | Amended on Jul. 5, 2017 by 201712018718<br>Sections Changed: Secured Parties |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| | CDS U.S. Holdings, Inc. Commandite Cirque du Soleil Inc. Commandite Cirque du Soleil Inc. / Cirque du Soleil GP Inc. | | | |

## VI.   NOVA SCOTIA

### 1.   *PERSONAL PROPERTY SECURITY ACT* (Nova Scotia)

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| 1. Royal Bank of Canada, as Collateral Agent | TPG Genpar VII-AIV, L.P. TPG Genpar VII-AIV Advisors, Inc. CDS U.S. Intermediate Holdings, Inc. Cirque du Soleil Canada Inc. CDS U.S. Holdings, Inc. CDS Canadian Holdings, Inc. Cirque du Soleil Images Inc. BGE Holdings, Inc. Burlesco, L.L.C. Cirque du Soleil (US), Inc. Cirque du Soleil Illusion, L.L.C. Cirque du Soleil My Call, L.L.C. Cirque du Soleil Nevada, Inc. Cirque du Soleil Orlando, L.L.C. Cirque du Soleil Vegas, L.L.C. Velsi, L.L.C. Cirque du Soleil Holding USA, Inc. Cirque du Soleil America, Inc. Cirque du Soleil Inc. 9318-2426 Quebec Inc. Cirque du Soleil Inspiration Inc. 45 Degrees Events Inc. Holding Canadien CDS, Inc. | Regn No.: 24716540 Regn Date: August 7, 2015 Expiry Date: August 7, 2025 | General Collateral: A security interest is taken in all of the Debtors' present and after-acquired personal property Additional Information: Registration amended (i) to record the amalgamation of Productions Conte II Inc., Productions Conte III Inc., Productions Conte IV Inc., 9104-3448 Quebec Inc., Productions Conte Inc., Creations Musca Inc., Cirque du Soleil Musique Inc. and Cirque du Soleil Images Inc. to continue as Cirque du Soleil Images Inc.; and (ii) to record the amalgamation of Cirque du Soleil Canada Inc., Productions Dosul Inc. and Groupe Constellation Inc. to continue as Cirque du Soleil Canada Inc. | Amended on Jun. 21, 2017 by 27823269 Amendment to replace the general collateral description, to Include Additional Information and to delete a number of debtors Amended on Jul. 5, 2017 by 27894021 Amendment to delete "Deutsche-Bank AG New York Branch, as Collateral Agent" as secured party and to add "Royal Bank of Canada, as Collateral Agent" |

(xliv)

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| | CDS Canadian Holdings, Inc. / Holding Canadien CDS, Inc. Holding Canadien CDS, Inc. / CDS Canadian Holdings, Inc. Evenements 45 Degrees Inc. 45 Degrees Events Inc. / Evenements 45 Degrees Inc. Evenements 45 Degrees Inc. / 45 Degrees Events Inc. Cirque du Soleil Holdings LP Gestion Cirque du Soleil S.E.C. Cirque du Soleil Holdings LP / Gestion Cirque du Soleil S.E.C. Gestion Cirque du Soleil S.E.C. / Cirque du Soleil Holdings LP Cirque du Soleil GP Inc. Commandite Cirque du Soleil Inc. Cirque du Soleil GP Inc. / Commandite Cirque du Soleil Inc. Commandite Cirque du Soleil Inc. / Cirque du Soleil GP Inc. TPG VII CDS Holdings, L.P. | | | |
| 2. Wilmington Trust, National Association, as Collateral Agent | TPG Genpar VII-AIV, L.P. TPG Genpar VII-AIV Advisors, Inc. CDS U.S. Intermediate Holdings, Inc. Cirque du Soleil Canada Inc. CDS U.S. Holdings, Inc. CDS Canadian Holdings, Inc. Cirque du Soleil Images Inc. BGE Holdings, Inc. Burlesco, L.L.C. Cirque du Soleil (US), Inc. Cirque du Soleil Illusion, L.L.C. Cirque du Soleil My Call, L.L.C. Cirque du Soleil Nevada, Inc. | Regn No.: 24716748 Regn Date: August 7, 2015 Expiry Date: August 7, 2025 | General Collateral: A security interest is taken in all of the Debtors' present and after-acquired personal property Additional Information: Registration amended (i) to record the amalgamation of Productions Conte II Inc., Productions Conte III Inc., Productions Conte IV Inc., 9104-3448 Quebec Inc., Productions Conte Inc., Creations Musca Inc., Cirque du Soleil Musique Inc. and Cirque du Soleil Images Inc. to continue as Cirque | Amended on Jun. 21, 2017 by 27823293 Amendment to replace the general collateral description, to Include Additional Information and to delete a number of debtors Amended on May 22, 2020 by 32791014 Amendment to delete "Bank of America, N.A., as Collateral Agent" as secured party and to add "Wilmington Trust, National Association, as Collateral Agent" |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
|  | Cirque du Soleil Orlando, L.L.C. Cirque du Soleil Vegas, L.L.C. Velsi, L.L.C. Cirque du Soleil Holding USA, Inc. Cirque du Soleil America, Inc. Cirque du Soleil Inc. 9318-2426 Quebec Inc. Cirque du Soleil Inspiration Inc. 45 Degrees Events Inc. Holding Canadien CDS, Inc. CDS Canadian Holdings, Inc. / Holding Canadien CDS, Inc. Holding Canadien CDS, Inc. / CDS Canadian Holdings, Inc. Evenements 45 Degrees Inc. 45 Degrees Events Inc. / Evenements 45 Degrees Inc. Evenements 45 Degrees Inc. / 45 Degrees Events Inc. Cirque du Soleil Holdings LP Gestion Cirque du Soleil S.E.C. Cirque du Soleil Holdings LP / Gestion Cirque du Soleil S.E.C. Gestion Cirque du Soleil S.E.C. / Cirque du Soleil Holdings LP Cirque du Soleil GP Inc. Commandite Cirque du Soleil Inc. Cirque du Soleil GP Inc. / Commandite Cirque du Soleil Inc. Commandite Cirque du Soleil Inc. / Cirque du Soleil GP Inc. TPG VII CDS Holdings, L.P. |  | du Soleil Images Inc.; and (ii) to record the amalgamation of Cirque du Soleil Canada Inc., Productions Dosul Inc. and Groupe Constellation Inc. to continue as Cirque du Soleil Canada Inc. |  |

VII.  **NEW BRUNSWICK**

1.  *PERSONAL PROPERTY SECURITY ACT* (New Brunswick)

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| 1.  Royal Bank of Canada, as Collateral Agent | TPG Genpar VII-AIV, L.P.<br>TPG Genpar VII-AIV Advisors, Inc.<br>CDS U.S. Intermediate Holdings, Inc.<br>Cirque du Soleil Canada Inc.<br>CDS U.S. Holdings, Inc.<br>CDS Canadian Holdings, Inc.<br>Cirque du Soleil Images Inc.<br>BGE Holdings, Inc.<br>Burlesco, L.L.C.<br>Cirque du Soleil (US), Inc.<br>Cirque du Soleil Illusion, L.L.C.<br>Cirque du Soleil My Call, L.L.C.<br>Cirque du Soleil Orlando, L.L.C.<br>Cirque du Soleil Vegas, L.L.C.<br>Velsi, L.L.C.<br>Cirque du Soleil Holding USA, Inc.<br>Cirque du Soleil America, Inc.<br>Cirque du Soleil Inc.<br>9318-2426 Quebec Inc.<br>Cirque du Soleil Inspiration Inc.<br>45 Degrees Events Inc.<br>Holding Canadien CDS, Inc.<br>CDS Canadian Holdings, Inc. /<br>Holding Canadien CDS, Inc.<br>Holding Canadien CDS, Inc. / CDS Canadian Holdings, Inc.<br>Evenements 45 Degrees Inc.<br>45 Degrees Events Inc. /<br>Evenements 45 Degrees Inc.<br>Evenements 45 Degrees Inc. / 45 Degrees Events Inc.<br>Cirque du Soleil Holdings LP | Regn No.: 26226787<br>Regn Date: August 7, 2015<br>Expiry Date: August 7, 2025 | General Collateral:<br>A security interest is taken in all of the Debtors' present and after-acquired personal property<br>Additional Information:<br>Registration amended (i) to record the amalgamation of Productions Conte II Inc., Productions Conte III Inc., Productions Conte IV Inc., 9104-3448 Quebec Inc., Productions Conte Inc., Creations Musca Inc., Cirque du Soleil Musique Inc. and Cirque du Soleil Images Inc. to continue as Cirque du Soleil Images Inc.; and (ii) to record the amalgamation of Cirque du Soleil Canada Inc., Productions Dosul Inc. and Groupe Constellation Inc. to continue as Cirque du Soleil Canada Inc. | Amended on Aug. 7, 2015 by 26226878<br>Amendment to correct the spelling of "Cirque du Soleil Nevada, Inc."<br>Amended on Jun. 21, 2017 by 29113404<br>Amendment to replace the general collateral description, to include Additional Information and to delete a number of debtors<br>Amended on Jul. 5, 2017 by 29177177<br>Amendment to delete "Deutsched Bank AG New York Branch, as Collateral Agent" as secured party and to add "Royal Bank of Canada, as Collateral Agent" |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| | Gestion Cirque du Soleil S.E.C. Cirque du Soleil Holdings LP / Gestion Cirque du Soleil S.E.C. Gestion Cirque du Soleil S.E.C. / Cirque du Soleil Holdings LP Cirque du Soleil GP Inc. Commandite Cirque du Soleil Inc. Cirque du Soleil GP Inc. / Commandite Cirque du Soleil Inc. Commandite Cirque du Soleil Inc. / Cirque du Soleil GP Inc. TPG VII CDS Holdings, L.P. Cirque du Soleil Nevada, Inc. | | | |
| 2. | Wilmington Trust, National Association, as Collateral Agent | TPG Genpar VII-AIV, L.P. TPG Genpar VII-AIV Advisors, Inc. CDS U.S. Intermediate Holdings, Inc. Cirque du Soleil Canada Inc. CDS U.S. Holdings, Inc. CDS Canadian Holdings, Inc. Cirque du Soleil Images Inc. BGE Holdings, Inc. Burlesco, L.L.C. Cirque du Soleil (US), Inc. Cirque du Soleil Illusion, L.L.C. Cirque du Soleil My Call, L.L.C. Cirque du Soleil Nevada, Inc. Cirque du Soleil Orlando, L.L.C. Cirque du Soleil Vegas, L.L.C. Velsi, L.L.C. Cirque du Soleil Holding USA, Inc. Cirque du Soleil America, Inc. Cirque du Soleil Inc. 9318-2426 Quebec Inc. Cirque du Soleil Inspiration Inc. 45 Degrees Events Inc. | Regn No.: 26227074 Regn Date: August 7, 2015 Expiry Date: August 7, 2025 | General Collateral: A security interest is taken in all of the Debtors' present and after-acquired personal property Additional Information: Registration amended (i) to record the amalgamation of Productions Conte II Inc., Productions Conte III Inc., Productions Conte IV Inc., 9104-3448 Quebec Inc., Productions Conte Inc., Creations Musca Inc., Cirque du Soleil Musique Inc. and Cirque du Soleil Images Inc. to continue as Cirque du Soleil Images Inc.; and (ii) to record the amalgamation of Cirque du Soleil Canada Inc., Productions Dosul Inc. and Groupe Constellation Inc. to continue as Cirque du Soleil Canada Inc. | Amended on Jun. 21, 2017 by 29113487 Amendment to replace the general collateral description, to include Additional Information and to delete a number of debtors Amended on May 22, 2020 by 33644386 Amendment to delete "Bank of America, N.A., as Collateral Agent" as secured party and to add "Wilmington Trust, National Association, as Collateral Agent |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| | Holding Canadien CDS, Inc. CDS Canadian Holdings, Inc. / Holding Canadien CDS, Inc. Holding Canadien CDS, Inc. / CDS Canadian Holdings, Inc. Evenements 45 Degrees Inc. 45 Degrees Events Inc. / Evenements 45 Degrees Inc. Evenements 45 Degrees Inc. / 45 Degrees Events Inc. Cirque du Soleil Holdings LP Gestion Cirque du Soleil S.E.C. Cirque du Soleil Holdings LP / Gestion Cirque du Soleil S.E.C. Gestion Cirque du Soleil S.E.C. / Cirque du Soleil Holdings LP Cirque du Soleil GP Inc. Commandite Cirque du Soleil Inc. Cirque du Soleil GP Inc. / Commandite Cirque du Soleil Inc. Commandite Cirque du Soleil Inc. / Cirque du Soleil GP Inc. TPG VII CDS Holdings, L.P. | | | |

## VIII.  NEWFOUNDLAND AND LABRADOR

### 1.  *PERSONAL PROPERTY SECURITY ACT (Newfoundland and Labrador)*

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| 1. Royal Bank of Canada, as Collateral Agent | TPG Genpar VII-AIV, L.P. TPG Genpar VII-AIV Advisors, Inc. CDS U.S. Intermediate Holdings, Inc. Cirque du Soleil Canada Inc. | Regn No.: 13173281 Regn Date: August 7, 2015 Expiry Date: August 7, 2025 | General Collateral: A security interest is taken in all of the Debtors' present and after-acquired personal property Additional Information: | Amended on Jun. 21, 2017 by 15059751 Amendment to replace the general collateral description, to Include Additional |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| | CDS U.S. Holdings, Inc.<br>CDS Canadian Holdings, Inc.<br>Cirque du Soleil Images Inc.<br>BGE Holdings, Inc.<br>Burlesco, L.L.C.<br>Cirque du Soleil (US), Inc.<br>Cirque du Soleil Illusion, L.L.C.<br>Cirque du Soleil My Call, L.L.C.<br>Cirque du Soleil Nevada, Inc.<br>Cirque du Soleil Orlando, L.L.C.<br>Cirque du Soleil Vegas, L.L.C.<br>Velsi, L.L.C.<br>Cirque du Soleil Holding USA, Inc.<br>Cirque du Soleil America, Inc.<br>Cirque du Soleil Inc.<br>9318-2426 Quebec Inc.<br>Cirque du Soleil Inspiration Inc.<br>45 Degrees Events Inc.<br>Holding Canadien CDS, Inc.<br>CDS Canadian Holdings, Inc. /<br>Holding Canadien CDS, Inc.<br>Holding Canadien CDS, Inc. / CDS<br>Canadian Holdings, Inc.<br>Evenements 45 Degrees Inc.<br>45 Degrees Events Inc. /<br>Evenements 45 Degrees Inc.<br>Evenements 45 Degrees Inc. / 45<br>Degrees Events Inc.<br>Cirque du Soleil Holdings LP<br>Gestion Cirque du Soleil S.E.C.<br>Cirque du Soleil Holdings LP /<br>Gestion Cirque du Soleil S.E.C.<br>Gestion Cirque du Soleil S.E.C. /<br>Cirque du Soleil Holdings LP<br>Cirque du Soleil GP Inc.<br>Commandite Cirque du Soleil Inc. | | Registration amended (i) to record the amalgamation of Productions Conte II Inc., Productions Conte III Inc., Productions Conte IV Inc., 9104-3448 Quebec Inc., Productions Conte Inc., Creations Musca Inc., Cirque du Soleil Musique Inc. and Cirque du Soleil Images Inc. to continue as Cirque du Soleil Images Inc.; and (ii) to record the amalgamation of Cirque du Soleil Canada Inc., Productions Dosul Inc. and Groupe Constellation Inc. to continue as Cirque du Soleil Canada Inc. | Information and to delete a number of debtors<br>Amended on Jul. 5, 2017 by 15100001<br>Amendment to delete "Deutsche Bank AG New York Branch, as Collateral Agent" as secured party and to add "Royal Bank of Canada, as Collateral Agent" |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| | Cirque du Soleil GP Inc. / Commandite Cirque du Soleil Inc. Commandite Cirque du Soleil Inc. / Cirque du Soleil GP Inc. TPG VII CDS Holdings, L.P. | | | Amended on Jun. 21, 2017 by 15059777 Amendment to replace the general collateral description to Include Additional Information to add to delete a number of debtors Amended on May 22, 2020 by 17853961 Amendment to delete "Bank of America, N.A., as Collateral Agent" as secured party and to add "Wilmington Trust, National Association, as Collateral Agent" |
| 2. Wilmington Trust, National Association, as Collateral Agent | TPG Genpar VII-AIV, L.P. TPG Genpar VII-AIV Advisors, Inc. CDS U.S. Intermediate Holdings, Inc. Cirque du Soleil Canada Inc. CDS U.S. Holdings, Inc. CDS Canadian Holdings, Inc. Cirque du Soleil Images Inc. BGE Holdings, Inc. Burlesco, L.L.C. Cirque du Soleil (US), Inc. Cirque du Soleil Illusion, L.L.C. Cirque du Soleil My Call, L.L.C. Cirque du Soleil Nevada, Inc. Cirque du Soleil Orlando, L.L.C. Cirque du Soleil Vegas, L.L.C. Velsi, L.L.C. Cirque du Soleil Holding USA, Inc. Cirque du Soleil America, Inc. Cirque du Soleil Inc. 9318-2426 Quebec Inc. Cirque du Soleil Inspiration Inc. 45 Degrees Events Inc. Holding Canadien CDS, Inc. CDS Canadian Holdings, Inc. / Holding Canadien CDS, Inc. Holding Canadien CDS, Inc. / CDS Canadian Holdings, Inc. Evenements 45 Degrees Inc. 45 Degrees Events Inc. / Evenements 45 Degrees Inc. | Regn No.: 13173356 Regn Date: August 7, 2015 Expiry Date: August 7, 2025 | General Collateral: A security interest is taken in all of the Debtors' present and after-acquired personal property Additional Information: Registration amended (i) to record the amalgamation of Productions Conte II Inc., Productions Conte III Inc., Productions Conte IV Inc., 9104-3448 Quebec Inc., Productions Conte Inc., Creations Musca Inc., Cirque du Soleil Musique Inc. and Cirque du Soleil Images Inc. to continue as Cirque du Soleil Images Inc.; and (ii) to record the amalgamation of Cirque du Soleil Canada Inc., Productions Dosul Inc. and Groupe Constellation Inc. to continue as Cirque du Soleil Canada Inc. | |

(ii)

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
|  | Evenements 45 Degrees Inc. / 45 Degrees Events Inc.<br>Cirque du Soleil Holdings LP<br>Gestion Cirque du Soleil S.E.C.<br>Cirque du Soleil Holdings LP /<br>Gestion Cirque du Soleil S.E.C.<br>Gestion Cirque du Soleil S.E.C. /<br>Cirque du Soleil Holdings LP<br>Cirque du Soleil GP Inc.<br>Commandite Cirque du Soleil Inc.<br>Cirque du Soleil GP Inc. /<br>Commandite Cirque du Soleil Inc.<br>Commandite Cirque du Soleil Inc. /<br>Cirque du Soleil GP Inc.<br>TPG VII CDS Holdings, L.P. |  |  |  |

## IX. PRINCE EDWARD ISLAND

### 1. PERSONAL PROPERTY SECURITY ACT (Prince Edward Island)

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| 1. Royal Bank of Canada, as Collateral Agent | TPG Genpar VII-AIV, L.P.<br>TPG Genpar VII-AIV Advisors, Inc.<br>CDS U.S. Intermediate Holdings, Inc.<br>Cirque du Soleil Canada Inc.<br>CDS U.S. Holdings, Inc.<br>CDS Canadian Holdings, Inc.<br>Cirque du Soleil Images Inc.<br>BGE Holdings, Inc.<br>Burlesco, L.L.C.<br>Cirque du Soleil (US), Inc.<br>Cirque du Soleil Illusion, L.L.C.<br>Cirque du Soleil My Call, L.L.C. | Regn No.: 3743364<br>Regn Date: August 7, 2015<br>Expiry Date: August 7, 2025 | General Collateral:<br>A security interest is taken in all of the Debtors' present and after-acquired personal property<br>Additional Information:<br>Registration amended (i) to record the amalgamation of Productions Conte II Inc., Productions Conte III Inc., Productions Conte IV Inc., 9104-3448 Quebec Inc., Productions Conte Inc., Creations Musca Inc., Cirque du Soleil Musique Inc. and Cirque du Soleil | Amended on Jun. 21, 2017 by 4266671<br>Amendment to replace the general collateral description, to include Additional Information and to delete a number of debtors<br>Amended on Jul. 5, 2017 by 4277721<br>Amendment to delete "Deutsche Bank AG New York Branch, as Collateral Agent" as secured |

(liii)

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
|  | Cirque du Soleil Nevada, Inc. Cirque du Soleil Orlando, L.L.C. Cirque du Soleil Vegas, L.L.C. Velsi, L.L.C. Cirque du Soleil Holding USA, Inc. Cirque du Soleil America, Inc. Cirque du Soleil Inc. 9318-2426 Quebec Inc. Cirque du Soleil Inspiration Inc. 45 Degrees Events Inc. Holding Canadien CDS, Inc. CDS Canadian Holdings, Inc. / Holding Canadien CDS, Inc. Holding Canadien CDS, Inc. / CDS Canadian Holdings, Inc. Evenements 45 Degrees Inc. 45 Degrees Events Inc. / Evenements 45 Degrees Inc. Evenements 45 Degrees Inc. / 45 Degrees Events Inc. Cirque du Soleil Holdings LP Gestion Cirque du Soleil S.E.C. Cirque du Soleil Holdings LP / Gestion Cirque du Soleil S.E.C. Gestion Cirque du Soleil S.E.C. / Cirque du Soleil Holdings LP Cirque du Soleil GP Inc. Commandite Cirque du Soleil Inc. Cirque du Soleil GP Inc. / Commandite Cirque du Soleil Inc. Commandite Cirque du Soleil Inc. / Cirque du Soleil GP Inc. TPG VII CDS Holdings, L.P. |  | Images Inc. to continue as Cirque du Soleil Images Inc.; and (ii) to record the amalgamation of Cirque du Soleil Canada Inc., Productions Dosul Inc. and Groupe Constellation Inc. to continue as Cirque du Soleil Canada Inc. | party and to add "Royal Bank of Canada, as Collateral Agent" |
| 2. Wilmington Trust, National | TPG Genpar VII-AIV, L.P. TPG Genpar VII-AIV Advisors, Inc. | Regn No.: 3743391 Regn Date: August 7, 2015 Expiry Date: August 7, 2025 | General Collateral: A security interest is taken in all of the Debtors' present and after- | Amended on Jun. 21, 2017 by 4266680 |

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| Association, as Collateral Agent | CDS U.S. Intermediate Holdings, Inc.<br>Cirque du Soleil Canada Inc.<br>CDS U.S. Holdings, Inc.<br>CDS Canadian Holdings, Inc.<br>Cirque du Soleil Images Inc.<br>BGE Holdings, Inc.<br>Burlesco, L.L.C.<br>Cirque du Soleil (US), Inc.<br>Cirque du Soleil Illusion, L.L.C.<br>Cirque du Soleil My Call, L.L.C.<br>Cirque du Soleil Nevada, Inc.<br>Cirque du Soleil Orlando, L.L.C.<br>Cirque du Soleil Vegas, L.L.C.<br>Velsi, L.L.C.<br>Cirque du Soleil Holding USA, Inc.<br>Cirque du Soleil America, Inc.<br>Cirque du Soleil Inc.<br>9318-2426 Quebec Inc.<br>Cirque du Soleil Inspiration Inc.<br>45 Degrees Events Inc.<br>Holding Canadien CDS, Inc.<br>CDS Canadian Holdings, Inc. / Holding Canadien CDS, Inc.<br>Holding Canadien CDS, Inc. / CDS Canadian Holdings, Inc.<br>Evenements 45 Degrees Inc.<br>45 Degrees Events Inc. / Evenements 45 Degrees Inc.<br>Evenements 45 Degrees Inc. / 45 Degrees Events Inc.<br>Cirque du Soleil Holdings LP<br>Gestion Cirque du Soleil S.E.C.<br>Cirque du Soleil Holdings LP / Gestion Cirque du Soleil S.E.C. | | acquired personal property<br>Additional Information:<br>Registration amended (i) to record the amalgamation of Productions Conte II Inc., Productions Conte III Inc., Productions Conte IV Inc., 9104-3448 Quebec Inc., Productions Conte Inc., Creations Musca Inc., Cirque du Soleil Musique Inc. and Cirque du Soleil Images Inc. to continue as Cirque du Soleil Images Inc.; and (ii) to record the amalgamation of Cirque du Soleil Canada Inc., Productions Dosul Inc. and Groupe Constellation Inc. to continue as Cirque du Soleil Canada Inc. | Amendment to replace the general collateral description, to include Additional Information and to delete a number of debtors<br>Amended on May 22, 2020 by 5158116<br>Amendment to delete "Bank of America, N.A., as Collateral Agent" as secured party and to add "Wilmington Trust, National Association, as Collateral Agent" |

(liv)

| Secured Party(ies) | Debtor(s) | Registration Number (Registration Period) | General Collateral Description | Amendments/Assignments Discharges/Renewals Transfers/Subordinations |
|---|---|---|---|---|
| | Gestion Cirque du Soleil S.E.C. / Cirque du Soleil Holdings LP Cirque du Soleil GP Inc. Commandite Cirque du Soleil Inc. Cirque du Soleil GP Inc. / Commandite Cirque du Soleil Inc. Commandite Cirque du Soleil Inc. / Cirque du Soleil GP Inc. TPG VII CDS Holdings, L.P. | | | |

(lv)

**SCHEDULE "K"**

**TRADEMARK AND COPYRIGHT  REGISTRATIONS**

**IN RESPECT OF WHICH SECURITY TO BE CANCELLED AND STRUCK**

**Trademarks**

| No. | Trademark | Status | Security |
|---|---|---|---|
| 1 | 45 DEGREES | Registered<br>**App** 1662052<br>**App** 31-JAN-2014<br>**Reg** TMA930723<br>**Reg** 07-MAR-2016 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 2 | 7e CIEL design<br>**7ᵉ CIEL** | Registered<br>**App** 1402135<br>**App** 04-JUL-2008<br>**Reg** TMA799908<br>**Reg** 14-JUN-2011 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 3 | ALEGRIA | Registered<br>**App** 1025879<br>**App** 16-AUG-1999<br>**Reg** TMA622851<br>**Reg** 19-OCT-2004 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 4 | ALEGRIA DESIGN<br>ALEGRIA | Registered<br>**App** 748315<br>**App** 25-FEB-1994<br>**Reg** TMA442846<br>**Reg** 12-MAY-1995 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 5 | AMALUNA | Registered<br>**App** 1542318<br>**App** 06-SEP-2011<br>**Reg** TMA883105<br>**Reg** 30-JUL-2014 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 6 | AMALUNA CIRQUE DU SOLEIL | Registered<br>**App** 1542322<br>**App** 06-SEP-2011<br>**Reg** TMA883106<br>**Reg** 30-JUL-2014 | None |
| 7 | ARTS NOMADES | Registered<br>**App** 1856827<br>**App** 11-SEP-2017<br>**Reg** TMA1056579<br>**Reg** 27-SEP-2019 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 8 | BANANA SHPEEL | Registered<br>**App** 1448037<br>**App** 12-AUG-2009<br>**Reg** TMA784281<br>**Reg** 07-DEC-2010 | None |
| 9 | BANANA SHPEEL CIRQUE DU SOLEIL | Registered<br>**App** 1448036<br>**App** 12-AUG-2009<br>**Reg** TMA784282<br>**Reg** 07-DEC-2010 | None |

| No. | Trademark | Status | Security |
|---|---|---|---|
| 10 | CABINET DES CURIOSITÉS | Registered<br>**App** 1663425<br>**App** 11-FEB-2014<br>**Reg** TMA955013<br>**Reg** 10-NOV-2016 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 11 | CABINET OF CURIOSITIES | Registered<br>**App** 1663424<br>**App** 11-FEB-2014<br>**Reg** TMA955017<br>**Reg** 10-NOV-2016 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 12 | CIRQUE CLUB | Registered<br>**App** 1759092<br>**App** 11-DEC-2015<br>**Reg** TMA1005579<br>**Reg** 26-SEP-2018 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 13 | CIRQUE DU MONDE | Registered<br>**App** 1009803<br>**App** 24-MAR-1999<br>**Reg** TMA562429<br>**Reg** 23-MAY-2002 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 14 | CIRQUE DU SOLEIL | Registered<br>**App** 1885911<br>**App** 02-MAR-2018<br>**Reg** TMA1070358<br>**Reg** 21-JAN-2020 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 15 | CIRQUE DU SOLEIL | Registered<br>**App** 1668260<br>**App** 17-MAR-2014<br>**Reg** TMA994826<br>**Reg** 19-APR-2018 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 16 | CIRQUE DU SOLEIL | Registered<br>**App** 1423168<br>**App** 29-DEC-2008<br>**Reg** TMA813306<br>**Reg** 05-DEC-2011 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 17 | CIRQUE DU SOLEIL | Registered<br>**App** 1042363<br>**App** 12-JAN-2000<br>**Reg** TMA664441<br>**Reg** 17-MAY-2006 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 18 | CIRQUE DU SOLEIL | Registered<br>**App** 705007<br>**App** 13-MAY-1992<br>**Reg** TMA410234<br>**Reg** 26-MAR-1993 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 19 | CIRQUE DU SOLEIL & DESIGN<br><br>CIRQUE DU SOLEIL | Registered<br>**App** 702557<br>**App** 09-APR-1992<br>**Reg** TMA418918<br>**Reg** 29-OCT-1993 | None |

| No. | Trademark | Status | Security |
|-----|-----------|--------|----------|
| 20 | CIRQUE DU SOLEIL (& DESIGN) CIRQUE DU SOLEIL | Registered **App** 1668259 **App** 17-MAR-2014 **Reg** TMA994827 **Reg** 19-APR-2018 | None |
| 21 | CIRQUE DU SOLEIL (DESIGN) **CIRQUE DU SOL** | Registered **App** 1802780 **App** 30-SEP-2016 **Reg** TMA1043890 **Reg** 23-JUL-2019 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 22 | CIRQUE DU SOLEIL AXEL | Formalized (Pending) **App** 1956925 **App** 11-APR-2019 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 23 | CIRQUE DU SOLEIL BAZZAR | Registered **App** 1884291 **App** 21-FEB-2018 **Reg** TMA1070348 **Reg** 21-JAN-2020 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 24 | CIRQUE DU SOLEIL CREACTIVE | Formalized (Pending) **App** 1953758 **App** 26-MAR-2019 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 25 | CIRQUE DU SOLEIL CRYSTAL | Registered **App** 1839302 **App** 25-MAY-2017 **Reg** TMA1041803 **Reg** 16-JUL-2019 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 26 | CIRQUE DU SOLEIL ECHO | Formalized (Pending) **App** 1982377 **App** 27-AUG-2019 | None |
| 27 | CIRQUE DU SOLEIL JOYÀ | Registered **App** 1720726 **App** 24-MAR-2015 **Reg** TMA991964 **Reg** 07-MAR-2018 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 28 | CIRQUE DU SOLEIL JUNIOR (& DESIGN) **CIRQUE du SOLEIL JUNIOR** | Registered **App** 1806010 **App** 24-OCT-2016 **Reg** TMA1057026 **Reg** 01-OCT-2019 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 29 | CIRQUE DU SOLEIL LUZIA | Registered **App** 1754354 **App** 12-NOV-2015 **Reg** TMA979701 **Reg** 31-AUG-2017 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 30 | CIRQUE DU SOLEIL PARAMOUR | Registered **App** 1738653 **App** 23-JUL-2015 **Reg** TMA972388 **Reg** 01-JUN-2017 | None |
| 31 | CIRQUE DU SOLEIL VOLTA | Searched (Pending) **App** 1807102 **App** 31-OCT-2016 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |

| No. | Trademark | Status | Security |
|-----|-----------|--------|----------|
| 32 | CIRQUE NATIONAL DU CANADA | Registered<br>**App** 595543<br>**App** 17-NOV-1987<br>**Reg** TMA358484<br>**Reg** 14-JUL-1989 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 33 | CLUB CIRQUE | Registered<br>**App** 1759093<br>**App** 11-DEC-2015<br>**Reg** TMA1005577<br>**Reg** 26-SEP-2018 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 34 | CORTEO | Registration pending (Pending)<br>**App** 1874692<br>**App** 21-DEC-2017 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 35 | CORTEO | Registered<br>**App** 1243620<br>**App** 14-JAN-2005<br>**Reg** TMA721594<br>**Reg** 21-AUG-2008 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 36 | CORTEO CIRQUE DU SOLEIL | Registration pending (Pending)<br>**App** 1874691<br>**App** 21-DEC-2017 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 37 | CORTEO CIRQUE DU SOLEIL | Registered<br>**App** 1243621<br>**App** 14-JAN-2005<br>**Reg** TMA721297<br>**Reg** 19-AUG-2008 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 38 | CREACTIVE | Formalized (Pending)<br>**App** 1956084<br>**App** 08-APR-2019 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 39 | CREACTIVE CIRQUE DU SOLEIL | Default - searched (Pending)<br>**App** 1900586<br>**App** 23-MAY-2018 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 40 | DRALION | Registered<br>**App** 1007122<br>**App** 03-MAR-1999<br>**Reg** TMA554496<br>**Reg** 27-NOV-2001 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 41 | FASCINATION design<br><br>FASCINATION | Registered<br>**App** 702562<br>**App** 09-APR-1992<br>**Reg** TMA442467<br>**Reg** 05-MAY-1995 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 42 | INVOKE PROVOKE EVOKE | Registered<br>**App** 1037150<br>**App** 23-NOV-1999<br>**Reg** TMA556942<br>**Reg** 28-JAN-2002 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 43 | KA | Registered<br>**App** 1213944<br>**App** 20-APR-2004<br>**Reg** TMA687699<br>**Reg** 14-MAY-2007 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |

| No. | Trademark | Status | Security |
|-----|-----------|--------|----------|
| 44 | KA CIRQUE DU SOLEIL | Registered<br>**App** 1213945<br>**App** 20-APR-2004<br>**Reg** TMA687698<br>**Reg** 14-MAY-2007 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 45 | KOOZA | Registered<br>**App** 1325042<br>**App** 21-NOV-2006<br>**Reg** TMA783230<br>**Reg** 23-NOV-2010 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 46 | KOOZA CIRQUE DU SOLEIL | Registered<br>**App** 1325043<br>**App** 21-NOV-2006<br>**Reg** TMA783650<br>**Reg** 29-NOV-2010 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 47 | KURIOS | Registered<br>**App** 1658718<br>**App** 08-JAN-2014<br>**Reg** TMA954244<br>**Reg** 03-NOV-2016 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 48 | KURIOS CIRQUE DU SOLEIL | Registered<br>**App** 1658719<br>**App** 08-JAN-2014<br>**Reg** TMA982870<br>**Reg** 16-OCT-2017 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 49 | LA NOUBA | Registered<br>**App** 892798<br>**App** 08-OCT-1998<br>**Reg** TMA548508<br>**Reg** 23-JUL-2001 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 50 | LES CHEMINS INVISIBLES | Registered<br>**App** 1438831<br>**App** 21-MAY-2009<br>**Reg** TMA825500<br>**Reg** 05-JUN-2012 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 51 | LUZIA | Registered<br>**App** 1754353<br>**App** 12-NOV-2015<br>**Reg** TMA969506<br>**Reg** 28-APR-2017 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 52 | MYSTERE | Registered<br>**App** 1027058<br>**App** 25-AUG-1999<br>**Reg** TMA547911<br>**Reg** 10-JUL-2001 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 53 | NATIONAL CIRCUS OF CANADA | Registered<br>**App** 595542<br>**App** 17-NOV-1987<br>**Reg** TMA358483<br>**Reg** 14-JUL-1989 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 54 | NEXTASY | Formalized (Pending)<br>**App** 1943871<br>**App** 31-JAN-2019 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |

| No. | Trademark | Status | Security |
|---|---|---|---|
| 55 | NOUVELLE EXPÉRIENCE DESIGN <br> NOUVELLE EXPÉRIENCE | Registered <br> **App** 702735 <br> **App** 09-APR-1992 <br> **Reg** TMA415751 <br> **Reg** 20-AUG-1993 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent <br><br> Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 56 | O | Registered <br> **App** 895066 <br> **App** 30-OCT-1998 <br> **Reg** TMA526634 <br> **Reg** 17-APR-2000 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent <br><br> Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 57 | O & DESIGN | Registered <br> **App** 887970 <br> **App** 18-AUG-1998 <br> **Reg** TMA550386 <br> **Reg** 06-SEP-2001 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent <br><br> Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 58 | OVAL BY EDEN PARK & DESIGN | Registered <br> **App** 895065 <br> **App** 30-OCT-1998 <br> **Reg** TMA519291 <br> **Reg** 09-NOV-1999 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent <br><br> Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 59 | OVO | Registered <br> **App** 1421149 <br> **App** 09-DEC-2008 <br> **Reg** TMA778368 <br> **Reg** 29-SEP-2010 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 60 | OVO CIRQUE DU SOLEIL | Registered <br> **App** 1421240 <br> **App** 10-DEC-2008 <br> **Reg** TMA812987 <br> **Reg** 30-NOV-2011 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 61 | QUIDAM | Registered <br> **App** 804913 <br> **App** 20-FEB-1996 <br> **Reg** TMA475894 <br> **Reg** 07-MAY-1997 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent <br><br> Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 62 | R.U.N | Formalized (Pending) <br> **App** 1958246 <br> **App** 18-APR-2019 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent <br><br> Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 63 | RAYS DESIGN | Registered <br> **App** 1174328 <br> **App** 09-APR-2003 <br> **Reg** TMA675267 <br> **Reg** 18-OCT-2006 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent <br><br> Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 64 | SALTIMBANCO design <br> SALTIMBANCO | Registered <br> **App** 702737 <br> **App** 09-APR-1992 <br> **Reg** TMA442468 <br> **Reg** 05-MAY-1995 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent <br><br> Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 65 | SOUS UN MÊME CIEL | Formalized (Pending) <br> **App** 2006210 <br> **App** 15-JAN-2020 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent <br><br> Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |

| No. | Trademark | Status | Security |
|---|---|---|---|
| 66 | SUN (DESIGN) | Registered<br>**App** 1668258<br>**App** 17-MAR-2014<br>**Reg** TMA994828<br>**Reg** 19-APR-2018 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 67 | SUN (DESSIN) | Registered<br>**App** 1423169<br>**App** 29-DEC-2008<br>**Reg** TMA778352<br>**Reg** 29-SEP-2010 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 68 | SUN LOGO | Searched (Pending)<br>**App** 1878045<br>**App** 17-JAN-2018 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 69 | THE ILLUSIONISTS & DESIGN | Advertised (Pending)<br>**App** 1900289<br>**App** 22-MAY-2018 | None |
| 70 | THE SENSUAL SIDE OF CIRQUE DU SOLEIL | Registered<br>**App** 1383083<br>**App** 12-FEB-2008<br>**Reg** TMA769185<br>**Reg** 09-JUN-2010 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 71 | TOTEM | Registered<br>**App** 1466270<br>**App** 19-JAN-2010<br>**Reg** TMA832906<br>**Reg** 26-SEP-2012 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 72 | TOTEM CIRQUE DU SOLEIL | Registered<br>**App** 1466277<br>**App** 19-JAN-2010<br>**Reg** TMA839792<br>**Reg** 11-JAN-2013 | Security Agreement placed on file August 11, 2020 in favour of ROYAL BANK OF CANADA (First Lien) |
| 73 | UNDER THE SAME SKY | Formalized (Pending)<br>**App** 2006211<br>**App** 15-JAN-2020 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 74 | VAREKAI | Registered<br>**App** 1124314<br>**App** 05-DEC-2001<br>**Reg** TMA635414<br>**Reg** 16-MAR-2005 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 75 | WINTUK CIRQUE DU SOLEIL | Registered<br>**App** 1340635<br>**App** 23-MAR-2007<br>**Reg** TMA770454<br>**Reg** 22-JUN-2010 | None |

| No. | Trademark | Status | Security |
|---|---|---|---|
| 76 | ZUMANITY | Registered<br>**App** 1188354<br>**App** 22-AUG-2003<br>**Reg** TMA644712<br>**Reg** 20-JUL-2005 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |
| 77 | ZUMANITY | Registered<br>**App** 1169972<br>**App** 28-FEB-2003<br>**Reg** TMA649154<br>**Reg** 28-SEP-2005 | Security Agreement placed on file August 5, 2020 in favour of ROYAL BANK OF CANADA, in its capacity as collateral agent<br><br>Security Agreement placed on file August 5, 2020 in favour of WILMINGTON TRUST, NATIONAL ASSOCIATION, in its capacity as collateral agent |

## Copyrights[4]

| Title | Registration Date | Registration No. | Owner | Security |
|---|---|---|---|---|
| A BAROQUE ODYSSEY | 2001-08-22 | 493464 | Cirque du Soleil Images Inc. (formerly known as Productions Télémagik Inc.) | A grant of interest in favour of Royal Bank of Canada filed on Sept. 29, 2020 as number 1174379<br>A grant of interest in favour of Wilmington Trust, National Association as administrative agent filed on Sept. 29, 2020 as number 1174380 |
| CIRQUE DU SOLEIL PRESENTS DRALION | 2000-08-25 | 486843 | Cirque Du Soleil Images Inc. | A grant of interest in favour of Royal Bank of Canada filed on Sept. 29, 2020 as number 1174379<br>A grant of interest in favour of Wilmington Trust, National Association as administrative agent filed on Sept. 29, 2020 as number 1174380 |
| Cirque du Soleil presents Quidam | 1999-12-06 | 481271 | Cirque du Soleil Images Inc. | A grant of interest in favour of Royal Bank of Canada filed on Sept. 29, 2020 as number 1174379<br>A grant of interest in favour of Wilmington Trust, National Association as administrative agent filed on Sept. 29, 2020 as number 1174380 |
| CIRQUE DU SOLEIL WORLDS AWAY | 2013-03-14 | 1102829 | CIRQUE DU SOLEIL BURLESCO, L.L.C. | None |
| Courroies aériennes - Aerial Straps | 1991-08-30 | 409122 | Les Productions du Cirque du Soleil | None |
| LA MAGIE CONTINUE | 2001-08-22 | 493465 | Cirque du Soleil Images Inc. (formerly known as Productions Télémagik Inc.) | A grant of interest in favour of Royal Bank of Canada filed on Sept. 29, 2020 as number 1174379<br>A grant of interest in favour of Wilmington Trust, National Association as administrative agent filed on Sept. 29, 2020 as number 1174380 |

---

[4] Certain of the copyrights may also be registered in the name of Cirque du Soleil Canada Inc. or Cirque du Soleil Images Inc. as ownership update requests have been sent to CIPO but are not yet reflected in the registry.

| Title | Registration Date | Registration No. | Owner | Security |
|---|---|---|---|---|
| SALTIMBANCO | 2001-08-22 | 493463 | Cirque du Soleil Images Inc. (formerly known as Productions Télémagik Inc.) | None |
| SUN DESIGN | 2010-09-27 | 1080806 | The Dream Merchant Company Kft. (assigned to Groupe Cirque du Soleil Canada Inc. in 2015 with The Dream Merchant Company Kft. remaining Owner) | None |
| SUN DESIGN | 2012-10-24 | 1099671 | Creations Meandres Inc. | None |
| SALTIMBANCO | 1992-04-14 | 414189 | Creations Meandres Inc. | None |
| SALTIMBANCO | 1992-04-14 | 414188 | Creations Meandres Inc. | None |
| SUN DESIGN | 2015-11-19 | 1126075 | Groupe Cirque du Soleil Inc. | None |
| SUN DESIGN | 2015-11-20 | 1126076 | Groupe Cirque du Soleil Inc. (Îles Cayman) | None |
| SUN DESIGN | 2015-11-20 | 1126077 | Groupe Cirque du Soleil Canada Inc. | None |
| SUN DESIGN | 2012-10-24 | 1099670 | Cirque du Soleil i.i.i. S.A. | None |
| CIRQUE DU SOLEIL: NOUVELLE EXPÉRIENCE | 1991-12-19 | 411204 | Les Productions Télémagik Inc. | A grant of interest in favour of Royal Bank of Canada filed on Sept. 29, 2020 as number 1174379<br>A grant of interest in favour of Wilmington Trust, National Association as administrative agent filed on Sept. 29, 2020 as number 1174380 |
| LES ENFANTS DU SOLEIL | 1992-05-29 | 415299 | Les Productions Télémagik Inc. | A grant of interest in favour of Royal Bank of Canada filed on Sept. 29, 2020 as number 1174379<br>A grant of interest in favour of Wilmington Trust, National Association as administrative agent filed on Sept. 29, 2020 as number 1174380 |
| CIRQUE DU SOLEIL: QUEL CIRQUE! | 1991-12-19 | 411203 | Les Productions Télémagik Inc. | A grant of interest in favour of Royal Bank of Canada filed on Sept. 29, 2020 as number 1174379<br>A grant of interest in favour of Wilmington Trust, National Association as administrative agent filed on Sept. 29, 2020 as number 1174380 |

| Title | Registration Date | Registration No. | Owner | Security |
|---|---|---|---|---|
| CIRQUE DU SOLEIL: WHAT A CIRCUS! | 1991-12-19 | 411205 | Les Productions Télémagik Inc. | A grant of interest in favour of Royal Bank of Canada filed on Sept. 29, 2020 as number 1174379<br>A grant of interest in favour of Wilmington Trust, National Association as administrative agent filed on Sept. 29, 2020 as number 1174380 |
| GAÏA | 1991-06-06 | 407450 | Productions Telemagik Inc./Telemagik Productions Inc. | A grant of interest in favour of Royal Bank of Canada filed on Sept. 29, 2020 as number 1174379<br>A grant of interest in favour of Wilmington Trust, National Association as administrative agent filed on Sept. 29, 2020 as number 1174380 |
| La Nouvelle Expérience | 1991-06-04 | 407397 | Productions Telemagik Inc./Telemagik Productions Inc. | A grant of interest in favour of Royal Bank of Canada filed on Sept. 29, 2020 as number 1174379<br>A grant of interest in favour of Wilmington Trust, National Association as administrative agent filed on Sept. 29, 2020 as number 1174380 |

**SCHEDULE "L"**

**PENDING SUITS AND LETTERS OF DEMAND**
**FORMING PART OF THE RELEASED CLAIMS**

**Cirque as Defendant**

1.      Action against VStar Theatrical, LLC by Cynthia Denise Bland (Pulaski County Circuit Court – District of Arkansas, Case No: 60 CV-20-1327) for alleged failure to comply with the *Americans with Disability Act* standards which prohibit a change in ground level in handicapped designated areas;

2.      Action against Cirque EPE Las Vegas, LLC by Deborah Crawford (Clark County Justice Court – District of Nevada, Case No: 19C022650) relating to the alleged negligence of Cirque in regard to its failure to properly illuminate and/or align the stairs in the theater and failure to maintain the theater in a safe manner allegedly resulting in the Plaintiff's personal injuries;

3.      Action against Inspiraçao Organizaçoes de Espetaculo Ltda by Inacio Jose Fernandes Neto and Maria Aparecida Quartieri Fernandes (Poder Judiciario Do Estado Do Parana Comarca De Foz Do Iguaçu, Case No: 0002417-82.2018.8.16.0030) relating to the expenses and damages incurred due to the cancellation of the Amaluna performance in Sao Paulo due to a heavy rain storm;

4.      Action against Inspiraçao Organizaçoes de Espetaculo Ltda by Luiz Thyaguz Machado and Thalyta Guilherme Silva (Goiânia - 9º Juizado Especial Cível, Case No: 5444994.85.2017.8.09.0051) relating to the expenses and damages incurred due to the cancellation of the *Amaluna* performance in Sao Paulo due to a bad weather;

5.      Action against Cirque du Soleil America, Inc. by Marjorie Randall (Hillsborough County Circuit Court – District of Florida, Case No: 19-CA-003292) relating to the alleged negligence of Cirque and a third party with respect to the maintenance of the sidewalk and driveway allegedly resulting in the Plaintiff's personal injuries;

6.      Action against Inspiraçao Organizçao de Espetaculos LTDA by Prefeitura Municipal de Sao Paulo (Tribunal de Justiça do Estado de Sao Paulo, Case No: 1617205-41.2016.8.26.0090) for allegedly failing to pay the municipal services tax due to the municipality for the presentation of the *Saltimbanco, Alegria, Quidam, Varekai* and *Corteo* performances between 2006 and 2012;

7.      Action against Evenements 45 Degrees Inc. by Schenker Itialiana S.p.A (Tribunal de Milan, Case No: 32998/2018) for the alleged non-payment of certain invoices for logistic services provided by Plaintiff;

8.      Action against VStar Entertainment Group, LLC by Tradewinds Logistics, Inc. (Hamilton County Superior Court – District of Indiana, Case No: 29D05-2004-CC-003150) for the alleged non-payment of certain invoices for logistic services provided by Plaintiff;

9.      Action against Cirque du Soleil America, Inc. by 673753 Ontario Ltd. (Ontario Superior Court, Case No: CV-18-006117380000) for the alleged failure to respect the *Bill of Lading Act* by refusing to be held responsible for unpaid bills and freight for work rendered by

sub-broker Plaintiff hired by Cirque's supplier, Archangel Global Logistics, LLC, during the North American Corteo tour;

10.    […];

11.    Action against Cirque du Soleil Inc. by Indu-Electric North-America (Los Angeles County Superior Court, Case No: 20CHCV00350) for the alleged non-payment of invoices pertaining to the sale of cables, supplies and other electronic goods provided by Plaintiff;

12.    Action against Inspiraçao Organizaçoes de Espetaculo Ltda by Fabio Antonio Da Silveira (Tribunal de Justiça do Estado de Sao Paulo) in regard to a labor law matter;

13.    Action against Inspiraçao Organizaçoes de Espetaculo Ltda by Carla Ane Oliveira Real (Tribunal de Justiça do Estado de Sao Paulo) in regard to a labor law matter;

14.    Action against Inspiraçao Organizaçoes de Espetaculo Ltda by Selma Prado Soares (Tribunal de Justiça do Estado de Sao Paulo) in regard to a labor law matter;

15.    Action against Cirque du Soleil, Inc. by Westgate Resorts, Ltd. (Ninth judicial Circuit – Orange County, Case No: 2020-CA-6410-O) for the alleged non-payment of lodging services provided by Plaintiff;

16.    Action against Cirque du Soleil by Laura Kmetko (Administrative Labour Tribunal of Québec) for alleged psychological harassment of sexual nature;

17.    Action against Cirque du Soleil Inc. by Stéphanie Desfeux-Souveton et al. (Administrative Labour Tribunal, Occupational Health and Safety Division and Labour Relations Division and Quebec Superior Court – District of Montreal, Case No: 500-17-112733-202) with respect to allegations of impeding on the Plaintiff's privacy by hiring a private investigator to follow, film, photograph and document the activities of Plaintiff and her family following a medical leave from work;

18.    Action against Cirque du Soleil by a group of Cirque employees (Chantal Bernier, Line Bisaillon, Frank Camus, Lyne Chabot, Lidia Nathalie Circama, Marie-Josée Côté, Rino Côté, Serge Décoste, Marc Gagnon, Lyne Gauthier, Pierre-Paul Larivière, Jennifer Marchitto, André Martel, Sébastien Mustille, Fulya Oguz, Pierre-Marc Parent, Nancy Peat, Carl Perrotte, and Yves Sheriff) for alleged unpaid wages following their termination from Cirque and for alleged payment defaults under severance package agreements;

19.    Action against VStar Entertainment Group by Penny Ciotta (Superior Court of California – Orange County Division, Case No: 30-2019-01118442-CU-PO-CJC) relating to allegations of negligence on the part of VStar with respect to the maintenance of a photo op which allegedly fell onto the Plaintiff and caused physical damage;

20.    Action against Cirque du Soleil by Michael Hale (Human Rights Tribunal of Ontario, File No: 2020-40911-I) relating to alleged discrimination based on disability in the provision of goods, services and/or facilities, in contravention of the Ontario *Human Rights Code*, in Toronto on or about November 23, 2019, at a representation of the Show 'Allegria';

21.    Action against Cirque du Soleil Canada Inc., CDS Canadian Holdings, Inc., Cirque du Soleil Holdings L.P., Daniel Lamarre, David Trujillo, Stéphane Lefebvre, Mitchell Garber

and Manon Brouillette by Québecor Inc., Québécor Média Inc., MédiaQMI Inc. and Michel Girard (Superior Court of Québec, Case No: 500-17-112722-205) regarding alleged defamation and prejudice suffered as a result of the publication by La Presse of a demand letter sent to Quebecor by Cirque du Soleil on May 1, 2020;

22.  Application for homologation of a settlement agreement brought by Élise Morin against Cirque du Soleil Canada Inc. (Québec Provincial Court, Case No: 500-22-261614-203) regarding the payment of the settlement amount of $8,500 for alleged damages suffered in the course of her employment with Cirque du Soleil Canada Inc.;

23.  Action against Cirque du Soleil Orlando, LLC and Liberty Mutual Insurance by Alexandre Dechanet (Division of Administrative Hearings, Compensation Claims, Orlando District Office, Case No: 20-019226 TWS) regarding a compensation claim for an industrial accident;

24.  Action against Gaia Luxembourg, SA by D. Angel Francisco Delgado Batista (Juzgado de lo Social no.33 de Madrid, Case No: 28.079.00.4-2020/0037593) regarding the alleged unjust dismissal of Plaintiff as a Gaia executive as a result of Covid-19;

25.  Action against Cirque du Soleil Inc. by Malteser Hilfsdienst e.V. (Regional Court - Landgericht Düsseldorf, Case no: AA02MHD/0028/20) for the alleged non-payment of services performed as non-profit committed to providing medical services during the presentation of *Totem* in Düsseldorf;

**Cirque as Impleaded Party**

1.  Action against the impleaded Cirque Apple Las Vegas, L.L.C. in Marian and Silvana Malita v. Mirage Resorts, Inc. and MGM Resorts International, Inc. (Clark County Court – District of Nevada, Case No: A-13-688148-C) relating to MGM Mirage's request for indemnification in accordance with Performance Service Agreement and allegations of personal injury sustained during a performance in the show *Love* caused by negligence in costume maintenance;

2.  Action against the impleaded Cirque du Soleil America, Inc. in Baxter, Bailey & Associates, Inc. v. Lawlor, The Forum and Caravan Supply Chain Inc. (Superior Court of California, Case No: 19NWLC48607) relating to Lawlor's request for indemnification in accordance with the Rental Agreement. Caravan Supply Chain, a logistics company responsible for the transport of Cirque's equipment, retained the services of Truckee River Transport Corp (predecessor to Baxter). Truckee allegedly failed to abide by the agreement and damaged trucks and Caravan refused to pay for Truckee's services;

3.  Implication of Evenements 45 Degrees Inc., as an impleaded party, in Mike Sawatzky v Gestion Solodermo Inc. Plaintiff was in a band called Les Colocs. After a band member Fortin died and the disbandment of Les Colocs occured, a transaction was signed in 2011 allowing Plaintiff to a percentage of all proceeds that the Fortin Estate received from the continued use Les Colocs recordings and royalty under Gestion Solodermo. Cirque's *Juste une p'tite nuite* was an homage to Les Colocs. Plaintiff alleges unsatisfaction with Cirque having only negotiated with Solodermo and alleges being owed his share of proceeds from the 2011 transaction from Solodermo; and

4.    Claim against Gedney S.A. and the impleaded parties, Cirque du Soleil, Inc. and Cirque du Soleil Canada Inc. by WiCreations BVBA for the unwillingness to solely be responsible for the repairs to the stage for the *Messi10* show given the Performance Service Agreement's alleged terms confirming Gedney's obligation to pay for such repairs; and

5.    Claim against Cirque du Soleil Inc. by The University of Texas at El Paso relating to their request for indemnification in accordance with the Arena Rental Agreement. Mary Jaquez, an attendee, alleges having sustained an injury during her attendance of the show;

6.    Action against the impleaded V-Star Theatrical Inc. by The University of Louisiana System Board of Supervisors through University of New Orleans and Sodexo Management, Inc. (Civil District Court for the Parish of Orleans, State of Louisiana, Case No: 19-10642) relating to their request for indemnification in accordance with the Arena Rental Agreement. Arlene B. Hebert, an attendee, alleges having sustained an injury during her attendance of the show;

**Letters of Demand**

1.    […];

2.    Claim asserted against Cirque du Soleil Inc. by Cargo Solution Express, Inc. relating to the alleged non-payment of loading and freight charges by Cirque's intermediary supplier, Paladin Freight Solutions Inc. Cargo Solution Express alleges that Cirque's supplier's refusal for payment allows them to file suit against the shipper/consignee for the unpaid charges;

3.    Claim asserted against Cirque du Soleil Inc. by Agence de Recouvrement de Crédit Métropolitain on behalf of NTS W USA, Corp and INTS (dba as Desigual) for the alleged non-payment of certain invoices;

4.    Claim asserted against Cirque du Soleil Inc. by Grandi Stazioni Retail S.p.A. relating to the alleged non-payment of invoices due for marketing services rendered for the presentation of *Amaluna* in Italy. Claimant was hired by an intermediary supplier, Asset Events SRLS, and the contract was between Claimant and Supplier;

5.    Claim against Cirque du Soleil America, Inc. by the Occupation Safety and Health Appeals Board of California (Division of Occupational Safety and Health, San Francisco District Office, California) for charges against Cirque in regard to an alleged occupational health and safety violation which caused the death of a Cirque employee;

6.    Claim against Cirque du Soleil, Inc. by Spencer Novich for the alleged infringement of his intellectual property in regard to the claim that Cirque used Spencer's act without his authorization in *Twas the Night Before* which was an alleged further infringement of a settlement agreement in which Cirque would have accepted to not reuse his act;

7.    Claim against Cirque du Soleil America, Inc. by APA Events and Alchemy Project Events FZ, LLC for the alleged wrongful cancellation of the *Bazzar* show in the Middle East. Defendant failed to fulfill the role of promoter by failing in his responsibilities to select and secure the site for presentation of Shows, to obtain the relevant permits and approvals for the Cirque's occupation and many more. Cirque was forced to cancel shows and incur

many expenses due to Defendant's negligence. Defendant filed a counterclaim for damages allegedly incurred due to the cancellation;

8.  Claim against Cirque du Soleil Nevada Inc. by MPOA, LLC for the alleged unauthorized use of MPOA's (Criss Angel) trademark ''X'' within its merchandising products in connection with the *R.U.N.* show;

9.  Claim against Cirque du Soleil Inc. by Vasily Demenchukov for the alleged non-payments of royalties due to him as the alleged designer of the chair act in Crystal;

10. Claim against Cirque du Soleil Inc. by the Centre national de la chanson des variétés et du jazz for the alleged infringement of France's fiscal legislation, namely the *Loi de finance rectificative de 2003-1312*, by not paying the Centre national a specific tax imposed on musical and variety shows for the October-November-December 2018 performances of the *Totem* show at the Plaine de jeux de Bagatelle in Paris;

11. Claim against Cirque du Soleil Inc. by Silvio Alcazar for alleged injuries sustained while in attendance of a Cirque show at the BB&T Center;

12. Claim against Cirque du Soleil Inc. by Venelatin Production LLC (assigned to Money Cirque LLC) for the alleged wrongful termination of the Promoter Service Agreement for the *Amaluna* show in South America, alleging damages for breach of contract in the amount of approximately US$ 5.6 million;

13. Claim asserted against Cirque du Soleil America, Inc. and The Works Creative Pte Ltd by TML Enterprises Pty Ltd. and Timothy Mark Lawson for the alleged non-payment for transition services provided by Claimant;

14. Claim against Cirque du Soleil America, Inc. by EC Credit Control (NZ) Ltd, a debt collection agency acting on behalf of Fairfax Media for alleged non-payment of certain invoices for advertising services provided by Claimant;

15. Claim against Cirque du Soleil by Credit Limits International Ltd, a debt collection agency acting on behalf of Chambre de Commerce Française de Grande-Bretagne for alleged non-payment of member fee due to automatic renewal;

16. Claim against Cirque du Soleil America, Inc. by Homestead Paving Co. for the alleged non-payment of invoices related to renovations at the Miami Dade County & South Florida Stadium;

17. Claim against Cirque du Soleil Holding USA, Inc. by Schmitt Sögne GmbH Weinkellerei for an alleged trademark infringement. Claimant is a German company implicated in the fabrication of alcohol, including wine, and bears the logo of a sun with a face. Claimant alleges Cirque's sun logo trademark application to use with wines will cause confusion;

18. Claim against Cirque du Soleil Orlando, LLC by Titan Electric Southeast LLC for the alleged non-payment of invoices related to electrical labor at the Cirque retail shop in Orlando;

19. […];

20. Claim against Cirque du Soleil by Jo Hanna for allegedly falling due to poor lighting, thus sustaining personal injuries;

21. Claim against Cirque du Soleil by Sue Kaufman for allegedly hurting her wrist due to faulty chair, thus sustaining personal injuries;

22. Claim against Cirque du Soleil by Sheila Reese for allegedly falling on the stairs due to faulty lighting, thus sustaining personal injuries;

23. Claim against Cirque du Soleil by Christian Grosse for alleged hear loss following the presentation of the show, thus sustaining personal injuries;

24. Claim against Cirque du Soleil by Shambra Solomon for allegedly slipping and falling in the theatre, thus sustaining personal injuries;

25. Claim against Cirque du Soleil by Paige Toth Solomon for allegedly slipping and falling in the theatre, thus sustaining personal injuries;

26. Claim against Cirque du Soleil by Asmah Zareh for allegedly having an artist fall on her during pre-show animation and sustaining personal injuries;

27. Claim against Blue Man Group by Teresa Cumming for allegedly being injured by helium balls and needing to miss her work to recover;

28. Claim against Cirque du Soleil by Agathe Alie for alleged amounts due to her following the termination of her employment at Cirque;

29. Claim against Cirque du Soleil by Robert Bollinger for alleged amounts due to him following the termination of his employment at Cirque;

30. Claim against Cirque du Soleil by Brigitte Carbonneau for alleged amounts due to her following the termination of her employment at Cirque;

31. Claim against Cirque du Soleil by Sylvain Lachappelle for alleged amounts due to him following the termination of his employment at Cirque;

32. Claim against Cirque du Soleil by Justin Rousseau for alleged amounts due to him following the termination of his employment at Cirque; and

33. Claim against Cirque du Soleil by Catherine Boivin for alleged amounts due to her following the termination of her employment at Cirque;

34. Claim against Cirque du Soleil by Evelyne Durocher for alleged amounts due to her following the termination of her employment at Cirque;

35. Claim against Cirque du Soleil Inc by Capt'n Crunch Recycling for unpaid rent for the alleged unapproved storage of Cirque trailers on their land;

36. Claim against Cirque du Soleil America, Inc. and the City of Norfolk by Charles Butler for the alleged personal injury suffered for falling on ice while working for Event Staging to set up for the Cirque show;

37.    Claim against Cirque du Soleil (unknown entity) by Enterprise Rent-A-Car and ELCO (claim services) for the alleged personal injury caused by independent contractor Jean Frenette to a third party;

38.    Claim against Cirque du Soleil Inc. by Philippe Agogué for alleged amounts due to him following the termination of his employment at Cirque;

39.    Claim against Blue Man Group by Jaana Nyroos for allegedly being injured by a confetti cannon during the BMG World Tour in Finland;

40.    Claim by Park Avenue Recovery on behalf of CFG Merchant Solutions, LLC (State of New Jersey, Department of the Treasury, Division of Revenue & Enterprise Services, Filing no: 53259035) for alleged unpaid amounts due to Archangel Global Logistics. Claim for amount assigned to CFG Merchant Solutions, LLC;

**CNESST**

41.    Claim against Cirque du Soleil by Amélie Lapointe for alleged amounts due to her following the termination of her employment at Cirque; and

42.    Claim against Cirque du Soleil by Delphine Sautron for alleged amounts due to her following the termination of her employment at Cirque.

43.    Request for communication of documents addressed to Cirque du Soleil Canada Inc. in the context of an enquiry by CNESST in file no. 620089734 regarding the application of the Act respecting labour standards and the National Holiday Act

7097333

**Exhibit 2**

**Administrative Reserves Order**

**SUPERIOR COURT**
(Commercial Division)

CANADA
PROVINCE OF QUEBEC
DISTRICT OF MONTREAL

N°:      500-11-058415-205

DATE:     October 20, 2020

---

**BEFORE THE HONOURABLE LOUIS J. GOUIN J.S.C.**

---

IN THE MATTER OF THE *COMPANIES' CREDITORS ARRANGEMENT ACT*, R.S.C. 1985, c. C-36, AS AMENDED:

**CIRQUE DU SOLEIL CANADA INC.**

-and-

**9424-9356 QUEBEC INC.**

-and-

**9424-9398 QUEBEC INC.**

-and-

**THE OTHER APPLICANTS LISTED IN SCHEDULE "A" HEREOF**

     Applicants
-and-

**ERNST & YOUNG INC.**

---

## ADMINISTRATIVE RESERVE ORDER

---

[1]    **ON READING** the Applicants' *Application for the Issuance of An Approval and Vesting Order, An Order Approving the Establishment of an Employee Fund, an Order Approving the Establishment of a Contractor Fund and An Order Approving the Establishment of Administrative Reserves* (the "**Application**"), the affidavit and the exhibits in support thereof, as well as the Fifth Report of Ernst & Young Inc. in its capacity as Monitor (the "**Monitor**") dated October **[●]**, 2020 (the "**Report**");

[2]    **SEEING** the service of the Application;

- 2 -

[3]     **SEEING** the submissions of the Applicants' and the Monitor's attorneys and those other parties' present, including the attorneys to the *ad hoc* committee of certain First Lien Lenders and Second Lien Lenders;

[4]     **SEEING** that it is appropriate to issue an order approving the Administrative Seller Reserve and the Administrative Monitor Reserve on the terms set out herein in connection with the transactions (the "**Transaction**") contemplated by Asset Purchase Agreement made July 15, 2020, as amended by an Amending Agreement to Asset Purchase Agreement dated October **[8]**, 2020 (as may be further amended in accordance with its terms, the "**Purchase Agreement**") by and between Cirque du Soleil Holdings L.P. (the "**Seller**"), as vendor, and Spectacle Bidco L.P. (the "**Initial Buyer**"), as purchaser, as assigned by the Initial Buyer to Spectacle BidCo Holdings Inc. (the "**Buyer**"), which Transaction was approved pursuant to an Approval and Vesting Order of this Court dated October 20, 2020 (the "**Approval and Vesting Order**").

**WHEREFORE, THE COURT:**

[5]     **GRANTS** the Application; and

[6]     **ORDERS** that: (i) unless otherwise indicated or defined herein, capitalized terms used in this Order shall have the meanings given to them in the Purchase Agreement; (ii) "**Debtors**" shall mean, collectively, the Applicants and Limited Partnerships listed on **Schedule "A"** hereto together with ExcludedCo1 and ExcludedCo2 (each as defined in the Approval and Vesting Order).

### SERVICE

[7]     **ORDERS** that any prior delay for the presentation of the Application is hereby abridged and validated so that the Application is properly returnable today and hereby dispenses with further service thereof.

[8]     **PERMITS** service of this Order at any time and place and by any means whatsoever.

### ADMINISTRATIVE RESERVE ACCOUNTS

[9]     **ORDERS AND DECLARES** that each of (i) the Administrative Seller Reserve in the amount of **[US/CAD]**$●, and (ii) the Administrative Monitor Reserve (together with the Administrative Seller Reserve, the "**Administrative Reserves**") in the amount of **[US/CAD]**$● is hereby approved, on and subject to the terms hereof.

[10]    **ORDERS** that the Monitor shall hold and deal with the Administrative Reserves in accordance with this Order.

[11]    **ORDERS** that the Monitor shall establish a segregated account in the name of the Monitor to hold the Administrative Seller Reserve in trust for the benefit of the Persons entitled to be paid the Administrative Reserve Costs of the Seller and the Buyer, and a separate segregated account in the name of the Monitor to hold the Administrative Monitor Reserve in trust for the benefit of the Persons entitled to be paid the Administrative Reserve Costs of the Monitor and the Buyer.

[12]    **ORDERS AND DECLARES** that, for the avoidance of doubt, the Administrative Reserves shall not constitute Property (as defined in the Initial Order) of any of the

- 3 -

Debtors and none of the CCAA Charges (as defined in the Initial Order) or any liability, claim, obligation, security interest (whether contractual, statutory or otherwise), lien, charge, hypothec, mortgage, pledge, trust or deemed trust (whether contractual, statutory, or otherwise), judgment, execution, writ of seizure or execution against or in respect of the Debtors or their Property shall attach to the Administrative Reserves.

[13]   **ORDERS AND DECLARES** that from time to time after the Effective Date (as defined in the Approval and Vesting Order), the Monitor may (i) pay from the Administrative Monitor Reserve the Administrative Reserve Costs of the Monitor at its sole discretion and without further authorization, (ii) pay from the Administrative Seller Reserve the Administrative Reserve Costs of the Seller upon receipt of written instructions received from the Seller, (iii) reduce, at its sole discretion, the amount of the Administrative Monitor Reserve as and to the extent it is no longer required to satisfy the Administrative Reserve Costs of the Monitor by distributing to the Buyer (or as the Buyer may direct) the amount of such reductions and (iv) reduce, based on written instructions received from the Seller, the amount of the Administrative Seller Reserve as and to the extent it is no longer required to satisfy the Administrative Reserve Costs of the Seller by distributing to the Buyer (or as the Buyer may direct) the amount of such reductions.

[14]   **ORDERS AND DECLARES** that any residual balance in the Administrative Monitor Reserve after the payment of all Administrative Reserve Costs of the Monitor shall be an asset of and owned by the Buyer and any residual balance in the Administrative Seller Reserve after the payment of all Administrative Reserve Costs of the Seller shall be an asset of and owned by the Buyer.

[15]   **ORDERS** that upon written request of the Buyer or its advisors from time to time, the Monitor shall update the Buyer regarding the Administrative Reserves, including providing an accounting of all payments made therefrom.

[16]   **ORDERS AND DECLARES** that the Monitor shall not, under any circumstances, be required to verify or determine the validity of any written instructions delivered by the Seller to the Monitor with respect to the Administrative Seller Reserve and the Monitor is hereby relieved of any liability or responsibility for any Claims which may arise as a result of the acceptance by the Monitor of any such written instructions in good faith.

[17]   **ORDERS** that, in addition to the rights and protections afforded to the Monitor under the CCAA, as an officer of this Court, or under the Initial Order, the Monitor shall not incur any liability or obligation as a result of carrying out the provisions of this Order, save for gross negligence or wilful misconduct on its part, and the Monitor shall not have any liability with respect to any losses, claims, damages or liabilities, of any nature or kind, to any person arising from or relating to this Order except to the extent such losses, claims, damages or liabilities result from gross negligence or wilful misconduct on its part.

## GENERAL

[18]   **DECLARES** that this Order shall have full force and effect in all provinces and territories in Canada.

[19]   **DECLARES** that Cirque du Soleil Canada Inc., as foreign representative of the Debtors, shall be authorized to apply as it may consider necessary or desirable, with or without notice, to any other court or administrative body, whether in Canada, the United States of America or elsewhere, for orders which aid and complement this Order, including an order authorizing the dissolution, winding-up, consolidation, or conversion of one or more of the Debtors, and, without limitation to the foregoing, an order under Chapter 15

- 4 -

of the U.S. Bankruptcy Code. All courts and administrative bodies of all such jurisdictions are hereby respectfully requested to make such orders and to provide such assistance to the Debtors and the Monitor as may be deemed necessary or appropriate for that purpose.

[20]    **REQUESTS** the aid and recognition of any court or administrative body in any Province of Canada and any Canadian federal court or administrative body and any federal or state court, administrative body or similar entity or organization in the United States of America and any court or administrative body elsewhere, to act in aid of and to be complementary to this Court in carrying out the terms of this Order.

[21]    **ORDERS** the provisional execution of the present Order notwithstanding any appeal and without the requirement to provide any security or provision for costs whatsoever.


**THE WHOLE WITHOUT COSTS**.


_____
**The Honourable Louis J. Gouin, J.S.C.**

- 5 -

## SCHEDULE "A"

**Applicants**

1. Cirque du Soleil GP Inc.
2. CDS Canadian Holdings, Inc.
3. Cirque du Soleil Canada Inc.
4. Cirque du Soleil Inc.
5. Cirque du Soleil Images Inc.
6. Cirque du Soleil Inspiration Inc.
7. CDS U.S. Holdings, Inc.
8. CDS U.S. Intermediate Holdings, Inc.
9. Cirque du Soleil Holding USA, Inc.
10. Cirque du Soleil (US), Inc.
11. Cirque du Soleil America, Inc.
12. VStar Entertainment Group, LLC
13. Cirque Dreams Holdings LLC
14. VStar Merchandising, LLC
15. VStar International, LLC
16. VStar Theatrical, LLC
17. VStar Touring, LLC
18. Cirque du Soleil Orlando, LLC
19. Cirque du Soleil Vegas, LLC
20. Cirque du Soleil Nevada, Inc.
21. Cirque du Soleil My Call, LLC
22. Velsi, LLC
23. Blue Man Inc.
24. Blue Man Group Holdings, LLC
25. Blue Man Group Records, LLC
26. Astor Show Productions, LLC
27. Blue Man Group Publishing, LLC
28. Blue Man Vegas, LLC
29. Blue Man Orlando, LLC
30. Blue Man Productions, LLC
31. Blue Man Chicago, LLC
32. 9415-8185 Québec Inc.
33. 9415-8219 Québec Inc.
34. 9415-8227 Québec Inc.
35. 9415-8235 Québec Inc.
36. Création 4U2C Inc.
37. Blue Man International, LLC
38. Cirque du Soleil Radio CT Holding, LLC
39. Cirque du Soleil Radio CT, LLC
40. The Works Entertainment, LLC
41. Cirque Theatrical, LLC
42. Cirque on Broadway, LLC
43. Joie de Vie, LLC

- 6 -

**Limited Partnerships**

1. Cirque du Soleil Holdings L.P.
2. CDS Canada 3 L.P.
3. CDS Canada 4 L.P.
4. Blue Man Boston Limited Partnership
5. CDS Canada 1 SCSp (Luxembourg special limited partnership)
6. CDS Canada 2 SCSp (Luxembourg special limited partnership)